Kimberly A. Kralowec (Cal. Bar No. 163158)
KRALOWEC LAW, P.C.
750 Battery Street, Suite 700
San Francisco, CA 94111
Telephone: (415) 546-6800
Facsimile: (415) 546-6801
Email: kkralowec@kraloweclaw.com

Danielle E. Leonard (Cal. Bar No. 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: dleonard@altber.com

Alfred G. Rava (Cal. Bar No. 188318)
RAVA LAW FIRM
3667 Voltaire Street
San Diego, CA 92106
Telephone: (619) 238-1993
Facsimile: (619) 374-7288
Email: alrava@cox.net

*Attorneys for Objectors Rich Allison and Steve Frye*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA KIM, individually on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>TINDER, INC., a Delaware Corporation; MATCH GROUP, LLC, a Delaware limited liability company; MATCH GROUP, INC., a Delaware corporation; and DOES 1 through 10, inclusive, and each of them,<br><br>        Defendants. | Case No. 2:18-CV-03093 JFW (AS)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF LISA KIM'S MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT**<br><br>Date: June 17, 2019<br>Time: 1:30 p.m.<br>Place: Courtroom 7A<br>       Hon. John F. Walter |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................................1

II.   ARGUMENT.................................................................................................3

      A.    The Final Approval Motion Rests on a Flawed Assessment of
            Litigation Risk.................................................................................3

            1.    *Candelore* Rejected Tinder's Defenses on the Merits...............3

            2.    No Valid Defenses to Class Certification Have Been Cited......9

            3.    No Damages Risks Have Been Identified Sufficient to Justify
                  the Steep Discount Represented by the Settlement .................10

      B.    The Final Approval Motion Inflates the Value of the Settlement
            "Benefits" in a Manner Unsupported by the Evidence .......................11

      C.    The Proposed Settlement Fails to Treat the Class Members
            Equitably Relative to Each Other............................................................15

      D.    Kim and Her Counsel Are Inadequate to Represent the Class ...........15

      E.    The Proposed Settlement Is the Result of a Collusive Reverse
            Auction, and Under the Required Level of Heightened Scrutiny,
            Should Not Be Approved ....................................................................16

      F.    The Class Members Were Not Adequately Informed of the Value of
            Their Claims, and Their Ability to Object and Submit Claims Was
            Unreasonably Burdened .......................................................................19

III.  CONCLUSION..............................................................................................21

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

Acosta v. Trans Union, LLC,
    243 F.R.D. 377 (C.D. Cal. 2007)..................................................................12

Angelucci v. Century Supper Club,
    41 Cal.4th 160 (2007) .....................................................................................7

Banks v. Nissan N. Am, Inc.,
    2015 WL 7710297 (N.D. Cal. Nov. 30, 2015)....................................8, 17, 19

In re Bluetooth Headset Prods. Liab. Litig.,
    654 F.3d 935 (9th Cir. 2011) ..................................................................*passim*

Candelore v. Tinder, Inc.,
    19 Cal.App.5th 1138 (2018) ...................................................................*passim*

China Agritech, Inc. v. Resh,
    138 S. Ct. 1800 (2018)...................................................................................18

Dennis v. Kellogg Co.,
    697 F.3d 858 (9th Cir. 2012) ..................................................................16, 19

In re Ferrero Litig.,
    2012 WL 284265 (S.D. Cal. Jan. 23, 2012) .................................................12

In re Ferrero Litig.,
    2012 WL 2802051 (S.D. Cal. Jul. 9, 2012).................................................12

Fraser v. Asus Computer Int'l,
    2012 WL 6680142 (N.D. Cal. Dec. 21, 2012) .............................................12

In re General Motors Corp. etc. Litig.,
    55 F.3d 768 (9th Cir. 1995) ............................................................12, 16, 20

Hanlon v. Chrysler Corp.,
    150 F.3d 1011 (9th Cir. 1998) ......................................................12, 16, 17

Harris v. Capital Growth Investors XIV,
    52 Cal.3d 1142 (1991) ...................................................................................4

-ii-

Hesse v. Sprint Corp.,
598 F.3d 581 (9th Cir. 2010) ........................................................................16

Koebke v. Bernardo Heights Country Club,
36 Cal.4th 824 (2005) ....................................................................................15

Koire v. Metro Car Wash,
40 Cal.3d 24 (1985) .................................................................................4, 6, 7

Lemmon v. Ace Hardware Corp.,
2014 WL 3107842 (N.D. Cal. Jul. 3, 2014) ..................................................10

Lentini v. California Center for the Arts,
370 F.3d 837 (9th Cir. 2004) ........................................................................10

Mandujano v. Basic Vegetable Products, Inc.,
541 F.2d 832 (9th Cir. 1976) ........................................................................21

Marina Point, Ltd. v. Wolfson,
30 Cal.3d 721 (1982) ...........................................................................4, 5, 6, 15

M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,
671 F.Supp. 819 (D. Mass. 1987)..................................................................12

McCune v. Singh,
2012 WL 2959436 (E.D. Cal. July 19, 2012)................................................10

Mirfasihi v. Fleet Mortg. Corp.,
356 F.3d 781 (7th Cir. 2004) ........................................................................17

O'Connor v. Uber Technologies, Inc.,
904 F.3d 1087 (9th Cir. 2018) ...................................................................9, 10

Plummer v. Chemical Bank,
668 F.2d 654 (2d Cir. 1982) ..........................................................................11

Reid v. I.C. Sys., Inc.,
2015 WL 12990169 (D. Ariz. Jul. 9, 2015)...................................................14

Reynolds v. Beneficial Nat'l Bank,
288 F.3d 277 (7th Cir. 2002) ..................................................................16, 18

*Sanchez v. Frito-Lay, Inc.*,
    2016 WL 5121890 (N.D. Cal. Jan. 23, 2017)....................................12, 14, 15

*Sobel v. Hertz Corp.*,
    2011 WL 2559565 (D. Nev. Jun. 27, 2011) ....................................3, 9, 12, 20

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) .............................................................3, 18, 19

*Walter v. Hughes Communications, Inc.*,
    2011 WL 2650711 (N.D. Cal. Jul. 6, 2011) ...........................................11, 13

*Weinberger v. Great Northern Nekoosa Corp.*,
    925 F.2d 518 (1st Cir. 1991)..........................................................................17

*In re Wireless Facilities, Inc. Sec. Litig. II*,
    253 F.R.D. 607 (S.D. Cal. 2008) ...................................................................12

*Zapeda v. PayPal, Inc.*,
    2014 WL 718509 (N.D. Cal. Feb. 24, 2014)...........................................17, 18

**Statutes**

California Civil Code
    §51 ................................................................................................................20
    §52 ................................................................................................................20
    §52(a)........................................................................................................*passim*
    §52(b)(3)........................................................................................................21
    §1694 et seq. .................................................................................................20

Federal Rules of Civil Procedure
    §23 ..........................................................................................................12, 16
    §23(b)............................................................................................................16
    §23(e)......................................................................................1, 17, 18, 19
    §23(e)(2)(A)..................................................................................................15
    §23(e)(2)(C) ..............................................................................................3, 11
    §23(e)(2)(C)(i) ................................................................................................3
    §23(e)(2)(D)..................................................................................................15
    §23(e)(5)(B)..................................................................................................21

## I.    INTRODUCTION

Objectors Rich Allison and Steve Frye respectfully ask the Court to deny plaintiff Lisa Kim's motion for final approval of her proposed classwide settlement of their age discrimination claims against Tinder, Inc.  Plaintiff has not met her burden of proving that the proposed settlement is fair, adequate and reasonable within the meaning of Rule 23(e).

Plaintiff has given the Court no analysis at all of the applicable California law governing the class members' age discrimination claims, including the California Court of Appeal's binding, published opinion, *Candelore v. Tinder, Inc.*, 19 Cal.App.5th 1138 (2018).  As a result, plaintiff has provided the Court with no basis to assess the strength of the class members' claims, or, in turn, whether the proposed settlement represents a fair and reasonable discount for litigation risk.  That failure is telling, because any analysis of the governing law reveals that this settlement reflects an unreasonable and extreme discount for non-existent litigation risk.

Plaintiff's only discussion of litigation risk is her assertion that Tinder "believes" it has liability "defenses."  However, plaintiff does not say what those defenses might be, and a close review of *Candelore* demonstrates that Tinder's core defenses to liability have already been rejected as a matter of law.  Nor does Kim cite any valid reasons to believe a class could not be certified, or that the class members could not recover their full statutory Unruh Act damages of $4,000 for "each and every offense" Tinder perpetrated against each of them. Civ. Code §52(a).

The settlement can and should be rejected for this reason alone.  Even crediting Kim's $24 million valuation of the settlement "benefits"—which, as discussed below, is an over-valuation unsupported by evidence—the class members stand to recover an average of only 0.25% of their *minimum* statutory damages of $4,000 per person.  No litigation risk has been identified sufficient to justify such an extreme discount from the class members' potential recovery—*especially* for the subgroup of 11,500 to 23,900 class members who were never prompted to agree to

OPPOSITION TO MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT, CASE NO. 2:18-CV-03093

arbitrate any claims against Tinder.  The proposed settlement releases the class members' claims for a fraction of pennies on the dollar.

The settlement, moreover, provides no guaranteed monetary fund.  Any "value" to the class members must, therefore, be based on an evaluation supported by evidence.  Plaintiff has provided no *supported* basis for the $24 million estimated value, or for any other estimate of the value of the "benefits" of the proposed settlement to the class members.  Critical information necessary to value the settlement "benefits" is missing from the record because Kim's counsel conducted "no discovery"[1] or investigation before rushing into the settlement, a factor consistently recognized by the Ninth Circuit as relevant in evaluating a settlement's adequacy and fairness.  For example, plaintiff's assumption of a 100% claims rate in a consumer class action settlement (notably, she conceals the number of claims actually made so far) has no evidentiary support or basis in reason.  Her valuations of the settlement's other purported "benefits" are likewise exaggerated and unsupported.

In short, the actual value of this settlement is far, far less than what plaintiff would have this Court believe.  When compared to the strength of the class members' claims, and considering the Unruh Act's mandatory statutory damages of $4,000 "for each and every offense," what the class members are being offered here, in exchange for releasing their claims, falls far outside the range of what Courts are willing to approve as adequate, fair and reasonable.

These fundamental flaws fatally undermine the settlement.  In addition, final approval of the settlement *and* certification of a settlement class should both be denied for the further reason that Kim and her counsel are inadequate to represent the proposed class whose claims would be released.

On top of that, all three indicia of collusion identified in *Bluetooth* are

---

[1]    Dkt. 41 at 5:1.

present.[2]  The $1.2 million fee payout Tinder has promised to pay Kim's counsel, along with a free-sailing provision, is disproportionate to any reasonable estimate of the settlement's value to the class; and any fees not awarded will revert back to Tinder, not to the class.  This strongly suggests collusion, which means the Court must apply the highest levels of scrutiny in assessing the settlement.  The strong record evidence that this settlement is actually an improper "reverse auction" further supports the conclusion that the settlement is unfair, unreasonable, and inadequate.

For all of these reasons, the motion for final approval should be denied.

## II.   ARGUMENT

### A.   The Final Approval Motion Rests on a Flawed Assessment of Litigation Risk

Rule 23(e)(2)(C)(i) requires an assessment of the litigation "risks" faced by the class.  This factor—the "strength of the plaintiffs' case"—is one of the essential, core elements that "the district court must consider" when deciding if a settlement is fair, adequate and reasonable.[3]  In this case, the "likely range of possible classwide recoveries" and "the likelihood of success in obtaining such results"[4] are both far higher than plaintiff Kim would have the Court believe.

#### 1.   *Candelore* Rejected Tinder's Defenses on the Merits

Kim fails to adequately assess the class members' litigation risk because her final approval motion fails to consider the impact of *Candelore*, which directly addresses the merits of the age discrimination claims against Tinder.[5]  The motion barely even mentions *Candelore*, calling it "a pleadings-stage" ruling that "has nothing to do with" the adequacy of the settlement.  Motion at 24:5-7.

---

[2]      *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

[3]      *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003).  *Accord Bluetooth*, 654 F.3d at 946.

[4]      Fed. R. Civ. P. 23(e)(2)(C), 2018 Amendment Advisory Committee Note.

[5]      *See, e.g.*, *Sobel v. Hertz Corp.*, 2011 WL 2559565, *7-*9 (D. Nev. Jun. 27, 2011) (rejecting the parties' risk assessment, and the proposed settlement as a whole, where parties' assessment gave "[l]ittle regard" to the impact of a prior binding liability ruling).

That characterization of *Candelore* could not be more wrong. *Candelore* concluded that Tinder's age-based pricing model violates California law, and in so holding, considered and rejected all of Tinder's liability defenses on the merits. In other words, after *Candelore*, Tinder has no valid substantive defenses left to assert. Whether the proposed settlement is fair, adequate and reasonable cannot be evaluated at all without closely considering *Candelore*.

Tinder's first line of defense in *Candelore* was to contend that the Unruh Act does not extend to arbitrary discrimination based on age because age is not enumerated in the Act. The Court of Appeal rejected that contention on the merits. Under California Supreme Court precedents, "there is *no dispute* that … the Unruh Act prohibits arbitrary discrimination based on age—a personal characteristic similar to the classifications enumerated in the Act." 19 Cal.App.4th at 1145 (emphasis added) (citing *Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 1153 (1991); *Marina Point, Ltd. v. Wolfson*, 30 Cal.3d 721, 730 (1982)). Tinder will not be able to defeat liability to the class by arguing otherwise.

The Court of Appeal also held that the Unruh Act "applies not merely in situations where businesses exclude individuals altogether," but also where businesses engage in "'unequal treatment'" of individuals. *Id.* at 1145-46 (quoting *Koire v. Metro Car Wash*, 40 Cal.3d 24, 29 (1985)). "Unequal treatment includes *offering price discounts on an arbitrary basis to certain classes of individuals*." *Id.* at 1146 (emphasis added). That holding forecloses another of Tinder's defenses.

Next, the Court considered Tinder's argument that its age-based "pricing model rationally treats 'youth [as] a *reasonable* proxy for economic disadvantage.'" *Id.* at 1146 (quoting Tinder's appellate brief; alteration and italics in original). "By Tinder's account, it is 'self-evident that people under 30 face financial challenges,' and this 'common knowledge provides a reasonable and non-arbitrary basis for Tinder to offer a discount to people under 30.'" *Id.* (quoting Tinder's appellate brief). Tinder also contended that its age-based pricing model was lawful because

"based on market research showing 'customers age 30 and younger have less capacity to pay for premium services.'" *Id.*

The Court of Appeal rejected each of these defenses.  The Court held that *even if* all of Tinder's justifications were "credit[ed]" as "true," Tinder's age-based pricing model still violated the Unruh Act.  *See id.* at 1146-48.  That is because Tinder's model "contravenes 'the *individual nature* of the statutory right of equal access to business establishments that is afforded to "all persons" by the Unruh Act.'" *Id.* at 1146 (emphasis in original) (quoting *Marina Point*, 30 Cal.3d at 725).

Quoting California Supreme Court Justice Matthew Tobriner in *Marina Point*: "'The statute's focus on the individual … precludes treatment of individuals as simply components of a racial, religious, sexual or national class. If height is required for a job, a tall woman may not be refused employment merely because, on the average, women are too short.  *Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply*.'" *Id.* at 1147 (quoting *Marina Point*, 30 Cal.3d at 740) (emphasis in original).  Tinder's age-based price differential "violates the principle articulated in *Marina Point* by operating on the 'generalized prediction' that an individual over the age of 30 earns more and is less budget constrained than another individual under the age of 30"—even if that "generalized prediction" is "true." *Id.* at 1148 (quoting *Marina Point*, 30 Cal.3d at 739).  "A blanket, class-based pricing model such as this, when based upon a personal characteristic such as age, constitutes prohibited arbitrary discrimination under the Unruh Act." *Id.* (citing *Marina Point* at 740).

The Court of Appeal also rejected Tinder's attempt to equate its age-based price differential to discounts for children and seniors, which other published opinions have approved.  *See id.* at 1148-49.  The age-based discounts in those cases, the Court explained, were "independently justified by social policy considerations evidenced in *legislative enactments*." *Id.* at 1149 (emphasis added).  "These statutory enactments, which reflect the considered judgment of a legislative body to

advance certain social policy objectives by treating children and seniors differently from the rest of the public, justified the use of class-based criteria in those cases, without requiring the courts to engage in the sort of generalizations about age and income that run counter to the individual nature of the right secured to all persons by the Unruh Act." *Id.* at 1150 (citing *Marina Point*, 30 Cal.App.4th at 742).

The Court explained its reasoning as follows: "The danger of using age as a proxy for income to justify age-discriminatory pricing becomes more apparent when one acknowledges that such pricing operates not merely as a 'discount' for the favored age group, but effectively as a *surcharge* for the disfavored one." *Id.* at 1151 (citing *Koire*, 40 Cal.3d at 34) (emphasis in original). "Were Tinder's justification sufficient, generalizations about the relative incomes of different age groups could be employed to rationalize higher prices for all consumers 30 and older in even the most essential areas of commerce—such as grocery shopping, gasoline purchases, etc.—even in instances where an individual did not in fact enjoy the economic advantages that are presumed about his or her age group as a whole." *Id.* (citing *Marina Point*). "It is *inconceivable* that an antidiscrimination law would countenance a grocer charging an unemployed 31-year-old patron twice as much as an employed 28-year-old customer merely on the basis of market testing showing that those over the age of 30 'as a group' generally earn more than 18- to 29-year-olds." *Id.* (emphasis added).

Tinder could not identify any "legislative pronouncements that would justify such a departure from the Unruh Act's language and provenance." *Id.* at 1152. In other words, Tinder was unable to cite any statute in which the Legislature has recognized an economic or social policy need to provide special protection to adults aged 18 to 29. *Id.*[6] In the absence of such a statute, judge-made social policy cannot

---

[6] Tinder could cite no such statute because none exists. *See* Dkt. 67-2 at 57 & n.14 (discussing statutes on which Tinder relied, which Court of Appeal held reflected no legislatively-endorsed social policy justifying price discrimination in favor of adults under 30, and more inapposite statutes cited in support of review).

support Tinder's age-based price differential. *Id.* at 1150-51 (declining to follow "outlier" decision in which court applied its own, judge-made views about economic and social policy rather than adhering to those expressed by the legislature).

Next, the Court rejected Tinder's argument that "public policies"—namely, "increased access to services for the general public" and "profit maximization"— justified Tinder's age-based price differential. "Unlike children's and senior's discounts, which are justified by compelling societal interests that can be 'gleaned [from] statutory enactments,' whatever interest society may have—if any—in increasing patronage among those under the age of 30 who may be interested in the premium features of an online dating app, that interest is *not sufficiently compelling to justify discriminatory age-based pricing* that may well exclude less economically advantaged individuals over the age of 30 from enjoying the same premium features." *Id.* at 1153 (quoting *Koire*, 40 Cal.3d at 31) (emphasis added).[7]

"As for profit maximization," that "can *never* serve as an excuse for prohibited discrimination among potential customers." *Id.* (emphasis added) (citing *Koire*, 40 Cal.3d at 32). The California Supreme Court in *Koire* "directly addressed and rejected the contention that a merchant's interest in profit maximization could justify discriminatory sex-based pricing," and "the same reasoning is likewise applicable" to Tinder's age-based pricing. *Id.* at 1154 (citing *Koire*, 40 Cal.3d at 32). To be lawful, price distinctions "must be drawn in such a way that they could conceivably be met by any customer, regardless of the customer's age or other personal characteristics." *Id.*

---

[7]   In *Koire*, a nightclub called Jezebel's attempted to justify its "Ladies' Night" promotion by claiming that the sex-based price differential "encourages more women to attend the bar, thereby promoting more interaction between the sexes." 40 Cal.4th at 33.  The California Supreme Court flatly rejected that argument, holding that "encouraging men and women to socialize in a bar" does *not* rise to the level of a "compelling societal interest" for which the state provides legal protections, such as immunity from Unruh Act liability. *Id.*; *see also Angelucci v. Century Supper Club*, 41 Cal.4th 160, 175 (2007) (a "*compelling* social policy" is required in order to justify exemptions from Unruh Act liability (emphasis added)). The nightclub in *Koire* is not materially different from Tinder's dating app.

In sum, *Candelore* expressly considered and rejected, one by one, each of Tinder's substantive liability defenses. According to Kim, Tinder "believes" it has "strong and meritorious defenses" to this case, and "substantive challenges to the claims would be raised." Motion at 3:18-20, 16:18-19. But the motion does not say what these defenses could be in view of *Candelore*, let alone address the strength of those hypothetical defenses.[8] Tinder has yet to identify any legally-sufficient justification for its age-based price discrimination. That is because no such justification exists. Put another way, there are no viable substantive defenses that warrant the massively discounted proposed settlement in this case.

Kim does a great disservice to the class by characterizing *Candelore* as having "nothing to do with" the adequacy of the proposed settlement. If that is how she construes *Candelore*, no wonder she was unable to negotiate better settlement terms.[9] Kim's characterization of *Candelore* as irrelevant is belied by the past conduct of her own counsel, who began searching for clients within days after its publication.[10] *That* assessment of risk was the true one. Tinder's extreme reaction to the opinion, and repeated efforts to sidestep its impact,[11] further contradict Kim's assertion that *Candelore* is irrelevant to the value of the claims.

After *Candelore*, Tinder has no defenses left on the merits. The proposed settlement represents an extremely steep discount from the actual value of the class

---

[8]   *See Banks v. Nissan N. Am, Inc.*, 2015 WL 7710297, *8 (N.D. Cal. Nov. 30, 2015) ("an evaluation of the 'strength of plaintiffs' case' requires more than just a recitation of defendant's anticipated arguments, it requires analysis of the merits of those arguments").

[9]   After submitting her final approval motion, Kim filed a declaration of the mediator stating that *Candelore* was addressed in the mediation briefs. Dkt. 72. In view of that new information, Kim's decision not to mention *Candelore* to *the Court* in either her preliminary approval motion or her fee motion (Dkt. 52, 63), and to argue now that *Candelore* "has nothing to do with" the adequacy of the settlement, is even more inexplicable.

[10]   Dkt. 63-3 at 13; Dkt. 63-1 at 31, 38 (entries dated 1/31/18 and 2/1/18; *Candelore* published on 1/28/18). In contrast, *before Candelore* was published, they abandoned four other age discrimination cases against Tinder. Dkt. 67-2 ¶¶25-28.

[11]   *See* Dkt. 67-2 ¶¶12-16, 18-24.

members' claims, based on hypothetical, unidentified liability "defenses" that do not actually exist.  It should not be approved.  *See Sobel*, 2011 WL 2559565 at *7-*9.

### 2.     No Valid Defenses to Class Certification Have Been Cited

Kim asserts that class certification was "in doubt" simply because Tinder "would oppose" it.  Motion at 16:16-18.  This assertion does not meet Kim's burden of providing the Court with a reasoned analysis of litigation risk.  Kim does not say what arguments Tinder might have made in opposing certification.  As this Court has already recognized, the "central inquiry" common to all class members is the legality or illegality of Tinder's blanket, age-based price differential.  Dkt. 60 at 7-8.  If an adequate class representative were at the helm, this case would be ideally suited for class treatment.[12]

Kim identifies no other impediment to class certification, except to speculate that arbitration agreements "can be a bar to class certification under the right circumstances."  Motion at 16:13-14.  This assertion disserves the interests of the class members, on whose behalf she conducted no discovery into the "circumstances."  It is an especially great disservice to the 11,500 to 23,900 class members who, by Tinder's own admission, never agreed to arbitrate any claims.  A certified class of these persons could seek Unruh Act damages of up to $95 million or more.  Kim does not explain why such a class could not be certified.

Moreover, Kim's argument is incorrect.  Even if some class members agreed to arbitration, that does not diminish their right to recover $4,000 for "each and every offense" under the Unruh Act.  Civ. Code §52(a).  And, in Kim's cited case, the district court held that the arbitration agreement was unenforceable—in that case a reversible error at the class certification stage because there, the threshold question of enforceability was designated to the arbitrator.  *O'Connor v. Uber Technologies,*

---

[12]     *See Sobel*, 2011 WL 2559565 at *10 (rejecting settlement where "the parties have not presented any compelling reasons to significantly doubt the likelihood" of class certification).

*Inc.*, 904 F.3d 1087, 1094-95 (9th Cir. 2018).   Here, Tinder conceded that the threshold question was for the Court, not the arbitrator.   Kim's cited case does not address whether class certification would be proper for all or part of the proposed settlement class.   It certainly would be for those who did not agree to arbitrate.

Kim points out that she would have to win her appeal on arbitration before she could seek class certification, but that is a problem unique to her, and no reason to discount the other class members' claims.   In *Candelore*, Tinder has never sought to compel arbitration.   Dkt. 67-2, ¶9.

Finally, even if some class members must litigate issues of formation and enforceability of an arbitration agreement, those issues are both: (a) common to those class members, and (b) absent an analysis of the risks presented by those issues, which Kim does not provide, an insufficient basis for the extremely steep discount from the $4,000 (per person per offense) in statutory damages under the Unruh Act that the proposed settlement represents.

### 3. No Damages Risks Have Been Identified Sufficient to Justify the Steep Discount Represented by the Settlement

Kim says that Tinder "believes" it has defenses to "the amount of damages sought," but again, Kim does not say what those defenses are.   Motion at 16:25. Under the Unruh Act, statutory damages of $4,000 are mandatory, not discretionary, "for each and every offense" against each victim.   Civ. Code §52(a).[13]   That provision reflects the California Legislature's determination that to remedy and deter unlawful discrimination, the consequences for businesses who engage in it must be heavy.[14]   The 240,000 class members stand to recover $960 million in Unruh Act

---

[13]   *See, e.g., Lentini v. California Center for the Arts*, 370 F.3d 837, 847-48 (9th Cir. 2004) (affirming award of $4,000 for each of 7 offenses against same plaintiff); *Lemmon v. Ace Hardware Corp.*, 2014 WL 3107842, *13 (N.D. Cal. Jul. 3, 2014) ("courts in California consider each particular occasion … that involved a discriminatory [act] to be a separate actionable Unruh Act violation"; defendant "will be liable" for "13 incidents" of discrimination against the same plaintiff); *McCune v. Singh*, 2012 WL 2959436, *5 (E.D. Cal. July 19, 2012) (awarding $4,000 for "each instance of discrimination" against the same plaintiff).

[14]   *See* A.B. 487, Senate Judiciary Committee, Bill Analysis (2001-2002 Reg.

damages, even if limited to one "offense" per person.  When calculated "for each and every offense"—that is, for each discriminatory monthly charge—the damages will be even higher.  Kim disserves the class by so readily arguing otherwise.  Dkt. 57-1 at 2:28 (claiming that "multiple-offense" awards are "unsupported by California law").  Kim identifies no valid defenses to these mandatory statutory awards.

## B.   The Final Approval Motion Inflates the Value of the Settlement "Benefits" in a Manner Unsupported by the Evidence

Under Rule 23(e)(2)(C), the Court must assess the value of the relief provided by the proposed settlement.  *See Bluetooth*, 654 F.3d at 946.  Before the Court can do this, the settlement proponents must introduce *evidence* of the value.[15]  Proper valuation, supported by competent evidence, is especially important in a case, like this one, in which no money fund with a fixed cash value is being created.

Kim's motion is entirely predicated on a series of asserted valuations of the settlement consideration.  However, the motion cites no admissible supporting evidence for these valuations, and none appears in the record.  *See* Motion at 2:21-3:6.  For example, the record contains no admissible, vetted evidence of the number of class members,[16] how many still have current Tinder accounts,[17] and how many were not even arguably bound to arbitrate.[18]  Put another way, the record contains

---

Sess.) (increasing minimum statutory damages from $1,000 to $4,000 "for each and every offense").

[15]   *See*, *e.g.*, *Plummer v. Chemical Bank*, 668 F.2d 654, 659 (2d Cir. 1982) ("there must be some 'evidentiary foundation' in support of the proposed settlement" (citation omitted)); *Walter v. Hughes Communications, Inc.*, 2011 WL 2650711, *12 (N.D. Cal. Jul. 6, 2011) (approval motion must be "supported by appropriate evidence").

[16]   The only cited evidence on this point is inadmissible.  *See* Objections to Evidence, filed herewith.  The class probably does include thousands of members, but its actual size has not been established.  Without that information, damages cannot be estimated accurately, nor can the settlement benefits be correctly valued.

[17]   Tinder filed a declaration on this point (Dkt. 55 ¶9), but Kim's counsel conducted no discovery to contest or confirm Tinder's assertions.  Also, until the class size is known, the number (as opposed to the percentage) cannot be computed.

[18]   Nor did Kim's counsel conduct any discovery to confirm Tinder's claim that as of July 31, 2015, a changed sign-up procedure bound the class members to "Terms

11

no evidence of crucial facts needed to determine the value of the settlement "benefits," or even to accurately estimate Tinder's potential exposure. "Such a lack of evidence is alone grounds for denying final approval, as the court is simply unable to fulfill its duty to the settlement class under Rule 23 …." *Sobel*, 2011 WL 2559565 at *10.

The record is bare of evidence on these essential points because Kim conducted "[n]o discovery" before negotiating the settlement.[19]  As Kim's own cited cases recognize, "meaningful"[20] and "sufficient"[21] discovery is essential.  Courts routinely decline to approve settlements unsupported by adequate discovery and investigation, whether formal or informal. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (class settlements should not be "negotiated in haste or in the absence of information illuminating the value of plaintiff's claims"); *see also*, *e.g.*, *In re General Motors Corp. etc. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("*GMC*") (citing "lack of significant discovery" in reversing final approval of class action settlement); *Sanchez v. Frito-Lay, Inc.*, 2016 WL 5121890, *4 (N.D. Cal. Jan. 23, 2017) (approval must be "based on something more than Plaintiff's conclusion"); *Fraser v. Asus Computer Int'l*, 2012 WL 6680142, *5 (N.D. Cal. Dec. 21, 2012) (denying approval where "insufficient discovery and investigation have been conducted"); *Sobel*, 2011 WL 2559565 at *6 ("Because highly relevant discovery had not in fact taken place, it is highly doubtful that a presumption of fairness should apply here."); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 397 (C.D. Cal. 2007)

---

of Use" with an arbitration clause. *See* Dkt. 44 at 4:13-14; Dkt. 41 at 5:1.

[19]  Dkt. 41 at 5:1; *see also* Dkt. 67 at 7:8-8:4; Dkt. 67-3, ¶¶2-5.

[20]  *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F.Supp. 819, 822, 825 (D. Mass. 1987) ("substantial discovery" conducted over "nearly four years").

[21]  *In re Ferrero Litig.*, 2012 WL 284265, *6 (S.D. Cal. Jan. 23, 2012); *In re Wireless Facilities, Inc. Sec. Litig. II*, 253 F.R.D. 607, 610 (S.D. Cal. 2008); *see also In re Ferrero Litig.*, 2012 WL 2802051 *1 (S.D. Cal. Jul. 9, 2012) (granting final approval where settlement was preceded by "numerous discovery requests, including for the production of documents, interrogatories, deposition notices, and third-party subpoenas").

(denying approval because plaintiffs' "investigative efforts were deficient").

Citing no evidence, and ignoring what the settlement agreement actually says, Kim's counsel grossly overvalue all three components of the settlement "benefits."[22]

Claims-Made:  The claims-made component is valued at $6 million based on the "disingenuous" assumption that 100% of the class members will submit claims.[23] *Walter*, 2011 WL 2650711 at *13 (counsel claiming to be experienced and qualified to handle class action litigation must be "aware that average claims submission rates … are typically ten percent or less").  Kim does not say how many claims have been submitted to date (Dkt. 71-1 ¶72), but there must be very few, because Kim now says that two more notices—not mentioned in the original settlement agreement and with unknown content not approved by the Court—are being emailed to the class members. *Id.* ¶73.  In any event, it is unreasonable to assume a 100% claims rate in assigning a value to this component of the settlement.  This component should be valued based on evidence of the number of actual claims made.  Even assuming an extremely generous (and highly unlikely) ten percent claims rate, the value of this component is only about $600,000. *See* Dkt. 67 at 17:13-14.

Super Likes:  The "Super Likes" component is valued at $12 million because, Kim says, it is "guaranteed" and "universal," and thus will benefit every class member.  Motion at 2:23 (citing Dkt. 71-1, ¶41).  This assertion is unsupported by the settlement agreement or by any other evidence.  Only Tinder users with active accounts will receive this "benefit."  Dkt. 52-1 §3.2.  In a declaration that Kim has repeatedly failed to cite, Tinder states that as of last December, only 56% of the class members still had active Tinder accounts.  Dkt. 55 ¶9.  That number is sure to continue falling over time as users drop out of the dating pool.  The "Super Likes" component of the settlement provides *no* benefit to over 44% of class members—

---

[22] All of the estimates of value have risen since the preliminary approval motion because Kim now asserts that the class is larger than previously represented. *Compare* Dkt. 52-1 ¶¶32-35 *with* Dkt. 71-1 ¶¶41-44.

[23] Motion at 3:1-2 (citing Dkt. 71-1 ¶42).

including those who wish to have nothing more to do with a company that discriminated against them. Kim's $12 million valuation should be cut down to $6.7 million (56% of $12 million) on that basis alone. Moreover, the claimed "value" of $1 per "Super Like" is grossly overstated, given that this feature is already made available to users for free, and the incremental value of additional "Super Likes" will, for most users, have diminishing returns. A more reasonable estimate of the value of this component is about $873,000. *See* Dkt. 67 at 16:19-17:1.

<u>Injunction</u>: The injunctive relief component is valued at $6 million, but again, this assumes that the injunction will benefit every class member. Motion at 3:3-5 (citing Dkt. 71-1 ¶43). It will not. It applies only to "new subscriptions," which means *no* class member will benefit from it. Dkt. 52-1 §3.4. Kim neglects to mention this language, which her own counsel negotiated and agreed to. The settlement must stand or fall based on the terms presented to the Court for approval. This injunction component is properly valued at $0, not $6 million, for the class.[24]

Taken together, the reasonable value of these settlement "benefits" is in the range of $1.5 million at the very most—an average of $6.25 per class member—which is just 0.15% of their *minimum* statutory damages of $4,000. Yet Kim's counsel and Kim "stand to gain significantly" more than that. *Reid v. I.C. Sys., Inc.*, 2015 WL 12990169, *5 (D. Ariz. Jul. 9, 2015). As one Court observed in rejecting a similar proposed settlement (claims-made, awarding an average of $2 or 0.13% of the recoverable statutory damages), this situation is "not fundamentally fair" to the class and "constitutes an obvious deficiency" in the proposed settlement. *Id.*

Kim's unreasonable valuations of every component of the settlement, coupled with her failure to conduct discovery to support those valuations, renders the entire settlement suspect. *See Sanchez*, 2016 WL 5121890 at *5 (similar "faulty valuation"

---

[24]     The injunctive component is also riddled with exceptions and loopholes that actually allow Tinder to maintain a discriminatory age-based pricing model. Dkt. 52-1 §3.4.   Even for new subscribers to Tinder Plus, the settlement value is $0.

by class counsel "raise[d] significant concerns on the part of the court about whether [counsel] adequately represented the interests of the absent putative class members in settlement negotiations and the extent to which the [settlement] is the product of a well-informed negotiation").

## C. The Proposed Settlement Fails to Treat the Class Members Equitably Relative to Each Other

Contrary to Rule 23(e)(2)(D), the settlement provides the same (valueless) "relief" to all class members, regardless of whether they agreed to arbitrate their claims and regardless of the number of "offenses" they suffered—that is, the number of months they were charged and paid Tinder's discriminatory prices.

Kim contends it would be "arbitrary" "preferential treatment" to allocate the settlement "benefits" equitably among the class members, and asserts that doing so would be as bad as Tinder's arbitrary age-based price discrimination.  Mtn. at 19:4-10.  This argument reveals a fundamental misunderstanding of the Unruh Act.

Whether someone agreed to arbitration, or used Tinder Plus longer than someone else, is not a "fundamental" "personal characteristic."  *Candelore*, 19 Cal.App.4th at 1145 (quoting *Koebke v. Bernardo Heights Country Club*, 36 Cal.4th 824, 842-43 (2005); *Marina Point*, 30 Cal.3d at 730).  Kim's attempt to equate equitable distribution of settlement benefits under Rule 23(e)(2)(D) with arbitrary discrimination under the Unruh Act is fatuous.  It cannot remedy the serious substantive and procedural flaws in the settlement.

## D. Kim and Her Counsel Are Inadequate to Represent the Class

Kim's motion ignores the fundamental problem that she is inadequate to represent thousands of members of the class as she defines it—namely, those who paid Tinder's discriminatory prices before July 31, 2015, the earliest date when Tinder allegedly changed its sign-up interface to prompt users to "agree" to its "Terms of Use."[25]  Fed. R. Civ. P. 23(e)(2)(A).  Kim's discussion of the "adequacy"

---

[25]   *See* Dkt. 24-1 ¶6.  Again, Kim conducted no discovery to test this claim.

element of settlement approval does not even acknowledge the existence of this group. Motion at 14:13-15:5, 24:11-13. By severely discounting the claims of these class members, and by conducting no discovery or investigation into their circumstances, Kim and her counsel have demonstrated that they have a conflict of interest and are incapable of vigorously prosecuting the action on behalf of the entire proposed class they seek to represent. *Hanlon*, 150 F.3d at 1020; *see GMC*, 55 F.3d at 801 (proposed class representatives "had no incentive to maximize the recovery" of dissimilarly-situated class members and "could skew the terms of the settlement to their own benefit").[26]

More fundamentally, Kim's attempt to release claims of individuals she cannot adequately represent violates due process. *Hesse v. Sprint Corp.*, 598 F.3d 581, 588 (9th Cir. 2010). This is true not only of the class members who never agreed to arbitrate, but also of the 62,000 class members who purchased Tinder Plus more than two years before Kim filed her suit. *See* Dkt. 67 at 10:3-12:8.

In short, the proposed settlement class cannot be certified under Rule 23(b), and the proposed settlement should not be approved under Rule 23(e).

### E.  The Proposed Settlement Is the Result of a Collusive Reverse Auction, and Under the Required Level of Heightened Scrutiny, Should Not Be Approved

The record in this case is replete with evidence of collusion, conflicts of interest, and inadequate representation. To fulfill its obligations to the absent class members under Rule 23, therefore, the Court must subject this proposed settlement to the highest levels of rigorous scrutiny. *See*, *e.g.*, *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012); *Bluetooth*, 654 F.3d at 946-47; *Hanlon*, 150 F.3d at 1026; *GMC*, 55 F.3d at 805.

---

[26] *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 285 (7th Cir. 2002) (Posner, J.) (reversing approval of settlement where "classes were absorbed into the settlement even though their claims were sharply different from those of the classes represented by settlement counsel").

As a preliminary matter, the settlement was negotiated before a contested class certification motion was filed or decided, a time when "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Bluetooth*, 654 F.3d at 946 (citing *Hanlon* 150 F.3d at 1026). This alone warrants "a more probing inquiry than may normally be required under Rule 23(e)." *Hanlon*, 150 F.3d at 1026.

In addition, "all three" of the *Bluetooth* "warning signs" of collusion are present. 654 F.3d at 947. <u>First</u>, the proposed settlement would give Kim's counsel "a disproportionate distribution"—a full $1.2 million, or *80%* of the total (generously) estimated value of what the class members stand to receive.[27] *Id.* (citing *Hanlon*, 150 F.3d at 1021). <u>Second</u>, the parties "negotiate[d] a 'clear sailing' arrangement" (Dkt. 52-1, §7.1), which "'increases the likelihood that class counsel will have bargained away something of value to the class.'" *Id.* at 947, 948 (quoting *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991)). <u>Third</u>, the parties agreed to "a kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class," which "amplifies the danger of collusion already suggested by a clear sailing provision." *Id.* (citing *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004)); *see* Dkt. 52-1, §7.1).

The Court's inquiry into "why the parties … negotiated" these terms should be a searching one. *Bluetooth*, 654 F.3d at 947-49. While Kim relies heavily on the involvement of a mediator (Motion at 13:23-27), this "is not on its own dispositive of whether the end product is a fair, adequate and reasonable settlement agreement." *Bluetooth*, 654 F.3d at 948; *see Banks v. Nissan N. Am, Inc.*, 2015 WL 7710297, *10, *12-*13 (N.D. Cal. Nov. 30, 2015) (finding settlement unfair and denying approval when "all three [*Bluetooth*] signs [were] present," despite mediator's declaration describing settlement as an "excellent result").[28]

---

[27]    *See* Dkt. 67 at 23:20-24; *id.* at 18:26-19:6.

[28]    *Accord*, *e.g.*, *Zapeda v. PayPal, Inc.*, 2014 WL 718509, *5-*6 (N.D. Cal. Feb.

17

"[T]he Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness *not apparent* on the face of the negotiations." *Bluetooth*, 654 F.3d at 948 (citing *Staton*, 327 F.3d at 960) (emphasis added). "[C]ourts therefore must be vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947.

On top of the indicia of collusion just discussed, this settlement has all the hallmarks of a classic "reverse auction," in which "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with," hoping that "a weak settlement" will be approved "that will preclude other claims against the defendant." *Reynolds*, 288 F.3d at 282.[29]

Tinder chose to negotiate with Kim—who lost the motion to compel arbitration and whose case was in appellate limbo—rather than with Candelore, who was not bound to arbitrate[30] and who had just obtained an important appellate victory.[31] Tinder reached out to Kim the day after Candelore stopped Tinder from obtaining an overbroad release through *another* class action settlement.[32]

Kim then rushed into settlement discussions despite having done "[n]o discovery" and no investigation other than taking Tinder's word for it.[33] The resulting settlement richly rewards Kim's counsel with $1.2 million—290% of their

---

24, 2014) (settlement unfair despite mediator's involvement).

[29]   *See also China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1814-15 (2018) ("reverse auction" occurs when "[d]efense lawyers …pit[] the various class counsel against one another and agree[] to settle with the lawyer willing to accept the lowest bid on behalf of the class…. This gamesmanship is not in class members' interest, nor in the interest of justice.").

[30]   Dkt. 67-1 ¶6.  *Accord* Dkt. 65 ¶7.

[31]   *See* Dkt. 67-2, ¶¶24, 30.

[32]   *Id.*, ¶23 (citing evidence: Dkt. 63-1 at 34, 39; Dkt. 63-3 at 38).

[33]   Dkt. 41 at 5:1; Dkt. 67 at 4:21-5:1; Dkt. 67 at 7:8-8:4 (citing evidence); *see also* Dkt. 71-1 ¶¶30, 41-44 (claiming to have done "confirmatory discovery" but stating an estimated class size, and calculating settlement "values," based on no evidence beyond what "Defendants represented").

---

claimed lodestar.  It rewards Kim with a $5,000 payment—800% of the class members' average recovery.  The class members are left with $6.25 at most, on average, which is just 0.15% of their *minimum* statutory damages under the Unruh Act.  If all this were not bad enough, the settlement also sweeps in a subgroup Kim cannot and has not adequately represented—the 11,500 to 23,900 class members who never agreed to arbitrate their claims.  If this settlement is approved, Tinder will have accomplished its goal of sidestepping its heavy exposure under *Candelore*.

Given the strong and numerous indicia of collusion in this case, the settlement cannot be approved consistent with the Court's duty to protect the class members' interests under Rule 23(e).  *See Dennis*, 697 F.3d at 868; *Banks*, 2011 WL 7710297 at *11-*12.  The fee motion is also implicated.  "[A] district court faced with 'multiple indicia of possible implicit collusion' has a 'special obligation to assure itself that the fees awarded in the agreement' are not 'unreasonably high.'"  *Id.* at *12 (quoting *Bluetooth*, 654 F.3d at 947; citing *Staton*, 327 F.3d at 965).

As just mentioned, Kim's fee motion seeks 80% of what the class members stand to receive, a figure "clearly excessive under our guidelines."  *Dennis*, 697 F.3d at 868.  When a fee motion seeks "clearly excessive" fees, this presents "an additional reason to be vigilant regarding the particulars of this class action settlement: is it all that it appears to be?  Are the assigned numbers real, or not?"  *Id.* (reversing final approval of class action settlement).  Here, they are not real.

### F.    The Class Members Were Not Adequately Informed of the Value of Their Claims, and Their Ability to Object and Submit Claims Was Unreasonably Burdened

Kim contends that the class members' reactions to the settlement demonstrate its "strength."  Motion at 4:6; *see Bluetooth*, 654 F.3d at 946 ("reaction of the class members" is a relevant factor in assessing fairness).  According to Kim, the only objectors (and all but one opt-out) are those represented by counsel—specifically, counsel knowledgeable about the Unruh Act and the class members' potential recovery under that Act.  Motion at 19:12-13.  From this, Kim infers that the rest of

1   the class members must think the settlement is fair.

2       Kim's inference is wrong.

3       The settlement notice failed to inform the class members of the value of their

4   claims.  The notice cited the wrong statute—Civil Code section "1694 et seq."

5   instead of sections 51 and 52—and said nothing whatsoever about the minimum

6   statutory damages of $4,000 per person per offense.  Dkt. 61-1.  Nor did the notice

7   mention the *Candelore* opinion.  *Id.*  Fully informed class members, with lawyers

8   to advise them on the true value of their claims, have vigorously contested the

9   settlement.[34]  The lack of *pro per* objectors says nothing about the settlement's

10  fairness, but it speaks volumes about the inadequacy of the settlement notice.  *See*

11  *GMC*, 55 F.3d at 812-13 (where "the absentees may not fully appreciate the size of

12  their potential claims" because "the notice did not inform" them of the information

13  needed to assess that, their silence should not be construed as approval of the

14  settlement).

15      Unrepresented objectors may have been deterred by the onerous requirements

16  imposed by the settlement notice for asserting a valid objection.  *See* Dkt. 61-1 at 3

17  (requiring precisely worded statement under penalty of perjury, mailed to multiple

18  addresses as well as timely filed with the court, meeting seven specific requirements

19  plus a separate notice of intent to appear, all within just thirty days after notice was

20  given).  Kim claims that even some of the *represented* objectors failed to meet these

21  burdensome requirements.  Motion at 19:20-21:16.  *Pro per* objectors may have

22  found the requirements too off-putting to even attempt.

23      Kim contends that the represented objectors' counsel are "concerned with

24  maintaining their right to seek legal fees" in other pending proceedings (Motion at

25

26  _____

[34]     *GMC*, 55 F.3d at 813 ("It is instructive that many of the better informed [class

27  members] … did object" and "did so quite vociferously"); *Sobel*, 2011 WL 2559565
    at *15 ("in assessing the Class' reaction, courts look not only to the number but also

28  the 'vociferousness of the objections,' which in this case has been strong" (quoting
    *GMC*)).

9), but this ignores the plain text of the Unruh Act. Regardless of whether this settlement is approved, objectors' counsel can and will seek to recover their fees in those other proceedings, on behalf of their individual clients, under the Unruh Act's mandatory fee-shifting provision. Civ. Code §52(b)(3). Kim also accuses the objectors' counsel of planning to "extort a large fee" in a "side deal" hidden from the Court. Motion at 21-22. Nonsense. Rule 23(e)(5)(B), as amended last year, prohibits that. Kim's ad hominem attack warrants no further response. The strong substantive merit of the asserted objections speaks for itself.

## III. CONCLUSION

For the reasons stated above, the Court is respectfully asked to deny the motion for final approval. In addition, the Court is asked to direct that Objectors' counsel be included in any future classwide settlement negotiations. *See Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 836 (9th Cir. 1976) ("Objections of substance which after a proper hearing are found by the trial court to require modification of the proposed settlement prior to judicial approval undoubtedly will bring about additional negotiations in which the class attorney *and the dissenters and their attorneys …* will participate." (emphasis added)).

DATED: May 24, 2019                    Respectfully submitted,

                              By:    *Kimberly A. Kralowec*
                                     Kimberly A. Kralowec
                                     KRALOWEC LAW, P.C.

                                     Danielle E. Leonard
                                     ALTSHULER BERZON LLP

                                     Alfred G. Rava
                                     RAVA LAW FIRM

                                     *Counsel for Objectors Rich Allison and Steve Frye*