John P. Kristensen (SBN 224132)I
David L. Weisberg (SBN 211675)
Christina M. Le (SBN 237697)
**KRISTENSEN WEISBERG, LLP**
12450 Beatrice Street, Suite 200
Los Angeles, California 90066
Telephone:  310-507-7924
Fax:  310-507-7906
john@kristensenlaw.com
david@kristensenlaw.com
christina@kristensenlaw.com

Todd M. Friedman (SBN 216752)
Adrian R. Bacon (SBN 280332)
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
21550 Oxnard Street, Suite 780
Woodland Hills, CA 91367
Telephone: (216) 220-6496
Facsimile: (866) 633-0028
tfriedman@toddflaw.com
abacon@toddflaw.com

*Attorneys for Plaintiff and all others similarly situated*

## THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LISA KIM, individually on behalf of herself and all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>TINDER, INC., a Delaware corporation; MATCH GROUP, LLC, a Delaware limited liability company; MATCH GROUP, INC., a Delaware corporation; and DOES 1 through 10, inclusive, and each of them,<br><br>　　　　Defendants. | Case No.: 2-18-cv-03093-JFW-AS<br><br>**PLAINTIFF LISA KIM'S REPLY IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND RESPONSE TO OBJECTIONS OF ALLISON, FRYE, PENA, MOJICA, RODRIGUEZ, AND JOHNSON**<br><br>Date:　　　June 17, 2019<br>Time:　　　1:30 p.m.<br>Courtroom:　7A<br>Hon. John F. Walter |

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................... 1

II. STATEMENT OF FACTS ............................................................ 3

    A. Proceedings Since Preliminary Approval ............................ 3

    B. Class Notice and Response to Settlement ............................ 5

III. ARGUMENT ............................................................................... 6

    A. A Word About *Rava v Athletics Investment Group, LLC* ............... 6

    B. Candelore Objectors' Position That Claims-Made Settlements Are Improper is Undermined By Widespread Case Law ............ 8

        1. The Injunction Benefits The Class ................................ 9

        2. The Super Likes are A Floor And Offer Tangible Benefits That Are Equivalent To Cash ........................... 10

        3. Cash Benefits are One Additional Component, and are Available To All Class Members ................................ 12

        4. Claims-Made Settlements Are Common, Approved All the Time, and was Necessary here for Logistical Reasons ...................................................................... 13

    C. This Settlement Was Not A Reverse Auction and Candelore Objectors Are Inadequate ................................ 15

    D. This Court Has the Jurisdiction to Enter Judgment ............ 19

    E. The Settlement Does Not Otherwise Violate the Due Process Rights of Absent Class Members ........................................ 20

    F. The Attorneys' Fees Request Is Reasonable ...................... 22

    G. The Davis and Norris Objections Lack Merit ................... 23

IV. CONCLUSION ........................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Aarons v. BMW of North America, LLC*, 2014 WL 4090564 (C.D. Cal.  April 29, 2014) ...........................................................................................................14

*Alfred G. Rava v. Athletics Investment Group, LLC*, Case No. RG 06268693, Superior Court of California County of Alameda (2006) .......................6, 8

*Britton v. Co-op Banking Group*, 916 F.2d 1405 (9th Cir. 1990) ........................19

*Cohn v. Corinthian Colleges, Inc*. 169 Cal.App.4th 523 (Cal. Ct. App. 2008) ......7

*Dep't of Indus. Relations v. Seaboard Surety Co*., 50 Cal.App.4th 1501 (1996) 21

*Edwards v. Nat'l Milk Producers Fed'n*, No. 11-CV-04766-JSW, 2017 WL 3623734 (N.D. Cal. June 26, 2017) ...........................................................20

*Eisen v. Porsche Cars North America, Inc*., Case No. 2:11–cv–09405–CAS–FFMx, 2014 WL 439006  (C.D. Cal. Jan. 30, 2014) .................................14

*Elec. Equip. Express, Inc. v. Donald H. Seiler & Co.*, 122 Cal. App. 3d 834 (1981) .....................................................................................................21

Esslinger v. HSBC Bank Nevada, N.A., 2012 WL 5866074, at *7 (E.D. PA. Nov. 20, 2012) ...........................................................................................23

*Gailing v. Rose, Klein & Marias*, 43 Cal.App.4th 1570 (1996) ...........................21

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ...............................................19

*Gordon v. Caribbean Cruise Line, Inc.*, Case No. 14-cv-5848, 2019 WL 498937 (N.D., Ill., Feb. 8, 2019) ...........................................................................16

Griggs v. Provident Consumer Disc. Co., *459 U.S. 56* (1982) ...........................19

*Hanlon v. Chrysler Corp*., 150 F.3d 1011 (9th Cir. 1998) ..................................13

*In re Domestic Air Transp. Antitrust Litig*., 148 F.R.D. 297 (N.D. Ga. 1993) ..20

*In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454 (9th Cir. 2000).13

*Kulesa v. PC Cleaner, Inc.*, C.D. 2014 WL 12581770 (C.D. Cal. Aug. 26, 2014) ...........................................................................................................14

*Lamps Plus, Inc. v. Varela*, (April 24, 2019. S.Ct.) 2019 WL 1780275 .............24

*Linney v. Cellular Alaska Partnership,* 151 F.3d 1234 (9th Cir. 1998) ...............13

*London v. Wal–Mart Stores, Inc.,* 340 F.3d 1246 (11th Cir.2003) ......................16

*Minton v. Cavaney*, 56 Cal.2d 576 (1961) ...........................................................21

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .............20

*Negrete v. Allianz Life Ins. Co. of North America,* 523 F.3d 1091 (9th Cir. 2008)15

*Norgart v. Upjohn Co.*, 21 Cal.4th 383 (1999) ....................................................21

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir.1982) ............13

*Parkinson v. Hyundai Motor America*, 796 F.Supp.2d 1160 (C.D. Cal. 2010) ...14

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir.2002) ........................15

*Rutter & Wilbanks Corp. v. Shell Oil Co*., 314 F.3d 1180 (10th Cir. 2002)........15

*Serna v. Big A Drug Stores, Inc.*, No. SACV 07–0276 CJC (MLGx), 2007 WL 7665762 (C.D. Cal. Oct. 9, 2007) ................................................................16

*Shames v. Hertz Corp.*, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ................14

*Sheikh v. Tesla, Inc.*, Case No. 17-cv-02193-BLF, 2018 WL 5794532 (N.D. Cal. Nov. 2, 2018) .....................................................................................20

*Silber v. Mabo*n, 18 F. 3d 1449 (9th Cir. 1994) ..................................................21

*Stalley v. ADS Alliance Data Systems, Inc.*, No. 8:11-cv-1652 T-33TBM, 2013 WL 1969262 (M.D. Fla. May 13, 2013) ....................................................19

*United States v. Claiborne,* 727 F.2d 842 (9th Cir. 1984) ..................................19

*Woods v. Google LLC*, Case No. 11-cv-01263-EJD, 2018 WL 4030570 (N.D. Cal. Aug. 23, 2018)..............................................................................16

*Wyatt v. Zanchi*, No. 1:09-cv-01242 BAM PC, 2011 WL 5838438 (E.D. Cal. Nov. 21, 2011)...........................................................................................19

*Yoon v. Gap, Inc.*, Case No. 08–05712 SVW (AJWx) 2010 WL 11597565 (C.D. Cal. Oct. 6, 2010) ...........................................................................16

*York v. Stewart*, No. 1:15-cv-01828-DAD-BAM (PC), 2018 WL 1014456 (E.D. Cal. Feb. 21, 2018) ..........................................................................19

**Rules**

Fed R. Civ. P. 23................................................................................14, 17, 20, 23

## MEMORANDUM OF POINTS & AUTHORITIES

### I.  INTRODUCTION

The Settlement at issue provides robust and widespread benefits for over 240,000 consumers, most of which are guaranteed without any Class Members needing to make a claim at all, and also halts an allegedly illegal practice of Defendants, which would continue to harm Class Members and others if not ended. 99.9% of Class Members chose to remain in the Class and participate in this Settlement.  Only six Class Members have objected, from two separate law firms with ongoing concurrent litigation, obviously as a result of their counsel's advice and not due to any genuine concern on behalf of the Class.  Resistance has been minimal in comparison to scope.  Moreover, almost all of the points raised by the Objectors were already considered by the Honorable Court when this Court granted Preliminary Approval of the Settlement and found its terms to be both fair and reasonable, and absent of collusion.  There is no reason to reverse course now.

To say that the Objectors' motives, reasoning and authority are questionable would be an understatement.  Objectors argue that the value of the settlement and structure are inadequate; however the Court already found that both the structure and valuation were adequate when balanced against the risks.  Objectors ignore and completely misconstrue the value and nature of the Settlement.  The record shows that Super Likes are a significant source of revenue for Defendants, and thus, by extension, they are something that would have been used by Class Members anyways, thereby having value equivalent to cash.  Regarding the injunction, Class Members will continue directly benefitting from an end to the discriminatory price structure for years to come.  Indeed, Mr. Allison and Mr. Frye, who are both still users of the Tinder App, will have their goals accomplished by no longer being discriminated against as a result of their age.  The same is true for other members of the Class, who will continue being discriminated against due to their age but for the injunction secured by Class Counsel.  Class Members who want to recover additional benefits can do so and receive cash in hand.  To argue,

as the Candelore Objectors do, that there was not a fund or floor to the settlement is to ignore the fact that over $18 million worth of benefits will be conferred automatically to the Class.[1]  In many respects, this is superior to a traditional common fund pro rata distribution where only those Class Members who participate with a claims form receive benefits.  It more closely resembles, in structure, the type of result that would occur if a judgment was secured at trial.[2]

This Settlement is the best opportunity that there is or will likely ever be for Class Members to get justice, remuneration, and their day in Court for the allegedly wrongful acts of the Defendants.  The position advanced by the Candelore Objectors is that the very small percentage of Class Members who did not sign arbitration agreements should be treated more favorably than the rest of the Class, even though they have brought the same claims as one another and are entitled to the same relief, if any.  That position conflicts with the plain language of Rule 23(e), as well as basic notions of fairness.  The David and Norris Objectors apparently would have the entire Class subjected to arbitration, even though the Supreme Court recently observed that under the *Soltz-Nielsen* doctrine, that would lead to a due process crisis for Class Members.  Moreover, 99.9% of Class

---

[1] This is a benefits floor.  This was why Class Counsel structured the Settlement in this manner – to ensure Class Members benefitted whether they participated or not.
[2] Objectors argue that the settlement was a reverse auction, but this is unsupported by the record.  Undersigned counsel were the first firm to formulate, assert, and litigate the theories and claims in this case, over four years ago.  The mere existence of another competing class action whose lawyers are not part of a settlement does not make this a reverse auction.  Candelore's counsel has not asserted that Defendant attempted to request a class settlement bid from their office during negotiations with Class Counsel, so it is unclear upon what they base their position.  Reverse auctions involve a Defendant attempting to settle with two different parties at the same time to see which party will settle for less.  By all accounts that is not factually what happened here.  Rather, Candelore's counsel refused to work with Class Counsel during litigation efforts.  Their objection is simply an expression of displeasure that they are not part of the Settlement.  But, since Candelore opted out of the Settlement, his counsels' ability to seek fees on Candelore's own claims for their efforts remains intact.  There is no inequity, only sour grapes.

Members did not opt out or object to the settlement, and clearly have no interest in pursuing their own individual arbitrations or small claims cases, which would be the only other forms of relief likely available to them.  All of this is to say that if the Court denies Final Approval, the Class Members are not going to get anything. The Class will not benefit from a rejection of this Settlement, certainly not the 95% of Class Members who the Candelore Objectors admit are not even the target Class in their separate case.   To deny Final Approval would be to abdicate the responsibilities of Class Counsel and the Court, in ensuring the certified Class receives fair and reasonable relief.  The Objectors clearly have financial motives in seeing that happen, but they don't care at all about the vast majority of the Class Members in this case.  Such reckless requests must be set aside, because the risk of denying Final Approval is too great, and the benefits afforded are too widespread and robust to do anything less.

## II.   STATEMENT OF FACTS

### A.   Proceedings Since Preliminary Approval

As set forth in detail in Plaintiff's Motion for Final Approval, Quasi-Objector Allan Candelore already filed an opposition to the Motion for Preliminary Approval, which was expressly considered by the Court, which granted approval irrespective of these objections.  See Dkt. No. 54-56, 60 and 62.  The objections of Candelore (Dkt. No. 54), are almost identical to those objections which are raised by his close personal friends Rich Allison and Steve Frye (proxies) represented by the same law firm. *Compare* Dkt. No. 54 with 65-67.  The Court found the amounts of the settlement to be fair and reasonable, and found no evidence of collusion between the parties.  Moreover, Judge Meisinger submitted a Declaration attesting to the arm's length nature of negotiations.  Dkt. No. 72.  No evidence or additional argument has been made by Frye or Allison to alter the Court's prior holding.

The Court's Order granting approval set forth several important dates, including the June 17, 2019 date of the Final Approval hearing, the May 13, 2019

deadline to Plaintiff to file the Motion for Final Approval, the May 6, 2019 deadline for objections to Plaintiff's Motion for Final Approval, and the June 3, 2019 deadline for any response to objections. Dkt. No. 62. On May 6, 2019, Objectors Rich Allison and Steve Frye (collectively, "Candelore Objectors") submitted Objections and supporting documents. Dkt. Nos. 65-69. Plaintiff filed her Motion for Final Approval on May 13, 2019. Dkt. No. 71. Objectors, despite having filed objections to the settlement have now also filed an Opposition to Plaintiff's Motion for Final Approval of Class Settlement. Dkt. 78. The Court's Order did not allow Objectors to file an Opposition to Plaintiff's Motion for Final Approval of Class Settlement. Further, Objectors did not seek to intervene under Fed. R. Civ. P. 24.

Since the Motion for Final Approval was filed, much has occurred. As Plaintiff mentioned in the Final Approval Motion, depositions were scheduled for May 16, 2019 for Objectors Steve Frye, Rich Allison, and third party quasi-objector Allan Candelore. None appeared for their depositions, and a notice of nonappearance was taken. Declaration of Adrian R. Bacon in Support of Final Approval ("Bacon Decl.") Ex K. Plaintiff moved to compel the depositions. Objectors' counsel Danielle Leonard offered to respond to five Interrogatories in response to the motion to compel. Dkt. No. 77-1 ¶ 11.[3] The Magistrate struck a middle ground and ordered Objectors to each answer five Interrogatories. Dkt. No. 79. Interrogatories were served (Bacon Decl. Ex B and C) and Objectors responded, sort of. Bacon Decl. Ex D-F. In fact, none of these responses were responses at all, merely boilerplate objections or non-answers. Class Counsel asked important questions such as what conversations took place between the objectors (to determine ulterior motives), whether the objectors have personal relationships with one another and their counsel (again to determine motives, as

---

[3] "I offered a reasonable alternative: that each individual respond to a limited number (five) of Interrogatories and that we would shorten the time for responding so that Ms. Kim would receive responses in advance of any filing deadlines for responding to objections."

well as to assess whether adequacy would be satisfied if they intervened on behalf of the class and to assess conflicts of interest), how they used the Tinder app (to determine standing or if they were simply shills put in place by their counsel), any aliases used (since Mr. Allison's proclaimed email address and name are not affiliated with a Tinder account), and litigation history (to determine if Objectors are vexatious litigants). Objectors didn't answer any Interrogatories substantively, merely providing short non-responses or boilerplate objections. Clearly, they are hiding something. They refused to appear for a deposition, opposed a motion to compel, offered to respond to Interrogatories as an alternative, and then didn't even provide responses to these legitimate and well-thought out Interrogatories. Their counsel may be content making misrepresentations to the Magistrate, and violating the spirit of a Court Order, but Class Counsel believe the Class deserves better.

**B.    Class Notice and Response to Settlement**

In addition to the Class Notice sent to Class Members via email by the Claims Administrator on April 5, 2019, Class Counsel has negotiated two more rounds of notice to the Class.[4]   A second round of notice was emailed to Class Members on May 17, 2019. Pinkerton Decl. ¶ 9. A third Notice will be sent to Class Members after the Court rules on Final Approval. Bacon Decl. ¶ 36. Ultimately, 77% of Class Members were provided direct email notice.  Pinkerton Decl at ¶ 7. To date, there have been 1,793 claims made with the administrator. Class Counsel anticipates this number will be double by the time the claims period is closed, and will continue to do everything in their power to ensure the highest level of participation feasible is achieved.   Notably, the over 240,000 Class

---

[4] There have been a total of 6 objections, between two law firms (the Candelore Objections, and the David and Norris Objections). There have been a total of 238 opt outs. 235 of them were made by the David and Norris objectors, and these individuals were already in active litigation with Tinder. One was Mr. Candelore, also in active litigation. One was Sean Gay, the only timely organic opt out of the entire settlement. Finally there is Fariborz Kevin Hatanian, who submitted a late opt out after the second round of class notice, and after the opt out deadline, but whose request will be honored as valid nonetheless. Bacon Decl. ¶ 42

1  Members who do not make claims are still receiving substantial benefits
2  automatically under the terms of the Settlement.  The claims process only is
3  required for one out of the three forms of relief made available to the Class.

4  **III.   ARGUMENT**

5      **A.   A Word About *Rava v Athletics Investment Group, LLC***

6          The hypocrisy of Objectors' position must be pointed out.  In 2006, Al Rava
7  filed a class action lawsuit with himself as the named plaintiff against the Oakland
8  A's under the Unruh Act, seeking statutory penalties for the baseball club's
9  promotional giveaway of hats to female attendees.  Apparently, he also wanted a
10  free plaid floppy hat with a Macy's logo on it, and sued for gender discrimination,
11  since he was not entitled to receive one.  *See Alfred G. Rava v. Athletics Investment*
12  *Group, LLC*, Case No. RG 06268693, Superior Court of California County of
13  Alameda (2006).  Bacon Decl. Ex G and H (copy of Final Approval Order, Motion
14  for Final Approval, Notice of Lodging, Declaration of Al Rava in Support of Final
15  Approval).  The settlement was on behalf of 2,500 male attendees who presumably
16  missed out on the chance for a free hat, like Mr. Rava.  *Id*.  The structure of the
17  settlement was that notice would be given through publication (less preferable than
18  direct notice), as well as direct notice to season ticket holders (at best a small
19  fraction of the class), and that those who made claims would be entitled to receive
20  $50 in cash, plus a $25 coupon for Macy's and a $25 coupon for the Athletics, for
21  a total of $100 per claim.  There was no injunctive component.  There was no fund
22  or floor on guaranteed class member benefits.  After notice was given, only 19
23  class members made valid claims, for a total class settlement value of $1,900.  Mr.
24  Rava asked for and was awarded a $20,000 incentive award for his role as the
25  named plaintiff, over 10 times the total amount recovered by the class.  This was
26  primarily based upon the fact that he was receiving death threats from the general
27  public and possibly from class members for filing the lawsuit. *Id*.  His attorneys
28  asked for $200,000 in fees *via a clear sailing provision*, with a multiplier of

approximately 2.0 on their lodestar.[5]   There were 15 opt outs, and several objections/comments.  All of these terms were granted final approval.  Bacon Decl. Ex H.  Perhaps most remarkable about the settlement is Mr. Rava's declaration in support of the class settlement, wherein he states as follows:

> "Based upon my skill, experience, and training, especially with the prosecution and settlement of Unruh Act claims, I believe the Settlement is fair, reasonable, and adequate given the facts and circumstances in this case.  Additionally, I believe the attorneys' fees and court costs of $200,000 sought by my attorneys and agreed to by the parties in this action to be reasonable given the length of time this case has been litigated, the amount of work performed by my attorneys, the skills exhibited by my attorneys, the formidableness of opposing counsel, and the results obtained."

See Bacon Decl. Ex G, Rava Declaration ¶ 21.  Mr. Rava's counsel boasted that both they and Mr. Rava were the two most experienced Unruh Act litigation attorneys in the state of California at the time.  *Id*. at Motion for Preliminary Approval pg. 4:11-15.  They also cautioned against the risks of litigation, including citing to an Unruh Act case Mr. Rava litigated, where the claims were subject to dismissal on a motion for summary judgment.  *Id*. at pgs. 4-5 (citing to *Cohn v. Corinthian Colleges, Inc*. 169 Cal.App.4th 523 (Cal. Ct. App. 2008).

If this sounds familiar, it is because the settlement, which involved the exact same claims at issue in this case (Unruh Act) was structured in a very similar and yet inferior manner to the settlement structure in the case at bar, and Al Rava blessed it not only by letting his attorneys agree to these terms, but by championing it as an outstanding result for the Class in his own sworn declaration under penalty of perjury.  Now his close personal friends, clients, and Objectors all are saying

---

[5]  Mr. Rava's attorneys argue in their moving papers as follows: "Multipliers can range from 2 to 4 or even higher.  See for example, *Coalition for L.C. County Planning etc. Interest v. Board of Supervisors* (1977) 76 Cal.App.3d 241, 251; *Arenson v. Board of Trade of City of Chicago* (N.D. Ill. 1974) 372 F.Supp. 1349.) *cf Wershba v. Apple Computer, Inc*. 91 Cal.App.4th 224."

that the deal secured here is not sufficient, but there is no legitimate difference legally between these two cases. The only difference is that Al Rava is not getting a $20,000 incentive award, and his co-counsel is not getting twice their lodestar under this deal, because they are not part of it. *Rava v. Athletics Investment Group, LLC*, should tell the Court all it needs to know about the intentions of Mr. Rava and his proxies/clients/friends who are objecting to this case. If they were the ones who were named plaintiffs/class counsel in this deal, they would be celebrating it as a victory for the Class, because they have done so before with less favorable class settlements under the same law. Candelore Objectors' position is severely undermined by their counsel's sworn declaration under oath in another strikingly similar class settlement. The disingenuous Objections should be disregarded.

### B.   Candelore Objectors' Position That Claims-Made Settlements Are Improper is Undermined By Widespread Case Law

The primary issue raised by Candelore Objectors seems to be with the structure and amount of the settlement, i.e. that it is a claims-made settlement without a fund to act as a floor, and that the total fund is too low. This is neither a tenable objection, nor is it an accurate description of the Settlement. Candelore Objectors' counsel Al Rava claims to be an experts on the Unruh Act. Bacon Decl. Ex G, Rava Decl ¶ 5 ("unlike most class representatives, I am also an attorney and have significant amount of knowledge and experience prosecuting Unruh Civil Rights Act claims on behalf of men and women treated unequally because of protected personal characteristic…"). Mr. Rava believed the inferior settlement reached in his own case where he acted as a class representative was "fair, reasonable, and adequate" but that this settlement is somehow not. *Id.* Putting this to the side for a moment, Candelore Objectors misconstrue the nature of the benefits to the Class in numerous respects which warrant a correction of the record.

The Settlement has three components, only one of which is based on claims made by Class Members. The two guaranteed benefits are significantly more

1   valuable than the Objectors argue, as demonstrated by the actual record of the case.

2   Moreover, claims-made settlements are routinely granted final approval, and are

3   often necessary and fair to class members, as was the case here.

### 1.    The Injunction Benefits The Class

5   Class Counsel negotiated an injunction discontinuing further discrimination

6   based on price in California.  This will benefit Class Members because Tinder will

7   <u>no longer sell any services to new subscribers that give discounts to those</u>

8   <u>subscribers that are under 29 years of age, which means all Class Members will no</u>

9   <u>longer be discriminated against based on price</u>.   Objectors mischaracterize the

10  injunction and the fact that it pertains only to "new subscriptions," and argue that

11  it does not benefit Class Members.  This is not true and they have their facts mixed

12  up, demonstrating that they don't understand what this case is about.

13  Tinder was selling its premium services at a 50% price point to people who

14  were under 29 years old.  Tinder was *not charging double* to Class Members, but

15  rather offering a *discount* to younger users.  As such, Tinder has to honor those

16  contracts for consumers who a*lready purchased* discounted services, or else Tinder

17  will face another class action lawsuit for breach of contract if it suddenly refuses

18  to honor such prices that were promised to such younger users.  Tinder is bound

19  by its contracts with *existing non-class member* users.  But Tinder is *not* bound by

20  *new non-class member users*, who will henceforth be charged the same price as

21  Class Members irrespective of their age, and offered no discount.   For new

22  subscriptions, everyone pays the same price, i.e. the price Class Members were

23  paying all along.  The Objectors' error stems from simply not understanding these

24  basic facts about their own claims, claims which Candelore's counsel purport to be

25  the experts of, arguing that Class Members are not purchasing "new subscriptions."

26  The "new subscriptions" referenced in the settlement agreement are *new non-class*

27  *member subscriptions* whereby the discounts will *no longer be offered to said non-*

28

*class-member-individuals*.  It does *not* mean that *Class Members* will continue to be discriminated against simply because they have an existing subscription.  That is not the target of the language in the settlement agreement at all.  Candelore Objectors lack a rudimentary understand of this case.  The injunction benefits all Class Members.  Objectors' argument is nonsensical.

### 2.   The Super Likes are A Floor And Offer Tangible Benefits That Are Equivalent To Cash

Tinder has agreed to a floor of guaranteed benefits that will automatically be conferred upon Class Members irrespective of whether they make a claim in this case.  These benefits, referred to in the Settlement Agreement as the Universal Participation Component, come in the form of Super Likes.  Objectors argue that Super Likes are equivalent to a coupon and are not a true benefit to Class Members.  They base this assertion upon no facts, no documents, no information, and no discovery.  The actual record shows they are wrong.

As part of Class Counsel's investigation into the claims, through mediation privileged discussions, the valuation and nature of Super Likes was explored.  Details of how Class Members use Super Likes, and how Tinder values these services from a revenue standpoint are described in the Declaration of Joseph Ciesla.  See Dkt. No. 55.  Unsurprisingly, Objectors completely ignore this evidence and pretend it does not exist, because it undermines the factual underpinnings of their entire argument.  Indeed, neither of the Candelore Objectors mention that they reviewed or relied on it in issuing their objections.  See Bacon Decl. Ex D-F; Dkt. No. 67, 67-1, 67-4, 67-5, 78.  Tinder's Declaration is direct evidence that the Objectors' concerns are just plain wrong.

As described by Mr. Ciesla, the Super Like is one of the premium features available through the Tinder app, which is sold on an a la carte basis.  Dkt. No. 55 ¶ 3.  The Tinder app generated over $240 million in a la carte purchases in 2018 alone, roughly 40% of which stemmed from Super Likes, i.e. $96 million.  *Id.* at ¶

4. Class Members were obviously spending a lot of money out of pocket on Super Likes, *in addition to their monthly subscription fees*, during the Class Period. Tinder's data from January 2019 shows that Class Members, i.e. premium subscribers in California, each purchased an additional 34 Super Likes (equivalent to $34) per month. *Id*. at ¶ 5. This means that these same Class Members may as well be getting cash instead of the universal participation component of 50 automatic Super Likes, because they can be expected to burn through this allotment of Super Likes in less than 45 days after receiving them on average, and will henceforth be expected to spend money out of pocket to continue purchasing these a la carte services. Data does not lie; Super Likes are as good as cash, and the reason they are in fact superior to cash in this particular case is because they can be directly placed into every single Class Member's Tinder account without anyone even having to make a claim. This is most superior method of delivering benefits to the Class because it guarantees that everyone who was affected by the conduct of the Defendant will receive value, even if they do not participate.

Mr. Rava's own class action against the Oakland A's is significantly inferior to this settlement in two important respects. First, there was no floor, because he guaranteed no benefits to the class, either via an injunction or via a universal participation component, and he likewise did not negotiate a fund of benefits that would be distributed on a pro rata share. It was a true reversionary settlement, whereas this settlement unequivocally is not. Second, the coupons given to Class members in the *Rava* matter were actually just coupons, and no evaluation of their true market value was ever investigated or presented to the Court. It is unclear what conditions were placed on these coupons, whether they were gift certificates or some form of discount offered to consumers who purchased a certain amount of goods, and no evidence in the record that class counsel even considered or evaluated, like Class Counsel did in this case, what the true market value of the

1   non-cash remuneration would actually be for class members.  It was sloppy.  Class
2   Counsel in this case were, conversely, diligent and thoughtful in the approach.

3        Super Likes are highly valuable as the record shows they are equivalent to
4   currency.  Moreover, their method of automatic delivery to Class Members is
5   superior to a pro rata distribution to only those class members who did make
6   claims, because such method of delivery offers a windfall to those who make
7   claims, depriving others who are not so inclined of benefitting under this portion
8   of the Settlement.  Everyone who was a Class Member should be able to get
9   something if they want to participate by not opting out.  This settlement ensures
10  just that, by providing an injunction, as well as automatic cash equivalent benefits.[6]

11           **3.   Cash Benefits are One Additional Component, and are**
12                **Available To All Class Members**

13       Finally, Class Members who make claims will receive an additional $25 in
14  cash, or the equivalent amount of future services, at their discretion.  This option
15  was available to each and every Class member, all they had to do was submit a
16  claim, which was straightforward and would take but a minute to accomplish from
17  their smart phone, which presumably is or was connected to the same email address
18  as the dating platform that was accessible through that same smartphone device.
19  Plaintiff emphasizes again that there was no feasible way to ensure that Class
20  Members received cash benefits without a claims process, because Tinder does not
21  maintain name and address data for Class Members.  See Dkt. No. 55 ¶¶ 6-8.  This
22  was thoroughly explored and investigated by Class Counsel in the discussions
23  leading up to mediation with Defendants.  As a result, there had to be a claims
24  process for any benefits where checks would be sent out to Class Members.  Class

25  _____

26  [6] With respect to those in the Class who found their match and do not intend to use
    dating services in the future, they can make claims for cash benefits, or opt out and
27  pursue an individual case.  The fact that some small number of Class Members
    may fall into this individualized category does not render the settlement as a whole
28  unfair.  Rule 23(e) requires parity between members.  That parity was achieved.

Counsel had already secured a floor of benefits available to the Class Members, through the automatic Super Likes and the Injunction.  These benefits were robust and diverse.  Cash benefits, while an important additional form of relief, were only one component of the Settlement structure.  The claims process will continue to be ongoing for 30 days after Final Approval is granted.  One more round of Class Notice will go out to the Class to notify them of the final deadline to submit claims after the final approval hearing, is approval is granted.

### 4.  Claims-Made Settlements Are Common, Approved All the Time, and was Necessary here for Logistical Reasons

Objectors classify this as a purely reversionary settlement, but in fact, the record of the case shows that it is a hybrid settlement with three distinct components, some of which are superior to a pure common fund claims-made settlement with a pro rata distribution.  That is to say, this is not a claims-made reversionary settlement, like the one Mr. Rava said was fair reasonable and adequate that he filed against the Oakland A's and where he personally received over 10 times the amount Class _collectively_ recovered just as a personal incentive award, and where his counsel recovered over 100 times what the Class recovered.  But even if it was a pure claims-made reversionary settlement, such structures are not necessarily disfavored by courts and often times are approved.

The Court has broad discretion to grant such approval and should do so where the proposed settlement is "fair, adequate, reasonable, and not a product of collusion."  _Hanlon v. Chrysler Corp_., 150 F.3d 1011, 1026 (9th Cir. 1998).  "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."  _Officers for Justice v. Civil Serv. Comm'n_, 688 F.2d 615, 628 (9th Cir.1982).  "In the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement."  _In re Mego Financial Corp. Securities_

*Litigation*, 213 F.3d 454, 458 (9ᵗʰ Cir. 2000) (citing *Linney v. Cellular Alaska Partnership,* 151 F.3d 1234, 1239 (9th Cir. 1998)).

Numerous courts, including in the Central District, from a variety of judges, have approved claims-made reversionary settlements.  For instance:

- *Eisen v. Porsche Cars North America, Inc*., Case No. 2:11–cv–09405–CAS–FFMx, 2014 WL 439006 *9-12 (C.D. Cal. Jan. 30, 2014) (Judge Snyder approved a claims-made reversionary settlement with a 1% take rate, and upholding separate  fee request where the fees were disproportionately larger than the collective class recovery);

- *Parkinson v. Hyundai Motor America*, 796 F.Supp.2d 1160 (C.D. Cal. 2010), (Judge Stolter approved a claims-made reversionary settlement which offered a partial credit for auto repairs to Class Members who wanted defects remedies, with full fees awarded);

- *Shames v. Hertz Corp.*, Case No. No. 07–CV–2174–MMA(WMC), 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) (Judge Anello granted final approval of a claims-made a coupon settlement, where class members would receive $2 per day rental car coupons if they made claims.  The attorneys requested nearly $6 million in fees, plus over $700,000 in costs, and agreed to clear sailing with defendant.  There were 12 objections to the settlement, and a low take rate.  The court found no collusion and granted approval and full fees);

- *Kulesa v. PC Cleaner, Inc.*, C.D. Case No. SA CV 12-0725 FMO (ANx), 2014 WL 12581770 (C.D. Cal. Aug. 26, 2014) (Judge Olguin granted final approval in a claims-made reversionary settlement where claimants would receive a $10 partial refund if they submitted a valid claim.  The fees were separately negotiated apart from class member recoveries, like the case at bar.  Counsel requested and was awarded a lodestar multiplier by the court);

- *Aarons v. BMW of North America, LLC*, 2014 WL 4090564 (C.D. Cal.  April 29, 2014) (Judge Gutierrez approved a claims-made reversionary settlement which offered automobile repairs to Class Members who made claims, with full fees awarded); and

- *Tait v. BSH Home Appliances Corp.,* Case No. 10-0711, 2015 WL 4537463 (C.D. Cal. July 27, 2015) (Judge Carter granted final approval in a claims-made reversionary settlement involving a clear sailing agreement on attorneys' fees, over several objectors).

The list goes on.  Were all of these respected courts wrong?  Surely not.  There is nothing improper with a claims-made reversionary settlement so long as the Rule 23(e) factors are met, due process is satisfied, and the court in its discretion approves the settlement as fair, reasonable and adequate for the Class.  Moreover, this case does not involve a purely claims-made reversionary settlement, but a hybrid settlement with many components, and is superior to these other forms of settlement in many respects.  It should similarly be approved.

**C.   This Settlement Was Not A Reverse Auction and Candelore Objectors Are Inadequate**

As the Ninth Circuit has held, an assertion that a reverse auction is afoot require some facts from an objecting counsel to support the assertion, not merely the specter of collusion.  *Negrete v. Allianz Life Ins. Co. of North America,* 523 F.3d 1091, 1099-1100 (9th Cir. 2008).   Indeed, in *Negrete*, the Ninth Circuit reversed a District Court order preventing settlement negotiations from carrying forward when the objecting party presented no evidence before the court of any collusion between adverse parties.  *Id.*  A reverse auction is said to occur when "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir.2002).   "It has an odor of mendacity about it." *Negrete* at 1099-1099.  "If [Candelore Objectors'] argument were accepted, the 'reverse auction argument would lead to the conclusion that no settlement could ever occur in the circumstances of parallel or multiple class actions—none of the competing cases could settle without being accused by another of participating in a collusive reverse auction.'" *Id.* at 1099-1100 (citing *Rutter & Wilbanks Corp. v. Shell Oil Co*., 314 F.3d 1180, 1189 (10th Cir.2002)).

Factually, what happened in this case was obviously not a reverse auction scenario.  Class Counsel are highly decorated class action litigators.  The Law

Offices of Todd Friedman for instance has been appointed class counsel in over 50 class actions, including nine in which they were appointed class counsel by contested motion. Kristensen Weisberg has likewise worked on numerous significant class action lawsuits, being appointed numerously. Class counsel have never been ruled to be inadequate counsel, and could not be considered "the most ineffectual class lawyers," especially when compared to Objectors' counsel who have a checkered and questionably litigation history of representing the same group of individuals in invidious and vexations litigation.[7]

Indeed, Mr. Rava's close personal and business relationships with Mr. Candelore and the Objectors likely create an irreconcilable conflict of interest, which renders him inadequate counsel.[8] Mr. Rava is the secretary of the NCFM, and Mr. Candelore, Allison and Frye are all members. Bacon Decl. Ex L-Y. Mr. Rava has represented them in cases dozens of times, as well as representing the president of the NCFM in cases alongside the objectors. *Id.* The objectors attend movies together, and then file lawsuits against the movie theater with Mr. Rava as their counsel. Bacon Decl. Ex O. There is a clear pattern of Mr. Rava using the

---

[7] A reverse auction necessarily implies a defendant is shopping around for the best deal, but Candelore Objectors do not provide any evidence suggesting that Defendants ever had any class settlement discussions with them. Moreover, it was Class Counsel who first engaged Defendants in the possibility of class resolution, well before the Court ruled on the motion to compel. How can there be a reverse auction when only one set of parties in one case were discussing settlement?

[8] *See Gordon v. Caribbean Cruise Line, Inc.*, Case No. 14-cv-5848, 2019 WL 498937 at *8-9 (N.D., Ill., Feb. 8, 2019) (close personal tied between class counsel and class representative rendered them inadequate); *London v. Wal–Mart Stores, Inc.,* 340 F.3d 1246, 1255 (11th Cir.2003) (plaintiff and class counsel had a very close friendship which went back many years and rendered both counsel and class representative inadequate); *Serna v. Big A Drug Stores, Inc.*, No. SACV 07–0276 CJC (MLGx), 2007 WL 7665762 *2-3 (C.D. Cal. Oct. 9, 2007) ( pre-existing business relationship between a class representative and class counsel may give rise to a conflict of interest); *Yoon v. Gap, Inc*., Case No. 08–05712 SVW (AJWx) 2010 WL 11597565 *6 (C.D. Cal. Oct. 6, 2010) (same); *Woods v. Google LLC*, Case No. 11-cv-01263-EJD, 2018 WL 4030570 *4-7 (N.D. Cal. Aug. 23, 2018).

objectors to further his goals of filing lawsuits, by sending them out into the wild to engage in conduct that would give them standing to sue someone for any number of trivial or frivolous forms of "discrimination" and then acting as their lawyer to attempt to shake down the defendant for a settlement.  Bacon Decl. Ex Ex L-Y.  This has happened dozens of times.  It apparently has resulted in death threats made on Mr. Rava that force him to keep a shotgun next to his bed according to his sworn declaration.  Bacon Decl. Ex G Rava Decl. at ¶¶ 9-16.  His efforts to drum up litigation happened in this case as well.  Mr. Frye was not even a Tinder Plus subscriber until his close personal friend Mr. Candelore won his appeal, and miraculously a few days later, he bought Tinder Plus services, and then proceeded to never use them, despite paying fees for the year.  The objectors are shills for Mr. Rava.  They have a personal friendship dating back more than a decade.  They have a professional and business relationship through the NCFM, where Mr. Rava is clearly engaged in some sort of conduct whereby he acts on NCFM's behalf as counsel for all of its members, including the objectors, as described by NCFM's president in a press release on the organization's website.  Bacon Decl. Ex M.  Class Counsel's attempts to investigate this obviously improper ongoing arrangement were stonewalled, first by Objectors' refusal to appear for a deposition, their opposition to the motion to compel, their deceptive representations to the Magistrate (Dkt. No. 77-1), and their subsequent boilerplate objections to the court ordered interrogatories.  Bacon Decl. Ex. D-F.  What is clear is that these objectors would be inadequate, as would their counsel, if any modicum of scrutiny were applied to the circumstances by a challenging defendant such as Tinder.  And yet, Objectors cavalierly take the position that there are no merits or certification defenses for Tinder.  There's a glaring one: inadequacy.

Class Counsel takes no pleasure in pointing this out, but is obligated to do so to protect the Class from what the Objectors are asking of this Court.  The only "odor of mendacity" is the cloud following Mr. Rava and his band of vexatious

litigant clients whose motives are highly questionable here, especially in light of the fact that Mr. Candelore did not object, but opted out, in what appears to be an effort to circumvent Rule 23(e)(5)(B)(i).  The Court should not stand for it.

### D.     Candelore's Opposition is Procedurally Defective *Again*

Just as Candelore filed an improper and procedurally defective opposition to preliminary approval without intervening, his counsel have again filed an impermissible Opposition brief, in a case where they are not parties, have not sought intervention, have no standing, and are privy to no Court Order allowing such a filing.  Objectors had their opportunity to comment.  They did so when they filed their Objections papers on May 6, 2019.  Dkt. No. 67.  On May 24, 2019, Objectors filed a gratuitous Opposition to Motion for Final Approval of Class Settlement. Dkt. 78. This was an impermissible and unauthorized second bite at the apple.  Neither the Federal Rules of Civil Procedure nor the Local Rules contemplate an objecting class member filing an Opposition to a Motion for Final Approval of Class Settlement. Regarding Class-Member Objections, Federal Rule of Civil Procedure 23(e)(5)(A) provides that any class member may object to a settlement proposal.  Further, in conducting class actions under Rule 23, a Court may issue orders allowing the class members an opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action.  Fed. R. Civ. P. 23(d)(1)(B)(ii).

In the present action, this Court issued an Order on March 12, 2019 granting Plaintiff's Motion for Preliminary Approval of Class Action Settlement. Dkt. 62. Regarding class members' objections, paragraph 15 provides that any Settlement Class member that does not submit a timely request for exclusion, may file a written objection to the Settlement no later than May 6, 2019 and have the right to be heard at the Final Approval hearing.  Nothing in the Court's Order allows an objector to file an Opposition to the Motion for Final Approval.  In circumstances

1  when the Federal Rules of Civil Procedure and a District Court's Order do not

2  authorize the filing of a motion or opposition thereto, the Court may strike it from

3  the record.[9]  As there is no Court rule or legal authority permitting Objectors to file

4  an Opposition to the Motion for Final Approval, it should be stricken from the

5  record and given no consideration by the Court.[10]

6          **E.**    **This Court Has the Jurisdiction to Enter Judgment**

7        "The filing of a notice of appeal is an event of jurisdictional significance —

8  it confers jurisdiction on the court of appeals and divests the district court of its

9  control over those aspects of the case involved in the appeal." *Griggs v. Provident*

10  *Consumer Disc. Co*., 459 U.S. 56, 58 (1982).  The "divestiture of jurisdiction rule

11  is not based upon statutory provisions or the rules of civil or criminal procedure.

12  Instead, it is a judge made rule originally devised in the context of civil appeals to

13  avoid confusion or waste of time resulting from having the same issues before two

14  courts at the same time." *United States v. Claiborne,* 727 F.2d 842, 850 (9th Cir.

15  1984). An appeal from a District Court on a specific issue does not deprive the

16

17  [9] *Wyatt v. Zanchi*, No. 1:09-cv-01242 BAM PC, 2011 WL 5838438, at *5 (E.D.

18  Cal. Nov. 21, 2011) (striking an unauthorized surreply); *York v. Stewart*, No. 1:15-cv-01828-DAD-BAM (PC), 2018 WL 1014456, at *2 (E.D. Cal. Feb. 21, 2018)

19  (striking and disregarding the plaintiff's second opposition to motion for summary judgment as unauthorized); *Stalley v. ADS Alliance Data Systems, Inc.*, No. 8:11-

20  cv-1652 T-33TBM, 2013 WL 1969262, at *2-3 (M.D. Fla. May 13, 2013) (striking

21  unauthorized papers filed without leave of court).

22  [10] Notably, when asked about their basis for the objection, both Mr. Frye and Mr.

23  Allison, despite being aware that their counsel filed a subsequent Opposition to Final Approval, did not state in their Interrogatory responses that either of them

24  based their objections to the settlement on the points raised in the Opposition brief. Bacon Decl. Ex D and E.  These verified responses were under penalty of perjury

25  and signed by both objectors.  This is yet another basis for the Opposition brief to be disregarded, as Objectors themselves stated under penalty of perjury that they

26  did not base their objection on the points raised therein.  The Opposition brief (Dkt.

27  No. 78) should this be stricken or at the very least disregarded as unsubstantiated

28  *ipsa dixit*.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997).

District Court from addressing other issues before the Court. *Britton v. Co-op Banking Group*, 916 F.2d 1405, 1412 (9th Cir. 1990) (appeal from order denying arbitration does not deprive court of jurisdiction to enter default judgment).

Candelore erroneously claims that this Court was divested of jurisdiction to hear this matter during the pending appeal. However, a district court is only divested of such jurisdiction insofar as, without divestiture, both the district court and appellate court would simultaneously deal with the same issue. Here, this is not the case because this District Court would be addressing the class settlement while the appeal is addressing whether the case should be compelled to arbitration. In addition, Candelore ignores that the parties stipulated to return jurisdiction from the Court Appeals to this Court to seek finalization of the settlement, with the Court of Appeals granting the order, conditionally waiving the appeal. In addition, the District Court ordered that the prior stay on the matter due to its prior ruling on the arbitration motion be lifted, to allow for the parties to specifically file this motion and seek finalization of the settlement. This is a non-issue.

## F.   The Settlement Does Not Otherwise Violate the Due Process Rights of Absent Class Members

To comport with the requirements of due process, class notice must be "reasonably calculated to reach interested parties." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 335 (N.D. Ga. 1993). The FJC's Judges' Class Action Notice and Claims Process Checklist considers 70-95% reach among class members to be a "high percentage" and reasonable. See Bacon Decl. Ex. I, *available at* https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf. Courts generally are in agreement that if class notice reaches at least 70% of the class members, due process has been satisfied. *Sheikh v. Tesla, Inc.*, Case No. 17-cv-02193-BLF, 2018 WL 5794532 at *4 (N.D. Cal. Nov. 2, 2018); *Edwards v. Nat'l Milk Producers Fed'n*, No. 11-CV-04766-JSW, 2017 WL 3623734, at *4 (N.D.

Cal. June 26, 2017) ("[N]otice plans estimated to reach a minimum of 70 percent are constitutional and comply with Rule 23."). Rule 23(c)(2)(B) does not require "actual notice" or that a notice be "actually received." *Silber v. Mabon*, 18 F. 3d 1449, 1454 (9th Cir. 1994). Direct email notice was successfully delivered to 77% of Class Members, with one more round of notice yet to be delivered after final approval. Pinkerton Decl. ¶ 7. A settlement website and toll free telephone line have also been maintained and will continue to be maintained potentially reaching even more Class Members. *Id*. at ¶¶ 10-13. Inadequate reach via an inadequate notice is the only viable basis upon which an objector can challenge due process.

The proposed Settlement Class consists of "*Every California subscriber to Tinder Plus or Tinder Gold, who at the time of subscribing was at least 29 years old and was charged a higher rate than younger subscribers*" for Class Period of March 2, 2015 through the date the Court granted preliminary approval of the settlement. Objectors' argument that the scope of the settlement violates due process because it sweeps in claims that extend before the two-year statute of limitation for Plaintiff's Unruh Act claim is based on a false premise. Under California law applicable to the Unruh Act, Courts recognize that the statute of limitation is an affirmative defense held by a defendant to a claim.[11] In the instant matter, the Defendants agreed to waive the statute of limitation for purposes of settlement to resolve this matter, as they are entitled to. Reference by Objectors to various arguments and cases disputing that Plaintiff could properly represent the Class based on the statute of limitation do not apply to the circumstances of this

---

[11] *See Norgart v. Upjohn Co.*, 21 Cal.4th 383, 396 (1999); *Dep't of Indus. Relations v. Seaboard Surety Co*., 50 Cal.App.4th 1501, 1511 (1996); *Minton v. Cavaney*, 56 Cal.2d 576, 581 (1961) (as an affirmative defense, the statute of limitations is waived if not raised by the defendant); *Gailing v. Rose, Klein & Marias*, 43 Cal.App.4th 1570, 1577 (1996) ("The defendant must raise ... [the statute-of-limitations defense] or the plaintiff has every right to collect a full judgment."); *Elec. Equip. Express, Inc. v. Donald H. Seiler & Co.*, 122 Cal. App. 3d 834, 845 (1981) ("the right to assert…the statute of limitations can nevertheless be waived").

1   settlement.  To suggest there are legal differences between those whose claims

2   extend back in time or who purchased Plus vs Gold is erroneous.  It is the same

3   claim.  The entire due process argument is based on a false premise.

4   ### G.   <u>The Attorneys' Fees Request Is Reasonable</u>

5        Objectors also argue that fee petition is unreasonable.  Class Counsel have

6   well-exceeded their additional hours estimate already due to litigation surrounding

7   these objections.  Moreover, Candelore Objectors have expressly and numerously

8   advised that they plan to appeal any Court's Order granting Final Approval.[12]

9   Class Counsel will defend the settlement before the Ninth Circuit if that occurs,

10  and anticipate that significantly more hours and expense will be required as a

11  result, resulting in a final lodestar multiplier of 1.53.  Bacon Decl. ¶¶ 37-41;

12  Kristensen Decl.  Not only is the argument that a lodestar multiplier of less than

13  2.0 undermined by Objectors' Counsel's legal blog (Bacon Decl. Ex J), and by

14  longstanding legal authority as cited throughout the papers, but Mr. Rava himself

15  said under penalty of perjury in his own class action lawsuit that a 2.0 multiplier

16  for his lawyers was fair and reasonable for the Class.  That case involved a situation

17  where the <u>attorneys were recovering over 100 times what the class members</u>

18  <u>aggregately recovered.</u>  Approval was granted in the *Rava* matter, as were fees.  In

19  this case, Class Members will be recovering a floor of benefits worth over $18

20  million, through an injunction and automatic provision of Super Likes, plus the

21  cash benefits that will be paid as a result of the claims made by Class Members

22  after the claims period ends.[13]  The fee request could have been based off of the

23  25% benchmark of the fund – i.e. $4.5 million, but instead Class Counsel put the

---

[12] The fact that they have threatened appeal before a ruling has been made show
they do not have a good faith basis for an appeal, since there hasn't even been a
ruling yet to analyze for any legal or factual error made by the Court.  Their appeal,
if they in fact file one, will be a waste of resources.  Plaintiff will be requesting
they post a bond and reserves the right to seek fees and costs.

[13] Defendants have agreed that any fees not awarded by the Court out of the $1.2
million fund of fees, will go to the Class, not revert to Tinder.  Counsel believe
they should be paid their full fees, as they have fought hard for this Settlement.

Class first, and negotiated a fair number that made sense, is well within the range of reasonableness and is fully within the Court's discretion.

### H.      The Davis and Norris Objections Lack Merit

Again, The Davis & Norris objections are completely frivolous.  None of the Davis & Norris objectors have provided declarations or other information describing in any meaningful way why they object to the terms of the settlement. Instead, their counsel drafted boilerplate identical one page forms that provided no information whatsoever. *See* Dkt. No. 70-3 to 70-6.  This is despite the class notice expressly stating that in order to object to the settlement, a Class Member must include "an explanation of why you object to the settlement, including any supporting documentation."  Moreover, the amended Rule 23 specifies that an objection "must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection."  See Fed. R. Civ. P. 23(e)(5).  All of the objections advanced by Davis & Norris are defective because they fail to conform to the requirements of either Rule 23, or the Notice.  They were also filed late, as was their counsel's notice of intent to appear at the Final Approval Hearing.  They are procedurally improper and it would thus be within the Court's discretion to ignore them entirely.

From a standing perspective, it also warrants mentioning that three of the four objectors are not even Class Members, and so have no standing to object.[14]

Finally, it cannot be overstated how dangerous and reckless the argument made by Davis and Norris is with respect to compelling the claims of the entire Class to arbitration.  This is what the Supreme Court said just a month ago:

---

[14] Those individuals have nothing to gain or lose in these proceedings; they do not have standing to object to this Settlement and cannot be prejudiced by its ultimate resolution.  *See Esslinger v. HSBC Bank Nevada, N.A.*, 2012 WL 5866074, at *7 (E.D. Pa. Nov. 20, 2012) (stating that non-class members "do not have standing to object to the settlement").  Objectors Mojica and Johnson are not class members because they paid the under 29 age rate, and do not have standing to bring a claim. Objector Rodriguez lived outside of California at the time of purchase.

> In individual arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes… Class arbitration lacks those benefits. It sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment. Indeed, we recognized just last Term that with class arbitration the virtues Congress originally saw in arbitration, its speed and simplicity and inexpensiveness, would be shorn away and arbitration would wind up looking like the litigation it was meant to displace. Class arbitration not only introduces new risks and costs for both sides, it also raises serious due process concerns by adjudicating the rights of absent members of the plaintiff class—again, with only limited judicial review.

*Lamps Plus, Inc. v. Varela*, 139 S.Ct. 1407, 1416 (2019.) (citations omitted). Days after this widely publicized order was issued, Davis and Norris advocated for class-wide arbitration. That is not a tenable position to take. Moreover, the position that Class Members might all want to pursue their individual arbitrations is undermined by the fact that only two consumers, out of over 240,000, who were not already represented by counsel in pending litigation, chose to out out. That's a .00083% rate of consumers interested in the idea advanced by Davis and Norris. Unless they plan to unethically start soliciting these Class members to ask them if they want to hire a lawyer to bring a lawsuit, which would be a violation of California Rule of Professional Conduct 1-400, Davis and Norris' proposal is factually untenable.

There are a host of other issues with these Objections as well, which Class Counsel understand Defendants will be addressing in their separate response. Any way you slice it, the Objections are meritless.

## IV.   CONCLUSION

Objectors take a scattershot approach to their attempts to undermine the robust and widespread settlement reached in this case, but ultimately none of their contentions are factually or legally tenable. Claims-made settlements are often appropriate, yet this Settlement is more accurately viewed as a hybrid common fund non-claims-made settlement combined with a claims-made aspect, plus a

valuable injunction.  There's no evidence of a reverse auction or collusion, and the evidence of the record shows definitively otherwise.  Class Counsel are highly experienced in class action litigation, having been approved by over 50 courts as adequate, both by contested motion and through settlement.  They have never been found inadequate.  Counsel conducted the appropriate level of investigation and discovery in the case necessary to evaluate the risks.  The amount of remuneration is fair, adequate and reasonable, as the Court already found at preliminary approval.  The Court has jurisdiction to enter judgment.  Class Members are put on equal footing to one another. And due process has been satisfied.

Denying final approval will result in 95% of Class Members having their claims immediately subject to dismissal without prejudice (subject to Class Counsel's Ninth Circuit appeal), with 99.9% of them having expressed no desire to bring their own individual actions.  This would be the true tragedy of ruling as Objectors' urge the Court – that these individuals would not recover anything for the alleged wrongs, that Defendants could continue discriminating based on age, and that Candelore would proceed, on behalf of less than 5% of these consumers, with a strong chance of losing on summary judgment.  This is not justice.  Al Rava and his friends do not have the interests of the Class at heart.  If they did, they would support this robust settlement, just as Mr. Rava championed a far less favorable Unruh Act class settlement years ago.

Again, this Court has <u>full discretion</u> to approve the Settlement.   Class Counsel respectfully urges the Court to do just that.

Dated:  June 3, 2019                    Respectfully submitted,


By:   _/s/ Todd M. Friedman_

Todd M. Friedman (SBN 216752)
Adrian R. Bacon (SBN 280332)
**LAW OFFICES OF TODD M. FRIEDMAN, P.C.**

John P. Kristensen (SBN 224132)
David L. Weisberg (SBN 211675)
Christina M. Le (SBN 237697)
**KRISTENSEN WEISBERG, LLP**

*Attorneys for Plaintiff and all others
similarly situated.*

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business Address is 21550 Oxnard St., Suite 780, Woodland Hills, CA 91367.

On June 3, 2019, I served the following document(s) described as: **MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**, on all interested parties in this action by placing:

[X]   a true copy
[ ]   the original thereof enclosed in sealed envelope(s) addressed as follows:

Alexandra Hill
ahill@manatt.com
Donald R. Brown
dbrown@manatt.com
Robert H. Platt
rplatt@manatt.com
Manatt Phelps and Phillips LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614

[X]   **BY CM/ECF:** I transmitted the document(s) listed above electronically to the e-mail addresses listed above.  I am readily familiar with the Court's CM/ECF system and the transmission was reported as complete, without error.

[X]   STATE – I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 3, 2019, at Woodland Hills, California.

By:  /s/ Todd M. Friedman
        Todd M. Friedman