1  John P. Kristensen (SBN 224132)
2  David L. Weisberg (SBN 211675)
   Christina M. Le (SBN 237697)
3  **KRISTENSEN WEISBERG, LLP**
   12450 Beatrice Street, Suite 200
4  Los Angeles, California 90066
5  Telephone:  310-507-7924
   Fax:  310-507-7906
6  john@kristensenlaw.com
7  david@kristensenlaw.com
   christina@kristensenlaw.com
8
   Todd M. Friedman (SBN 216752)
9  Adrian R. Bacon (SBN 280332)
10 **LAW OFFICES OF TODD M. FRIEDMAN, P.C.**
   21550 Oxnard Street, Suite 780
11 Woodland Hills, CA 91367
12 Telephone: (216) 220-6496
   Facsimile: (866) 633-0028
13 tfriedman@toddflaw.com
14 abacon@toddflaw.com

15 *Attorneys for Plaintiff and all others similarly situated*

16
17          THE UNITED STATES DISTRICT COURT
     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

18 LISA KIM, individually on behalf of      ) Case No.: 2-18-cv-03093-JFW-AS
   herself and all others similarly         )
19 situated,                                )
                                            ) **DECLARATION OF ADRIAN R.**
20                                          ) **BACON RE: REPLY IN**
          Plaintiff,                        ) **SUPPORT OF MOTION FOR**
21                                          ) **FINAL APPROVAL OF CLASS**
          vs.                               ) **SETTLEMENT AND RESPONSE**
22                                          ) **TO OBJECTIONS**
                                            )
23 TINDER, INC., a Delaware                 )
   corporation; MATCH GROUP, LLC,           ) Date:      June 17, 2019
24 a Delaware limited liability company;    ) Time:        1:30 p.m.
   MATCH GROUP, INC., a Delaware            ) Courtroom:   7A
25 corporation; and DOES 1 through 10,      ) Hon. John F. Walter
   inclusive, and each of them,             )
26                                          )
                                            )
27        Defendants.                       )
28 ─────────────────────────────────        )

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF ADRIAN R. BACON

**I, ADRIAN R. BACON, declare:**

1.　　I am a partner at The Law Offices of Todd M. Friedman, P.C. and an attorney in good standing duly admitted to the State Bar of California and before This Court and an attorney of record for Plaintiff Lisa Kim ("Plaintiff") in this class action against Defendants Tinder, Inc., Match Group, LLC and Match Group, Inc. ("Defendants").  This declaration is submitted in support of Plaintiff's Response to Objectors and Reply in Support of Motion for Final Approval of Class Action Settlement.  This declaration is based upon my own personal knowledge.  If called upon I could and would competently testify to the matters asserted herein.

2.　　Except for those matters stated on information and belief, which I am informed and believe are true and correct, I have personal knowledge of all matters set forth herein. If called as a witness, I could and would competently testify thereto.

3.　　I have exclusively worked as a Plaintiffs' side class action attorney for the duration of my legal career.  Prior to being licensed, I worked for the Federal Trade Commission where I assisted with numerous investigations, litigations and sweeps on behalf of consumers.  I have litigated hundreds of class action cases, and been appointed class counsel in dozens of actions, including numerous cases where I was appointed class counsel by contested motion.  Many of these cases are set forth in Mr. Friedman's Declaration in support of Plaintiff's Motion for Attorneys Fees and Costs.  I have written comments to the FCC advocating for strong consumer privacy rights.  I have argued cases before the Ninth Circuit and Eleventh Circuit Courts of Appeals advocating for various consumer rights.  To say that I have dedicated my career to assisting and advocating on behalf of consumers would be an understatement.

4.      I am one of the lead attorneys for Plaintiff and the Class in this matter, having worked on this matter since the inception of the prior *Warner v Tinder* action referenced in the papers, the complaint for which case I investigated and drafted.  A true and correct copy of the First Amended Complaint in *Warner v Tinder* is attached hereto as Exhibit A.

5.      I attended the mediation with Judge Meisinger and assisted in negotiations on behalf of the Class.  I have reviewed all declarations of my partner Mr. Friedman, my co-counsel John Kristensen, and the Declaration of Judge Meisinger, and agree wholly with their content.

6.      I believe the settlement provides for fair, reasonable and adequate relief to the Class Members, and support the final approval of the settlement.

7.      Attached hereto as Exhibit I is a true and correct copy of the FJC Judges' Class Action Notice and Claims Process Checklist.

8.      My office and my co-counsel have attempted to investigate the basis of the Objectors' Objections to the lawsuit but have been met with an unexpected level of what I would call hostility and resistance from these individuals, specifically with respect to Mr. Candelore, Mr. Frye and Mr. Allison, and their counsel.  After receiving the Objections, we attempted to depose these individuals, but they did not appear for their depositions.  I took a non-appearance.  A true and correct copy of the non-appearance transcript with exhibits is attached hereto as Exhibit K.

9.      Following the non-appearance, Plaintiff moved to compel the appearance of Objectors for a deposition.  Objectors offered to respond to five interrogatories as an alternative.  We opposed this alternative because we were certain based on interactions to date that they would not respond substantively to our written questions, and we felt compelled to pursue the ability to cross examine and impeach such non-responses under oath in a deposition context.  The

1   Honorable Magistrate held that the interrogatories were sufficient, and ordered
2   Objectors to answer five Interrogatories.

3       10.     My office served Interrogatories on Steve Fry and Rich Allison on
4   May 29, 2019, true and correct copies of which are attached hereto as Exhibits B
5   and C.

6       11.     Mr. Allison and Mr. Frye served responses on June 1, 2019, true and
7   correct copies of which are attached hereto as Exhibits D, E and F.

8       12.     As part of our diligence as Class Counsel on behalf of the Class, we
9   investigated the Objectors and their counsel, to determine the motives of these
10  individuals in objecting to the settlement.  Some of our findings are included here.

11      13.     Attached as Exhibit G is a Motion for Final Approval of Class Action
12  Settlement, and supporting papers, including a declaration of counsel, a declaration
13  of Plaintiff, and other materials, in the case of *Alfred G. Rava v. Athletics
14  Investment Group, LLC*, Case No. RG 06268693, Superior Court of California
15  County of Alameda (2006).

16      14.     Attached as Exhibit H is an Order Granting Final Approval of Class
17  Action Settlement in the case of *Alfred G. Rava v. Athletics Investment Group,
18  LLC*, Case No. RG 06268693, Superior Court of California County of Alameda
19  (2006).

20      15.     Attached as Exhibit J is a true and correct copy of a blog post posted
21  on the website https://www.uclpractitioner.com/class_actions_settlements/.  The
22  blog posting claims it was made by Objectors' Counsel Kimberly A. Kralowec of
23  Kralowec Law, P.C. The address for Kralowec Law P.C. on the website matches
24  the address for Kralowec Law, P.C. on the Objectors' caption page.

25      16.     Attached as Exhibit L is a copy of a blog post from website
26  https://ncfm.org/2013/01/activities/ncfm-president-files-a-class-action-sex-
27  discrimination-lawsuit-against-the-los-angeles-fours-seasons-hotel-westlake/.
28  The article which states that it was authored by National Coalition For Men

1
2
3
4
5

("NCFM") Secretary Al Rava.  The blog post discusses Mr. Rava's involvement filing numerous class actions against various clubs, hotels or other organizations on behalf of several NCFM members, including Mr. Frye, Mr. Harry Crouch who is identified as the NCFM President, and Mr. Marc Angelucci, identified as the NCFM Vice President.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

17.    The Article also contains a comment from an apparent member of NCFM which states "some of the plaintiffs donate money to NCFM when they win."  We as Class Counsel believed this would create a conflict of interest between the Candelore Objectors and their counsel, if there was a preconceived business relationship of this nature between Objectors, Mr. Candelore, and Mr. Rava, who is the secretary of NCFM.  It appeared to us based on our review of these materials and others in our investigation that NCFM has a stated widespread policy of using its members to sue various organizations for what they perceive to be violations of the Unruh Civil Rights Act, through their counsel Al Rava, in order to generate revenue for the NCFM. These cases would often be filed as class actions, but would rarely be resolved as class actions.  Class Counsel believes this create an irreconcilable conflict of interest between Candelore and the Class, rendering Candelore, and his counsel wholly inadequate to represent the interests of the Class Members.  If NCFM members could use the class action mechanism to secure large individual settlements, and donate these proceeds back to NCFM, it would create a conflict of interest, especially considering Mr. Rava's role as the Secretary of NCFM.  Unfortunately, we were not permitted to ask these questions in a deposition setting.

24
25
26
27
28

18.    Attached hereto as Exhibit M. is a true and correct copy of a blog post from website https://ncfm.org/2015/08/news/discrimination-news/discrimination-against-men-news/ncfm-our-secretary-al-rava-and-the-unruh-act-under-attack-for-standing-tall-for-equal-rights/.  The Article states it was authored by Harry Crouch, the president of NCFM.  The Article identified Mr. Rava as the Secretary

of NCFM and appears to suggest that Mr. Rava has a routine practice of representing NCFM members in Unruh Act litigation.

19.   Attached hereto as Exhibit N. is a true and correct copy of an article from website  https://www.motherjones.com/politics/2016/01/men-rights-unruh-act-women-discrimination/2/.  The Article a number of cases filed by Mr. Rava on behalf of his clients Mr. Candelore, Mr. Crouch, and Rich Allison, including one case where these men all decided to show up to a women's' networking mixer meant to encourage young women to become entrepreneurs put on by Chic, knowing they were going to be denied entrance, and then brought a lawsuit against the company for discriminating against men.

20.   They did the same thing to AMC Movie Theater for giving free popcorn to federal workers during the federal furlough.  A true and correct copy of the complaint and order dismissing the action after a demurrer was filed are attached hereto as Exhibit O.

21.   Attached hereto as Exhibit P is a copy of a class action complaint Mr. Rava filed for MCFM President Harry Crouch against several hotels for advertising a girl's night out happy hour special.   This complaint was incredibly concerning to us as Class Counsel and we wanted to ask questions of Mr. Frye at a deposition setting about the filing of this lawsuit by his counsel due to testimony he presented in his sworn Declaration in support of the Objection.

22.   Specifically, in Paragraph 6 his declaration at Dkt. No. 66, Mr. Frye stated as follows:

> I have previously submitted only one objection to a class action settlement. In September of 2012, I objected to the settlement of class action settlement reached in an Unruh Civil Rights Act case, Los Angeles County Superior Court Case Number BC437103, *Loren Stone v. Westlake Wellbeing Properties, LLC, a California Corporation dba Four Seasons Hotel Westlake Village.*

23.     Mr. Frye was not a named party in the Crouch action based on Exhibit P.  A true and correct copy of the docket in the *Stone* action is attached hereto as Exhibit Z.  It appeared to us as Class Counsel that Mr. Frye was being used in that case as a shill by Mr. Rava and Mr. Crouch on behalf of NCFM to object without having a pending case, similar to how Mr. Frye and Mr. Allison are used by Mr. Rava in this case despite having Mr. Candelore as a client with a pending case.  It was a troubling recurring theme that we uncovered, and felt obligated to ask questions about.  It appears that judgment was entered and the settlement was approved in the *Stone* matter, over the objectors.

24.     Attached as Exhibit Q is a true and correct copy of a Westlaw docket pull from the case of *Al Rava v Club Med Sales Inc.*, Case No. 03CC09858 Orange County Superior Court.  The docket entry specifies that Mr. Rava tried to act as a class representative representing himself on behalf of others, but was disqualified due to a conflict of interest.

25.     Attached as Exhibit R is a true and correct copy of an unpublished opinion in the case of *Steve Frye v VH Property Corp.*, California Court of Appeal Case No. B246991.  Mr. Frye sued a golf course for offering discounts to women during breast cancer awareness month, with Mr. Rava as his counsel.  Judgment was granted by the trial court, an appeal ensued and the decision was affirmed.

26.     Attached as Exhibit S is a true and correct copy of a Westlaw docket entry for the case of *Steve Frye v P&D RESTAURANT CONCEPTS, L.L.C.*  The case indicates it was filed by Al Rava on behalf of Steve Frye for discrimination against men at a bar which offered ladies night.  In pertinent part, it states" The defendant denied the plaintiff's allegations and claimed that Frye was 'in the business of filing lawsuits against local restaurants claiming that they discriminate against him because he is male,' the objective being that economically, small businesses would have no choice but to pay money to avoid costs of litigation. A jury returned a verdict in favor of the defendant."

27.     Attached as Exhibit T is a true and correct copy of an order denying class certification in the case of *Steve Frye v S&B Foods, LLC*.  In part, class certification was denied due to a finding of inadequacy.

28.     Attached as Exhibit U is a true and correct copy of the trial order following a bench trial in the same case.  The court entered judgment in favor of the defendant, in large part finding Mr. Frye to be "evasive" "not believable" and "[t]hat trial testimony was completely impeached by his deposition testimony – further tattering his already not very credible testimony."

29.     Attached as Exhibit V is a true and correct copy of a court order in the matter of *Steven Surrey and Alfred G. Rava, v Spreckles Theater and Theatrical Enterprises Corporation*.  The case involved age discrimination claims under the Unruh Act, for a movie theater that offered discounts to people under 30 years old.  On summary judgment, the court ruled in favor of defendant and dismissed the case.

30.     Attached as Exhibit W is a true and correct copy of a court order granting summary judgment for defendants and awarding over $500,000 in fees to the defendant in a case litigated by Al Rava representing the plaintiff entitled *Love v Mail on Sunday*.

31.     Attached as Exhibit X is a true and correct copy of a filed lawsuit in the matter of *Rich Allison v Red Door Epicurian, LLC*, filed under the Unruh Civil Rights Act in Orange County Superior Court by his counsel Al Rava.

32.     Attached as Exhibit Y is a true and correct copy of a filed lawsuit in the matter of *Steve Frye v. Sage Client 349, LLC*, filed under the Unruh Civil Rights Act in San Diego County Superior Court by his counsel Al Rava.

33.     I also came across the following articles regarding objector Steve Frye:

- https://losangeles.cbslocal.com/2014/11/05/jury-sides-with-brea-restaurant-in-senorita-night-discrimination-lawsuit/

- https://www.eater.com/2014/11/7/7173613/man-lawsuit-gender-discrimination-chachas
- https://www.nbcsandiego.com/investigations/Gender-Discrimination-Men-Are-Suing-Women-For-Not-Letting-Them-Into-Women-Only-Events-480880911.html
- https://www.vox.com/the-goods/2018/10/24/18014276/mens-rights-activist-eagle-rock-brewery-lawsuit
- https://www.latimes.com/politics/la-na-pol-trump-mens-rights-20161027-story.html

These cases all appear to have been filed by Al Rava.

34.    There is a great deal more information and documentation we were able to uncover in our investigation of the objectors and their counsel, but we feel this is an adequate-enough summary to inform the Court of the apparent intentions, motives, and inadequacies we perceive of the objectors and their counsel.

35.    Objectors' counsel Danielle Leonard during our approximately 45 minute meet and confer call prior to Plaintiff's Motion to Compel the depositions of the Objectors, numerously informed me that if the Court granted final approval, they planned to appeal.  She did not specify a basis for the appeal, just the preconceived intention they had to appeal generally no matter what decision was reached.  Thus, I anticipate that there will be an appeal of the decision by the Objectors, no matter how sound in fact or law.

36.    Regarding the claims rate, my office negotiated a third round of class notice to be sent to Class Members following final approval, with a final date by which Class members will be required to submit claims.  It has been my experience working on dozens of class action settlements over the years that a reminder notice with a firm final deadline of this nature leads to a significant influx of additional claims.  Based on this, I anticipate a final claims rate for the monetary portion of the settlement will be between 1% and 3%.  This does take into account the benefits

1
2
received by the class members automatically under the inunction and the automatic provision of Super Likes through the universal participation components.

3
4
5
6
7
8
9
10
11
12
13
37.     My partner Mr. Friedman estimated in his declaration in support of the motion for fees and costs that our firm would spend between 100-150 hours working on this matter through final approval of settlement and final administration.  In fact, we have already spent approximately 150 hours of our time on this case since that time.  I have personally either sent or received well over 600 emails since that time relating to various matters in this case.  We drafted the final approval papers, worked on a motion to compel, participated in written discovery, reviewed and researched the various objections, oversaw administration, and drafted the contemporaneous response brief.  Long hours were worked, and they were divided between myself and Mr. Friedman on these tasks for my office.  My co-counsel worked on these tasks as well.

14
15
16
38.     Additionally, I estimate that if Candelore Objectors appeal, which they have said they will, that my office will spend another 200 hours, conservatively, on the Ninth Circuit Appeal.

17
18
19
20
39.     I used a blended rate of $675 per hour, the average of my rate and Mr. Friedman's rate, to calculate the estimated lodestar based on these figures.  Thus, the additional lodestar estimate in addition to the prior hours report of my firm is $236,250.00

21
22
23
24
40.     I understand that my co-counsel has incurred an additional $35,700 in fees since that time, and anticipates they will incur an additional $100,000 in fees on appeal.  Thus, the additional lodestar estimate in addition to the prior hours report of Kristensen Weisberg is $135,700

25
26
27
28
41.     Using the prior lodestar calculation incurred as of the date of the motion for attorney's fees and costs of $411,237.75, as set forth in Mr. Friedman's Declaration, and adding the actual and anticipated additional hours incurred and to be incurred, our estimated final lodestar calculation between both firms is

1
2
3
4

$783,187.75. Our fee request for $1.2 million thus represents a multiplier of 1.53. This is far lower than the 2.3 multiplier anticipated in our fee petition, and the reduction in the multiplier is almost entirely a result of the objections raised by the Candelore Objectors.

5
6
7
8
9

     42.    Besides the David and Norris opt outs and Mr. Candelore, my office has only received notice of two other opt outs.  The first was for class member Sean Gay.  The second was submitted after the deadline by an individual named Fariborz Kevin Hatanian.  Mr. Hatanian's opt out request, while late is going to be honored by the parties.

10
11

     43.    I declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct to the best of my knowledge.

12

     Executed on June 3, 2019 at Orange, California.

13
14
15
16
17

                          ____/s Adrian R. Bacon_____
                              ADRIAN BACON
                               Declarant

18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

LAW OFFICES OF TODD M.
FRIEDMAN, P.C.
Todd M. Friedman, Esq. (216752)
tfriedman@attorneysforconsumers.com
Adrian R. Bacon, Esq. (280332)
abacon@attorneysforconsumers.com
324 S. Beverly Dr., #725
Beverly Hills, CA 90212
Telephone: (877) 206-4741
Facsimile: (866) 633-0228

*Attorneys for Plaintiff*,
Billy Warner

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BILLY WARNER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br>      Plaintiff, <br><br>      v. <br><br> TINDER, INC., <br><br>      Defendant. | Case No.: 2:15-cv-01668-MMM-AJW <br><br> <u>CLASS ACTION</u> <br><br> SECOND AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF <br><br> 1. **UNRUH CIVIL RIGHTS ACT CAL. CIV. CODE §§ 51 *ET. SEQ.*** <br> 2. **ELECTRONIC FUNDS TRANSFER ACT 15 U.S.C. §1693 ET SEQ.,** <br> 3. **CALIFORNIA BUS. & PROF. CODE §§ 17600, ET SEQ.** <br> 4. **CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17500, *ET SEQ*,** <br> 5. **CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200, *ET SEQ.*** <br><br> JURY TRIAL DEMANDED |

## INTRODUCTION

1.  BILLY WARNER ("Plaintiff"), by Plaintiff's attorneys, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, to challenge the illegal actions TINDER, INC. ("Defendant") with regard to Defendant's misleading business practices, including practice of making automatic renewal offers and continuous service offers, as those terms are defined by Cal. Bus. & Prof. Code § 17600, false advertising, unlawful price discrimination, and violations of the Electronic Funds Transfers Act 15 U.S.C. §1693 *et. seq.*, that caused Plaintiff and other consumers damages.

2.  Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to a Plaintiff, or to a Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

3.  While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

4.  Unless otherwise stated, Plaintiff alleges that any violations by Defendant were knowing and intentional, and that Defendant did not maintain procedures reasonably adapted to avoid any such violation.

5.  Unless otherwise indicated, the use of any Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that Defendant named.

## JURISDICTION AND VENUE

6.  Jurisdiction is proper under 28 U.S.C. § 1332(d)(2) because Plaintiff, a resident of the State of Florida, seeks relief on behalf of a Nationwide class, which will result in at least one class member belonging to a different state than that of Defendant, a company whose principal place of business and State of Incorporation are in the State of California. In addition, the matter in

Case 2:18-cv-08693-JFW-AS Document 80-1 Filed 06/03/19 Page 15 of 361 Page ID
#:1995
Case 2:13-cv-01668-MMM-ASx Document 93 Filed 04/29/15 Page 3 of 30 Page ID #:57

controversy exceeds $5,000,000 exclusive of interest of costs. Therefore, both diversity jurisdiction and the damages threshold under the Class Action Fairness Act of 2005 ("CAFA") are present, and this Court has jurisdiction.

7. Further, this Court has jurisdiction under 28 U.S.C. 1331, because this action is brought pursuant to the EFTA, 15 U.S.C. 1693 *et seq*.

8. Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; (ii) Defendant resides in this judicial district; and, (iii) Defendant conducted business within this judicial district at all times relevant.

9. Because Defendant conducts business within the State of California, personal jurisdiction is established.

PARTIES

10. Plaintiff is an individual who resides in the County of Dade, State of Florida and a "person" as defined by Cal. Bus. & Prof. Code § 17201.

11. Plaintiff is informed and believes, and thereon alleges, that Defendant is a company whose State of Incorporation and principal place of business is in the State of California.

12. Plaintiff is informed and believes, and thereon alleges, that Defendant is a worldwide company that promotes itself as a free online dating application.

FACTUAL ALLEGATIONS

*General Background, False Advertising and Unfair /Deceptive Trade Practices*

13. At all times relevant, Plaintiff is an individual residing within the State of Florida.

14. Plaintiff is informed and believes, and thereon alleges, that at all time relevant, Defendant conducted business in the State of California.

15. Plaintiff is informed and believes, and thereon alleges, that at all time relevant, Defendant's sales of products and services are governed by the controlling law in the state in which they do business and from which the sales

or products and services, and the allegedly unlawful acts originated, which is California.

16. In or around early 2014, Plaintiff downloaded an "app" called Tinder from Defendant via iTunes, onto his iPhone mobile device.

17. Tinder promotes itself as a dating application for mobile phones, which promotes itself as follows:

"[Tinder] lets you find people who are within a certain radius of where you are located. You can see the profile pictures of people and their interests, and then qualify YES or NO.

If both qualify positive, Tinder enables a chat room to communicate with the person.

Tinder runs through your Facebook account, so please sign in with your Facebook data. Running is anonymous, so anything you do in Tinder be published on Facebook. Tinder take your public profile and photos and share your interests with others within the radius of Tinder away near where your you are.

With Tinder you can have casual dating, meet the love of your life, or make friends. You decide!

Tinder is free and is available on iPhone and Android phones." [1]

18. Tinder utilizes a user's location using the GPS built into their phone, then uses their Facebook information to create a profile. A Tinder profile is made up of a user's first name, age, photos and any pages they have 'liked' on Facebook.

19. Tinder then finds a user potential matches within a nearby geographical radius, and suggests potential matches, which a user has the option to like or pass.

20. Tinder's primary draw for consumers is a feature known as a "swipe," which is the act of swiping one's finger on their smart phone's touch screen within

---

[1] See Tinder's own website at http://www.apptinder.com/.

Case 2:18-cv-03093-JFW-AS Document 80-1 Filed 06/03/19 Page 17 of 361 Page ID
Case 2:13-cv-01668-MMM-AJW Document 93 Filed 04/20/15 Page 5 of 30 Page ID
#:1997

the Tinder app either left or right, in order to respectively approve or pass on a suggested potential match. If both users swipe left and "like" one another, Tinder will create a direct line of communication between the individuals, and allow them to start messaging one another.

21. In downloading the Tinder app, Plaintiff was informed, by various advertisements, promotions, and websites that Defendant's app was a "free online dating app." Defendant holds itself out to be free on its own website, stating "Tinder is free and is available on iPhone and Android phones."[2]

22. Tinder's advertisement and promotions through the iTunes store promotes Tinder as "free" and states: "To download the free app Tinder by Tinder Inc., get iTunes now" As well as that it is a "free download."[3]

23. Indeed, Tinder is universally advertised as "freeware"[4] and "free" software.[5]

24. A true and correct copy of the screenshot from Defendant's ad on the Google App Store is shown as follows[6]:

///

///

///

---

[2] See http://www.apptinder.com/.

[3] See Tinder's advertisement offered through the Apple iTunes store at https://itunes.apple.com/us/app/tinder/id547702041?mt=8

[4] See Tinder's advertisement offered through a third party App store at http://downloads.tomsguide.com/Tinder,0301-52985.html

[5] See Tinder's advertisement offered through the Android store at http://xyo.net/android-app/tinder-e08Z.0I/

[6] https://play.google.com/store/apps/details?id=com.tinder&hl=en



25. Tinder has, up until now, allowed users to enjoy unlimited free swipes and has been a free app.

26. Tinder has never advertised, represented, or otherwise indicated to its customers, including Plaintiff, that the use of its services will require any form or payment. Rather, Defendant continuously held itself out to be a service that was entirely free to consumers, and engaged in a widespread advertising campaign that its services were free.

27. In agreeing to download and use Defendant's Tinder app, Plaintiff actually relied upon Defendant's representations that downloading the app would permit Plaintiff to meaningfully use Defendant's app uninterrupted and for the foreseeable future, without payment of any additional fees or costs.

28. Said reliance is based upon the fact that Defendant did not warn Plaintiff, nor consumers similarly situated, that further fees may apply to ensure uninterrupted usage of Defendant's app, that Defendant's app may, at a later time, be rendered obsolete by Defendant's own affirmative business practices, as well as Defendant's representations that its product was "free".

29. Relying on these representations, Plaintiff and other class members became

entrenched in the use of Defendant's Tinder app, foregoing the use of other online dating sites.

30. Defendant offered these free services with the goal in mind of enlisting a user base of tens or hundreds of millions of users, with the ultimate goal of later changing the rules of participation and deceptively and forcibly migrating a substantial percentage of its user based to a paid subscription model.

31. Had Defendant warned Plaintiff that additional fees may apply, Plaintiff would have reconsidered Plaintiff's use of Defendant's app.

32. Failure to disclose that additional fees may apply unfairly induced Plaintiff's downloading of Defendant's app, as he reasonably believed it to be a "free" service.

33. In agreeing to download and use Defendant's Tinder app, Plaintiff understood that his "payment" and Defendant's profit model would revolve around third party advertising such as banner ads, as is common in other free social networking sites and apps.

34. Following years of benefiting from Defendant's marketing, Defendant abruptly began informing consumers on or about March 2, 2015, that consumers would no longer be able to utilize Tinder for the functions which consumers had previously enjoyed free use.

35. According to Defendant, consumers that desired to continue using Tinder uninterrupted are required to purchase an account-level subscription of Tinder Plus, at a cost of $2.99 per month.

36. Specifically, Defendant abruptly informed consumers, including Plaintiff, that they would no longer be able to enjoy unlimited swipes unless they signed up for a Tinder Plus account.

37. Defendant's abrupt policy change constitutes an unfair and deceptive trade practice, put into place to forcibly migrate users to paid subscription services, in order to receive the same services that had previously been provided and

advertised as free of charge.

38. Defendant benefitted greatly from its false advertising scheme, by enlisting a massive user base under the guise of a "free" service, and then profiting off of their subsequent necessary purchases of subscription services.

39. Defendant gave no advance of this change to Plaintiff or other consumers.

40. In fact, Plaintiff learned first of this drastic business model change during the middle of his use of the Tinder App, when a screen popped up on his smart phone's screen on or about March 5, 2015 and stated "You're out of likes. Get more likes in 0:00:00. Get unlimited likes with Tinder Plus for $2.99/mo."

41. A true and correct copy of the screenshot from Plaintiff's iPhone showing this message is shown as follows:



42. Plaintiff was under the impression he already had the ability to get "unlimited

swipes" without having to pay anything additionally to Defendant. Indeed, this was the "free" service that had been advertised to Plaintiff.

43. Having unlimited swipes is a necessary requirement for a user to meaningfully use the Tinder app, due in large part to the vast majority of users' matches being either fake users, escort services, or pornography bots.

44. For these reasons, the limited number of swipes Plaintiff was restricted to prevented him from effectively using the Tinder app at all.

45. In a classic bait and switch, Tinder utilized years of clever marketing, and advertised free social networking and online dating services to consumers, enticing them to become entrenched and "addicted"[7] to the Tinder app's system, only to unexpectedly take away the very services its customers relied on and enjoyed about the Tinder app, and forced them to unexpectedly pay to receive the same level of service they had originally signed up for upon downloading the Tinder app.

46. Upon being unexpectedly provided notice by Defendant that the continued use of Tinder would require additional payment, Plaintiff reluctantly purchased a one month subscription to the Tinder app, for $2.99.

47. Had Defendant abruptly, unfairly and deceptively induced Plaintiff into paying additional subscription fees to use its "free" services, Plaintiff would not have done so.

48. In so misleading Plaintiff and other similarly situated consumers, Defendant deceived Plaintiff and others into believing that the product they downloaded was no longer serviceable and available for use, as part of a widespread and systemic ruse to unfairly, fraudulently and unlawfully induce said consumers into purchasing paid subscription services rather than continue using the already downloaded, free and clear, Tinder app services, at considerable and previously undisclosed additional expense.

---

[7] http://www.huffingtonpost.com/2013/04/09/tinder-dating-app_n_3044472.html

49. In inducing Plaintiff to download and use Defendant's app, Defendant did not inform Plaintiff that additional fees and a subscription to Tinder Pro would be required to receive a reasonably necessary number of regular swipes, rendering the Tinder App worthless to Plaintiff, had he not purchased a Tinder Pro subscription.

50. This misrepresentation and omission was material to Plaintiff's purchase of the Tinder application from Defendant.

51. Regardless of whether Defendant's representations to Plaintiff were true or untrue, such statements had a tendency to mislead Plaintiff and other similarly situated consumers, who relied upon such representations and either ceased use of the app (saving Defendant additional maintenance expense by way of such misrepresentations), or were mislead into purchasing a Tinder Pro subscription at additional expense.

52. Such reliance was reasonable, in light of Defendant's misleading representations.

53. Furthermore, Plaintiff is not alone; Defendant has improperly induced thousands of other consumers to either discontinue usage of Defendant's app or pay a subscription fee. This act and omission constitutes unlawful, unfair, and fraudulent conduct under California's Unfair Competition Law, Business & Professions Code §17200 *et seq.* (the "UCL"); and California's False Advertising Law California Bus. & Prof. Code § 17500, et seq. (the "FAL").

54. Some examples of consumer complaints regarding Tinder's unfair, deceptive and unlawful and fraudulent conduct follow:

| |
|---|
| Sebastian Frohm March 2, 2015 – "I'm done The way you guys are trying to monetize the app is garbage. Really? I have to pay if I like too many people? Immediately uninstall. Thanks guys." |
| Danny B March 4, 2015 – "I 9 bucks a month? I'd rather have ads every 20 swipes than this money grab crap. You have lost a daily user. Goodbye" |
| Mike March 3, 2015 – "Stopped using I don't support companies |

> who try to edge out older users by charging them more.  Sorry Tinder not everyone on your app can be young and hot"
>
> Arune Brekk March 3, 2015 – "Completely ruined by monetization and spam.  Wow, just when I thought this app couldn't get any more annoying with the recent onslaught of spam accounts, you go and start charging for features.  And charging twice as much for people over 30?! It's like you're trying to tank your app.  Well, it was a good run while it lasted."[8]

55.  More consumer complaints regarding these deceptive practices are present on the Google App store, and other such online consumer forums.[9]

### *Tinder's Subsequent Unlawful and Deceptive Withdrawals*

56.  On or about March 30, 2015, despite Plaintiff already having been induced to pay $2.99 to continue with the same level of services previously advertised as free, Plaintiff was unexpectedly prompted again by Defendant to pay additional fees in order to continue utilizing the Tinder Plus services he had previously paid for in full.

57.  Defendant prompted Plaintiff to "Get Plus for $19.99/Mo" despite the fact that Plaintiff had previously paid $2.99 to subscribe to Tinder Plus, and had, prior to that, enjoyed unlimited swipes for free, pursuant to Tinder's advertisements.   A screenshot of the misleading and deceptive message Plaintiff received is shown as follows:

///

///

///

---

[8]    http://img.wonderhowto.com/img/original/60/15/63561061001686/0/635610610016866015.jpg

[9] https://play.google.com/store/apps/details?id=com.tinder&hl=en



58. Plaintiff subsequently purchased Plus again, and paid $19.99.

59. Despite double-paying for Tinder Plus, once at a rate of $2.99, and a second time for $19.99, on or about April 9, 2015, Plaintiff was auto-debited $2.99 by Defendant for Tinder Plus.

60. Plaintiff did not authorize Defendant to continue charging him $2.99 for Tinder Plus.

61. Plaintiff reasonably believed his subscription to Tinder Plus for $19.99 superseded his prior purchase of Tinder Plus for $2.99 per month.

62. Defendant misled Plaintiff and other reasonably minded consumers by charging them multiple times for the same services, and by continuing to automatically withdraw funds from their accounts, under highly misleading terms.

*California's Automatic Purchase Renewal Statute*

63. At all times relevant, Defendant made and continues to make automatic

renewal offers and continuous service offers, as those terms are defined by Cal. Bus. & Prof. Code § 17600, et seq. ("California's Automatic Purchase Renewal Statute") to Plaintiff and other consumers similarly situated.

64. At the time Plaintiff purchased a subscription, Defendant failed to present Defendant's automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner, as defined by California's Automatic Purchase Renewal Statute, before the subscription or purchasing agreement was fulfilled, and in visual or temporal proximity to Defendant's request for consent to the offer.

65. At the time Plaintiff purchased this subscription, Defendant charged Plaintiff for a automatic renewal offer without first obtaining Plaintiff's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms.

66. At the time Plaintiff subscribed to Defendant's services, Plaintiff was subjected to Defendant's unlawful policies and/or practices, as set forth herein, in violation of Cal. Bus. & Prof. Code § 17600, et seq.

67. The material circumstances surrounding this experience by Plaintiff were the same, or nearly the same, as the other class members Plaintiff proposes to represent, and Plaintiff and all putative class members were required to pay, and did pay, money for this subscription marketed and sold by Defendant.

## *Electronic Funds Transfers Act Violations*

68. Plaintiff provided Apple with his bank card number, through the iTunes store.

69. Defendant subsequently charged Plaintiff's account in the amount of $2.99. Plaintiff was never informed that his financial information would be retained for future automatic payments.

70. On or about April 9, 2015, Plaintiff began to notice monthly re-occurring charges being automatically deducted from his account by Defendant.

71. After some investigation, Plaintiff discovered that Defendants were deducting

Case 2:18-cv-03093-JFW-AGW  Document 93-1  Filed 06/03/19  Page 26 of 361  Page ID
#:2006
Case 2:15-cv-01668-MWW-AGW  Document 93-1  Filed 04/20/15  Page 14 of 30  Page ID #:68

sums from his account, on a recurring basis, in order to make payments
towards his Tinder Plus Account, despite his never providing Tinder written
authorization to make these deductions, and despite the fact that the $2.99 per
month withdrawal was canceled and superseded when Plaintiff was prompted
to purchase and did purchase the same services for $19.99 per month.

72. Defendants continued to deduct this monthly sum from Plaintiff for at least
one (1) month without Plaintiff's authorization.

73. Further, Defendants did not provide to Plaintiff, nor did Plaintiff execute, any
written or electronic writing memorializing or authorizing the recurring or
automatic payments.

74. Plaintiff did not provide Defendants either with a written or an electronic
signature authorizing the recurring or automatic payments.

75. Plaintiff alleges such activity to be in violation of the Electronic Funds
Transfer Act, 15 U.S.C. 1693 et seq. ("EFTA"), and its surrounding
regulations, including, but not limited to, 12 C.F.R. §§1005.7, 1005.8, and
1005.9.

### *Unlawful Price Discrimination*

76. In or about March 2015, after rolling out its new forced migration to Tinder
Plus, Tinder announced publically to NPR that it would be charging $9.99 to
consumers for these services (at a 50% discount), but notably, that any
individual who was over 30 years of age would be charged $19.99 for the
identical services.[10]

77. Plaintiff purchased a Tinder Plus account for $19.99, and was not offered a
discount by Tinder, due to his being over 30 years of age.

78. Tinder continues to make such discounts available to customers on the sole
basis of their age.

---

[10]     See     http://www.npr.org/blogs/alltechconsidered/2015/03/02/390236051/
tinders-premium-dating-app-will-cost-you-more-if-youre-older

79. In a statement to NPR, Tinder defended the move and said testing has proved the tiered pricing will work:

> "Over the past few months, we've tested Tinder Plus extensively in several countries," said Tinder spokeswoman Rosette Pambakian. "We've priced Tinder Plus based on a combination of factors, including what we've learned through our testing, and we've found that these price points were adopted very well by certain age demographics. Lots of products offer differentiated price tiers by age, like Spotify does for students, for example. Tinder is no different; during our testing we've learned, not surprisingly, that younger users are just as excited about Tinder Plus but are more budget constrained and need a lower price to pull the trigger."

80. Defendant offers no other discounts for its Tinder Plus services, than that offered to consumers based solely upon their age.

81. On or about March 30, 2015, Plaintiff purchased a Tinder Plus subscription for $19.99, from Tinder through the Tinder App. Plaintiff was charged a total of $19.99 for the purchase. Plaintiff alleges on information and belief that he could have obtained a better rate if he were under 30 years of age, or represented to Tinder that he was under 30 years of age. Plaintiff is not under 30 years of age, and was not made aware of any potential discounts at the time of his purchase of Tinder Plus.

82. Defendant's discriminatory pricing scheme is arbitrary.

<h3 align="center">CLASS ALLEGATIONS</h3>

83. Plaintiff brings this action on his own behalf, and on behalf of all others similarly situated ("The Class").

84. Plaintiff represents, and is a member of the following Class and Subclasses, defined as follows:

> Class:
>> All persons in the United States that downloaded Defendant's app, Tinder, at any time prior to March 2, 2015.
>
> EFTA Subclass:

Case 2:18-cv-03098-JFW-AGR   Document 90-1   Filed 06/03/19   Page 28 of 361   Page ID
#:2008
Case 2:15-cv-01668-MWF-AGR   Document 93-1   Filed 04/20/15   Page 16 of 30   Page ID #:70

All persons in the United States whose bank accounts were debited on a reoccurring basis by Defendants without Defendants obtaining a written authorization signed or similarly authenticated for preauthorized electronic fund transfers within the one year prior to the filing of the Complaint.

Auto-Renewal Subclass:
All persons in the United States that purchased a subscription from Defendant via Defendant's App as part of an automatic renewal plan or continuous service offer for products and services from Defendant within the four years prior to the filing of this Complaint.

Price Discrimination Subclass:
All persons in the United States that purchased a subscription from Defendant via Defendant's App, and who were charged a rate that exceeded the rate available for a comparable purchase by an individual who was offered a discount based on their reported age.

85. Defendant and their employees or agents are excluded from the Class.

86. Plaintiff does not know the exact number of persons in the Class, but believes them to be in the several hundreds, if not thousands, making joinder of all these actions impracticable.

87. The identity of the individual members is ascertainable through Defendant's and/or Defendant's agents' records or by public notice.

88. There is a well-defined community of interest in the questions of law and fact involved affecting the members of The Class. The questions of law and fact common to the Class predominates over questions affecting only individual class members, and include, but are not limited to, the following:

   a. Whether Defendant's practices are "unfair" as defined by California Business and Professions Code § 17200;

   b. Whether Defendant's practices are "illegal" as defined by California Business and Professions Code § 17200;

c. Whether Defendant's practices are "fraudulent" as defined by California Business and Professions Code § 17200;

d. Whether such practice violates California Business and Professions Code § 17200;

e. Whether Defendant violated California Bus. & Prof. Code § 17500, et seq.

f. Whether Defendant violated the Electronic Funds Transfers Act 15 U.S.C. §1693 et. seq

g. Whether Defendant violated California Bus. & Prof. Code § 17600, et seq.

h. Whether Defendant violated the Unruh Civil Rights Act, California Civil Code, Section 51 et seq.

i. Whether Defendant charged Plaintiff and class members' payment method for an automatic renewal or continuous service without first obtaining Plaintiff's and class members' affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms;

j. Whether Defendant's Terms and Conditions contains the automatic renewal offer terms and/or continuous service offer terms as defined by Cal. Bus. & Prof. Code § 17601;

k. Whether Defendant failed to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled, and in visual or temporal proximity to the request for consent to the offer;

l. Whether Cal. Bus. & Prof. Code § 17603 provides for restitution for money paid by class members in circumstances where the goods and services provided by Defendant are deemed an unconditional gift;

m. Whether Plaintiff and the Class are entitled to restitution under Cal. Bus. & Prof. Code §§ 17200-17203;

n. Whether Plaintiff and class members are entitled to declaratory relief, injunctive relief and/or restitution under Cal. Bus. & Prof. Code § 17535, and,

o. The proper formula(s) for calculating and/or restitution owed to Class members.

p. Whether members of the EFTA Subclass entered into agreements with Defendant to have automatic, or recurring, electronic payments drawn from their personal accounts to be paid to Defendants towards settlement of the Class members' alleges services received by Defendants.

q. Whether the members of the EFTA Subclass were not provided with, nor did they execute, written agreements memorializing the automatic or recurring electronic payments.

r. Whether Defendants did not request, nor did it provide, EFTA Subclass members with written agreements memorializing the automatic or recurring electronic payments.

s. Whether the members of the EFTA Subclass did not provide either a written ("wet") or otherwise electronic signature authorizing the automatic or recurring electronic payments.

t. Whether, despite not providing written or electronic authorization for payments to be drawn from their accounts, Defendants took unauthorized payments from EFTA Subclass members' accounts.

u. Whether members of the Classes are entitled to statutory damages;

v. Whether members of the Classes are entitled to declaratory relief; and,

w. Whether members of the Classes are entitled to injunctive relief.

89. Plaintiff will fairly and adequately protect the interest of the Classes.

90. Plaintiff has retained counsel experienced in consumer class action litigation and in handling claims involving unlawful debt collection practices.

91. Plaintiff's claims are typical of the claims of the Class which all arise from the same operative facts involving Defendant's practices.

92. A class action is a superior method for the fair and efficient adjudication of this controversy.

93. Class-wide damages are essential to induce Defendant to comply with the federal and State laws alleged in the Complaint.

94. Class members are unlikely to prosecute such claims on an individual basis since the individual damages are small. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims, e.g., securities fraud.

95. Plaintiff and the Class seek injunctive relief against Defendant to prevent Defendant from forcing consumers to purchase a subscription for Defendant's app.

96. Defendant has acted on grounds generally applicable to the Class thereby making appropriate final declaratory relief with respect to the class as a whole.

97. Members of The Class are likely to unaware of their rights.

98. Plaintiff contemplates providing notice to the putative class members by direct mail in the form of a postcard and via publication.

99. Plaintiffs request certification of a hybrid class combining the elements of Fed. R. Civ. P. 23(b)(3) for monetary damages and Fed. R. Civ. P. 23(b)(2) for equitable relief.

///

///

///

# FIRST CAUSE OF ACTION

## VIOLATION OF THE UNRUH CIVIL RIGHTS ACT

### CALIFORNIA CIVIL CODE, §§ 51 ET. SEQ.

[Against Defendant on Behalf of Plaintiff and the Price Discrimination Subclass]

100. Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

101. California's Unruh Civil Rights Act ("UCRA") prohibits arbitrary discrimination by businesses on the basis of specified classifications, including age.

102. UCRA must be liberally construed to accomplish this purpose.

103. Defendant discriminated reasonable regulation, nor was it rationally related to the services it performs.

104. The Act's remedial provisions are set forth in Civil Code Section 52(a), which provides:

> Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6.

105. Plaintiff and the members of the Price Discrimination Subclass were injured by Tinder's violations of Civil Code Section 51 et seq. and bring this action to recover statutory damages and attorney's fees.

# SECOND CAUSE OF ACTION

## VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT

[Against Defendant on Behalf of Plaintiff and the EFTA Subclass]

106. Section 907(a) of the EFTA, 15 U.S.C. §1693e(a), provides that a

"preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

107. Section 903(9) of the EFTA, 15 U.S.C. § 1693a(9), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

108. Section 205.l0(b) of Regulation E, 12 C.F.R. § 205.l0(b), provides that "[preauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer.  The person that obtains the authorization shall provide a copy to the consumer."

109. Section 205.10(b) of the Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. § 205.l0(b), Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." *Id.* at ¶10(b), comment 5.  The Official Staff Commentary further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." *Id.* at ¶10(b), comment 6.

110. Defendant has debited Plaintiff's and also the EFTA Subclass members' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated for preauthorized electronic fund transfers from Plaintiff's and also the EFTA Subclass members' accounts, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.l0(b).

111. Defendant has debited Plaintiff's and also the EFTA Subclass members' bank accounts on a recurring basis without providing a copy of a written authorization signed or similarly authenticated by Plaintiff or the EFTA Subclass members for preauthorized electronic fund transfers, thereby

violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.l0(b).

## THIRD CAUSE OF ACTION

VIOLATION OF THE CALIFORNIA AUTOMATIC PURCHASE RENEWAL STATUTE
(Cal. Bus. & Prof. Code §§ 17600 et seq.)

[Against Defendant on Behalf of Plaintiff and the Auto-Renewal Subclass]

112. Plaintiff incorporates by reference each allegation set forth above.

113. In or about 2015, as set forth above, Defendant has engaged in the practice of making automatic renewal offers and continuous service offers, as those terms are defined by Cal. Bus. & Prof. Code § 17600, et seq. ("California's Automatic Purchase Renewal Statute"), to California consumers and the general public.

114. Plaintiff and members of the Auto-Renewal Subclass have suffered an "injury in fact" and have lost money and/or property as a result of Defendant's: (a) failure to present Defendant's automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer; (b) charges to the consumer's credit or debit card or the consumer's account for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms; and (c) failure to provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer; and where Defendant also fails to disclose in the acknowledgment how to cancel and allow the consumer to cancel before the consumer pays for the

goods or services, in violation of Cal. Bus. & Prof. Code § 17600, et seq.

115. As a direct and proximate result of Defendant's aforementioned conduct and representations, Defendant received and continues to hold monies rightfully belonging to Plaintiff and other similarly situated consumers

116. As a direct and proximate result of Defendant's violations of Cal. Bus. & Prof. Code § 17600, et seq., Plaintiff and members of the Auto-Renewal Subclass are entitled to a declaration that Defendant violated the California Automatic Purchase Renewal Statute.

117. Plaintiff and the Auto-Renewal Subclass are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING ACT

#### (Cal. Bus. & Prof. Code §§ 17500 et seq.)

118. Plaintiff incorporates by reference each allegation set forth above.

119. Pursuant to California Business and Professions Code section 17500, et seq., it is unlawful to engage in advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

120. Defendant misled consumers by making misrepresentations and untrue statements about the Tinder App, namely, by instructing Plaintiff and other Class Members that "Tinder is free and is available on iPhone and Android phones," when in fat, additional subscription fees are necessary for consumers to meaningfully use the Tinder App.  Defendant failed to disclose to consumers, at the time of their download of the Tinder app, that additional subscription fees would be required, or that they would not be able to receive unlimited swipes.  Defendant knew that their representations and omissions were untrue and misleading, and deliberately made the aforementioned

representations and omissions in order to deceive reasonable consumers like Plaintiff and other Class Members into paying more for something they reasonably believed they had already purchased.

121. As a direct and proximate result of Defendant's misleading and false advertising, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property. Plaintiff reasonably relied upon Defendant's representations regarding the Tinder App, namely that the Ignition App was downloaded free and clear, and would continue to provide unlimited swipes free of charge without any additional payment. In reasonable reliance on Defendant's false advertisements, Plaintiff and other Class Members downloaded the Tinder App. In turn Plaintiff and other Class Members were provided with an App that turned out to be of significantly less value than what they were led to believe they had purchased, and therefore Plaintiff and other Class Members have suffered injury in fact.

122. Further, Defendant subsequently advertised the Tinder Pro App as being $2.99 per month, and unilaterally changed the price to $19.99 per month after Plaintiff had purchased the subscription.

123. Defendant failed to disclose to Plaintiff or other consumers that it reserved the right to change its price at any time and at its sole discretion, and this omission was material to Plaintiff's purchase of the Tinder Pro account for $2.99 per month.

124. The misleading and false advertising described herein presents a continuing threat to Plaintiff and the Class Members in that Defendant persists and continues to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendant's conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiff is entitled to preliminary and permanent injunctive relief ordering Defendant to cease their false advertising, as well as disgorgement and restitution to

Plaintiff and all Class Members Defendant's revenues associated with their false advertising, or such portion of those revenues as the Court may find equitable.

<h2 style="text-align:center">FIFTH CAUSE OF ACTION</h2>

VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200

[Against All Defendants]

125. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

126. Actions for relief under the unfair competition law may be based on any business act or practice that is within the broad definition of the UCL. Such violations of the UCL occur as a result of unlawful, unfair or fraudulent business acts and practices. A plaintiff is required to provide evidence of a causal connection between a defendant's business practices and the alleged harm--that is, evidence that the defendant's conduct caused or was likely to cause substantial injury. It is insufficient for a plaintiff to show merely that the defendant's conduct created a risk of harm. Furthermore, the "act or practice" aspect of the statutory definition of unfair competition covers any single act of misconduct, as well as ongoing misconduct.

UNFAIR

127. California Business & Professions Code § 17200 prohibits any "unfair ... business act or practice." Defendant's acts, omissions, misrepresentations, and practices as alleged herein also constitute "unfair" business acts and practices within the meaning of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Plaintiff reserves the right to allege further conduct which constitutes other unfair business acts or practices. Such conduct is

ongoing and continues to this date.

128. In order to satisfy the "unfair" prong of the UCL, a consumer must show that the injury: (1) is substantial; (2) is not outweighed by any countervailing benefits to consumers or competition; and, (3) is not one that consumers themselves could reasonably have avoided.

129. Here, Defendant's conduct has caused and continues to cause substantial injury to Plaintiff and members of the Class. Plaintiff and members of the Class have suffered injury in fact due to Defendant's unilateral decision to require subscription service for Defendant's app. Thus, Defendant's conduct has caused substantial injury to Plaintiff and the members of the Sub-Class.

130. Moreover, Defendant's conduct as alleged herein solely benefits Defendant while providing no benefit of any kind to any consumer. Such deception utilized by Defendant convinced Plaintiff and members of the Class that the Defendant's app was free and would not require a fee for its reasonable use. Thus, the injury suffered by Plaintiff and the members of the Sub-Class is not outweighed by any countervailing benefits to consumers.

131. Finally, the injury suffered by Plaintiff and members of the Sub-Class is not an injury that these consumers could reasonably have avoided. After Defendant, falsely and universally represented that Defendant's app was available for "free," these consumers suffered injury in fact due to Defendant's refusal to continue to make said app available to consumers that downloaded the app. As such, Defendant took advantage of Defendant's position of perceived power in order to deceive Plaintiff and the Class members to make a payment toward an app only to then require a monthly payment after years of usage. Therefore, the injury suffered by Plaintiff and members of the Class is not an injury which these consumers could reasonably have avoided.

132. Further, Defendant subsequently advertised the Tinder Pro App as being $2.99 per month, and unilaterally changed the price to $19.99 per month after

Plaintiff had purchased the subscription.

133. Defendant failed to disclose to Plaintiff or other consumers that it reserved the right to change its price at any time and at its sole discretion, and this omission was material to Plaintiff's purchase of the Tinder Pro account for $2.99 per month.

134. Thus, Defendant's conduct has violated the "unfair" prong of California Business & Professions Code § 17200.

FRAUDULENT

135. California Business & Professions Code § 17200 prohibits any "fraudulent ... business act or practice."  In order to prevail under the "fraudulent" prong of the UCL, a consumer must allege that the fraudulent business practice was likely to deceive members of the public.

136. The test for "fraud" as contemplated by California Business and Professions Code § 17200 is whether the public is likely to be deceived.  Unlike common law fraud, a § 17200 violation can be established even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage.

137. Further, Defendant subsequently advertised the Tinder Pro App as being $2.99 per month, and unilaterally changed the price to $19.99 per month after Plaintiff had purchased the App.

138. Defendant failed to disclose to Plaintiff or other consumers that it reserved the right to change its price at any time and at its sole discretion, and this omission was material to Plaintiff's purchase of the Tinder Pro account for $2.99 per month.

139. Here, not only were Plaintiff and the Class members likely to be deceived, but these consumers were actually deceived by Defendant.  Such deception is evidenced by the fact that Plaintiff agreed to pay download and use Defendant's "free" app only to be surprised by Defendant's new requirement for a monthly subscription payment.  Further deception occurred when Defendant subsequently advertised its Tinder Pro services for $2.99 per

month, only to change its price to $19.99 per month after Plaintiff had purchased the subscription.

140. Plaintiff's reliance upon Defendant's deceptive statements is reasonable due to the unequal bargaining powers of Defendant and Plaintiff. For the same reason, it is likely that Defendant's fraudulent business practice would deceive other members of the public.

141. Thus, Defendant's conduct has violated the "fraudulent" prong of California Business & Professions Code § 17200.

U<span>NLAWFUL</span>

142. California Business and Professions Code Section 17200, et seq. prohibits "any unlawful…business act or practice."

143. As explained above, Defendant deceived Plaintiff and other Class Members by representing the Tinder App to be a "free" service that provided unlimited swipes, while also failing to disclose that the app would be rendered useless for free users by Defendant's own business decisions, at a later time, and that considerable subscription fees would be required to continue using the applications.

144. Further, Plaintiff has alleged that Defendant violated The Unruh Civil Rights Act, Cal. Civil Code §§ 51 et. seq., the Electronic Funds Transfers Act 15 U.S.C. ¶ 1693 et. seq., and the California Automatic Purchase Renewal Statute California Business & Professions Code ¶¶ 17600 et seq.

145. These representations, omissions, and other unlawful acts by Defendant are therefore an "unlawful" business practice or act under Business and Professions Code Section 17200 et seq.

146. Defendant used false advertising, marketing, and misrepresentations, and otherwise unlawfully induce Plaintiff and Class Members to purchase the Tinder App.   Had Defendant not falsely advertised, marketed, or misrepresented the Tinder App, Plaintiff and Class Members would not have purchased the Class Products, or would have purchased an alternative and

appropriate services that provided the services they believed they were purchasing. Defendant's conduct therefore caused and continues to cause economic harm to Plaintiff and Class Members.

Prayer For Relief

WHEREFORE, Plaintiff, and The Class Members pray for judgment as follows:

- Certifying the Class as requested herein;
- Providing such further relief as may be just and proper.

In addition, Plaintiff, and The Class Members pray for further judgment as follows:

- restitution of the funds improperly obtained by Defendant;
- Any and all statutory enhanced damages;
- All reasonable and necessary attorneys' fees and costs provided by statute, common law or the Court's inherent power;
- for equitable and injunctive and pursuant to California Business and Professions Code § 17203; and,
- any and all other relief that this Court deems just and proper.

Dated**:** April 20, 2015                    **Law Offices of Todd M. Friedman, P.C.**

By:_/s/ Todd M. Friedman_____
          Todd M. Friedman, Esq.
          Attorneys for Plaintiff

Trial By Jury

Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiff and The Class are entitled to, and demand, a trial by jury.

Dated**:** April 20, 2015                    **Law Offices of Todd M. Friedman, P.C.**

By:_/s/ Todd M. Friedman_____
          Todd M. Friedman, Esq.
          Attorneys for Plaintiff

Case 2:18-cv-03093-JFW-AGR   Document 90-1   Filed 06/03/19   Page 42 of 361   Page ID
#:2022
Case 2:15-cv-01688-MMM-AGR   Document 93   Filed 04/20/15   Page 30 of 30   Page ID #:84

Filed electronically on this 20th day of April, 2015, with:

United States District Court CM/ECF system

Notification sent electronically on this 20th day of April, 2015, to:

Honorable Judge Margaret M. Morrow
United States District Court
Central District of California


MANATT, PHELPS & PHILLIPS, LLP
ROBERT H. PLATT
DONALD R. BROWN


s/Adrian R. Bacon
Adrian R. Bacon

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

**Todd M. Friedman (216752)**
**Adrian R. Bacon (280332)**
**Law Offices of Todd M. Friedman, P.C.**
**21550 Oxnard St., Suite 780**
**Woodland Hills, CA 91367**
**Phone: 877-206-4741**
**Fax: 866-633-0228**
**tfriedman@toddflaw.com**
**abacon@toddflaw.com**
*Attorneys for Plaintiff, Lisa Kim, and all others similarly situated*

### UNITED STATE DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA KIM, individually and on behalf of all others similarly situated**,** | **Case No.: 2:18-cv-03093-JFW-AS** |
| Plaintiff, | **PLAINTIFF'S INTERROGATORIES TO OBJECTOR RICH ALLISON, SET ONE** |
| vs. | |
| TINDER, INC.**,** | |
| Defendant. | |

PROPOUNDING PARTY:      Plaintiff LISA KIM

RESPONDING PARTY:       Rich Allison

SET NO:                 One

**TO OBJECTOR RICH ALLISON, AND HIS ATTORNEY OF RECORD:**

　　PLEASE TAKE NOTICE that pursuant to the Federal Rules of Civil Procedure, Plaintiff propounds the following interrogatories:

### INTERROGATORIES

　　Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff requests that Objector Rich Allison answer, **under oath**, the following interrogatories.

1. Describe with reasonable particularity the circumstances leading to your decision to file an objection to the class action settlement in this action, including when you first considered doing so, what documents, information and other factors played a role in your decision, who you discussed that decision with, and what you discussed.

---

**PLAINTIFF'S INTERROGATORIES TO RICH ALLISON**
PAGE 1 OF 2

THE LAW OFFICES OF TODD M. FRIEDMAN, PC
Woodland Hills CA 91367

THE LAW OFFICES OF TODD M. FRIEDMAN, PC
Woodland Hills CA 91367

2.  Identify and describe all email addresses, account user names, and other personally identifying information associated with your Tinder Account, including the name associated with your Tinder Account, any aliases used, and, if a name other than "Rich Allison" was used, your reasons for so doing.

3.  Describe with reasonable particularity your personal relationships with Steve Frye, Allan Candelore, and Alfred Rava, including how long you have known each of these individuals, in what capacity you know one another, how frequently you meet socially, and under what circumstances you come into contact with one another.

4.  Describe with reasonable particularity all conversations you have had with Steve Frye and/or Allan Candelore which relate in any way to this litigation, Mr. Candelore's litigation against Tinder, or your Objection, including what was discussed in specific detail, how many such conversations occurred, and what dates on which these conversations took place.

5.  Describe with reasonable particularity all lawsuits you have ever filed or which were filed on your behalf in which you were a named plaintiff, including the name of each case, parties involved, case number, venue, and a brief description of what the case was about and the laws under which you brought suit.

Date: May 29, 2019           **The Law Offices of Todd M. Friedman, PC**

By: s/ Todd M. Friedman
Todd M. Friedman
*Attorney for Plaintiff*

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is The Law Offices of Todd M. Friedman, PC, 21550 Oxnard St., Suite 780, Woodland Hills, CA 91367.   On May 29, 2019, I served the herein described document(s):

**PLAINTIFF'S INTERROGATORIES TO RICH ALLISON, SET ONE**

☒     MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Woodland Hills, California addressed as set forth below.

☒     E-MAIL – by attaching the document(s) listed above to an email and sending via the net to the email addresses listed below.

| MANATT, PHELPS & PHILLIPS, LLP<br>ROBERT H. PLATT<br>rplatt@manatt.com<br>DONALD R. BROWN<br>dbrown@manatt.com<br>11355 West Olympic Boulevard<br>Los Angeles, CA 90064-1614 | Kimberly Kralowec<br>Kralowec Law, P.C.<br>750 Battery Street, Suite 700<br>San Francisco, CA 94111<br>kkralowec@kraloweclaw.com |
|---|---|
| Alfred G. Rava<br>Rava Law Firm<br>3667 Voltaire Street<br>San Diego, CA 92106<br>alrava@cox.net | Danielle E. Leonard<br>Altshuller Berzon LLP<br>177 Post Street, Suite 300<br>San Francisco, CA 94108<br>dleonard@altber.com |

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct.  Executed on May 29, 2019 at Woodland Hills, California.

*s/ Lauren Walker*
Lauren Walker

PROOF OF SERVICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

**Todd M. Friedman (216752)**
**Adrian R. Bacon (280332)**
**Law Offices of Todd M. Friedman, P.C.**
**21550 Oxnard St., Suite 780**
**Woodland Hills, CA 91367**
**Phone: 877-206-4741**
**Fax: 866-633-0228**
**tfriedman@toddflaw.com**
**abacon@toddflaw.com**
*Attorneys for Plaintiff, Lisa Kim, and all others similarly situated*

THE LAW OFFICES OF TODD M. FRIEDMAN, PC
Woodland Hills CA 91367

### UNITED STATE DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA KIM, individually and on behalf of all others similarly situated**,** | **Case No.: 2:18-cv-03093-JFW-AS** |
| Plaintiff, | **PLAINTIFF'S INTERROGATORIES TO OBJECTOR STEVE FRYE, SET ONE** |
| vs. | |
| TINDER, INC.**,** | |
| Defendant. | |

PROPOUNDING PARTY:       Plaintiff LISA KIM

RESPONDING PARTY:       Steve Frye

SET NO:       One

**TO OBJECTOR STEVE FRYE, AND HIS ATTORNEY OF RECORD:**

PLEASE TAKE NOTICE that pursuant to the Federal Rules of Civil Procedure, Plaintiff propounds the following interrogatories:

### **INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff requests that Objector Steve Frye answer, **under oath**, the following interrogatories.

1. Describe with reasonable particularity the circumstances leading to your decision to file an objection to the class action settlement in this action, including when you first considered doing so, what documents, information and other factors played a role in your decision, who you discussed that decision with, and what you discussed.

THE LAW OFFICES OF TODD M. FRIEDMAN, PC
Woodland Hills CA 91367

2. Describe with reasonable particularity the circumstances of when, why and how you have used the Tinder App, including both with respect to your use of the free App, and Tinder Plus services.  When answering this Interrogatory be sure to state when you first signed up for each type of service, why you chose to do so, how frequently you have used the service, and how you have used the service.

3. Describe with reasonable particularity your personal relationships with Rich Allison, Allan Candelore, and Alfred Rava, including how long you have known each of these individuals, in what capacity you know one another, how frequently you meet socially, and under what circumstances you come into contact with one another.

4. Describe with reasonable particularity all conversations you have had with Rich Allison and/or Allan Candelore which relate in any way to this litigation, Mr. Candelore's litigation against Tinder, or your Objection, including what was discussed in specific detail, how many such conversations occurred, and what dates on which these conversations took place.

5. Describe with reasonable particularity all lawsuits you have ever filed or which were filed on your behalf in which you were a named plaintiff, including the name of each case, parties involved, case number, venue, and a brief description of what the case was about and the laws under which you brought suit.

Date: May 29, 2019          **The Law Offices of Todd M. Friedman, PC**

By: s/ Todd M. Friedman
Todd M. Friedman
*Attorney for Plaintiff*

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is The Law Offices of Todd M. Friedman, PC, 21550 Oxnard St., Suite 780, Woodland Hills, CA 91367.   On May 29, 2019, I served the herein described document(s):

**PLAINTIFF'S INTERROGATORIES TO STEVE FRYE**

☒     MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Woodland Hills, California addressed as set forth below.

☒     E-MAIL – by attaching the document(s) listed above to an email and sending via the net to the email addresses listed below.

| | |
|---|---|
| MANATT, PHELPS & PHILLIPS, LLP<br>ROBERT H. PLATT<br>rplatt@manatt.com<br>DONALD R. BROWN<br>dbrown@manatt.com<br>11355 West Olympic Boulevard<br>Los Angeles, CA 90064-1614 | Kimberly Kralowec<br>Kralowec Law, P.C.<br>750 Battery Street, Suite 700<br>San Francisco, CA 94111<br>kkralowec@kraloweclaw.com |
| Alfred G. Rava<br>Rava Law Firm<br>3667 Voltaire Street<br>San Diego, CA 92106<br>alrava@cox.net | Danielle E. Leonard<br>Altshuller Berzon LLP<br>177 Post Street, Suite 300<br>San Francisco, CA 94108<br>dleonard@altber.com |

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct.  Executed on May 29, 2019 at Woodland Hills, California.

*s/ Lauren Walker*
Lauren Walker

**PROOF OF SERVICE**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT D

Kimberly A. Kralowec (Cal. Bar No. 163158)
KRALOWEC LAW, P.C.
750 Battery Street, Suite 700
San Francisco, CA  94111
Telephone:   (415) 546-6800
Facsimile:    (415) 546-6801
Email:        kkralowec@kraloweclaw.com

Danielle E. Leonard (Cal. Bar No. 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone:   (415) 421-7151
Facsimile:    (415) 362-8064
Email:        dleonard@altber.com

Alfred G. Rava (Cal. Bar No. 188318)
RAVA LAW FIRM
3667 Voltaire Street
San Diego, CA 92106
Telephone:   (619) 238-1993
Facsimile:    (619) 374-7288
Email:        alrava@cox.net

*Attorneys for Objectors Rich Allison and Steve Frye*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA KIM, individually on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>TINDER, INC., a Delaware Corporation; MATCH GROUP, LLC, a Delaware limited liability company; MATCH GROUP, INC., a Delaware corporation; and DOES 1 through 10, inclusive, and each of them,<br><br>        Defendants. | Case No. 2:18-CV-03093 JFW (AS)<br><br>**RESPONSE OF CLASS MEMBER OBJECTOR RICH ALLISON TO PLAINTIFF LISA KIM'S FIRST SET OF INTERROGATORIES** |

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and this Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions (ECF No. 79), class member objector Rich Allison sets forth herein answers and objections to Plaintiff Lisa Kim's First Set of Interrogatories, dated May 29, 2019.

No incidental or implied admissions are intended in these responses. Mr. Allison's response to all or any part of the Interrogatories should not be taken as an admission that (1) Mr. Allison accepts or admits the existence of any fact(s) set forth or assumed by that Interrogatory; (2) Mr. Allison has possession, custody or control of knowledge responsive to that Interrogatory; or (3) documents exist responsive to that Interrogatory.  Mr. Allison response to all or any part of any Interrogatory is not intended to be, and shall not be, a waiver by Mr. Allison of all or any part of any objection(s) to that Interrogatory.

## GENERAL OBJECTIONS

1.     Mr. Allison objects to the Interrogatories insofar as they seek information beyond that required under the Federal Rules of Civil Procedure, the applicable Local Rules, and this Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions (ECF No. 79).

2.     Mr. Allison objects to the Interrogatories to the extent they purport to require information not in his possession, custody, or control.

3.     Mr. Allison objects to the Interrogatories to the extent that they seek information that is publicly available or otherwise already in Plaintiff's possession, custody or control, and assert that such Interrogatories are unduly burdensome.

4.     Mr. Allison objects to the Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work-product doctrine or other applicable privilege.  No such information will be provided.

5.      Mr. Allison's responses are not intended to be, nor shall be deemed, an admission of the matters stated, implied or assumed by the Interrogatories, including any admission that Rule 33 applies to class member objectors.  In responding, Mr. Allison neither waives nor intends to waive, but expressly reserve, any and all objections as to the admissibility at trial of any information or documents produced. Disclosure of information shall not constitute a waiver of any ground for objecting to disclosure with respect to other documents, information or material relating thereto or concerning the same issues, the subject matter thereof or any information contained therein.

6.      Each of the following responses shall be deemed to incorporate and be subject to the foregoing objections.

## RESPONSES TO INTERROGATORY SET ONE

### INTERROGATORY NO. 1:

Describe with reasonable particularity the circumstances leading to your decision to file an objection to the class action settlement in this action, including when you first considered doing so, what documents, information and other factors played a role in your decision, who you discussed that decision with, and what you discussed.

### RESPONSE TO INTERROGATORY NO. 1:

Mr. Allison incorporates by reference the General Objections.  Mr. Allison also objects to this Interrogatory as COMPOUND, as it contains multiple discrete subparts, and therefore EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions, which limited Plaintiff to "five questions related to their decision to object to the settlement."  ECF No. 79. This question encompasses at least five specific subparts i.e., five specific questions, and thus totals the five questions the Court permitted in its Order.

1   Mr. Allison also objects to this Interrogatory to the extent that it calls for

2   information that is protected by ATTORNEY-CLIENT PRIVILEGE.  Mr. Allison

3   also objects to this Interrogatory as impermissibly VAGUE and AMBIGUOUS as

4   to the terms "circumstances," "leading to your decision," "considered doing so,"

5   "factors," "played a role in your decision," and "that decision."  Mr. Allison also

6   objects to the Interrogatory as UNDULY BURDENSOME, as calls for an

7   extensive NARRATIVE regarding a series of questions, rather than asking a

8   specific question.

9   Subject to and notwithstanding these objections, Mr. Allison responds as

10  follows:  I became aware of the existence of a settlement agreement in this case at

11  some point in time after Plaintiff Kim filed the agreement with the Court and asked

12  the Court for approval.  I do not recall the exact date but it was earlier this year

13  (2019).  I believe the settlement agreement is unfair and inadequate, based on what

14  I understand it offers class members.  I set forth my reasons in my Objection

15  Declaration (ECF No. 65) and those were further explained in the supporting

16  documents filed by my counsel.  I have not discussed the reasons for my decision

17  set forth in those documents, or the information I considered in deciding to object

18  to this class action settlement, with anyone other than counsel.

19  **INTERROGATORY NO. 2:**

20      Identify and describe all email addresses, account user names, and other

21      personally identifying information associated with your Tinder Account,

22      including the name associated with your Tinder Account, any aliases used,

23      and, if a name other than "Rich Allison" was used, your reasons for so

24      doing.

25  **RESPONSE TO INTERROGATORY NO. 2:**

26  Mr. Allison incorporates by reference the General Objections.  Mr. Allison

27  also objects to this Interrogatory in its entirety on the ground that it is

28

1   COMPOUND and on the additional ground that Interrogatory No. 1 already

2   completes the total of five questions the Court permitted in its Order.  ECF 79.

3        Mr. Allison also objects to this Interrogatory in its entirety on the ground

4   that it EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex

5   Parte Application to Compel Depositions, which limited Plaintiff to "questions

6   *related to their decision to object to the settlement*." ECF No. 79 (emphasis added).

7   This Interrogatory does not ask a question related to Mr. Allison's decision to

8   object.

9        Mr. Allison also objects to this Interrogatory as NOT RELEVANT to any

10  issue in dispute.  Plaintiff has previously admitted that Mr. Allison is on the class

11  list.  Mr. Allison also objects that responsive information regarding his Tinder

12  account has already been provided in his Objection Declaration (ECF No. 65), in

13  full compliance with all requirements imposed upon objecting class members in

14  the class notice.  The Interrogatory, purporting to require him to re-state

15  information already provided in his Objection Declaration (ECF No. 65), is NOT

16  PROPORTIONAL to the needs of the case and is UNDULY BURDENSOME.

17  Mr. Allison also objects on the grounds of PERSONAL PRIVACY.  Plaintiff has

18  no basis for need for the requested information regarding Mr. Allison's Tinder

19  account.

20       Subject to and notwithstanding these objections, Mr. Allison responds as

21  follows:  See my Objection Declaration (ECF No. 65), which is incorporated by

22  reference as though stated here in full. I did not use an "alias" or any name other

23  than Rich Allison for my Tinder account.

24  **INTERROGATORY NO. 3:**

25       Describe with reasonable particularity your personal relationships with Steve

26       Frye, Allan Candelore, and Alfred Rava, including how long you have

27       known each of these individuals, in what capacity you know one another,

28

1  how frequently you meet socially, and under what circumstances you come

2  into contact with one another.

3  **RESPONSE TO INTERROGATORY NO. 3:**

4       Mr. Allison incorporates by reference the General Objections.  Mr. Allison

5  also objects to this Interrogatory in its entirety on the ground that Interrogatory No.

6  1 completes the total of five questions the Court permitted in its Order.  ECF 79.

7       Mr. Allison also objects to this Interrogatory in its entirety on the ground

8  that it EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex

9  Parte Application to Compel Depositions, which limited Plaintiff to "questions

10 *related to their decision to object to the settlement*." ECF No. 79 (emphasis added).

11 This Interrogatory does not ask a question related to Mr. Allison's decision to

12 object to this settlement.

13      Mr. Allison also objects to this Interrogatory on the ground that it seeks

14 information that is NOT RELEVANT to any issue before the Court.  Mr. Allison

15 also objects to this Interrogatory on the ground that it is COMPOUND, and

16 therefore exceeds the Court's limitation of these Interrogatories to five questions.

17 ECF No. 79.  Mr. Allison also objects to this Interrogatory to the extent that it calls

18 for information that is protected by ATTORNEY-CLIENT PRIVILEGE.  Mr.

19 Allison also objects to this Interrogatory as impermissibly VAGUE and

20 AMBIGUOUS as to the terms "personal relationships," "capacity," "frequently,"

21 "meet socially," "circumstances," and "contact."  Mr. Allison also objects on the

22 grounds of PERSONAL PRIVACY and on the grounds that the Interrogatory is

23 NOT PROPORTIONAL to the needs of the case and is UNDULY

24 BURDENSOME.  Plaintiff has no basis for questions regarding Mr. Allison's

25 relationships, including any questions regarding his counsel, in general, and no

26 need for the specific information requested here.

27

28

**INTERROGATORY NO. 4:**

Describe with reasonable particularity all conversations you have had with Steve Frye and/or Allan Candelore which relate in any way to this litigation, Mr. Candelore's litigation against Tinder, or your Objection, including what was discussed in specific detail, how many such conversations occurred, and what dates on which these conversations took place.

**RESPONSE TO INTERROGATORY NO. 4:**

Mr. Allison incorporates by reference the General Objections. Mr. Allison also objects to this Interrogatory in its entirety on the ground that Interrogatory No. 1 completes the five questions permitted by the Court. ECF 79. Mr. Allison also objects to this Interrogatory as COMPOUND, and exceeding the scope of the Court's limitation to five questions on that ground as well. ECF 79.

Mr. Allison also objects to this Interrogatory on the ground that it EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions, which limited Plaintiff to "questions *related to their decision to object to the settlement*." ECF No. 79 (emphasis added). In particular, the following go beyond an inquiry into Mr. Allison's decision to object to the settlement: conversations "that relate in any way" to this litigation; conversations "that relate in any way" to Mr. Candelore's litigation against Tinder. Mr. Allison also objects to these questions as NOT RELEVANT to any issue before the Court.

Mr. Allison therefore limits this response to: "all conversations you have had with Steve Frye and/or Allan Candelore which relate in any way to… your Objection, including what was discussed in specific detail, how many such conversations occurred, and what dates on which these conversations took place." Mr. Allison objects to this question to the extent that it calls for information that is protected by ATTORNEY-CLIENT PRIVILEGE. Mr. Allison also objects to this

question as impermissibly VAGUE and AMBIGUOUS with respect to the term "which relate in any way."

Subject to and notwithstanding these objections, Mr. Allison responds as follows:  The only communications, which related in any way to my Objection, included my attorneys.

**INTERROGATORY NO. 5:**

Describe with reasonable particularity all lawsuits you have ever filed or which were filed on your behalf in which you were a named plaintiff, including the name of each case, parties involved, case number, venue, and a brief description of what the case was about and the laws under which you brought suit.

**RESPONSE TO INTERROGATORY NO. 5:**

Mr. Allison incorporates by reference the General Objections.  Mr. Allison also objects to this Interrogatory in its entirety on the ground that Interrogatory No. 1 completes the five questions permitted by the Court.  ECF 79.

Mr. Allison also objects to this Interrogatory in its entirety on the ground that it EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions, which limited Plaintiff to "questions *related to their decision to object to the settlement*." ECF No. 79 (emphasis added). This Interrogatory does not ask a question related to Mr. Allison's decision to object.  Mr. Allison also objects to this Interrogatory as COMPOUND, and exceeding the scope of the Court's limitation to five questions on that ground as well.  ECF 79.  Mr. Allison also objects to this Interrogatory as NOT PROPORTIONAL to the needs of the case and as UNDULY BURDENSOME in that it seeks publicly-filed information equally available to Plaintiff.

1    As to Objections:

2    Dated:  May 31, 2019

3

4                              By: _____

5                                  Alfred G. Rava
                                   RAVA LAW FIRM

6                                  Kimberly A. Kralowec

7                                  KRALOWEC LAW, P.C.

8                                  Danielle E. Leonard

9                                  ALTSHULER BERZON LLP

10

11                                 *Counsel for Objectors Rich Allison and Steve*

12                                 *Frye*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION OF INTERROGATORY ANSWERS**

I, Rich Allison, believe based on reasonable inquiry that the foregoing answers are true and correct to the best of my knowledge, information, and belief. I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at San Diego, California on May 31, 2019.

Rich Allison

## **PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is the Rava Law Firm, 3667 Voltaire Street, San Diego, California, 92106.

On June 1, 2019, I served Rich Allison's Responses and Objections to Plaintiff's Special Interrogatories, Set One by (1) MAIL by placing this document in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below, and by (2) E-MAIL by attaching this document to an email and sending the email to the below email addresses.

Todd M. Friedman
Adrian R. Bacon
Law Offices of Todd M. Friedman, P.C.
21550 Oxnard St., Suite 780
Woodland Hills, CA 91367
tfriedman@toddflaw.com
abacon@toddflaw.com
*Attorneys for Plaintiff Lisa Kim and all others similarly situated*

John P. Kristensen
Kristensen Weisberg, LLP
12540 Beatrice Street, Suite 200
Los Angeles, California 90066
john@kristensenlaw.com
*Attorneys for Plaintiff Lisa Kim and all others similarly situated*

Robert Platt
Donald Brown
Manatt Phelps & Phillips, LLP
11355 W. Olympic Blvd.
Los Angeles, CA  90064
dbrown@manatt.com
rplatt@manatt.com
*Attorneys for Defendant Tinder, Inc.*

Kimberly Kralowec
Kralowec Law, P.C.
750 Battery Street, Suite 700
San Francisco, CA 94111
kkralowec@kraloweclaw.com
*Attorney for Objectors Rich Allison and Steve Frye*

Danielle E. Leonard
Altshuller Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
dleonard@altber.com
*Attorney for Objectors Rich Allison and Steve Frye*

Andrew Wheeler-Berliner
Brittany McClintick
DAVIS & NORRIS, LLP
2154 Highland Avenue South
Birmingham, AL 35205
andrew@TheBerlinerFirm.com
bmcclintick@davisnorris.com
*Attorneys for Objectors Jay Rodriguez, Sabrina Johnson, Luis Pena, and Richard Mojica*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct. Executed on June 1, 2019 at San Diego, California.

*/s/ Alfred G. Rava*
Alfred G. Rava

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT E

1  Kimberly A. Kralowec (Cal. Bar No. 163158)
2  KRALOWEC LAW, P.C.
   750 Battery Street, Suite 700
3  San Francisco, CA  94111
   Telephone:   (415) 546-6800
4  Facsimile:   (415) 546-6801
   Email:       kkralowec@kraloweclaw.com
5
6  Danielle E. Leonard (Cal. Bar No. 218201)
   ALTSHULER BERZON LLP
7  177 Post Street, Suite 300
   San Francisco, CA 94108
8  Telephone:   (415) 421-7151
   Facsimile:   (415) 362-8064
9  Email:       dleonard@altber.com

10 Alfred G. Rava (Cal. Bar No. 188318)
11 RAVA LAW FIRM
   3667 Voltaire Street
12 San Diego, CA 92106
   Telephone:   (619) 238-1993
13 Facsimile:   (619) 374-7288
   Email:       alrava@cox.net
14

15 *Attorneys for Objectors Rich Allison and Steve Frye*

16              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
17

18 LISA KIM, individually on behalf of          Case No. 2:18-CV-03093 JFW (AS)
   herself and all others similarly situated,
19                                              **RESPONSE OF CLASS
20              Plaintiff,                       MEMBER OBJECTOR STEVE
                                                FRYE TO PLAINTIFF LISA
21       v.                                     KIM'S FIRST SET OF
                                                INTERROGATORIES**
22 TINDER, INC., a Delaware Corporation;
   MATCH GROUP, LLC, a Delaware
23 limited liability company; MATCH
   GROUP, INC., a Delaware corporation;
24 and DOES 1 through 10, inclusive, and
   each of them,
25
26              Defendants.
27

28

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and this Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions (ECF No. 79), class member objector Steve Frye sets forth herein answers and objections to Plaintiff Lisa Kim's First Set of Interrogatories, dated May 29, 2019.

No incidental or implied admissions are intended in these responses. Mr. Frye's response to all or any part of the Interrogatories should not be taken as an admission that (1) Mr. Frye accepts or admits the existence of any fact(s) set forth or assumed by that Interrogatory; (2) Mr. Frye has possession, custody or control of knowledge responsive to that Interrogatory; or (3) documents exist responsive to that Interrogatory.  Mr. Frye response to all or any part of any Interrogatory is not intended to be, and shall not be, a waiver by Mr. Frye of all or any part of any objection(s) to that Interrogatory.

## GENERAL OBJECTIONS

1.    Mr. Frye objects to the Interrogatories insofar as they seek information beyond that required under the Federal Rules of Civil Procedure, the applicable Local Rules, and this Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions (ECF No. 79).

2.    Mr. Frye objects to the Interrogatories to the extent they purport to require information not in his possession, custody, or control.

3.    Mr. Frye objects to the Interrogatories to the extent that they seek information that is publicly available or otherwise already in Plaintiff's possession, custody or control, and assert that such Interrogatories are unduly burdensome.

4.    Mr. Frye objects to the Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work-product doctrine or other applicable privilege.  No such information will be provided.

5.      Mr. Frye's responses are not intended to be, nor shall be deemed, an admission of the matters stated, implied or assumed by the Interrogatories, including any admission that Rule 33 applies to class member objectors.  In responding, Mr. Frye neither waives nor intends to waive, but expressly reserve, any and all objections as to the admissibility at trial of any information or documents produced. Disclosure of information shall not constitute a waiver of any ground for objecting to disclosure with respect to other documents, information or material relating thereto or concerning the same issues, the subject matter thereof or any information contained therein.

6.      Each of the following responses shall be deemed to incorporate and be subject to the foregoing objections.

## RESPONSES TO INTERROGATORY SET ONE

**INTERROGATORY NO. 1:**

> Describe with reasonable particularity the circumstances leading to your decision to file an objection to the class action settlement in this action, including when you first considered doing so, what documents, information and other factors played a role in your decision, who you discussed that decision with, and what you discussed.

**RESPONSE TO INTERROGATORY NO. 1:**

Mr. Frye incorporates by reference the General Objections.  Mr. Frye also objects to this Interrogatory as COMPOUND, as it contains multiple discrete subparts, and therefore EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions, which limited Plaintiff to "five questions related to their decision to object to the settlement."  ECF No. 79. This question encompasses at least five specific subparts i.e., five specific questions, and thus totals the five questions the Court permitted in its Order.

Mr. Frye also objects to this Interrogatory to the extent that it calls for information that is protected by ATTORNEY-CLIENT PRIVILEGE.  Mr. Frye also objects to this Interrogatory as impermissibly VAGUE and AMBIGUOUS as to the terms "circumstances," "leading to your decision," "considered doing so," "factors," "played a role in your decision," and "that decision."  Mr. Frye also objects to the Interrogatory as UNDULY BURDENSOME, as calls for an extensive NARRATIVE regarding a series of questions, rather than asking a specific question.

Subject to and notwithstanding these objections, Mr. Frye responds as follows:

I do not recall the exact date I became aware of the settlement in this case.  I understood previous to that that I was a potential class member in another case, and I now understand that this settlement seeks to wipe out those claims.  I became aware of the settlement at some point after the Plaintiff filed for approval in this case, probably early in 2019.  I read the settlement agreement.  I do not believe the benefits offered are adequate at all, and I object to the attempt to release these claims for so little, e.g., the law entitles class members to $4,000 for each and every offense, which is far, far more than the paltry $25 per class member in the settlement; plus, I no longer subscribe to Tinder Plus, so the Super Likes are of no value to me. I set forth the reasons for my objections in my Objection Declaration (ECF No. 66) and those were further explained in the supporting documents filed by my counsel.  I have not discussed the reasons for my decision set forth in those documents, or the information I considered in deciding to object to this class action settlement, with anyone other than counsel

**INTERROGATORY NO. 2:**

Identify and describe all email addresses, account user names, and other personally identifying information associated with your Tinder Account,

including the name associated with your Tinder Account, any aliases used, and, if a name other than "Steve Frye" was used, your reasons for so doing.

**RESPONSE TO INTERROGATORY NO. 2:**

Mr. Frye incorporates by reference the General Objections.  Mr. Frye also objects to this Interrogatory in its entirety on the ground that it is COMPOUND and on the additional ground that Interrogatory No. 1 already completes the five questions the Court permitted in its Order.  ECF 79.

Mr. Frye also objects to this Interrogatory in its entirety on the ground that it EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions, which limited Plaintiff to "questions *related to their decision to object to the settlement*." ECF No. 79 (emphasis added).  This Interrogatory does not ask a question related to Mr. Frye's decision to object.

Mr. Frye also objects to this Interrogatory as NOT RELEVANT to any issue in dispute.  Plaintiff has previously admitted that Mr. Frye is on the class list.  Mr. Frye also objects that responsive information regarding his Tinder account has already been provided in his Objection Declaration (ECF No. 66), in full compliance with all requirements imposed upon objecting class members in the class notice.  The Interrogatory, purporting to require him to re-state information already provided in his Objection Declaration (ECF No. 66), is NOT PROPORTIONAL to the needs of the case and is UNDULY BURDENSOME. Mr. Frye also objects on the grounds of PERSONAL PRIVACY.  Plaintiff has no basis for need for the requested information regarding Mr. Frye's Tinder account.

Subject to and notwithstanding these objections, Mr. Frye responds as follows:  See my Objection Declaration (ECF No. 66), which is incorporated by reference as though stated here in full. I did not use an "alias" or any name other than Steve Frye for my Tinder account.

**INTERROGATORY NO. 3:**

Describe with reasonable particularity your personal relationships with Rich Allison, Allan Candelore, and Alfred Rava, including how long you have known each of these individuals, in what capacity you know one another, how frequently you meet socially, and under what circumstances you come into contact with one another.

**RESPONSE TO INTERROGATORY NO. 3:**

Mr. Frye incorporates by reference the General Objections.  Mr. Frye also objects to this Interrogatory in its entirety on the ground that Interrogatory No. 1 completes the total of five questions the Court permitted in its Order.  ECF 79.

Mr. Frye also objects to this Interrogatory in its entirety on the ground that it EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions, which limited Plaintiff to "questions *related to their decision to object to the settlement*." ECF No. 79 (emphasis added).  This Interrogatory does not ask a question related to Mr. Frye's decision to object to this settlement.

Mr. Frye also objects to this Interrogatory on the ground that it seeks information that is NOT RELEVANT to any issue before the Court.  Mr. Frye also objects to this Interrogatory on the ground that it is COMPOUND, and therefore exceeds the Court's limitation of these Interrogatories to five questions.  ECF No. 79.  Mr. Frye also objects to this Interrogatory to the extent that it calls for information that is protected by ATTORNEY-CLIENT PRIVILEGE.  Mr. Frye also objects to this Interrogatory as impermissibly VAGUE and AMBIGUOUS as to the terms "personal relationships," "capacity," "frequently," "meet socially," "circumstances," and "contact."  Mr. Frye also objects on the grounds of PERSONAL PRIVACY and on the grounds that the Interrogatory is NOT PROPORTIONAL to the needs of the case and is UNDULY BURDENSOME.

Plaintiff has no basis for questions regarding Mr. Frye's relationships, including any questions regarding his counsel, in general, and no need for the specific information requested here.

**INTERROGATORY NO. 4:**

Describe with reasonable particularity all conversations you have had with Rich Allison and/or Allan Candelore which relate in any way to this litigation, Mr. Candelore's litigation against Tinder, or your Objection, including what was discussed in specific detail, how many such conversations occurred, and what dates on which these conversations took place.

**RESPONSE TO INTERROGATORY NO. 4:**

Mr. Frye incorporates by reference the General Objections. Mr. Frye also objects to this Interrogatory in its entirety on the ground that Interrogatory No. 1 completes the five questions the Court permitted in its Order. ECF 79. Mr. Frye also objects to this Interrogatory as COMPOUND, and exceeding the scope of the Court's limitation to five questions on that ground as well. ECF 79.

Mr. Frye also objects to this Interrogatory on the ground that it EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions, which limited Plaintiff to "questions *related to their decision to object to the settlement*." ECF No. 79 (emphasis added). In particular, the following go beyond an inquiry into Mr. Frye's decision to object to the settlement: conversations "that relate in any way" to this litigation; conversations "that relate in any way" to Mr. Candelore's litigation against Tinder. Mr. Frye also objects to these questions as NOT RELEVANT to any issue before the Court.

Mr. Frye therefore limits this response to: "all conversations you have had with Steve Frye and/or Allan Candelore which relate in any way to… your Objection, including what was discussed in specific detail, how many such

conversations occurred, and what dates on which these conversations took place." Mr. Frye objects to this question to the extent that it calls for information that is protected by ATTORNEY-CLIENT PRIVILEGE.   Mr. Frye also objects to this question as impermissibly VAGUE and AMBIGUOUS with respect to the term "which relate in any way."

Subject to and notwithstanding these objections, Mr. Frye responds as follows:  The only communications, which related in any way to my Objection, included my attorneys.

**INTERROGATORY NO. 5:**

Describe with reasonable particularity all lawsuits you have ever filed or which were filed on your behalf in which you were a named plaintiff, including the name of each case, parties involved, case number, venue, and a brief description of what the case was about and the laws under which you brought suit.

**RESPONSE TO INTERROGATORY NO. 5:**

Mr. Frye incorporates by reference the General Objections.  Mr. Frye also objects to this Interrogatory in its entirety on the ground that Interrogatory No. 1 completes the five questions the Court permitted in its Order.  ECF 79.

Mr. Frye also objects to this Interrogatory in its entirety on the ground that it EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions, which limited Plaintiff to "questions *related to their decision to object to the settlement*." ECF No. 79 (emphasis added).  This Interrogatory does not ask a question related to Mr. Frye's decision to object.  Mr. Frye also objects to this Interrogatory as COMPOUND, and exceeding the scope of the Court's limitation to five questions on that ground as well.  ECF 79.  Mr. Frye also objects to this Interrogatory as NOT PROPORTIONAL to the needs of the

1 | case and as UNDULY BURDENSOME in that it seeks publicly-filed information
2 | equally available to Plaintiff.
3 |
4 |
5 |
6 | As to Objections:
7 | Dated: May 31, 2019
8 |
9 | By: _____
  | Alfred G. Rava
10 | RAVA LAW FIRM
11 |
  | Kimberly A. Kralowec
12 | KRALOWEC LAW, P.C.
13 |
  | Danielle E. Leonard
14 | ALTSHULER BERZON LLP
15 |
16 | *Counsel for Objectors Rich Allison and Steve*
17 | *Frye*
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

1

## VERIFICATION OF INTERROGATORY ANSWERS

2    I, Steve Frye, believe based on reasonable inquiry that the foregoing answers

3  are true and correct to the best of my knowledge, information, and belief.  I verify

4  under penalty of perjury under the laws of the United States of America that the

5  foregoing is true and correct.

6    Executed at _____, California on _____, 2019.

7

8

9

10  _____

11  Steve Frye

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>PROOF OF SERVICE</u>

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is the Rava Law Firm, 3667 Voltaire Street, San Diego, California, 92106.

On June 1, 2019, I served Steve Frye's Responses and Objections to Plaintiff's Special Interrogatories, Set One by (1) MAIL by placing this document in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below, and by (2) E-MAIL by attaching this document to an email and sending the email to the below email addresses.

Todd M. Friedman
Adrian R. Bacon
Law Offices of Todd M. Friedman, P.C.
21550 Oxnard St., Suite 780
Woodland Hills, CA 91367
tfriedman@toddflaw.com
abacon@toddflaw.com
*Attorneys for Plaintiff Lisa Kim and all others similarly situated*

John P. Kristensen
Kristensen Weisberg, LLP
12540 Beatrice Street, Suite 200
Los Angeles, California 90066
john@kristensenlaw.com
*Attorneys for Plaintiff Lisa Kim and all others similarly situated*

Robert Platt
Donald Brown
Manatt Phelps & Phillips, LLP
11355 W. Olympic Blvd.
Los Angeles, CA  90064
dbrown@manatt.com
rplatt@manatt.com
*Attorneys for Defendant Tinder, Inc.*

Kimberly Kralowec
Kralowec Law, P.C.
750 Battery Street, Suite 700
San Francisco, CA 94111
kkralowec@kraloweclaw.com
*Attorney for Objectors Rich Allison and Steve Frye*

Danielle E. Leonard
Altshuller Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
dleonard@altber.com
*Attorney for Objectors Rich Allison and Steve Frye*

Andrew Wheeler-Berliner
Brittany McClintick
DAVIS & NORRIS, LLP
2154 Highland Avenue South
Birmingham, AL 35205
andrew@TheBerlinerFirm.com
bmcclintick@davisnorris.com
*Attorneys for Objectors Jay Rodriguez, Sabrina Johnson, Luis Pena, and Richard Mojica*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct. Executed on June 1, 2019 at San Diego, California.

*/s/ Alfred G. Rava*
Alfred G. Rava

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT F

1    Kimberly A. Kralowec (Cal. Bar No. 163158)
2    KRALOWEC LAW, P.C.
     750 Battery Street, Suite 700
3    San Francisco, CA  94111
     Telephone:  (415) 546-6800
4    Facsimile:   (415) 546-6801
     Email:       kkralowec@kraloweclaw.com
5
6    Danielle E. Leonard (Cal. Bar No. 218201)
     ALTSHULER BERZON LLP
7    177 Post Street, Suite 300
     San Francisco, CA 94108
8    Telephone:  (415) 421-7151
     Facsimile:   (415) 362-8064
9    Email:       dleonard@altber.com
10
     Alfred G. Rava (Cal. Bar No. 188318)
11   RAVA LAW FIRM
     3667 Voltaire Street
12   San Diego, CA 92106
     Telephone:  (619) 238-1993
13   Facsimile:   (619) 374-7288
     Email:       alrava@cox.net
14
15   *Attorneys for Objectors Rich Allison and Steve Frye*

16              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
17

18   LISA KIM, individually on behalf of        Case No. 2:18-CV-03093 JFW (AS)
     herself and all others similarly situated,
19                                               **SUPPLEMENTAL RESPONSE**
20               Plaintiff,                      **OF CLASS MEMBER**
                                                 **OBJECTOR STEVE FRYE TO**
21         v.                                    **PLAINTIFF LISA KIM'S FIRST**
                                                 **SET OF INTERROGATORIES**
22   TINDER, INC., a Delaware Corporation;
23   MATCH GROUP, LLC, a Delaware
     limited liability company; MATCH
24   GROUP, INC., a Delaware corporation;
     and DOES 1 through 10, inclusive, and
25   each of them,
26               Defendants.
27
28

---

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and this Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions (ECF No. 79), class member objector Steve Frye sets forth herein answers and objections to Plaintiff Lisa Kim's First Set of Interrogatories, dated May 29, 2019.

No incidental or implied admissions are intended in these responses. Mr. Frye's response to all or any part of the Interrogatories should not be taken as an admission that (1) Mr. Frye accepts or admits the existence of any fact(s) set forth or assumed by that Interrogatory; (2) Mr. Frye has possession, custody or control of knowledge responsive to that Interrogatory; or (3) documents exist responsive to that Interrogatory.  Mr. Frye response to all or any part of any Interrogatory is not intended to be, and shall not be, a waiver by Mr. Frye of all or any part of any objection(s) to that Interrogatory.

## GENERAL OBJECTIONS

1.      Mr. Frye objects to the Interrogatories insofar as they seek information beyond that required under the Federal Rules of Civil Procedure, the applicable Local Rules, and this Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions (ECF No. 79).

2.      Mr. Frye objects to the Interrogatories to the extent they purport to require information not in his possession, custody, or control.

3.      Mr. Frye objects to the Interrogatories to the extent that they seek information that is publicly available or otherwise already in Plaintiff's possession, custody or control, and assert that such Interrogatories are unduly burdensome.

4.      Mr. Frye objects to the Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, work-product doctrine or other applicable privilege.  No such information will be provided.

5.      Mr. Frye's responses are not intended to be, nor shall be deemed, an admission of the matters stated, implied or assumed by the Interrogatories, including any admission that Rule 33 applies to class member objectors.  In responding, Mr. Frye neither waives nor intends to waive, but expressly reserve, any and all objections as to the admissibility at trial of any information or documents produced. Disclosure of information shall not constitute a waiver of any ground for objecting to disclosure with respect to other documents, information or material relating thereto or concerning the same issues, the subject matter thereof or any information contained therein.

6.      Each of the following responses shall be deemed to incorporate and be subject to the foregoing objections.

### SUPPLEMENTAL RESPONSES TO INTERROGATORY SET ONE

**INTERROGATORY NO. 2:**

> Describe with reasonable particularity the circumstances of when, why and how you have used the Tinder App, including both with respect to your use of the free App, and Tinder Plus services. When answering this Interrogatory be sure to state when you first signed up for each type of service, why you chose to do so, how frequently you have used the service, and how you have used the service.

**RESPONSE TO INTERROGATORY NO. 2:**

Mr. Frye incorporates by reference the General Objections.  Mr. Frye also objects to this Interrogatory in its entirety on the ground that it is COMPOUND and on the additional ground that Interrogatory No. 1 already completes the five questions the Court permitted in its Order.  ECF 79.

Mr. Frye also objects to this Interrogatory in its entirety on the ground that it EXCEEDS THE SCOPE of the Court's Order DENYING Plaintiff's Ex Parte Application to Compel Depositions, which limited Plaintiff to "questions *related to*

1  *their decision to object to the settlement.*" ECF No. 79 (emphasis added).  None of

2  these Interrogatory's five or six questions asks a question that is related to Mr.

3  Frye's decision to object.

4       Mr. Frye also objects on the grounds of PERSONAL PRIVACY.  Plaintiff

5  has no basis for need for the requested information regarding Mr. Frye's usage of

6  his Tinder account.

7       Mr. Frye also objects to this Interrogatory as NOT RELEVANT to any issue

8  in dispute.  Plaintiff has previously admitted that Mr. Frye is on the class list.  Mr.

9  Frye also objects that responsive information regarding his Tinder account has

10  already been provided in his Objection Declaration (ECF No. 66), e.g., the date he

11  first signed up for Tinder Plus, in full compliance with all requirements imposed

12  upon objecting class members in the class notice.  The Interrogatory, requiring him

13  to re-state information already provided in his Objection Declaration and inquiring

14  into his personal privacy regarding his usage of Tinder Plus (ECF No. 66), is NOT

15  PROPORTIONAL to the needs of the case and is UNDULY BURDENSOME.

16

17  As to Objections:

18  Dated: June 1, 2019

19

20  By: _____

21      Alfred G. Rava
        RAVA LAW FIRM

22
        Kimberly A. Kralowec
23      KRALOWEC LAW, P.C.

24
        Danielle E. Leonard
25      ALTSHULER BERZON LLP

26      *Counsel for Objectors Rich Allison and Steve
27      Frye*

28
                                    3

## **PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is the Rava Law Firm, 3667 Voltaire Street, San Diego, California, 92106.

On June 1, 2019, I served Steve Frye's Supplemental Responses and Objections to Plaintiff's Special Interrogatories, Set One by (1) MAIL by placing this document in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below, and by (2) E-MAIL by attaching this document to an email and sending the email to the below email addresses.

Todd M. Friedman
Adrian R. Bacon
Law Offices of Todd M. Friedman, P.C.
21550 Oxnard St., Suite 780
Woodland Hills, CA 91367
tfriedman@toddflaw.com
abacon@toddflaw.com
*Attorneys for Plaintiff Lisa Kim and all others similarly situated*

John P. Kristensen
Kristensen Weisberg, LLP
12540 Beatrice Street, Suite 200
Los Angeles, California 90066
john@kristensenlaw.com
*Attorneys for Plaintiff Lisa Kim and all others similarly situated*

Robert Platt
Donald Brown
Manatt Phelps & Phillips, LLP
11355 W. Olympic Blvd.
Los Angeles, CA  90064
dbrown@manatt.com
rplatt@manatt.com
*Attorneys for Defendant Tinder, Inc.*

Kimberly Kralowec
Kralowec Law, P.C.
750 Battery Street, Suite 700
San Francisco, CA 94111
kkralowec@kraloweclaw.com
*Attorney for Objectors Rich Allison and Steve Frye*

Danielle E. Leonard
Altshuller Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
dleonard@altber.com
*Attorney for Objectors Rich Allison and Steve Frye*

Andrew Wheeler-Berliner
Brittany McClintick
DAVIS & NORRIS, LLP
2154 Highland Avenue South
Birmingham, AL 35205
andrew@TheBerlinerFirm.com
bmcclintick@davisnorris.com
*Attorneys for Objectors Jay Rodriguez, Sabrina Johnson, Luis Pena, and Richard Mojica*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct. Executed on June 1, 2019 at San Diego, California.

*/s/ Alfred G. Rava*
Alfred G. Rava

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT G

*5817179*

1  Gregory L. Cartwright (201698)
   The Cartwright Law Group, APLC
2  550 West "C" Street, Suite 1710
   San Diego, CA 92101
3  (619) 233-0126 tel.
   (619) 233-0127 fax.
4

5  Attorneys for Plaintiff,
   ALFRED G. RAVA
6

7

8                 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                          **COUNTY OF ALAMEDA**

10 ALFRED G. RAVA, suing on behalf of himself and )   **CASE NO.: RG 06268693**
   those similarly situated,                      )
11                                                 )   **NOTICE OF LODGMENT IN SUPPORT**
                         Plaintiffs                )   **OF FINAL APPROVAL**
12                                                 )   **OF CLASS ACTION SETTLEMENT**
                                                   )
13                                                 )
   v.                                              )
14                                                 )
                                                   )
15                                                 )
                                                   )
16 ATHLETICS INVESTMENT GROUP LLC, et al.          )   Hearing Date:    August 7, 2009
                                                   )   Hearing Time:    11:00am
17                                                 )   Complaint Filed: May 8, 2006
                         Defendants                )   Dept.:           20
18                                                 )   Judge:           Hon. Robert Freedman
                                                   )   Trial Date:      none set
19

20

21 **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

22         Plaintiff hereby lodges the following:

23    A.    Contra Costa News article dated June 18, 2009.

24    B.    Press Release dated May 31, 2007

25    C.    Emails addressed to Alfred G. Rava

26    D.    MLB Press Release dated July 26, 2000

27    E.    WEWS news article

28    F.    Declaration of George Stephan filed in Orange County Superior Court case

1    06CC00090, dated February 14, 2009

2    G.   Declaration of Daniel L. Rasmussen filed in Orange County Superior Court case

3    06CC00090, dated February 12, 2009

4                              THE CARTWRIGHT LAW GROUP, APLC

5

6   July 15, 2009          By:

7                              Gregory L. Cartwright

                                  Attorneys for Plaintiff

8                              ALFRED G. RAVA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126  FAX (619) 233-0127

1  Gregory L. Cartwright (201698)
   The Cartwright Law Group, APLC
2  550 West "C" Street, Suite 1710
   San Diego, CA 92101
3  (619) 233-0126 tel.
   (619) 233-0127 fax.
4

5  Attorneys for Plaintiff,
   ALFRED G. RAVA
6

7

**FILED**
ALAMEDA COUNTY

JUL 1 6 2009

By ___Y姍 Su/l___

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                        **COUNTY OF ALAMEDA**

10 ALFRED G. RAVA, suing on behalf of himself and )   **CASE NO.: RG 06268693**
   those similarly situated,                       )
11                                                  )   **NOTICE OF MOTION AND MOTION**
                         Plaintiffs                 )   **FOR FINAL APPROVAL**
12                                                  )   **OF CLASS ACTION SETTLEMENT**
                                                    )
13                                                  )
14 v.                                               )
                                                    )
15                                                  )
                                                    )
16 ATHLETICS INVESTMENT GROUP LLC, et al.           )   Hearing Date:   August 7, 2009
                                                    )   Hearing Time:   11:00am
17                                                  )   Complaint Filed: May 8, 2006
                         Defendants                 )   Dept.:          20
18                                                  )   Judge:          Hon. Robert Freedman
                                                    )   Trial Date:     none set
19

20

21 **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

22      Plaintiff hereby gives notice of his Motion and hereby moves this honorable Court for an

23 order seeking FINAL APPROVAL OF SETTLEMENT in this matter, including confirmation and

24 award of case administration costs of $25,992.47, confirmation and award of an "enhancement"

25 award to the Class Representative Alfred G. Rava in the amount of $20,000, and a confirmation and

26 award of attorneys fees and cost of litigation to the class counsel, The Cartwright Law Group, APLC

27 in the amount of $200,000.  The Motion is based upon this notice, the proposed order filed herewith,

28 the Memorandum of Points & Authorities filed in support hereof, the declaration of class counsel

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

Nte of Motion and Motion for Approval of Class Action Settlement

1    Gregory L. Cartwright, the declaration of plaintiff Alfred G. Rava, the declaration of Troy Hoffman

2    and the papers and files of this action, and any further evidence and argument presented at the time

3    of the hearing. Said motion to take place in the above-described Court on August 7, 2009 at

4    11:00am.

5                                                    THE CARTWRIGHT LAW GROUP, APLC

6

7    July 15, 2009                 By:
                                          Gregory L. Cartwright
8                                         Attorneys for Plaintiff
                                          ALFRED G. RAVA
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

*7511605*

Gregory L. Cartwright (201698)
The Cartwright Law Group, APLC
550 West "C" Street, Suite 1710
San Diego, CA 92101
(619) 233-0126 tel.
(619) 233-0127 fax.

Attorneys for Plaintiff,
ALFRED G. RAVA

**FILED**
ALAMEDA COUNTY

JUL 1 6 2009

By _____

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

ALFRED G. RAVA, suing on behalf of himself and those similarly situated,

        Plaintiffs

v.

ATHLETICS INVESTMENT GROUP LLC, et al.

        Defendants

CASE NO.: RG 06268693

**PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT**

Hearing Date: August 7, 2009
Hearing Time: 2:00pm
Complaint Filed: May 8, 2006
Dept.: 20
Judge: Hon. Robert Freedman
Trial Date: none set

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

**I**

**INTRODUCTION**

This honorable Court granted preliminary approval of the settlement in this action on March 26, 2009, finding the Settlement to be presumptively fair, reasonable and adequate. Plaintiff now brings this motion seeking final approval of the fairness of this settlement and confirming the agreed upon award of attorneys fees, court costs and an enhancement award for the class representative. In response to the class notice, dozens of potential class members have come forward to make claims, and of those 19 have made valid claims pursuant to the terms of the Court's Order on the Preliminary Approval hearing. Given that not a single objection was made by a class member, there is a strong presumption that the settlement is fair, adequate and reasonable, and this Court is respectfully requested to grant the instant motion in its entirety.

**II**

**LAW & ARGUMENT**

**A. BACKGROUND FACTS[1] AND THE LITIGATION OF THE ACTION**

On May 8, 2004, the Oakland A's played the Minnesota Twins at the McAfee Coliseum in Oakland. Athletics Investment Group LLC , in conjunction with Macy's, presented an item of sport's memorabilia, a "plaid floppy cap" with Macy's name on one side and the A's logo on the other to the first 7,500 females over the age of 18 to enter the stadium for the game and pre-game activities. Plaintiff attended the game on May 8, 2004 and did not receive a hat because of his gender. Plaintiff's class action complaint in this matter, filed on May 8, 2006 contains causes of action for (1) Violation of the Unruh Civil Rights Act - California Civil Code section 51., (2) Violation of California Civil Code section 51.5, and (3) Violation of City of Oakland Municipal Code section 944.020.

**B. THE NEGOTIATED SETTLEMENT**

The Parties in this action reached a negotiated settlement and came before this Court on multiple dates to obtain preliminary approval of the proposed settlement, the sum and substance of

---

[1] The facts stated herein are taken from the pleadings and papers filed in this action, as well as the accompanying declarations of Alfred G. Rava, Gregory L. Cartwright, and Troy Hoffman.

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126    FAX (619) 233-0127

1   which is as follows: Defendants agree to provide each of the 2500 class members a settlement

2   valued at $100 comprised of a  cash award totaling $50 in cash - $25.00 to be paid by Macy's and

3   $25.00 to be paid by the Athletics and  $50 worth of script - a $25.00 coupon from Macy's and a

4   $25.00 coupon from the Athletics for a total maximum value to the class of $250,000. The

5   settlement was on a claims made basis. Additionally, defendants have agreed to pay  attorneys fees

6   and court costs of not more than $200,000, and an enhancement for the class representative of

7   $20,000, and class notice/administration costs of not more than $40,000.

8   **C. PRELIMINARY APPROVAL OF THE SETTLEMENT**

9        On March 26, 2009 the Court granted preliminary approval of the settlement, the form of

10   class notice and the manner, place and date of notice to the class.  Importantly, the Court found that

11   the Settlement "falls within the range of reasonableness and appears to be presumptively valid,

12   subject only to any objections that may be raised at the final fairness hearing and final approval by

13   this Court." As set out below, no valid objection to the Settlement has been made.

14   **D. NOTICE TO CLASS MEMBERS AND CLAIMS MADE**

15        The terms of the Settlement provided that notice to the class members was be given by (1)

16   mailing notices to the season ticket holders for the 2004 season; and (2) by publication of class

17   notices in the Oakland Tribune.  During the hearings on the Motion for Preliminary Approval, the

18   Court voiced concerns regarding the adequacy of notice if only the Oakland Tribune was used for

19   the publication of the class  notice.  Class Counsel offered to pay from the award of attorneys fees

20   and court costs  made in this action for any costs above the initial $40,000 agreed upon by the parties

21   for class administration expenses.  Accordingly, notice to the class members was to be given by (1)

22   mailing notices to the season ticket holders for the 2004 season; and (2) by publication of class

23   notices in the Oakland Tribune, the Contra Costa Times and the San Jose Mercury News.  Of the

24   2889 notices mailed to the list of the 2004 season ticket holders, only 36 proved undeliverable.

25        In addition to the publication of Class Notice, the case garnered a significant amount of

26   media attention.  The publication of news stories both within California and in the national media

27   during the claims period including stories published on the online versions of CBS Sports, the San

28   Diego Tribune, the Oakland Tribune, the San Francisco Chronicle, Sports Illustrated and ESPN,

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

P&A ISO Final Approval of Class Action Settlement

1    among others, and served to provide further notice of this action to class members and the public at

2    large.

3         The claims period ended June 25, 2009.  Throughout the claims period, there were a total of

4    52 claims and of those a total of 19 complied with the claims requirements. In addition, 15 class

5    members opted out of the settlement.  To date, no valid objections have been served on counsel nor

6    filed with the Court. However, counsel is advised that Mr. Stephan, counsel for the Athletics, did

7    receive a complaint from a female fan that was styled as an "objection" but did not comply in any

8    way with the requirements of an objection, nor did it appear that the person making that "objection"

9    was even a member of the class.  Class Counsel also received a written complaint from a female fan

10   regarding the lawsuit, but it also failed to comply in any way with the claims procedure, was made

11   by female fan (and therefore not a class member) and did not contain any statement that could be

12   interpreted as an "objection."

13   **D. THE SETTLEMENT IS PRESUMPTIVELY FAIR, ADEQUATE AND REASONABLE**

14        While the trial court must always discharge its independent duties to the class, it will operate

15   under a presumption of fairness when the settlement is the result of arm's-length negotiation,

16   investigation and discovery are undertaken that are sufficient to permit counsel and the court to act

17   intelligently in evaluating the settlement, counsel are experienced in similar litigation, and the

18   percentage of objectors is small. Ultimately, the court's determination is simply " 'an amalgam of

19   delicate balancing, gross approximations and rough justice.' " *In re Microsoft I-V Cases*

20   135 Cal.App.4th 706, 723 (internal citations omitted).  Here, each of these factors is met, and

21   therefore the presumption that the Settlement is fair, adequate and reasonable exists.  The Court has

22   already ruled in its Order Granting Preliminary Approval of Class Action Settlement entered March

23   26, 2009 that the settlement "appears to be presumptively valid, subject only to any objections..."

24        As set forth in the Plaintiff's Motion for Preliminary Approval and in the declaration of Class

25   Counsel herewith, the Parties exchanged documentary evidence, conducted investigations into the

26   facts, and have litigated this case for over three years, including multiple dispositive motions, and

27   only then agreed to mediate the case.  Only after Plaintiff conducted his investigation and after

28   defeating various attacks on the complaint did the Parties engaged in full-day mediation in Los

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126    FAX (619) 233-0127

1  Angeles on July 1, 2008 with Judge Sheffield (Ret.)  The case did not settle at that time.  Thereafter,

2  Judge Sheffield  continued to work with the parties to reach a negotiated, arms-length settlement,

3  and that was accomplished via a Memorandum of Understanding approximately six weeks later at

4  the end of August 2008.

5        While not co-extensive nor dispositive of the Court's duties, "considerable weight" should

6  be given to the fact that the settlement was reached with the assistance of a neutral mediator in our

7  case, Judge Sheffield. "The court undoubtedly should give considerable weight to the competency

8  and integrity of counsel and the involvement of a neutral mediator in assuring itself that a settlement

9  agreement represents an arm's length transaction entered without self-dealing or other potential

10  misconduct." *Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116, 129.

11        The settlement was negotiated by and approved by both the Class Representative and Class

12  Counsel.  At the risk of being accused of hubris, the undersigned submits that both he and Mr. Rava

13  together are the two most experienced attorneys concerning Unruh Civil Rights Act cases generally

14  and specifically as to those brought as class actions.  As set forth in the accompanying declarations,

15  the settlement is fair adequate and reasonable in their opinion.

16        And, while more than 2800 season ticket holders from the 2004 season received notice via

17  mail, and there were published notices in three Bay Area news papers (as well as multiple local and

18  National news stories regarding the settlement) *not a single objection was made by any class*

19  *member.*  Based upon these facts, the court should grant final approval for the settlement.

20        Moreover, the Court is urged to consider the value of the settlement to the Settlement Class

21  in light of the likelihood of success through trial and appeal.  In doing so, the Court should consider

22  a recent appellate Court decision in *Cohn v. Corinthian Colleges, Inc.* 169 Cal.App.4th 523.   The

23  *Cohn* case dealt with similar facts to the case at bar.  In *Cohn*, the Plaintiff sued Corithian Colleges

24  and the Anaheim Angels for a promotional give away of a tote bag for Mother's Day event at an

25  Angels game. As in our case, the Angels only gave the promotional item to adult female fans, and

26  not men. The *Cohn* matter was briefed, and set for oral argument when the parties in this case

27  attended mediation.  Given that the appeals court in that case could have made a ruling adverse to

28  either side, the Parties in this case intentionally reached their settlement and executed the

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

P&A ISO Final Approval of Class Action Settlement

1   Memorandum of Understanding before oral argument in that case was heard with an eye towards

2   limiting their respective exposure.   Since the parties executed the MOU, the appeals court has ruled

3   in *Cohn* that the Angels' Mother's Day promotion did not violate the Unruh Civil Rights Act.  If the

4   parties were to proceed to trial, it is likely that the defendants would argue the *Cohn* decision is

5   controlling authority, and Plaintiff would argue that unique facts at issue in this case which were not

6   before the Court in the *Cohn* matter would distinguish the two cases. Nonetheless, there remains a

7   real risk that *Cohn* could be construed to limit any recovery whatsoever from any class member.

8   Against this backdrop, the Settlement conferring upon class members a benefit of $100 is fair,

9   adequate and reasonable.

10         All Settlement Class Members who submitted timely and properly completed Claim Forms

11   were treated equally.  The definition of the "Settlement Class" is well defined and allowed those

12   men who could demonstrate through the claims procedure that they were discriminated against in the

13   promotional give away to receive the benefit of the settlement.  The amount that the defendants have

14   agreed to pay each class member in settlement proceeds (a value equal to $100) is exclusive of the

15   attorney fees request, the Class Representative enhancement, and the costs of administration.

16         The Settlement Agreement provides the same benefit, in terms of the monetary award and

17   vouchers to all males who fit within the class definition, including the Class Representative.   In

18   determining each Settlement Class Member's eligibility, defendants, through the Class

19   Administrator (Simpluris, Inc.) have relied on the claim forms submitted by each Settlement Class

20   Member.

21         The stage of the proceedings at which this settlement was reached militates in favor of final

22   approval of the settlement.  The agreement to settle did not occur until after two and half years of

23   litigation, law and motion practice, investigation, lengthy settlement negotiations and after the Class

24   Representative and Class Counsel  possessed sufficient information to make an informed judgment

25   regarding the likelihood of success on the merits and the results that could be obtained through

26   further litigation.

27         Pursuant to the Court's order concerning discovery for the Defendants' Motions for

28   Summary Judgment, and in support and their respective briefs, the parties exchanged declarations,

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

1 photographs of the events and various other documentary evidence including the written agreement

2 between the Athletics and Macy's, press releases, the Athletics/Macy's marketing survey, and the

3 receipts from the hat supplier showing that the Athletics paid $1.47 per hat. The foregoing evidence

4 demonstrated that there was a maximum number of 7,500 hats during the give away, the defendants'

5 purported intent behind the promotion, the involvement of the two defendants, and the approximate

6 number of eligible class members. At this stage, Class Counsel, the Class Representative and the

7 Court has sufficient evidence to determine that the settlement is fair, adequate and reasonable

8 pursuant to *Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116.

9          The release that will be obtained by Defendants is set forth in paragraph 22 of the Joint

10 Stipulation (Joint Stipulation, page 14, lines 11-28, page 15 1-5). The release extends to the named

11 defendants and the typical list of related parties and entities. The claims being released are those

12 claims "arising out of or related to the A's/Macy's reversible bucket hat giveaway at the A's baseball

13 game on May 8, 2004....and all other claims and allegations made in the Action and that reasonably

14 arise out of or related to the facts alleged in the Case from May 8, 2004 through the date the Court

15 finally approves the Settlement."

## E. THE CLASS REPRESENTATIVE'S INCENTIVE AWARD

17          Class Counsel requests that an incentive award of $20,000 be paid to the Class

18 Representative Alfred G. Rava in this matter due to the additional efforts Class Representative has

19 had to endure.  Such awards are typical in class action matters and have been upheld. See, *Bell v.*

20 *Farmers Ins. Exch.* (2004) 115 Cal.App.4th 715, 726.  Mr. Rava has been closely involved in and

21 participated this litigation, has been kept informed by me of all material developments, attended a

22 day-long mediation and flew to Oakland from San Diego to attend the hearing on the Defendants'

23 demurrers and motions to strike. Mr. Rava has advanced some of his own money to support this

24 litigation, and expended at least 100 hours of his time. Additionally, Mr. Rava has had to suffer

25 truly nasty conduct on the part of those who disagree with this litigation, and has suffered personal

26 attacks and even threats. See generally, Mr. Rava's declaration filed herewith.

27          Moreover, throughout this rather lengthy litigation, Mr. Rava  has remained steadfast in his

28 insistence that this matter be remedied for the benefit and betterment of the class as a whole,

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

P&A ISO Final Approval of Class Action Settlement

1 │ notwithstanding that, had he so chosen, he could have eschewed his obligations thereto and privately

2 │ resolved his claims with the defendant for significant remuneration.

3 │ **F. THE COSTS OF CASE ADMINISTRATION**

4 │ As set forth in the accompanying declaration of Troy Hoffman, the cost of case

5 │ administration in this matter were $25,922.47.  To date, the Athletics have already paid to Simpluris

6 │ the sum of $9,597.98, thereby leaving a total of $16,324.49 remaining to be paid by defendants.  By

7 │ the terms of the settlement and the Court's preliminary approval order, the defendants have agreed to

8 │ pay a maximum sum of $40,000 towards class administration costs.  Furthermore, any sums above

9 │ that would have been paid for by Class Counsel out of his own pocket as agreed to in open court as

10 │ well as a subsequent written stipulation. As the administration costs are below the estimated

11 │ $40,000, the Court is respectfully requested to confirm them as reasonable and pursuant to the terms

12 │ of the Settlement, giving defendants full credit for the $9,597.98 paid to date and order the

13 │ defendants to pay over to Simpuris the sum of $16,324.49

14 │ **G. CLASS COUNSEL'S ATTORNEYS FEES AND COURT COSTS**

15 │ A prevailing plaintiff in an Unruh Civil Rights Act case is entitled to an award of mandatory

16 │ attorneys fees and costs. *Civil Code* Section 52.  In support of the request for attorneys fees, true and

17 │ correct copy of the billing statement is attached to the Declaration of Gregory L. Cartwright as

18 │ Exhibit A.  All costs and time reflected thereon were actually expended in pursuit of the litigation of

19 │ this matter.  As the attached invoice indicates, the costs incurred in this case are $6,235.21.

20 │ Incidental expenses for such things as photocopying, fax charges and long distance telephone

21 │ expenses have been omitted.  The  costs sought are all reasonable and necessary for the prosecution

22 │ of this action, and as such, the court is respectfully requested to order the defendants to pay these

23 │ costs as part of Class Counsel's request for the payment of $200,000 for costs and fees.

24 │ Additionally, Class Counsel has spent no fewer than 340 hours litigating this matter and that

25 │ time includes an estimate of 10 hours for work to be performed following the filing of this motion.

26 │ Importantly, the time that was spent on this matter by support staff, paralegals and law clerks is not

27 │ reflected, only time spent by the attorneys working on this case.

28 │ This matter was undertaken as a pure contingency matter, and that coupled with counsel's

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

1    experience and results obtained makes the fee award in this case appropriate for a multiplier

2    "Under Serrano III, the lodestar is the basic fee for comparable legal services in the

3    community; it may be adjusted by the court based on factors including, as relevant herein, (1) the

4    novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the

5    extent to which the nature of the litigation precluded other employment by the attorneys, (4) the

6    contingent nature of the fee award. The purpose of such adjustment is to fix a fee at the fair market

7    value for the particular action. In effect, the court determines, retrospectively, ***whether the litigation***

8    ***involved a contingent risk or required extraordinary legal skill justifying augmentation*** of the

9    unadorned lodestar in order to approximate the fair market rate for such services." *Ketchum v. Moses*

10   (2001) 24 Cal.4th 1122,1132 (emphasis added) (internal citations omitted).

11   Here, there were multiple novel and difficult legal issues. Early on in this case, defendants

12   filed Motions to Strike and Demurrers which tested the applicable statute of limitations of these

13   claims. Later, the attack came in the form of defendants filing Motions for Summary Judgment.

14   Those Motions were based upon various legal arguments, including significant out of state

15   authorities. Importantly, it was this a very similar motion and based upon substantially the same law

16   and arguments as the defendants filed in the *Cohn v. Corinthian Colleges* case in Orange County.

17   (Indeed, the defendants in the two cases were represented by the same attorney, Mr. Stephan).

18   Accordingly, the legal issues were difficult and the Court entertained nearly 1 ½ hours of oral

19   argument on these dispositive motions.

20   Multipliers can range from 2 to 4 or even higher. See for example, *Coalition for L. A. County*

21   *Planning etc. Interest v. Board of Supervisors* (1977) 76 Cal.App.3d 241, 251; *Arenson v. Board of*

22   *Trade of City of Chicago* (N.D.Ill. 1974) 372 F.Supp. 1349.) *cf Wershba v. Apple Computer, Inc.* 91

23   Cal.App.4th 224 (The lodestar multiplier used was 1.42.)

24   Here, a multiplier of 1.5 to 2.0 is appropriate given (1) the difficulty with and the results

25   obtained concerning the Demurrers and the Motions for Summary Judgment; and (2) the contingent

26   nature of the representation and the associated risk of such an arrangement. Taking even the lower

27   end of this range of 1.5 as the appropriate multiplier, yields an attorney fee award of $204,420. Even

28   before adding recoverable costs of the litigation, that sum is above the maximum attorneys fees and

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

P&A ISO Final Approval of Class Action Settlement

before adding recoverable costs of the litigation, that sum is above the maximum attorneys fees and court costs award of $200,000 agreed to by the parties in the Settlement Agreement.

Furthermore, this sum is more than reasonable when compared to similar cases. As mentioned above, counsel for the Athletics, Mr. Stephan, was also the attorney of record in the *Cohn v. Corinthian Colleges* case where his attack on the complaint via a Motion For Summary Judgment was similar to the one brought in this action and was successful. Counsel in that case claimed some $421,243 in attorneys fees expended up to around the time of their Motion for Summary Judgment. Certainly, if the relatively short-lived defense of a similar class action Unruh Civil Rights Act incurred $421,243 in attorneys fees for a single defendant, then the sum of $200,000 for both costs and fees given the results obtained, the amount of work performed and the length of litigation is certainly reasonable.

### III

### CONCLUSION

Based upon the foregoing, the Court is respectfully requested to grant final approval of the Settlement, and enter judgment thereon.

THE CARTWRIGHT LAW GROUP, APLC

July 15, 2009                    By: _____

Gregory L. Cartwright
Attorneys for Plaintiff
ALFRED G. RAVA

The Cartwright Law Group, APLC
550 West "C" Street, Suite 1710
San Diego, CA 92101
(619) 233-0126   FAX (619) 233-0127

P&A ISO Final Approval of Class Action Settlement

*5817191*

Gregory L. Cartwright (201698)
The Cartwright Law Group, APLC
550 West "C" Street, Suite 1710
San Diego, CA 92101
(619) 233-0126 tel.
(619) 233-0127 fax.

Attorneys for Plaintiff,
ALFRED G. RAVA

FILED
ALAMEDA COUNTY

JUL 1 6 2009

By _____ Yasmin Duff

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

| | |
|---|---|
| ALFRED G. RAVA, suing on behalf of himself and those similarly situated,<br><br>Plaintiffs<br><br>v.<br><br><br>ATHLETICS INVESTMENT GROUP LLC, et al.<br><br>Defendants | CASE NO.: RG 06268693<br><br>**DECLARATION OF ALFRED G. RAVA IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT**<br><br><br><br>Hearing Date: August 7, 2009<br>Hearing Time: 11:00am<br>Complaint Filed: May 8, 2006<br>Dept.: 20<br>Judge: Hon. Robert Freedman<br>Trial Date: None Set |

I, ALFRED G. RAVA, declare:

1. I am the Plaintiff and the Class Representative in the above-captioned matter. I have personal knowledge of the facts set forth herein, and am competent and willing to testify to the same if sworn to do so. As to matters asserted upon information and belief, I believe them to be true.

2. I am also an attorney in good standing duly licensed to practice law in California and Texas, and have so practiced since 1997.

3. I have devoted a significant amount of time over the past several years in the prosecution and settlement of the sex discrimination claims I brought here on behalf of myself and the other men who, along with all female patrons under 18 years of age, were denied the black reversible bucket

1  hat during defendants' promotion on Saturday, May 8, 2004. I have also had threats made against

2  my life and physical well-being, as well as threats against my family and my pets, for taking on the

3  duties of the Plaintiff and Class Representative in this matter. But I believe the present action, as

4  well as other similar complaints against other California Major League Baseball franchises for sex-

5  based promotions, have caused all California Major League Baseball franchises to no longer employ

6  marketing promotions that denied fans promotional gifts based on sex, and to stop hosting baseball

7  clinics at California Major League Baseball stadiums that denied Little League-aged boys a chance

8  to meet their heroes because only females were allowed to attend. For example, lodged herewith as

9  Exhibit A, is a true and accurate copy of a June 2009 article in the Contra Costa Times about how

10  the present case and a similar lawsuit against the Los Angeles Angels resulted in the Athletics and

11  Angels to "no longer do[] giveaways for men or women only." This article includes the following

12  quote by an Athletics spokesman about the lawsuit:

14       Bob Rose, a spokesman for the A's, said the organization will no longer offer male- or

15       female-only giveaways, in part due to the suit. As an example, Rose cited this year's

16       Mother's Day giveaway. On May 10, the A's gave away tote bags to the first 10,000 fans.

18      4. I estimate I have spent approximately 100 hours in helping my lawyers at the Cartwright

19  Law Group prosecute and settle this case. This includes the time I spent reviewing and, where

20  appropriate, providing my input on the pleadings and documents related to discovery, motions,

21  mediation, settlement, notice, and court approval of the settlement.

22      5. I likely spent more time assisting my attorneys with these documents than a "typical"

23  class representative would because, unlike most class representatives, I am also an attorney and have

24  significant amount of knowledge and experience in prosecuting Unruh Civil Rights Act claims on

25  behalf of men and women treated unequally because of protected personal characteristics. In fact, I

26  represented the prevailing plaintiffs/appellants at the California Supreme Court in the Court's most

27  recent Unruh Act sex discrimination case, *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160,

28  concerning a supper club that charged men more than women to be admitted.

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

6. *Angelucci* unanimously held that discrimination victims did not have to first ask the offending business to be treated equally in order to have standing to file an Unruh Act claim. That is, a disfavored person did not have to demean themselves further by asking the business "May I please be treated the same as your White/Male/Heterosexual or Christian customers?" in order to have an Unruh Act claim. I substituted in for the plaintiffs' attorney at the California Supreme Court after the trial court and a unanimous Court of Appeal ruled a person must first assert their right to equal treatment to have standing for an Unruh Act claim, rulings which the Supreme Court found to be "startling" and "absurd." *Angelucci*, at 169.

7. The Consumer Attorneys of California called *Angelucci* "a significant civil rights victory." Lodged herewith as Exhibit B is a true and accurate copy of the CAOC's press release regarding the *Angelucci* ruling.

8. My estimated 100 hours that I have committed to this case also includes time I spent traveling to Oakland for a hearing, which I was unable to attend due to my contracting my first and only case of food poisoning, contracted at an Oakland restaurant that was open very late at night - a clue I missed. I also traveled to and attended an all-day mediation in Los Angeles with Retired Judge William Sheffield, which eventually led to the present settlement. I estimate that I spent approximately $1,200 of my money to pay for filing fees, travel costs, and miscellaneous expenses not paid for by my attorneys.

9. I am not expecting any incentive award I receive in this case to reimburse me for the hourly rate I would have charged during the last several years as an attorney prosecuting other Unruh Act claims. But the considerable time I spent representing the class here was time taken away from my other cases handled on either an hourly or contingency basis, and is time I can never recover. Nor do I think I can ever recover from the threats I received after certain Major League Baseball fans and other members of the public learned I sued the Oakland Athletics and this court granted preliminary approval of the settlement.

10. In 2006, shortly after several media outlets, including the Contra Costa Times, reported the filing of this lawsuit, I got a phone call from someone who only identified himself as an Athletics fan, who warned me "You better not leave your house or office without some protection."

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

1    The day after this story was first published, my vehicle was keyed outside my office.

2        11. Following the Court's preliminary approval of the settlement, news stories appeared

3    regarding the lawsuit and the settlement.

4        12. Thereafter, I began to receive hundreds of phone calls and emails from Athletics and

5    Major League Baseball fans and others expressing their anger with my lawsuit and this court's

6    preliminary approval of the settlement. Occasionally, I would receive a call or email supporting me

7    and/or the court, but most were full of vitriol against me and/or the court.

8        13. For example, I received a call from an irate woman who identified herself as an Oakland

9    Athletics season ticket holder who warned me "If we ever see you at an A's game, you will not make

10   it out of the parking lot alive." Later that same day, another Major League Baseball fan, this one

11   from San Diego, who disturbingly took the time to learn something about my personal life, told me

12   "You better keep your two dogs on a leash," referring my two rescued dogs that I often walk, on

13   leashes, in my neighborhood.

14       14. The emails I got immediately after news stories were published were also threatening

15   and full of venom. Lodged herewith as Exhibit C are true and accurate copies of some of these

16   emails, with some excerpts below from the first several emails:

17   •   You ever hear of karma? BAD THINGS are going to happen to you; be ready.

18   •   [K]arma is a bitch and sure don't want to be standing near you during the next

19       lightning storm.

20   •   I wish I could punch you in the mouth.

21   •   You're a filthy, dickless, cocksucking homo.

22   •   [K]eep you eyes peeled because I'm guessing an oil tanker is going to t-bone you at

23       an intersection and explode on your little crybaby, bitching, advantage-taking face.

24       . . . Go Fuck Yourself San Diego.

25   •   [K]arma is a bitch. Someday it will all come back around. It always does.

26   •   You would be a piece of shit Penn State fag.

27   •   You are the biggest scumbag on the face of this planet. Make yourself disappear. We

28       would be better off without you. Enjoy Hell.

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

Declaration of Alfred G. Rava In Support of Final Approval of Settlement

- 4 -

- Subject: worthless people like you should be mercy-killed.

    Go to hell bitch. What a truly worthless life you have led. Now get on your knees and suck my dick, you asshole.

- You are the biggest piece of shit douche bag I have ever heard of in my life. . . . If there is any real justice in this world, horrible unspeakable things will happen to you. Say hello to your dead mother you fucking cocksucker. I hope you burn in hell with her.

- You should find the nearest skyscraper and throw yourself off of it and do the world a favor.

- Be proud of your classless crusade if you will, but I hope that this ruins your entire career, your a scum bag and an embarrassment to our country and our legal system.

- I hope you feel good about yourself when you think how much money and time you are spending to get your gay ass "fishing hat" you probly dont even fish you stupid ass fuck. I hope you get in an accident and burn alive, your are pure scum. im sure your mother would be proud of you im glad she died but you deseve much worse than that.

- You are one absolutely pathetic fool. I wish to piss all over your face and show you what a real penis looks like, clearly you don't have one.

- You are a sorry piece of shit. living in california, i am sure you're familiar with the concept of karmic retribution. one day, someone's going to get you back for your frivolous and self-serving actions; hopefully, someone big and violent. lawyers like you give the rest of the legal professionals in the world a bad name. . . .

    I hope a tiny mite claws its way up your urethra and you little penis eventually falls off. better yet, i hope you join the ranks of men who contract breast cancer and are forced to eat crow for your actions against breast cancer initiatives. the sad part is that were you to be diagnosed with breast cancer. . . .

    ps- i hope you die painfully over a very long period of time.

- I find myself thinking that the only fate that you truly deserve is to have your skin,

muscle, nerve, bones, and organs melted in a manner befit of the Raiders of the Lost Ark.

- You sir, are the reason, in that joke about the difference between a dead snake and a dead lawyer in the road, the skidmarks are in front of the snake.  I can only hope that same driver finds you.

- I hope u get breast cancer douche.

- Subject: Hey Nigger . . .
  YOU ARE A ROTTEN SCUMBAG! . . . I hope bad things happen to your children.

- I have a potential case for you.  Perhaps you can suck my penis while I fist fuck your asshole.  How does that sound?

- You don't even deserve feet.  I can't wait till I hear you have prostate cancer.  I hope someone sets you on fire.

- Good luck in life sir, may it be short.

- You're a fucking scumbag!

- You don't deserve to live.

- You are a pof shit and hope you die from cancer.

15.  Because of the threats made against me as a result of my filing a lawsuit against the Athletics and Macy's and of the preliminary approval of the settlement of that lawsuit, I have had to make improvements to the security system at my home and now sleep with a shotgun near my bed.

16.  The timing of the publication of these stories also jibed with an astonishing amount of spam-like emails I received asking for personal information, account numbers, and passwords, or sporting strange attachments or links I did not dare open.

17.  These articles did not mention a 2000 marketing study entitled "The Commissioner's Initiative on Women and Baseball," commissioned to determine how Major League Baseball and its franchises could grab more money from women for tickets, merchandise, food, and beverages.  A

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

true and accurate copy of MLB's article on this marketing study is attached hereto as Exhibit D. This marketing study recommended that Major League Baseball franchises could increase revenues from female consumers by having more promotions for women, including a Mother's Day promotion, with more giveaways for women. A true and accurate copy of an independent article on this marketing study is lodged herewith as Exhibit E. I believe this marketing study explains the financial and not altruistic reason why Major League Baseball franchises have Mother's Day promotions where many of the franchises give the same gifts exclusively to female fans 18 and older.

18. I discovered this article on www.mlb.com about Major League Baseball's interest in hosting Mother's Day promotions with gifts exclusively for women after the Orange County Superior Court granted the defendants' motions for summary judgment in that similar case. Therefore, this study, which contradicted the Angels' proffered reason for its Mother's Day promotion, i.e., to "honor mothers," never made it into the trial court and Court of Appeal record. Not surprisingly, the Angels did not produce the Commissioner's Initiative on Women and Baseball marketing study as part of the limited discovery the Angels convinced the Orange County Court to have the parties to voluntarily produce for deciding those rushed motions for summary judgement. Similarly, I understand the Athletics, have not produced any materials in this matter concerning the Commissioner's Initiative on Women and Baseball.

19. The Angels case was similar to this one in many respects, mainly in that the Angels and Athletics filed very similar motions for summary judgment. This is understandable because both cases concerned so-called Mother's Day promotions (although the Athletics' promotion occurred on a Saturday, which was not Mother's Day) that denied the giveaway item to all females under 18 and to all males, and the earlier Angels' motion for summary judgment, filed by the same attorney who

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

represented the Athletics, was granted.

20. Both the Angels and Athletics cases were essentially decided by summary judgment, and the parties in both cases incurred significant legal fees. Upon information and belief, the Angels had $421,243 in legal fees up to around the time of the granting of its motion for summary judgment, while the Angels' co-defendant Corinthian Colleges had $129,037.75 in legal fees up to about the same time. Lodged herewith as Exhibit F is a true and accurate copy of a declaration by attorney George Stephan summarizing the Angels' legal fees. Lodged herewith as Exhibit G is a true and accurate copy of a declaration by Corinthian Colleges' attorney Dan Rasmussen summarizing his client's legal fees. Note that Orange County Superior Court Judge Jonathan Cannon ruled that the "*Apple Computer* misrepresentation by plaintiff's counsel," which Mr. Stephan referred to in his declaration, was baseless and plaintiff's counsel properly completed the local court's form regarding class actions and B&P 17200 claims.

21. Based upon my skill, experience, and training, especially with the prosecution and settlement of Unruh Act claims, I believe the Settlement is fair, reasonable, and adequate given the facts and circumstances in this case. Additionally, I believe the attorneys' fees and court costs of $200,000 sought by my attorneys and agreed to by the parties in this action to be reasonable given the length of time this case has been litigated, the amount of work performed by my attorneys, the skills exhibited by my attorneys, the formidableness of opposing counsel, and the results obtained.

I declare the foregoing is true and correct under penalty of perjury of the law of California. Executed at San Diego, California this 15th day of July 2009.

Alfred G. Rava

*5817195*

FILED
ALAMEDA COUNTY

JUL 1 6 2009

By _____

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

| | |
|---|---|
| ALFRED G. RAVA, suing on behalf of himself and those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ATHLETICS INVESTMENT GROUP LLC; OAKLAND ATHLETICS LIMITED PARTNERSHIP; MACY'S DEPARTMENT STORES, INC.; MACY'S WEST; and DOES 1 through 50,<br><br>Defendants. | Case No. RG 06268693<br><br>**CLASS ACTION**<br><br>**DECLARATION OF TROY HOFFMAN, CLASS ACTION CLAIMS ADMINISTRATOR**<br><br>Date: August 7, 2009<br>Time: 11:00am<br>Dept: 20<br>Judge: Honorable Robert Freedman |

1

**DECLARATION OF TROY HOFFMAN, CLASS ACTION CLAIMS ADMINISTRATOR**

I, TROY HOFFMAN, hereby declare as follows:

1.   I am employed by Simpluris, Inc., Claims Administrator. I am a Case Manager of the class action case, *Rava v. Athletics Investment Group, LLC, et. al.*   As such, I have personal knowledge of the facts stated herein and would testify as follows:

2.   Simpluris, Inc. ("Claims Administrator") has extensive experience in providing notice of class actions and administering class action settlements.   We have provided notification and/or claims administration services in hundreds of class action cases.

3.   The Claims Administrator was selected by the Parties to provide notice of the settlement and process claims and exclusions in this action.   In this capacity, the Claims Administrator was charged with a) arranging publication of Notice of Proposed Class Action in the Oakland Tribune, San Jose Mercury News, Contra Costa Times, b) printing and mailing to known season ticket holders who attended the game on May 8, 2004 the Notice of Class Action Settlement, Claim Form and Release  (hereinafter collectively referred to as "Notice Packet"); c) processing undeliverable mail; d) receiving other communications about the Settlement; e) issuing and mailing settlement checks, including the named Plaintiff's enhancement check, to all valid Claimants who were in attendance at the May 8, 2004 game.

4.   The Claims Administrator received the Court-approved documents from Class Counsel on April 6, 2009.

5.   The Claims Administrator formatted the Notice Packets for mailing to the known season ticket holders who attended the game on May 8, 2004. The mailing would consist of a 4-page Notice of Class Action Settlement and a 2-page Claim Form and Release.   Claims Administrator received approval from the Parties and a sufficient number of each document were printed according to the anticipated class size.

6.   On April 10, 2009, the Claims Administrator received the data file from Defense Counsel containing season ticket holders' names, last known mailing addresses, Social Security Numbers and information for each season ticket holder who attended the game on May 8, 2004. The file contained two thousand eight hundred and eighty-nine (2,889) known season ticket holders.

2
DECLARATION OF TROY HOFFMAN, CLASS ACTION CLAIMS ADMINISTRATOR

7.     On May 11, 2009 Claims Administrator caused a National Change of Address (NCOA) search in an attempt to provide the most up to date address for each known season ticket holder for the 2004 season. A search of this database provides updated addresses for any individual who has moved in the previous four (4) years and notified the U.S. Postal Service of their change of address.

8.     The Claims Administrator coordinated with various publications to have a one time Notice published in the Oakland Tribune, San Jose Mercury News, and the Contra Costa Times. This Notice was published in the above-referenced newspapers on May 11, 2009.

9.     The publication in these newspapers generated an additional nine (9) potential claimants who were in attendance at the May 8, 2004 game, increasing the final list to two thousand eight hundred and ninety-eight (2,898) people.

10.     The mailed Notices were enclosed in envelopes with the names and known addresses printed on the Claim Form. On May 11, 2009, the Notice Packets were mailed via U.S. first class mail to all known season ticket holders who attended the game on May 8, 2004.

11.     During the period May 11, 2009 through June 25, 2009, thirty-six (36) Notice Packets were returned to our office by the Post Office and deemed undeliverable.

12.     A total of one (1) Notice Packet was re-mailed during the Claims Period as a result of a forwarding address being provided by the Post Office.

13.     As of the date of this declaration, the Claims Administrator has received a total of sixty-eight (68) responses including:

(a) nineteen (19) valid Claim Forms;

(b) fifteen (15) opt-outs;

(c) zero (0) disputed Claim Forms;

(d) thirty-three (33) deficient Claim Forms;

(e) zero (0) late Claim Forms;

(f) zero (0) late Opt-Outs; and,

(g) one (1) invalid Objection.

3

DECLARATION OF TROY HOFFMAN, CLASS ACTION CLAIMS ADMINISTRATOR

14.     As of the date of this declaration, there were thirty-three (33) outstanding Deficient Claim Forms. Per Stipulation for Class Action Settlement, these Claims have been denied, as appropriate proof of attendance was not provided at time of submission of Claim Form.

15.     As of the date of this declaration, Claims Administrator has received one (1) written objection to the settlement. Mr. Stephan addressed this objection with the Court on or about June 30, 2009.   This objection was deemed invalid as it was filed by a female who attended the game and per the Stipulation for Class Action Settlement, females do not qualify.

16.     Of the two thousand eight hundred and ninety-eight (2,898) season ticket holders, and those that contacted us through the newspaper publications, who attended the May 8, 2004 game, there were nineteen (19) valid Claims submitted.

17.     Claims Administrator costs for this case is $25,922.47 in association with the administration of the Settlement. This includes all fees that will be charged through the completion of the Settlement. Simpluris has already received two (2) payments totaling $9,597.98 for the costs of publishing in the above-referenced newspaper publications. The remaining balance owed to Simpluris for services performed in this case to date are $16,324.49.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration is executed this 14TH day of July, at Costa Mesa, California.

TROY HOFFMAN

4

1

2

3

4

5

6

7

8

SUPERIOR COURT OF THE STATE OF CALIFORNIA

9

COUNTY OF ALAMEDA

10

| | |
|---|---|
| ALFRED G. RAVA, suing on behalf of himself and those similarly situated, | Case No. RG 06268693 |
| Plaintiffs, | **CLASS ACTION** |
| vs. | **[PROPOSED] FINAL ORDER APPROVING CLASS ACTION SETTLEMENT, AND JUDGMENT OF DISMISSAL WITH PREJUDICE** |
| ATHLETICS INVESTMENT GROUP LLC; OAKLAND ATHLETICS LIMITED PARTNERSHIP; MACY'S DEPARTMENT STORES, INC.; MACY'S WEST; and DOES 1 through 50, | Date:          August 7, 2009 Time:          11:00am Dept:          20 Judge:         Hon. Robert Freedman Complaint Filed: May 8, 2006 Trial Date:    None Set |
| Defendants. | |

11

12

13

14

15

16

17

18

19

20

21

TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:

22

The above-referenced class action ("Action") having come before the Court on August 7,

23

2009, for a hearing on Final Order Approving Class Settlement, and Judgment of Dismissal with

24

Prejudice ("Final Order"), consistent with the Court's Preliminary Approval Order ("Preliminary

25

Approval Order"), filed and entered March 26, 2009, and as set forth in the Joint Stipulation of

26

Settlement and Release Between Plaintiff and Defendants ("Joint Stipulation" or "Settlement") in

27

the Action, and due and adequate notice having been given to all Class Members as required in

28

the Preliminary Approval Order, and the Court having considered all papers filed and proceedings

1

1    had herein and otherwise being fully informed and good cause appearing therefore, it is hereby

2    ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

3        1.    All terms used herein shall have the same meaning as defined in the Joint

4    Stipulation.

5        2.    Consistent with the definitions provided in the Joint Stipulation, the term

6    "Settlement Class" and "Class Members" shall mean all males who attended the A's baseball

7    game at the Oakland Coliseum on May 8, 2004 ("the Settlement Class" or "the Class Members").

8    The Settlement Class will not include any person who submits a timely and valid Request for

9    Exclusion as provided in this Settlement; any Class Member who has opted out of the Settlement

10   is precluded from objecting to the Settlement and lacks standing to challenge the Settlement and

11   this Final Order.  For purposes of the Settlement and this Final Order, "Defendants" and/or

12   "Released Parties" shall include Athletics Investment Group LLC and Macy's Department Stores,

13   Inc., and any other corporate entities named or served as defendants in this case, and their present

14   and former parent companies, subsidiaries, related or affiliated companies, shareholders, officers,

15   directors, employees, agents, attorneys, insurers, successors and assigns, and any individual or

16   entity that could be jointly liable with Defendants, and their respective counsel, or any of them.

17   The term "Action" shall mean this class action.  The term "Parties" shall mean Plaintiff and

18   Defendants.

19       3.    This Court has jurisdiction over the subject matter of this Action and over all

20   Parties to this Action, including all Class Members.

21       4.    Distribution and publication of the Notice and the Claim Form directed to the

22   Class Members as set forth in the Joint Stipulation and the other matters set forth therein have

23   been completed in conformity with the Preliminary Approval Order, including individual notice

24   to all Class Members who could be identified through reasonable effort, and the best notice

25   practicable under the circumstances.  The Notice provided due and adequate notice of the

26   proceedings and of the matters set forth therein, including the proposed Settlement set forth in the

27   Joint Stipulation, to all persons entitled to such Notice, and the Notice fully satisfied the

28   requirements of due process.  All Class Members and all Released Claims are covered by and

2

1    included within the Settlement and this Final Order.

2        5.    The Court hereby finds the Settlement was entered into in good faith pursuant to

3    and within the meaning of California Code of Civil Procedure section 877.6. The Court further

4    finds that the Settlement is fair, reasonable and adequate and that Plaintiff has satisfied the

5    standards and applicable requirements for final approval of this class action settlement under

6    California law, including the provisions of California Code of Civil Procedure section 382 and

7    Federal Rule of Civil Procedure 23, approved for use by the California state courts in *Vasquez v.*

8    *Superior Court* (1971) 4 Cal.3d 800, 821.

9        6.    The Court hereby approves the Settlement set forth in the Joint Stipulation and

10   finds the Settlement is, in all respects, fair, adequate and reasonable, and directs the Parties to

11   effectuate the Settlement according to its terms. The Court finds the Settlement has been reached

12   as a result of intensive, serious and non-collusive arms-length negotiations. The Court further

13   finds the Parties have conducted extensive and costly investigation and research, and counsel for

14   the Parties are able to reasonably evaluate their respective positions. The Court also finds the

15   Settlement at this time will avoid additional substantial costs, as well as avoid the delay and risks

16   that would be presented by the further prosecution of the Action. The Court has reviewed the

17   benefits that are being granted as part of the Settlement and recognizes the significant value to the

18   Class Members. The Court also finds the Class is properly certified as a class for settlement

19   purposes only.

20       7.    As of the date of entry of this Final Order, each and every released claim of each

21   and every Class Member is and shall be deemed to be conclusively released as against the

22   Released Parties. As of the date of this Final Order, the Class Representative and each and every

23   Class Member who has not submitted a valid Request for Exclusion is hereby released and

24   forever barred and enjoined from prosecuting the released claims, except as to such rights or

25   claims as may be created by the Settlement, against Defendants and the Released Parties, their

26   present and former parent companies, subsidiaries, related or affiliated companies, shareholders,

27   officers, directors, employees, agents, attorneys, insurers, successors and assigns, and any

28   individual or entity which could be jointly liable with Defendants, from any and all claims, debts,

3

1    liabilities, demands, obligations, guarantees, costs, expenses, attorneys' fees, damages, action or

2    causes of action of any nature under any state, federal or local law, arising out of or related to the

3    allegations made in the Action and that reasonably arise out of the facts alleged in the Action,

4    including but not limited to a release of all known and unknown claims arising out of or related to

5    the A's/Macy's reversible bucket hat giveaway at the A's baseball game on May 8, 2004, the

6    California Unruh Civil Rights Act, the California Civil Code, the City of Oakland Municipal

7    Code, damages, harm, injury, injunctive relief, punitive damages, penalties of any nature, interest,

8    fees, costs, and all other claims and allegations made in the Action and that reasonably arise out

9    of or relate to the facts alleged in the Action from May 8, 2004, through the date the Court finally

10    approves the Settlement (hereinafter "Released Claims").  In addition, as of the date of this Final

11    Order, the Class Representative and each and every Class Member is barred and enjoined from

12    instituting or accepting damages, liquidated damages, punitive damages, penalties of any nature,

13    attorneys' fees and costs, or any other relief from any other suit, class or collective action,

14    administrative claim or other claim of any sort or nature whatsoever against Defendants and the

15    Released Parties, for any period from May 8, 2004 up to and including the date of final approval

16    of the Settlement, relating to the Released Claims.  This Settlement extends to all claims of every

17    nature and kind whatsoever, known or unknown, suspected or unsuspected, past or present, which

18    the Class Members have or may have against the Defendants and the Released Parties as to the

19    Released Claims, and all rights under Section 1542 of the California Civil Code are hereby

20    expressly waived as to the Released Claims.

21         8.      Neither the Settlement nor any of the terms set forth in the Joint Stipulation is an

22    admission by Defendants, or any of the other Released Parties, nor is this Final Order a finding of

23    the validity of any claims in the Action or of any wrongdoing by Defendants, or any of the other

24    Released Parties.  Neither this Final Order, nor the Joint Stipulation, nor any document referred to

25    herein, nor any action taken to carry out the Joint Stipulation is, may be construed as, or may be

26    used as, an admission by or against Defendants, or any of the other Released Parties, of any fault,

27    wrongdoing or liability whatsoever.  The entering into or carrying out of the Joint Stipulation, and

28    any negotiations or proceedings related thereto, shall not in any event be construed as, or deemed

1   to be evidence of, an admission or concession with regard to the denials or defenses by

2   Defendants, or any of the other Released Parties, and shall not be offered in evidence in any

3   action or proceeding in any court, administrative agency or other tribunal for any purpose

4   whatsoever other than to enforce the provisions of this Final Order, the Joint Stipulation, the

5   Released Claims, or any related agreement or release. Notwithstanding these restrictions, any of

6   the Released Parties may file in the Action, or submit in any other proceeding, the Final Order,

7   the Joint Stipulation, and any other papers and records on file in the Action as evidence of the

8   Settlement to support a defense of *res judicata, collateral estoppel*, release, or other theory of

9   claim or issue preclusion or similar defense as to the Released Claims.

10        9.    The Court hereby enters a judgment of dismissal of the entire Action, and with

11   prejudice, as of the filing date of this Final Order, pursuant to the terms set forth in the Joint

12   Stipulation. Without affecting the finality of this Final Order in any way, the Court hereby retains

13   continuing jurisdiction over the interpretation, implementation and enforcement of the Settlement

14   and all orders entered in connection therewith.

15        10.   The Court hereby finds the settlement payments provided for under the Settlement

16   to be fair and reasonable in light of all the circumstances.  The Court, therefore, orders the

17   calculations and the payments to be made and administered in accordance with the terms of the

18   Settlement.

19        11.   The Court hereby confirms The Cartwright Law Group, APLC as Class Counsel in

20   the Action.

21        12.   Pursuant to the terms of the Settlement, and the authorities, evidence and argument

22   submitted by Class Counsel, the Court hereby awards Class Counsel attorneys' fees and costs in

23   the amount of $200,000.00 as final payment for and complete satisfaction of any and all

24   attorneys' fees and costs incurred by and/or owed to Class Counsel and any other person or entity

25   related to the Action. The Court further orders that the award of attorneys' fees and costs set

26   forth in this Paragraph shall be administered pursuant to the terms of the Joint Stipulation, and

27   transferred and/or made payable to The Cartwright Law Group, APLC as Class Counsel in the

28   Action.

13.    The Court also hereby approves and orders an Enhancement Award to Plaintiff Alfred Rava of $20,000.00 for his service as Class Representative.

14.    The Court also hereby approves and orders payment from the Gross Settlement Amount for the actual claims administration costs, and notice and publication costs, incurred by Simpluris, Inc. in the total amount of $25,922.47, of which $9,597.98 has been paid by defendants, with the additional sum of $16,324.49 due to be paid to Simpluris, Inc.

15.    The Court also hereby finds and orders the Settlement is and constitutes a fair, reasonable and adequate compromise of the Released Claims against Defendants and the Released Parties.

16.    Provided the Settlement becomes effective under the terms of Paragraph 14(b) in the Joint Stipulation, the Court hereby orders the deadline for mailing the Court-approved Settlement Awards, attorneys' fees and costs, and Enhancement Award is as set forth in the Implementation Schedule within the Preliminary Approval Order.

17.    The Court also hereby finds that there were no objections to the Settlement raised by any person on the record at the hearing on the Final Order.

**IT IS SO ORDERED.**

Dated: _____

_____
Honorable Robert Freedman
Judge of the Superior Court

Final Order Approving Class Action Settlement, and Judgment of Dismissal with Prejudice

### Proof of Service

1

2      I, Lee Grant, declare: That I am over the age of 18 years and not a party to the

3  within action. My business address is 550 West "C" Street, Suite 1710, San Diego, CA 92101.

4  On July 15, 2009 I served the following documents:

5

6      -Notice and Motion for Final Approval of Settlement
       -P&A in Support of Motion for Final Approval of Settlement
7      -Declaration of Alfred G. Rava in Support of Motion for Final Approval of Settlement
       -Declaration of Troy Hoffman in Support of Motion for Final Approval of Settlement
8      -Declaration of Gregory L. Cartwright in Support of Motion for Final Approval of Settlement
       -Notice of Lodgment in Support of Motion for Final Approval of Settlement
9      -Proposed Order

10  On:

11      George J. Stephan, Esq.              Cary G. Palmer, Esq.
        Buchalter Nemer                      Jackson Lewis, LLP
        1000 Wilshire Blvd Ste 1500          801 K Street, Suite 2300
12      Los Angeles, CA 90017                Sacramento, CA 95814

13      ()    **BY MAIL.** I placed each such sealed envelope(s), with postage fully prepaid

14  for first-class mail, for collection and mailing at The Cartwright Law Group, APLC, San Diego,

15  California, following ordinary business practices. I am familiar with the practices of The

16  Cartwright Law Group, APLC for collection and processing of mail, said practice being that in

17  the ordinary course of business, correspondence and other mails are deposited in the United

18  States Postal Service the same day as it is placed for collection.

19      ()    **BY PERSONAL DELIVERY**. I delivered the above referenced

20  documents, in person, to the above described person, at the address below:

21      (X)   **BY OVERNIGHT DELIVERY**. On the date below, I sent via Federal Express the above

22  described documents to the above described individuals all charges pre-paid, using its 'FedEx Standard

23  Overnight" option.

24

25      I declare under penalty of perjury under the laws of the State of California that the

26  foregoing is true and correct. Executed on July 15, 2009 at San Diego, California.

27

28
                                        Lee J. Grant II

*5817187*

1  Gregory L. Cartwright (201698)
   The Cartwright Law Group, APLC
2  550 West "C" Street, Suite 1710
   San Diego, CA 92101
3  (619) 233-0126 tel.
   (619) 233-0127 fax.

4

5  Attorneys for Plaintiff,
   ALFRED G. RAVA

FILED
ALAMEDA COUNTY

JUL 1 6 2009

By _____ Yasmin Say?

6

7

8                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                            COUNTY OF ALAMEDA

10 ALFRED G. RAVA, suing on behalf of himself and )   CASE NO.: RG 06268693
   those similarly situated,                      )
11                                                 )   DECLARATION OF GREGORY L.
                        Plaintiffs                 )   CARTWRIGHT IN SUPPORT OF
12                                                 )   MOTION FOR FINAL  APPROVAL
                                                   )   OF SETTLEMENT
13                                                 )
   v.                                              )
14                                                 )
                                                   )
15                                                 )
                                                   )
16 ATHLETICS INVESTMENT GROUP LLC, et al. )          Hearing Date:    August 7, 2009
                                                   )   Hearing Time:    11:00am
17                                                 )   Complaint Filed: May 8, 2006
                        Defendants                 )   Dept.:           20
18                                                 )   Judge:           Hon. Robert Freedman
                                                   )   Trial Date:      none set
19

20     I, GREGORY L. CARTWRIGHT, declare as follows:

21     1. I am the attorney of record in the above captioned case, have personal knowledge of the

22 facts stated herein, and am competent and willing to testify to same if sworn to do so.

23                        THE LITIGATION BACKGROUND

24     2. May 9, 2004 was Mother's Day. On May 8, 2004, the Oakland A's played the Minnesota

25 Twins at the McAfee Coliseum in Oakland.  Athletics Investment Group LLC , in conjunction with

26 Macy's, presented an item of sport's memorabilia, a "plaid floppy cap" with Macy's name on one side

27 and the A's logo on the other  to the first 7,500 females over the age of 18 to enter the stadium for

28 the game and pre-game activities. Plaintiff attended the game on May 8, 2004 and did not receive a a

Declaration of Gregory L. Cartwright ISO Mtn for Final Approval of Class Action Settlement

1   hat because of his gender. Plaintiff's class action complaint in this matter, filed on May 8, 2006

2   contains causes of action for (1) Violation of the Unruh Civil Rights Act - California Civil Code

3   section 51., (2) Violation of California Civil Code section 51.5, and (3) Violation of City of Oakland

4   Municipal Code section 944.020.

### THE NEGOTIATED SETTLEMENT

6         3. The Parties in this action reached a negotiated settlement and came before this Court on

7   multiple dates to obtain preliminary approval of the proposed settlement, the sum and substance of

8   which is as follows: Defendants agree to provide each of the 2500 class members a settlement

9   valued at $100 comprised of a cash award totaling $50 in cash - $25.00 to be paid by Macy's and

10   $25.00 to be paid by the Athletics and $50 worth of script - a $25.00 coupon from Macy's and a

11   $25.00 coupon from the Athletics for a total maximum value to the class of $250,000. The

12   settlement will be made on a claims made basis. Additionally, defendants have agreed to pay

13   attorneys fees and court costs of not more than $200,000, and an enhancement for the class

14   representative of $20,000, and class notice/administration costs of not more than $40,000.

### THE PRELIMINARY APPROVAL

16         4. On March 26, 2009 the Court granted preliminary approval of the settlement, the form of

17   class notice and the manner, place and date of notice to the class. Importantly, the Court found that

18   the Settlement "falls within the range of reasonableness and appears to be presumptively valid,

19   subject only to any objections that may be raised at the final fairness hearing and final approval by

20   this Court." As set out below, counsel is unaware of any valid objection to the Settlement having

21   been made.

### NOTICE TO CLASS MEMBERS AND CLAIMS MADE

23         5. The terms of the Settlement provided that notice to the class members was be given by (1)

24   mailing notices to the season ticket holders for the 2004 season; and (2) by publication of class

25   notices in the Oakland Tribune. During the hearings on the Motion for Preliminary Approval, the

26   Court voiced concerns regarding the adequacy of notice if only the Oakland Tribune was used for

27   the publication of the class notice. Class Counsel offered to pay from the award of attorneys fees

28   and court costs made in this action for any costs above the initial $40,000 agreed upon by the parties

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

1  for class administration expenses. Accordingly, notice to the class members was be given by (1)

2  mailing notices to the season ticket holders for the 2004 season; and (2) by publication of class

3  notices in the Oakland Tribune, the Contra Costa Times and the San Jose Mercury News. Of the

4  2889 notices mailed to the list of the 2004 season ticket holders, only 36 proved undeliverable.

5        6. In addition to the publication of Class Notice, the case garnered a significant amount of

6  media attention. There were numerous publications of news stories both within California and in the

7  national media during the claims period including stories published on the online versions of the

8  CBS Sports, the San Diego Tribune, the San Francisco Chronicle, Sports Illustrated and ESPN,

9  among others, and served to provide further notice of this action to class members and the public at

10  large.

11        7. The claims period ended June 25, 2009. Throughout the claims period, there were a total

12  of 52 claims and of those a total of 19 complied with the claims requirements. In addition, 15 class

13  members opted out of the settlement. To date, I am unaware of any valid objections being served on

14  counsel nor filed with the Court. However, I am advised that counsel for the Athletics, Mr. Stephan,

15  did receive a complaint from a female fan that was styled as an "objection" but did not comply in

16  any way with the requirements of an objection, nor did it appear that the person making that

17  "objection" was even a member of the class. I myself received a written complaint from a female

18  fan regarding the lawsuit, but it also failed to comply in any way with the claims procedure, was

19  made by female fan (and therefore not a class member) and did not contain any statement that could

20  be interpreted as an "objection."

21        **THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE**

22        8. The Parties have been litigating this dispute for more than three years with the Complaint

23  having been filed on May 8, 2006. Defendants filed both a demurrer and a motion to strike the

24  Complaint, which were overruled and denied respectively. Thereafter, defendants filed Answers.

25  Plaintiff, for his part, demurred to defendants' affirmative defenses set forth in their Answers. That

26  demurrer, too, was overruled.

27        9. By order of the Court at the January 10, 2007 Case Management Conference, the Parties

28  were to exchange documentary evidence intended to be relied upon by them in connection with

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

1    Defendants' anticipated Motions For Summary Judgment, and the Defendants were to file their

2    Motions for Summary Judgment.  The Parties did exchange their documents, however, due

3    unspecified delays, and continuances, those motions were not heard until November 27, 2007.  The

4    Court issued its ruling denying those motions on or about January 15, 2008.

5         10. Thereafter, the parties agreed to attend mediation, and to use Judge William Sheffield

6    (Ret.) at Judicate West.   The Parties engaged in full-day mediation in Los Angeles on July 1, 2008.

7    The case did not settle at that time.  Thereafter, Judge Sheffield continued to work with the parties to

8    reach a negotiated, arms-length settlement, and that was accomplished via a Memorandum of

9    Understanding approximately six weeks later at the end of August 2008.

10        11. The Parties continued to work together to draft, revise and execute the Joint Stipulation

11   that was finally completed and executed by the parties and their counsel in early February 2009.

12        12. In settling this action, both I and the Class Representative recognized the expense and

13   length of continued proceedings necessary to continue the litigation against defendants through trial

14   and through any possible appeals.  We have also taken into account the uncertainty and risk of the

15   outcome of further litigation, and the difficulties and delays inherent in such litigation. We have

16   also taken into account the extensive settlement negotiations conducted.  Based on these

17   considerations, we have determined that the settlement set forth in the Settlement Agreement is a

18   fair, adequate and reasonable settlement and is in the best interests of the class.

19        13. Substantial amounts of time, energy and resources of all parties have been and, unless

20   settlement was made, would have continued to be devoted to the prosecution and defense of the

21   claims asserted by the Class Representative.  Defendants have, therefore, agreed to resolve this

22   action in the manner and upon the terms set forth in the Settlement Agreement.

23        14. While they have agreed to settle this action, defendants have denied and continue to deny

24   each of the claims and contentions alleged in this action.  Defendants have repeatedly asserted and

25   continue to assert defenses thereto and have expressly denied and continue to deny any wrongdoing

26   or legal liability arising out of any of the facts or conduct alleged in the action.  Defendants have also

27   denied and continue to deny, among other things, the allegations that the plaintiff and the class have

28   suffered damages, that its hat give away promotion was unlawful or discriminatory, or that the

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

1  plaintiff or class was harmed by the conduct alleged in this action. The class representative, on the

2  other hand, has claimed and continues to claim, that the claims released by the Settlement

3  Agreement have merit and give rise to liability on the part of Defendants.

4        15. This settlement is the result of intensive arms-length negotiations. The settlement

5  resulted from the good faith efforts of the parties to resolve this case through years of litigation and

6  negotiation. Indeed, even before the parties attended mediation they had exchanged several

7  settlement demands and offers over the course of the case. Numerous written and oral settlement

8  proposals were exchanged and the parties' counsel conducted a day long mediation with Hon.

9  William Sheffield (Ret.) of Judicate West. Following that mediation, the parties continued to

10 negotiate (with the assistance of Judge Sheffield) for nearly an additional six weeks to agree upon,

11 draft and execute a written Memorandum of Understanding. The parties continued thereafter for

12 several months to work together to draft the Joint Stipulation.

13       16. The parties exchanged documents in connection with the Motions for Summary

14 Judgment. Throughout this negotiation period, Class counsel diligently acted to obtain settlement of

15 this case, ensured that the terms of the settlement were fair to every member of the class, and

16 obtained the requisite opportunities for notice, participation, exclusion and objection in accordance

17 with California class action law.

18       17. Defendants have denied and continue to deny each and all of the claims and contentions

19 alleged in the action. Defendants have asserted and continue to assert many defenses thereto, and

20 have expressly denied and continue to deny any wrongdoing or legal liability arising out of the

21 conduct alleged in the action. Nonetheless, as set forth in the settlement agreement, the parties have

22 concluded that it is desirable that the action be settled in the manner and upon the terms and

23 conditions set forth in the Settlement Agreement in order to avoid the expense, inconvenience and

24 burden of further legal proceedings, and the uncertainties of trial and appeals. As set forth in the

25 Settlement Agreement, defendants have determined that it is desirable and beneficial to put to rest

26 the claims asserted in the action.

27       18. The class representative and I recognize the expense of further litigation including class

28 certification and trial as well as any possible appeal which could take several years. We have also

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

1  have taken into account the uncertain outcome and risk of litigation, especially in complex actions

2  such as this action. We recognize the possible difficulties of proving this case and the risks to the

3  class associated with the defenses alleged to the claims asserted in this action.  We believe that the

4  settlement agreement confers substantial benefits upon the class.  Based upon my evaluation, I have

5  determined that the terms contained in the settlement agreement are in the best interests of the class,

6  and are fair, adequate and reasonable.

7       19. All Class Members received the same opportunity to participate in and receive the

8  payment of cash and script totaling $100.00 of value.

9       20. The Court should consider the value of the settlement to the Settlement Class in light of

10  the likelihood of success through trial and appeal.  In doing so, the Court should consider recent a

11  appellate Court decision in *Cohn v. Corinthian Colleges, Inc.* 169 Cal.App.4th 523.   The *Cohn* case

12  dealt with similar facts to the case at bar.  In *Cohn*, the Plaintiff sued Corithian Colleges and the

13  Anaheim Angels for a promotional give away of a tote bag for Mother's Day event at an Angels

14  game. As in our case, the Angels only gave the promotional item to adult female fans, and not men.

15  The *Cohn* matter was briefed, and set for oral argument when the parties in this case attended

16  mediation.  Given that the appeals court in that case could have made a ruling adverse to either side,

17  the Parties in this case intentionally reached their settlement and executed the Memorandum of

18  Understanding before oral argument in that case was heard with an eye towards limiting their

19  respective liabilities.  Since the parties executed the MOU, the appeals court has ruled in *Cohn*  that

20  the Angels' Mother's Day promotion did not violate the Unruh Civil Rights Act.  If the parties were

21  to proceed to trial, it is likely that the defendants would argue the *Cohn* decision is controlling

22  authority, and Plaintiff would argue that unique facts at issue in this case which were not before the

23  Court in the *Cohn* matter would distinguish the two cases. Nonetheless, there remains a real risk that

24  *Cohn* could be construed to limit any recovery whatsoever from any class member.  Against this

25  backdrop, the Settlement conferring upon class members a benefit of $100 is fair, adequate and

26  reasonable.

27       21. Given the complexities of this case and the uncertainties of proof and appeal, the

28  proposed settlement in both the Class Representative's and my view is within the range of

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

1   appropriate settlements and has no obvious deficiencies.

2       22. All Settlement Class Members who submitted timely and properly completed Claim

3   Forms were treated equally. The definition of the "Settlement Class" is well defined and allowed

4   those men who could demonstrate through the claims procedure that they were discriminated against

5   in the promotional give away to receive the benefit of the settlement. The amount that the defendant

6   has agreed to pay each class member in settlement proceeds (a value equal to $100) is exclusive of

7   the attorney fees request, the Class Representative enhancement, and the costs of administration.

8   The Settlement Agreement contemplated and "incentive award" for the Class Representative.

9       23. The Settlement Agreement provides the same benefit, in terms of the monetary award

10  and vouchers to all males who fit within the class definition. In determining each Settlement Class

11  Member's eligibility, defendants, through the Class Administrator (Simpluris, Inc.) have relied on

12  the claim forms submitted by each Settlement Class Member.

13      24. The stage of the proceedings at which this settlement was reached militates in favor of

14  final approval of the settlement. The agreement to settle did not occur until after two and half years

15  of litigation, law and motion practice, investigation, lengthy settlement negotiations and after I

16  possessed sufficient information to make an informed judgment regarding the likelihood of success

17  on the merits and the results that could be obtained through further litigation.

18      25. Pursuant to the Court's order concerning discovery for the Defendants' Motions for

19  Summary Judgment, and in support and their respective briefs, the parties exchanged declarations,

20  photographs of the events and various other documentary evidence including the written agreement

21  between the Athletics and Macy's, press releases, the Athletics/Macy's marketing survey, and the

22  receipts from the hat supplier showing that the Athletics paid $1.47 per hat. The foregoing evidence

23  demonstrated that there was a maximum number of 7,500 hats during the give away, the defendants'

24  purported intent behind the promotion, the involvement of the two defendants, and the approximate

25  number of eligible class members. At this stage, I believe both I and the Court has sufficient

26  evidence to determine that the settlement is fair, adequate and reasonable pursuant to *Kullar v. Foot*

27  *Locker Retail, Inc.* (2008) 168 Cal.App.4th 116.

28      26. The release that will be obtained by Defendants is set forth in paragraph 22 of the Joint

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

1  Stipulation (Joint Stipulation, page 14, lines 11-28, page 15 1-5). The release extends to the named

2  defendants and the typical list of related parties and entities.  The claims being released are those

3  claims "arising out of or related to the A's/Macy's reversible bucket hat giveaway at the A's baseball

4  game on May 8, 2004....and all other claims and allegations made in the Action and that reasonably

5  arise out of or related to the facts alleged in the Case from May 8, 2004 through the date the Court

6  finally approves the Settlement."

7      27. The Notice stated that the members of the Class who wish to receive the benefit of the

8  settlement shall complete and return the Claim Form pursuant to the instructions contained therein

9  by first class mail or equivalent, postage paid.  The notice also provided that any member of the

10  Class may choose to "opt out" of the Class, and that any such person who chooses to "opt out" of the

11  class will not be entitled to any recovery from the settlement fund and will not be bound by the

12  settlement or have any right to object, appeal or comment thereon.

13      28. The Notice also provides that any objections to the settlement shall be heard, and any

14  papers submitted in support of any such objections shall be received and considered by the court at

15  the instant Final Approval Hearing.

16      29. The Notice required by the Joint Stipulation was designed to meaningfully reach the

17  largest number of potential members of the Class.  It therefore complies fully with applicable case

18  law that the notice given should have a reasonable chance of reaching a substantial percentage of the

19  Class.  The publication of the Settlement Notice in the Oakland Tribune where the original Notice of

20  Class Action was published meets the requirements of due process, and is the best notice practicable

21  under the circumstances and constitutes due and sufficient notice to all persons entitled to such

22  notice.

23      30.  The Notice as previously approved by the Court was accurate and informative.  It

24  provided information on the terms and provisions of the settlement; the benefits the settlement

25  provided to the Settlement Class; the date, time and place of the final settlement approval hearing;

26  and the procedure and deadlines for submitting claims, comments, objections or requests for

27  exclusion.  The notice satisfied the content requirements for notice following the exemplar class

28  notice in the Manual for Complex Litigation, Second  §41.43.  This notice also fulfills the

1 | requirement that class notices be neutral.  Newberg, §8.39.

2 |     31. I have actively litigated at least 35 Unruh Civil Rights Act cases throughout California

3 | including cases brought as class actions.   In the past, I have served as co-counsel on at two other

4 | Unruh Civil Rights Act cases brought as class action matters, and have be co-counsel on three other

5 | class action matters – two brought as wage and hour matters and one brought pursuant to the

6 | Consumer Legal Remedies Act.  I do not believe there is any other attorney that has litigated this

7 | number of individual and class action claims brought pursuant to the Unruh Civil Rights Act.  Based

8 | upon my experience in these types of cases, I believe that the settlement is fair, adequate and

9 | reasonable.

### THE CLASS REPRESENTATIVE'S INCENTIVE AWARD

11 |     32. Class counsel requests that an incentive award of $20,000 be paid to the Class

12 | Representative Alfred G. Rava in this matter due to the additional efforts Class Representative has

13 | had to endure in this matter.  Mr. Rava has been closely involved in and participated this litigation,

14 | has been kept informed by me of all material developments, attended a day-long mediation and flew

15 | to Oakland from San Diego to attend the hearing on the Defendants' demurrers and motions to

16 | strike.  Mr. Rava has advanced some of his own money to support this litigation, and expended at

17 | least 50 hours of his time.  Additionally, Mr. Rava has had to suffer truly nasty conduct on the part

18 | of those who disagree with this litigation, and has suffered personal attacks and even threats.

19 | Moreover, throughout this rather lengthy litigation, Alfred G. Rava  has remained steadfast in his

20 | insistence that this matter be remedied for the benefit and betterment of the class as a whole,

21 | notwithstanding that, had he so chosen, he could have eschewed his obligations thereto and privately

22 | resolved his claims with the defendant for significant remuneration.

### THE COSTS OF CASE ADMINISTRATION

24 |     33. As set forth in the accompanying declaration of Troy Hoffman, the costs of case

25 | administration in this matter were $25,922.47.  To date, the Athletics have already paid to Simpluris

26 | the sum of $9,597.98, thereby leaving a total of $16,324.49 remaining to be paid by defendants By

27 | the terms of the settlement and the Court's preliminary approval order, the defendants have agreed to

28 | pay a maximum sum of $40,000 towards class administration costs.  Furthermore, any sums above

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

1  that must be borne by Class Counsel.

2  **CLASS COUNSEL'S ATTORNEYS FEES AND COURT COSTS**

3  34. A true and correct copy of the billing statement is attached hereto as Exhibit A. All costs

4  and time reflected thereon were actually expended by my firm in the litigation of this matter. As the

5  attached invoice indicates, the costs incurred in this case $6,235.21. Incidental expenses for such

6  things as photocopying, fax charges and long distance telephone expenses have been omitted. The

7  costs sought are all reasonable and necessary for the prosecution of this action.

8  35. Additionally, my firm has spent no fewer than 340 hours litigating this matter and that

9  time includes an estimate of 10 hours for work to be performed following the filing of this

10  declaration. Importantly, the time that was spent on this matter by support staff, paralegals and law

11  clerks is not reflected, only time spent by the attorneys working on this case.

12  36. This matter was undertaken as a pure contingency matter, and that coupled with my

13  experience and results obtained makes the fee award in this case appropriate for a multiplier as more

14  fully set forth in the accompanying Memorandum.

15  37. I am a graduate of Tulane Law School, and have approximately 10 years' experience in

16  private practice as a civil litigator. I have litigated cases in San Diego, Orange, Riverside, Los

17  Angeles, Ventura, Alameda and Plumas Counties. I have tried to decision six contested matters,

18  including four jury trials and two bench trials. I have arbitrated four other matters. In addition to

19  my work in civil rights and discrimination law, I also practice in the areas of "anti-SLAPP,"

20  commercial litigation, employment and labor law, identity theft, securities fraud, and claims against

21  fiduciaries such as real estate agents and brokers and attorneys. Based upon my experience, $400 is

22  a reasonable hourly rate, and is likely below the average prevailing rate for lawyers of similar

23  experience and skill in the Bay Area.

24  I declare that the foregoing is true and correct under penalty of perjury under the laws of the

25  State of California. Executed at San Diego, California this 8th day of July 2009

26  Gregory L. Cartwright

27

28

THE CARTWRIGHT LAW GROUP, APLC
550 West "C" Street, Suite 1710
SAN DIEGO, CA 92101
(619) 233-0126   FAX (619) 233-0127

The Cartwright Law Group, APLC
550 West "C" Street, Suite 1710
San Diego, CA 92101

(619) 233-0126 tel.
(619) 233-0127 fax

Alfred, Rava

Page: 1
07/15/2009
Account No:    998-00
Statement No:    1860

Rava v. Athletics

Interim Statement

## Fees

|  |  | Rate | Hours |  |
|---|---|---|---|---|
| 04/20/2006 GLC | office conference with Al Rava re potential class action matter against A's; review evidence; research A's and Macy's | 400.00 | 2.25 | 900.00 |
| 04/24/2006 GLC | research and outline class action complaint | 400.00 | 1.50 | 600.00 |
| 04/26/2006 GLC | draft class-action complaint | 400.00 | 2.50 | 1,000.00 |
| 06/19/2006 GLC | t/c w/ client re status and organize Summons & Complaint and forward for service | 400.00 | 0.35 | 140.00 |
| 07/05/2006 GLC | draft settlement demand; t/c class rep re status of case | 400.00 | 1.10 | 440.00 |
| 08/21/2006 GLC | teleconf w/ atty Cary Palmer re continuance; t/c client re same | 400.00 | 0.25 | 100.00 |
| 08/23/2006 GLC | t/c opposing counsel re extension for time to answer | 400.00 | 0.20 | 80.00 |
| 08/25/2006 GLC | draft correspondence to counsel re continuance and answer | 400.00 | 0.35 | 140.00 |
| 09/05/2006 GLC | review and research demurrer and motion to strike; t/c client re issues | 400.00 | 1.25 | 500.00 |
| 09/19/2006 GLC | t/c opposing counsel; draft stipulation to continue dates and transfer to complex deptartment | 400.00 | 0.75 | 300.00 |

Page: 2
07/15/2009

Alfred, Rava

Account No:     998-00
Statement No:     1860

Rava v. Athletics

| | | Rate | Hours | |
|---|---|---|---|---|
| 09/20/2006 GLC | t/c w/ court clerk re staying motions | 400.00 | 0.20 | 80.00 |
| 10/02/2006 GLC | outline and research opposition to motion to strike and demurrer | 400.00 | 6.50 | 2,600.00 |
| 10/03/2006 GLC | research and revise opposition to demurrer and motion to strike; review legislative history; t/c with Al Rava; draft and revise declaration of Gregory L. Cartwright in support thereof; draft Request For Judicial Notice | 400.00 | 8.00 | 3,200.00 |
| 10/13/2006 GLC | review reply papers and research same | 400.00 | 1.25 | 500.00 |
| 10/16/2006 GLC | prepare for hearing; travel to Oakland for hearing on demurrer/motion to strike | 400.00 | 8.50 | 3,400.00 |
| 10/17/2006 GLC | prepare for and attend hearing; return travel | 400.00 | 5.00 | 2,000.00 |
| 10/26/2006 GLC | review rulings on demurrer and motion to strike and draft notice thereof; conf w/ client and staff re same; t/c opposing counsel Cary Palmer re CMC and complex case issues, service of process issues; draft discovery requests; review correspondence from opp counsel; draft correspondence to opposing re: notice of default | 400.00 | 4.75 | 1,900.00 |
| 10/31/2006 GLC | review correspondence from rava re corporate entities; review correspondence from opposing counsel re corporate entities; office conference w/ class rep re: defendants and dismissals; conf w/ staff re Request for Dismissals and discovery plan | 400.00 | 0.55 | 220.00 |
| 11/01/2006 GLC | research and draft Case Management Conference statement | 400.00 | 0.75 | 300.00 |
| 11/02/2006 GLC | draft request for dismissal of Macy's West and limited partnership; revise CMC statement | 400.00 | 0.65 | 260.00 |
| 11/14/2006 GLC | t/c court call | 400.00 | 0.10 | 40.00 |
| 11/16/2006 GLC | research and draft demurrer to Macy's answer | 400.00 | 4.50 | 1,800.00 |

Page: 3
07/15/2009

Alfred, Rava

Account No:      998-00
Statement No:       1860

Rava v. Athletics

|  |  | Rate | Hours |  |
|---|---|---|---|---|
| **11/17/2006** | | | | |
| GLC | research, draft and revise demurrer to A's complaint; review Demand for Statement of Damages; t/c client; prepare for and attend (telephonically) Case Management Conference | 400.00 | 8.20 | 3,280.00 |
| GLC | t/c Macy's atty re demurrer to answer | 400.00 | 0.20 | 80.00 |
| **11/27/2006** | | | | |
| GLC | revise demurrer to Macy's Answer; draft and revise demurrer to Athletics' answer | 400.00 | 5.50 | 2,200.00 |
| **12/19/2006** | | | | |
| GLC | t/c client; t/c opposing counsel; review e-mail from court clerk; revise and forward stipulation | 400.00 | 0.45 | 180.00 |
| **01/02/2007** | | | | |
| GLC | t/c with client; review CCMC order; draft CCMC statement | 400.00 | 1.90 | 760.00 |
| **01/03/2007** | | | | |
| GLC | revise, serve and file CCMC Statement | 400.00 | 0.50 | 200.00 |
| **01/10/2007** | | | | |
| GLC | prepare for, travel to and attend CCMC hearing | 400.00 | 6.25 | 2,500.00 |
| **01/18/2007** | | | | |
| GLC | review opposition brief, research and outline reply | 400.00 | 3.00 | 1,200.00 |
| **01/22/2007** | | | | |
| GLC | research and draft reply memos | 400.00 | 7.50 | 3,000.00 |
| **01/25/2007** | | | | |
| GLC | review tentative ruling on demurrers to answer; telephonic hearing on demurrers; t/c with (2) opposing counsel re discovery and Law & Motion; t/c with client re same | 400.00 | 0.90 | 360.00 |
| **02/20/2007** | | | | |
| GLC | review proposed order and e-mail opposing counsel re same | 400.00 | 0.20 | 80.00 |
| **04/30/2007** | | | | |
| GLC | t/c client re possible stay; draft correspondence to opposing counsel re: stay pending outcome of Cohn v. Corinthian Colleges; draft proposed stipulation and order re stay | 400.00 | 1.10 | 440.00 |
| **06/18/2007** | | | | |
| GLC | review A's updated case management conference with attached ruling in Cohn v. Corithian Colleges | 400.00 | 0.20 | 80.00 |
| **06/26/2007** | | | | |
| GLC | revise CMC statement and declaration of Rava | 400.00 | 1.10 | 440.00 |

Page: 4

07/15/2009

Alfred, Rava

Account No:     998-00
Statement No:        1860

Rava v. Athletics

|  |  | Rate | Hours |  |
|---|---|---|---|---|
| 06/28/2007 GLC | travel to and attend CMC | 400.00 | 6.50 | 2,600.00 |
| 08/08/2007 GLC | cursory review MSJ; t/c client re same; emails to and from George Stephan | 400.00 | 0.75 | 300.00 |
| 10/26/2007 MJC | research re Separate Statement and Evidence Code; revise opposition and separate statement | 400.00 | 8.20 | 3,280.00 |
| 10/27/2007 MJC | Oppose MSJ/MSA; draft evidentiary objections and key to Sep. St.; prepare Request for Judicial Notice for A's/Macy's | 400.00 | 10.00 | 4,000.00 |
| 10/28/2007 MJC | Oppose MSJ/MSA; draft evidentiary objections and key to Sep. St.; prepare RJN for A's/Macy's; Macy's Oppo | 400.00 | 8.00 | 3,200.00 |
| 10/29/2007 GLC | research and revise opposition brief for Motion for Summary Judgment and supporting documents | 400.00 | 7.50 | 3,000.00 |
| 10/30/2007 GLC | draft and revise opposition papers to Motion for Summary Judgment, draft objection to Macy's Request for Judicial Notice | 400.00 | 11.50 | 4,600.00 |
| 10/31/2007 GLC | revise opposition papers for Motion for Summary Judgment | 400.00 | 8.50 | 3,400.00 |
| 11/08/2007 GLC | draft CMC statement | 400.00 | 0.35 | 140.00 |
| 11/09/2007 GLC | review reply; t/c court clerk re change of dates on hearing | 400.00 | 0.55 | 220.00 |
| 11/26/2007 GLC | review and research reply papers for Motion for Summary Judgment | 400.00 | 1.75 | 700.00 |
| 11/27/2007 GLC | t/c client; review tentative ruling and papers; research 51.5 issue re: macy's; travel to and attend hearing | 400.00 | 10.50 | 4,200.00 |
| 12/12/2007 GLC | t/c Rava and review press release info re purpose of promotion | 400.00 | 0.45 | 180.00 |
| 01/17/2008 GLC | prepare for and appear at CMC; t/c client re update | 400.00 | 0.75 | 300.00 |

Alfred, Rava

07/15/2009
Account No:    998-00
Statement No:    1860

Rava v. Athletics

| Date | | Description | Rate | Hours | |
|---|---|---|---|---|---|
| 01/18/2008 | GLC | review final ruling by court on MSJ's; t/c client re settlement demand, trial issues, discovery plan and class certificaiton | 400.00 | 0.85 | 340.00 |
| 01/22/2008 | GLC | draft settlement demand | 400.00 | 0.65 | 260.00 |
| 02/05/2008 | GLC | draft correspondence to counsel and forward to same re CMC and depos; review CMC minute order and draft CMC Notice and proof of service and serve via mail and fax; t/c opposing counsel Palmer re CMC status, whereabouts of George Stephan, and settlement options; review state bar website re whereabouts of George Stephan; t/c client re status of case, CMC, and conversation with opp counsel | 400.00 | 1.75 | 700.00 |
| 02/08/2008 | GLC | t/c George Stephan re status of firm change, settlement issues, CMC issues; t/c client re same; research attorneys fees issues, class certification issues, common fund issues; t/c w/ counsel in Club Med matter re settlement approval comparing settlement terms in Rava v. Athletics | 400.00 | 2.50 | 1,000.00 |
| 02/11/2008 | GLC | review club med order; t/c client re club med and settlement of A's case; draft revised settlement demand to opposing counsel | 400.00 | 1.50 | 600.00 |
| 02/12/2008 | GLC | revise settlement demand and forward | 400.00 | 0.30 | 120.00 |
| 02/25/2008 | GLC | t/c Cary Palmer re settlement, status, and CMC; t/c client re same | 400.00 | 0.35 | 140.00 |
| 02/27/2008 | GLC | Review substitution of atty for Athletics; outline Joint CMC statement and continuance issues; draft discovery plan and begin discovery requests | 400.00 | 1.75 | 700.00 |
| 02/28/2008 | GLC | draft and forward stipulation to continue dates; email to opposing counsel; conference with staff re discovery plan; outline Request for Production of Doucments; draft form rogs | 400.00 | 2.10 | 840.00 |
| 03/06/2008 | GLC | draft discovery requests | 400.00 | 3.90 | 1,560.00 |
| 03/07/2008 | GLC | revise discovery requests; email to opposing counsel re revocation of settlement offer; t/c George Stephan; t/c (4) | | | |

Alfred, Rava

Rava v. Athletics

| | | Rate | Hours | |
|---|---|---|---|---|
| | client re settlement issues | 400.00 | 4.50 | 1,800.00 |
| 03/11/2008 GLC | conferebce w/ appellate attorney Randy Christionson regarding Angels appeal, and issues related to Athletics, and research same | 400.00 | 1.10 | 440.00 |
| 04/04/2008 GLC | review correspondence re discovery | 400.00 | 0.20 | 80.00 |
| 04/09/2008 GLC | draft correspondence to Russel Allyn re discovery | 400.00 | 0.25 | 100.00 |
| 04/25/2008 GLC | emails and from to opposing counsel re CMC and PMK depos | 400.00 | 0.20 | 80.00 |
| 05/07/2008 GLC | t/c client re mediators; review Judicate West website re Judge Sheffield; t/c Adjudicate West re: available dates; draft JCMC; emails to and from opposing counsel re mediation and JCMC | 400.00 | 1.60 | 640.00 |
| 05/09/2008 GLC | review and file CMC statement; emails to and from opposing counsel re mediation; emails to client re same; t/c Judicate West re scheduling | 400.00 | 0.50 | 200.00 |
| 05/16/2008 GLC | t/c George Stephan re Motion to Compel; draft email confirming same | 400.00 | 0.20 | 80.00 |
| 06/03/2008 GLC | review agreement from Adjudicate West for mediation; t/c adjudicate west; t/c client | 400.00 | 0.50 | 200.00 |
| 06/23/2008 GLC | outline mediation brief; office conference w/ client and t/c w/ Simplurus re class administration issues | 400.00 | 1.50 | 600.00 |
| 06/24/2008 GLC | draft and revise mediation brief | 400.00 | 2.00 | 800.00 |
| 06/25/2008 GLC | revise and organize mediation brief; t/c George Stephan re non-appearance of AIG adjuster at mediation; t/c client re same; | 400.00 | 0.75 | 300.00 |
| 06/26/2008 GLC | review mediation brief and prepare for mediation | 400.00 | 0.80 | 320.00 |

Alfred, Rava

Rava v. Athletics

| | | | Rate | Hours | |
|---|---|---|---|---|---|
| 06/30/2008 GLC | prepare for mediation | | 400.00 | 3.20 | 1,280.00 |
| 07/01/2008 GLC | travel to and and from and attend mediation in Los Angeles at Adjudicate West with Judge Sheffield | | 400.00 | 10.00 | 4,000.00 |
| 07/02/2008 GLC | emails to and from client re status of case | | 400.00 | 0.10 | 40.00 |
| 07/10/2008 GLC | review mediator's proposal, forward to client and teleconf re same | | 400.00 | 0.50 | 200.00 |
| 07/14/2008 GLC | t/c client re mediator's proposal and draft and forward correspondence to Judge Sheffield | | 400.00 | 0.65 | 260.00 |
| 07/22/2008 GLC | t/c and email to and from mediator re status of mediator's proposal; t/c client re same | | 400.00 | 0.45 | 180.00 |
| 07/25/2008 GLC | emails to and from opposing counsel re CMC statement | | 400.00 | 0.20 | 80.00 |
| 08/06/2008 GLC | t/c mediator; review and analyze proposal; t/c w/ Simpluris representative re contact information; t.c court clerk and email same re CMC; t/c client re status of case | | 400.00 | 1.50 | 600.00 |
| 08/08/2008 GLC | t/c (2) with client; emails to and from Judge Sheffield and opposing counsel re mediator's proposal | | 400.00 | 2.50 | 1,000.00 |
| 08/11/2008 GLC | t/c Al Rava re settlement; emails to and from mediator and opposing counsel  issues | | 400.00 | | |
| 08/12/2008 GLC | emails to and from counsel and mediator re settlement | | 400.00 | 0.30 | 120.00 |
| 08/19/2008 GLC | review and analyze settlement agreement; t/c (2) with client re same; revise settlement agreement and forward to mediator and opposing counsel | | 400.00 | 1.25 | 500.00 |
| 08/20/2008 GLC | review revised settlement agreement; t/c client re same; draft response; review Supreme Court ruling in Benitez re: 1st Amendment argument | | 400.00 | 0.75 | 300.00 |

Page: 8
07/15/2009

Alfred, Rava

Account No:    998-00
Statement No:    1860

Rava v. Athletics

| Date | | Description | Rate | Hours | |
|------|---|-------------|------|-------|---|
| 08/21/2008 | GLC | emails to and from opposing counsel re settlement terms; t/c client re same | 400.00 | 1.20 | 480.00 |
| 08/22/2008 | GLC | review emails from mediator and opposing counsel | 400.00 | 0.10 | 40.00 |
| 09/09/2008 | GLC | t/c Cary Palmer re CMC and settlement docs; t/c  Court Call | 400.00 | 0.35 | 140.00 |
| 10/20/2008 | MJC | research and drafting of opposition to Motion for Summary Judgment/Adjudication | 400.00 | 6.00 | 2,400.00 |
| 10/21/2008 | MJC | research and outline opposition to Motion for Summary Judgment/Adjudication | 400.00 | 8.00 | 3,200.00 |
| 10/24/2008 | MJC | revise opposition to MSJ | 400.00 | 8.00 | 3,200.00 |
| 10/25/2008 | MJC | revise opposition to Motion for Summary Judgement; outline Separate Statement in Opposition | 400.00 | 7.75 | 3,100.00 |
| 11/08/2008 | GLC | review email from opposing counsel and respond | 400.00 | 0.10 | 40.00 |
| 11/17/2008 | GLC | review stipulation and t/c client re same, status of case, and settlement | 400.00 | 0.80 | 320.00 |
| 11/24/2008 | GLC | review and revise settlement docs; t/c opposing counsel; t/c class rep. | 400.00 | 2.50 | 1,000.00 |
| 02/02/2009 | GLC | emails to and from oppo counsel; t/c client re status | 400.00 | 0.25 | 100.00 |
| 02/05/2009 | GLC | emails to and from court clerk and opp counsel | 400.00 | 0.20 | 80.00 |
| 02/06/2009 | GLC | emails to and from Judge Sheffield re declaration; research and outline  Memorandum of Points & Authorities In Support of Motion for Preliminary Approval of Settlement | 400.00 | 3.25 | 1,300.00 |
| 02/09/2009 | GLC | research and draft motion for prelim approval; draft decl for Judge Sheffield | 400.00 | 7.20 | 2,880.00 |

Alfred, Rava

Rava v. Athletics

| | | Rate | Hours | |
|---|---|---|---|---|
| **02/10/2009** | | | | |
| GLC | review Footlocker case and local rules; emails to and from counsel; revise brief | 400.00 | 7.50 | 3,000.00 |
| **02/11/2009** | | | | |
| GLC | revise motion for preliminary approval; draft decl of Rava | 400.00 | 6.50 | 2,600.00 |
| **02/12/2009** | | | | |
| GLC | revise brief and declaration for Rava; emails to and from opposing counsel re same | 400.00 | 1.75 | 700.00 |
| **02/13/2009** | | | | |
| GLC | revise P&A for preliminary approval; draft notice of motion; emails to and from Troy Hoffman and revise declaration; draft notice of lodgment; emails to opposing counsel | 400.00 | 5.50 | 2,200.00 |
| **02/18/2009** | | | | |
| GLC | review tentative ruling; emails to and from opposing counsel; t/c Troy Hoffman re supplemental declaration; draft and revise supplemental declaration; revise class notices and proposed order | 400.00 | 6.50 | 2,600.00 |
| **02/19/2009** | | | | |
| GLC | draft revised order; draft supplemental decl of GLC; attempt to travel to hearing; court call fees | 400.00 | 7.50 | 3,000.00 |
| **02/26/2009** | | | | |
| GLC | research and draft declaration for hoffman; email to same | 400.00 | 0.50 | 200.00 |
| **02/27/2009** | | | | |
| GLC | t/c w/ hoffman and emai lto same; revise decl, serve and file | 400.00 | 0.45 | 180.00 |
| **03/03/2009** | | | | |
| GLC | review tentative; email opposing counsel; research applicable case law; t/c client re same | 400.00 | 0.75 | 300.00 |
| **03/04/2009** | | | | |
| GLC | prepare for, travel to and attend continued hearing on motion for preliminary approval | 400.00 | 10.00 | 4,000.00 |
| **03/13/2009** | | | | |
| GLC | review email from opposing counsel re preliminary approval and notice; emailslto and from client | 400.00 | 0.35 | 140.00 |
| **03/17/2009** | | | | |
| GLC | t/c client re revisions; email to opposing counsel | 400.00 | 0.20 | 80.00 |
| **03/18/2009** | | | | |
| GLC | emails to and from opposing counsel; review changes to proposed order | 400.00 | 0.35 | 140.00 |

Alfred, Rava

|  |  | Account No: | 998-00 |
|--|--|-------------|--------|
|  |  | Statement No: | 1860 |

Rava v. Athletics

|  |  | Rate | Hours |  |
|--|--|------|-------|--|
| **03/20/2009** |  |  |  |  |
| GLC | draft declaration and emails to and from opposing counsel re status | 400.00 | 0.50 | 200.00 |
| **03/23/2009** |  |  |  |  |
| GLC | draft declaration of Gregory L. Cartwright in support of Preliminary Approval and adjustment to costs of administration | 400.00 | 0.75 | 300.00 |
| **04/06/2009** |  |  |  |  |
| GLC | emails re updated notices | 400.00 | 0.20 | 80.00 |
| **04/21/2009** |  |  |  |  |
| GLC | emails to and from case administrator at Simpluris and opposing counsel | 400.00 | 0.10 | 40.00 |
| **04/28/2009** |  |  |  |  |
| GLC | emails to George Stephan; revise stipulation re advance of publication costs | 400.00 | 0.35 | 140.00 |
| **04/29/2009** |  |  |  |  |
| GLC | t/c george stephan re terms of stipulation regarding advance of publication costs; t/c client re same | 400.00 | 0.50 | 200.00 |
| **05/04/2009** |  |  |  |  |
| GLC | emails to and from case administrator and opposing counsel re publication of class notice | 400.00 | 0.35 | 140.00 |
| **05/25/2009** |  |  |  |  |
| GLC | review report from Simpluris; t/c client re same and claim | 400.00 |  |  |
| **06/08/2009** |  |  |  |  |
| GLC | review email and weekly report from Simpluris | 400.00 | 0.10 | 40.00 |
| **06/15/2009** |  |  |  |  |
| GLC | review email and weekly report from Simpluris | 400.00 | 0.10 | 40.00 |
| **06/22/2009** |  |  |  |  |
| GLC | review email and weekly report from Simpluris | 400.00 |  |  |
| **06/29/2009** |  |  |  |  |
| GLC | review email and report from Simpluris | 400.00 | 0.10 | 40.00 |
| **06/30/2009** |  |  |  |  |
| GLC | t/c Al Rava re declaration and fairness hearing | 400.00 | 0.50 | 200.00 |
| **07/06/2009** |  |  |  |  |
| GLC | review email and report from simpluris | 400.00 | 0.10 | 40.00 |
| **07/09/2009** |  |  |  |  |
| GLC | emails to and from Simpluris re report and declaration | 400.00 | 0.10 | 40.00 |

Alfred, Rava

07/15/2009

Account No: 998-00
Statement No: 1860

Rava v. Athletics

| Date | | Description | Rate | Hours | |
|------|--|-------------|------|-------|--|
| 07/10/2009 | GLC | research and outline motion on fairness hearing | 400.00 | 3.10 | 1,240.00 |
| 07/13/2009 | GLC | draft GLC declaration; emails to and from Simpluris re declaration re class notice; review and finalize billing statement for attorneys fees and court costs | 400.00 | 8.10 | 3,240.00 |
| 07/14/2009 | GLC | t/c client re status of motion and supporting declarations; review case file re: accuracy of billing; emails to and from Simpluris and opposing counsel re final report from Simpluris and declaration of Troy Hoffman; t/c Jaime Gregory at Simpluris re declaration of Troy Hoffman, costs of administration and claims; finalize motion on fairness hearing and supporting documents; revise declaration of Alfred G. Rava in Support of Motion; revise Declaration of Gregory L. Cartwright in Support of Motion; | 400.00 | 7.50 | 3,000.00 |
| 08/07/2009 | GLC | (estimated) prepare for, travel to and attend final fairness hearing | 400.00 | 10.00 | 4,000.00 |
| | | For Current Services Rendered | | 340.70 | 136,280.00 |

Recapitulation

| Timekeeper | Hours | Rate | Total |
|------------|-------|------|-------|
| Gregory L. Cartwright | 284.75 | $400.00 | $113,900.00 |
| Margaret J. Cartwright | 55.95 | 400.00 | 22,380.00 |

Expenses

| Date | Description | Amount |
|------|-------------|--------|
| 07/03/2006 | Law In Motion -service | 95.00 |
| 07/08/2006 | Law In Motion - service | 195.00 |
| 10/03/2006 | Westlaw - out of library charge | 15.43 |
| 10/04/2006 | fax filing charge | 22.00 |
| 10/06/2006 | airfare charge | 198.60 |
| 10/17/2006 | airfare charge - change of flight charge | 40.00 |
| 11/04/2006 | filing fee | 7.00 |
| 11/17/2006 | Westlaw- out of library charge | 12.00 |
| 11/28/2006 | fax filing fee demurrer | 106.00 |
| 01/03/2007 | FedEx Charge | 20.48 |
| 01/08/2007 | airfare | 198.80 |
| 01/10/2007 | cab far from Oakland Airport to Courthouse | 40.00 |
| 01/10/2007 | parking charge at San Diego Airport | 20.00 |
| 01/10/2007 | cab fare courthouse to airport | 35.00 |
| 01/22/2007 | FedEx charges | 112.46 |
| 01/22/2007 | westlaw charges - out of library | 125.83 |
| 06/26/2007 | airfare | 282.20 |
| 06/26/2007 | FedEx charges | 110.88 |
| 06/28/2007 | cab fare | 35.00 |

Page: 12
07/15/2009

Alfred, Rava

Account No:    998-00
Statement No:    1860

Rava v. Athletics

| Date | Description | Amount |
|---|---|---|
| | | 20.00 |
| 06/28/2007 | airport parking San Diego Airport | 40.00 |
| 06/28/2007 | cab fare Courthouse to Airport | 16.00 |
| 10/30/2007 | westlaw - out of library charges | 89.46 |
| 10/30/2007 | FedEx Charges | 65.00 |
| 10/31/2007 | A&A Legal Services | 7.00 |
| 11/06/2007 | fax filing charge | 91.98 |
| 11/06/2007 | FedEx Charges | 188.80 |
| 11/27/2007 | airfare | 60.00 |
| 11/27/2007 | cabfare to and from airport | 20.00 |
| 11/27/2007 | parking at San Diego Airport | 55.00 |
| 01/16/2008 | Court Call charge | 101.51 |
| 04/10/2008 | transcript of 12/20/07 hearing | 4.00 |
| 05/13/2008 | fax filing charge | 3,100.00 |
| 06/30/2008 | mediator's fees | 30.00 |
| 07/01/2008 | parking at Judicate West - mediation | 55.00 |
| 09/10/2008 | court call | 35.77 |
| 02/13/2009 | FedEx | 40.00 |
| 02/16/2009 | clerk of court - filing fee | 55.00 |
| 02/19/2009 | court call | 26.01 |
| 03/23/2009 | FexEx | 23.00 |
| 03/24/2009 | fax filing fee | 40.00 |
| 07/14/2009 | filing fee final approval motion | 400.00 |
| 08/07/2009 | (estimated) travel expenses for airfare, cabfare and parking | |

Total Expenses                                                    6,235.21

Total Current Work                                            142,515.21

Balance Due                                                      $142,515.21

### Billing History

| Fees | Hours | Expenses | Advances | Finance Charge | Payments |
|---|---|---|---|---|---|
| 136,280.00 | 340.70 | 6,235.21 | 0.00 | 0.00 | 0.00 |

Please note that a finance charge at the annual rate of 10% applies to invoices not paid within thirty days.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT H



F I L E D
ALAMEDA COUNTY

AUG 0 7 2009

CLERK OF THE SUPERIOR COURT
By_____
                              Deputy

1

2

3

4

5

6

7

8                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                           COUNTY OF ALAMEDA

10

11  ALFRED G. RAVA, suing on behalf of himself     Case No. RG 06268693
    and those similarly situated,
12                                                  **CLASS ACTION**
                  Plaintiffs,
13                                                  **FINAL ORDER APPROVING CLASS**
            vs.                                     **ACTION SETTLEMENT, AND**
14                                                  **JUDGMENT OF DISMISSAL WITH**
    ATHLETICS INVESTMENT GROUP LLC;                 **PREJUDICE**
15  OAKLAND ATHLETICS LIMITED
    PARTNERSHIP; MACY'S DEPARTMENT                  Date:        August 7, 2009
16  STORES, INC.; MACY'S WEST; and DOES 1           Time:        11:00am
    through 50,                                     Dept:        20
17                                                  Judge:       Hon. Robert Freedman
                  Defendants.                       Complaint Filed: May 8, 2006
18                                                  Trial Date:  None Set

19

20        TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:

21        The above-referenced class action ("Action") having come before the Court on August 7,

22  2009, for a hearing and Final Order Approving Class Settlement, and Judgment of Dismissal with

23  Prejudice ("Final Order"), consistent with the Court's Preliminary Approval Order ("Preliminary

24  Approval Order"), filed and entered March 26, 2009, and as set forth in the Joint Stipulation of

25  Settlement and Release Between Plaintiff and Defendants ("Joint Stipulation" or "Settlement") in

26  the Action, and due and adequate notice having been given to all Class Members as required in

27  the Preliminary Approval Order, and the Court having considered all papers filed and proceedings

28  had herein and otherwise being fully informed and good cause appearing therefore, it is hereby

                                        1

ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. All terms used herein shall have the same meaning as defined in the Joint Stipulation.

2. Consistent with the definitions provided in the Joint Stipulation, the term "Settlement Class" and "Class Members" shall mean all males who attended the A's baseball game at the Oakland Coliseum on May 8, 2004 ("the Settlement Class" or "the Class Members"). The Settlement Class will not include any person who submits a timely and valid Request for Exclusion as provided in this Settlement; any Class Member who has opted out of the Settlement is precluded from objecting to the Settlement and lacks standing to challenge the Settlement and this Final Order.  For purposes of the Settlement and this Final Order, "Defendants" and/or "Released Parties" shall include Athletics Investment Group LLC and Macy's Department Stores, Inc., and any other corporate entities named or served as defendants in this case, and their present and former parent companies, subsidiaries, related or affiliated companies, shareholders, officers, directors, employees, agents, attorneys, insurers, successors and assigns, and any individual or entity that could be jointly liable with Defendants, and their respective counsel, or any of them. The term "Action" shall mean this class action.  The term "Parties" shall mean Plaintiff and Defendants.

3. This Court has jurisdiction over the subject matter of this Action and over all Parties to this Action, including all Class Members.

4. Distribution and publication of the Notice and the Claim Form directed to the Class Members as set forth in the Joint Stipulation and the other matters set forth therein have been completed in conformity with the Preliminary Approval Order, including individual notice to all Class Members who could be identified through reasonable effort, and the best notice practicable under the circumstances.  The Notice provided due and adequate notice of the proceedings and of the matters set forth therein, including the proposed Settlement set forth in the Joint Stipulation, to all persons entitled to such Notice, and the Notice fully satisfied the requirements of due process.  All Class Members and all Released Claims are covered by and included within the Settlement and this Final Order.

2

1      5.     The Court hereby finds the Settlement was entered into in good faith pursuant to

2   and within the meaning of California Code of Civil Procedure section 877.6.  The Court further

3   finds that the Settlement is fair, reasonable and adequate and that Plaintiff has satisfied the

4   standards and applicable requirements for final approval of this class action settlement under

5   California law, including the provisions of California Code of Civil Procedure section 382 and

6   Federal Rule of Civil Procedure 23, approved for use by the California state courts in *Vasquez v.*

7   *Superior Court* (1971) 4 Cal.3d 800, 821.

8      6.     The Court hereby approves the Settlement set forth in the Joint Stipulation and

9   finds the Settlement is, in all respects, fair, adequate and reasonable, and directs the Parties to

10  effectuate the Settlement according to its terms.  The Court finds the Settlement has been reached

11  as a result of intensive, serious and non-collusive arms-length negotiations.  The Court further

12  finds the Parties have conducted extensive and costly investigation and research, and counsel for

13  the Parties are able to reasonably evaluate their respective positions.  The Court also finds the

14  Settlement at this time will avoid additional substantial costs, as well as avoid the delay and risks

15  that would be presented by the further prosecution of the Action.  The Court has reviewed the

16  benefits that are being granted as part of the Settlement and recognizes the significant value to the

17  Class Members.  The Court also finds the Class is properly certified as a class for settlement

18  purposes only.

19     7.     As of the date of entry of this Final Order, each and every released claim of each

20  and every Class Member is and shall be deemed to be conclusively released as against the

21  Released Parties.  As of the date of this Final Order, the Class Representative and each and every

22  Class Member who has not submitted a valid Request for Exclusion is hereby released and

23  forever barred and enjoined from prosecuting the released claims, except as to such rights or

24  claims as may be created by the Settlement, against Defendants and the Released Parties, their

25  present and former parent companies, subsidiaries, related or affiliated companies, shareholders,

26  officers, directors, employees, agents, attorneys, insurers, successors and assigns, and any

27  individual or entity which could be jointly liable with Defendants, from any and all claims, debts,

28  liabilities, demands, obligations, guarantees, costs, expenses, attorneys' fees, damages, action or

3

1   causes of action of any nature under any state, federal or local law, arising out of or related to the

2   allegations made in the Action and that reasonably arise out of the facts alleged in the Action,

3   including but not limited to a release of all known and unknown claims arising out of or related to

4   the A's/Macy's reversible bucket hat giveaway at the A's baseball game on May 8, 2004, the

5   California Unruh Civil Rights Act, the California Civil Code, the City of Oakland Municipal

6   Code, damages, harm, injury, injunctive relief, punitive damages, penalties of any nature, interest,

7   fees, costs, and all other claims and allegations made in the Action and that reasonably arise out

8   of or relate to the facts alleged in the Action from May 8, 2004, through the date the Court finally

9   approves the Settlement (hereinafter "Released Claims").  In addition, as of the date of this Final

10  Order, the Class Representative and each and every Class Member is barred and enjoined from

11  instituting or accepting damages, liquidated damages, punitive damages, penalties of any nature,

12  attorneys' fees and costs, or any other relief from any other suit, class or collective action,

13  administrative claim or other claim of any sort or nature whatsoever against Defendants and the

14  Released Parties, for any period from May 8, 2004 up to and including the date of final approval

15  of the Settlement, relating to the Released Claims.  This Settlement extends to all claims of every

16  nature and kind whatsoever, known or unknown, suspected or unsuspected, past or present, which

17  the Class Members have or may have against the Defendants and the Released Parties as to the

18  Released Claims, and all rights under Section 1542 of the California Civil Code are hereby

19  expressly waived as to the Released Claims.

20        8.      Neither the Settlement nor any of the terms set forth in the Joint Stipulation is an

21  admission by Defendants, or any of the other Released Parties, nor is this Final Order a finding of

22  the validity of any claims in the Action or of any wrongdoing by Defendants, or any of the other

23  Released Parties.  Neither this Final Order, nor the Joint Stipulation, nor any document referred to

24  herein, nor any action taken to carry out the Joint Stipulation is, may be construed as, or may be

25  used as, an admission by or against Defendants, or any of the other Released Parties, of any fault,

26  wrongdoing or liability whatsoever.  The entering into or carrying out of the Joint Stipulation, and

27  any negotiations or proceedings related thereto, shall not in any event be construed as, or deemed

28  to be evidence of, an admission or concession with regard to the denials or defenses by

4

1    Defendants, or any of the other Released Parties, and shall not be offered in evidence in any

2    action or proceeding in any court, administrative agency or other tribunal for any purpose

3    whatsoever other than to enforce the provisions of this Final Order, the Joint Stipulation, the

4    Released Claims, or any related agreement or release.  Notwithstanding these restrictions, any of

5    the Released Parties may file in the Action, or submit in any other proceeding, the Final Order,

6    the Joint Stipulation, and any other papers and records on file in the Action as evidence of the

7    Settlement to support a defense of *res judicata, collateral estoppel*, release, or other theory of

8    claim or issue preclusion or similar defense as to the Released Claims.

9         9.    Pursuant to Rule 3.769(h) of the California Rules of Court, the Court hereby enters

10   a judgment of dismissal of the entire Action, and with prejudice, as of the filing date of this Final

11   Order, pursuant to the terms set forth in the Joint Stipulation.  Without affecting the finality of

12   this Final Order in any way, the Court hereby retains continuing jurisdiction over the

13   interpretation, implementation and enforcement of the Settlement and all orders entered in

14   connection therewith.

15        10.   The Court hereby finds the settlement payments provided for under the Settlement

16   to be fair and reasonable in light of all the circumstances.  The Court, therefore, orders the

17   calculations and the payments to be made and administered in accordance with the terms of the

18   Settlement.

19        11.   The Court hereby confirms The Cartwright Law Group, APLC as Class Counsel in

20   the Action.

21        12.   Pursuant to the terms of the Settlement, and the authorities, evidence and argument

22   submitted by Class Counsel, the Court hereby awards Class Counsel attorneys' fees and costs in

23   the amount of $200,000.00 as final payment for and complete satisfaction of any and all

24   attorneys' fees and costs incurred by and/or owed to Class Counsel and any other person or entity

25   related to the Action; $20,000.00 of the Court's award for attorneys' fees and costs shall be

26   maintained in the Claims Administrator's settlement account until completion of the distribution

27   process and the Court's approval of a final accounting, which is scheduled for February 11, 2010

28   at 2:00 pm.  If the final report anticipated to be submitted by the Claims Administrator on or

before February 3, 2010 is satisfactory to the Court, no appearances will be required at the hearing and the Court will at that time release the remaining $20,000.00 for attorneys' fees and costs. The Court further orders that the award of attorneys' fees and costs set forth in this Paragraph shall be administered pursuant to the terms of the Joint Stipulation, and transferred and/or made payable to The Cartwright Law Group, APLC as Class Counsel in the Action.

13.     The Court also hereby approves and orders an Enhancement Award to Plaintiff Alfred Rava of $20,000.00 for his service as Class Representative.

14.     The Court also hereby approves and orders payment from the Gross Settlement Amount for the actual claims administration costs, and notice and publication costs, incurred by Simpluris, Inc. in the total amount of $25,922.47, of which $9,597.98 has been paid by defendants, with the additional sum of $16,324.49 due to be paid to Simpluris, Inc.

15.     The Court also hereby finds and orders the Settlement is and constitutes a fair, reasonable and adequate compromise of the Released Claims against Defendants and the Released Parties.

16.     Provided the Settlement becomes effective under the terms of Paragraph 14(b) in the Joint Stipulation, the Court hereby orders the deadline for mailing the Court-approved Settlement Awards, attorneys' fees and costs, and Enhancement Award is as set forth in the Implementation Schedule within the Preliminary Approval Order.

17.     The Court also hereby finds that there were no objections to the Settlement raised by any person on the record at the hearing on the Final Order.

**IT IS SO ORDERED.**

Dated: _Aug 7, 2009_

_Honorable Robert Freedman_
_Judge of the Superior Court_

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I

# Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide | 2010

## Major Checkpoints

☐ **Will notice effectively reach the class?**
The percentage of the class that will be exposed to a notice based on a proposed notice plan can always be calculated by experts. A high percentage (e.g., between 70–95%) can often reasonably be reached by a notice campaign.

☐ **Will the notices come to the attention of the class?**
Notices should be designed using page-layout techniques (e.g., headlines) to command class members' attention when the notices arrive in the mail or appear on the Internet or in printed media.

☐ **Are the notices informative and easy to understand?**
Notices should carry all of the information required by Rule 23 and should be written in clear, concise, easily understood language.

☐ **Are all of the rights and options easy to act upon?**
There should be no unnecessary hurdles that make it difficult for class members to exercise their rights to opt out, object, submit a claim, or make an appearance.

## Before Certification/Preliminary Settlement Approval

☐ **Can any manageability problems from notice issues be overcome?**
Consider potential problems in reaching and communicating with class members—e.g., language barriers, class size, geographic scope—and whether a notice plan will be able to overcome such problems.

☐ **Can a high percentage of the proposed class be reached (i.e., exposed to a notice)?**
Consider the breakdown of known and unknown class members, the age of any mailing lists, and the parties' willingness to spend necessary funds to fully reach the class.

☐ **Is it economically viable to adequately notify the class?**
If the cost to reach and inform a high percentage of the class is not justified by a proposed settlement, an opt-out class may not be appropriate. Inability to support proper notice may also be evidence that the settlement is weak.

☐ **Will unknown class members understand that they are included?**
If a well-written notice will leave class members in doubt as to whether they are included, consider whether the class definition, or the class certification, is appropriate.

## Upon Certification/Preliminary Settlement Approval

☐ **Do you have a "best practicable" notice plan from a qualified professional?**
A proper notice plan should spell out how notice will be accomplished, and why the proposed methods were selected. If individual notice will not be used to reach everyone, be careful to obtain a first-hand detailed report explaining why not. See "Notice Plan" section below.

# Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide | 2010

❑ ***Do you have unbiased evidence supporting the plan's adequacy?***
Be careful if the notice plan was developed by a vendor who submitted a low bid and might have incentives to cut corners or cover up any gaps in the notice program. In order to find the "best practicable" notice as Rule 23 requires, your own expert report may be advisable. This is especially true in the diminished adversarial posture in which settlement places the parties. It is also true at preliminary approval, before outsiders are aware of the proposed notice plan, which itself may limit the parties' awareness, in turn impacting your final approval decision.

❑ ***Have plain language forms of notice been created?***
Draft forms of the notices should be developed, in the shape, size, and form in which they will actually be disseminated, for your approval before authorizing notice to the class. See "Notice Documents" below.

❑ ***Will a qualified firm disseminate notice and administer response handling?***
There are many experienced firms that compete for administration of notice dissemination and claims and response handling. Appointing a qualified firm is important because errors may require re-notification, drain funds, delay the process, and threaten recognition of your final judgment.

## Notice Plan

❑ ***Is the notice plan conducive to reaching the demographics of the class?***
The notice plan should include an analysis of the makeup of the class. There may be more women than men; it may skew older; it may be less educated than average. Each audience can be matched with the most efficient and effective methods of notice for reaching those people.

❑ ***Is the geographic coverage of the notice plan sufficient?***
Notice for a class action should take steps to reach people wherever they may be located, and also take into account where most class members reside.

   ○ ***Is the coverage broad and fair? Does the plan account for mobility?***
   Class members choose to live in small towns as well as large cities. Be careful with notice exclusively targeted to large metropolitan newspapers. Class members move frequently (14–17% per year according to the U.S. Census Bureau), so purchasers in one state may now reside in another.

   ○ ***Is there an extra effort where the class is highly concentrated?***
   Evidence may show that a very large portion of class members reside in a certain state or region, and notice can be focused there, while providing effective, but not as strong, notice elsewhere.

❑ ***Does the plan include individual notice?***
If names and addresses are reasonably identifiable, Rule 23(c)(2) requires individual notice. Be careful to look closely at assertions that mailings are not feasible.

   ○ ***Did you receive reliable information on whether and how much individual notice can be given?***
   Consider an expert review of the information you have been provided regarding the parties' ability to give individual notice. The parties may have agreed to submit a plan that does not provide sufficient individual notice in spite of the rule.

# Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide | 2010

○ ***Will the parties search for and use all names and addresses they have in their files?***
If the parties suggest that mailings are impracticable, look to distinguish between truly unreasonable searches (e.g., the defendant has nuggets of data that could be matched with third-party lists by a new computer program and several man-years) and situations where a search would be difficult but not unreasonably burdensome (e.g., lists reside directly in the defendant's records but are outdated or expensive to mail to because of the volume). Rule 23 generally requires the latter.

○ ***Will outdated addresses be updated before mailing?***
The plan should detail steps to update addresses before mailing, including postal service change-of-address records, and third-party address databases if the list is very old. Watch out for potentially ineffective "last known address" mailings.

○ ***Has the accuracy of the mailing list been estimated after updating efforts?***
Look for information that indicates how accurate the mailing addresses will be after the planned address updating effort.

○ ***Has the percentage of the class to be reached by mail been calculated?***
The parties should be able to indicate how great a percentage of the overall class will be reached by individual notice, so that the extent of any necessary additional notice can be determined.

○ ***Are there plans to re-mail notices that are returned as undeliverable?***
Even after updating addresses before mailing, mail will be returned as undeliverable. Further lookup tactics and sources are often available, and it is reasonable to re-mail these notices.

○ ***Will e-mailed notice be used instead of postal mailings?***
If available, parties should use postal mailing addresses, which are generally more effective than e-mail in reaching class members: mail-forwarding services reach movers, and the influx of "SPAM" e-mail messages can cause valid e-mails to go unread. If e-mail will be used—e.g., to active e-mail addresses the defendant currently uses to communicate with class members—be careful to require sophisticated design of the subject line, the sender, and the body of the message, to overcome SPAM filters and ensure readership.

❑ ***Will publication efforts combined with mailings reach a high percentage of the class?***
The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%. A study of recent published decisions showed that the median reach calculation on approved notice plans was 87%.

❑ ***Are the reach calculations based on accepted methodology?***
An affiant's qualifications are important here. Reach calculation methodology is commonly practiced in advertising and media-planning disciplines. Claims administrators are often accountants by training and may lack personal knowledge or the training to conduct reach analyses.

○ ***Is the net reach calculation thorough, conservative, and not inflated?***
Circulation figures for separate dissemination methods cannot simply be added to determine reach. Total audience must be calculated for each publication and the net must be calculated for a combination of publications. Be sure the reach calculation removes overlap between those people exposed to two or more dissemination methods (e.g., a person who receives a mailing may also be exposed to the notice in a publication).

---

# Judges' Class Action Notice and Claims Process Checklist
## and Plain Language Guide | 2010

○ ***Do the reach calculations omit speculative reach that only might occur?***
Watch for estimated reach calculations that are based in part on speculative notice that might occur, e.g., news coverage about the lawsuit or settlement. Often, these news articles do not ultimately explain class members' rights, and the content is not in the court's control.

○ ***Is any Internet advertising being measured properly?***
Audiences of Internet websites are measured by "impressions." Total, or "gross," impressions of the entire website do not reveal how many people will view the notice "ad" appearing periodically on a particular page. Inflated audience data via Internet ads is common. It is very expensive to reach a significant percentage of a mass audience with Internet banner ads. Watch for suggestions that Internet ads and social network usage can replace all other methods. Reach, awareness, and claims will likely be very low when such a program is complete.

❑ ***Is non-English notice necessary?***
Consider the demographics of the class to determine whether notice is necessary in Spanish or another language. The number of class members whose native language is not English should guide you on whether to actively disseminate notice in other languages, or to simply make foreign language notices available at a website.

❑ ***Does the notice plan allow enough time to act on rights after notice exposure?***
Class members need time to receive a notice by mail or in a publication. A minimum of 30 days is necessary from completed dissemination before deadlines, with 60–90 days preferred. This allows for re-mailings, fulfillment of requests for more information, and consideration of rights and options.

❑ ***Will key documents be available at a neutral website?***
Class members should have access to information beyond the notice. Besides the summary notice and detailed notice (following the FJC examples at www.fjc.gov), it is reasonable to post the following documents at a neutral administrator's website dedicated to the case: the plaintiffs' complaint, the defendants' answer, your class-certification decision (in the event of a class certified for trial), and the settlement agreement and claim form (in the event of a settlement). Other orders, such as your rulings on motions to dismiss or for summary judgment, should ordinarily be made available as well.

❑ ***Can the class get answers from a trained administrator or from class counsel?***
Even the best notice will generate questions from class members. A toll-free number call center, an interactive website staffed by trained administrators, and class counsel who are accessible to the people they represent are reasonable steps to help class members make informed decisions.

## Notice Documents *(also see Plain Language Notice Guide, below)*

❑ ***Have you approved all of the forms of the notices?***
Before authorizing the parties to begin disseminating notices, you should ask for and approve all forms of notice that will be used. This includes a detailed notice; a summary notice; and information that will appear at the website and in any other form, such as an Internet banner, TV notice, and radio notice. See www.fjc.gov for illustrative notice forms for various cases. It is best to see and approve the forms of notice the way they will be disseminated, in their actual sizes and designs.

# Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide | 2010

❑ ***Are the notices designed to come to the attention of the class?***
The FJC's illustrative notices, as also described in the accompanying "***Plain Language Notice Guide***," explain how to be sure the notices are "noticed" by the casual-reading class member. With "junk mail" on the rise, and the clutter of advertising in publications, legal notices must stand out with design features long-known to communications pros.

    ❍ ***Does the outside of the mailing avoid a "junk mail" appearance?***
Notices can be discarded unopened by class members who think the notices are junk mail. A good notice starts with the envelope design, examples of which are at www.fjc.gov.

    ❍ ***Do the notices stand out as important, relevant, and reader-friendly?***
It is important to capture attention with a prominent headline (like a newspaper article does). This signals who should read the notice and why it is important. The overall layout of the notice will dictate whether busy class members will take time to read the notice and learn of their rights.

❑ ***Are the notices written in clear, concise, easily understood language?***
Required by Rule 23 since 2003, it is also simply good practice to recognize that communicating legal information to laypeople is hard to do.

❑ ***Do the notices contain sufficient information for a class member to make an informed decision?***
Consider the amount of information provided in the notice. Watch for omission of information that the lawyers may wish to obscure (such as the fee request) but that affects class members nonetheless.

❑ ***Do the notices include the Rule 23 elements? Even the summary notice?***
Summary notices, whether mailed or published, encourage readership, and the FJC illustrative notices show that even summary notices can include all elements required by Rule 23(c)(2)(B). But an overly short summary notice, one that mostly points interested readers to a detailed notice, can result in most class members (who read only the summary notice) being unaware of basic rights.

❑ ***Have the parties used or considered using graphics in the notices?***
Depending on the class definition or the claims in the case, a picture or diagram may help class self-identify as members, or otherwise determine whether they are included.

❑ ***Does the notice avoid redundancy and avoid details that only lawyers care about?***
It is tempting to include "everything but the kitchen sink" in the detailed notice. Although dense notices may appear to provide a stronger binding effect by disclosing all possible information, they may actually reduce effectiveness. When excess information is included, reader burnout results, the information is not communicated at all, and claims are largely deterred.

❑ ***Is the notice in "Q&A" format? Are key topics included in logical order?***
The FJC illustrative notices take the form of answers to common questions that class members have in class action cases. This format, and a logical ordering of the important topics (taking care to include all relevant topics) makes for a better communication with the class.

❑ ***Are there no burdensome hurdles in the way of responding and exercising rights?***
Watch for notice language that restricts the free exercise of rights, such as onerous requirements to submit a "satisfactory" objection or opt-out request.

# Judges' Class Action Notice and Claims Process Checklist
## and Plain Language Guide | 2010

❑ **Is the size of the notice sufficient?**
Consider the balance between cost efficiency and effectiveness. A smaller publication notice will save money, but too small and it will not afford room for a noticeable headline, will not fit necessary information, and will not be readable if using fine print.

## Claims Process

❑ **Is a claims process actually necessary?**
In too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members. When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms.

❑ **Does the claims process avoid steps that deliberately filter valid claims?**
Close attention to the nature of a necessary claims process may help eliminate onerous features that reduce claims by making claiming more inconvenient.

❑ **Are the claim form questions reasonable, and are the proofs sought readily available to the class member?**
Watch for situations where class members are required to produce documents or proof that they are unlikely to have access to or to have retained. A low claims rate resulting from such unreasonable requirements may mean that your eventual fairness decision will overstate the value of the settlement to the class and give plaintiff attorneys credit for a greater class benefit than actually achieved.

❑ **Is the claim form as short as possible?**
A long, daunting claim form is more likely to be discarded or put aside and forgotten by recipients. Avoid replicating notice language or injecting legalistic terminology into the claim form which will deter response and confuse class members.

❑ **Is the claim form well-designed with clear and prominent information?**
Consider whether the claim form has simple, clearly worded instructions and questions, all presented in an inviting design. The deadlines and phone numbers for questions should be prominent.

❑ **Have you considered adding an online submission option to increase claims?**
As with many things, convenience is of utmost importance when it comes to claims rates. Today, many class members expect the convenience of one-click submission of claims. Technology allows it, even including an electronic signature. Claim forms should also be sent with the notice, or published in a notice, because many will find immediate response more convenient than going to a website.

❑ **Have you appointed a qualified firm to process the claims?**
You will want to be sure that the claims administrator will perform all "best practice" functions and has not sacrificed quality in order to provide a low price to win the administration business.

# Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide | 2010

❑ ***Are there sufficient safeguards in place to deter waste, fraud, and/or abuse?***
The claims process, the claim form itself, and the claims administrator all play roles in ensuring that approved claims are valid claims, so that payments go to class members who meet the criteria. Closely monitoring the process, perhaps through a special master—or at least by requiring the parties to file full reports of claims made—is a good idea.

## *After Notice/Before Trial or Final Settlement Approval*

❑ ***Did the notice plan achieve what it promised?***
Look for evidence that the notice plan reached the class members as well as anticipated.

❑ ***What is the reaction of the class?***
You will want to look at the number and nature of any objections, as well as the number of opt-outs and claims. Special note: waiting for the claims deadline to expire before deciding on final approval ensures that you can look at a full picture of the fairness of the settlement. By so doing you will be able to judge the actual value of the settlement to the class and calculate attorney fees in relation to that value.

❑ ***Have you made sufficient findings in the record?***
Consider, based on the evidence, making detailed findings so as to inhibit appellate review or to withstand a subsequent collateral review of your judgment.

❑ ***Is any subsequent claims-only notice necessary?***
If you find the settlement fair, reasonable, and adequate, but the number of claims is low, you may consider additional notice to the class after final approval.

## Federal Judicial Center Plain Language Notice Guide

*"Thumbnail" representations of illustrative notices at www.fjc.gov (click on "Class Action Notices Page")*

### Detailed Notice—First Page

• Page one is an overall summary of the notice. The objective is to use the fewest words to say the most. It is a snapshot of the case, of the reasons for the notice, and of the rights that class members have.

• The court's name at the top conveys the importance of the notice.

• A headline in a large font captures attention. It conveys what the notice is about and who is included, and it suggests a benefit to reading the entire notice.

• The words in italics below the headline communicate the official nature of the notice and provide a contrast from a lawyer's solicitation. Be sure to avoid a traditional legalistic case caption.

• Short bullet points highlight the nature of the case and the purpose of the notice. Bullet points also communicate who is included, the benefits available (if it is a settlement), and steps to be taken—identifying deadlines to observe.  The first page should pique class members' interest and encourage them to read the entire notice.

• The table of rights explains the options available. These are deliberately blunt. Be careful to avoid redundancy with the information inside the notice.

• The first page should prominently display a phone number, e-mail address, or website where the class can obtain answers to questions.

• If appropriate for the class, include a non-English (e.g., Spanish) language note about the availability of a copy of the notice in that language.



UNITED STATES DISTRICT COURT FOR THE DISTRICT OF STATE

**If you bought XYZ Corporation stock in 1999, you could get a payment from a class action settlement.**

*A federal court authorized this notice.  This is not a solicitation from a lawyer.*

• A settlement will provide $6,990,000 (17 ½ cents per share if claims are submitted for each share) to pay claims from investors who bought shares of XYZ Corporation stock during 1999.

• The settlement resolves a lawsuit over whether XYZ misled investors about its future earnings; it avoids costs and risks to you from continuing the lawsuit; pays money to investors like you; and releases XYZ from liability.

• Court-appointed lawyers for investors will ask the Court for up to $3,010,000 (7½ cents per share), to be paid separately by XYZ, as fees and expenses for investigating the facts, litigating the case, and negotiating the settlement.

• The two sides disagree on how much money could have been won if investors won a trial.

• Your legal rights are affected whether you act, or don't act.  Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| SUBMIT A CLAIM FORM | The only way to get a payment. |
| EXCLUDE YOURSELF | Get no payment.  This is the only option that allows you to ever be part of any other lawsuit against XYZ, about the legal claims in this case. |
| OBJECT | Write to the Court about why you don't like the settlement. |
| GO TO A HEARING | Ask to speak in Court about the fairness of the settlement. |
| DO NOTHING | Get no payment. Give up rights. |

• These rights and options—**and the deadlines to exercise them**—are explained in this notice.

• The Court in charge of this case still has to decide whether to approve the settlement.  Payments will be made if the Court approves the settlement and after appeals are resolved.  Please be patient.

QUESTIONS?  CALL 1-800-000-0000 TOLL FREE, OR VISIT XYZSETTLEMENT.COM
PARA UNA NOTIFICACIÓN EN ESPAÑOL, LLAMAR O VISITAR NUESTRO WEBSITE



WHAT THIS NOTICE

**BASIC INFORMATION**.................................
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT**...............…..........
5. What does the lawsuit complain about?
6. How does MNO answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

### Detailed Notice—Table of Contents

• Organize the topics into different sections and place the information in a logical order.

• A "Q&A" or "Answers to Common Questions" format helps class members find the information that is important to their decision-making process.

• Customize the topics to the facts of the case, but keep the overall notice short:  8–11 pages should be plenty even for complex matters.

• Don't avoid obvious questions (or answers) that class members will have.

## Federal Judicial Center Plain Language Notice Guide

*"Thumbnail" representations of illustrative notices at www.fjc.gov (click on "Class Action Notices Page")*



### Detailed Notice—Inside Content

• Short answers are best. Be sure that the text answers the question being asked and does not "spin" the information in a way to achieve a desired result—e.g., do not use language that encourages class members to accept a proposed settlement.

• Watch for redundant and lengthy information, but also substantive omissions. Be frank and open for better reader comprehension and, as a result, a stronger binding effect.

• Every detail does not belong in the notice, but all rights and options do. Explain settlement benefits and state the fees that the lawyers will seek. Watch for burdensome requirements that might inhibit objections, opt outs, or claims.

• Use plain language. You may closely follow the illustrative models at www.fjc.gov.

### Summary Notice

• The summary notice should be short but comprehensive. Refer to all of the requirements of Rule 23 in a simple and clear summary fashion. Follow the FJC models wherever possible.

• The "Legal Notice" banner at the top helps stop a publisher from typesetting the word "advertisement" at the top, which would create a perception that the notice is a solicitation. Do not use the legal case caption style.

• The headline in large font captures the attention of readers who glance at the page. It flags what the notice is about, who is included, and it signals a benefit to be derived by reading the notice.

• The initial paragraphs provide a snapshot of all key information.

• Be sure to explain class membership in a simple way. Consider a graphic to help readers understand that they are included.

• Make a brief but clear reference to the substance of the case and the claims involved.

• Identify clearly what class members could get and how they would get it. These are the most common questions from class members.

• Be sure to include clear references to opt out, objection, and appearance rights. State the amount of the lawyers' fee request.

• Include a prominent reference to the call center and website.

### Federal Judicial Center Plain Language Notice Guide
*"Thumbnail" representations of illustrative notices at www.fjc.gov (click on "Class Action Notices Page")*

### Outside of Mailing

• Design the notice to make it distinguishable from "junk mail."

• A reference to the court's name (at the administrator's address) ensures that the class recognizes the notice's legitimacy.

• "Call-outs" on the front and back encourage the recipient to open and read the notice when it arrives with other mail.

> Notice Administrator for U.S. District Court
> P.O. Box 00000
> City, ST 00000-0000
>
> **Notice to those who bought XYZ Corp. Stock in 1999.**
>
> Jane Q. Class Member
> 123 Anywhere Street
> Anytown, ST 12345-1234

• The call-out on the front (shown on example above) identifies what the notice is about and who is affected. On the back you may highlight the settlement benefits, or the rights involved.

• Use these techniques even if the mailed notice is designed as a self-mailer, i.e., a foldover with no envelope.

> **Notice Administrator for U.S. District Court**
>
> John Q. Investor                                              Month 00, 0000
> P.O. Box 0000
> City, ST 00000-0000
>
> Dear Mr. Investor:
>
> You are listed as an investor in XYZ Corp. stock.  Enclosed is a notice about the settlement of a class action lawsuit called *North v. XYZ Corp.*, No. CV 00-5678.  You may be eligible to claim a payment from the settlement, or you may want to act on other legal rights.  Important facts are highlighted below and explained in the notice:
>
> **XYZ Corp. Securities Class Action Settlement**
>
> • **Security:** XYZ Corp. common stock  (CUSIP: 12345X678)
> • **Time Period:** XYZ Corp. stock bought in 1999
> • **Settlement Amount:** $6,990,000 for investors (17½ cents per share if claims are submitted for each share).
> • **Reasons for Settlement:** Avoids costs and risks from continuing the lawsuit; pays to investors ...

### Cover Letter (when compliance with PSLRA is needed)

• Identify the court's administrator as the sender—this conveys legitimacy.

• The content should be very short. Remember that this is not the notice.

• A reference in bold type to the security involved flags the relevance of the letter.

• The bullet points track each PSLRA cover letter requirement. Avoid lengthy explanations that are redundant with the notice. Be blunt for clarity.

• The content in the FJC's PSLRA cover letter can simply be customized for the case at hand. The design encourages interest, reading, and action.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT J

# The UCL Practitioner

### Posts categorized "Class actions - settlements"

Tuesday, April 02, 2019
### U.S. Supreme Court remands *cy pres* case for further proceedings: *Frank v. Gaos*

About a year ago, I reported that the U.S. Supreme Court had granted cert. in *Frank v. Gaos*, No. 17-961, and would be reviewing Ninth Circuit's opinion in *In re Google Referrer Header Privacy Litigation*, 869 F.3d 767 (2017).  As discussed in this blog post, in *Google Referrer*, the Ninth Circuit affirmed the district court's order approving distribution of class action settlement proceeds to *cy pres* recipients only.  The objectors probably hoped the Supreme Court would invalidate all such *cy pres* settlements.  But on March 20, 2019, the U.S. Supreme Court disposed of the matter without reaching the *cy pres* question.

In a per curiam opinion, the Court remanded the case back to the Ninth Circuit for it (or for the district court) to address the question of the named plaintiffs' standing under *Spokeo*.  *Frank v. Gaos*, ____ U.S. ____ (Mar. 20, 2019) (citing *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016)).  The plaintiffs sought statutory remedies under the Stored Communications Act, which prohibits disclosures of certain types of electronic communications.  According to the plaintiffs, Google's use of "referrer headers," which inform website owners of the search terms used to navigate to their sites, violated the Act.  *Id.* (slip op. at 1-2).  *Spokeo,* handed down while the appeal in *Google Referrer* was pending, "held that 'Article III standing requires a concrete injury even in the context of a statutory violation.'"  *Id.* (slip op. at 4).  Because the standing question "raise[d] a wide variety of legal and factual issues not addressed in the merits briefing before us or at oral argument," the Court chose to remand these issues back to the lower courts to determine in the first instance.  *Id.*

In a dissenting opinion, Justice Thomas said he would reverse on the merits, and expressed the view that "*cy pres* payments are not a form of relief to the absent class members and should not be treated as such ...."  *Id.* (Thomas, J., dissenting) (slip op. at 2).

Posted by Kimberly A. Kralowec at 04:00 AM in Class actions - settlements, Class actions - Supreme Court | Permalink | Comments (0)

Monday, July 30, 2018
### Ninth Circuit grants en banc rehearing in class action settlement case: *In re Hyundai and Kia Fuel Economy Litigation*

As I predicted in April, the Ninth Circuit has granted en banc rehearing and will reconsider the panel decision in *In re Hyundai and Kia Fuel Economy Litigation*, 881 F.3d 679 (9th Cir. 2018) (discussed here, here, and here).

According to this article in *The Recorder* (subscription), the matter will be set for oral argument during the week of September 24, 2018 in Pasadena, California.

I recently had the privilege of presenting oral argument in the Ninth Circuit's courthouse in Pasadena.  It is a lovely building and location.  It was one of the last arguments heard by the late, great Judge Stephen Reinhardt, having taken place about three weeks before he died.  I was very saddened to hear about his passing so soon after I had argued before him.

The Ninth Circuit's opinion, which was a win for us, was handed down just a few days before his death.  When the defendant sought rehearing, Judge Wardlaw was assigned to the case in Judge Reinhardt's place, but he signed the original opinion, which turned out to be one of his last.  *See Robinson v. OnStar, LLC*, 721 Fed. Appx. 704 (9th Cir. 2018) (modified opinion reversing district court's order compelling individual arbitration).

Posted by Kimberly A. Kralowec at 04:00 AM in Appellate practice, Class actions - settlements | Permalink | Comments (0)

Monday, April 30, 2018
### U.S. Supreme Court grants cert. in *cy pres* case: *Frank v. Gaos*

Today, the U.S. Supreme Court granted the objectors' cert. petition in _Frank v. Gaos_, No. 17-961. The underlying Ninth Circuit opinion is _In re Google Referrer Header Privacy Litigation_, 869 F.3d 767 (2017), which is discussed in this blog post.

In _Google Referrer_, Ninth Circuit affirmed the district court's order approving a class action settlement in which all monetary proceeds were distributed to _cy pres_ recipients, reasoning that distributions to individual class members were not economically feasible. 869 F.3d at 741-42.

The cert. petition contended that the case presented an opportunity for the Court to reach the "fundamental concerns surrounding the use of such remedies in class action litigation" identified by Chief Justice Roberts in his 2013 "statement respecting the denial of certiorari" in _Marek v. Lane_, no. 13-136. (See these blog posts.)  It looks like at least four justices agreed.

The _SCOTUSblog_ case page has links to all the briefs filed to date.  The U.S. Supreme Court's docket page has additional links.

Posted by Kimberly A. Kralowec at 08:48 AM in Class actions - settlements, Class actions - Supreme Court | Permalink | Comments (0)

Wednesday, February 07, 2018

## Ninth Circuit affirms approval of Trump University settlement: _Sampson v. Trump University LLC_

Yesterday, the Ninth Circuit affirmed the well-publicized $25 million settlement in the fraud and false advertising class action against Trump University.  _Sampson v. Trump University, LLC_, ____ F.3d ____ (Feb. 6, 2018).

After the class was certified, the class members were provided with notice and an opportunity to opt out.  Slip op. at 7-8.  Thereafter, the case settled.  _Id._ at 9-10.  The class members were then given a second notice, summarizing the settlement terms and providing an opportunity to object, but no second opportunity to opt out.  _Id._  The objector argued that the original notice led her to believe that a second opt-out opportunity would be afforded.  _Id._ at 10.  She also argued that as a matter of due process, she should have been given a second chance to opt out.  _Id._ at 18.

The Ninth Circuit disagreed with both contentions.  _Id._ at 12-20.

On the due process issue, the panel pronounced: "Our precedent squarely forecloses this argument."  _Id._ at 18-19 (citing _Officers for Justice v. Civil Service Commission_, 688 F.2d 615, 622-23 (9th Cir. 1982)).  "[W]hile some class action settlements allow a second opt-out opportunity, 'they are unusual and probably result from the bargaining strength of the class negotiators[]' rather than any due process concerns." _Id._ at 19 (quoting _Officers for Justice_, 688 F.2d at 635).

Posted by Kimberly A. Kralowec at 04:00 AM in Class actions - settlements | Permalink | Comments (0)

Friday, January 26, 2018

## Ninth Circuit reverses nationwide class action settlement: _In re Hyundai and Kia Fuel Economy Litigation_

On Tuesday, the Ninth Circuit handed down a lengthy opinion in a UCL and CLRA class action in which it reversed, on a 2-1 vote, the district court's order granting certification of a nationwide settlement class.  _In re Hyundai and Kia Fuel Economy Litigation_, ____ F.3d ____ (9th Cir. Jan. 23, 2018).

The opinion extensively analyzes _Mazza v. American Honda Motor Co._, 666 F.3d 581 (9th Cir. 2012) (discussed in this blog post), in which certification of a similar nationwide class was also reversed.

I have not yet had a chance to fully absorb the new opinion, but Perry Elizabeth Cooper wrote up an interesting report at bna.com.  I would imagine that a petition for _en banc_ rehearing is in the offing, and it might even be granted.  On the other hand, _en banc_ rehearing was denied in _Mazza_, which was also decided on a 2-1 vote.

Posted by Kimberly A. Kralowec at 01:00 PM in Class actions - certification, Class actions - settlements, The CLRA, UCL - class certification, UCL - federal decisions | Permalink | Comments (0)

Wednesday, August 23, 2017

## Ninth Circuit approves "*cy pres*-only" settlement: *In re Google Referrer Header Privacy Litig.*

In *In re Google Referrer Header Privacy Litigation*, ____ F.3d ____ (9th Cir. Aug. 22, 2017), the Ninth Circuit affirmed an order granting final approval of an $8.5 million nationwide settlement of certain privacy claims against Google.

Under the settlement, approximately $3.2 million would be "set aside for attorneys' fees, administration costs, and incentive payments to the named plaintiffs," with the rest "allocated to six *cy pres* recipients" who would use the money "to promote public awareness and education, and/or to support research, development, and initiatives, related to protecting privacy on the Internet." Slip op. at 6.

The Ninth Circuit held that the district court properly found the settlement to be "non-distributable," and therefore appropriate for a *cy pres* distribution. *Id.* at 8-9 (citing *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012)).

The panel also rejected the objectors' argument that a "non-distributable" settlement, by definition, cannot meet the "superiority" element of class certification. *Id.* at 10-11. To the contrary:

> The two concepts [*i.e.*, *cy pres* and "superiority"] are not mutually exclusive, since "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." .... The district court did not abuse its discretion in finding the superiority requirement was met because the litigation would otherwise be economically infeasible. This finding dovetails with the rationale for the cy pres-only settlement.

*Id.* at 11 (footnote omitted) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010)).

The final sections of the opinion address the propriety of the selected *cy pres* recipients and of the attorneys' fees awarded to class counsel *Id.* at 11-21. One judge dissented from the *cy pres* recipients portion of the opinion, reasoning that the district court should have more closely vetted the three recipients affiliated with class counsel's alma maters. *Id.* at 21-27. The majority, however, found no abuse of discretion. *Id.* at 19.

Posted by Kimberly A. Kralowec at 04:00 AM in Attorneys' fees (CCP §1021.5), Class actions - settlements | Permalink | Comments (0)

Wednesday, February 01, 2017

## Ninth Circuit approves magistrate judge's jurisdiction, but strikes down class settlement: *Koby v. ARS National Services, Inc.*

In *Koby v. ARS National Services, Inc.*, ____ F.3d ____ (9th Cir. Jan. 25, 2017), the Ninth Circuit, on its own motion, considered whether the named plaintiffs in a class action have authority to consent to a magistrate judge's exercise of jurisdiction, and to bind the unnamed class members to that decision. The panel concluded that they do, and that the unnamed class members are not considered "parties" for purposes of 28 U.S.C. section 636(c)(3):

> We conclude that the statute requires the consent of the named plaintiffs alone and join three other circuits that have reached the same conclusion. *See Day v. Persels & Associates, LLC*, 729 F.3d 1309, 1316 (11th Cir. 2013); *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012); *Williams v. General Electric Capital Auto Lease, Inc.*, 159 F.3d 266, 269 (7th Cir. 1998).

> As a purely linguistic matter, § 636(c)(1)'s reference to the consent of "the parties" could be read to encompass both the named plaintiffs and the absent class members, for the term does not have a single fixed meaning. In some contexts absent class members are treated as parties, *see In re Cement Antitrust Litigation*, 688 F.2d 1297, 1307–10 (9th Cir. 1982) (judicial recusal statute), while in other contexts they are not, *see Snyder v. Harris*, 394 U.S. 332, 340 (1969) (diversity jurisdiction statute). As the Supreme Court has observed, absent class members may be treated as parties "for some purposes and not for others." *Devlin*, 536 U.S. at 10.

> Viewing § 636(c) as a whole, it seems clear that Congress did not intend absent class members to be treated as parties in this context. ....

Slip op. at 9. The Court also rejected the argument of an amicus curiae that "§ 636(c) violates Article III of the Constitution by permitting magistrate judges to exercise jurisdiction over class actions without obtaining the consent of each absent class member." *Id.* at 12-14.

The Court then turned to the objector's challenges to the magistrate judge's order approving the class action settlement, which provided for "worthless injunctive relief" but no other remedy (*id.* at 1), and held that the settlement should not have been approved:

> The magistrate judge abused her discretion by approving the settlement in this case. The settlement should not have been approved for one primary reason: There is no evidence that the relief afforded by the settlement has any value to the class members, yet to obtain it they had to relinquish their right to seek damages in any other class action.

*Id.* at 15.

Posted by Kimberly A. Kralowec at 04:00 AM in Class actions - settlements | Permalink | Comments (0)

Tuesday, November 08, 2016
## Ninth Circuit also considers disqualification of class counsel: *Radcliffe v. Hernandez*



First of all, I want to encourage everyone to get to the polls today and vote! I certainly will be voting today (Go Hillary!).

When I was reading the *Walker* opinion for my post yesterday, I realized the Ninth Circuit had handed down an opinion on a similar subject earlier this year (March) that I hadn't covered yet.

In *Radcliffe v. Hernandez*, 818 F.3d 537 (9th Cir. 2016), the court considered whether the attorneys who had included improper promises concerning incentive awards in a class action settlement agreement, thereby creating a conflict of interest for class counsel between the class representatives and the unnamed class members, should be disqualified from continuing to represent the class. In 2013, the Ninth Circuit had reversed final approval of the settlement because of the incentive award provisions. *See Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013) (briefly discussed in this blog post).

On remand, the objectors who had obtained that reversal moved to disqualify the firms previously appointed as lead counsel, who had negotiated the settlement with the problematic provisions. The district court denied the motion, but certified the questions to the Ninth Circuit, which granted permission to appeal. 818 F.3d at 540-41. The Ninth Circuit affirmed, holding that "California law does not require automatic disqualification in class action cases." *Id.* at 541.

In so holding, the Court considered a number of California decisions involving conflicts in non-class cases, but concluded that none of these:

> fits the circumstances of the lawyer who represents a class of plaintiffs whose interests may in some ways be adverse to each other, but all of whose interests are adverse to the defendant. In a class action, conflicts often arise not because an attorney simultaneously represents litigation *adversaries* but because they simultaneously represent different members of the *same* class who develop divergent interests regarding how to prevail on their shared claims. Thus, in *Radcliffe I,* we explained that the conditional incentive award was improper because it "undermined [the named plaintiffs'] ability to 'fairly and adequately protect the interests of the class.' " *Radcliffe I*, 715 F.3d at 1165 (quoting Fed. R. Civ. Pro. 23(a) (4)). "This requirement is rooted in due-process concerns—'absent class members must be afforded adequate representation before entry of a judgment which binds them.' " *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). These concerns with adequate representation and due process for absent party members are simply not present in individual plaintiff suits. And because the California Supreme Court has never discussed the automatic disqualification rule in the context of class actions, it also has never been required to confront the ethical

issues and conflicts of interest that are unique to class action cases. Given this vacuum, we are not willing to assume that California courts would apply the same disqualification rules to a class action case as they do in individual plaintiff cases.

*Id.* at 544-45. In particular, given the specific type of conflict that the settlement agreement created, disqualification was not warranted:

> [I]n this case the district court could reasonably conclude that the conflict of interest was appropriately cured when we rejected the settlement agreement that contained the improper conditional incentive award. This conflict was not inherent to the relationship between Hernandez Counsel [*i.e.*, class counsel] and the rest of the class but rather, as in *Rodriguez*, resulted from a particular provision in an agreement that was later held invalid.

*Id.* at 546. The opinion goes on to hold that class counsel remained adequate to represent the class and should not be replaced by objectors' counsel. *Id.* at 547-49.

The opinion concludes:

> We previously found that Hernandez Counsel created a significant conflict of interest between themselves, their clients, and the rest of the class, and nothing in the present order diminishes or qualifies that holding. We are not convinced, however, that the conflict we found requires automatic disqualification of class counsel. We believe that, given the unique ethical and due process concerns involved in class actions, district courts must have the discretion to address attorney representation and disqualification issues based on the details of each case, and we further believe the California Supreme Court would agree. Accordingly, we hold that the district court did not abuse its discretion in denying White Counsel's motion to disqualify Hernandez Counsel and to be appointed as class counsel, and granting Hernandez Counsel's cross-motion to be appointed as class counsel.

*Id.* at 549.

Posted by Kimberly A. Kralowec at 04:00 AM in Class actions - certification, Class actions - general, Class actions - settlements | Permalink | Comments (0)

Thursday, September 08, 2016

## Recent opinion addresses class notice in CLRA settlements: *Choi v. Mario Bodescu Skin Care, Inc.*

In the published portion of *Choi v. Mario Bodescu Skin Care, Inc.*, 248 Cal.App.4th 292 (Jun. 21, 2016), the Court of Appeal (Second Appellate District, Division Three) affirmed final approval of a class action settlement involving UCL, CLRA and other claims.

In so doing, the panel rejected the objector's argument that, for purposes of the CLRA claim, the published notice was deficient because it failed to comport with Civil Code section 1781(d). *Id.* at 298-300. That section, the Court held, does not apply to *settlement* notices, which are governed by section 1781(f). *Id.* at 299. The published notice was fully compliant with the latter provision, which grants the trial court broader "discretion to fashion notice of a settlement class." *Id.* The trial court did not abuse its discretion in approving one-time published notice in *Parade* magazine. *See id.*

The panel also questioned whether the CLRA's notice provisions were intended to apply to nationwide class actions, or in actions asserting both CLRA and other claims:

> Furthermore, it is infeasible to comply with the requirement in Civil Code section 1781, subdivision (d) to give notice in "a newspaper of general circulation in the county in which the transaction occurred." Determining in which counties around the United States sales of the creams occurred in this case would be impossible. Civil Code section 1781 does not appear to govern nationwide consumer class actions. The McLaren Objectors have not demonstrated that Civil Code section 1781, subdivision (d) applies to require four-times notice to a nationwide settlement class, particularly where other class claims were alleged and all of the remedies were obtained under causes of action other than the CLRA.

*Id.* at 300.

Posted by Kimberly A. Kralowec at 04:00 AM in Class actions - settlements, The CLRA | Permalink | Comments (0)

Monday, August 22, 2016

## Judicial Conference Committee on Rules of Practice and Procedure proposed amendments to Rule 23

This month, the Judicial Conference Committee on Rules of Practice and Procedure published a <u>preliminary draft of proposed amendments</u> to <u>Federal Rule of Civil Procedure 23</u>, governing class actions.  The proposed changes to Rule 23, and the proposed Committee Note, appear at pp. 211-232 of the pdf file.

To my eye, most of the changes do nothing more than codify what is already standard class action practice and procedure.  Only one of the changes stands out.  Proposed amended Rule 23(e)(5)(B) would require court approval of any payment (or other "consideration") to an objector (or objector's counsel) to drop the objection.  This would weaken professional objectors' leverage and perhaps deter frivolous objections.

Last week, the *National Law Journal* had an <u>article</u> (subscription) on this proposed amendment:

> Many practitioners say they see the rules change as a means of curbing what they consider to be an abuse of the class action settlement process.
>
> "What's new about that proposal is it basically says that an objector can't be paid off to drop their objection without approval by the district court," said <u>Leslie Brueckner</u>, senior attorney at Public Justice. "That could have a big impact because it could effectively halt the problem of so-called 'professional objectors,' who basically hold up class action settlements for their own pecuniary gain, by basically exposing that kind of practice to the light of day."

(Hyperlink added.)  Comments on the proposed rule changes (which include changes to other provisions besides Rule 23) <u>are due on February 15, 2017</u>.

Posted by <u>Kimberly A. Kralowec</u> at 04:00 AM in <u>Class actions - certification</u>, <u>Class actions - settlements</u>, <u>News reports and practice articles</u> | <u>Permalink</u> | <u>Comments (0)</u>

Friday, August 19, 2016

## An opinion on fees to consider in view of *Laffitte*: *Roos v. Honeywell International, Inc.*

In November 2015—well after the merits briefing in *<u>Laffitte</u>* was complete—the Court of Appeal (First Appellate District, Division One) handed down its opinion in *<u>Roos v. Honeywell International, Inc.</u>*, 241 Cal.App.4th 1472 (2015).  *Roos* is another case involving an objector's challenge to the fees awarded to class counsel, and I remember thinking at the time that it was a good candidate for a "grant and hold" pending resolution of *Laffitte*. However, no review petition was filed.

*Roos* addresses many of the same topics considered in *Laffitte*.  The opinion's discussion of the history of the lodestar-multiplier method and the percentage method under federal and California law (*Roos*, 241 Cal.App.4th at 1490-94) is ground thoroughly covered by Justice Werdegar in *Laffitte* (slip op. at 8-27).  To the extent there may be any inconsistencies between the two opinions, *Laffitte*, of course, governs.  The *Roos* analysis is informed by the no-longer-accurate assumption that "[t]he extent to which the percentage-of-recovery method should be relied upon in common-fund cases litigated in California courts remains unresolved." *Roos*, 241 Cal.App.4th at 1492.  In *Laffitte*, the Supreme Court resolved that question (to the extent there was ever any doubt) by holding that the percentage method is alive and well in common fund cases.

Relying on *Serrano*, the *Roos* opinion also describes the lodestar method as "the primary means of calculating the reasonableness of attorney fees in California." *Id.* at 1495 (citing <u>Serrano v. Priest</u>, 20 Cal.3d 25, 48 n.23 (1977)).  This sentence from *Roos* can no longer be considered good law.  In *Laffitte*, the Supreme Court rejected the argument that the cited *Serrano* footnote means that the lodestar method should be accorded primacy in common fund cases.  *Laffitte*, slip op. at 20-21.

I do think that the outcome in *Roos* would have been the same under *Laffitte*.  The Court of Appeal affirmed an order granting class counsel's motion for a fee award amounting to 37.5% of the settlement fund, which represented a fractional lodestar multiplier of 0.20.  *Roos*, 241 Cal.App.4th at 1480.  *Laffitte* makes clear that such an exercise of discretion is unlikely to be disturbed.

The *Roos* opinion also has interesting discussions of class member standing to object (241 Cal.App.4th at 1483-86) and the propriety of distributing residual settlement funds to *cy pres* recipients (*id.* at 1487-88).  The opinion is well worth a re-read after *Laffitte*.

Posted by Kimberly A. Kralowec at 04:00 AM in Attorneys' fees (CCP §1021.5), Class actions - settlements, Class actions - Supreme Court | Permalink | Comments (0)

Thursday, August 04, 2016
## New class settlement opinion: *Duran v. Obesity Research Institute, LLC*

In *Duran v. Obesity Research Institute, LLC*, ____ Cal.App.4th ____ (Jun. 23, 2016; pub. ord. Jul. 15, 2016), the Court of Appeal (Fourth Appellate District, Division One) reversed an order granting final approval of a nationwide, claims-made class action settlement. The case alleged CLRA and UCL violations against the maker of certain dietary supplements that were allegedly not "clinically proven" to help users lose weight, contrary to assertions made on the package.

Among other problems, the court noted that certain statements in the claim form (which the court treated as part of the class notice) were inconsistent with the terms of the parties' revised settlement agreement. *See* slip op. at 13-15. One of the problems was that the claim form referred to products that were excluded from the scope of the settlement! *Id.* at 13. It sounds like the parties amended the original settlement agreement in response to the trial court's comments at an initial approval hearing, but forgot to make corresponding changes to the claim form. *See id.* at 14. The Court of Appeal considered this problem so significant (and no wonder) that it reversed on that ground, even though the objectors had not raised the issue, either below or in their appellate briefing. *Id.* at 15-17.

The panel then turned to the method of class notice to be provided on remand (assuming preliminary approval is again granted). *Id.* at 18-24. Direct notice was sent by email to those who purchased the products on the defendant's website (but not those who purchased the products on Wal-Mart's website); published notice was made in *USA Today*; and a settlement website was established. *Id.* at 19. The court held that evidence should have been presented on the feasibility and cost of obtaining contact information for, and providing direct notice to, class members who purchased online from Wal-Mart, Amazon, CVS, Walgreens, and other retailers. *Id.* at 19-21.

The court also directed the lower court to reconsider whether published notice in *USA Today* was sufficient, observing that the products were never advertised in that paper, and noting the lack of evidence that the parties made any effort to target the relevant demographic (*i.e.*, people interested in weight loss). *Id.* at 21-24. "For example, in *Wershba, supra*, 91 Cal.App.4th at page 251, a class action involving support for Apple computers, notice was published not only in *USA Today*, but also in *MacWorld.*" *Id.* at 23.

Finally, the court held that the injunctive relief portion of the settlement, which required the defendant to make certain changes to its advertising, was "illusory" and duplicated relief already obtained by the FTC in a related proceeding. *Id.* at 24-26. "As such, it is difficult to conceive how this injunctive relief adds value." *Id.* at 26.

Posted by Kimberly A. Kralowec at 04:22 PM in Class actions - settlements | Permalink | Comments (0)

Friday, February 27, 2015
## Supreme Court takes up attorneys' fees case: *Laffitte v. Robert Half International Inc.*

On Wednesday, February 25, 2014, the Supreme Court granted review in *Laffitte v. Robert Half International*, No. S222996. The docket does not yet provide a summary of the issues to be considered.

In *Laffitte*, the Court of Appeal (Second Appellate District, Division Seven), affirmed the trial court's order granting final approval of a class action settlement and attorneys' fees award in a wage and hour case. *Laffitte v. Robert Half Int'l Inc.*, 231 Cal.App.4th 860 (2014), *review granted*. My original blog post on the opinion is here.

It is not clear which issue or issues the Court will be focusing on. If and when I obtain copies of the petition for review and other briefing, I will post them here.

Posted by Kimberly A. Kralowec at 04:00 AM in Attorneys' fees (CCP §1021.5), Class actions - settlements, Class actions - Supreme Court | Permalink | Comments (2)

Friday, February 20, 2015
## "Class(ic) Settlement Problems" by Judge Curtis Karnow

The January/February 2015 issue of CAOC *Forum* has an article by San Francisco Superior Court Judge Curtis E.A. Karnow entitled "Class(ic) Settlement Problems."

The article provides "a list of issues which often seem to pose problems when counsel file motions for preliminary approval of [class action] settlements."

Four resources are listed at the end of the article, including Judge Brick's Guidelines for Counsel re Class Settlement Applications, as uploaded to my blog in 2009 at this link.

Judge Karnow's author's note says that the article "has been submitted for publication in both defense and plaintiffs' publications for the benefit of both bars seeking to resolve class action cases through settlement." The link provided above is a CAOC members-only link. The article is also available here and here.

Posted by Kimberly A. Kralowec at 04:00 AM in Class actions - settlements, News reports and practice articles | Permalink | Comments (0)

Monday, December 01, 2014

## New settlement approval and attorneys' fees opinion: *Laffitte v. Robert Half International Inc.*

In *Laffitte v. Robert Half International Inc.*, ___ Cal.App.4th ___ (Oct. 29, 2014; pub. ord. Nov. 21, 2014), the Court of Appeal (Second Appellate District, Division Seven) confirmed the continuing vitality of the percentage-of-the-fund method of fixing attorneys' fee awards in common fund cases.

The Court also addressed settlement approval, and construed the Ninth Circuit's opinions in *In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010) and *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011). This is the first time either opinion has been cited in a published Court of Appeal opinion.

My publication request for CAOC is here.

Posted by Kimberly A. Kralowec at 04:00 AM in Attorneys' fees (CCP §1021.5), Class actions - settlements | Permalink | Comments (0)

Thursday, July 24, 2014

## Court of Appeal considers stipulations to temporary judges in class action context: *Luckey v. Superior Court*

In *Luckey v. Superior Court (Cotton On USA, Inc.)*, ___ Cal.App.4th ___ (July 22, 2014), the parties stipulated to appointment of a temporary judge to rule on the motions for preliminary and final approval of a class action settlement. (The proposed temporary judge was the mediator retained to assist in negotiating the settlement.) The trial court refused to approve the stipulation. The plaintiff challenged this ruling by filing a writ petition. Slip op. at 2, 8.

The Court of Appeal (Second Appellate District, Division Three) declined to disturb the trial court's ruling, holding that until a class is certified, the named plaintiff "has no authority to consent to a temporary judge on behalf of the putative class." *Id.* at 2. The Court reasoned that the absent class members were not "parties litigant" within the meaning of the provision of the California Constitution authorizing stipulations to temporary judges:

> [W]hile Luckey and [defendant] Cotton On were the only "parties litigant" at the time of the stipulation to the temporary judge, they were also the only parties who could be bound by such a stipulation. As the conceded purpose of the stipulation was to bind *all* putative class members to the stipulation, and they could not be bound until they had been given notice and an opportunity to appear, the stipulation was ineffective. The state Constitution provides that, for a stipulation to a temporary judge to be effective, that stipulation must be made by the parties litigant. In a pre-certification class action, the parties litigant have not yet been identified; thus, no such stipulation can be effectively made.

Slip op. at 22-23 (footnotes omitted).

On a personal note, I completed my office move at the end of June and my new physical and mailing address is as follows:

**The Kralowec Law Group**
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Tel: 415-546-6800

I am sharing office space with <u>Schneider Wallace Cottrell Konecky LLP</u>, which has been great so far.

Posted by <u>Kimberly A. Kralowec</u> at 04:00 AM in <u>Class actions - general</u>, <u>Class actions - settlements</u> | <u>Permalink</u> | <u>Comments</u>
<u>(0)</u>

Wednesday, June 04, 2014
## New class action settlement opinion: *Litwin v. iRenew Bio Energy Solutions LLC*

In the published portion of <u>*Litwin v. iRenew Bio Energy Solutions LLC*</u>, ____ Cal.App.4th ____ (May 28, 2014), the Court of
Appeal (Second Appellate District, Division One) reversed final approval of a class action settlement because the notice
informed the class members that if they wished to object, they (or their counsel) must appear in person at the final approval
hearing.

The panel explained:

> Requiring class members in a nationwide class or even a statewide class to appear at the final approval hearing or hire an
> attorney to have their objections heard works a hardship on objectors, as the benefit to the objector from the class action
> may be so low that it would be cost prohibitive or physically challenging to personally assert one's rights at a hearing in a
> potentially distant location. .... Requiring any objector to attend the final approval hearing does not offer a meaningful
> opportunity to be heard, and therefore violates class members' due process rights.

> .... Although appellant was afforded the opportunity to be heard, there may have been many class members whose
> objections were chilled. Misstating objectors' rights such that they are dissuaded from exercising their opportunity to be
> heard does not fairly apprise class members of their options associated with the settlement. For these reasons, the order
> granting final approval of the settlement must be reversed.

Slip op. at 8-9.

Posted by <u>Kimberly A. Kralowec</u> at 04:00 AM in <u>Class actions - settlements</u> | <u>Permalink</u> | <u>Comments (0)</u>

Tuesday, March 18, 2014
## New class action settlement opinion: *Carter v. City of Los Angeles*

In <u>*Carter v. City of Los Angeles*</u>, ____ Cal.App.4th ____ (Feb. 26, 2014; pub. ord. Mar. 13, 2014), the Court of Appeal (First
Appellate District, Division One) held, on a 2-1 vote, that the trial court had improperly approved a class action settlement
that released statutory damages claims, but did not provide unnamed class members with an opportunity to opt out.

The majority's analysis relies heavily on the discussion of Rule 23(b)(2) class certification in <u>*Wal-Mart Stores, Inc. v. Dukes*</u>,
131 S. Ct. 2541 (2011), although the opinion acknowledges that *Dukes* is not binding.

The dissenting justice believed the majority's analysis misconstrued *Dukes*:

> I am not persuaded. First, the relevant sentence of *Wal-Mart* is not only dictum but also expressly acknowledges that
> the Court has "never held" that lack of notice and opt-out rights in a class action with nonpredominating claims for
> monetary damages *always* violates due process. (*Wal-Mart*, *supra*, 131 S.Ct. at p. 2559.) Second, that passage in *Wal-
> Mart* is inapplicable here in any event, because it refers to "absence of notice and opt-out" (*ibid.*), but here class
> members were given notice and the opportunity to object. *Wal-Mart* says nothing, even in dictum, about whether the
> absence of opt-out rights in these circumstances would violate due process. Third, the settlement in this case secures
> highly valuable benefits for all class members, and those benefits overwhelmingly predominate over the objectors'
> individual claims for monetary damages, which are probably worthless. Under the circumstances of this case, there is no
> "serious possibility" (*ibid.*) that certification of the class and approval of the settlement violates due process.

Rothschild, Acting P.J., dissenting (slip op. at 1).

5/12/2019          Case 2:18-cv-03093-JFW-AS     Document 80-1 Filed 06/03/19 Page 168 of 361     Page ID
                                                    UCL Practitioner: Class actions - settlements
                                          #:2148
Posted by Kimberly A. Kralowec at 04:00 AM in Class actions - settlements | Permalink | Comments (0)

Tuesday, August 06, 2013
### Cert. petition filed in cy pres settlement case: *Lane v. Facebook*

On July 26, 2013, a petition for a writ of certiorari was filed with the U.S. Supreme Court by the objectors in the *Lane v. Facebook* case. *Marek v. Lane*, no. 13-136.

In its original opinion in this case, the Ninth Circuit affirmed a class action settlement with a significant cy pres component. *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012). En banc rehearing was denied in February, with six judges strenuously dissenting. *Lane v. Facebook, Inc.*, 709 F.3d 791 (9th Cir. 2013).

The cert. petition describes the issue presented as follows:

> Federal Rule of Civil Procedure 23(e)(2) requires that a settlement that binds class members must be "fair, reasonable, and adequate." In this case, the Ninth Circuit upheld approval of a settlement that disposed of absentee class members' claims while providing those class members no relief at all. Breaking with decisions of the Second, Third, Fifth, Seventh, and Eighth Circuits, the Ninth Circuit held that the settlement's award of $6.5 million to establish a new foundation controlled by the lead defendant and class counsel was a fair and adequate remedy under the trust-law doctrine of cy pres. The question presented is:

> Whether, or in what circumstances, a cy pres remedy that provides no direct relief to class members comports with the requirement of Rule 23(e)(2) that a settlement that binds class members must be "fair, reasonable, and adequate."

It will of course be very interesting to see whether this case is taken up. The other pending U.S. Supreme Court petition that I'm currently following is *POM Wonderful LLC v. The Coca Cola Co.*, No. 12-761 (U.S.) (discussed here). This case has already been relisted once.

If you are aware of any other pending cert. petitions of interest, please drop me an email.

Posted by Kimberly A. Kralowec at 05:00 AM in Class actions - settlements, Class actions - Supreme Court | Permalink | Comments (0) | TrackBack (0)

Friday, May 17, 2013
### Two Ninth Circuit class action settlement decisions: *In re: HP Inkjet Printer Litigation* and *Radcliffe v. Experian*

The Ninth Circuit has handed down two opinions in recent weeks addressing class action settlements.

In *Radcliffe v. Experian Information Solutions Inc.*, ____ F.3d ____ (9th Cir. Apr. 22, 2013; mod. May 2, 2013), the court reversed final approval because some of the class representatives' incentive awards were made conditional upon their support of the settlement, which undermined their adequacy (and that of their counsel).

In *In re: HP Inkjet Printer Litigation*, ____ F.3d ____ (9th Cir. May 15, 2013), the court reversed final approval and the attorneys' fees award, finding that the award did not comport with the provisions of CAFA governing attorneys' fees in "coupon" settlement cases. Judge Berzon dissented.

On a related note, on February 26, 2013, the Court denied en banc rehearing of the panel opinion in *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012). This is the case in which the court approved a class action settlement with a significant cy pres component. The order denying rehearing, and a strenuously-worded dissent by six judges, were both published: *Lane v. Facebook, Inc.*, 709 F.3d 791 (9th Cir. Feb. 26, 2013).

My original post on the *Facebook* case is here.

Posted by Kimberly A. Kralowec at 05:00 AM in Class actions - settlements | Permalink | Comments (0) | TrackBack (0)

Friday, February 22, 2013
### Third Circuit considers cy pres settlements: *In re Baby Prods. Antitr. Litig.*

5/12/2019    Case 2:18-cv-03093-JFW-AS    Document 80-1    Filed 06/03/19    Page 169 of 361    Page ID
UCL Practitioner: Class actions - settlements
#:2149

In *In re Baby Products Antitrust Litigation*, ____ F.3d ____ (3d Cir. Feb. 19, 2013), the Third Circuit considered cy pres settlement distributions in class action cases for the first time.  It held that cy pres distributions are permissible, but vacated the order approving the particular settlement before it and remanded for further proceedigs.

An excerpt:

> Although we agree with the ALI that cy pres distributions are most appropriate where further individual distributions are economically infeasible, we decline to hold that cy pres distributions are only appropriate in this context. Settlements are private contracts reflecting negotiated compromises. *Sullivan*, 667 F.3d at 312. The role of a district court is not to determine whether the settlement is the fairest possible resolution—a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly. The Court must determine whether the compromises reflected in the settlement—including those terms relating to the allocation of settlement funds—are fair, reasonable, and adequate when considered from the perspective of the class as a whole.

Slip op. at 18.

Posted by Kimberly A. Kralowec at 05:00 AM in Class actions - settlements | Permalink | Comments (0) | TrackBack (0)

Tuesday, December 04, 2012

## "Shaking the Class Action Settlement Tree: *Cy Pres* Distributions in the Wake of *Dennis v. Kellogg*"

The Private Advertising Litigation Committee of the American Bar Association will present a free teleseminar on Wednesday, December 5, 2012 at 9:30 a.m. Pacific (12:30 Eastern) called "Shaking the Class Action Settlement Tree: *Cy Pres* Distributions in the Wake of *Dennis v. Kellogg*."

This is the seminar description:

> On September 4, 2012, in *Dennis v. Kellogg Co.*, 2012 WL 3800230 (9th Cir. Sept. 4, 2012), the U.S. Court of Appeals for the Ninth Circuit reissued its July 2012 opinion striking down a consumer class action settlement solely on the basis of a faulty *cy pres* distribution provision.  Among other things, the court found that the *cy pres* distribution of Kellogg product to "unspecified charities involved in feeding the indigent" did not bear a sufficient nexus to the claims in the false advertising action to support a class settlement. The panel of experts will discuss the *Dennis* decision and others, and offer their insights into the future of class settlements containing *cy pres* provisions.
>
> **Moderator:**
> - Aaron Blynn,Genovese Joblove & Battista P.A.
>
> **Panelists:**
> - Alexis Amezcua, Morrison Foerster
> - Don Beshada, Beshada Farnese LLP
> - Lee Peeler, Advertising Self-Regulatory Council, Council of Better Business Bureaus

Click here for more information or to register.

Posted by Kimberly A. Kralowec at 05:00 AM in Class actions - settlements, MCLE programs | Permalink | Comments (0) | TrackBack (0)

Tuesday, September 25, 2012

## New Ninth Circuit class settlement opinion: *Lane v. Facebook, Inc.*

In *Lane v. Facebook, Inc.*, ____ F.3d ____ (9th Cir. Sept. 20, 2012), the Ninth Circuit affirmed final approval of a class action settlement, summarizing its holding as follows:

> The question presented is whether the district court abused its discretion in approving the parties' $9.5 million settlement agreement as "fair, reasonable, and adequate," either because a Facebook employee sits on the board of the organization distributing *cy pres* funds or because the settlement  amount was too low. We hold that it did not.

Slip op. at 11537.  Senior Circuit Judge Kleinfeld filed a dissenting opinion.

Posted by Kimberly A. Kralowec at 05:00 AM in Class actions - settlements | Permalink | Comments (0) | TrackBack (0)

Thursday, September 13, 2012

### Ninth Circuit withdraws and issues new opinion in class action settlement case: *Dennis v. Kellog Co.*

On September 4, 2012, the Ninth Circuit withdrew its earlier opinion and handed down a new opinion in a class action settlement case, _Dennis v. Kellog Co._, ____ F.3d ____ (9th Cir. Sept. 4, 2012).  Here is my blog post on the earlier opinion.

The new opinion still reverses the final approval order because the cy pres recipients who would have received the settlement fund residual were "divorced from the concerns embodied in consumer protection laws such as the UCL and the CLRA."  Slip op. at 10540.

The new opinion also vacates the attorneys' fees award, but unlike the earlier opinion, contains no separate section discussing the award.  *Id.* at  10544.  Instead, in a footnote, the opinion says that "[o]ur decision on the merits of the settlement renders moot the attorneys' fees issue." *Id.* at 10544 n.2 (citing *Waggoner v. C&D Pipeline Co.*, 601 F.2d 456, 459 (9th Cir. 1979)).

As a result, the new opinion no longer contains this language from the withdrawn opinion, which was widely quoted in the press:

> [L]et us not forget that the $2 million fee award breaks out to just over $2,100 per hour. Not even the most highly sought after attorneys charge such rates to their clients.

Withdrawn opinion, slip op. at 8128.  That, of course, is not the standard by which the propriety of a fee award is measured in the Ninth Circuit in a contingency-fee action.  Under well-established Ninth Circuit decisional law, multipliers may be approved in a proper case, so it misses the mark to consider the total rate that a fee award "breaks out" to, without considering whether a multiplier is appropriate under relevant Ninth Circuit standards.   The language was appropriately omitted from the new opinion.

Posted by Kimberly A. Kralowec at 05:00 AM in Attorneys' fees (CCP §1021.5), Class actions - settlements | Permalink | Comments (0) | TrackBack (0)

Wednesday, August 15, 2012

### New Ninth Circuit class settlement opinion: *Rodriguez v. Disner*

You may remember that in 2009, the Ninth Circuit handed down an opinion approving the settlement in the BAR/BRI antitrust class action, but disapproving certain "ex ante incentive agreements" formed between some of the representative plaintiffs and their counsel.  _Rodriguez v. West Publishing Corp._, 563 F.3d 948 (9th Cir. 2009) (mentioned in this blog post).

Last week, the Ninth Circuit considered the case again.  In _Rodriguez v. Disner_, ____ F.3d ____ (9th Cir. Aug. 10, 2012), the panel affirmed the district court's ruling that the attorneys who formed those incentive agreements had forfeited almost all of their fees, and reversed the district court's order denying fees to the objectors who were the first to bring the conflict of interest to the court's attention.

Posted by Kimberly A. Kralowec at 05:00 AM in Attorneys' fees (CCP §1021.5), Class actions - settlements | Permalink | Comments (0) | TrackBack (0)

Tuesday, July 17, 2012

### Ninth Circuit addresses cy pres doctrine in new class settlement decision: *Dennis v. Kellogg Co.*

In _Dennis v. Kellogg Co._, ____ F.3d ____ (9th Cir. Jul. 13, 2012), the Ninth Circuit reversed final approval of a class action settlement because the cy pres recipients who would receive the settlement fund residual were "divorced from the concerns embodied in consumer protection laws such as the UCL and the CLRA."  Slip op. at 8120-21.  The court also found the attorneys' fees award excessive.  *Id.* at 8125-29.

The case involved UCL and CLRA claims against Kellogg Co. for representing that Frosted Mini-Wheats cereal "was scientifically proven to improve children's cognitive functions for several hours after breakfast." *Id.* at 8114.

Posted by Kimberly A. Kralowec at 05:00 AM in Class actions - settlements | Permalink | Comments (0) | TrackBack (0)

Wednesday, May 02, 2012

### First Circuit addresses cy pres settlement distributions: *In re: Lupron Marketing and Sales Practices Litig.*

Last week, the First Circuit handed down an interesting decision addressing "the evolving law of cy pres distributions in class action settlement agreements." *In re: Lupron Marketing and Sales Practices Litig.*, ___ F.3d ___ (1st Cir. Apr. 24, 2012) (slip op. at 21).

Retired U.S. Supreme Court Justice David Souter sat on the panel.

[via]

Posted by Kimberly A. Kralowec at 05:00 AM in Class actions - settlements | Permalink | Comments (0) | TrackBack (0)

Wednesday, December 21, 2011

### Third Circuit hands down long-awaited "diamonds" antitrust class settlement decision: *Sullivan v. DB Investments, Inc.*

Yesterday, the Third Circuit, sitting *en banc*, handed down its long-awaited decision in the "diamonds" antitrust class action, *Sullivan v. DB Investments, Inc.*, ___ F.3d ___ (Dec. 20, 2011).

I have not yet had an opportunity to review the opinion, but evidently the court affirmed in full the district court's order granting final approval of the classwide settlement and certifying settlement classes, and in so doing, discussed *Dukes v. Wal-Mart* in depth. There is a lengthy dissent. Howard Bashman, author of *How Appealing* and counsel for one of the objectors, took pains to point out that the 90-day period to file a cert. petition with the U.S. Supreme Court begins to run today.

In other another *Sullivan* case, the Ninth Circuit has handed down its opinion following the California Supreme Court's decision this past June in *Sullivan v. Oracle Corp.* (discussed here and here). *See Sullivan v. Oracle Corp.*, ___ F.3d ___ (Dec. 13, 2011).

I am unlikely to be able to report further on these cases, or on any other new developments, until after the 1st of the year. Please keep sending me new opinions, orders, briefs, news, etc., nonetheless. Happy holidays, all.

Posted by Kimberly A. Kralowec at 05:00 AM in Class actions - certification, Class actions - settlements | Permalink | Comments (0) | TrackBack (0)

Wednesday, November 30, 2011

### New Ninth Circuit class settlement decision: *Nachshin v. AOL, LLC*

In *Nachshin v. AOL, LLC*, ___ F.3d ___ (9th Cir. Nov. 21, 2011), the Ninth Circuit confirmed the propriety of *cy pres* distributions in class action settlements, but rejected the particular *cy pres* distribution plan before it:

> The *cy pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the "next best" class of beneficiaries. *See Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307-08 (9th Cir. 1990). *Cy pres* distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity. *See id.* The *cy pres* distributions here do not comport with our *cy pres* standards. While the donations were made on behalf of a nationwide plaintiff class, they were distributed to geographically isolated and substantively unrelated charities.

Slip op. at 20288-89. The Ninth Circuit remanded for the parties to propose and the district court to approve *cy pres* distributions to different charities. *See id.* at 20295-97.

Posted by Kimberly A. Kralowec at 05:00 AM in Class actions - settlements | Permalink | Comments (0) | TrackBack (0)

Friday, August 26, 2011

## Recent decisions of interest from other Circuits

Here are a few recent decisions of interest from other U.S. Courts of Appeals:

_Behrend v. Comcast Corp._, ____ F.3d ____ (3d Cir. Aug. 23, 2011) (affirming class certification of antitrust claims; "The factual and legal underpinnings of _Wal-Mart_—which involved a massive discrimination class action and different sections of Rule 23 —are clearly distinct from those of this case. _Wal-Mart_ therefore neither guides nor governs the dispute before us.")

_In re Aqua Dots Products Liability Litigation_, ____ F.3d ____ (7th Cir. Aug. 17, 2011) (affirming denial of class certification for lack of adequacy; Judge Easterbrook essentially held that a manufacturer recall already remedied the problem and a parallel class action would gain nothing)

_In re Literary Works in Electronic Databases Copyright Litigation_, ____ F.3d ____ (2d Cir. Aug. 17, 2011) (reversing certification of settlement class for lack of adequacy, finding conflicts among subgroups of class members and remanding for creation of subclasses represented by separate counsel)

_Cruz v. Cingular Wireless, LLC_, ____ F.3d ____ (11th Cir. Aug. 10, 2011) (applying _Concepcion_ and upholding a no-class-action arbitration clause)

_Lawson v. Life of the South Ins. Co._, ____ F.3d ____ (11th Cir. Aug. 10, 2011) (declining to enforce a no-class-action arbitration clause under third-party beneficiary or equitable estoppel theories; the defendant was not a party to the contract containing the clause and the claims did not arise under that contract (citing _Mundi v. Union Sec. Life Ins. Co._, 555 F.3d 1042 (9th Cir. 2009))

_Millea v. Metro-North Rwy Co._, ____F.3d ____ (2d Cir. Aug. 8, 2011) (reversing statutory attorneys' fees award and remanding for recalculation; "Especially for claims where the financial recovery is likely to be small, calculating attorneys' fees as a proportion of damages runs directly contrary to the purpose of fee-shifting statutes: assuring that civil rights claims of modest cash value can attract competent counsel. The whole purpose of fee-shifting statutes is to generate attorneys' fees that are _disproportionate_ to the plaintiff's recovery. Thus, the district court abused its discretion when it ignored the lodestar and calculated the attorneys' fees as a proportion of the damages awarded.")

_In re Zurn Pex Plumbing Products Liability Litigation_, ____ F.3d ____ (8th Cir. Jul. 6, 2011) ("[Defendant]'s desire for an exhaustive and conclusive _Daubert_ inquiry before the completion of merits discovery cannot be reconciled with the inherently preliminary nature of pretrial evidentiary and class certification rulings. [¶] The main purpose of _Daubert_ exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker."; affirming class certification of warranty and negligence claims and distinguishing _Dukes_)

_Jock v. Sterling Jewelers, Inc._, ____ F.3d ____ (2d Cir. Jul. 1, 2011) (interpreting _Stolt-Neilsen_ and class arbitration proceedings)

Posted by Kimberly A. Kralowec at 05:00 AM in Attorneys' fees (CCP §1021.5), Class actions - arbitration, Class actions - certification, Class actions - settlements | Permalink | Comments (0) | TrackBack (0)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT K

# *In The Matter Of:*

### *Lisa Kim*
### *v.*
### *Tinder, Inc.*

---

### *Transcript of Proceedings Re: Nonappearances VOL*

### *May 16, 2019*

---



17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **1098324**
number of pages 7

THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DISTRICT


LISA KIM, INDIVIDUALLY ON        )
BEHALF OF HERSELF AND ALL        )
OTHERS SIMILARLY SITUATED,       )
                                 )
              PLAINTIFF,         )CIVIL ACTION NO. 2-18-
                                 )CV-03093
                                 )
                                 )
TINDER, INC., A DELAWARE         )
CORPORATION; MATCH GROUP, LLC,   )
A DELAWARE LIMITED LIABILITY     )
COMPANY; MATCH GROUP, INC., A    )
DELAWARE CORPORATION; AND DOES   )
THROUGH 10, INCLUSIVE, AND       )
EACH OF THEM,                    )
                                 )
              DEFENDANTS.        )
_____  )


        TRANSCRIPT OF PROCEEDINGS RE: NONAPPEARANCES

   OF STEVEN FRYE, ALLAN CANDELORE, AND RICH ALLISON

   taken on Thursday, May 16, 2019, on behalf

   of Plaintiff at 1851 East First Street,

   Suite 918, Santa Ana, California, 92870,

   beginning at 10:33 a.m. and ending at 10:37 a.m.;

   on Thursday, May 16, 2019, before April Panameno,

   Certified Shorthand Reporter, No. 13739.

Transcript of Proceedings Re: Nonappearances - 5/16/2019

```
 1    APPEARANCES OF COUNSEL:

 2

 3         FOR THE PLAINTIFF:

 4              LAW OFFICES OF TODD M. FRIEDMAN, P.C.
                BY: ADRIAN R. BACON, ESQ.
 5              21550 Oxnard Street
                Suite 780
 6              Woodland Hills, California 91367
                (888) 595-9111
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1              SANTA ANA, CALIFORNIA

2       Thursday, May 16, 2019, 10:33 a.m. - 10:37 a.m.

3

4              MR. BACON:  We are here today in the

5     matter of "Lisa Kim versus Tinder, Inc., et al."  My

6     name is Adrian Bacon.  I'm one of the attorneys

7     who's been appointed as a class counsel in the class

8     action that has been approved preliminarily by the

9     court for purposes of settlement.

10             Today we are here to take a nonappearance

11    of two Objectors:  Steven Frye, Rich Allison, as

12    well as Allan Candelore, who has submitted a witness

13    declaration in this matter in support of the

14    Objectors.

15             None of the Objectors have appeared for

16    their noticed depositions.  Objectors's counsel were

17    served with two sets of deposition notices, the

18    first of which was scheduled for Friday,

19    May 10th, 2019, at this location.  My co-counsel's

20    office then subsequently withdrew the deposition

21    notices and moved the depositions to today via a

22    subpoena which was served on Objectors's counsel.

23             Objectors's counsel agreed to accept

24    service of those subpoenas.  I will introduce a copy

25    of them for the record, the first of which is the

Transcript of Proceedings Re: Nonappearances - 5/16/2019

1    subpoena to testify at deposition served for

2    Objector, Steven Frye.

3                    (Exhibit 1 marked.)

4         MR. BACON:  The second of which is the

5    subpoena to testify at deposition for Witness,

6    Allan Candelore.

7             We will mark that Exhibit 2.

8                    (Exhibit 2 marked.)

9         MR. BACON:  And the third of which is the

10   subpoena to testify at deposition for Objector,

11   Rich Allison.

12            We will mark that as Exhibit 3.

13                   (Exhibit 3 marked.)

14        MR. BACON:  Yesterday, May 15th, 2019,

15   Objectors's counsel served my office and my

16   co-counsel's office with objections to the

17   deposition notices and subpoenas in this matter.

18   This was the first formal objection that we received

19   to the notice of these otherwise properly-served

20   subpoenas.

21            I'm introducing a copy of the letter we

22   received along with the objections as Exhibit 4.

23                   (Exhibit 4 marked.)

24        MR. BACON:  The letter is dated

25   May 15, 2019.  It was sent to class counsel by

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

1    Danielle Leonard.

2          I will also say for the record that my

3    office has requested that if the dates that we have

4    noticed these depositions for would not be agreeable

5    due to calendaring conflicts; we've asked the

6    Objectors and their counsel to provide us with

7    alternate dates.  They have to date not provided us

8    with any responses to this request.

9          Objectors have not filed a motion for a

10   protective order in this case; nor have they

11   otherwise moved to quash these subpoenas.  We take a

12   nonappearance today, and we reserve the right to

13   request terminating sanctions if they refuse to

14   appear or withdraw their objections, and we take the

15   position that it is necessary to preserve and

16   protect the rights of the class members, that we are

17   diligently attempting to further their rights for

18   purposes of this settlement.

19   (Whereupon, the proceedings concluded at 10:37 a.m.)

20

21

22

23

24

25

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

```
 1                    CERTIFICATE

 2               OF SHORTHAND REPORTER

 3

 4        I, the undersigned, a Certified Shorthand Reporter

 5   of the State of California, do hereby certify:

 6        That the foregoing proceedings was taken before me

 7   at the time and place herein set forth; that a verbatim

 8   record of the proceedings was made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; further, that the foregoing is an accurate

11   transcription thereof.

12        I further certify that I am neither financially

13   interested in the action, nor a relative or employee of

14   an attorney of any of the attorneys.

15        IN WITNESS WHEREOF, I have this date subscribed my

16   name.

17   Dated:  May 19, 2019

18

19

20        _____

          APRIL PANAMENO, CSR NO. 13739
21

22

23

24

25
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

```
 1                        I N D E X

 2

 3     THURSDAY, MAY 16, 2019

 4

 5

 6

 7     PROCEEDINGS BY:                        PAGE

 8     MR. BACON                                 3

 9

10

11                     E X H I B I T S

12

13     MARKED            DESCRIPTION          PAGE

14     Exhibit 1    SUBPOENA TO TESTIFY (STEVEN FRYE)      4

15     Exhibit 2    SUBPOENA TO TESTIFY (ALLAN CANDELORE)  4

16     Exhibit 3    SUBPOENA TO TESTIFY (RICH ALLISON)     4

17     Exhibit 4    LETTER DATED MAY 15, 2019              4

18

19

20

21

22

23

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Central District of California

| | | |
|---|---|---|
| LISA KIM | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   2-18-cv-03093 |
| TINDER, INC., et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
Steven Frye
c/o counsel KRALOWEC LAW, P.C.; ALTSHULER BERZON LLP; RAVA LAW FIRM
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
**Your objections to the Class Settlement**

| Place:   Law Offices of Todd M. Friedman, P.C., 1851 E. 1st St., 9th Floor, Santa Ana, CA 92705 | Date and Time: 05/16/2019 10:00 am |
|---|---|

The deposition will be recorded by this method:   stenographically and videographer

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: All COMPLAINTS you have filed in state or federal court; All DOCUMENTS regarding your signing up with Tinder; All deposition and trial TRANSCRIPTS where you were the witness

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   05/08/2019

        *CLERK OF COURT*
                                                                    OR

                                                                    s/ John P. Kristensen

        *Signature of Clerk or Deputy Clerk*                        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Plaintiff Lisa Kim
                                                            , who issues or requests this subpoena, are:

John P. Kristensen, 12540 Beatrice St. #200, Los Angeles, CA 90066, john@kristensenlaw.com; 310 507-7924

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT**

1

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 2-18-cv-03093

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____     _____
                                        *Server's signature*

                          _____
                                        *Printed name and title*

                          _____
                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

CERTIFICATE OF SERVICE

I certify that on this 14th day of May 2019, the foregoing document titled SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION was served upon the following parties via e-mail and pursuant to Rule 5 of the FEDERAL RULES OF CIVIL PROCEDURE:

Alexandra Hill
MANATT PHELPS AND PHILLIPS LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
323-312-4000
Fax: 310-312-4224
Email: ahill@manatt.com

Kimberly A. Kralowec
KRALOWEC LAW, P.C.
750 Battery Street, Suite 700
San Francisco, CA 94111
Telephone: (415) 546-6800
Facsimile: (415) 546-6801
Email: kkralowec@kraloweclaw.com

Donald R Brown
MANATT PHELPS AND PHILLIPS LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
310-312-4000
Fax: 310-312-4224
Email: dbrown@manatt.com

Danielle E. Leonard
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: dleonard@altber.com

Robert H Platt
MANATT PHELPS AND PHILLIPS LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
310-312-4000
Fax: 310 312 4224
Email: rplatt@manatt.com

Alfred G. Rava
RAVA LAW FIRM
3667 Voltaire Street
San Diego, CA 92106
Telephone: (619) 238-1993
Facsimile: (619) 374-7288
Email: alrava@cox.net

*/s/Vanessa Brahm*
Vanessa Brahm

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| LISA KIM | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2-18-cv-03093 |
| TINDER, INC., et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                              Allan Candelore
            c/o counsel KRALOWEC LAW, P.C.; ALTSHULER BERZON LLP; RAVA LAW FIRM
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
Your objections to the Class Settlement

| Place: Law Offices of Todd M. Friedman, P.C., 1851 E. 1st St., 9th Floor, Santa Ana, CA 92705 | Date and Time: 05/16/2019 1:00 pm |
|---|---|

The deposition will be recorded by this method:   stenographically and videographer

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: All COMPLAINTS you have filed in state or federal court; All DOCUMENTS regarding your signing up with Tinder; All deposition and trial TRANSCRIPTS where you were the witness

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   05/08/2019

            *CLERK OF COURT*
                                              OR
                                                        s/ John P. Kristensen
_____              _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Plaintiff Lisa Kim
_____, who issues or requests this subpoena, are:
John P. Kristensen, 12540 Beatrice St. #200, Los Angeles, CA 90066, john@kristensenlaw.com; 310 507-7924

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT
2

PENGAD 800-631-6989

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 2-18-cv-03093

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

CERTIFICATE OF SERVICE

I certify that on this 14th day of May 2019, the foregoing document titled SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION was served upon the following parties via e-mail and pursuant to Rule 5 of the FEDERAL RULES OF CIVIL PROCEDURE:

Alexandra Hill
MANATT PHELPS AND PHILLIPS LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
323-312-4000
Fax: 310-312-4224
Email: ahill@manatt.com

Donald R Brown
MANATT PHELPS AND PHILLIPS LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
310-312-4000
Fax: 310-312-4224
Email: dbrown@manatt.com

Robert H Platt
MANATT PHELPS AND PHILLIPS LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
310-312-4000
Fax: 310 312 4224
Email: rplatt@manatt.com

Kimberly A. Kralowec
KRALOWEC LAW, P.C.
750 Battery Street, Suite 700
San Francisco, CA 94111
Telephone: (415) 546-6800
Facsimile: (415) 546-6801
Email: kkralowec@kraloweclaw.com

Danielle E. Leonard
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: dleonard@altber.com

Alfred G. Rava
RAVA LAW FIRM
3667 Voltaire Street
San Diego, CA 92106
Telephone: (619) 238-1993
Facsimile: (619) 374-7288
Email: alrava@cox.net

*/s/Vanessa Brahm*
Vanessa Brahm

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| LISA KIM | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   2-18-cv-03093 |
| TINDER, INC., et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:

Rich Allison

c/o counsel KRALOWEC LAW, P.C.; ALTSHULER BERZON LLP; RAVA LAW FIRM

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

Your objections to the Class Settlement

| Place: Law Offices of Todd M. Friedman, P.C., 1851 E. 1st St., 9th Floor, Santa Ana, CA 92705 | Date and Time: 05/16/2019 3:00 pm |
|---|---|

The deposition will be recorded by this method:   stenographically and videographer

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: All COMPLAINTS you have filed in state or federal court; All DOCUMENTS regarding your signing up with Tinder; All deposition and trial TRANSCRIPTS where you were the witness

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   05/08/2019

*CLERK OF COURT*

OR

| | |
|---|---|
| | s/ John P. Kristensen |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Plaintiff Lisa Kim
, who issues or requests this subpoena, are:

John P. Kristensen, 12540 Beatrice St. #200, Los Angeles, CA 90066, john@kristensenlaw.com; 310 507-7924

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT 3

PENGAD 800-631-6989

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  2-18-cv-03093

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                 _____
                                                              *Server's signature*

                                                              _____
                                                              *Printed name and title*

                                                              _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

CERTIFICATE OF SERVICE

I certify that on this 14th day of May 2019, the foregoing document titled SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION was served upon the following parties via e-mail and pursuant to Rule 5 of the FEDERAL RULES OF CIVIL PROCEDURE:

Alexandra Hill
MANATT PHELPS AND PHILLIPS LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
323-312-4000
Fax: 310-312-4224
Email: ahill@manatt.com

Donald R Brown
MANATT PHELPS AND PHILLIPS LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
310-312-4000
Fax: 310-312-4224
Email: dbrown@manatt.com

Robert H Platt
MANATT PHELPS AND PHILLIPS LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
310-312-4000
Fax: 310 312 4224
Email: rplatt@manatt.com

Kimberly A. Kralowec
KRALOWEC LAW, P.C.
750 Battery Street, Suite 700
San Francisco, CA 94111
Telephone: (415) 546-6800
Facsimile: (415) 546-6801
Email: kkralowec@kraloweclaw.com

Danielle E. Leonard
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: dleonard@altber.com

Alfred G. Rava
RAVA LAW FIRM
3667 Voltaire Street
San Diego, CA 92106
Telephone: (619) 238-1993
Facsimile: (619) 374-7288
Email: alrava@cox.net

*/s/Vanessa Brahm*
Vanessa Brahm

**ALTSHULER BERZON LLP**

ATTORNEYS AT LAW
177 POST STREET, SUITE 300
SAN FRANCISCO, CALIFORNIA 94108
(415) 421-7151
FAX (415) 362-8064
www.altshulerberzon.com

STEPHEN P. BERZON
ERIC P. BROWN
HAMILTON CANDEE
EVE H. CERVANTEZ
BARBARA J. CHISHOLM
JEFFREY B. DEMAIN
JAMES M. FINBERG
EILEEN B. GOLDSMITH
MEREDITH A. JOHNSON
SCOTT A. KRONLAND
ANDREW KUSHNER
REBECCA C. LEE
DANIELLE E. LEONARD
STACEY M. LEYTON
AMANDA C. LYNCH
MATTHEW J. MURRAY
ZOE PALITZ
P. CASEY PITTS
DANIEL T. PURTELL
MICHAEL RUBIN
MEGAN WACHSPRESS
STEFANIE L. WILSON

FRED H. ALTSHULER
FOUNDING PARTNER EMERITUS

PETER D. NUSSBAUM
PARTNER EMERITUS

CORINNE JOHNSON
FELLOW

May 15, 2019

**By Email and First Class Mail**
Todd Friedman
Adrian Bacon
Law Offices of Todd M. Friedman P.C.
21550 Oxnard St. # 780
Woodland Hills, CA  91367
tfriedman@toddflaw.com
abacon@toddflaw.com

John P. Kristensen
David L. Weisberg
Christina M. Le
Kristensen Weisberg, LLP
12450 Beatrice Street, Suite 200
Los Angeles, California 90066
john@kristensenlaw.com
david@kristensenlaw.com
christina@kristensenlaw.com

Re: Deposition Notices and Subpoenas in *Kim v. Tinder*, 2-18-cv-03093

Counsel:

I'm writing with respect to the deposition notices and subpoenas that you have served on Allan Candelore, who has opted out of the *Kim* settlement, and class member objectors Steve Frye and Rich Allison.  As the enclosed Objections explain, and as we informed you yesterday, we are objecting to these depositions and production requests in their entirety.  If you wish to proceed further, we hereby request that you meet and confer pursuant to the procedures set forth in Local Rule 37 and Magistrate Judge Sagar's procedures.  Please let us know if, after reviewing our objections, you wish to proceed, and your available dates and times for a meet and confer conference.



Re: Deposition Notices and Subpoenas in *Kim v. Tinder*, 2-18-cv-03093
May 15, 2019
Page 2

Our position is set forth in the accompanying documents and is summarized below. We have requested by email yesterday that you explain why you believe the depositions are warranted and what legal authority you have for taking depositions of class members without an order from the Court. We reiterate that request and look forward to seeing your written statement as set forth in L.R. 37-1. We hope by exchanging this information we can resolve this dispute without the need to involve the Court.

I.   **Initial Deposition Notices**

Your initial efforts to demand these depositions were procedurally improper, an issue that is now resolved by our granting you the courtesy of accepting your email service of the subpoenas on May 14. However, these earlier actions warrant further response, because they appear to reflect an attempt to impose undue burden and harass our clients in response to exercising their right to object to what they believe is an inadequate settlement that purports to release their legal claims.

First, without any attempt to discuss the matter by telephone or email, your staff emailed us notices of deposition on May 6, 2019. We had no agreement to accept notices of deposition by email. In any event, Rule 30 notices of non-plaintiff class members are procedurally improper. And, more importantly, you purportedly noticed these three depositions, in emails sent after the close of business on May 6, 2019, for *just four days later*, Friday, May 10, 2019. Given that the final approval hearing in this matter is not until June 17, 2019, and your responses to any objections are not due until June 3, 2019, under the schedule you requested and therefore certainly were aware of, this conduct can only be harassment and an attempt to impose an undue burden on our clients.

In light of this conduct, it was incumbent on you to properly serve any request to depose these individuals, and we had no obligation to respond on behalf of our clients to this request unless and until you did. You withdrew the initial notices, and then, again without any agreement to accept email service, had your staff send amended Rule 30 notices and attached Rule 45 subpoenas by email after the close of business on May 8, 2019, noticing the depositions for just one week later, May 16, 2019. In response to this second improper attempt to serve, as a matter of professional courtesy, we offered to accept emailed service and asked you to properly serve those subpoenas with the appropriate waiver of service form, which you agreed to do on May 10. You did not actually send the subpoenas with the waiver form until May 14, again noticing the depositions for just two days later, on May 16, 2019 (and in Mr. Frye's case, less than forty-eight hours later).

Moreover, during email communications with my co-counsel Kimberly Kralowec, you implied that by requesting proper compliance with the rather unambiguous service rules, we were somehow making things more difficult for your client. To be very clear, there is nothing improper about a request to properly serve our clients. In the end, we agreed as a professional courtesy to accept service of the subpoenas by email, but you should understand that we do not share your view that the rules that govern discovery are somehow flexible or do not apply.

Re: Deposition Notices and Subpoenas in *Kim v. Tinder*, 2-18-cv-03093
May 15, 2019
Page 3

Assuming that you do not agree with our objections and we have a dispute that requires the Court's assistance to resolve, we expect that you will comply with the Local Rules and procedures that govern discovery disputes in this Court.

## II.   Rule 45 Deposition and Production Subpoenas

You have requested the deposition appearance and production of documents from two class member objectors (Rich Allison and Steve Frye) and Allan Candelore, who has opted out of the class. These individuals have provided a full response in the accompanying written objections, and as stated in those documents, they object to these depositions and production requests in their entirety on several grounds.

First and foremost, discovery from absent class members is not appropriate except upon a showing of very specific, relevant need (such as confirming disputed class member status with information not available from a defendant) and only upon order of a court. There simply is no basis for requiring our clients to undergo the time and expense and burden of sitting for depositions, at which you will seek information that is not relevant to the issues before the Court. You do not dispute that Mr. Frye and Mr. Allison fall within the class definition set forth in the *Kim* settlement, and therefore have the right to object on any ground they see fit to raise with the Court. You do not dispute that Mr. Candelore did fall within the class definition, but has opted out of this litigation. The factual information provided to the Court by these individuals regarding the dates and procedures by which they signed up for and purchased Tinder Plus is likewise straightforward and easily confirmed with information from the Defendant (indeed, if you had taken any discovery during the course of litigating the *Kim* case, that information would already be in your possession). You cannot excuse your failure to take any discovery at all in this case prior to negotiating this settlement by attempting to seek factual information from our clients now. Based on your final approval motion, it appears that the Defendants are voluntarily providing you with information about whether each of the objectors is in fact a class member.

More importantly, the issue before the Court in this case is whether the settlement you negotiated on behalf of your client, reaching out to settle and release the claims of all the other California consumers of Tinder Plus who were discriminated against by Tinder, is fair, reasonable and adequate. We obviously have differences of opinion on that issue, but that is no basis for deposing our clients. The focus of the Court's inquiry is on the benefits this agreement does, and does not, provide to class members, not our clients' individual circumstances. These requests therefore appear only to be aimed at discovering irrelevant information and harassing our clients. To be clear, your interest in portraying our clients as serial litigants is completely irrelevant to the adequacy of the settlement you negotiated that is before the Court.

Second, even if these depositions were proper discovery under Rule 26 and Rule 45, which they are not, your requests are unduly burdensome for several reasons, including the extremely short and unreasonable time frame. Short of an absolute emergency, noticing depositions on two days (or even a week's) notice is unreasonable in any circumstance. There is no justification for this unreasonable request, particularly when you proposed the schedule for

Re: Deposition Notices and Subpoenas in *Kim v. Tinder*, 2-18-cv-03093
May 15, 2019
Page 4

final approval that now governs the issues before the Court. Even under that schedule, with the
final approval hearing on June 17, 2019, there is no justification for demanding depositions on
such extremely short notice, and these subpoenas are improper. Moreover, the location, your
offices in Santa Ana, is prohibitive and unduly burdensome for Mr. Candelore and Mr. Allison,
who reside in San Diego.

Third, the requests for production are also entirely objectionable. Mr. Allison and Mr.
Frye have provided the court with the required information regarding any cases in which they
have been a class action objector. Whether these individuals have been plaintiffs in other cases
is entirely irrelevant to their objections to this settlement. As for Mr. Candelore, you already
have a copy of his age discrimination complaint against Tinder, and his role as a plaintiff in other
matters is irrelevant, given that he has opted out of this settlement, and his declaration sought
only to provide the court with important factual information – about which there is no dispute.
The request for documents pertaining to signing up for Tinder is also fatally overbroad and
unduly burdensome—any information you seek regarding these individuals' status as class
members has already been provided in their declarations, and confirmation of it is easily
obtained from the Defendant in this case.

On behalf of these clients, if you wish to proceed with the meet and confer process, and if
we are unable to resolve our differences and we therefore need to request the Court's assistance,
the only proper outcome is an order denying any motion to compel and/or quashing these
subpoenas entirely.

We look forward to receiving: 1) your position as to whether you wish to proceed after
reviewing our objections; 2) the dates and times you are available for a meet and confer
conference; and 3) a letter setting forth your position and legal authority consistent with Local
Rule 37-1.

Sincerely,

Danielle Leonard

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT L




**National Coalition For Men** (NCFM)

NCFM: 619-231-1909
932 C Street, Suite B
San Diego, CA 92101

A 501(c)3 Nonprofit Corporation

*Since 1977, NCFM has been committed to ending harmful discrimination and stereotypes against boys, men, their families and the women who love them.
We are a gender inclusive, nonpartisan, ethnically diverse organization that effects civil rights reform through advocacy, education, outreach, services and litigation.*

- Home
- About
- Issues
- Action
- Help
- Testimonials
- Write a Review
- Member Login

Search Examples: "Fathers"

## NCFM President files a class action sex discrimination lawsuit against the Los Angeles Fours Seasons Hotel Westlake

January 2, 2013  By NCFM





READ ABOUT OUR
**SUCCESS**

CLICK HERE TO
**DONATE**

NATIONAL COALITION
FOR MEN (NCFM)

NCFM has members throughout North America and in many countries.

JOIN US

Become part of the solution rather than part of the problem

www.ncfm.org

By NCFM Secretary Al Rava, Esq.

NCFM president Harry Crouch is following on the footsteps of NCFM vice-president Marc Angelucci who, in 2007, prevailed in the landmark California Supreme Court "Ladies' Night" **sex discrimination** case of *Marc Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160.  *Angelucci* ruled that men who were charged more than women to enter a supper club did not have to ask the offending business for equal treatment in order to have standing to file a *sex discrimination* lawsuit.  NCFM's amicus brief to the California Supreme Court was instrumental in the *Angelucci* decision.

The latest NCFM-related lawsuit to champion equal rights for men and women and to eradicate archaic and illegal Ladies' Night promotions, was filed by NCFM president Harry Crouch on New Year's Eve.  Harry filed a class action lawsuit in Los Angeles County Superior Court on behalf of himself and all similarly situated men and women against the Four Seasons Hotel Westlake Village (California) for its weekly Girls' Night Out promotion that treated male and female patrons unequally.

On Girls' Night Out, held every Wednesday for over a year in the Four Seasons lounge, Four Seasons provided female patrons with free food (appetizers) and 1/2 priced beverages, while denying the free food and discounted beverages to male patrons.  Four Seasons provided the free food and discounted beverages to only female patrons based solely on sex, it did not matter how wealthy, how well-fed, or well-hydrated Four Seasons female patrons were in comparison to its male patrons to qualify for the free food and discounted beverages.

As set forth in the class action complaint, [http://ncfm.org/wp-content/uploads/2013/01/12-27-12-Harry-Crouch-Class-Action-Complaint_opt.pdf]:

Despite the many State of California anti-discrimination statutes, unanimous California Supreme Court opinions, California Attorney General and Department of Fair Employment and Housing actions, and California Department of Alcoholic Beverage Control ("ABC") regulations that prohibit California businesses from treating patrons unequally based on their sex, and specifically condemn and outlaw Ladies' Night and Ladies' Day promotions that treat female and male patrons unequally, defendants brazenly advertised and employed a recurring Girls' Night Out promotion for over a year that treated female and male unequally based solely on their sex.

Mr. Crouch's class action includes female patrons as part of the class because, as set forth in the below excerpts from the complaint, Ladies' Night promotions harm women as well as men:

*"Koire* also ruled "the Legislature established that arbitrary sex discrimination by business is per se injurious" and "differential pricing based on sex may be generally detrimental to both men and women, because it reinforces harmful stereotypes." *Id.* at 33.  Among the harmful stereotypes detrimental to the advancement of equal rights for women and men that defendants' Girls' Night Out perpetuated include: (1) all women are genetically incapable of earning as much money as men; (2) all women are genetically predisposed to not being able to pay as much as men for the same thing; (3) all women enjoy being subsidized by strange men at hotel bars and restaurants; (4) all adult women enjoy being treated like little girls by not being required to pay the full price that adult men are required to pay for the same goods or services, (5) all women enjoy drinking discounted beverages and eating free food in front of men who paid full price for the same types of drinks or food; (6) all women welcome and enjoy a hotel treating them as little more than sexual bait for the hotel's male customers; and (7) all women and men are expected to just stand around and take it like sheared sheep when a business charges one sex more than the other sex for the exact same thing.

Defendants' archaic Girls' Night Out promotion, apparently implemented to benefit the "little women," is the hallmark of traditionalistic thinkers who may advise a young woman her best chance for a happy life is to ace her home economics class and learn how to make queso from Velveeta in order to catch a good man.  Not only has the California Supreme Court expressed its disapproval of the treatment of women through Ladies' Night promotions, but the United States Supreme Court has similarly weighed in about "romantic paternalism" directed at women.  In *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973), wherein the U.S. Supreme Court ruled the U.S. military must provide its female members with the same housing and medical benefits as it provides its male members, Justice William J. Brennan Jr. wrote that this is another example of one of those types of traditional sex discrimination that ostensibly appears to benefit women, but "rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage."

Defendants' Girls' Night Out promotion caused discontent, animosity, harm, resentment, or envy among the sexes, and is especially troubling, arbitrary, and invidious at a time when the depressed economy put a higher proportion of men out of work than women.  For example, when Harry Crouch attended the Girls' Night Out in March of 2010, the national unemployment rate for men was higher than it was for women, standing at 10% for men and only 8% for women.

During Girls' Night Out, Four Seasons would have provided female millionaires such as Nancy Pelosi or Sarah Palin with discounted drinks and free food, but would have denied the same to combat veterans from the Iraq and Afghanistan wars.  Or, multi-millionaire Oprah Winfrey could have traveled from her Montecito, California mansion and have been given deeply discounted drinks and free food on Girls Night Out, while unemployed male construction workers would have had to pay full price for their beverages and be denied the free food.  On Girls' Night Out, a female defense attorney pulling down a six figure annual salary would have received discounted drinks and free food, but a minimum wage male file clerk, working for the same firm and sitting at the same Four Seasons table, would have had to pay full price for the same types of beverages and food.

NCFM member Steve Frye had earlier filed a individual lawsuit in Los Angeles County Superior Court, against this same Four Seasons Hotel for its Girls' Night Out promotion, also alleging sex discrimination for treating male and female patrons unequally.  That case is pending.









· BANGALORE
· CAROLINAS
· CHICAGO
· LOS ANGELES
· NORTHERN CALIFORNIA
· TWIN CITIES







**Sex Discrimination works both ways.**

**Sex Discrimination is just as harmful to men if not more so than it is to
women.**

http://ncfm.org/wp-content/uploads/2013/01/12-27-12-Harry-Crouch-Class-Action-Complaint_opt.pdf



IS FEMINISIM A
HATE GROUP

# Related

NCFM Members Win Huge
Landmark Sex Discrimination Case
The Daily Journal, California's
leading daily newspaper, recently
published in Verdicts and
Settlements the verdict obtained by
several NCFM members and their
January 25, 2011
In "Action"

NCFM plaintiff wins $400,000.00+
class action against Club Med for
anti-male discrimination
For immediate release 2/28/08
COURT ENTERS JUDGMENT IN
CLASS ACTION LAWSUIT
AGAINST CLUB MED FOR "LADIES
FLY FREE PROMOTION" Los
February 28, 2008
Similar post



NCFM, The truth behind the Unruh
Civil Rights Act lawsuit against Chic
CEO and attacks against NCFM
Secretary Al Rava
August 29, 2015
In "Al Rava, Esq."

Tags: al rava, discrimination against men, harry crouch, ladies nigh, marc angelucci, national coalition for men, ncfm,
sex discrimination

**30 Responses to** NCFM President files a class action sex discrimination lawsuit against the Los
Angeles Fours Seasons Hotel Westlake

1. **Eagle Rock's Hard Place — California Brewery Looks to Bounce Back Following Men's Rights
   Legal Action – Read Beer** on December 4, 2018 at 4:48 PM

   […] that males are discriminated against—stems from a connection to the National Coalition for Men, which has
   reported his membership. He also runs the website EqualityForMen.com. Among Frye's legal representation in the past
   […]

   Reply

   • **NCFM** on December 4, 2018 at 5:33 PM

     To our knoledge NCFM has nothing to do with EqalityForMen.com, the California Brewery or any lawsuit having
     to do with the California Brewery, and Steve Frye is not a member of NCFM. Period.

     Reply

2. Jen Mathews on October 30, 2013 at 2:32 PM

   So do you guys make a living just going and suing places that have Ladies' Nights? You care about $$$, not men's and
   women's gender inequalities. Spend your time helping the cause rather than raking the dough into your own pockets
   and maybe you would be more believable.

• NCFM Sends Cease, Desist and
  Preserve Evidence Letter to the
  Southern Poverty Law Center
  | May 31, 2019

• NCFM Law Group Member
  John Davis, Esq., It is Time for
  New Laws to Punish False
  Accusers | May 24, 2019

• NCFM Member 'Kit Martin'
  Indicted for Murder in Kentucky
  | May 21, 2019

• NCFM Adviser Gordon E.
  Finley, PhD, Shamed for
  motherhood | May 16, 2019

• NCFM Adviser Gordon E.
  Finley PhD, Masculinity saved
  lives | May 13, 2019

• NCFM VP Marc Angelucci back
  in court over NCFM Member
  Jerry Cox corrupt Mariposa
  County landgrab case | April 26,
  2019

• NCFM 2018 Recipient of our
  Award for Excellence in the
  Advancement of Men's Issues,
  Mark Perry Ph.D | April 11, 2019

• NCFM Adviser Charles Corry,
  PhD, Post Traumatic Stress and
  Injustice | April 9, 2019

• NCFM Member Nels Otto, Men
  and Sports | April 5, 2019



- NCFM Adviser Gordon Finley Ph.D. For men's sakes, ditch VAWA | *March 27, 2019*

- NCFM Adviser Gordon Finley PhD, Real higher ed not easy to find – and the cowboy way | *March 20, 2019*

- NCFM Mr. Manners, Are women discriminated against when running for political office? *March 16, 2019*

3. **Marc A on January 4, 2013 at 10:15 PM**

   Justmanup, NCFM filed a successful lawsuit against the state of CA that overturned the discriminatory laws that exclude battered men from state funded services. NCFM is still working on that issue. NCFM was involved in a similar lawsuit in Minnesota. NCFM does lots of things. The pricing discrimination is one of many. it isn't taking any resources away from NCFM, in fact some of the plaintiffs donate money to NCFM when they win. Back in 2004 we raised lots of money from these Ladies' Nights lawsuts and used the money to get paternity fraud victims to Sacramento to testify about paternity fraud, and we changed the law that way. I support this lawsuit.

   Select Language

   [Reply] Powered by Google Translate

   Select Category

   • **Steve F on January 9, 2013 at 10:46 AM**

     Gee, you would think that the braintrust at Four Seasons and other such businesses, especially those with Ca. Liquor Licenses, would bother to read the requirements, guidelines and restrictions of said License which clearly indicates its unlawful to have gender based promotions....shame on them and even less of an excuse for this unlawful act(s)

     [Reply]

     ▪ **Jen Mathews on November 1, 2013 at 6:42 PM**

       Nice of you to join in on the conversation Steve. Do you just scan local papers for bars to go and sue? Do we really need to be spending the taxpayer money litigating drink specials? Nice quick way to make money for you I suppose.

       [Reply]

   • **Jen Mathews on November 1, 2013 at 6:38 PM**

     I support the other things you do but most, if not all, of these companies and bars you are suing are just ignorant of the law. What about the cases (I've read many of yours) in which it is a small business owner? A $10K lawsuit over something like this could seriously sink their business!! I get your point but you would make less enemies if you went to business that had ladies' specials and informed them of the California law rather than not giving them a chance and smacking them with a lawsuit. Doing that makes you look like opportunists. Also, not a good idea to back Chris Brown.

     [Reply]

4. **Marc A on January 4, 2013 at 10:12 PM**

NCFM filed a successful lawsuit against the state of CA that overturned the discriminatory laws that exclude battered men from state funded services. NCFM is still working on that issue. NCFM was involved in a similar lawsuit in Minnesota. NCFM does lots of things. The pricing discrimination is one of many. it isn't taking any resources away from NCFM, in fact some of the plaintiffs donate money to NCFM when they win. Back in 2004 we raised lots of money from these Ladies' Nights lawsuts and used the money to get paternity fraud victims to Sacramento to testify about paternity fraud, and we changed the law that way. I support this lawsuit.

Reply

5. **Justmanup on January 4, 2013 at 2:08 PM**

(I hit return and posted an incomplete response)

Sue, I think a sexist happy hour is not a very serious problem when considering the big picture if how men are treated in US society.

Reply

6. **Mike McCormick on January 4, 2013 at 2:04 AM**

Way to go Harry. So let's carry the scenario out a bit further…Rich lady gets trashed on 1/2 price drinks and free food, picks up and heads home with male file clerk for some further adult frivolity. On waking the next morning she decides she didn't give informed consent because of her impaired state. Male file clerk ends up in prison for rape, and Four Seasons pays out millions to rich lady because their promotion ultimately led to consensual but at the same time somehow, through the magic of an expansive legal definition, unwanted and uninformed sex.

The Four Seasons should give NCFM a big donation/settlement and thank you note just for exposing what could ultimately turn out to be a set up that could cost them a whole lot more money. And in the process maybe everyone will end up with 1/2 price drinks and free food. Of course only after signing a hold harmless agreement with the hotel prior to entering the lounge. I see a job offer from the Four Seasons risk management department in your future.

You're a hero Harry, keep up the great work!

Reply

○ **Al Rava on January 4, 2013 at 8:26 AM**

This is a great comment.

Reply

■ **NCFM on January 4, 2013 at 11:07 AM**

That's because my friend Mike is a great guy. I'm thinking of resigning from NCFM and becoming a file clerk just for the adult frivolity of it, without the jail part. As absurd would be the Four Seasons reading Mike's comment and sending us a thank you letter for saving them millions of dollars. Some people don't appreciate the help. However, the risk management job intrigues me…

Harry Crouch, President NCFM

Reply

---

7. **Bob Yourell** on January 3, 2013 at 4:23 PM

Big kudos to Harry Crouch for taking on these issues. This is time-consuming work. I'm glad he can handle the abuse heaped on by people that don't understand the point of this action. I wonder if those same critics would be defending separate but equal facilities if it were 1950? There's a bar in Rosarito that offers a Men's Night and a Ladies' Night. What do you think? Is that good enough? I can think of some problems with that in practice.

Reply

---

- Sue on January 3, 2013 at 7:02 PM

Is that the "Rosarito" in Canada or Bangladesh?

The answer depends on the location of "Rosarito,"or is every reader expected to know where the "Rosarito" is that is referred to in this posting?

Reply

---

■ **NCFM** on January 4, 2013 at 11:09 AM

Mexico… it's in Mexico.

Reply

---

■ **Sue** on January 4, 2013 at 12:23 PM

Then it wouldn't be actionable. Mexico's laws are different than California's which are different than Michigan's, etc.

Reply

---

8. **Gordon E. Finley, Ph.D.** on January 3, 2013 at 2:31 PM

Hey, what about a "Gentlemen's Night" with the same perks for men and costs for women.

Perhps all those Southern California "Cougars" will flock like flies for a shot at a hot younger man!

Separate but Equal has been legislated before, why not now?

Reply

- **McDrake on January 3, 2013 at 2:43 PM**

Really, separate has never been equal! I am sure they will short cut the Gentleman"s Night since they have already shown a total disrespect for men, in spite of the Law!

Reply

- **Sue on January 3, 2013 at 2:53 PM**

Yeah, sure, a "Gentlemen's Night" to counterbalance a "Ladies' Night." And why not allow "Caucasians' Night" if it's counterbalanced with an "African-Americans' Night." Or, a "Jews' Night" followed by a "Muslims' Night" followed by a "Christians' Night" etc.

I don't think so.

Reply

- **Harry Crouch on January 3, 2013 at 3:51 PM**

Good one Gordon! I should have thought of that. Lots of Cougars here. Probably more in Florida. Also probably not against the law in Florida. We should try it there first!

Reply

9. **Justmanup on January 3, 2013 at 1:09 AM**

NCFM, If you really want to make a difference, file a class action suit on behalf of all married men against the state marriage laws that treat married men as subservient to women.

Then you would be really accomplishing something.

Reply

- **Sue on January 3, 2013 at 9:16 AM**

That would be a huge waste of NCFM's time and money.

Besides, if you think this would really accomplish something, why don't you bring such a class action lawsuit against state marriage laws that treat married men as subservient to women. You may have the required standing to file such a class action lawsuit while NCFM would not, because you as an indivdivual can get married, whereas the NCFM organization cannot.

Please let us know if you file such a lawsuit and what you accomplish by doing so.

Reply

---

- **Justmanup on January 4, 2013 at 9:43 AM**

Sue, I think the intent of my remark was not clear. I'll spell out more explicitly what I want to say:

NCFM should not waste time on filing class action lawsuits about happy hour or ladies night. These are smaller financial annoyances that do not have a substantial negative effect on men in general. What NCFM should do is go aggressively after SERIOUS cases of discrimination that affect all men, such as marriage law inequities and family court inequities, jail sentencing practices, always-arrest-the-man domestic violence rules, kid-glove treatment of false rape accusers, and similar SERIOUS violations of men's civil rights. Ladies' night does not even make it to the top 100 list.

Now, if NCFM has legal standing to litigate ladies' night for all men (who may or may not go to bars), I cannot see why, contrary to what you said, why NCFM would not have legal standing to take on marriage laws and practices for all men (married or not).

Reply

---

  - **Sue on January 4, 2013 at 12:36 PM**

Let me see if I understand you. For over a year, a [rather sophisticated] California business charges hundreds or thousands of men more than women for the exact same types of food and beverages and you don't think this is "SERIOUS case[] of discrimination." Okay, whatever you say.

Does this mean that you'd be okay with McDonald's hosting a weekly "Caucasians' Night" for over a year and provide only Caucasian patrons with free food and discounted beverages? Or, McD's hosting a weekly "Men's NIght" that provides free food and discounted beverages to male patrons but denies the same to all female patrons?

Also, the article didn't say NCFM is suing Four Seasons, it says NCFM president Harry Crouch (as an individual, not on behalf of NCFM) is suing Four Seasons. While NCFM may have standing to file this lawsuit, it did not.

I agree that the other forms of discrimination against men you listed are serious and should be stopped.

Reply

---

- **Justmanup on January 4, 2013 at 2:06 PM**

Sue, I think a sexist happy hour is not a very serious problem when considering the big picture if how men are treated in US society.

Reply

---

- Justmanup on January 4, 2013 at 2:23 PM

  (I hit return at the wrong moment and and incomplete entry was posted)
  Sue, I think a sexist happy hour is not a very serious problem when considering the big picture of how men are
  mistreated in the misandric society which is the US today.

  I understand that it may be demotivating when someone tries to accomplish something that is useful, but then
  gets chastised by me or anyone else for having picked perhaps not the most important fight. I don't mean to
  slight the effort, I appreciate the effort. Please keep up the effort!

  What I am saying is that if we really want change the misandric society we have in the USA today, it is very
  important which struggles we pick to fight. And my personal opinion is what I have expressed above, namely that
  there are MANY other struggles that are much more worthy than the sexist happy hour one.

  So, I'm not trying to demotivate anyone. I am trying to to emphasize that we need to focus on the gravely serious
  issues of misandry. There are plenty of them.

  Feminists did not get their power by complaining about the supposedly inequitable difference in price of dry-
  cleaning between men's shirts and women's blouses. They talked about, but they didn't spend all that much
  energy on it. They went for the jugular instead. We need to respond by tackling the issues that directly affect
  men's personal freedom, financial freedom, personal safety, health and well-being.

  Peace out, and keep up the good work.

  Reply

  - **shmiggen** on March 9, 2013 at 1:11 PM

    I disagree. Ladies Night is all-pervasive. It is basic discrimination throughout the land, and deliberate. I
    don't see this as small potatoes at all.

    Reply

10. Charlie on January 2, 2013 at 10:09 PM

    Geez, how nice it must be to go out "with the girls" and know that you can eat and drink for free! I know the bars do this
    so more men will show up but it is an antiquated, biased program used by bars. By its merits it assumes men are
    inferior to women. Men are once again encouraged to be seen as "paychecks" by women. This illegal practice must be
    stopped!

    Reply

11. Marcellinha on January 2, 2013 at 7:42 PM

    What the heck was the Four Seasons' thinking when it decided to charge its customers different prices for the exact
    same types of food or drinks based solely on their customers' sex? "Unbelievable" is right. I wonder who the brainiac is
    who came up with this promotion.

    Reply

≡

12. **Sue on January 2, 2013 at 7:37 PM**

How surprising that a supposedly sophisticated business such as a Four Seasons Hotel would be so stupid to give only its female patrons free food and discounted drinks. I doubt this Four Seasons would ever consider charging female guests less than male guests for the same type of hotel room, but it didn't hesitate – every week for over a year – to charge women less then men for food and beverages in its lounge. Unbelievable!

Reply

**Leave a Reply**

**Social Login:**

Your email address will not be published. Required fields are marked *

Name *

Email *

Website

I'm not a robot

reCAPTCHA
Privacy - Terms

POST COMMENT

☐ Notify me of follow-up comments by email.

☐ Notify me of new posts by email.

This site uses Akismet to reduce spam. Learn how your comment data is processed.

MISSION STATEMENT

*Since 1977, NCFM has been committed to ending harmful discrimination and stereotypes against boys, men, their families and the women who love them.*

*We are a gender inclusive, nonpartisan, ethnically diverse organization that effects civil rights reform through advocacy, education, outreach, services and litigation.*

Copyright © 2019 National Coalition For Men (NCFM). All Rights Reserved

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT M





NCFM: 619-231-1909
932 C Street, Suite B
San Diego, CA 92101

A 501(c)3 Nonprofit Corporation

# National Coalition For Men (NCFM)

*Since 1977, NCFM has been committed to ending harmful discrimination and stereotypes against boys, men, their families and the women who love them.*
*We are a gender inclusive, nonpartisan, ethnically diverse organization that effects civil rights reform through advocacy, education, outreach, services and litigation.*

- Home
- About
- Issues
- Action
- Help
- Testimonials
- Write a Review
- Member Login

Search Examples: "Fathers"

## NCFM, our Secretary Al Rava, and the Unruh Act under attack for standing tall for equal rights

August 12, 2015   By NCFM

By NCFM





READ ABOUT OUR
**SUCCESS**

CLICK HERE TO
**DONATE**

NATIONAL COALITION
FOR MEN (NCFM)

Founded in 1977
NCFM is the
oldest Men's Rights
organization in
America

JOIN US

Become part of the solution rather
than part of the problem

www.ncfm.org

By Harry Crouch, President, NCFM

National Coalition of Men Secretary Al Rava, Esq. has been largely responsible for stopping discrimination against men in the strange state of California at great risk to his safety, health, and profession. Al has been subjected to threats, undue criticism and ridicule because of his unrelenting stand against the discrimination of men in public accommodations. I feel privileged to be a member of NCFM because of NCFM members like my friend Mr. Rava who is a true civil rights advocate and hero.

In California, the **Unruh Act** has for decades prevented discrimination in public accommodations based on ones sex, which is a good thing. One of our Board Members notes, "… the *Unruh Act* was big in the 70's, when all kinds of lawsuits were filed against dry cleaners, haircut places, etc. for businesses discriminating against women. Where was

this outrage and name calling then against women's rights like there is here against Mr. Rava, the Unruh Act, and to some degree NCFM?"

This article has been updated and can be read here: http://ncfm.org/2015/08/news/ncfm-the-truth-behind-the-unruh-civil-rights-act-lawsuit-against-chic-ceo-and-attacks-against-ncfm-secretary-al-rava/

  

## The Unruh Act is for everyone, not just women.

### The Unruh Act and those who had the courage to use it are the primary reason many forms of wrongful discrimination in California no longer exists.

**2 Responses to *NCFM, our Secretary Al Rava, and the Unruh Act under attack for standing tall for equal rights***

Sue Nami on August 13, 2015 at 10:06 AM

The continuing successes by NCFM members in their lawsuits against California businesses that discriminated against customers solely because of their sex has been the largest single factor in ending this type of invidious discrimination in the largest state of the union. Because of NCFM members' hard work, this type of discrimination is virtually non-existent in California today. Can anyone say "Nobel Prize for Peace?" Simple amazing stuff.

**REPLY**

Doug Lefelhocz on August 13, 2015 at 3:25 AM

People who bring up the "pay gap" when talking about some of those lawsuits either forget that poor men exist or simply don't care about discriminating against poor men. Since those poor men often happen to have African ancestry, this implies that they find it acceptable to discriminate against black men. That this sort of racism gets entailed by business denying equal services to men probably should get pointed out more often. Unfortunately, I can't comment at any of these sites, because their don't have a comment section or they have banned me before.

**REPLY**

## Related



NCFM, The truth behind the Unruh Civil Rights Act lawsuit against Chic CEO and attacks against NCFM Secretary Al Rava
August 29, 2015
In "Al Rava, Esq."



NCFM Plays Pivital Civil Rights Roll California in Courts Repeatedly Ruling that Women-Only Gyms Illegal
April 11, 2011
In "Action"

NCFM helps the PGA avoid a lawsuit over "Women's Day"
Tiger Woods will be starting his 2011 PGA season in San Diego at the Farmers Insurance Open at Torrey Pines Golf Course, but thanks to NCFM, the tournament's Women's
January 20, 2011
In "Action"

Tags: al rava, cnn money, discrimination against men], harry crouch, national coalition for men, sara o'brien, unruh act

**Leave a Reply**

**Social Login:**

Your email address will not be published. Required fields are marked *



AMERICAN
ENDOWMENT FOUNDATION

☆ ☆ ☆ ☆ ☆
NCFM FREEDOM
ENDOWMENT
Woodward Fund

Support
National Coalition for
Men San Diego.
When you shop at smile.amazon.com,
Amazon donates.
Go to smile.amazon.com

amazonsmile



NCFM
YOUTUBE CHANNEL



- BANGALORE
- CAROLINAS
- CHICAGO
- LOS ANGELES
- NORTHERN CALIFORNIA
- TWIN CITIES

Name *

Email *

Website

I'm not a robot

reCAPTCHA
Privacy - Terms

**POST COMMENT**

☐ Notify me of follow-up comments by email.

☐ Notify me of new posts by email.

This site uses Akismet to reduce spam. Learn how your comment data is processed.



IS FEMINISIM A
**HATE GROUP**



+ −
REVOLVERMAPS

- NCFM Sends Cease, Desist and Preserve Evidence Letter to the Southern Poverty Law Center
  | *May 31, 2019*

- NCFM Law Group Member John Davis, Esq., It is Time for New Laws to Punish False Accusers | *May 24, 2019*

- NCFM Member 'Kit Martin' Indicted for Murder in Kentucky
  | *May 21, 2019*

- NCFM Adviser Gordon E. Finley, PhD, Shamed for motherhood | *May 16, 2019*

- NCFM Adviser Gordon E. Finley PhD, Masculinity saved lives | *May 13, 2019*

- NCFM VP Marc Angelucci back in court over NCFM Member Jerry Cox corrupt Mariposa County landgrab case | *April 26, 2019*

- NCFM 2018 Recipient of our Award for Excellence in the Advancement of Men's Issues, Mark Perry Ph.D | *April 11, 2019*

- NCFM Adviser Charles Corry, PhD, Post Traumatic Stress and Injustice | *April 9, 2019*

- NCFM Member Nels Otto, Men and Sports | *April 5, 2019*

- NCFM Adviser Gordon Finley Ph.D., For men's sakes, ditch VAWA | *March 27, 2019*

- NCFM Adviser Gordon Finley PhD, Real higher ed not easy to find – and the cowboy way | *March 20, 2019*

- NCFM Mr. Manners, Are women discriminated against when running for political office? | *March 16, 2019*

Select Language ▾

Powered by Google **Translate**

Select Category ▾







## MISSION STATEMENT

*Since 1977, NCFM has been committed to ending harmful discrimination and stereotypes against boys, men, their families and the women who love them.*

*We are a gender inclusive, nonpartisan, ethnically diverse organization that effects civil rights reform through advocacy, education, outreach, services and litigation.*

Copyright © 2019 National Coalition For Men (NCFM). All Rights Reserved

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT N

Case 2:18-cv-03093-JFW-AS    Document 80-1    Filed 06/03/19    Page 215 of 361    Page ID #:2195

# MotherJones

**POLITICS**    January 15, 2016

## These Men's Rights Activists Are Suing Women's Groups for Meeting Without Men

**It's an unexpected use of a decades-old civil rights law.**

Case 2:18-cv-03093-JFW-AS   Document 80-1   Filed 06/03/19   Page 216 of 361   Page ID
#:2196

earnings for women.) "Surely, networking mixers to encourage more men to take part in those fields are needed, but not at the exclusion of women," wrote Crouch.

Critics in legal circles contend that these lawsuits appear to be as much about making an easy buck as they are about defending aggrieved men.

The NCFM members' lawsuit alleged that by holding a networking event marketed toward women, Burns and Chic CEO were in fact illegally discriminating against men. The 2014 complaint filed in San Diego Superior Court focused on the event's marketing, noting: "Imagine the uproar by women business owners and entrepreneurs, feminists, and other equal rights advocates if a business consulting company in partnership with a business networking firm brazenly touted a no-women-allowed business networking event as follows." It illustrated the point with a rewritten version of the ad for the event, substituting references to women with men.



Both Donna Hoffman, the president of Women on Course, and Chic CEO's Burns settled with the plaintiffs for an undisclosed sum. As a result of the suit, Burns got a new job and shrunk the business she'd built over six years, suffering a "significant" financial and personal toll. (She wouldn't elaborate on her legal costs, out of concern for potentially violating the terms of her settlement. Rava also said he could not comment on settlements due to confidentiality.) "All Chic CEO is trying to do is provide women with the information they need to get a business started," Burns writes in an email. "Just because we help women, doesn't mean we hurt men."

NCFM members disagreed. They alleged that they were illegally excluded from a business opportunity that was "closed to struggling single dads, disabled combat veterans from the Iraq and Afghanistan wars, and other business men and male entrepreneurs who, just like business women and female entrepreneurs, hoped to and had the right to meet and mingle with entrepreneurs, CEOs, directors, savvy business people and other entrepreneurial-minded people."

*"Just because we help women, doesn't mean we hurt men."*

In response to the argument that events like Chic CEO's help address the pay gap, Crouch wrote on the NCFM's website that according to "the plethora of real social science research...only a minute amount of the pay gap may be due to sex discrimination."

Alfred G. Rava—a San Diego-based attorney who is also the NCFM's secretary and free legal consultant—has been suing on behalf of aggrieved men for more than a decade and represented the NCFM members against Chic CEO. The 59-year-old attorney has filed more than 150 sex discrimination lawsuits in the last 12 years, many citing the Unruh Act. In 2003, seven San Diego nightclubs paid Rava and Steven Surrey, a paralegal, a $125,000 settlement after they brought a series of lawsuits challenging the clubs' "Ladies Night" and other woman-specific discounts. (Part of this sum also went to their attorney fees.)* In 2004, the San Diego Repertory Theater paid Surrey $12,000 after he wrote to it, with Rava's help, alleging that its ticket discounts—half-priced tickets for women on specific nights—were illegal. In 2009, Rava won a half-million-dollar settlement from the Oakland A's for a class-action suit that contested a Mother's Day promotion where the A's gave the first 7,500 women to arrive at the ballpark that weekend a sun hat. Rava told *Mother Jones* that he's never been paid by the NCFM for his "advocacy for equality for men." He also said he could not disclose how much money, if any, he or his clients made from various settlements over discrimination claims because the settlements are confidential.

*In 2009, he won a half-million-dollar settlement from the Oakland A's for a suit that contested a Mother's Day promotion where the A's gave women at the ballpark a sun hat.*

Rava's most high-profile victory was a sex discrimination case that, in 2007, made it all the way to the California Supreme Court. In the lawsuit, four men, including several NCFM members, alleged that the ticket prices charged by a Los Angeles restaurant and night club were discriminatory—in some instances women got a $5 discount or got in free. The issue that the Supreme Court had to decide was not whether the men were discriminated against, but whether the men had the standing to file the suit at all. The club argued they didn't because men never asked to be charged at the ladies' rate. But California's Supreme Court ruled in the men's favor, so they were free to sue the club. The NCFM members were then awarded a judgment by a lower court—but Rava says they were unable to collect because the club had gone out of business.

This Supreme Court victory laid some of the legal groundwork for Rava's recent cases against women's professional groups.

In May 2015, Leslie Fishlock, the CEO of Geek Girl, a tech training company, got a letter from the NCFM alleging that the female-focused marketing for her upcoming Geek Girl tech conference was discriminatory. Copied on the letter were some of her conference's biggest sponsors, including the University of San Diego and Microsoft. Fishlock was shocked, and she worried her sponsors would pull out at the last minute. They didn't, but Fishlock says she spent thousands of dollars on attorneys to avoid a lawsuit.

"It's a fear-based shake down strategy," Fishlock says. "I couldn't sleep. I worried that they would show up to my events, even though we allow guys to come. After the conference, I thought, 'I don't even know if I want to do this anymore.' I shouldn't have to live in that kind of fear."

Since then, Fishlock has been warning other women in tech about how to tweak their marketing language to avoid the NCFM's challenges. She says she has sent emails to "all of the women I know who have networking groups."

The NCFM has also written similar letters to a number of other groups, including a local YMCA and a Monterey bike race, contesting woman-specific promotions. It's unclear if Rava has been behind the drafting of all these letters, but the legal citations and lines of argument in portions of the letters are strikingly similar to those in the Chic CEO and Women on Course lawsuits. A cached page featuring the letter sent to Geek Girl on the NCFM's website thanks Rava for his help. Rava confirms he has consulted for the NCFM about businesses that treat men and women differently, and notes that the letters are signed by the NCFM's president, Harry Crouch.

Rava has lost cases as well, including a much-publicized suit opposing a Mother's Day giveaway by the Anaheim Angels. But when it comes to male discrimination cases, his overall track record is impressive.

"I'm shocked that he has gotten any traction at all," says Michael Kimmel, a professor of sociology at Stony Brook University who has written extensively on men's rights groups. Kimmel cites the example of Roy Den Hollander, a men's rights activist and New York attorney who has filed sex discrimination suits on behalf of men over the past decade. He sued over ladies' nights at a number of New York nightclubs, the Violence Against Women Act, and Columbia University's women's studies department. All three of these cases were dismissed.

But the Unruh Act's protections are broad, which some say makes California fertile territory for Rava's work. Robert Dato, an Orange County attorney who defeated Rava in the Angels case, says the act can encourage frivolous lawsuits, in part because it contains a one-sided provision requiring losing defendants to pay back the plaintiff's attorneys fees, but not vice versa. Rava doesn't agree that the breadth of the Unruh Act encourages sex discrimination lawsuits, in part, he tells *Mother Jones*, because his litigation and advocacy have led to a dearth of parties to sue. "These gender-based promotions and business practices have been virtually eliminated in California," writes Rava in an email, "and no sex discrimination promotions or events means no sex discrimination lawsuits." Rava told *Mother Jones* that he's not working on any Unruh Act cases at this time.

California courts have suggested that Rava and his plaintiffs are exploiting the breadth of the Unruh Act to make money off settlements. They "have been involved in numerous of what have been characterized as 'shake down' lawsuits,'" wrote a California appeals court in dismissing Rava's case against the Anaheim Angels. "They proclaim themselves equal rights activists, yet repeatedly attempted to glean money…through the threat of suit." The California Supreme Court raised the same issue in its opinion on Rava's supper club case, noting,

*"They proclaim themselves equal rights activists, yet repeatedly attempted to*

"We share to some degree the concerns voiced by the trial court
and the appellate court...regarding the potential for abusive
litigation being brought under the Act."

*glean money...through the
threat of suit."*

Rava dismisses the courts' references to the potential shake-
down nature of his lawsuits. He explains in an email that the courts are merely repeating "personal attacks" made by
his opponents when the law is not on their side: "Perhaps because California's anti-discrimination laws and the facts
are so much against these serial sex discriminators and their attorneys," writes Rava, "that in some cases the parties
and their attorneys have little choice but to make personal attacks against or 'pound' the discrimination victims and
their attorneys."

Candelore, Allison, and Crouch are undeterred. As noted by Yahoo News and in San Diego court records, Candelore
has been a plaintiff in 12 civil cases since 2011. In 10 of those 12 cases, he was represented by Rava. In nine of those,
Crouch was also a plaintiff, and in eight of them Allison was a plaintiff.

But the question remains: Why have tech and business become targets for the men's rights movement? Kimmel offered
a theory.

"The STEM field has been, for better or worse, one of the last bastions of uncriticized masculinity," says Kimmel. "You
still find that in Silicon Valley. There's a kind of crazy nerd macho where your masculinity is proved by how little sleep
you get and how much work you can do. So for these men, it's exasperated entitlement. 'Those were our jobs; why are
you taking those too?'"

*Correction: An earlier version of this article misstated Steven Surrey's job title.*

*Correction: The headline of this article has been revised to more accurately reflect the nature of the defendants in the
lawsuits.*

Case 2:18-cv-03093-JFW-AS    Document 80-1    Filed 06/03/19    Page 220 of 361    Page ID
#:2200

These Men's Rights Activists Are Suing Women's Groups for Meeting Without Men – P...    Page 7 of 7
Case 2:18-cv-03093-JFW-AS    Document 80-1    Filed 06/03/19    Page 221 of 361    Page ID
#:2201

Copyright © 2019 Mother Jones and the Foundation for National Progress. All Rights Reserved.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT O

FILED
CIVIL BUSINESS OFFICE-B
CENTRAL DIVISION

14 JUL -1 PM 2: 40

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

Alfred G. Rava, SBN 188318
Rava Law Firm
3667 Voltaire Street
San Diego, CA 92106
Tel. 619-238-1993
Fax 619-374-7288
Email: alrava@cox.net

Attorney for Plaintiffs

F I L E D
Clerk of the Superior Court

JUL 0 1 2014

By: _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SAN DIEGO - HALL OF JUSTICE

| | |
|---|---|
| RICH ALLISON, ALLAN CANDELORE, HARRY CROUCH, JEFF PERWEIN, CAROLYN BELL, JONATHAN CORRELL, WILLIAM HOWE, KEVIN SURREY, and BRAD CHRISTENSEN, <br><br> Plaintiffs, <br><br> v. <br><br> AMC ENTERTAINMENT INC. and DOES 1 through 50, <br><br> Defendants. | Case No.   37-2014-00021952-CU-CR-CTL <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR:** <br><br> 1.  Violation of Civil Code § 51 - The Unruh Civil Rights Act; and <br><br> 2.  Violation of Civil Code § 51.5 <br><br> **UNLIMITED JURISDICTION** |

Plaintiffs allege, on information and belief, the following:

## NATURE AND BASIS OF CLAIMS

1. This lawsuit arises out of Defendant AMC Entertainment Inc.'s AMC Theatres arbitrarily discriminating against Plaintiffs and other theatergoers based on their employer by hosting a recurring marketing promotion from October 1, 2013, through October 10, 2013, at its theaters in California and other states, which provided free popcorn to only federal government employees, while AMC denied the same advantage or privilege to unemployed theatergoers, patrons employed by the State of California or by California counties and municipalities, and moviegoers working in the private sector (hereinafter the "Promotion"). Plaintiffs bring their claims under California's Unruh Civil Rights Act (codified as Civil Code section 51) and under Civil Code section 51.5.

1

2. In pertinent part, the Unruh Civil Rights Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." The California Supreme Court in *Angelucci v. Century Supper* Club (2007) 41 Cal.4[th] 160, 167, recognized that "The Unruh Act stands as a bulwark protecting each person's inherent right to "full and equal" access to "all business establishments." (Citations omitted.) The Act, like the common law principles upon which it was partially based, imposes a compulsory duty upon business establishments to serve all persons without arbitrary discrimination."

3. The California Supreme Court has also maintained that the Unruh Act must be construed liberally in order to carry out its purpose, *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 28, and that the Act serves as a preventive measure, without which it is recognized that businesses might fall into discriminatory practices, *Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 75. *Ibister* also concluded that in enacting the *Unruh Act,* the Legislature intended to ban *all* forms of arbitrary discrimination in public accommodations. *Ibid.*

4. Accordingly, the California Supreme Court, in construing the scope of the Act, has concluded that its protections were not confined to the enumerated categories in Civil Code section 51, but these categories were only "illustrative rather than restrictive." (*In re Cox* (1970) 3 Cal.3d 205, 216 [the Act prohibits a business from excluding a customer because of his association with another person of unconventional appearance]; *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 735 [the Act prohibits an apartment owner from refusing to rent an apartment to a family with a minor child]; *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790 [the Act prohibits a condominium development from restricting residence to persons over 18].) In turn, the California Court of Appeal has twice held that arbitrary occupational discrimination is prohibited under the Unruh Civil Rights Act.

5. In the more recent of these two Court of Appeal cases, *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, plaintiffs, the operator of a family daycare home and a nonprofit fair

2

---

1   housing organization, alleged that defendants, a lender and its employees, violated the Unruh Act by
2   rejecting a mortgage application on the basis that they did not lend on daycare homes. The Court of
3   Appeal held that plaintiffs stated a viable cause of action under the Unruh Act for occupational-
4   status discrimination. *Sisemore*, 151 Cal.App.4th at p. 1406. *Sisemore* noted that "the California
5   Supreme Court in dictum mentioned that discrimination on the basis of employment status was a
6   cognizable claim under the Act. (*Marina Point*, supra, 30 Cal.3d at p. 736; see also *58*
7   *Ops.Cal.Atty.Gen. 608* (1975) [concluding that arbitrary occupational discrimination was prohibited
8   by Act].)" *Ibid.*

9       6. The other Court of Appeal case that recognized that the Unruh Act prohibits arbitrary
10  occupational discrimination, is *Long v. Valentino* (1989) 216 Cal. App. 3d 1287. *Long* is about a
11  police officer who brought an Unruh Act claim against the American Civil Liberties Union and an
12  ACLU staff attorneys for being ejected from an ACLU seminar on police espionage. *Long*, 216
13  Cal.App.3d at p. 1290. The officer, who was officially assigned to monitor the conference, alleged
14  that his verbal ejection from the seminar by the attorney constituted unlawful occupational
15  discrimination under the Unruh Civil Rights Act. *Id.* at p. 1293. The Court of Appeal held the
16  ejection of the officer was in contravention of the Unruh Act. *Id.* at pp. 1297 – 1298.

17      7. The *Long* court went on to find that the police officer, although he was acting in an official
18  capacity, "he is still a human being. He can be yelled at, screamed at, *asked to leave*. Free speech
19  can be exercised to the fullest in denouncing his presence, and that he must endure. But he may not
20  be the object of a discriminatory ejection from a public meeting." *Id.* at pp. 1299 – 1300. Similarly,
21  the unemployed theatergoers, the state, county, and municipal employees, and the private sector
22  employees who were all denied free popcorn or the $6.00 credit during AMC Theatre's Promotion
23  are also human beings, who should not have been discriminated against by AMC solely because
24  these consumers were not fortunate enough to have been employed by the federal government at the
25  time of the Promotion. United States government employees are no better than State of California
26  government employees or better than any other type of employee, and it was completely arbitrary for
27  AMC to treat United States government employees better than everyone else during the Promotion.
28

3

Complaint for Injunctive Relief and Damages

8. Beginning on October 1, 2013, through at least October 10, 2013, AMC Theatres employed a marketing promotion at its theaters nationwide wherein participating AMC Theaters provided a free small popcorn or an equal credit towards a large size popcorn to all federal employees upon presentation of a valid government ID, as designated above, the "Promotion." During the Promotion, AMC denied the free popcorn or equal credit – both valued at about $6.00 – to patrons who were unemployed, or were employed by state, county, or municipal governments, or worked in the private sector. During the Promotion, the following federal employees would have been the exclusive beneficiaries of AMC's Promotion:

- Multimillionaire California members of Congress such as Representative Darrell Issa (estimated net worth over $220 million), Senator Diane Feinstein (estimate net worth over $45 million, Representative Nancy Pelosi (estimated net worth over $35 million), and Representative Gary Miller (estimated net worth over $17 million).

- The Environmental Protection Agency employee who, since 2010, has viewed two to six hours of porn per day on his computer at work, has over 7,000 porn files on that computer, watched porn when inspector general agents visited his office, made over $120,000 in 2013, received performance awards for his time at the agency, and is still employed at the EPA despite confessing to the time he spent at work viewing pornography on his computer.

- The Department of Veteran Affairs employees, including former Secretary of Veteran Affairs Erick Shinseki (2013 salary: $199,700, plus a posh pension plan and health insurance), who have been accused of (a) falsifying wait times to make it appear as if veterans did not have to wait as long to see a doctor as they really did – over two months for many veterans, (b) denying care to veterans, or (c) being responsible for the deaths of many veterans who may have died because of the inordinate waiting time for care.

- Federal district court judges and appellate court justices with respective annual salaries of $199,100 and $211,200, which are much more than the salaries of their State of California trial court and appellate court counterparts; but AMC denied the lower-paid State of California judges and justices the free snack and $6.00 credit during the Promotion.

4

- The minority of federal employees furloughed for a few days in October of 2013, during the so-called government shutdown, *but who were later paid in full for these days off*, thereby enjoying twelve days of paid vacation during their furlough – paid for by the same people denied the free snacks AMC provided to federal government workers during the Promotion!

9. On October 10, 2013, Plaintiffs Rich Allison, Allan Candelore, Harry Crouch, Jeff Perwein, and Carolyn Bell, none of whom were federal government employees on this date, patronized an AMC theatre located in Fashion Valley Mall in San Diego, which was participating in the Promotion. An AMC employee or agent at the concession stand told Rich Allison, Allan Candelore, Harry Crouch, Jeff Perwein, and Carolyn Bell that AMC was providing only federal government employees with a free small popcorn upon the presentation of a valid government ID. AMC denied Rich Allison, Allan Candelore, Harry Crouch, Jeff Perwein, and Carolyn Bell free popcorn or credit towards the purchase of a large popcorn solely because these Plaintiffs were not federal government employees. So Rich Allison, Allan Candelore, Harry Crouch, Jeff Perwein, and Carolyn Bell were each required to pay, and each did pay, AMC $6.00 for a small container of popcorn.

10. On October 5, 2013, Plaintiff Jonathan Correll, who was not a federal government employee on this date, patronized an AMC Mission Valley 20 theatre in San Diego, California, which was participating in the Promotion. An AMC employee or agent at the concession stand told Mr. Correll that AMC was providing only federal government employees with a free small popcorn upon the presentation of a valid government ID. AMC denied Mr. Correll free popcorn or credit towards the purchase of a large popcorn solely because Mr. Correll was not a federal government employee. So Mr. Correll was required to pay, and did pay, AMC $6.00 for a small container of popcorn.

11. On October 3, 2013, Plaintiff William Howe, who was not a federal government employee on this date, patronized an AMC Theatre in Montebello, California, which was participating in the Promotion. An AMC employee or agent at the concession stand told Mr. Howe that AMC was providing only federal government employees with a free small popcorn upon the presentation of a valid government ID. AMC denied Mr. Howe free popcorn or credit towards the purchase of a large popcorn solely because Mr. Howe was not a federal government employee. So Mr. Howe was required to pay, and did pay, AMC $6.00 for a small container of popcorn.

5

12. On October 2, 2013, Plaintiff Kevin Surrey and Steve Surrey, neither of whom were federal government employees on this date, patronized an AMC Theatre in La Jolla, California, which was participating in the Promotion.  An AMC employee or agent at the concession stand told Kevin Surrey and Steve Surrey that AMC was providing only federal government employees with a free small popcorn upon the presentation of a valid government ID.  AMC denied Kevin Surrey and Steve Surrey free popcorn or credit towards the purchase of a large popcorn solely because neither of them were federal government employees.  So Kevin Surrey and Steve Surrey were each required to pay, and each did pay, AMC $6.00 for a small container of popcorn.

13. On October 8, 2013, Plaintiff Kevin Surrey and Steve Surrey, neither of whom were federal government employees on this date, patronized the same AMC Theatre in La Jolla, California, which was again participating in the Promotion.  An AMC employee or agent at the concession stand told Kevin Surrey and Steve Surrey that AMC was providing only federal government employees with a free small popcorn upon the presentation of a valid government ID.  AMC denied Kevin Surrey and Steve Surrey free popcorn or credit towards the purchase of a large popcorn solely because neither of them were federal government employees.  So Kevin Surrey and Steve Surrey were each required to pay, and each did pay, AMC $6.00 for a small container of popcorn.

14. On October 6, 2013, Plaintiff Brad Christensen, who was not a federal government employee on this date, patronized an AMC Theatre in San Diego, California that was participating in the Promotion.  An AMC employee or agent at the concession stand told Mr. Christensen that AMC was providing only federal government employees with a free small popcorn upon the presentation of a valid government ID.  AMC denied Mr. Christensen free popcorn or credit towards the purchase of a large popcorn solely because Mr. Christensen was not a federal government employee.  So Mr. Christensen was required to pay, and did pay, AMC $6.00 for a small container of popcorn.

15. As a result AMC's Promotion, AMC denied Plaintiffs the equal accommodations, advantages, facilities, privileges, or services they are entitled to under California's Unruh Civil Rights Act, codified as Civil Code section 51.  This Promotion violated California Civil Code sections 51 and 51.5, which prohibit California businesses from arbitrarily discriminating against consumers because they do not have a job, because of their type of job, or because of their employer.

6

Complaint for Injunctive Relief and Damages

16. A marketing promotion by any California business that confers accommodations, advantages, facilities, privileges, or services upon federal government employees, but denies the same to unemployed consumers, to consumers employed by the State of California or any California county or municipality, and to consumers working in the private sector, is as repugnant, arbitrary, and unlawful as a promotion that confers accommodations, advantages, facilities, privileges, or services on everyone except federal government employees.  Imagine the uproar by federal government employees if AMC had a recurring marketing promotion that provided free snacks or a $6.00 credit to all theatregoers *except* to those who worked for the federal government. It was purely arbitrary for AMC's Promotion to award highly-paid federal district court judges, appellate justices, and their staffs free food while denying the same to State of California judges, justices, and their staffs.  It was purely arbitrary for AMC to provide free snacks to fully-employed federal court reporters and other staff members during the Promotion, while denying free snacks or the $6.00 credit to the many State of California Superior Court reporters and staff members who were furloughed and terminated because of severe budget cuts, and who were struggling to make ends meet.

17. A California business employing a marketing promotion that charges federal government employees less than everyone else for the same exact thing is as unlawful as employing a marketing promotion that charges consumers who works in the pornography industry less than everyone else for the same thing, or that charges tow truck drivers less than everyone else for the same thing, or that charges parking enforcement officers less than everyone else for the same thing, or charges men less than women – or vice versa – for the exact same thing.  In fact, the California Supreme Court has twice unanimously held that California business violated the Unruh Act by favoring one sex over the other by charging the disfavored sex more than the favored sex – as little as fifteen cents more - for the exact same thing.  *Angelucci v. Century Supper Club* (2007) 41 Cal.$^{4th}$ 160 (Ladies' Night promotions that charged men more than women to enter supper club violated Unruh Act); *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24 (car washes and nightclubs that charged male patrons more than female patrons – as little as fifteen cents more – for the same thing during Ladies' Day or Ladies' Night promotions violated the Unruh Act).

7

Complaint for Injunctive Relief and Damages

18. The California Department of Fair Employment and Housing ("DFEH"), the State agency charged with preventing unlawful discrimination in places of public accommodation, such as nightclubs, car washes, and movie theaters, has published an Unruh Civil Rights Act brochure specifically addressing the unlawfulness of promotions that favor one group over another. This DFEH brochure is attached hereto as Exhibit 1, and can also be found at http://www.dfeh.ca.gov/DFEH/Publications/PublicationDocs/UnruhActBrochure.pdf.

19. By simply advertising its Promotion wherein AMC threatened to charge unemployed and employed state, county, municipal, and private sector theatregoers more than federal government employees for the exact same thing, AMC caused injury to plaintiffs and consumers not fortunate enough to work for the federal government, and violated California anti-discrimination laws. Much like a landlord or home seller would violate housing discrimination laws by advertising for "Whites Only," or a company would violate employment discrimination laws by advertising job openings with the offensive "Mexicans Need Not Apply" - even if these businesses would provide their housing to non-whites or would hire Hispanics. In fact, in January of 2008, in response to the proliferation of ladies-only poker tournaments at California card rooms, the California Attorney General and the Bureau of Gambling Control issued a Gambling Establishment Advisory, attached hereto as Exhibit 2, which warned card rooms that ladies only poker tournaments violated the Unruh Act. The Attorney General warned that it may be unlawful under the Unruh Act to simply advertise tournaments as "ladies only" even if men were allowed to play in the tournaments. This Gambling Establishment Advisory can be also be found at http://ag.ca.gov/gambling/pdfs/NUM8LOT.pdf.

## PARTIES

20. Plaintiff Rich Allison is a California resident.

21. Plaintiff Allen Candelore is a California resident.

22. Plaintiff Harry Crouch is a California resident.

23. Plaintiff Jeff Perwein is a California resident.

24. Plaintiff Carolyn Bell is a California resident.

25. Plaintiff Jonathan Correll is a California resident.

8

26. Plaintiff William Howe is a California resident.

27. Plaintiff Kevin Surrey is a California resident.

28. Plaintiff Brad Christensen is a California resident.

29. On information and belief, at all times relevant hereto, Defendant AMC Entertainment Inc. was a Delaware corporation, doing business in California as AMC Theatres with a California Secretary of State corporation number C3218782, and advertised and employed the Promotion.

30. The true names and capacities of Does 1 through 50 are unknown to Plaintiffs. When their true names and capacities are learned, Plaintiff will amend this complaint accordingly. Plaintiffs are informed and believe, and on that basis allege, each fictitiously named defendant is responsible in some way for the occurrences herein alleged, and those defendants proximately caused plaintiff and the other male consumers' damages. Each reference in this complaint to "defendant," "defendants," or a specifically named defendant refers to all defendants sued under fictitious names.

31. Unless otherwise alleged, whenever reference is made in this complaint to any act of "defendant," "defendants," or a specifically named defendant, such allegation shall mean that each defendant acted individually and jointly with the other defendant named in the complaint.

32. Unless otherwise alleged, whenever reference is made in this complaint to any act or omission of any corporate or business defendant, such allegation shall mean that such corporation or other business defendant committed or omitted to act as in this complaint through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or apparent scope of their authority.

33. At all relevant times alleged herein, each defendant has been each the agent, alter-ego, representative, partner, joint venturer, employee, or assistant of the other defendants and has acted within the course and scope of said agency, alter-ego, representation, partnership, or joint venture with the knowledge, notification, authorization, and consent of each of the other defendants.

## JURISDICTION AND VENUE

34.     This court has subject matter jurisdiction over this matter pursuant to Article VI, section 10 of the California Constitution because this action is a cause not given by statute to other

9

trial courts, and seeks (among other relief) a permanent injunction.  Subject matter jurisdiction is further premised on, *inter alia*, California Civil Code sections 51, and 51.5.

35.　　This court has personal jurisdiction over defendants in this action because all defendants do sufficient business in California and have sufficient minimum contacts in California to render the exercise of personal jurisdiction over them by California courts consistent with traditional notions of fair play and substantial justice.

36.　　Venue is proper in this court because most of the discrimination and unequal treatment alleged herein occurred in San Diego County, California.

## FIRST CAUSE OF ACTION

### Violation of the Unruh Civil Rights Act, Civil Code Section 51

37.　　Plaintiffs incorporate in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

38.　　By virtue of Defendant's acts and omissions in promoting, hosting, and employing the Promotion, Defendant intentionally and arbitrarily denied equal accommodations, advantages, facilities, privileges, or services to Plaintiffs on the basis of their occupation, employment, and/or employer, which is prohibited by the Unruh Civil Rights Act, codified as Civil Code section 51.

39.　　Defendant's conduct harmed Plaintiffs and caused them to sustain damages.

40.　　Defendant's conduct was a substantial factor in causing harm to Plaintiffs.

41.　　Said discrimination subjects Defendant to injunctive relief.

## SECOND CAUSE OF ACTION

### Violation of Civil Code Section 51.5

42.　　Plaintiffs incorporate in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

43.　　By virtue of Defendant's acts and omissions in promoting, hosting, and employing the Promotion, Defendant arbitrarily denied equal accommodations, advantages, facilities,

10

privileges. or services to Plaintiffs on the basis of their occupation, employment, employment status and/or employer, which is prohibited by Civil Code section 51.5.

44.     Defendant's conduct harmed Plaintiffs and caused them to sustain damages.

45.     Defendant's conduct was a substantial factor in causing harm to Plaintiffs.

46.     Said discrimination subjects Defendant to injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     For an order providing equitable and injunctive relief permanently enjoining Defendant from engaging in unequal treatment of consumers based on their occupation, employment, and/or employer in violation of Civil Code sections 51 and 51.5;

2.     For actual damages pursuant to Civil Code section 52 for each and every offense committed by Defendant against each Plaintiff;

3.     For statutory damages pursuant to Civil Code section 52 for each and every offense committed by Defendant against each Plaintiff;

4.     For costs incurred herein, including attorneys' fees to the extent allowable by statute, including but not limited to Civil Code sections 52 and Code of Civil Procedure section 1021.5; and

5.     For such other and further legal and equitable relief as this court may deem proper.

Dated: July 1, 2014                 Respectfully submitted.

By: _____
     Alfred G. Rava

11

Complaint for Injunctive Relief and Damages

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF SAN DIEGO**
**CENTRAL**

**MINUTE ORDER**

DATE: 12/05/2014              TIME: 09:00:00 AM        DEPT: C-67

JUDICIAL OFFICER PRESIDING: Eddie C Sturgeon
CLERK:  R. Herrera
REPORTER/ERM: Kira Aberle #21952
BAILIFF/COURT ATTENDANT:  M. Micone

CASE NO: **37-2014-00021952-CU-CR-CTL**  CASE INIT.DATE: 07/01/2014
CASE TITLE: **Allison vs. AMC Entertainment Inc [IMAGED]**
CASE CATEGORY: Civil - Unlimited       CASE TYPE: Civil Rights

---

**EVENT TYPE**: Demurrer / Motion to Strike
MOVING PARTY: AMERICAN MULTI-CINEMA INC
CAUSAL DOCUMENT/DATE FILED: Demurrer MEMO OF P & A'S; PROOF OF SERVICE, 09/19/2014

**APPEARANCES**

Alfred G Rava, counsel, present for Plaintiff(s).
AMERICAN MULTI-CINEMA INC, self represented Defendant, present telephonically.

The Court hears oral argument and CONFIRMS the tentative ruling as follows:

**Defendant's demurrer is SUSTAINED WITHOUT LEAVE TO AMEND.**

Civil Code section 51.13 is applicable to both causes of action.  Consequently, the conduct alleged does not constitute arbitrary discrimination. The Plaintiffs have failed to state facts sufficient to state a claim for injunctive relief.

IT IS SO ORDERED.

_____
  Judge Eddie C Sturgeon

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT P

Alfred G. Rava, SBN 188318
The Rava Law Firm
3667 Voltaire Street
San Diego, CA 92106
Tel. 619-238-1993
Fax 619-374-7288
Email: alrava@cox.net

Attorney for Plaintiff Harry Crouch and the Putative Class

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| HARRY CROUCH, on behalf of himself and all others similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>DHM WESTLAKE, INC. dba FOUR SEASONS HOTEL WESTLAKE VILLAGE; WESTLAKE WELLBEING PROPERTIES, LLC dba FOUR SEASONS HOTEL WESTLAKE VILLAGE; CASTLE & COOKE, INC.; and DOES 1 through 100, Inclusive,<br><br>               Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR:**<br><br>1. **Violation of Civil Code § 51 – The Unruh Civil Rights Act; and**<br>2. **Violation of Business and Professions Code § 125.6.**<br><br>**UNLIMITED JURISDICTION** |

Plaintiff Harry Crouch, on behalf of himself and all others similarly situated, alleges the following:

**NATURE AND BASIS OF CLAIMS**

    1. This lawsuit arises out of defendants' unequal treatment of female and male patrons during a weekly "Girls' Night Out" sex-based pricing promotion at the Four Seasons Hotel in Westlake Village, California ("Four Seasons").  On Girls' Night Out, which Four Seasons employed for over a year on every Wednesday from May 5, 2009 to July 7, 2010, Four Seasons charged female patrons $6.00 or $8.00 for beverages, but charged male patrons much more than $6.00 or $8.00 -- as much as $14.50 each -- for the same types of beverages.  Also, on Girls' Night Out, Four Seasons provided female patrons with free food, while it denied free food to male patrons.

2. Four Seasons' disparate pricing for drinks and free food during Girls' Night Out was based solely on the patrons' sex.  It was not based on how wealthy Four Seasons' female patrons were in comparison to its male patrons, or how well-hydrated or well-fed its female patrons were in comparison to its male patrons -- it was based only on the patrons' sex.

3. Despite the many State of California anti-discrimination statutes, unanimous California Supreme Court opinions, California Attorney General and Department of Fair Employment and Housing actions, and California Department of Alcoholic Beverage Control ("ABC") regulations that prohibit California businesses from treating patrons unequally based on their sex, and specifically condemn and outlaw Ladies' Night and Ladies' Day promotions that treat female and male patrons unequally, defendants brazenly advertised and employed a recurring Girls' Night Out promotion for over a year that treated female and male unequally based solely on their sex.

4. As shown on the Four Seasons' advertisements attached hereto as Exhibit 1, Four Seasons openly touted its Girls' Night Out promotion "just for the girls" and "at an exclusive ladies-only price" as excerpted below:

**GIRLS' NIGHT OUT**
Specialty cocktails are available at
an exclusive price of $6
with complimentary
appetizers just for the girls
Wednesdays, 5:00 to 7:00 pm

***Girls' night out***
On Wednesday evenings from 5:00 pm to 7:00 pm, join us for a
girls' night out.  Specialty cocktails are available at an exclusive
ladies-only price of USD 6.00, with complimentary appetizers just
for the girls.

**GIRLS' NIGHT OUT**
Drink specials from $6 and
Complimentary appetizers
just for the girls.
Wednesdays
5:00 to 7:00 pm

**GIRLS NIGHT OUT COCKTAILS**
**8**

2

Class Action Complaint for Injunctive Relief and Damages

5. During the Wednesday, March 31, 2010, Girls' Night Out promotion, defendants treated plaintiff Harry Crouch unequally based on his sex when Four Seasons denied Mr. Crouch the free food that Four Seasons provided to only female patrons on this Girls' Night Out.  Mr. Crouch therefore was required to pay and did pay for his food that evening.

6. As a result of defendants' unequal treatment of all Girls' Night Out patrons -- female and male -- based on the patrons' sex, defendants denied all Girls' Night Out patrons the equal accommodations, advantages, facilities, privileges, or services they are entitled to under California's Unruh Civil Rights Act, and several other California anti-discrimination laws discussed below. Defendants' recurring Girls' Night Out promotion violated California's strong public policy to eradicate sex discrimination, reflected in the many California statutes that prohibit businesses from discriminating against patrons based on protected personal characteristics such as sex, race, religion, national origin, or sexual orientation.  Four Seasons' Girls' Night Out promotion is in direct contravention of California Civil Code sections 51 (codification of the Unruh Civil Rights Act), 51.5, and 51.6 (Gender Tax Repeal Act of 1995), and Business and Professions Code section 125.6, all of which prohibit California businesses from treating patrons unequally on the basis of their sex.

7. A business practice that provides discounted beverages and free food to only female patrons is as repugnant and unlawful as one that provides discounted beverages and free food to only male patrons, or as repugnant and unlawful as charging people of color more than Caucasians for the same types of food or drinks or vice versa, or charging homosexuals more than heterosexuals for the same types of food or drinks, or vice versa.  Simply put, it is against California's Unruh Civil Rights Act and several other California anti-discrimination statutes for a business in California to discriminate against patrons based on protected personal characteristics such as sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation.

8. In the seminal California Supreme Court case on Ladies' Day and Ladies' Night promotions, *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, the Court unanimously held that Ladies' Day and Ladies' Night promotions that treated patrons unequally based on sex by charging men more than women for the same thing—as little fifteen cents more—violated the Unruh Civil Rights Act.  *Koire* found "Public policy in California strongly supports eradication of discrimination based on sex. The

3

Class Action Complaint for Injunctive Relief and Damages

1    Unruh Act expressly prohibits sex discrimination by business enterprises." *Id*. at 37.

2        9. *Koire* also ruled "the Legislature established that arbitrary sex discrimination by business is

3    per se injurious" and "differential pricing based on sex may be generally detrimental to both men

4    and women, because it reinforces harmful stereotypes." *Id*. at 33.  Among the harmful stereotypes

5    detrimental to the advancement of equal rights for women and men that defendants' Girls' Night Out

6    perpetuated include: (1) all women are genetically incapable of earning as much money as men; (2)

7    all women are genetically predisposed to not being able to pay as much as men for the same thing;

8    (3) all women enjoy being subsidized by strange men at hotel bars and restaurants; (4) all adult

9    women enjoy being treated like little girls by not being required to pay the full price that adult men

10   are required to pay for the same goods or services, (5) all women enjoy drinking discounted

11   beverages and eating free food in front of men who paid full price for the same types of drinks or

12   food; (6) all women welcome and enjoy a hotel treating them as little more than sexual bait for the

13   hotel's male customers; and (7) all women and men are expected to just stand around and take it like

14   sheared sheep when a business charges one sex more than the other sex for the exact same thing.

15       10. Defendants' archaic Girls' Night Out promotion, apparently implemented to benefit the "little

16   women," is the hallmark of traditionalistic thinkers who may advise a young woman her best chance

17   for a happy life is to ace her home economics class and learn how to make queso from Velveeta in

18   order to catch a good man.  Not only has the California Supreme Court expressed its disapproval of

19   the treatment of women through Ladies' Night promotions, but the United States Supreme Court has

20   similarly weighed in about "romantic paternalism" directed at women.  In *Frontiero v. Richardson*,

21   411 U.S. 677, 684 (1973), wherein the U.S. Supreme Court ruled the U.S. military must provide its

22   female members with the same housing and medical benefits as it provides its male members, Justice

23   William J. Brennan Jr. wrote that this is another example of one of those types of traditional sex

24   discrimination that ostensibly appears to benefit women, but "rationalized by an attitude of 'romantic

25   paternalism' which, in practical effect, put women, not on a pedestal, but in a cage."

26       11. The Judicial Counsel of California's recent changes to its jury instructions for Unruh Act

27   violations reflects the Judicial Counsel's recognition of the California Supreme Court ruling in *Koire*

28   that Ladies' Night promotions are "per se injurious."  On June 22, 2012, the Judicial Council of

California, Administrative Office of the Courts, adopted a report concerning additions and revisions of the Judicial Council of California Civil Jury Instructions (CACI), so that these changes would keep CACI current with statutory and case authority.  See "Report to the Judicial Council For business meeting on June 22, 2012."

12. This Report changed CACI 3020, Unruh Civil Rights Act Essential Fact Elements, so a plaintiff no longer needs to prove harm or damages for an Unruh Act claim because, as held by the *Koire* Ladies' Night case, this type of sex discrimination is "per se injurious."  The Report, describes this change as follows:

> Elements 3 and 4 of the proposed jury instructions are problematic. Those elements require plaintiff to prove that s/he was "harmed" and that defendant's conduct was a substantial factor in causing the harm. In our opinion, these elements are not required in the large number of Unruh Act cases in which plaintiffs are only seeking the statutory minimum damages. Those damages must be awarded automatically once discrimination has been shown.
>
> . . .
>
> Courts have held that discrimination under the Unruh Act is "per se injurious." (See, e.g., *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 33.) Therefore, unless the plaintiff is seeking more than the minimum damages, proof of harm is not necessary. Both 3020 and 3021 should be revised to make it clear that plaintiff does not need to prove either harm or that defendant's conduct was a substantial factor in causing harm, unless, plaintiff is seeking "actual damages" beyond the statutory minimum.

Report at p. 29.

13. *Koire* was upheld by the California Supreme Court in its latest opinion on Ladies' Night promotions, *Angelucci v. Century Supper Club* (2007) 41 Cal.4[th] 160, wherein the Court unanimously ruled that men who were charged more than women to enter a supper club did not have to ask the offending business for equal treatment in order to have an unequal treatment claim under the Unruh Act.  Therefore, if Four Seasons were to have hosted an equally ill-advised sex-based pricing promotion such as a "Boys' Night Out" that charged female patrons more than male patrons for beverages, and/or gave only male patrons free food, female patrons would not have to confront defendants and affirmatively assert their right to be treated the same as their male counterparts to have standing for an Unruh Act claim.

5

Class Action Complaint for Injunctive Relief and Damages

14. Defendants' Girls' Night Out promotion caused discontent, animosity, harm, resentment, or envy among the sexes, and is especially troubling, arbitrary, and invidious at a time when the depressed economy put a higher proportion of men out of work than women.  For example, when Harry Crouch attended the Girls' Night Out in March of 2010, the national unemployment rate for men was higher than it was for women, standing at 10% for men and only 8% for women.

15. During Girls' Night Out, Four Seasons would have provided female millionaires such as Nancy Pelosi or Sarah Palin with discounted drinks and free food, but would have denied the same to combat veterans from the Iraq and Afghanistan wars.  Or, multi-millionaire Oprah Winfrey could have traveled from her Montecito, California mansion and have been given deeply discounted drinks and free food on Girls Night Out, while unemployed male construction workers would have had to pay full price for their beverages and be denied the free food.  On Girls' Night Out, a female defense attorney pulling down a six figure annual salary would have received discounted drinks and free food, but a minimum wage male file clerk, working for the same firm and sitting at the same Four Seasons table, would have had to pay full price for the same types of beverages and food.

16. Defendant DHM Westlake, Inc. is the owner or holder of ABC License Number 445119.  ABC licensees are prohibited from discriminating against patrons based on the patrons' sex.  For example, Business and Professions Code section 125.6 prohibits State of California licensees, such as holders of ABC licenses, from discriminating against customers based on sex and other personal characteristics.  *Easebe Enterprises, Inc. v. Alcoholic Bev. etc. Appeals Bd.* (1983) 141 Cal.App.3d 981.  The ABC specifically informs all licensees about the illegality of charging patrons different prices based on sex.  For example, the ABC's Business Practice Information Index provides:

> While drinks may be advertised at reduced prices, these specially-priced drinks cannot be made available only to certain groups of persons (e.g., Ladies Nights specials).  This violates Business and Professions Code Section 125.6.
>
> "Ladies Night" Promotions
> An advertising program, which includes an inducement for ladies to frequent licensed premises on a particular night and thereby receive meals and cocktails at reduced prices because they are "ladies" is considered discriminatory and contrary to Business and Professions Code section 125.6 and Civil Code section 51.

6

Class Action Complaint for Injunctive Relief and Damages

17. Also, ABC license applications require an applicant to certify it has not and will not violate or cause or permit to be violated any provisions of the Alcoholic Beverage Control Act.  Bus. & Prof. Code § 23952.  Also, ABC Official Publication 620A, Model House Policies reads:

Guidelines for Writing Policies

- You may have any company policy that does not conflict with existing laws (for example, no discrimination).

- We will not promote drink specials to certain groups of people. For example, "Ladies' Night." (This is against the law.)

18. The Van Nuys District Office of the California Department of Alcoholic Beverage Control issued defendant DHM Westlake a warning letter about Four Seasons' Girls' Night Out promotion, and that letter is attached hereto as Exhibit 2.

19. The California Department of Fair Employment and Housing ("DFEH"), the State agency charged with preventing unlawful discrimination in places of public accommodation, has published an Unruh Civil Rights Act brochure specifically addressing the unlawfulness of Ladies' Night promotions.  This DFEH brochure is attached hereto as Exhibit 3, and can also be found at http://www.dfeh.ca.gov/DFEH/Publications/PublicationDocs/UnruhActBrochure.pdf.

20. Defendants DHM Westlake, Inc., Westlake Wellbeing Properties, LLC, and Cooke & Castle, Inc. created, hosted, advertised, promoted, employed and/or managed this Girls' Night Out, and/or provided the necessary ABC license type 47 for Girls' Night Out, thereby discriminating or aiding in the unequal treatment of women and men that occurred during every Girls' Night Out.

21. While the statute of limitations for Unruh Act claims is two years, see *Gatto v. County of Sonoma* (2002) 98 Cal. App. 4th 744 (Unruh Act claims are based on the State's common law of personal injury and therefore have the same statute of limitations), the time for bringing this claim has been tolled by at least the doctrine of equitable tolling by the May 5, 2010, filing of a similar class action complaint in this court for the same Girls' Night Out promotion, *Loren Stone v. Westlake Wellbeing Properties, LLC*, Los Angeles County Superior Court Case Number BC437103 (the "Stone Case").  However, the complaint in the Stone Case does not include an Unruh Civil Rights

1  Act cause of action as alleged in this lawsuit, and the notice of the proposed settlement of the Stone

2  Case specifically does not release any Unruh Civil Rights Act claims the class members in the Stone

3  Case have against the Stone Case's sole named defendant: Westlake Wellbeing Properties, LLC.

4  The operative First Amended Complaint Stone Case does not include female patrons in its definition

5  of class members who were treated unequally during Girls' Night Out, but this complaint does.

6  22. The plaintiff here, Harry Crouch, among others, has opted out of the proposed settlement in

7  the Stone Case, and objected to that settlement because that settlement was not fair to the class,

8  among many other objections.  In a November 2, 2012, hearing on a motion for a final approval of

9  the proposed settlement of the Stone Case, the court characterized the proposed final settlement of

10  the Stone Case as follows: "This overall settlement, the way it has turned out, is disturbing."  The

11  court did not grant approval of the final settlement of the Stone Case at the November 2, 2012

12  hearing, and another hearing on the settlement of the Stone Case is set for January 8, 2013..

13  23. By this action, plaintiff Harry Crouch, on behalf of himself and all others similarly situated,

14  seeks redress for defendants' unequal treatment of female and male patrons based on their sex.

15                                          **PARTIES**

16  24. Plaintiff Harry Crouch is a California resident over 21 years of age.

17  25. On information and belief, at all times relevant hereto, defendant DHM Westlake, Inc. was a

18  California corporation doing business as Four Seasons Hotel Westlake Village located at 2 Dole

19  Drive in Westlake Village, California.  DHM Westlake, Inc. is the owner or holder of California

20  ABC License Number 445119, which also benefits fellow defendants.  This is an ABC License Type

21  47 for on-sale general eating place.  But for DHM Westlake's ABC license, Girls' Night Out would

22  not have been possible.

23  26. On information and belief, at all times relevant hereto, defendant Westlake Wellbeing

24  Properties, LLC was a California limited liability company doing business as Four Seasons Hotel

25  Westlake Village located at 2 Dole Drive in Westlake Village, California.  Westlake Wellbeing

26  Properties, LLC is the owner of this Four Seasons Hotel.  But for Westlake Wellbeing Properties'

27  ownership of this Four Seasons Hotel, Girls' Night Out would not have been possible.

28

8

27. On information and belief, at all times relevant hereto, defendant Castle & Cooke, Inc. was an Hawaii corporation assigned Entity Number C1954302 by the California Secretary of State. Castle & Cooke's website lists the Four Seasons Hotel Westlake Village as one of its "properties." But for Castle & Cooke's ownership of this Four Seasons Hotel property, Girls' Night Out would not have been possible

28. The true names and capacities of Does 1 through 100 are unknown to plaintiff.  When their true names and capacities are learned, plaintiff will amend this complaint accordingly. Plaintiff is informed and believes, and on that basis alleges, each fictitiously named defendant is responsible in some way for the occurrences herein alleged, and those defendants proximately caused plaintiff and the other male consumers' damages.  Each reference in this complaint to "defendant," "defendants," or a specifically named defendant refers to all defendants sued under fictitious names.

29. Unless otherwise alleged, whenever reference is made in this complaint to any act of "defendant," "defendants," or a specifically named defendant, such allegation shall mean that each defendant acted individually and jointly with the other defendant named in the complaint.

30. Unless otherwise alleged, whenever reference is made in this complaint to any act or omission of any corporate or business defendant, such allegation shall mean that such corporation or other business defendant committed or omitted to act as in this complaint through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or apparent scope of their authority.

31. At all relevant times alleged herein, each defendant acted as an agent, representative, partner, joint venturer, employee, assistant, or aide of each of the other defendants and has acted within the course and scope of said agency, representation, partnership, or joint venture.

### JURISDICTION AND VENUE

32.      This court has subject matter jurisdiction over this matter pursuant to Article VI, section 10 of the California Constitution because this action is a cause not given by statute to other trial courts, and seeks (among other relief) a permanent injunction.  Subject matter jurisdiction is further premised on, *inter alia*, California Civil Code section 51 and Business and Professions Code section 125.6.

9

Class Action Complaint for Injunctive Relief and Damages

33.     This court has personal jurisdiction over defendants in this action because all defendants do sufficient business in California and have sufficient minimum contacts in California to render the exercise of personal jurisdiction over them by California courts consistent with traditional notions of fair play and substantial justice.

34.     Venue is proper in this court because the unequal treatment alleged herein occurred in Westlake Village, California, and this is a class action.

## CLASS ALLEGATIONS

35.     Plaintiff brings this Class Action on behalf of himself, and on behalf of all other persons similarly situated, defined as follows:

All male and female patrons who were treated unequally based on their sex during the Girls' Night Out promotion at the Four Seasons Hotel Westlake Village, during the period from May 5, 2009 through July 7, 2010 (the "Class").

36.     This action has been brought and may properly be maintained pursuant to Code of Civil Procedure section 382 because:

(a)     The members of the Class are so numerous it would be impracticable to join them all individually in a single action.  The Class are believed to number several hundred or thousand members.  If the court determines notice to be necessary or appropriate, members of the Class may be notified of the pendency of this action by mail and/or email, supplemented or substituted by published notice.

(b)     Common questions of law and fact exist as to all members of the Class.  These questions predominate over any questions which affect only the individual members of the Class.  These common legal and factual questions include:

(1)     Whether defendants' Girls' Night Out promotion, advantage, privilege, service, or activity treated members of the Class unequally based on the sex of the members;

(2)     Whether defendants treated male and female patrons unequally on the basis of their sex by requiring male patrons and female patrons to pay

10

Class Action Complaint for Injunctive Relief and Damages

different prices for the same types of beverages and/or food on Girls' Night Out;

(3)    Whether defendant violated Civil Code section 51 by requiring male patrons and female patrons to pay different prices for the same types of beverages on Girls' Night Out;

(4)    Whether defendant violated Civil Code section 51 by requiring male patrons and female patrons to pay different prices for the same types of beverages and/or food on Girls' Night Out;

(5)    Whether defendant DHM Westlake, Inc., holder of ABC License Number 445119, violated Business & Professions Code 125.6 (1) because of any characteristic listed or defined in subdivision (b) or (e) of Section 51 of the Civil Code, DHM Westlake refused to perform the ABC-licensed activity or aided the refusal to perform that ABC-licensed activity or if, (2) because of any characteristic listed or defined in subdivision (b) or (e) of Section 51 of the Civil Code, DHM Westlake made any discrimination, or restriction in the performance of the ABC-licensed activity, and should thereby be enjoined by this court for either action.

37.    The claims of plaintiff are typical of those of the proposed Class. Like the members of the proposed Class, plaintiff was treated unequally during a Girls' Night Out. Defendants denied plaintiff and the members of the proposed Class equal accommodations, advantages, facilities, privileges, or services based upon the patrons' sex, all of which plaintiff and members of the proposed class are entitled to under California's Unruh Civil Rights Act. Plaintiff and the members of the proposed Class are similarly situated and were similarly harmed by the same course of unlawful conduct alleged herein. Because the California Supreme Court in *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 33 found that sex-based pricing promotions such as Ladies' Day and Ladies' Night promotions that charge customers different prices for the same thing based solely on

11

Class Action Complaint for Injunctive Relief and Damages

the customers' sex to be *per se* injurious ("the Legislature established that arbitrary sex discrimination by business is per se injurious"), harm and causation are presumed for both the plaintiff and the Class in order to recover the $4,000 statutory damages per offense plaintiff has listed in his prayer for relief.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class. He is a member of the proposed Class and has no interests adverse to the interests of the proposed Class.  He is a champion of equal rights for women and men, being the president of the National Coalition for Men, the world's oldest organization advocating equal treatment for women and men. He is interested in and prays for equal treatment for all consumers, no matter what their sex.  He has been treated unequally because of his sex as a result of defendants' conduct.  This unequal treatment and harm to himself and other consumers provide him with a substantial stake in this action and the incentive to prosecute it vigorously for himself and the Class.  He has retained experienced and competent counsel familiar with class actions, consumer protection law, the applicable sex discrimination laws, and complex litigation, and intends to pursue this action vigorously.  Plaintiff's attorney represented the prevailing plaintiffs/appellants in the California Supreme Court's landmark Unruh Act/Gender Tax Repeal Act case of *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, and has worked with the California Attorney General, Department of Fair Employment and Housing, Department of Alcoholic Beverage Control, Bureau of Gambling Control, the California Legislature, and many other State of California agencies and officials in support of California's strong public policy to eradicate sex discrimination. Plaintiff's attorney was also asked by the Judicial Counsel of California to comment on the Judicial Counsel's recently proposed changes to its CACI jury instructions for violations of the Unruh Act and of similar California anti-discrimination statutes. See pages 28 - 29 of  the "Report to the Judicial Council For business meeting on June 22, 2012."

39.     A class action is superior to other available methods for the fair and efficient adjudication of the litigation because individual joinder of all members of the Class is impracticable. The damages suffered by each individual member of the Class are relatively small given the expense and burden of individual prosecution of an individual action.  Thus, it would be virtually impossible

12

Class Action Complaint for Injunctive Relief and Damages

for the members of the Class to individually redress the wrongs done to them.  Even if the members of the Class themselves could afford such individual litigation, such litigation would constitute a highly avoidable inefficiency in the administration of justice by the courts.  Further, individualized litigation presents the potential for inconsistent or contradictory judgments.

40.     In engaging in the wrongful conduct alleged herein, defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole, and making appropriate class certification under Code of Civil Procedure section 382 and any other relevant provisions of other statutes alleged herein.

## FIRST CAUSE OF ACTION

**Violation of the Unruh Civil Rights Act, Civil Code Section 51 For Not Providing Patrons With Equal Accommodations, Advantages, Facilities, Privileges, Or Services**

41.     Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

42.     By virtue of defendants' acts and omissions during the Girls' Night Out promotion, defendants denied equal accommodations, advantages, facilities, privileges, or services to patrons on the basis of the patrons' sex, all as prohibited by the Unruh Civil Rights Act, codified as Civil Code section 51.

43.     Because the California Supreme Court in *Koire v. Metro Car* Wash (1985) 40 Cal3d 24, 33 found that sex-based pricing promotions such as Ladies' Day and Ladies' Night promotions that charge customers different prices for the same thing based solely on the customers' sex to be per se injurious ("the Legislature established that arbitrary sex discrimination by business is per se injurious"), harm and causation are presumed in order to recover the $4,000 statutory damages per offense that plaintiff prays for here.

44.     Said discrimination further renders defendants subject to injunctive relief.

**SECOND CAUSE OF ACTION**

**Violation of Business and Professions Code Section 125.6**

**For Discriminating In The Performance Of The ABC Licensed Activity Based On Patrons' Sex**

45.    Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

46.    Defendant DHM Westlake, Inc. is the holder or owner of California Department of Alcoholic Beverage Control License Number 445119, which also benefits co-defendants.  This is an ABC License Type 47 for on-sale general eating place.

47.    By virtue of defendants' conduct alleged herein, defendants made a discrimination or restriction in the performance of the ABC licensed activity against plaintiff and the Class on the basis of the patrons' sex.

48.    Defendants' conduct harmed plaintiff and the Class and caused them damages.

49.    Defendants' conduct was a substantial factor in harming plaintiff and the Class.

50.    Said discrimination renders defendants subject to injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for the following relief on behalf of himself and all others similarly situated:

1.    For an order providing equitable and injunctive relief permanently enjoining defendants from engaging in unequal treatment of patrons in violation of Civil Code section 51 and Business & Professions Code section 125.6;

2.    For an order certifying the proposed Class under California Code of Civil Procedure section 382, appointing plaintiff and his counsel to represent the Class, and directing that reasonable notice of this action be given to the Class by defendants;

3.    For statutory damages pursuant to Civil Code section 52;

4.    For costs incurred herein, including attorneys' fees to the extent allowable by statute, including but not limited to Civil Code sections 52 and Code of Civil Procedure section 1021.5; and

5.    For such other and further legal and equitable relief as this court may deem proper.

14

Class Action Complaint for Injunctive Relief and Damages

1    Dated: December 27, 2012                    Respectfully submitted,

2

3

4                                               By: _____

5                                                    Alfred G. Rava

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Class Action Complaint for Injunctive Relief and Damages

# Exhibit 1



# GIRLS' NIGHT OUT

Drink specials from $6 and complimentary appetizers just for the girls.

Wednesdays
5:00 to 7:00 pm

# HAPPY HOUR

Drink and appetizer specials from $6.

Tuesdays & Thursdays
5:00 to 7:00 pm





## GIRLS' NIGHT OUT

Specialty cocktails are available at
an exclusive price of $6
with complimentary
appetizers just for the girls.

Wednesdays, 5:00 to 7:00 pm

---

## HAPPY HOUR

Live music and recession friendly
$6 drink and appetizer specials.

Thursdays, 5:00 to 7:00 pm



For more information,
please call (818) 575-3000
or visit
www.fourseasons.com/westlakevillage.



**FOUR SEASONS HOTEL**
*Westlake Village, California*



# FOUR SEASONS HOTEL
*Westlake Village, California*

Two Dole Drive ,  Westlake Village ,  California ,  U.S.A.  91362  Tel.  1 (818) 575-3000    Fax.  1 (818) 575-3100

**Rates and reservations**

Find a hotel or resort

Purchase a gift card

Contact us

Search  [Search]

**Four Seasons Westlake Village, California**

**Photos and videos**

**Rates and reservations**

**Guest rooms and suites**

**Spa and wellness**

**Dining**

**Services and activities**

**About this destination**

Hotel fact sheet

**Plan your**

Wedding

Celebration or event

Meeting

Local time:  **10:43 a.m.**

Local temp:  **54°F / 12°C**

## Dining



**Restaurants**

Hampton's

ONYX

**Lounges**

Lobby Lounge

**The Bar**

**In-Room Dining**

In-Room Dining

Share photo (1 of 2)

## The Bar

Custom cherry and burled-wood panelling, leather wing-back chairs and intimate group seating around the fireplace lend a cosy, club-like atmosphere to The Bar. Also featured are three mahogany billiard tables and a plasma screen television for entertainment.

The menu consists of tasty appetisers complemented by cocktails and a wide selection of international beers.

**Events and promotions**

*Happy hour Tuesdays and Thursdays*

Join us for happy hour from 5:00 pm to 7:00 pm every Tuesday and Thursday. Enjoy specialty cocktails and appetisers starting from USD 6.00.

*Girls' night out*

On Wednesday evenings from 5:00 pm to 7:00 pm, join us for a girls' night out. Specialty cocktails are available at an exclusive ladies-only price of USD 6.00, with complimentary appetisers just for the girls.

**Hours**

| | |
|---|---|
| Sunday to Thursday | 11:30 am  –  12:00 midnight |
| Friday and Saturday | 11:30 am  –  1:00 am |

**Quick reference**

| | |
|---|---|
| Location | Lobby level |
| Indoor seating | 60 |
| Outdoor seating | 20 |
| Attire | Casual |

- **View sample menu**

- Bar menu

Page last updated: March 08, 2010

## GIRLS NIGHT OUT COCKTAILS
### 8

**Orange Dreamsicle**
Grey Goose L'Orange, Vanilla Vodka
Orange Juice, Splash of Cream

**Pink Cosmopolitian**
Ketel One Vodka, Cointreau
Cranberry Juice, Fresh Lime

**Raspberry Crush**
Ketel One Vodka, Chambord, Lemonade

**First Crush**
Hendricks Gin, Fresh Cucumber,
Fresh Lime, Dash of Sprite

**Strawberry Blossom**
Cachaca, Fresh Lime Juice, Brown Sugar
Local Organic Strawberries, Splash of Club Soda

## WINES BY THE GLASS
### 6

Merlot, Saddlerock, California
Chardonnay, Geode, Santa Barbara

# Exhibit 2

STATE OF CALIFORNIA — BUSINESS, TRANSPORTATION AND HOUSING AGENCY

ARNOLD SCHWARZENEGGER, Governor

**DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL**
Van Nuys District Office - Southern Division
6150 Van Nuys Blvd, Suite 220
Van Nuys, California 91401
(818) 901-5017



October 5, 2010

Alfred G. Rava
The Rava Law Firm
3667 Voltaire Street
San Diego, CA 92106

RE: DHM WESTLAKE INC.
DBA: Four Seasons Hotel Westlake Village
2 Dole Dr.
Westlake Village, CA 91362
File: 455119

Dear Mr. Rava,

This office is in receipt of the compliant that was filed on September 2, 2010 by The Rava Law Firm concerning the above licensee and violations involving discrimination.

This office has generated a letter of warning concerning the practices and a letter has been mailed to the licensed corporation.

If I can be of further assistance, please do not hesitate to contact this office.

Sincerely,

Armando Gonzalez
District Administrator

# Exhibit 3

## Protections Under the Law Against Sex Discrimination

The Unruh Civil Rights Act (Civ. Code, § 51), originally enacted in 1959, was designed to protect the rights of Californians from arbitrary discrimination and to guarantee their rights to full and equal access to all public accommodations regardless of sex.

Discrimination by business establishments on the basis of sex is against the law. It is unlawful for any business that is open to the general public to discriminate against a patron based on any of the following classifications: sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation. The Unruh Act protection is not limited to these classifications. It is an Unruh Act violation for a business to offer special treatment, whether preferential or detrimental, to one class of patrons regardless of the business' motives for doing so.

## Businesses that are Governed by the Unruh Civil Rights Act

The list below includes examples of businesses that are covered by the Unruh Act. This list is non-exhaustive, and may include any place of public accommodation regardless of whether the entity is a traditional business or non-profit entity.

- Bars and Nightclubs.
- Restaurants.
- Hotels and Motels.
- Retail Shops.
- Golf Courses.
- Fitness Clubs or Gyms.
- Theaters.
- Hospitals.
- Barber Shops and Beauty Salons.
- Non-Profit Organizations (open to the public).
- Public Agencies.
- Housing Accommodations.

## Filing a Complaint

The Department of Fair Employment and Housing (DFEH or Department) is charged with the task of upholding the Unruh Act, and ensuring that its laws and principles are not violated. If you believe you are a victim of unlawful discrimination, do not hesitate to call the DFEH and file a complaint following these steps:

- Contact the DFEH by calling the toll free number at (800) 884-1684 to schedule an appointment.
- "Be prepared to present specific facts about the alleged harassment of discrimination.
- "Provide any copies you may have of documents that support the charges in the complaint.
- Keep records and documents about the complaint, such as receipts, stubs, bills, applications, flyers, witness contact information, and other materials.

## Examples of Sex-Based Discrimination Under the Unruh Violations

The following are examples of potential violations of the Unruh Act. The list is not meant to be exhaustive, and there is other conduct that may violate the Act.

- Providing free admission, discounts, or promotional gifts to only one sex.
- Charging men and women different prices for comparable services, such as clothing alterations, haircuts, dry cleaning, or drinks at a restaurant or bar.

- Maintaining "women only" or "men only" exercise areas of a fitness club or gym and excluding or deterring the opposite sex from those areas.
- Establishing a "women only" or "men only" business establishment which would otherwise be completely open to the public.
- Excluding one sex from a business premises during certain times.
- Posting signs or adopting policies for "women recommended" or "men preferred."
- Requiring members of one sex to submit to searches to gain admittance to a business.

establishment while providing admittance to members of the other sex without the same level or degree of search.

- Promoting a business with "ladies night" discounts on admission and services.
- Denying access to a business, such as a nightclub to a particular sex, or giving preference to one sex over the other.



Complaints must be filed within one year from the last act of discrimination. The DFEH will conduct an impartial investigation.

The Department is not an advocate for either the person complaining or the person complained against. The Department represents the state. The DFEH will, if possible, try to assist both parties to resolve the complaint. If a voluntary settlement cannot be reached, and there is sufficient evidence to establish a violation of the law, the Department may issue an accusation and litigate the case before the Fair Employment and Housing Commission or in civil court. This law provides for a variety of remedies that may include the following:

- Out-of-pocket expenses.
- Cease and desist orders.
- Damages for emotional distress.
- Statutory damages of three times the amount of actual damages, or a minimum of $4,000 for each offense.

For more information, contact the DFEH
Toll Free (800) 884-1684
Sacramento area and out-of-state (916) 227-0551
Videophone for the Deaf (916) 226-5285
E-mail  contact.center @dfeh.ca.gov
Web site  www.dfeh.ca.gov
Facebook
http://www.facebook.com /#!/pages/Department-of-Fair-Employment-and-Housing/183801915445
YouTube  http://www.youtube.com /califdfeh
Twitter  http://twitter.com /DFEH

In accordance with the California Government Code and Americans with Disabilities Act requirements, this publication can be made available in Braille, large print, computer disk, or tape cassette as a disability-related reasonable accommodation for an individual with a disability. To discuss how to receive a copy of this publication in an alternative format, please contact the DFEH at the telephone numbers and links above.



State of California
**DEPARTMENT OF
FAIR EMPLOYMENT & HOUSING**





## References

1. California Civil Code section 51.
2. *Rotary Club of Duarte v. Board of Directors* (1987) 178 Cal.App.3d 1035. A non-profit club was a business establishment under the Unruh Act because it offered its members substantial "commercial advantages and business benefits." Membership in these kinds of organizations is a privilege or advantage under the Unruh Act. Thus, termination of membership based on sex is prohibited.
3. *Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594. By offering the public access to its facilities, the County Club became a business establishment under the Unruh Act and could not exclude women.

4. *Ibister v. Boys' Club of Santa Cruz* (1985) 40 Cal.3d 72. A non-profit activities center for boys was a place of public accommodation, and excluding an entire class of patrons, such as women, was illegal.
5. *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160. It was a violation of the Unruh Act for a night club to charge its male patrons a higher price for admission. The patrons need not affirmatively request nondiscriminatory treatment, but rather, are entitled to it. The Unruh Act imposes a compulsory duty upon business establishments to serve all persons without arbitrary discrimination.
6. *Koire v. Metro Car Wash (* 1985) 40 Cal.3d 24. The Unruh Act broadly condemns any business establishment's policy of gender-based price discounts.

## Unruh Civil Rights Act

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT Q

Case 2:18-cv-03093-JFW-AS   Document 80-1   Filed 06/03/19   Page 263 of 361   Page ID
#:2243
Alfred G. Rava, an individual suing on behalf of himself,..., 2008 WL 1959900...

2008 WL 1959900 (Cal.Superior) (Verdict and Settlement Summary)

Copyright (c) 2019 ALM Media Properties, LLC. All Rights Reserved

Superior Court, Orange County, California.

Alfred G. **Rava**, an individual suing on behalf of himself, all those similarly situated
and the general public v. Club Med Sales Inc., a Delaware Corporation; and Does 1-100

No. 03CC09858

DATE OF VERDICT/SETTLEMENT: February 25, 2008

TOPIC: DISCRIMINATION - UNRUH CIVIL RIGHTS ACT - DISCRIMINATION - GENDER

"ladies Fly Free" Promotion Discriminatory, Men Claimed

**SUMMARY:**

RESULT: Settlement

The parties agreed to settle the case for $1,250 in cash and $1,200 in Club Med travel vouchers for each class member.
The settlement included $400,000 in attorneys' fees. The court also ordered Club Med to pay $23,232.23 in costs. As part
of the settlement, Club Med agreed not conduct any future gender-based promotions.

**EXPERT WITNESSES:**

**ATTORNEYS:**

Plaintiff: Erik C. Jenkins; Fuller Jenkins; La Jolla, CA (Alfred **Rava**); Joseph M. Grant; The Grant Law Firm; Houston,
TX (Alfred **Rava**); Philip H. Stillman; Stillman & Associates; Cardiff, CA (Alfred **Rava**)

Defendant: John McKay; McKay, Graham & de Lorimier; Los Angeles, CA (Club Med Sales Inc.); Michael Acain;
McKay, Graham & de Lorimier; Los Angeles, CA (Club Med Sales Inc.)

JUDGE: Ronald L. Bauer

RANGE AMOUNT: 0

STATE: California

COUNTY: Orange

**INJURIES: Rava and the other class members claimed that Club Med discriminated against males through its "Ladies
Fly Free" promotion. They sought unspecified compensatory damages for the money they spent on airfare and Club Med
vacation packages during the promotion period.**

**Facts:**

The plaintiffs brought a class action suit against Club Med based on the "Ladies Fly Free" promotion it offered
throughout California from June 17 to July 22, 2003. The promotion, which was advertised on the Internet and in print
media, offered women free or discounted airfare to Cancun and Turks and Caicos Islands for seven-day vacations during
a specific period of time. Male customers were not offered the same special.

Alfred **Rava**, an attorney, sued Club Med, on behalf of himself and others similary situated, brought the class action,
alleging that the "Ladies Fly Free" promotion discriminated against men in violation of the Unruh Civil Rights Act
and the Gender Tax Repeal Act. As of February 2008, the class included 50 males who purchased airlines tickets during
Club Med's five-week promotion.

The court subsequently disqualified **Rava** as the class representative, finding that he had conflicts of interest which would prevent him from properly proceeding as the class representative. Francis Van Landingham was then appointed the class representative and remains the representative (although the case name was not changed).

Club Med denied that it engaged in any intentional discrimination of any class of individuals with regard to its "Ladies Fly Free" promotion. It continues to deny that it engaged in any act which would constitute a violation of California's Unruh Act or any anti-discriminatory statute of this state.

ALM Properties, Inc.
Superior Court of California, Orange County, at Orange

PUBLISHED IN: VerdictSearch California Reporter Vol. 7, Issue 19

---

**End of Document**                            © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT R

Filed 1/8/14  Frye v. VH Property CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| STEVE FRYE, | B246991 |
| Plaintiff and Appellant, | (Los Angeles County |
| v. | Super. Ct. No. BC470726) |
| VH PROPERTY CORP., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Ramona G. See, Judge.  Affirmed.

Fuller Jenkins Clarkson, Erik C. Jenkins, Karen L. Wishnev; The Rava Law Firm and Alfred G. Rava for Plaintiff and Appellant.

Jill A. Martin for Defendant and Respondent.

* * * * * *

Plaintiff and appellant Steve Frye brought and action for violation of the Unruh Civil Rights Act (Civ. Code, §§ 51, 51.5) (Unruh Act) and the Gender Tax Repeal Act of 1995 (Civ. Code, § 51.6) (Gender Tax Repeal Act) after he played golf at a course owned and operated by defendant and respondent VH Property Corp., doing business as Trump National Golf Club (Trump).  He alleged the statutory violations on the basis of Trump's promotion offering a discount to women during breast cancer awareness month.  The trial court granted Trump's motion for summary judgment.

We affirm.  The trial court properly ruled any discriminatory effect resulting from the discount was not unreasonable, arbitrary or invidious under the Acts, and promoting public awareness of breast cancer was consistent with strong public policy.

## FACTUAL AND PROCEDURAL BACKGROUND

Trump is a luxury public golf course located in Rancho Palos Verdes.  During October 2010, Trump offered a promotion in recognition of breast cancer awareness month (Promotion).  The flyer announcing the Promotion, captioned "Think Pink at Trump National in October," provided:  "In recognition of breast cancer awareness month, come encounter a considerably more pink Trump National in October!  From pink golf tees to pink-ribbon headwear and ball markers wherein a portion of their sales supports breast cancer research, we would like all of our golfers to remember the significance of this month.  [¶]  As a special exclusively for ladies this month, **ladies can enjoy 25% off greens fees** through the end of October!"  The flyer continued to describe the promotional code that must be mentioned at the time of booking in order to receive the promotional rate.

According to Trump's general manager, the golf course was closed from October 26 to October 28, 2010 for green aerification and fairway overseeding.  When the course reopened on October 29, 2010, Trump offered a different Promotion whereby golfers could play at a discounted rate of $150 any time of day.  Between October 26 and October 31, 2010, no golfer was offered or was able to purchase a round of golf at the rate described in the Promotion.

2

Appellant, a self-described "men's rights activist," has previously filed at least 30 lawsuits against assorted business establishments, alleging their gender-based promotional pricing violated California public policy.  After reading about Trump's Promotion, he called Trump and was told that the Promotion would run through the end of the month.  Appellant played golf at Trump on October 29, 2010 and contacted his attorney later that day.

Through his foundation, Donald Trump donated a total of $35,000 to the Susan G. Komen Foundation in February and April 2011.

In September 2011, appellant filed an action against Trump on behalf of himself and others similarly situated, alleging causes of action for violation of the Unruh Act and the Gender Tax Repeal Act.  Trump answered, generally denying the allegations and asserting multiple affirmative defenses.

In August 2012 Trump moved for summary judgment on the grounds appellant could not establish any statutory violation and he lacked standing because the Promotion ended before he played the course.  In support of the motion it offered Donald Trump's declaration, and current and former employees' declarations; depositions excerpts, including from appellant's deposition; Web site excerpts related to breast cancer awareness; copies of assembly bills related to gender equality in athletics; and excerpts from articles related to women's participation in golf.

Appellant opposed the motion, asserting that triable issues of fact existed as to whether Trump had raised a legally-recognized public policy exception to the Unruh Act and whether the Promotion remained available when he played golf at Trump.  In support of his opposition, he submitted his own declaration, deposition excerpts and a copy of his telephone records, and sought judicial notice of articles about organizations profiting from breast cancer awareness and proposed legislation.  He also filed evidentiary objections to portions of the declarations offered by Trump.  In turn, Trump filed evidentiary objections to a portion of appellant's declaration.

Following a November 6, 2012 hearing, the trial court granted the summary judgment motion "on the grounds that the subject promotion's discriminatory effect was

not unreasonable, arbitrary, or invidious under the Unruh Act or the Gender Tax Repeal
Act, and is consistent with strong public policy in California."  Alternatively, the trial
court found the undisputed evidence showed the Promotion was not offered when
appellant played at Trump, and thus he lacked standing because he had not suffered any
injury from the Promotion.  The trial court overruled appellant's evidentiary objections
and sustained in part and overruled in part Trump's evidentiary objections.

Judgment was entered in November 2012 and this appeal followed.

## DISCUSSION

Appellant maintains the trial court erred in granting summary judgment because it
misconstrued the law relating to gender-based promotions and because he offered
evidence sufficient to raise a triable issue of fact as to whether the Promotion was
available on the date he played golf.  Because we find no merit to appellant's first
contention, we need not address the second.  (E.g., *JEM Enterprises v. Washington
Mutual Bank* (2002) 99 Cal.App.4th 638, 644 [appellate court may affirm summary
judgment on any ground raised by the moving party]; *Le Bourgeois v. Fireplace
Manufacturers, Inc.* (1998) 68 Cal.App.4th 1049, 1057, fn. 10 [same].)

## I.      Summary Judgment Principles and Standard of Review.

Summary judgment is properly granted when no triable issue exists as to any
material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ.
Proc., § 437c, subd. (c).)  A defendant moving for summary judgment meets "his or her
burden of showing that a cause of action has no merit if that party has shown that one or
more elements of the cause of action . . . cannot be established, or that there is a complete
defense to that cause of action."  (Code Civ. Proc., § 437c, subd. (p)(2).)  Once the
moving defendant has met its initial burden, "the burden shifts to the plaintiff . . . to show
that a triable issue of one or more material facts exists as to that cause of action or a
defense thereto."  (*Ibid.*)

We review the trial court's grant of summary judgment de novo, independently
evaluating the correctness of the trial court's ruling and applying the same legal standards
as the trial court.  (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138,

1142; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843–857.)  Issues of statutory interpretation likewise raise pure questions of law, subject to independent appellate review.  (*American Civil Rights Foundation v. Los Angeles Unified School Dist.* (2008) 169 Cal.App.4th 436, 448; *Slocum v. State Bd. of Equalization* (2005) 134 Cal.App.4th 969, 974.)

## II.   The Trial Court Properly Granted Summary Judgment Because the Undisputed Evidence Showed the Promotion Was Not Unreasonable, Arbitrary or Invidious.

In pertinent part, the Unruh Act provides:  "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b).)  Correspondingly, the Gender Tax Repeal Act addresses gender-based price discrimination and provides that "[n]o business establishment of any kind whatsoever may discriminate, with respect to the price charged for services of similar or like kind, against a person because of the person's gender."  (Civ. Code, § 51.6, subd. (b).)  Both provisions are frequently analyzed collectively.  (See *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166, fn. 5 [declining to consider separately claims under the Unruh Act and the Gender Tax Repeal Act, given claims under both provisions are subject to the same analysis with respect to notice and injury]; see also *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 30 [finding that gender-based price discounts also violate the Unruh Act].)

"The objective of the [Unruh] Act is to prohibit businesses from engaging in unreasonable, arbitrary or invidious discrimination.  [Citation.]  Therefore, the [Unruh] Act applies not merely in situations where businesses exclude individuals altogether, but also where treatment is unequal."  (*Pizarro v. Lamb's Players Theatre* (2006) 135 Cal.App.4th 1171, 1174; accord, *Sunrise Country Club Assn. v. Proud* (1987) 190 Cal.App.3d 377, 381 ["the Unruh Civil Rights Act does not purport to prohibit all

differences in treatment or accommodations offered, only unreasonable, arbitrary or invidious discrimination"].)  "However, the [Unruh] Act does not entirely prohibit businesses from drawing distinctions on the basis of the protected classifications or personal characteristics; . . . . [t]hus, 'certain types of discrimination have been denominated "reasonable" and, therefore, not arbitrary.' [Citation.]"  (*Howe v. Bank of America N.A.* (2009) 179 Cal.App.4th 1443, 1450.)  "One basis relied on by the courts for upholding discriminatory practices as nonarbitrary is when a strong public policy exists in favor of disparate treatment."  (*Pizarro v. Lamb's Players Theatre, supra,* at p. 1174; accord, *Howe v. Bank of America N.A., supra,* at p. 1451 [discrimination based on a ""'"compelling societal interest"'"" is not arbitrary and therefore not violative of the Unruh Act].)

In granting summary judgment, the trial court relied primarily on *Cohn v. Corinthian Colleges, Inc.* (2008) 169 Cal.App.4th 523, 525–526 (*Cohn*), where the court held neither the Unruh Act nor the Gender Tax Repeal Act was violated by a professional baseball team's Mother's Day celebration that included a tote bag giveaway to honor mothers and the recipients were limited to women over age 18.  The *Cohn* court explained that the type of unreasonable, arbitrary or invidious discrimination against which the Unruh Act was designed to protect "is present where the policy or action '"emphasizes irrelevant differences between men and women"' or perpetuates any irrational stereotypes.  [Citations.]  The State of California has a legitimate interest in eradicating this type of discrimination because of the negative impact such prejudice has on society.  [Citation.]  [¶]  The instant case does not emphasize an irrelevant difference, nor perpetuate an irrational stereotype.  It is a biological fact that only women can be mothers.  Neither men nor women are harmed by this, and the Angels did not arbitrarily create this difference. . . .  The tote bag giveaway honors mothers as a group of individuals without promoting any irrational stereotypes, and therefore does not violate the [Unruh] Act."  (*Cohn, supra*, at pp. 528–529.)

Applying the same reasoning, the trial court ruled:  "Here, it is undisputed that Defendant ran the subject promotion in recognition of Breast Cancer Awareness Month.

[Citations.]  The Promotion did not emphasize 'irrelevant differences' between men and women or 'perpetuate' any kind of stereotype, but rather, supported public awareness of breast cancer.  Therefore, as a matter of law, the subject promotion's discriminatory effect, if any, was not unreasonable, arbitrary, or invidious under either the Unruh Act or the Gender Tax Repeal Act, and is consistent with strong public policy in California. [Citation.]"

We agree.  The undisputed evidence established the Promotion was designed around breast cancer awareness.  Trump offered undisputed evidence to show that the vast majority of breast cancer sufferers are women, with men comprising less than one percent of those annually diagnosed with breast cancer.  (See *Battling Breast Cancer: New York's Laws are not Enough* (2007) 13 Cardozo Journal of Law & Gender 579, fn. 2 ["the incidence of breast cancer in women is about 100 times greater than in men"].) Thus, as in *Cohn, supra,* 169 Cal.App.4th at page 528, where the court found no Unruh Act or Gender Tax Repeal Act violation because "the giveaway was based on motherhood, with gender only a secondary consideration," the Promotion here was based on breast cancer awareness, with gender as a secondary consideration.  We conclude that breast cancer awareness is a sufficiently strong public policy to warrant the differential treatment permitted by the Promotion.  (See *Reins of Life v. Vanity Fair Corp.* (N.D. Ind. 1997) 5 F.Supp.2d 629, 632–633 [finding that the promotion of "denim day," designed to educate men and women about breast cancer, satisfied public interest element supporting denial of an injunction].)  Indeed, the policy here is more compelling than that in *Pizarro v. Lamb's Players Theatre, supra,* 135 Cal.App.4th at page 1176, where the court held permissible an age-based ticket discount to baby boomers because the discount was reasonably and not arbitrarily designed to facilitate their attendance at a musical about them.

In the cases on which appellant relies, price discounts to women were untethered to any strong public policy and therefore held to violate the Unruh Act because they were arbitrary.  In *Koire v. Metro Car Wash, supra,* 40 Cal.3d 24, the male plaintiff sued both car washes and nightclubs offering price discounts to women.  The court rejected the

defendants' argument "that sex-based price differences are not arbitrary because they are supported by 'substantial business and social purposes,'" finding that neither increasing profitability nor encouraging interaction between genders was a sufficient public policy to support the price discounts.  (*Id.* at pp. 32.)  Addressing a gender-based price discount for nightclub entry, the court in *Angelucci v. Century Supper Club, supra,* 41 Cal.4th at page 175, reaffirmed the principles it articulated in *Koire v. Metro Car Wash*, stating: "We also acknowledged there might be public policies warranting differential treatment of male and female patrons under *some* circumstances, but '[t]he plain language of the Unruh Act mandates equal provision of advantages, privileges and services in business establishments of this state.  Absent a compelling social policy supporting sex-based price differentials, such discounts violate the Act.'  [Citation.]"

Appellant's other arguments are likewise insufficient to overcome the undisputed evidence showing the Promotion was reasonable and nonarbitrary.  First, we reject appellant's argument that the Promotion was unreasonable because it reinforced harmful stereotypes.  (See *Koire v. Metro Car Wash, supra,* 40 Cal.3d at pp. 34–35.)  To the contrary, as in *Cohn, supra,* 169 Cal.App.4th at page 528, where the court held it was reasonable to provide tote bags to women over age 18 to honor mothers, it was reasonable for Trump to offer a discount to women as the predominant sufferers of breast cancer.  (See *United States v. Virginia* (1996) 518 U.S. 515, 533 ["Physical differences between men and women, however, are enduring"].)  Second, appellant offered no evidence to support his contention that the Promotion was unreasonably discriminatory because it tended to suggest that men are insensitive and disinterested in women's health. (See *Cohn, supra,* at p. 529 [rejecting the plaintiff's contention the tote bag giveaway "was invidious because it tended to cause discontent, animosity, or envy," given that the plaintiff offered no evidence to support the contention and no other patrons complained about the tote bags].)  Finally, the Promotion was unlike the "Skirt and Gown Night" promotion found to amount to unlawful discrimination in *Peppin v. Woodside Delicatessen* (Md.App. 1986) 506 A.2d 263, 265.  In that case, the court held the evidence showed a restaurant's offering a discount to those patrons wearing a skirt or

gown "was intended to—and did—have the same effect and serve the same function as Ladies' Night, *i.e.* it provided price discounts to women and, in fact, operated as a mere extension of Ladies' Night." (*Id*. at p. 266.)  The record in that case contained no evidence that the promotion was designed to facilitate any public policy beyond increasing female patronage, whereas here the undisputed evidence showed the Promotion addressed breast cancer awareness.  (See *Koire v. Metro Car Wash, supra*, at p. 38 [explaining "[t]here may also be instances where public policy warrants differential treatment for men and women"].)

The trial court properly determined that appellant's allegations "are not supported by the interpretation of, or policy behind, the [Unruh] Act." (*Cohn, supra,* 169 Cal.App.4th at p. 528.)  "[T]he Unruh Act protects against intentional discrimination that is unreasonable, arbitrary, or invidious.  This important piece of legislation provides a safeguard against the many real harms that so often accompany discrimination.  For this reason, it is imperative we not denigrate its power and efficacy by applying it to manufactured injuries such as those alleged by the plaintiff in this case." (*Id*. at p. 526.) Summary judgment was properly granted.

**DISPOSITION**

The judgment is affirmed.  Trump is entitled to its costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

FERNS

We concur:


_____, P. J.

BOREN


_____, J.

CHAVEZ

---

\*　　　Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT S

FRYE V. P&D RESTAURANT CONCEPTS, L.L.C. D/B/A..., JVR No. 1504280012...

Case 2:18-cv-03093-JFW-AS   Document 80-1   Filed 06/03/19   Page 277 of 361   Page ID #:2257

JVR No. 1504280012, 2014 WL 8734207 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West
Superior Court, Orange County, California.

**FRYE** v. P&D RESTAURANT CONCEPTS, L.L.C. D/B/A CHA CHAS TACOS AND TEQUILA

30-2013-00663232-CU-CR-CJC
DATE OF INCIDENT: January 24, 2013
DATE OF FILING: July 19, 2013
DATE OF TRIAL/SETTLEMENT: November 03, 2014

TOPIC:

LIABILITY:

General: Restaurant

Specific: Discrimination


**SUMMARY**
**Outcome: Defense Verdict**
**Total: $0**
HIGH AMOUNT: $0

LOW AMOUNT: $0


**Related Court Documents:**
Case management statement: 2013 WL 10068085

Case management statement: 2013 WL 10068088

Defendant's opposition to plaintiffs motion to compel further responses: 2014 WL 7496562

Special verdict form: 2014 WL 7496561


**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Sage Sepahi, Law Offices of Sage Sepahi, Del Mar, CA
Plaintiff: Catherine L. Coughlin, Law Offices of Sage Sepahi, San Diego, CA
Defendant: Jacqueline A. Turner, Grobaty & Pitet, Newport Beach, CA
Defendant: Christopher L. Pitet, Grobaty & Pitet, Newport Beach, CA
Defendant: Erica P. Herczeg, Grobaty & Pitet, Newport Beach, CA

JUDGE: Craig Griffin

RANGE AMOUNT: $0
STATE: California

FRYE V. P&D RESTAURANT CONCEPTS, L.L.C. D/B/A..., JVR No. 1504280012...

Case 2:18-cv-03093-JFW-AS Document 80-1 Filed 06/03/19 Page 278 of 361 Page ID #:2258

COUNTY: Orange

**PRIMARY INJURY: Civil Rights Violation: Overall**
Discrimination: Sex

**SUMMARY**
**PLAINTIFF:**
Sex: M

Age: Adult

**DEFENDANT:**
Sex: O

Organization Type: P&D Restaurant Concepts, L.L.C. d/b/a Cha Chas Tacos and Tequila

**DAMAGES:**
Total Compensatory Award: $0

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Interest: $0

Other Damages: $0

Loss of Services: $0

Comparative Negligence Percentage: 0

**FACTS:**
Adult male Steven Frye filed a civil rights claim against defendant P&D Restaurant Concepts d/b/a Cha Cha's Tacos and Tequila after he was allegedly denied full and equal advantages, privileges and services at the defendant restaurant due to his gender on two separate occasions, Jan. 24, 2013 and May 9, 2013, hosted as 'Senorita Thursdays.' The plaintiff, who sued the defendant pursuant to violations of the Unruh act (Civil Code Secs. 51 and 51.5 and 51.6), as well as Cal. Bus. & Prof. Code Sec. 125.6, sought an injunction barring future ladies night events, contending the defendant repeatedly advertised and hosted a series of sex-based ladies night events during which men, including the plaintiff, were charged disparate prices for the same services offered to female patrons. The defendant denied the plaintiff's allegations and claimed that Frye was 'in the business of filing lawsuits against local restaurants claiming that they discriminate against him because he is male,' the objective being that economically, small businesses would have no choice but to pay money to avoid costs of litigation. A jury returned a verdict in favor of the defendant.

Jury Verdict Research

COURT: Superior

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT T

2017 WL 9286750 (Cal.Super.) (Trial Order)
Superior Court of California.
Los Angeles County

Steve **FRYE**, Plaintiff,
v.
S & B FOODS, LLC, Defendant.

No. KC067090.
January 25, 2017.

**Ruling on Submitted Matter Re Motion for Class Certification**

Ann I. Jones, Judge.

**\*1** Hearing Date: January 20, 2017

Assigned to: HON. ANN I. JONES

Department 308

This court, having received and reviewed the pleadings, as well as the authorities cited therein, and having heard oral argument, rules as follows:

The motion for class certification is DENIED.

Plaintiff's request for judicial notice is GRANTED.

## BACKGROUND

The operative First Amended Complaint ("FAC") arises from 38 weekly "Ladies' Nights' promotions that ran every Thursday from 5/17/12 through 2/7/13 (except 11/22/12 (Thanksgiving)), at Clubhouse 66, a restaurant and bar owned and operated by Defendant S&B Foods, LLC ("Defendant"). The FAC alleges that, on "Ladies' Nights," Defendant did not allow male customers to order cocktail specials from the promotional menus. On two separate occasions (1/17/13 and 1/24/13), Plaintiff Steven Frye ("Plaintiff") visited Clubhouse 66 and was not allowed to order specialty drinks at discounted prices. Based on these allegations, Plaintiff asserts violations of Civil Code §§51 and 51.5 (Unruh Civil Rights Act) ("Unruh Act").

Before the Court is Plaintiff's motion for class certification.

## APPLICABLE LAW

CCP §382 permits certification "when the question is of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." The plaintiff bears the burden of demonstrating that class certification under §382 is proper. See *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 460; *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 654. To do so, the plaintiff must "establish the existence of

both an ascertainable class and a well-defined community of interest among the class members." See *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435. The community of interest requirement has three essential elements: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." Id. The plaintiff must also demonstrate that the class procedure is superior to other forms of adjudication. See *Reese v. Wal-Mart Stores. Inc.* (1999) 73 Cal.App.4th 1225, 1234.

## DISCUSSION

## (1) ASCERTAINABLE CLASS

Courts consider three factors when determining whether a class is ascertainable: "(1) the class definition, (2) the size of the class, and (3) the means available for identifying class members. [Citations.]" See *Global Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal. App. 4th 836, 858.

## A. CLASS DEFINITION

Plaintiff seeks to certify the following class: [1]

All male customers who were denied the right to order from Ladies Night menus, or were charged a different price for the same advertised drinks, on any of the following dates:

*2012*: 5/17/12, 5/24/12, 5/31/12, 6/7/12, 6/14/12, 6/21/12, 6/28/12, 7/5/12, 7/12/12, 7/19/12, 7/26/12, 8/2/12, 8/9/12, 8/16/12, 8/23/12, 8/30/12, 9/6/12, 9/13/12, 9/20/12, 9/27/12, 10/4/12, 10/11/12, 10/18/12, 10/25/12, 11/1/12, 11/8/12, 11/15/12, 11/29/12, 12/6/12, 12/13/12, 12/20/12, 12/27/12

**\*2** *2013*: 1/3/13, 1/10/13, 1/17/13, 1/24/13, 1/31/13, and 2/7/13

## B. SIZE OF CLASS

"The class must be 'numerous' in size. But there is no fixed minimum or maximum number… The numerosity analysis is limited to how many individuals fall within the class *definition* and whether their joinder is impracticable, not how many 'net' class members there might be after considering affirmative defenses." See Weil & Brown, Cal. Practice Guide: Civ. Pro. Before Trial (The Rutter Group 2015) ¶ 14:21 (italics in original) (citing to *Hendershot v. Ready to Roll Transp., Inc.* (2014) 228 Cal.App.4th 1213, 1223); see also *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 934 (stating that "[n]o set number is required as a matter of law for the maintenance of a class action" and citing examples wherein classes of as little as 10 [*Bowles v. Superior Court* (1955) 44 Cal.2d 574], 28 [*Hebbard v. Colorove* (1972) 28 Cal.App.3d 1017], and 35 [*Collins v. Rocha* (1972) 7 Cal.3d 232] were upheld).

"A party seeking class certification bears the burden of satisfying the requirements of Code of Civil Procedure section 382, including numerosity, and the trial court is entitled to consider 'the totality of the evidence in making [the] determination' of whether a 'plaintiff has presented substantial evidence of the class action requisites." See *Soderstedt v. CBIZ S. California, LLC* (2011) 197 Cal.App.4th 133, 154.

Plaintiff has not met his burden. In the memorandum of points and authorities, Plaintiff states that "a combination of witness testimony and simple arithmetic indicate a class reasonably estimated to include more than 750 people." See Motion, 10:19-20. Plaintiff bases this estimate on: Plaintiff's "observ[ation] that the establishment, which can seat approximately 250-300 people, was about half full" during his 1/17/13 visit; declarations from two witnesses [Melanie Montoya ("Montoya") and Julie West ("West")] stating that they heard "male voices" requesting to sample or order the

specially priced drinks; [2] and Plaintiff's "assum[ption] that roughly half of those present on each night of the promotion were male (125 if the establishment were half full)" and 20 of them ordered and were dented the specially priced drinks. See Motion, 4:2-9.

Plaintiff's estimate of a 750 class size is not supported by admissible evidence. Plaintiff's statement in the Joint Initial Status Conference Statement [3] (filed 3/23/15) regarding the estimated class size is not evidence. See Evidence Code §140 ("'Evidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact."); see also *Soderstedt, supra*, 197 Cal.App.4[th] at 154 ("But pleadings are allegations, not evidence, and do not suffice to satisfy a party's evidentiary burden.").

**\*3** In reply, Plaintiff contends that California law commonly permits statistical evidence in class actions. See Reply, 7:21-8:2 (citing to *Capitol People First v. Dep't of Developmental Services* (2007) 155 Cal.App.4th 676). While Plaintiff is correct that statistical evidence is a permissible method of proof, Plaintiff has not presented admissible statistical evidence of a 750 class size.

The witness declarations by Montoya and West also do not demonstrate sufficient numerosity.

As Defendant points out, Montoya merely states that she heard "two male voices" ask her server and "several male voices" ask another server for *samples* of Ladies' Night drink specials, but were refused. See Montoya Declaration, ¶¶10-11. However, refusal to provide drink samples is not at issue in this case. Instead, the class is defined to encompass male customers who "were denied the right to order from Ladies['] Night menus, or were charged a different price for the same advertised drinks."

At best, the evidence points to only one or two other class members. See West Declaration, ¶9 (stating that she "heard a man's voice" try to order from the Ladies' Night menu, and was told, "sorry, they're for ladies only"); Montoya Declaration, ¶¶10-11.

### C. *MEANS FOR IDENTIFICATION OF CLASS MEMBERS*

In *Aauirre v. Amscan Holdings, Inc.* (2015) 234 Cal. App.4[th] 1290, the proposed class was defined as "[a]ll persons in California from whom Defendant requested and recorded a ZIP code in conjunction with a credit card purchase transaction from June 2, 2007 through October 13, 2010." See *Aguirre, supra*, 234 Cal.App.4[th] at 1293. The trial court determined that it was not an ascertainable class due to "plaintiff's inability to clearly *identify, locate* and *notify* class members through a reasonable expenditure of time and money." Id. at 1299 (italics in original). According to the Court of Appeal, the trial court applied improper criteria in its ascertainability determination, explaining:

Where … the class … describes a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description, and plaintiff has proposed an objective method for identifying class members when that identification becomes necessary, there exists an ascertainable class. [4]

As in *Aquirre*, prospective class members could self-identify based on the class definition. The class definition clearly defines the characteristics of a class member— i.e., "male" and "denied the right to order from Ladies['] Night menus" or "charged a different price for the same advertised drinks" on any of the specified dates.

But unlike in *Aquirre*, Plaintiff has not proposed an adequate means for identifying class members at the remedial stage (as opposed to the certification stage). [5]

**\*4**  In *Aquirre*, the plaintiff "pointed to sales receipts and credit card statements, noting that potential class members have the ability to present a receipt or credit card statement showing that a credit card transaction was entered into on a specific date, at a specific store location, and the specific amount of the purchase, and that such receipt or credit card statement 'could [then] be cross-referenced with the records of defendant to show the specific purchase amount, show a ZIP Code was requested associated with that specific purchase amount and the transaction records.'" See *Aquirre, supra*, 234 Cal.App.4th at 1302.

Here, to show the existence of a means for identifying class members at the remedia stage, Plaintiff relies upon the declaration of Kevin Cohen ("Cohen"), [6] Plaintiff's new electronic payment systems expert. According to Cohen, "the individuals who purchased food and/or drinks on the relevant dates using a credit or debit card may be identified by inspecting the Aldelo POS system server and devices containing electronically stored information in Clubhouse 66's possession." See Cohen Declaration, ¶5. He explains, *inter alia*, that from the records of Clubhouse 66's merchant acquirer (i.e., payment card processor) and further refined by records maintained by each card network (e.g., Visa, MasterCard, Discover, American Express, etc.), "a list can be compiled of every bank which authorized a charge made by a putative class member, sorted bank by bank." Id., ¶11. He then states that "[w]ith the sorted list, a request can be sent to each bank, containing only the requests to make a charge at Clubhouse 66 during its Thursday Ladies' Night promotions using one of the payment card numbers issued by that bank," and "[e]ach bank can match the unique payment card numbers provided to a specific individual account holder." Id., ¶12.

However, Cohen's qualification to testify regarding the Aldelo POS is questionable. For example, at his deposition (which post-dated his declaration), Cohen testified that he did not know what information can be retrieved from the Aldelo POS. See Cohen Depo. (attached to Daucher Declaration as Exhibit 7), 19:11 -21 ("… I don't know what would be on there; however, it's a standard software-based system that has to retain a certain amount of information in order for credit cards to have charge backs, you know, so there are certain information that's retained on the computer in order for there to be a communication between the computer, the company, or the merchant bank."). As of the time of his deposition, he also had never investigated an Aldelo POS and had never used a computer that had Aldelo software installed on it. Id., 20:8-10, 24:16-18.

But even putting aside Cohen's qualification to testify regarding the Aldelo POS, Cohen merely states that "individuals who *paid for drinks at Clubhouse 66 [with a credit card]* on Thursdays from May 17, 2012 through February 7, 2013, can be individually identified and confirmed." See Cohen Declaration, ¶13. This is not an adequate means for identifying class members (i.e., male customers denied the right to order from Ladies' Night menus or charged a different price for the same advertised drinks) at the remedial stage.

### *(2) COMMUNITY OF INTEREST*

**\*5**  "The community of interest requirement has three essential elements: "(1) predominant questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." See *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.

### A. *PREDOMINANT COMMON QUESTIONS*

"to assess predominance, a court 'must examine the issues framed by the pleadings and the law applicable to the causes of action alleged.' It must determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence." See *Blinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1024.

Plaintiff contends that common questions of fact and law predominate. According to Plaintiff, "[t]wo central issues of law are identical to all: Whether the denial of service and/or disparate pricing solely due to the patron's sex amounts to a violation of [Civil Code] §§ 51 and/or 51.5," and "[t]he only issues of fact not common among class members in this case are the date(s) on which the discrimination occurred … and the precise amount of statutory damages that each may be entitled to receive, based on the number of violations he experienced." See Motion, 14:5-7, 15:3-6.

The Court agrees with Defendant that the Unruh Act cases, *Weaver v. Pasadena Tournament of Roses Ass'n* (1948) 32 Cal.2d 833 and *Bartlett v. Hawaiian Village, Inc.* (1978) 87 Cal.App.3d 435, are instructive.

In *Weaver*, the plaintiffs, "on behalf of themselves and all others similarly situated," brought an action to recover the $100 statutory penalty imposed for wrongful refusal of admission to the 1/1/47 game at the Rose Bowl, a "place of public amusement and entertainment" See *Weaver, supra,* 32 Cal.2d at 835. According to the plaintiffs, the defendants advertised a public sale of approximately 7,500 tickets, but closed the box office after selling only 1,500 tickets. Id. at 835-836. The California Supreme Court recognized that "the plaintiffs, and perhaps others who waited in line and were refused tickets of admission, have an interest in a common question of law, that is, whether the statutory recovery is authorized when an operator of a 'place of public, amusement or entertainment' advertises 7,500 tickets for sale to the general public and then later, after selling only 1,500, closes the box office upon announcing that 'all of the available tickets had been sold.'" Id. at 838-839. But it continued: "[T]he determination of such question in the present case would still leave to be litigated the right of any other person to recover on his statutory claim in the light of whether *he*, in reliance upon the advertised sale, stood in line, received an identification stub, was denied tickets before the promised 7,500 had been sold, presented himself at the Rose Bowl as a 'sober, moral person,' demanded admission, tendered the price, and was refused, entitling him 'to recover … his actual damages' as well as the fixed statutory penalty of $100.' Id. at 839 (italics in original).

In *Bartlett*, the plaintiffs brought a class action on behalf of patrons allegedly denied admission to a public bath house solely due to certain personal characteristics. See *Bartlett*, supra, 87 Cal.App.3d at 436-437. The Court of Appeal in *Bartlett* followed the rule in *Weaver*. It stated: "The only issue common to the named plaintiffs and unnamed class members is essentially one of law: whether the respondents are liable under the Act for wrongful exclusion of any person possessing the alleged persona characteristics. That circumstance alone does not fulfill the required element of 'community of interest,' since-as noted-each claimant must still litigate a number of substantial fact questions peculiar to his right of recovery." Id. at 440.

**\*6** Similar to *Weaver* and *Bartlett*, each class member still needs to litigate individualized issues—i.e., whether he ordered a drink from the Ladies' Night menus (or was charged a different price for the same advertised drinks) and was actually refused a particular occasion.

### B. *TYPICALITY*

The purpose of the typicality requirement "is to assure that the interest of the named representative aligns with the interests of the class. ' "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." ' The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." ' See *Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4[th] 1496, 1502.

Plaintiff has not presented evidence of typicality. Similar to *Belles v. Schweiker* (8th Cir. 1983) 720 F.2d 509, Plaintiff has not shown that class members have the same or similar grievance arising from Defendant's Ladies' Night promotions. As discussed above in connection with the numerosity requirement, at best, Plaintiff's evidence shows that only one other person tried to order from the Ladies' Night menu. Plaintiff's statement in his declaration that "[his] claims are typical

of other class members" is insufficient. See Frye Declaration, ¶11; see also *Belles, supra*, 720 F.2d at 515 ("Proof of typicality requires more than general conclusory allegations.").

In opposition, Defendant also states that Plaintiff is a "serial plaintiff," and thus, "cannot be said to be typical in terms of his deliberate interactions in these circumstances." See Opposition, 14:19-20; see also Daucher Declaration, Exhibit 1 (providing a "non- exhaustive" list of 44 cases filed by Plaintiff). In this regard, the Court agrees with Plaintiff that the other cases filed by Plaintiff have no bearing in determining typicality.

## C. ADEQUACY

"Adequacy of representation depends on whether the plaintiff's attorney is qualified to conduct the proposed litigation and the plaintiff's interests are not antagonistic to the interests of the class." See *McGhee v. Bank of America* (1976) 60 Cal. App. 3d 442, 450.

Defendant challenges the adequacy of both Plaintiff's counsel (Sage S. Sepahi) and Plaintiff.

As for Plaintiffs counsel, Defendant contends that Plaintiff's counsel is inadequate because of "failure to diligently prosecute this case, his misrepresentations to the Court regarding his expert retention, his lack of class action experience, and his lack of success in prosecuting Unruh Act cases." See Opposition, 15:3-5.

As for Plaintiff, Defendant states that he "has also been unsuccessful as a plaintiff in Unruh Act cases," noting that in one case, Plaintiff sued a golf course for providing discounted golf fees to women in celebration of breast cancer awareness and the Court of Appeal affirmed summary judgment in favor of the defendant golf course. Id., 16:19-24.

As Plaintiff correctly contends, Defendant cites no authority for the proposition that lack of success in prior, unrelated class actions is a consideration in determining a class representative's adequacy.

**\*7** However, Defendant's concerns regarding Plaintiff's counsel's adequacy appear mostly well-taken. [7]

First, Defendant's counsel informed Plaintiffs counsel on 11/4/15 that the Aldelc server was available for inspection, but no inspection has yet occurred. See Dauchei Declaration, ¶¶5-7 and Exhibit 3; see also Supplemental Sepahi Declaration, ¶6 ("Mr. Cohen stands ready to inspect Defendant's system."). Especially given the concern of potential spoliation of evidence resulting from Defendant's transition from the Aldelo POS to a Micros POS, a diligent attorney would have inspected the Aldelo server as soon as possible.

Second, the motion described Loftessness as "Plaintiff's *retained* expert" and the Sepahi Declaration in support of the motion explained that Plaintiff was unable to submit a signed declaration from Loftessness "because Mr. Loftessness is presently unavailable." See Motion, 11:10; see also Sepahi Declaration, ¶9. However, Defendant presents evidence that, although Loftessness sent Plaintiff's counsel an engagement letter on 3/1/16, Plaintiff's counsel did not return the engagement letter until 8/22/16 (almost one month after the filing of the moving papers). i

Third, Plaintiff's counsel appears to have limited class action experience. In his initial declaration, he generally states that he "ha[s] assisted other attorneys in the prosecution of class actions." See Sepahi Declaration, ¶3. In his supplemental declaration, Plaintiffs counsel names only one class action—i.e., *Howard v. Ford Motor Company* (Alameda Case No. 763785-2), which involved defective Ford automobiles. See Supplemental Sepahi Declaration, ¶9. Further, Plaintiff's counsel fails to provide any details regarding the extent of his "assist[ance]" in the litigation of *Howard*.

Frye v. S & B Foods, LLC, 2017 WL 9286750 (2017)

## D. *SUPERIORITY/MANAGEABILITY*

Citing to *Reese*, *supra*, 73 Cal.App.4th 1225, Defendant challenges the superiority of a class action to individual actions.

In *Reese*, the plaintiff brought a class action partly alleging Unruh Act violations arising from Wal-Mart's offering of a "Ladies Day" promotional discount on oil changes. See *Reese*, *supra*, 73 Cal.App.4[th] at 1230. In affirming the trial court's ruling denying class certification, the Court of Appeal stated that the trial court used the proper legal standard (i.e., "whether substantial benefits would accrue to both the litigants and the courts from class treatment") and did not abuse its discretion in finding that such standard was not met. Id. at 1229. As to the latter, it explained:

In this case, the trial court did not abuse its discretion in determining that substantial benefits would not accrue from class treatment where (1) individual claims were viable without class treatment; (2) multiple lawsuits were unlikely in light of the fact that the only aggrieved party who had brought suit (the plaintiff) had deliberately generated his own injury; (3) class treatment would consume more time and expense than an adjudication of the pending case or a limited number of individual suits; (4) some form of effective class-wide relief was available without class certification through the unfair competition claim alleged by plaintiff; and (5) the statutory penalties sought by plaintiff and others could disgorge any unjust enrichment without resort to class certification. Id.

**\*8**  Certain of the reasons for finding lack of superiority in *Reese* are equally applicable here.

First, denial of class treatment would not burden individual claims because the Unruh Act provides sufficient incentive for individuals who feel aggrieved by Defendant's Ladies' Nights promotions to file suit. See Civil Code §52 (providing for actual damages, penalties, and attorney's fees). As observed by the Court of Appeal in *Reese*, "[s]ince one important function of class actions is to provide 'small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation,' this was certainly a relevant (albeit not determinative) consideration in assessing whether class treatment would bring substantial benefits.' See *Reese*, *supra*, 73 Cal.App.4[th] at 1235.

Second, it is unlikely that multiple lawsuits would arise. Other than the "man's voice' referred to in the West Declaration, Plaintiff has not presented evidence of individuals who were not allowed to order drinks at discounted prices. Further, although the Defendant's Ladies' Nights promotions occurred in 2012 and 2013, there is no evidence of other claims against Defendant. According to the Court of Appeal in *Reese*, similar circumstances allowed the trial court to "reasonably question whether class treatment was necessary to avoid the possibility of repetitious litigation." Id. at 1236 (noting that the Ladies Day oil change special had been an ongoing promotion in 1994, 1995, and 1996, but as of the filing of the motion for class certification in 1998, no one other than the plaintiff had filed suit).

Third, class treatment would consume more time and expense than multiple individual actions (particularly here where multiple lawsuits are unlikely). In *Reese*, the Court of Appeal stated that, typically, it would be speculative to assume that multiple lawsuits are unlikely on the record. Id. at 1237. Nonetheless, it stated that "a court may appraise 'the extent and nature of other litigation already commenced by members of the class' in determining whether a class action is superior." Id.

For the foregoing reasons, Plaintiff has not met his burden of demonstrating that class certification under CCP §382 is proper.

### *DEFENDANT'S EVIDENTIARY OBJECTIONS*

### A. *Cohen Declaration*

1. SUSTAINED

2. SUSTAINED

3. SUSTAINED

### B. *Montova Declaration*

1. OVERRULED

2. OVERRULED

### C. *West Declaration*

1. OVERRULED

### *PLAINTIFF'S EVIDENTIARY OBJECTIONS*

### A. *Daucher Declaration*

1. SUSTAINED

2. SUSTAINED

IT IS SO ORDERED:

DATED: January 25, 2017

<<signature>>

ANN I. JONES

Judge of the Superior Court

Footnotes

1   See FAC, ¶15.

2   These do not constitute hearsay. See *People v. Jurado* (2006) 38 Cal.4[th] 72, 117 ('Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated.").

3   See Plaintiff's Notice of Lodging, Exhibit J, ¶6.

4   See *Aquirre, supra,* 234 Cal.App.4th at 1306.

5   As stated by the Court of Appeal in *Aquirre,* "the representative plaintiff need not identify, much less locate, individual class members to establish the existence of an ascertainable class." See *Aquirre, supra,* 234 Cal.App.4[th] at 1301. It also stated that the representative plaintiff is not required to "establish a means for providing personal notice of the action to individual class member" as "such a requirement would conflict with the liberal notice provisions contained in California Rules of Court, rule

3.766(f),' which permits other means of notice such as "publication in a newspaper or magazine; broadcasting on television, radio, or the Internet; or posting or distribution through a trade or professional association, union, or public interest group." Id.; see also CRC rule 3.766(f).

6    In support of (he motion, Plaintiff previously submitted an unsigned draft declaration of Scott Loftessness ("Loftessness"). See Sepah Declaration, ¶9 and Exhibit 1. On 10/17/16, the Court granted Plaintiff's ex parte application to substitute Cohen for Loftessness as Plaintiff's expert. See 10/17/16 Minute Order.

7    Plaintiff's counsel's track record in the litigation of Urtruh cases does not render him inadequate. See *Armstrong v. Chicago Park Dist.* (N.D. Ill. 1987) 117 F.R.O. 623, 631 ('Neither should counsel's relative lack of success to date be determinative— even exceptionally competent counsel can lose a losing case.").

---

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT U

2017 WL 9286751 (Cal.Super.) (Trial Order)
Superior Court of California.
Los Angeles County

Steve **FRYE**, Plaintiff,

v.

S & B FOODS, LLC dba Clubhouse 66, et al., Defendant.

No. KC067090.
September 27, 2017.

**Statement of Decision**

Ann I. Jones, Judge.

**\*1**  Having concluded the bench trial and having issued a proposed statement of decision, for which no timely objections were served or filed [1], the Court now issues its Statement of Decision.

Pursuant to Section 634 and Cal. Rules of Court 3.1590 (g), the parties shall have fifteen days from the issuance of this decision to object, concur or correct the Proposed Statement of Decision.

# I. BACKGROUND

Plaintiff Steve Frye ("Frye") is self-employed and a self-described equal rights advocate. As identified in Trial Exhibits 15 and 16, Frye has been a plaintiff in over 48 civil rights cases, many of which have as their challenged subject matter "Ladies only" events.

Defendant S & B Foods is a California Limited Liability Corporation doing business under the name Clubhouse 66 since April 2009. Clubhouse 66 is a bar and restaurant and is licensed by the California Department of Alcohol and Beverage Control ("ABC").

At trial, the following witnesses testified: Rick Seidner, the Managing Member of S & B Foods; Steve Frye and Amanda Slayton, a bartender and manager at Clubhouse 66.

Plaintiff's complaint alleges that Clubhouse 66 refused to extend its ladies night promotions to him when we went to the establishment on January 24, 2013. [2]  This case was originally pled as a class action. The Court denied certification in January 2017. That ruling was not appealed. The court thereafter ruled by way of *in limine motion* in July 2017 that evidence concerning the plaintiff's visit to Clubhouse 66 on January 17, 2013 should be excluded. Given the events of that visit, plaintiff lacked standing to complain regarding the Ladies' Night promotions offered on that evening and, therefore, the evidence's prejudice clearly outweighed its minimal probative value. At trial, plaintiff sought $24,000 in statutory damages for violations of Civil Code Sections 51 and 51.5. for claimed violations of civil rights law on both January 17 and January 24, 2013 by both the corporate defendant and unnamed employees as "aiders and abettors".

The court presided over a half-day bench trial on September 5, 2017. The parties filed post-trial briefs on September 8, 2017 and the matter was, thereafter, taken under submission.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                                                      1

## II. DISCUSSION

Civil Code Section 51 (the Unruh Civil Rights Act) states that all persons of the state are entitled to full and equal accommodations, advantages, facilities privileges or services in all business establishments of any kind. This provision "broadly outlaws arbitrary **discrimination** in public accommodations." *Osborne v. Yasmeh* (2016) 1 Cal. App. 5th 1118, 1126.

**\*2** Civil Code Section 51.5, which is not "technically part of the Unruh Civil Rights Act," provides similar protractions to those associated with persons described in the Unruh Civil Rights Act. *Id.* at 1126-1127. This section affirmatively prohibits more specific types of **discrimination** by business establishments, including the refusal to sell to a person because of gender. *Id.; Roth v. Rhodes* (1994) 25 Cal. App. 4th 520, 537.

Plaintiff alleges that he suffered a violation of both provisions on January 24, 2013 when he went into Clubhouse 66 and asked to order any of the three "Ladies Night" specials that appeared on a flyer that evening. He testified that he was told that he could not order the specials as they were for women customers only. Although he ordered a different, more expensive drink on that occasion, he did not ask to order one of the special drinks on the Ladies Night menu; rather, he simply asked for a "Grey Goose" cosmopolitan, which he was served. (See Trial Exhibit 6). He also claims that unnamed employees of Clubhouse 66 "aided and abetted" in this denial and, therefore, ought to trigger the imposition of additional statutory penalties.[3]

The crux of the plaintiff's case rests entirely upon Frye's testimony. He is the sole person who testified that he was unable to purchase from the Ladies Night menu at Clubhouse 66 on January 24, 2013. His testimony regarding the critical events of that evening, however, was not credible.

First, despite his experience and sophistication regarding Ladies-only events and the Unruh Act, plaintiff went into Clubhouse 66 that evening alone. Without any witnesses, he was unable to corroborate his observations regarding the critical events of that evening. That corroboration would be particularly useful where, as here, Frye's version of events is contrary to the uncontroverted testimony of the defendant's manager as to who was actually working at Clubhouse 66 that evening.

Frye testified that he was handed a flyer by an unidentified male employee upon entering the establishment, but failed to ask his name. That omission is critical where, as here, his description of the person given by Frye at trial fails to match either of the two male employees at Clubhouse 66 working on that evening. The unavoidable conclusion is that Frye made up this entire initial incident.

Frye then testified that he was told by a bartender that he could not order any drinks from the Ladies Only flyer. Once again, Frye didn't ask for that employee's name. Again, that omission is critical because Frye's description of that employee again does not comport with the features and coloring of the only male bartender working at Clubhouse 66 that evening. Once again, mis inconsistency casts significant doubt regarding Frye's testimony.

**\*3** Second, Frye failed to bring his concerns regarding his alleged **discrimination** to the attention of anyone at the establishment that evening. Although he testified that he was "insulted" by being discriminated against, he did not report his concerns to anyone at Clubhouse 66 that evening. Rather, he ordered a specialized cocktail (one that was not a regular well drink), was served, finished his drink, paid the tab and left At no time did he attempt to order one of the featured

Ladies Night drinks, albeit at a higher price. The uncontroverted testimony of the Clubhouse 66 manager was that such a drink would have been prepared for him -just as the special Grey Goose Cosmopolitan drink was prepared – although

arguably at a non-discounted price. Given that plaintiff has repeatedly asserted that this case is not a "disparate pricing case," that omission in Frye's conduct on the evening in question is significant.

If it were the allegedly illegal practice that Frye sought to vindicate, it would have been natural to bring that offense to the immediate attention of management, who could have ceased the practice and ameliorated the <mark>discrimination</mark> by allowing Frye to order from the Ladies' Night menu. Instead, Frye remained silent. Moreover, given the credible testimony of Rick Seidner, the establishment would have discontinued the practice once informed of its possible illegality. It was not until the management received a letter from Frye's attorney that they were on notice of a need to change the bar's business practices – which they did immediately thereafter. A reasonable conclusion from this conduct is mat Frye was motivated by a desire to sue – a motivation that might occasion the invention of key facts at trial.

Third, Frye's testimony on a critical aspect of this entire event was entirely inconsistent with his deposition testimony. At trial, Frye claimed that he could not recall whether he was aware of the Ladies' Night Specials at Clubhouse 66 when we first went into the establishment. That trial testimony was completely impeached by his deposition testimony – further tattering his already not very credible testimony. He had been alerted to the Ladies Night specials at Clubhouse 66 by his girlfriend and clearly went to that establishment on a number of occasions thereafter with that knowledge.

In addition to his failure to identify employees accurately, to conduct himself in a way that would have been consistent with his claimed "insult" at being discriminated against, or to recall that he went to the Clubhouse 66 on that evening knowing that he could expect a Ladies' Night menu, his overall appearance at trial and while testifying made him not credible. His demeanor was uncomfortable and his answers were vague and evasive. In whole, his testimony was not believable.

Given that plaintiff's key fact witness is not credible, it cannot be found that the plaintiff has met his burden of establishing a violation of Civil Code Sections 51 and 51.5.

## III. CONCLUSION

As plaintiff has failed to meet his burden of proof, judgment shall be for the defendant. Defendant shall lodge a proposed judgment consistent with this Statement of Decision on or before October 3, 2017.

DATED: 9/27/17

<<signature>>

Judge Ann I. Jones

Footnotes

1     Defendant filed a concurrence in the proposed statement of decision; plaintiff filed nothing.

2     This case was originally pled as a class action. The Court denied certification in January 2017. That ruling was not appealed. The court ruled by way of *in limine motion* in July 2017 that evidence concerning the plaintiff's visit to Clubhouse 66 on January 17, 2013 should be excluded. Given the events of that visit, plaintiff lacked standing to complain regarding the defendant's Ladies' Night promotions and, therefore, the undue prejudice of evidence regarding activities on that date clearly outweighed its minimal probative value.

3     At trial, the court requested the identity of these claimed "aiders and abettors," which plaintiff's counsel could not provide. Nor did plaintiff seek to amend the complaint before the commencement of trial to add defendants as "aider and abettors." Defendant objects to the introduction of previously undisclosed theories of liability and unnamed parties. The court agrees with the defendant Absent any identification, much less notice and an opportunity to be heard, it would violate due process to

**Frye v. S & B Foods, LLC, 2017 WL 9286751 (2017)**

impose a civil penalty on parties arising from a case in which they have never been named as defendants, served with process, or given an opportunity to defend themselves.

End of Document                                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT V

Case 2:18-cv-03093-JFW-AS   Document 80-1   Filed 06/03/19   Page 296 of 361   Page ID
#:2276
In re the Matter of: Steven SURREY and Alfred G. Rava,..., 2006 WL 3475505...

2006 WL 3475505 (Cal.Superior) (Trial Order)
Superior Court of California.
San Diego County

In re the Matter of: Steven **SURREY** and Alfred G. Rava, Plaintiffs,
v.
Spreckles Theater and Theatrical Enterprises Corporation, Defendants.

No. GIC 847399.
January 3, 2006.

**Order After Hearing Final Ruling**

Present Hon.: Jeffrey B. Barton, Judge.

DATE: January 3, 2006

CLERK: Deborah Jellison

BAILIFF: None

DEPT: 69

REPORTER A: Not Reported

REPORTERS' ADDRESS: P.O. BOX 120128

SAN DIEGO, CA 92112-0128

By: Phillip H. Stillman

BY: Evelyn F. Heidelberg

On December 16,2005, the Court heard oral argument on defendants Spreckels Theatre ("Spreckels") and Theatrical Enterprises Corporation's ("Theatrical") Motion for Summary Judgment. *The Court vacates the tentative ruling of December 15, 2005, and enters the following ruling:*

Defendants' Motion for Summary Judgment is *granted.* From commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826,850.) Additionally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (Ibid.) The movant meets its burden by presenting evidence in the form of " 'affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice' must or may 'be taken.' " (Id. at p. 855; Code Civ. Proc., § 437c, subd. (b).) If the movant meets its burden of production, the movant "causes a shift, and the opposing party is then subjected to a burden of production of [its] own to make a prima facie showing of the existence of a triable issue of material fact." (Aguilar v. Atlantic Richfield Co., supra, at 850.)

In re the Matter of: Steven SURREY and Alfred G. Rava..., 2006 WL 3475505...

Case 2:18-cv-03093-JFW-AS   Document 80-1   Filed 06/03/19   Page 297 of 361   Page ID #:2277

Defendants have met their initial burden of production to show that that there is a no genuine issue of disputed fact that the City Ballet's discounted tickets for those under 30 years of age, for the single performance on May 16, 2005, do not constitute an arbitrary **discrimination** under the Unruh Act. The Unruh Act applies to a claim for age **discrimination** notwithstanding that "age" is not included within the types of **discrimination** delineated in the Act. (Ingels v. Westwood One Broadcasting Services, Inc. (2005) 129 Cal.App.4th 1050, 1068.)

Defendants' undisputed evidence shows that City Ballet is a non-profit corporation and contracts with Theatrical for use of Spreckels Theatre as a venue. (UMF 3-5.) City Ballet agreed to pay Theatrical $10,000, plus $2 a ticket and 25% over gross sales. City Ballet agreed to indemnify Theatrical against all claims. City Ballet's modest budget is $500,000, of which 30% is funded through ticket sales, and relies on donations and grants. (UMF 9-10.) City Ballet is not self sustaining, and the City of San Diego provides funds annually through the City's Organizational Support Program ("OSP") funded by the City's TOT. (UMF 12.)

The OSP guidelines require the applicants to "describe efforts to diversify and attract new audiences" and to address the question "what goals/strategies will you implement in the proposed year to serve customers whose opportunities to participate in the arts and culture may be limited by age, disability, language, education, geographic, ethnic or economic constraints?" (UMF 18.)

City Ballet has taken the position that it is important for young persons to be exposed to the City Ballet so that they can become appreciative and eventually become donors/subscribers so that City Ballet will continue to be a viable ballet company. (UMF 25.) Based upon the managing director Jo Anne Emery's 30 years experience, of which 11 years has been spent observing and interacting with audiences of City Ballet Productions, she has seen segments of the population underserved by the City Ballet and that if young persons are not brought into the City Ballet audience, then City Ballet will not be able to sustain itself as an ongoing, financially viable non-profit organization. Emery has observed that the City Ballet's ticket purchasing audience is predominantly composed of middle aged and elderly individuals, and as such is gradually dying off. (Decl. of Emery, 1-13.)

There is also the undisputed fact that the arts add to the quality of life. (UMF 36.) Furthermore, since 2001, City Ballet has offered discounts to certain performances to those over 60. (UMF 40.) The discounted prices is fully consistent with social policy considerations, including regenerating the audience for the performing arts, so as to continue the art's contributions to the economic vitality and quality of life in the San Diego region, and the favored public policies of the City of San Diego and the California Arts Council encouraging applicants for public funds, upon which the City Ballet is dependent, to implement strategies to "attract new audiences" and "serve customers whose opportunities to participate... may be limited by age... education...or economic restraints."

Plaintiffs Alfred Rava and Steven Surrey have failed to raise by admissible evidence facts to show defendants' practice of discounting tickets on May 16, 2005, for persons under thirty years old to encourage new patrons to visit the ballet, which is partially funded by the City of San Diego, is arbitrary, invidious and unreasonable **discrimination** based upon age. Plaintiffs' declarations lack foundation to dispute that there is a diverse mix of people purchasing tickets to the ballet, or that the City Ballet's decision was capriciously arbitrary. Plaintiffs have failed to raise issues of material fact that the sole reason for pricing the differential was plaintiffs' age.

The Court rules on defendants' evidentiary objections to plaintiff Rava's declaration as follows:

| | |
|---|---|
| ¶5 | 2:11-13: Overruled, non-hearsay. |
| ¶5- | Balance of objections-overruled. |
| ¶6-11. | Sustained. |

Case 2:18-cv-03093-JFW-AS Document 80-1 Filed 06/03/19 Page 298 of 361 Page ID #:2278

| | |
|---|---|
| ¶12-14. | Overruled. |
| ¶15-17. | Overruled. |
| ¶18-19. | Sustained. |
| ¶20-21. | Overruled. |
| ¶22-23. | Sustained. |
| ¶24. | Overruled. |
| Ex. A & B- | Sustained. |

Similarly, the Court applies the same reasoning for the objections to Surrey's declaration. Objection #25 to Surrey's declaration is sustained.

IT IS SO ORDERED.

DATED: January 3, 2006        JEFFREY B. BARTON

JEFFREY B. BARTON

Judge of the Superior Court

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT W

Case 2:18-cv-03093-JFW-AS  Document 80-1  Filed 06/03/19  Page 300 of 361  Page ID
#:2280
Love v. Mail on Sunday, Not Reported in F.Supp.2d (2007)

2007 WL 2709975
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Mike LOVE, Plaintiff,
v.
THE MAIL ON SUNDAY, et al., Defendants.

No. CV05-7798 ABC(PJWX).
|
Sept. 7, 2007.

**Attorneys and Law Firms**

Alfred G. Rava, The Rava Law Firm, San Diego, CA,
Philip H. Stillman, Flynn & Stillman, Cardiff, CA, for
Plaintiff.

Michael Love, pro se.

Andrew J. Thomas, Kelli L. Sager, Robyn Aronson,
Davis Wright and Tremaine, Barry E. Mallen, Joy T.
Teitel, Manatt Phelps & Phillips, Edward A. Ruttenberg,
Leopold Petrich & Smith, Los Angeles, CA, Gregory J.
Aldisert, Gregory S. Gabriel, Kinsella Weitman Ise Kump
Aldisert, Santa Monica, CA, Neville L. Johnson, Johnson
& Johnson, Beverly Hills, CA, for Defendants.

ORDER RE: MOTION FOR ATTORNEYS'
FEES FILED BY DEFENDANTS
BRIAN WILSON, JEAN SIEVERS, THE
LIPPIN GROUP, INC., AND SOOP LLC

COLLINS, J.

**\*1** Pending before the Court is a Motion for Award
of Attorneys' Fees and Costs filed on May 29, 2007
by Defendants Brian Wilson, Jean Sievers, the Lippin
Group, Inc., and Soop, LLC ("Wilson Defendants" or
"Defendants"). Plaintiff Mike Love filed an Opposition
on July 23, 2007. Defendants filed a Reply on August
6, 2007. The Court found this motion appropriate for
determination without oral argument and took it under
submission. *See* Fed. R. Civ. Pro. 78; Local Rule 7-15.
Upon consideration of the parties' submissions and the
case file, the Court hereby GRANTS Defendants' Motion.

**I. BACKGROUND**

Defendants Brian Wilson, Jean Sievers, the Lippin Group,
Inc., and Soop, LLC, are the prevailing parties on
each of the eighteen claims for relief alleged against
them by Plaintiff Mike Love. Plaintiff filed his original
Complaint on November 2, 2005, a First Amended
Complaint on May 4, 2006, and a Second Amended
Complaint on September 5, 2006. Plaintiff, a founding
member of the music group The Beach Boys, stated
claims arising out of a dispute with defendant Associated
Newspapers, Ltd. ("ANL"), [1] a United Kingdom entity,
concerning ANL's newspaper promotion and giveaway
of a CD entitled "Good Vibrations," which contained
Beach Boys songs re-recorded by Beach Boys founding
member defendant Brian Wilson. Specifically, Plaintiff
stated the following causes of action: (1) violation of
statutory right of publicity (Cal. Civ.Code § 3344);
(2) violation of the common law right of publicity;
(3) breach of the covenant of good faith and fair
dealing; (4) action for indemnity under written indemnity
contract; (5) declaratory relief regarding the settlement
and indemnity agreements; (6) breach of fiduciary duty;
(7) copyright infringement by unlawful reproduction of
copyrighted work (17 U.S.C. § 106(1)); (8) copyright
infringement by unlawful preparation of derivative work
(17 U.S.C. § 106(2)); (9) copyright infringement by
unlawful distribution of copyrighted work; (10) federal
trademark infringement (15 U.S.C. § 1114); (11) federal
unfair competition (15 U.S.C. § 1125(a), Lanham Act
43(a)); (12) federal trademark dilution (15 U.S.C. §
1125(c), Lanham Act § 43(c)); (13) unfair, deceptive
or unlawful business practices (Cal. Bus. & Prof.Code
§ 17200, et. seq.); (14) interference with contractual
relations with BRI; (15) interference with contractual
relations with Rondor Music; (16) intentional interference
with prospective economic advantage; (17) negligent
interference with prospective economic advantage; and
(18) civil conspiracy.

The Court adjudicated two motions to dismiss, one
motion for partial summary judgment, and a motion
for summary judgment. The Court's first order (August
15, 2006) dismissed with prejudice thirteen of Plaintiff's
eighteen claims, and dismissed with leave to amend
four claims; the Court's second order (November 16,
2006) dismissed with prejudice four of the five remaining
claims; the Court's third order (February 8, 2007) granted

summary judgment to Defendants on Plaintiff's Lanham Act claim; and the Court's fourth order (May 10, 2007) granted Defendant Wilson's motion for summary judgment with respect to Plaintiff's claim for breach of fiduciary duty, the only claim that remained in the case. Final judgment was entered on June 1, 2007. Defendants now seek attorneys' fees for their successful defense of the action. [2]

## II. DISCUSSION

A. Legal Standard

**\*2** "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The Ninth Circuit requires a district court to calculate an award of attorneys' fees by first calculating the "lodestar." *See Caudle v. Bristow Optical Co. Inc.,* 224 F.3d 1014, 1028 (9th Cir.2000). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Caudle,* 224 F.3d at 1028, citing *Morales v. City of San Rafael,* 96 F.3d 359, 363 (9th Cir.1996). The lodestar should be presumed reasonable unless some exceptional circumstance justifies deviation. *Quesada v. Thomason,* 850 F.2d 537, 539 (9th Cir.1988).

After computing the lodestar, the district court is to assess whether additional considerations enumerated in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), require the court to adjust the figure. *Caudle,* 224 F.3d at 1028. The *Kerr* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; (12) awards in similar cases. *Kerr,* 526 F.2d at 70.

B. Defendants are Entitled to Attorneys' Fees for Most of the Claims on Which They Prevailed.

Defendants have demonstrated their entitlement to attorneys' fees with respect to most of the claims stated against them. There is no serious question that Defendants are prevailing parties on every claim, and for nearly every claim, there is a statutory or contractual basis for awarding Defendants' fees. With one exception, discussed below, those several claims lacking an independent basis for awarding attorneys' fees are inextricably intertwined with claims that do. In addition, the Court rejects Plaintiff's contention that Defendants' fees must be reduced because the Court either did not rule on every argument Defendants made in their motions, or ruled against some of Defendants' arguments. "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Hensley,* 461 U.S. at 435.

1. Right of Publicity Claims

Defendants are entitled to attorneys' fees for prevailing on Plaintiff's claim for violation of California's statutory right of publicity, Cal. Civ.Code § 3344 (first claim) and his claim for violation of the common law right of publicity (second claim). Section 3344 clearly states that "the prevailing party in any action under this section shall ... be entitled to attorneys' fees and costs." Plaintiff does not dispute that this section renders an award of attorneys' fees mandatory. *See Kirby v. Sega of America, Inc.,* 144 Cal.App.4th 47, 62, 50 Cal.Rptr.3d 607 (2006).

**\*3** Plaintiff does contend, however, that Defendants' fees for these claims must be denied because they failed to segregate the fees arising out of these claims from the fees arising out of the other claims. Plaintiff also suggests that fees for the common law claim should be distinguished from fees for the statutory claim. However, Plaintiff's common law claim and his statutory claim were both premised on the same alleged unauthorized use of his likeness in connection with the Good Vibrations CD, and the Court dismissed both claims on exactly the same basis. Plaintiff also made his false claim of California residence-contradicting his prior claim of Nevada residence-with regard to both claims. These claims were therefore "inextricably intertwined," and the Court will not apportion costs between them. *See Kirby,* 144 Cal.App.4th at n. 7. The Court also rejects Plaintiff's

position that the fees for the right of publicity claims must be apportioned from Plaintiff's other claims. Although "as a general matter, a prevailing party in a case involving Lanham Act and non-Lanham Act claims can recover attorneys' fees only for work related to the Lanham Act claims," *Gracie v. Gracie,* 217 F.3d 1060, 1069 (9th Cir.2000), as discussed herein, the Court finds either independent statutory or contractual bases for awarding Defendants fees with regard to nearly every claim. [3] Thus, because Defendants are entitled to fees as to those claims, "apportionment" of fees among those claims is simply unnecessary.

### 2. Claims Arising Out of the 1994 Settlement Agreement and the 1973 Agreement for Indemnification

Plaintiff alleged four claims against Defendant Wilson arising out of two contracts. Plaintiff's claims for breach of the covenant of good faith and fair dealing (third claim), declaratory relief (fifth claim), and, in part, the claim for breach of fiduciary duty (sixth claim) were based on the 1994 settlement agreement between Plaintiff and Wilson. Plaintiff's claim for contractual indemnity (fourth claim) and, in part, his claim for declaratory relief (fifth claim) were based on a 1973 Agreement of Indemnification signed by all of the shareholders of Brother Records, Inc., including Plaintiff and Wilson. Wilson argues that the attorneys' fees provisions in those agreements entitle him to his attorneys' fees for prevailing on these claims. The Court agrees.

Paragraph 9.2 of the 1994 settlement agreement states:

> If an action is instituted by any party to this Agreement for breach of this Agreement, or its terms, or for breach of any warranty or representation, or to interpret or enforce this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs, including all attorneys' fees and costs of suit incurred in connection with the executing and collecting upon

final judgment in said litigation in addition to any other relief.

Mallen Decl. Ex. 4. Plaintiff's third, fifth, and sixth claims for relief clearly fall within the ambit of this provision. Despite Plaintiff's strained position to the contrary, these claims, by the terms in which Plaintiff pled them, asked the Court to interpret and enforce the 1994 agreement. That upon interpreting the agreement the Court found neither the implied term nor the fiduciary duty Plaintiff sought to coax therefrom does not remove the claims from the realm of contract interpretation. The Court interpreted the agreement, and found Plaintiff's claims unsupported. Paragraph 9.2 therefore entitles Wilson to his attorneys' fees for his successful defense of these claims.

**\*4** Similarly, Paragraph 3 of the Agreement for Indemnification upon which Plaintiff's claim for indemnity and, in part, his claim for declaratory relief were predicated states:

> If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to a reasonable attorneys' fee, which may be set by the Court in the same action or on a separate action brought for that purpose, in addition to any other relief to which he may be entitled.

Mallen Decl. Ex. 3. Plaintiff's claim for indemnity and part of his claim for declaratory relief were predicated on the 1973 agreement and sought the Court's interpretation and enforcement of the agreement. The Court did interpret the agreement, and found that it did not provide for the relief Plaintiff sought. Plaintiff argues, however, that because the Court found that the agreement entitled only BRI to the type of indemnification Plaintiff sought, Wilson cannot benefit from the attorneys' fees provision of the agreement. However, Paragraph 3 clearly provides for attorneys' fees for "the prevailing party" in "any action at law or in equity ... to enforce or interpret the provisions of this Agreement." (emphasis added) The provision is not

limited only to those actions involving BRI as a party; rather, it applies to "any action."

Curiously, Plaintiff cites *Heppler v. J.M. Peters Co., 73 Cal.App.4th 1265, 87 Cal.Rptr.2d 497 (1999)* for the proposition that "Where a nonsignatory plaintiff sues a signatory defendant in an action on a contract and the signatory defendant prevails, the signatory defendant is entitled to attorney fees only if the nonsignatory plaintiff would have been entitled to its fees if the plaintiff had prevailed." *Heppler, 73 Cal.App.4th at 1292, 87 Cal.Rptr.2d 497.* That principle has no application to this case because Plaintiff and Wilson are both signatories to the agreement.

Finally, the Court rejects Plaintiff's attempts to limit the application of Paragraphs 9.2 and 3 to only certain types of actions. The paragraphs plainly apply to "an action" and "any action," respectively, to enforce or interpret the agreements. Accordingly, Wilson is entitled to attorneys' fees for prevailing against these claims.

However, the Court finds that one component of Plaintiff's breach of fiduciary duty claim does not arise out of the 1994 contract, that is, his claim for breach of fiduciary duty arising out of the alleged partnership between himself and Wilson, dating from the 1960s. This aspect of the claim was based on facts and legal theories different from those upon which his contract-based claim rested. Defendants have presented no basis for awarding fees for this claim, and the Court discerns none. Accordingly, the Court will make an approximation of the amount of fees incurred as a result of the defense of this claim and deduct it from the total award.

### 3. Copyright Claims

**\*5** On August 15, 2006, the Court dismissed Plaintiff's seventh eighth, and ninth claims for copyright infringement. Under the Copyright Act of 1976, a district court has the discretion to award "a reasonable attorneys' fee to the prevailing party." 17 U.S.C. § 505. *The Traditional Cat Ass'n, Inc. v. Gilbreath, 340 F.3d 829, 832 (9th Cir.2003).* Some of the factors that a district court might consider are: "(1) the degree of success obtained; (2) frivolousness; (3) motivation; (4) the objective unreasonableness of the losing party's factual and legal arguments; and (5) the need, in particular circumstances, to advance considerations of compensation and deterrence." *Fogerty v. Fantasy, Inc.,*

*510 U.S. 517, 534 n. 4, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).* Ultimately, the question is whether a successful defense of the action furthered the purposes of the Copyright Act, not whether a fee award would do so. *Id. at 527.*

These factors weigh in favor of an award of attorneys' fees. First, Defendants were completely successful against the copyright claims, securing their dismissal with prejudice in their first motion to dismiss. The claims bordered on frivolous and were not objectively reasonable because Plaintiff did not own the copyrights, even if he was a "beneficial owner"; he claimed that Defendants were liable for infringement because they allegedly "authorized" the copyright owner's licensing of the works to a third party, an untenable claim at best; there was no basis at all for Plaintiff's claim against Lippin, Sievers, or Soop; and Plaintiff presented no evidence whatsoever that any of the moving Defendants distributed any CDs. Plaintiff's contention that his claims were valid because the covermount license Rondor granted was invalid is unavailing, as Plaintiff presented no evidence of this contention. Thus, the second and fourth factors weigh in favor of granting fees. The Court cannot determine with sufficient certainty whether Plaintiff had an improper motive for pursuing his copyright claims, the third factor. However, there is a need in this case to compensate Defendants for the costs incurred in defending this action, and to deter Plaintiff from advancing unsupportable claims. As the Court noted in previous orders, Plaintiff's case was vastly overpled, thus unnecessarily expanding Defendants' (and this Court's) work. Plaintiff's copyright claims contributed to the bloat of this case.

Finally, the Court finds that the successful defense of the action furthered the purposes of the Copyright Act. "The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.' To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Fogerty v. Fantasy, Inc., 510 U.S. 517, 527, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994)* (citations omitted). "Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be

encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." *Id.* The successful defense herein served the purposes of the copyright law by maintaining the boundaries of liability under copyright law, and by protecting the utility of copyright licenses. Specifically, the Court's dismissal of the copyright claims against these Defendants was premised on the notion that non-parties to a licensing agreement cannot be liable for alleged infringement committed by the licensee simply for "authorizing" the copyright owner's issuance of the license. Indeed, a contrary conclusion would undermine the ability of copyright owners to license their property, and of licensees to rely on those licenses, without interference from outside parties.

**\*6** Accordingly, the Court finds that Defendants are entitled to attorneys' fees for their successful defense against Plaintiff's copyright claims.

4. Lanham Act Claims

Defendants prevailed against Plaintiff's claims under the Lanham Act. The Lanham Act allows for an award of attorney's fees in "exceptional cases." 15 U.S.C. § 1117(a). *See also McClaran v. Plastic Indus., Inc.,* 97 F.3d 347, 364 (9th Cir.1996). Fees under the Lanham Act are appropriate "[w]hen a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith." *Stephen W. Boney, Inc. v. Boney Servs., Inc.,* 127 F.3d 821, 827 (9th Cir.1997).

The Court finds that Plaintiff's Lanham Act claims were groundless and unreasonable. First, on August 15, 2006, the Court dismissed Plaintiff's claim for trademark infringement on the ground that he lacked standing because he did not own the Beach Boys mark, and his license to the mark was limited to live performances-a right that could not be infringed by Defendants' alleged use of the mark in connection with the CD. Neither the factual basis for this conclusion, nor the law compelling it, were genuinely subject to dispute. Indeed, the scope of Plaintiff's license was obviously within his own knowledge prior to his filing the suit, further demonstrating the unreasonableness of this claim. *See, e.g., Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 797 F.2d 70, 75 (2nd Cir.1986)* (affirming district court's determination that plaintiff did not have a good faith basis for its trademark claim where, prior to filing its complaint, plaintiff knew that it did not own the trademark upon which it sued.)

Further, and alternatively, the Court also found that Plaintiff stated absolutely no allegations against these Defendants by which they (as opposed to ANL) could be held responsible for the creation or distribution of the allegedly infringing material.

Second, on February 8, 2007, the Court granted summary judgment on the federal unfair competition claim on the ground that the Lanham Act could not be applied extraterritorially in this case, where the only allegedly infringing conduct occurred in the United Kingdom, and had no effect on U.S. commerce. Plaintiff characterizes his argument for the extraterritorial application of the Lanham Act as "well-grounded" and supported by case law; however, the Court found these cases "readily distinguishable" and "of no persuasive value." February 8, 2007 Order at 6.

Further, in granting summary judgment, the Court noted that Plaintiff presented not one item of evidence substantiating any U.S. effect. Indeed, the Court found that the one piece of evidence Plaintiff presented on this issue was the misleading and deceptive Declaration of Steven Surrey. The Court found that Plaintiff's conduct in presenting this deceptive declaration "unreasonably and vexatiously ... lengthened or multiplied both Defendants' and this Court's work," and imposed sanctions on Plaintiff's counsel.[4] Finally, Plaintiff did not oppose Defendants' motion to dismiss his claim for federal trademark dilution (twelfth claim), demonstrating the claim's lack of merit.

**\*7** Plaintiff attempts to rely on the advice of counsel defense to an award of attorneys' fees under the Lanham Act. However, Plaintiff's attempt is unavailing, as that defense must be supported by a specific showing of reasonable reliance, including by a showing of the advice counsel gave. *See Takecare Corp. v. Takecare of Oklahoma, Inc.,* 889 F.2d 955, 958 (10th Cir.1989) (noting that, in cases determining the application of the advice of counsel defense, "the district court had some means of establishing what the advice was or purported to be.") Plaintiff here makes only a blanket statement of reliance on counsel. This is not enough to effectively invoke the defense.

For the reasons stated above, the Court finds that this is an "exceptional case" within the meaning of the Lanham

Case 2:18-cv-03093-JFW-AS   Document 80-1   Filed 06/03/19   Page 305 of 361   Page ID
#:2285
Love v. Mail on Sunday, Not Reported in F.Supp.2d (2007)

Act, thereby justifying an award of Defendants' attorneys' fees.

### 5. Plaintiff's Interference Claims

On August 15, 2006, the Court granted with prejudice Defendants' unopposed motion to dismiss Plaintiff's claim for interference with contractual relations with respect to BRI (fourteenth claim), for interference with contractual relations with respect to Rondor (fifteenth claim), for intentional interference with prospective economic advantage (sixteenth claim), and for negligent interference with prospective economic advantage (seventeenth claim).

Defendants contend that they are entitled to attorneys' fees for these claims because they all arose out of contracts between Plaintiff and others, which contracts contained attorneys' fees provisions, and which Defendants claimed the right to invoke. Plaintiff contends that Defendants have no right to invoke the attorneys' fees provisions in those contracts. The Court finds it unnecessary to decide whether Defendants can invoke the attorneys' fees provisions in those contracts. Rather, each of Plaintiff's four interference claims is intertwined with all of his other claims. Specifically, Plaintiff's interference claims were that Defendants' alleged misappropriation, copyright infringement, and trademark infringement interfered with his economic relations with third parties. Clearly, the Plaintiff's interference claims are inextricably intertwined with other claims for which an award of fees is warranted, both in that the work done to prevail on them is not separable from the work done with regard to the other claims, and in the manner in which they were pled. Finally, given the early stage in which these claims were dismissed and Plaintiff's non-opposition to that motion, it appears that the work performed to prevail on these claims was negligible.

Accordingly, the Court finds it unnecessary to apportion the fees for the interference claims from the fees stemming from the other claims.

### 6. Plaintiff's Other Claims

Defendants also prevailed on Plaintiff's claim for violation of California Business & Professions Code § 17200 (thirteenth claim, dismissed sua sponte on February 8, 2007) and on Plaintiff's claim for civil conspiracy (eighteenth claim, dismissed November 16, 2006). By definition, these claims are predicated on other claims:

specifically, they both arose out of Plaintiff's claims for violations of the right of privacy, copyright infringement, and violations of the Lanham Act. Accordingly, the Court finds that Plaintiff's claims for § 17200 violations and civil conspiracy are inextricably intertwined with Plaintiff's claims warranting an award of fees. The Court therefore will not apportion fees on these claims.

### C. Reasonableness of the Fee Request

**\*8** Defendants seek a total of $596,352 in fees for the 1,109 hours their attorneys billed to prevail in this action. To document their request, Defendants submitted a Declaration of Charles G. Gomez, a Manatt attorney, wherein Mr. Gomez states that he analyzed and categorized all of the fees billed in this litigation. Attached to the Gomez Declaration is Exhibit A, a chart Mr. Gomez prepared summarizing the work performed and hours and fees incurred. Also attached is Exhibit B, a printed report of the Manatt attorneys' daily time entries for this case sorted chronologically by task. Plaintiff objects that this request is unreasonable on multiple bases, and filed the Declaration of John Sturgeon, a partner at the law firm White & Case LLP, wherein Mr. Sturgeon offers his opinion the Defendants' fees are unreasonable.

### 1. Defense Counsel's Hourly Rates are Reasonable.

Defendants were represented in this action by the firm Manatt, Phelps & Phillips, LLP ("Manatt firm"). The personnel working on this matter were billed at the following rates: Barry Mallen, partner, $540 and $570 per hour; Joy Teitel, senior associate, $410 and $460 per hour; Lee Phillips, partner, $660 and $690 per hour; Eric Custer, senior counsel, $460 and $485 per hour; Mark Lee, partner, $560 and $590 per hour; Charles Gomez, junior associate, $305 per hour; and Bridget McLaughlin and Lindy Williams, senior paralegals, $220 and $230 per hour, and $245 per hour, respectively. These rates are consistent with the rates typically charged by other highly-regarded southern California law firms for similar work by attorneys of comparable experience. *See e.g., Comite De Jornaleros De Redondo Beach v. City of Redondo Beach,* 2006 WL 4081215, *3 (C.D.Cal.2006) (finding that $600 was a reasonable hourly rate in 2006 for a partner at Morrison & Forster's Los Angeles office, who graduated from law school in 1991.) *See also Blecher Decl.* ¶ 31 (stating that the Manatt firm's hourly rates are reasonable given the firm's reputation and experience

in intellectual property and entertainment litigation, and music transactional matters.)

The Court overrules Plaintiff's objection that Defendants fees must be reduced because defense counsel billed in quarter-hour increments. Billing in quarter-hour increments is a common practice for federal litigators in Los Angeles. *U.S. v. 60,201.00 U.S. Currency,* 291 F.Supp.2d 1126, 1120-31 (C.D.Cal.2003). The Court also overrules Plaintiff's objection to Defendants' block-billing, as it does not appear that Defendants actually used block-billing; rather, the time entries provided to the Court specify which tasks were performed for each time entry. The Court will not reduce Defendants' fee award for either reason.

The Court also gives no weight to Plaintiff's contention that it was unreasonable for Defendants to hire a nationally-renowned law firm-with relatively high hourly rates-given the lack of complexity of this case. To the contrary, this case was far from routine, involving eighteen claims, entailing questions of the extraterritorial application of U.S. law, pled against numerous and only tenuously-related Defendants, seeking perhaps millions of dollars in damages. Far from being an overreaction to a simple case, Defendants' retention of reputable and skilled counsel to engage the multifarious allegations against them was eminently reasonable.

2. Plaintiff's Objections to Hours Expended

**\*9** First, the Court finds that the documentation Defendants provided-the summary chart and the daily time entries-is sufficient evidence of the tasks performed and fees charged to support their fee request. The Court also notes that Plaintiff has not contested Defendants' tabulation of the hours expended. Accordingly, the Court will rely on the chart in Exhibit A as an accurate calculation and sum of the fees charged for the hours worked by each attorney, and the total amount shown therein ($596,352) will be the starting point for the Court's determination of the lodestar. In addition, the Court will rely on Exhibit A for its categorization of the fees according to task, such as "Motion to dismiss SAC by Wilson," "Answer to SAC by Wilson," etc. With these considerations in mind, the Court will rule on Plaintiff's objections.

Plaintiff objects to paying Defendants' fees with regard to the motion to disqualify counsel; argues that the

hours charged for the six motions to dismiss are "grossly excessive"; and faults Defendants for duplicative billing, conducting conferences with defense counsel and clients, and spending more time on the Rule 26 disclosures than other defendants did. None of these objections is well taken.

First, Defendants' motion to disqualify Plaintiff's counsel was not "frivolous." The Court denied the motion, but it was not unreasonable or filed to harass. Indeed, given the complex litigation history between the parties, the Court found it worth stating that, despite denying the motion to disqualify, it would hold Mr. Flynn and Mr. Stillman to their declarations that Mr. Flynn would not appear in this case, or attend or participate in any mandatory meetings between the parties.

Second, the hours spent on the six motions to dismiss were reasonable. The Manatt firm filed one motion to dismiss for the Sievers/Lippin defendants, which was mooted when Plaintiff filed his FAC. The Manatt firm then filed a motion to dismiss the FAC on behalf of Brian Wilson, addressing only those claims pled against him. The Manatt firm also filed a motion to dismiss the FAC by Melinda Wilson. Then, the Sievers/Lippin defendants filed a motion to dismiss the FAC. Finally, after Plaintiff filed an SAC, the Manatt firm filed two more motions to dismiss: one on Brian Wilson's behalf, and the other for the Sievers/Lippin defendants. Defendants needed to file six motions to dismiss because the motions addressed themselves to three complaints (the Complaint, the First Amended Complaint (FAC), and the Second Amended Complaint (SAC)), whose eighteen causes of action were pled differently as to the four (or five, counting Melinda Wilson) defendants represented by the Manatt firm. Accordingly, the Court finds that this work was reasonable. In addition, the Court has reviewed the hours expended in prosecuting each motion and finds that they are reasonable in light of the number of claims involved and the complexity (and lack of clarity) of Plaintiff's allegations.

**\*10** Plaintiff also argues that the unreasonableness of Manatt's fees is illustrated by the fact that his counsel billed only 535 hours to litigate this action, less that 50% of the hours Manatt billed. This argument is unpersuasive. Defending against an over-pled complaint packed with a barrage of convoluted allegations often requires more work than maintaining such an action requires. In

addition, the greater amount of time defense counsel committed to this case was reflected in the higher quality of their work. *See Hensley,* 461 U.S. at 435 ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.") Ultimately, Plaintiff's counsel may have billed fewer hours, but Plaintiff also lost. Thus, in this case, the difference in hours that Plaintiff and Defendants spent has no bearing on the reasonableness of Defendants' work.

The Court overrules Plaintiff's objection to Defendants' claim for 21 hours spent preparing the Rule 26 disclosures. Defendants note that they needed to spend that much time on this task because Plaintiff did not take the lead in organizing these disclosures-a task that plaintiffs ordinarily undertake. Defendants will be compensated for all of these fees.

The Court also overrules Plaintiff's argument that the fee request should be reduced because of duplication of work. Several courts, including this Court and the Ninth Circuit, typically reduce fee awards when, upon an examination of submitted time records, duplicative efforts are found. *See, e.g., Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1210 (9th Cir.1985) (stating fees should be reduced "if a case was overstaffed and hours duplicated"); *Rodriguez v. United States of America,* No. CV 99-11821 CBM (C.D. Cal. June 2, 2006) (finding 20% reduction in hours acceptable after review of time records). The Court has reviewed the timesheets, and finds that they do not reflect duplicative work. The case was leanly staffed, attorneys performed tasks appropriate to their experience and billing rates, and certainly some amount of time must be spent on internal conferences and reviewing pleadings and memoranda in order to effectively litigate a case as a team. Because the timesheets do not indicate that these tasks were done in a duplicative manner, the Court will not reduce Defendants' fees on this ground. The Court also rejects Plaintiff's argument that the Manatt firm's fees are too high when compared to the total fees sought by other prevailing defendants represented by other counsel. Relative to the other firms, the Manatt firm "took the laboring oar," Sanctuary Defs' Reply 1:23-2:3, on many of the motions filed; accordingly, Manatt's bills are higher than the bills submitted by Sanctuary and David Leaf. This difference in fees further undermines Plaintiff's charge that the defendants engaged in duplicative billing, undertook unnecessary analysis, and conducted unnecessary conferences. Indeed, it is clear that

the defendants in this case coordinated their efforts to keep their attorney bills low and *avoid* duplication of work.

**\*11** The Court overrules Plaintiff's objections to defense counsel's 38 hours of conferences with counsel for other defendants in this action. Spending 38 hours over the course of two years to coordinate a defense against this complex action, with four different defense firms, representing differently-situated defendants, is reasonable.

However, the Court will deduct some time from the 96.5 hours ($56,255) spent consulting with Melinda Wilson on Brian Wilson's behalf. Although the Court recognizes the need to develop the facts of the case and consult with clients as to strategy, a non-trivial portion of that time was spent developing the facts related to Plaintiff's claim for fiduciary duty arising out of the alleged partnership between Plaintiff and Wilson dating back to the 1960s. Recognizing the impossibility of arriving at an accurate apportioning, the Court must nevertheless apportion time spent defending against this claim from time spent on the others. The Court therefore reduces that time by one fifth. Accordingly, the Court will deduct from Defendants' fee request one fifth of $56,255, that is, $11,251.

As stated above, the Court will reduce the time spent preparing the summary judgment motion on the fiduciary duty claim because the fees generated to defeat the portion of that claim based on the partnership between Plaintiff and Wilson from the 1960s are not recoverable. Defendants seek $75,152 for their preparation of the motion. In the Court's estimate, based on the summary judgment papers and the Court's order resolving the motion, approximately 50 percent of Defendants' efforts were expended on that portion of the motion. Accordingly, the Court will reduce Plaintiff's fee award by 50 percent of $75,152, that is, by $37,576.

Plaintiff also objects to Defendants' claim for 198.75 hours ($103,309) for case strategy, pleading review, document review, internal conferences, investigation, and research. Given the complexity of this case, and its two-year duration, the Court finds that that amount of time spent on these tasks is reasonable. However, recognizing that some of this time was spent with regard to the non-recoverable portion of the fiduciary duty claim, the Court will reduce this amount by five percent, that is, by $5,165.

Finally, Plaintiff objects to Defendants' claim for $23,501 for computerized legal research, stating, first, that the claim is not sufficiently documented, and, second, that costs for computerized research expenses are either disallowed or usually significantly reduced. The Ninth Circuit has not directly stated whether computerized legal research should be considered attorneys' fees or overhead. *See B & H Mfg. Co. v. Bright,* 2006 U.S. Dist. LEXIS 12249, *46 (E.D.Cal.2006). This Court agrees with the Seventh Circuit's view that "[t]he added cost of computerized research is normally matched with a corresponding reduction in the amount of time an attorney must spend researching. Therefore, we see no difference between a situation where an attorney researches manually and bills only the time spent and a situation where the attorney does the research on a computer and bills for both the time and the computer fee." *Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago,* 38 F.3d 1429, 1440-1441 (7th Cir.1994). However, analogizing computerized legal research to manual research in books also leads to the conclusion that some portion of the charges for computerized research must be viewed as overhead because law firms do not charge clients for books maintained in their law libraries. *See Cairns v. Franklin Mint Co.,* 115 F.Supp.2d 1185, 1189 (C.D.Cal.2000). Although the Court would be inclined to grant Defendants their computerized legal research fees, they are insufficiently documented. The Gomez Declaration states merely that "Manatt also billed $23,501 for computerized legal research," and includes one line item in Exhibit A saying the same thing. This is insufficient evidence to demonstrate that the requested fees were actually incurred in this litigation. Accordingly, the Court will reduce Defendants' fee request by $23,501.

**\*12**  Based on the above, the Court finds that the total of the deductions in this case is:

$$11,251 + 37,576 + 5,165 + 23,501 = \$77,493$$

Accordingly, the lodestar is:

$$596,352 77,493 = \$518,859$$

### D. The *Kerr* Factors

Having calculated the lodestar to equal $518,859, the Court will consider whether the *Kerr* factors require the Court to adjust the figure. In the Court's view, the staffing of this case was well-calibrated to the complexity and numerosity of the issues, and efficiently litigated. This case involved somewhat difficult questions relating to the extraterritorial application of the Lanham Act and California partnership law, and it took significant legal skill to successfully defend against this action. The hourly rates charged are within the norm for this service in this region, as discussed above. Defendants obtained a complete victory. The experience, reputation, and ability of the Manatt attorneys well-merit the fees sought. In fact, counsel wrote off a significant portion of their fees as a courtesy to their clients. In addition, the total amount Defendants seek is below amounts that other courts have affirmed as reasonable attorneys' fee awards in Lanham Act and copyright cases. *See, e.g., Taco Cabana International Inc., v. Two Pesos, Inc.,* 932 F.2d 1113 (5th Cir.1991) *aff'd,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (affirming $937,500 attorney fee award in Lanham Act case); *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.,* 253 F.3d 1332, 1335 (11th Cir.2001) (after summary judgment in Lanham Act claim, affirming award of $328,501.59 in fees and $26,417.79 in costs to one defendant, and $372,615.00 in fees and $21,953.00 in costs to another defendant.) The Court finds that none of the *Kerr* factors weighs in favor of adjusting the award.

### III. CONCLUSION

For the foregoing reasons, Court hereby GRANTS Defendants' motion and awards them attorneys' fees in the amount of $518,859, to be paid by Plaintiff within thirty (30) days of the issuance of this order. Thereafter, Defendants are entitled to post-judgment interest on the amount.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2709975

Footnotes

1   ANL was dismissed from this case on July 14, 2006, when the Court granted its motion to dismiss for lack of personal
    jurisdiction. ANL is not among the defendants seeking attorneys' fees.

2   The Court denies Plaintiff's request to postpone determination of this motion until after his merits appeal is adjudicated. An
    appeal on the merits does not deprive the district court of jurisdiction to award attorneys' fees. *Masalosalo by Masalosalo
    v. Stonewall Ins. Co.,* 718 F.2d 955, 957 (9th Cir.1983). Further, determining this motion now-prior to the Ninth Circuit's
    determination of the merits appeal-promotes judicial economy by allowing any appeal of the fee award to be consolidated
    with Plaintiff's merits appeal. *Id.* Plaintiff presents no compelling reason to do otherwise.

3   As discussed herein, several claims lacking a strictly independent basis for a fee award-the common law right of publicity
    claim, the Cal. Bus. & Prof.Code § 17200 claim, the civil conspiracy claim, and the interference claims-are clearly
    inextricably intertwined with claims that do provide an independent basis for fees. Thus, apportionment for those claims
    is not necessary. In addition, it is clear that the defense of those claims involved only a negligible amount of work; thus,
    even if appropriate, apportionment of those fees would be of little practical effect.

4   Plaintiff's counsel submitted a declaration purporting to explain that the Surrey Declaration was not misleading, and, 
    if it was, it was an innocent mistake. The Court finds this unconvincing. At a minimum, Plaintiff's counsel should have
    disclosed his relationship to Mr. Surrey. In any case, the claim was nevertheless not supported by any significant evidence
    of U.S. effect.

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT X

Alfred G. Rava, SBN 188318
Rava Law Firm
3667 Voltaire Street
San Diego, CA 92106
Phone: 619-238-1993
Fax: 619-374-7288
Email: alrava@cox.net

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**09/28/2017** at 01:49:17 PM

Clerk of the Superior Court
By Laura Melles,Deputy Clerk

Attorney for Plaintiff Rich Allison

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SAN DIEGO – CENTRAL JUSTICE CENTER

| | |
|---|---|
| RICH ALLISON,<br><br>                      Plaintiff,<br><br>v.<br><br>RED DOOR EPICUREAN, LLC, d/b/a THE RED DOOR RESTAURANT & WINE BAR; LADIES GET PAID; CLAIRE WASSERMAN; and DOES 1 through 50, Inclusive,<br><br>                      Defendants. | Case No.  37-2017-00036282-CU-CR-CTL<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR:**<br><br>1.  Violation of Civil Code § 51 - The Unruh Civil Rights Act;<br>2.  Violation of Civil Code § 51.5;<br>3.  Violation of Civil Code § 51.6 - The Gender Tax Repeal Act of 1995;<br>4.  Business & Professions Code § 125.6; and<br>5.  Negligence<br><br>UNLIMITED JURISDICTION |

All animals are equal, but some animals are more equal than others.
– George Orwell, *Animal Farm*

Plaintiff Rich Allison alleges the following:

## NATURE AND BASIS OF CLAIMS

1.  Imagine the uproar, the protests, and the calls for a boycott by feminists and equal rights advocates if Defendant Red Door Epicurean, LLC's Red Door Restaurant & Wine Bar, located in the heart of San Diego's Hillcrest neighborhood – the hub of San Diego's apparently all-inclusive LGBT community – had the temerity to host an event with the exclusionary title of "Men Get Drinks," for which the advertisements brazenly promised that only people with certain personal characteristics would be welcome, as follows:

1

**Bring friends—the more the merrier :)**

Male-identifying, non-binary folks are welcome. Sorry, girls!

2. Yet, as seen in the below excerpt from Exhibit 1 to this Complaint, Defendants Red Door, Ladies Get Paid, and Claire Wasserman had no problem advertising, marketing, sponsoring, hosting, employing, or otherwise at least aiding an event with the exclusionary title of "Ladies Get Drinks," which was held at Red Door on Tuesday, August 15, 2017, and for which the advertisements brazenly promised that the only people who were and who were not welcomed at this event in San Diego's Hillcrest neighborhood were the following:

**Bring friends—the more the merrier :)**

Female-identifying, non-binary folks are welcome. Sorry, guys!

3. On August 15, 2017, and at all times relevant to this Complaint, Plaintiff Rich Allison was not and is not a female-identifying, non-binary folk, but instead was and still is a heterosexual male and retired U.S. Marine Corps captain. Several days before attempting to attend Defendants' Ladies Get Drinks event, Mr. Allison registered for it through the www.eventbrite.com website. Then, on August 15, 2017, Mr. Allison attempted to enter the Red Door premises where the Ladies Get Drinks event was being held, when he was confronted by a Red Door bartender who kicked Mr. Allison out of the event because Mr. Allison was a man, despite Mr. Allison showing the Red Door bartender proof that Mr. Allison had registered for the event. Mr. Allison was kicked out of Defendant's Ladies Get Drinks event because of his sex, that is, because he was a male, and not a female, female-identifying, non-binary folk.  Defendants did indeed make it sorry for guys that evening by not allowing men, solely based on their sex, to attend this Ladies Get Drinks event that was advertised, marketed, sponsored, hosted, employed, or otherwise aided by Defendants Red Door, Ladies Get Paid, and Claire Wasserman.

4. After the Red Door bartender kicked Mr. Allison out of the Ladies Get Drinks event and into the street, Mr. Allison entered another entrance into the Red Door and into another Red Door barroom

Complaint for Injunctive Relief and Damages

1  that was not hosting the Ladies Get Drinks event.  Here, another Red Door bartender allowed Mr.

2  Allison to stay and buy a drink, which Mr. Allison. However, on information and belief, Mr. Allison

3  was denied the same discount on drinks that the women who were permitted to attend the Ladies Drink

4  Free event nearby received for their drinks. Defendants' failure to provide Mr. Allison a discount for

5  a beverage while women were provided a discount on their beverages required male patrons to pay a

6  Man Tax on drinks and services during the time the Ladies Get Drinks event was held at the Red Door.

7  5. Despite the many State of California anti-discrimination statutes, California Supreme Court

8  opinions, California Attorney General and Department of Fair Employment and Housing actions, and

9  California Department of Alcoholic Beverage Control regulations that prohibit California businesses

10  from treating patrons unequally based on their sex, and specifically condemn and forbid Ladies' Night

11  and Ladies' Day promotions that treat female and male patrons unequally, Defendants boldly

12  advertised, marketed, sponsored, hosted, employed, or otherwise aided a sex-based marketing

13  promotion that treated male and female patrons unequally based solely on their sex.

14  6. As a result of Defendants' unequal treatment of patrons based solely on their sex, Defendants

15  denied consumers the equal accommodations, advantages, facilities, privileges, or services they are

16  entitled to under California's Unruh Civil Rights Act, codified as Civil Code section 51.  Defendants'

17  Ladies Get Drinks event violated California's strong public policy to eradicate sex discrimination,

18  reflected in the many California statutes that prohibit businesses from discriminating against patrons

19  based on their sex.  Defendants' Ladies Get Drinks event violated California Civil Code sections 51,

20  51.5, and 51.6 (Gender Tax Repeal Act of 1995), and California Business & Professions Code section

21  125.6, all of which prohibit California businesses from treating patrons unequally based on their sex.

22  7.  For a business operating in the progressive state of California, in the year 2017, to provide

23  accommodations, advantages, privileges, or services to only female patrons, is as repugnant and

24  unlawful as businesses being involved in a "Caucasian Night" or a "Heterosexual Night" and denying

25  admission and discounted drinks and other accommodations, advantages, privileges, or services to

26  patrons of color or to gay or lesbian patrons, respectively.   Simply put, it is against many California

27  laws for a business to discriminate against patrons based on their sex or other personal characteristics,

28  such as race or sexual orientation, which should surprise no one.

Complaint for Injunctive Relief and Damages

8.  The seminal California Supreme Court case on businesses that treat male and female consumers unequally based on their sex, *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, held that Ladies' Day and Ladies' Night promotions that treated patrons unequally based on sex by charging male patrons more than female patrons for the same thing—<u>as little fifteen cents more</u>—violated the Unruh Civil Rights Act.  *Koire* found "Public policy in California strongly supports eradication of discrimination based on sex. The Unruh Act expressly prohibits sex discrimination by business enterprises." *Id*. at 37.

9.  Defendants' no-men-allowed Ladies Get Drinks event repudiated hundreds of years of women's struggles to be viewed as being equal to men and is typical of old-fashioned sexism that might also advise a young woman that her best chance for a happy life is to ace her home economics class and learn how to make queso from Velveeta to catch a good man.  Not only has the California Supreme Court twice unanimously expressed its disapproval of how Ladies' Day and Ladies' Night promotions harm women, the United States Supreme Court has similarly weighed in as well about "romantic paternalism" directed at women.  In *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973), the U.S. Supreme Court ruled the military must provide its female members with the same housing and medical benefits as it provides its male members. Justice William J. Brennan Jr. wrote that the military's unequal treatment of men and women is yet another example of one of those types of traditional sex discrimination that ostensibly appears to benefit women, but is "rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage."

10. The Judicial Counsel of California's jury instructions for violations of Civil Code sections 51, 51.5, and 51.6, i.e., CACI 3060, 3061, and 3062, respectively, reflect the Judicial Counsel's recognition of the California Supreme Court ruling in *Koire* that sex-based pricing promotions are "per se injurious."  The Directions For Use for CACI 3060, 3061, and 3062 all recognize that a plaintiff asking for only the statutory damages provided by Civil Code section 52 for violations of section 51, 51.5, and 51.6, respectively, does not have to prove that he or she was harmed or that defendant's conduct was a substantial factor in causing the plaintiff's harm, because harm is presumed.

11. *Koire* was upheld by the California Supreme Court in its most recent opinion on sex-based promotions, *Angelucci v. Century Supper Club* (2007) 41 Cal.4[th] 160, wherein the Court unanimously

4

Complaint for Injunctive Relief and Damages

1   ruled that men who were charged more than women to enter a supper club on Ladies Night did not

2   have to assert their right to equal treatment to the offending business in order to have standing for a

3   Civil Code section 51, 51.5, or 51.6 claim.

4       12. Defendants' no-men-allowed Ladies Get Drinks event caused discontent, animosity, harm,

5   resentment, or envy among the sexes, constituted arbitrary, unreasonable, and/or invidious

6   discrimination, constituted a willful and malicious injury to Plaintiff, and contravened California's

7   historical effort to eradicate sex discrimination.  Defendants willfully and maliciously injured Plaintiff

8   during its Ladies Get Drinks event by knowingly and intentionally denying Plaintiff admission,

9   discounted drinks, and other services based solely on Plaintiff's sex.

10       13. The California Department of Fair Employment and Housing ("DFEH"), the State agency

11   charged with preventing unlawful discrimination in places of public accommodation, has published a

12   brochure specifically addressing the unlawfulness of sex-based events.  This DFEH brochure is

13   attached   hereto   as   Exhibit   2,   and   can   also   be   found   at

14   http://www.dfeh.ca.gov/DFEH/Publications/PublicationDocs/UnruhActBrochure.pdf.

15       14. The California Department of Justice and the California Bureau of Gambling Control has

16   similarly expressed its condemnation of sex-based events, specifically their disapproval of the

17   proliferation of no-men-allowed poker tournaments hosted by California's licensed card rooms.  The

18   California Attorney General and the Bureau of Gambling Control issued a Gambling Establishment

19   Advisory, attached hereto as Exhibit 3, warned card rooms that ladies-only poker tournaments violated

20   the Unruh Act.  The Attorney General warned that it may be unlawful under the Unruh Act to simply

21   advertise tournaments as "ladies only" even if men were in fact admitted.  This Advisory can be found

22   at http://ag.ca.gov/gambling/pdfs/NUM8LOT.pdf.

23       15. By this action, Plaintiff Rich Allison seeks redress for Defendants' above no-men-allowed

24   Ladies Get Drinks event that treated men and women unequally based solely on their sex.

25   **PARTIES**

26       16. Plaintiff Rich Allison is a man and a California resident.

27       17. On information and belief, at all times relevant hereto, Defendant Red Door Epicurean, LLC

28   is a California limited liability company, doing business as "The Red Door Restaurant & Wine Bar"

Complaint for Injunctive Relief and Damages

located at 741 W. Washington Street in San Diego, and holding California Secretary of State limited liability company registration number 200907810011, and California Department of Alcoholic Beverage Control License Number 477296.

18. On information and belief, at all times relevant hereto, Defendant Ladies Get Paid is a business of unknown form not registered with the California Secretary of State.

19. On information and belief, at all times relevant hereto, Defendant Claire Wasserman is the sole proprietor and/or founder of Ladies Get Paid.

20. The true names and capacities of Does 1 through 50 are unknown to Plaintiff.  When their true names and capacities are learned, Plaintiff will amend this complaint accordingly.   Plaintiff is informed and believes, and on that basis alleges, each fictitiously named defendant is responsible in some way for the occurrences herein alleged, and those defendants proximately caused plaintiff and the other male consumers' damages.  Each reference in this complaint to "defendant," "defendants," or a specifically named defendant refers to all defendants sued under fictitious names.

21. Unless otherwise alleged, whenever reference is made in this complaint to any act of "defendant," "defendants," or to a specifically named defendant, such as "McFadden's" such allegation shall mean that each defendant acted individually and jointly with the other defendant named in the complaint.

22. Unless otherwise alleged, whenever reference is made in this complaint to any act or omission of any corporate or business defendant, such allegation shall mean that such corporation or other business defendant committed or omitted to act as in this complaint through its officers, members, directors, stockholders, employees, agents, and/or representatives while they were acting within the actual or apparent scope of their authority.

23. At all relevant times alleged herein, each defendant has been each the agent, alter-ego, representative, partner, joint venturer, employee, or assistant of the other defendants and has acted within the course and scope of said agency, alter-ego, representation, partnership, or joint venture with the knowledge, notification, authorization, and consent of each of the other defendants.

Complaint for Injunctive Relief and Damages

**JURISDICTION AND VENUE**

24.     This court has subject matter jurisdiction over this matter pursuant to Article VI, section 10 of the California Constitution because this action is a cause not given by statute to other trial courts, and seeks (among other relief) a permanent injunction.  Subject matter jurisdiction is further premised on, *inter alia*, California Civil Code sections 51, 51.5, and 51.6, and Business and Professions Code section 125.6.

25.     This court has personal jurisdiction over defendants in this action because all defendants do sufficient business in California and have sufficient minimum contacts in California to render the exercise of personal jurisdiction over them by California courts consistent with traditional notions of fair play and substantial justice.

26.     Venue is proper in this court because the unequal treatment alleged herein occurred in San Diego, California.


**FIRST CAUSE OF ACTION**

**Violation of The Unruh Civil Rights Act, Civil Code Section 51**

**Refusing to Allow Plaintiff Admission Into Defendants' Ladies Get Drinks Event**

27.     Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

28.     By denying Plaintiff admission into the no-men-allowed Ladies Get Drinks event and providing admission to only female patrons, Defendants intentionally denied equal accommodations, advantages, facilities, privileges, or services to Plaintiff based on his sex, which is prohibited by the Unruh Civil Rights Act, codified as Civil Code section 51.

29.     A substantial motivating reason for Defendants' conduct was the Plaintiff's sex.

30.     Defendants' conduct harmed Plaintiff.

31.     Defendants' conduct was a substantial factor in causing harm to Plaintiff.

32.     Defendants' unequal treatment of customers subjects Defendants to injunctive relief.

Complaint for Injunctive Relief and Damages

**SECOND CAUSE OF ACTION**

**Violation of The Unruh Civil Rights Act, Civil Code Section 51**

**Denial Of Discounted Drink Services To Plaintiff**

33.     Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

34.     By denying Plaintiff discounted drink services that were provided to only female patrons during the no-men-allowed Ladies Get Drinks event, Defendants intentionally denied equal accommodations, advantages, facilities, privileges, or services to Plaintiff based on his sex, which is prohibited by the Unruh Civil Rights Act, codified as Civil Code section 51.

35.     A substantial motivating reason for Defendants' conduct was the Plaintiff's sex.

36.     Defendants' conduct harmed Plaintiff.

37.     Defendants' conduct was a substantial factor in causing harm to Plaintiff.

38.     Defendants' unequal treatment of customers subjects Defendants to injunctive relief.

**THIRD CAUSE OF ACTION**

**Violation of Civil Code Section 51.5**

**Refusing to Allow Plaintiff Admission Into Defendants' Ladies Get Drinks Event**

39.     Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

40.     By denying Plaintiff admission into the no-men-allowed Ladies Get Drinks event and providing admission to only female patrons, Defendants discriminated against Plaintiff based on his sex, which is prohibited by Civil Code section 51.5.

41.     A substantial motivating reason for Defendants' conduct was the Plaintiff's sex.

42.     Defendants' conduct harmed Plaintiff.

43.     Defendants' conduct was a substantial factor in causing harm to Plaintiff.

44.     Defendants' unequal treatment of customers subjects Defendants to injunctive relief.

8

## FOURTH CAUSE OF ACTION

### Violation of Civil Code Section 51.5

### Denial Of Discounted Drink Services To Plaintiff

45.     Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

46.     By denying Plaintiff discounted drink services that were provided to only female patrons during the no-men-allowed Ladies Get Drinks event, Defendants discriminated against Plaintiff based on his sex, which is prohibited by Civil Code section 51.5.

47.     A substantial motivating reason for Defendants' conduct was the Plaintiff.

48.     Defendants' conduct harmed Plaintiff.

49.     Defendants' conduct was a substantial factor in causing harm to Plaintiff.

50.     Defendants' unequal treatment of customers subjects Defendants to injunctive relief.

## FIFTH CAUSE OF ACTION

### The Gender Tax Repeal Act Of 1995, Civil Code Section 51.6

### Denial Of Discounted Drink Services To Plaintiff

51.     Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

52.     By denying Plaintiff discounted drink services during the course of the no-men-allowed Ladies Get Drinks event, Defendants discriminated with respect to the price charged for services of similar or like kind, against Plaintiff because of his gender, which is prohibited by Civil Code section 51.6.

53.     A substantial motivating reason for Defendants' conduct was the Plaintiff's sex.

54.     Defendants' conduct harmed Plaintiff.

55.     Defendants' conduct was a substantial factor in causing harm to Plaintiff.

56.     Defendants' unequal treatment of customers subjects Defendants to injunctive relief.

9

Complaint for Injunctive Relief and Damages

## SIXTH CAUSE OF ACTION

### Violation of Business & Professions Code Section 125.6

57.     Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

58.     Defendant Red Door Epicurean, LLC is the holder of California Department of Alcoholic Beverage Control License Number 477296.

59.     Upon information and belief, by denying Plaintiff admission to Defendants' no-men-allowed Ladies Get Drinks event, and denying Plaintiff discounted drinks during the Ladies Get Drinks event, Red Door Epicurean, LLC made a discrimination or restriction in the performance of its ABC-licensed activity of providing and serving alcoholic beverages to the public on the basis of the patrons' sex, as proscribed by California Business & Profession Code section 125.6.

60.     Red Door Epicurean, LLC's conduct harmed Plaintiff.

61.     Red Door Epicurean, LLC's conduct subjects Red Door Epicurean, LLC to injunctive relief

## SEVENTH CAUSE OF ACTION

### Negligence

62.     Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if the same were set out at length herein.

63.     Red Door Epicurean, LLC had a duty of care to avoid injury to Plaintiff.  Specifically, Red Door Epicurean, LLC had a duty of care to avoid treating Plaintiff unequally based on their sex.

64.     Red Door Epicurean, LLC selected, hired, retained, and contracted with persons and/or entities that harmed Plaintiff, as described above.

65.     Red Door Epicurean, LLC had the authority and duty to supervise, prohibit, control, and/or regulate these persons and/or entities that harmed Plaintiff.

66.     Red Door Epicurean, LLC knew or reasonably should have known that persons or entities would indeed harm Plaintiff.

10

67.     Red Door Epicurean, LLC breached its duty of care by (1) denying Plaintiff his right to equal treatment, and (2) failing to use reasonable care in selecting, hiring, supervising, retaining, or contracting with persons or entities that harmed Plaintiff.

68.     In the alternative, Red Door Epicurean, LLC negligently conceived, implemented, and/or aided the no-men-allowed Ladies Get Drinks event.

69.     As a direct and proximate result of Red Door Epicurean, LLC negligence and negligent hiring, supervision, and retention, Plaintiff suffered damages in amounts to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1.      For an order providing equitable and injunctive relief permanently enjoining Defendants from engaging in unequal treatment of consumers based on the consumers' sex in violation of Civil Code sections 51, 51.5, and 51.6, and Business & Profession Code section 125.6.

2.      For statutory damages pursuant to Civil Code section 52;

3.      For costs incurred herein, including attorneys' fees to the extent allowable by statute, including but not limited to Civil Code sections 52 and Code of Civil Procedure section 1021.5; and

4.      For such other and further legal and equitable relief as this court may deem proper.


Dated: September 28, 2017                    Respectfully submitted,


                                    By: /s/ Alfred G. Rava
                                         Alfred G. Rava
                                         Rava Law Firm

11

Complaint for Injunctive Relief and Damages

# EXHIBIT 1



**AUG**
**15**

## Ladies Get Drinks: San Diego

by Ladies Get Paid

Free      **Register**

### DESCRIPTION

The lady revolution is starting. But first, let's have drinks.

Ladies Get Paid is a community of women who help each other rise up at work and get paid what they deserve. We hope you'll join our meetup at The Red Door so we can get to know you and figure out more ways LGP can support you.

**Bring friends—the more the merrier :)**
Female-identifying, non-binary folks are welcome. Sorry, guys!

**Stay in touch**
Be sure to follow Ladies Get Paid Chicago on Facebook, Twitter, and Instagram for updates.

### DATE AND TIME

Tue, August 15, 2017

6:00 PM – 8:00 PM PDT

### LOCATION

Bar By Red Door
741 W. Washington Street
San Diego, CA 92103
View Map



### TAGS

Things To Do In San Diego, CA    Networking    Business

**SHARE WITH FRIENDS**



## Ladies Get Paid

Organizer of Ladies Get Drinks: San Diego

 Website

Ladies Get Paid helps women achieve their professional goals and get paid fairly. We speak up about challenges in the workplace, and provide the tools you need to take the next steps in your career.

www.ladiesgetpaid.com

PROFILE      CONTACT

## More Events From This Organizer

MON, AUG 14 6:30 PM
**Ladies Get Drinks: Burlington**

The Spot, Burlington

FREE        #Business    #Networking

TUE, AUG 15 6:00 PM
**Ladies Get Drinks: Chicago**

Plymouth Rooftop Bar & Grill, Chicago

FREE        #Business    #Networking

# EXHIBIT 2

## Protections Under the Law Against Sex Discrimination

The Unruh Civil Rights Act (Civ. Code, § 51), originally enacted in 1959, was designed to protect the rights of Californians from arbitrary discrimination and to guarantee their rights to full and equal access to all public accommodations regardless of sex.

Discrimination by business establishments on the basis of sex is against the law. It is unlawful for any business that is open to the general public to discriminate against a patron based on any of the following classifications: sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation. The Unruh Act protection is not limited to these classifications. It is an Unruh Act violation for a business to offer special treatment, whether preferential or detrimental, to one class of patrons regardless of the business' motives for doing so.

## Businesses that are Governed by the Unruh Civil Rights Act

The list below includes examples of businesses that are covered by the Unruh Act. This list is non-exhaustive, and may include any place of public accommodation regardless of whether the entity is a traditional business or non-profit entity.

- Bars and Nightclubs.
- Restaurants.
- Hotels and Motels.
- Retail Shops.
- Golf Courses.
- Fitness Clubs or Gyms.
- Theaters.
- Hospitals.
- Barber Shops and Beauty Salons.
- Non-Profit Organizations (open to the public).
- Public Agencies.
- Housing Accommodations.

## Filing a Complaint

The Department of Fair Employment and Housing (DFEH or Department) is charged with the task of upholding the Unruh Act, and ensuring that its laws and principles are not violated. If you believe you are a victim of unlawful discrimination, do not hesitate to call the DFEH and file a complaint following these steps:

- Contact the DFEH by calling the toll free number at (800) 884-1684 to schedule an appointment.
- "Be prepared to present specific facts about the alleged harassment of discrimination.
- "Provide any copies you may have of documents that support the charges in the complaint.
- Keep records and documents about the complaint, such as receipts, stubs, bills, applications, flyers, witness contact information, and other materials.

## Examples of Sex-Based Discrimination Under the Unruh Violations

The following are examples of potential violations of the Unruh Act. The list is not meant to be exhaustive, and there is other conduct that may violate the Act.
- Providing free admission, discounts, or promotional gifts to only one sex.
- Charging men and women different prices for comparable services, such as clothing alterations, haircuts, dry cleaning, or drinks at a restaurant or bar.

- Maintaining "women only" or "men only" exercise areas of a fitness club or gym and excluding or deterring the opposite sex from those areas.
- Establishing a "women only" or "men only" business establishment which would otherwise be completely open to the public.
- Excluding one sex from a business premises during certain times.
- Posting signs or adopting policies for "women recommended" or "men preferred."
- Requiring members of one sex to submit to searches to gain admittance to a business.

establishment while providing admittance to members of the other sex without the same level or degree of search.
- Promoting a business with "ladies night" discounts on admission and services.
- Denying access to a business, such as a nightclub to a particular sex, or giving preference to one sex over the other.



Complaints must be filed within one year from the last act of discrimination. The DFEH will conduct an impartial investigation.

The Department is not an advocate for either the person complaining or the person complained against. The Department represents the state. The DFEH will, if possible, try to assist both parties to resolve the complaint. If a voluntary settlement cannot be reached, and there is sufficient evidence to establish a violation of the law, the Department may issue an accusation and litigate the case before the Fair Employment and Housing Commission or in civil court. This law provides for a variety of remedies that may include the following:

- Out-of-pocket expenses.
- Cease and desist orders.
- Damages for emotional distress.
- Statutory damages of three times the amount of actual damages, or a minimum of $4,000 for each offense.

For more information, contact the DFEH
Toll Free (800) 884-1684
Sacramento area and out-of-state (916) 227-0551
Videophone for the Deaf (916) 226-5285
E-mail  contact.center @dfeh.ca.gov
Web site  www.dfeh.ca.gov
Facebook
http://www.facebook.com /#!/pages/Department-of-Fair-Employment-and-Housing/183801915445
YouTube  http://www.youtube.com /califdfeh
Twitter  http://twitter.com /DFEH

In accordance with the California Government Code and Americans with Disabilities Act requirements, this publication can be made available in Braille, large print, computer disk, or tape cassette as a disability-related reasonable accommodation for an individual with a disability. To discuss how to receive a copy of this publication in an alternative format, please contact the DFEH at the telephone numbers and links above.



State of California
**DEPARTMENT OF
FAIR EMPLOYMENT & HOUSING**





## References

1. California Civil Code section 51.
2. *Rotary Club of Duarte v. Board of Directors* (1987) 178 Cal.App.3d 1035. A non-profit club was a business establishment under the Unruh Act because it offered its members substantial "commercial advantages and business benefits." Membership in these kinds of organizations is a privilege or advantage under the Unruh Act. Thus, termination of membership based on sex is prohibited.
3. *Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594. By offering the public access to its facilities, the County Club became a business establishment under the Unruh Act and could not exclude women.
4. *Ibister v. Boys' Club of Santa Cruz* (1985) 40 Cal.3d 72. A non-profit activities center for boys was a place of public accommodation, and excluding an entire class of patrons, such as women, was illegal.
5. *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160. It was a violation of the Unruh Act for a night club to charge its male patrons a higher price for admission. The patrons need not affirmatively request nondiscriminatory treatment, but rather, are entitled to it. The Unruh Act imposes a compulsory duty upon business establishments to serve all persons without arbitrary discrimination.
6. *Koire v. Metro Car Wash (* 1985) 40 Cal.3d 24. The Unruh Act broadly condemns any business establishment's policy of gender-based price discounts.

# Unruh Civil Rights Act

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

# EXHIBIT 3



# BUREAU OF GAMBLING CONTROL

EDMUND G. BROWN JR.
**Attorney General**

---

**Mathew J. Campoy
Acting Bureau Chief**

| **NUMBER 8** | **GAMBLING ESTABLISHMENT ADVISORY** | **January 18, 2008** |

# "LADIES ONLY TOURNAMENTS"

It has come to the attention of the Bureau of Gambling Control that some gambling establishments conduct "ladies only" poker tournaments that exclude men from participating, or admit them on different terms from those accorded to women.  It is the Bureau's view that such tournaments may violate California's anti-discrimination laws.

Under the Unruh Civil Rights Act (Civil Code sections 51 and 51.5), businesses may not discriminate in admittance, prices, or services offered to customers based on the customers' sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation.  "Ladies only" tournaments or any other promotional events that fail to admit men and women to advertised activities on an equal basis regardless of sex are unlawful.  It may also be unlawful under the Unruh Act to advertise tournaments as "ladies only" even if men are in fact admitted.

The Bureau will approve only those events that include the following features: the event will be open to all customers, the promotional gifts will be given equally to all event participants, the fees and prices will be the same for all event participants, any discounts will not be based on gender or another personal characteristic protected by the Unruh Act, and the event's promotional materials do not advertise gender-based discounts or imply a gender-based entrance policy or any other unlawful discriminatory practice.

Gambling establishments should take notice that pursuant to Business and Professions Code section 125.6, violations of the Unruh Act are cause for discipline under the Gambling Control Act.

---

*For more information regarding this advisory, contact the California Department of Justice, Bureau of Gambling Control at (916) 263-3408.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT Y

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**10/13/2017** at 10:19:25 AM

Clerk of the Superior Court
By Ivana Salas, Deputy Clerk

Alfred G. Rava, SBN 188318
Rava Law Firm
3667 Voltaire Street
San Diego, CA 92106
Phone: 619-238-1993
Fax: 619-374-7288
Email: alrava@cox.net

Attorney for Plaintiff Steve Frye

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN DIEGO – NORTH COUNTY REGIONAL CENTER

| | |
|---|---|
| STEVE FRYE,<br><br>Plaintiff,<br><br>v.<br><br>SAGE CLIENT 349, LLC d/b/a SPRINGHILL SUITES OCEANSIDE; DJ MANDYMIXES; MANDY RODRIGUEZ; and DOES 1 through 50, Inclusive,<br><br>Defendants. | Case No.  37-2017-00038591-CU-CR-NC<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR:**<br><br>1. Violation of Civil Code § 51 - The Unruh Civil Rights Act;<br>2. Violation of Civil Code § 51.5;<br>3. Business & Professions Code § 125.6; and<br>4. Negligence<br><br>UNLIMITED JURISDICTION |

All animals are equal, but some animals are more equal than others.
– George Orwell, *Animal Farm*

Plaintiff Steve Frye alleges the following:

**NATURE AND BASIS OF CLAIMS**

1. Imagine the uproar, the protests, and the calls for a boycott by feminists and equal rights advocates if Defendant Sage Client 349, LLC's Springhill Suites Oceanside hotel ("Springhill Suites") had the temerity to host an event with the exclusionary title of "Men's Night Out," for which the advertisements brazenly promised that only people with certain personal characteristics would be welcome, as follows:

1

**Who can attend?**
This event is open to ALL men 21 and over! You just have to be pre-registered and like to have fun!  Invite and register as many friends as you like!

2.  Yet, as seen in the below excerpt from Exhibit 1 to this Complaint, Defendants Springhill Suites, DJ MandyMixes, and Mandy Rodriquez had no problem advertising, marketing, sponsoring, hosting, employing, or otherwise at least aiding an event with the exclusionary title of "Girls' Night Out," which was held at Springhill Suites on Saturday, August 26, 2017, and for which the advertisements brazenly promised that only women were welcome at this event in this supposed place of public accommodations, as follows:

**Who can attend?**
This event is open to ALL women 21 and over! You just have to be pre-registered and like to have fun!  Invite and register as many friends as you like!

3.  At all times relevant to this Complaint, Plaintiff Steve Frye was and still is a man. In May of 2017, after seeing an advertisement for Defendants' Girls' Night Out that read that the event was seemingly only "open to ALL ladies 21 and over," Mr. Frye sent Defendants DJ MandyMixes and Mandy Rodriquez an email asking if he could attend the event given that he was a man and the ad seemed to be saying that this was a no-men-allowed event at this place of public accommodation.  DJ MandyMixes and Mandy Rodriquez promptly replied to Mr. Frye with an email that read as follows:

Hi Steve - Thank you for your interest in my dance party! As of right now it's just for the girls. But I'm looking into possibly having a separate dance party that would be guys and gals. Would you like me to add you to my interest list so you get an update when that happens?

2

Complaint for Injunctive Relief and Damages

4.  Nevertheless, thinking that a hotel, i.e., a place of public accommodation, would not host a no-men-allowed event, on August 26, 2017, the date of the event, Mr. Frye attempted to enter the Springhill Suites' premises where the Girls' Night Out event was being held, and he was told by a woman sitting at the entrance to the Girls' Night Out event that he could not attend. Mr. Frye was then told by a Springhill Suites employee at the Springhill Suites hotel registration or front desk that the event was for women only.  Defendants refused Mr. Frye admission into the Girls' Night Out event because of his sex. This event was advertised, marketed, sponsored, hosted, employed, or otherwise at least aided by Defendants Springhill Suites, DJ MandyMixes, and Mandy Rodriquez.

5.  Despite the many State of California anti-discrimination statutes, California Supreme Court opinions, California Attorney General and Department of Fair Employment and Housing actions, and California Department of Alcoholic Beverage Control regulations that prohibit California businesses from treating patrons unequally based on their sex, and specifically condemn and forbid Ladies' Night and Ladies' Day promotions that treat female and male patrons unequally, Defendants boldly advertised, marketed, sponsored, hosted, employed, or at least aided a sex-based marketing promotion that treated male and female patrons unequally based solely on their sex.

6.  As a result of Defendants' unequal treatment of patrons based solely on their sex, Defendants denied consumers the equal accommodations, advantages, facilities, privileges, or services they are entitled to under California's Unruh Civil Rights Act, codified as Civil Code section 51.  Defendants' Girls' Night Out event violated California's strong public policy to eradicate sex discrimination, reflected in the many California statutes that prohibit businesses from discriminating against patrons based on their sex.  Defendants' Girls' Night Out event violated California Civil Code sections 51 and 51.5, and California Business & Professions Code section 125.6, all of which prohibit California businesses from treating patrons unequally based on their sex.

7.  For a business operating in the progressive state of California, in the year 2017, to provide accommodations, advantages, privileges, or services to only female patrons, is as repugnant and unlawful as businesses being involved in a "Caucasian Night" or a "Heterosexual Night" and denying admission and discounted drinks and other accommodations, advantages, privileges, or services to patrons of color or to gay or lesbian patrons, respectively.   Simply put, it is against many California

3

Complaint for Injunctive Relief and Damages

laws for a business to discriminate against patrons based on their sex or other personal characteristics, such as race or sexual orientation, which should surprise no one.

8.   The seminal California Supreme Court case on businesses that treat male and female consumers unequally based on their sex, *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, held that Ladies' Day and Ladies' Night promotions that treated patrons unequally based on sex by charging male patrons more than female patrons for the same thing—as little fifteen cents more—violated the Unruh Civil Rights Act.  *Koire* found "Public policy in California strongly supports eradication of discrimination based on sex. The Unruh Act expressly prohibits sex discrimination by business enterprises." *Id*. at 37.

9.   Defendants' no-men-allowed Girls' Night Out event repudiated hundreds of years of women's struggles to be viewed as being equal to men and is typical of old-fashioned sexism that might also advise a young woman that her best chance for a happy life is to ace her home economics class and learn how to make queso from Velveeta to catch a good man.  Not only has the California Supreme Court twice unanimously expressed its disapproval of how Ladies' Day and Ladies' Night promotions harm women, the United States Supreme Court has similarly weighed in as well about "romantic paternalism" directed at women.  In *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973), the U.S. Supreme Court ruled the military must provide its female members with the same housing and medical benefits as it provides its male members. Justice William J. Brennan Jr. wrote that the military's unequal treatment of men and women is yet another example of one of those types of traditional sex discrimination that ostensibly appears to benefit women, but is "rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage."

10. The Judicial Counsel of California's jury instructions for violations of Civil Code sections 51, 51.5, and 51.6, i.e., CACI 3060, 3061, and 3062, respectively, reflect the Judicial Counsel's recognition of the California Supreme Court ruling in *Koire* that sex-based pricing promotions are "per se injurious."  The Directions For Use for CACI 3060, 3061, and 3062 all recognize that a plaintiff asking for only the statutory damages provided by Civil Code section 52 for violations of section 51, 51.5, and 51.6, respectively, does not have to prove that he or she was harmed or that defendant's conduct was a substantial factor in causing the plaintiff's harm, because harm is presumed.

4

Complaint for Injunctive Relief and Damages

11. *Koire* was upheld by the California Supreme Court in its most recent opinion on sex-based promotions, *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, wherein the Court unanimously ruled that men who were charged more than women to enter a supper club on Ladies Night did not have to assert their right to equal treatment to the offending business in order to have standing for a Civil Code section 51 or 51.5 claim.

12. Defendants' no-men-allowed Girls' Night Out event caused discontent, animosity, harm, resentment, or envy among the sexes, constituted arbitrary, unreasonable, and/or invidious discrimination, constituted a willful and malicious injury to Plaintiff, and contravened California's historical effort to eradicate sex discrimination.  Defendants willfully and maliciously injured Plaintiff during its Girls' Night Out event by knowingly and intentionally denying Plaintiff admission and other services and goods based solely on Plaintiff's sex.

13. The California Department of Fair Employment and Housing ("DFEH"), the State agency charged with preventing unlawful discrimination in places of public accommodation, has published a brochure specifically addressing the unlawfulness of sex-based events.  This DFEH brochure is attached hereto as Exhibit 2, and can also be found at http://www.dfeh.ca.gov/DFEH/Publications/PublicationDocs/UnruhActBrochure.pdf.

14. The California Department of Justice and the California Bureau of Gambling Control has similarly expressed its condemnation of sex-based events, specifically their disapproval of the proliferation of no-men-allowed poker tournaments hosted by California's licensed card rooms.  The California Attorney General and the Bureau of Gambling Control issued a Gambling Establishment Advisory, attached hereto as Exhibit 3, warned card rooms that ladies-only poker tournaments violated the Unruh Act.  The Attorney General warned that it may be unlawful under the Unruh Act to simply advertise tournaments as "ladies only" even if men were in fact admitted.  This Advisory can be found at http://ag.ca.gov/gambling/pdfs/NUM8LOT.pdf.

15. By this action, Plaintiff Steve Frye seeks redress for Defendants' no-men-allowed Girls' Night Out event that treated men and women unequally based solely on their sex.

Complaint for Injunctive Relief and Damages

**PARTIES**

16. Plaintiff Steve Frye is a man and a California resident.

17. On information and belief, at all times relevant hereto, Defendant Sage Client 349, LLC is a Colorado limited liability company, registered with the California Secretary of State as limited liability company Number 201131210196, and doing business as "Springhill Suites Oceanside" located at 110 North Myers Street, Oceanside, California, and holding California Department of Alcoholic Beverage Control License Number 47-532652.

18. On information and belief, at all times relevant hereto, Defendant DJ MandyMixes is a business of unknown form not registered with the California Secretary of State.

19. On information and belief, at all times relevant hereto, Defendant Mandy Rodriguez is the sole proprietor and/or alter ego of DJ MandyMixes.

20.  The true names and capacities of Does 1 through 50 are unknown to Plaintiff.  When their true names and capacities are learned, Plaintiff will amend this complaint accordingly.  Plaintiff is informed and believes, and on that basis alleges, each fictitiously named defendant is responsible in some way for the occurrences herein alleged, and those defendants proximately caused plaintiff and the other male consumers' damages.  Each reference in this complaint to "defendant," "defendants," or a specifically named defendant refers to all defendants sued under fictitious names.

21. Unless otherwise alleged, whenever reference is made in this complaint to any act of "defendant," "defendants," or to a specifically named defendant, such as "McFadden's" such allegation shall mean that each defendant acted individually and jointly with the other defendant named in the complaint.

22. Unless otherwise alleged, whenever reference is made in this complaint to any act or omission of any corporate or business defendant, such allegation shall mean that such corporation or other business defendant committed or omitted to act as in this complaint through its officers, members, directors, stockholders, employees, agents, and/or representatives while they were acting within the actual or apparent scope of their authority.

23. At all relevant times alleged herein, each defendant has been each the agent, alter-ego, representative, partner, joint venturer, employee, or assistant of the other defendants and has acted

6

Complaint for Injunctive Relief and Damages

within the course and scope of said agency, alter-ego, representation, partnership, or joint venture with the knowledge, notification, authorization, and consent of each of the other defendants.

## JURISDICTION AND VENUE

24.     This court has subject matter jurisdiction over this matter pursuant to Article VI, section 10 of the California Constitution because this action is a cause not given by statute to other trial courts, and seeks (among other relief) a permanent injunction.  Subject matter jurisdiction is further premised on, *inter alia*, California Civil Code sections 51, 51.5, and 51.6, and Business and Professions Code section 125.6.

25.     This court has personal jurisdiction over defendants in this action because all defendants do sufficient business in California and have sufficient minimum contacts in California to render the exercise of personal jurisdiction over them by California courts consistent with traditional notions of fair play and substantial justice.

26.     Venue is proper in this court because the unequal treatment alleged herein occurred in Oceanside, California.

## FIRST CAUSE OF ACTION

### Violation of The Unruh Civil Rights Act, Civil Code Section 51

### Against All Defendants

### Refusing to Allow Plaintiff Admission Into Defendants' Girls' Night Out Event

27.     Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

28.     By denying Plaintiff admission into the no-men-allowed Girls' Night Out event and providing admission to only female patrons, Defendants intentionally denied equal accommodations, advantages, facilities, privileges, or services to Plaintiff based on his sex, which is prohibited by the Unruh Civil Rights Act, codified as Civil Code section 51.

29.     A substantial motivating reason for Defendants' conduct was the Plaintiff's sex.

Complaint for Injunctive Relief and Damages

30. Defendants' conduct harmed Plaintiff.

31. Defendants' conduct was a substantial factor in causing harm to Plaintiff.

32. Defendants' unequal treatment of customers subjects Defendants to injunctive relief.

### SECOND CAUSE OF ACTION

**Violation of Civil Code Section 51.5**

**Against All Defendants**

**Refusing to Allow Plaintiff Admission Into Defendants' Girls' Night Out Event**

33. Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

34. By denying Plaintiff admission into the no-men-allowed Girls' Night Out event and providing admission to only female patrons, Defendants discriminated against Plaintiff based on his sex, which is prohibited by Civil Code section 51.5.

35. A substantial motivating reason for Defendants' conduct was the Plaintiff's sex.

36. Defendants' conduct harmed Plaintiff.

37. Defendants' conduct was a substantial factor in causing harm to Plaintiff.

38. Defendants' unequal treatment of customers subjects Defendants to injunctive relief.

### THIRD CAUSE OF ACTION

**Against Defendant Sage Client 349, LLC**

**Violation of Business & Professions Code Section 125.6**

39. Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

40. Defendant Sage Client 349, LLC is the holder of California Department of Alcoholic Beverage Control License Number 47-532652.

41. Upon information and belief, by denying Plaintiff admission to Defendants' no-men-allowed Girls' Night Out event, Sage Client 349, LLC made a discrimination or restriction in the

8

performance of its ABC-licensed activity of providing and serving alcoholic beverages to the public on the basis of the patrons' sex, as proscribed by California Business & Profession Code section 125.6.

42.  Sage Client 349, LLC's conduct harmed Plaintiff.

43.  Sage Client 349, LLC's conduct subjects Sage Client 349, LLC to injunctive relief

## FOURTH CAUSE OF ACTION

### Against Defendant Sage Client 349, LLC

### Negligence

44.  Plaintiff incorporates in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if the same were set out at length herein.

45.  Sage Client 349, LLC had a duty of care to avoid injury to Plaintiff.  Specifically, Sage Client 349, LLC had a duty of care to avoid treating Plaintiff unequally based on his sex.

46.  Sage Client 349, LLC selected, hired, retained, and contracted with persons and/or entities that harmed Plaintiff, as described above.

47.  Sage Client 349, LLC had the authority and duty to supervise, prohibit, control, and/or regulate these persons and/or entities that harmed Plaintiff.

48.  Sage Client 349, LLC knew or reasonably should have known that persons or entities would indeed harm Plaintiff.

49.  Sage Client 349, LLC breached its duty of care by (1) denying Plaintiff his right to equal treatment, and (2) failing to use reasonable care in selecting, hiring, supervising, retaining, or contracting with persons or entities that harmed Plaintiff.

50.  In the alternative, Sage Client 349, LLC negligently conceived, implemented, and/or aided the no-men-allowed Girls' Night Out event.

51.  As a direct and proximate result of Sage Client 349, LLC negligence and negligent hiring, supervision, and retention, Plaintiff suffered damages in amounts to be proven at trial.

9

Complaint for Injunctive Relief and Damages

1

## **PRAYER FOR RELIEF**

2       WHEREFORE, Plaintiff prays for the following relief:

3       1.      For an order providing equitable and injunctive relief permanently enjoining

4  Defendants from engaging in unequal treatment of consumers based on the consumers' sex in violation

5  of Civil Code sections 51 and 51.5, and Business & Profession Code section 125.6.

6       2.      For statutory damages pursuant to Civil Code section 52;

7       3.      For costs incurred herein, including attorneys' fees to the extent allowable by statute,

8  including but not limited to Civil Code sections 52 and Code of Civil Procedure section 1021.5; and

9       4.      For such other and further legal and equitable relief as this court may deem proper.

10

11  Dated: October 4, 2017                    Respectfully submitted,

12

13                                      By: /s/ Alfred G. Rava
                                            Alfred G. Rava
14                                          Rava Law Firm

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

Complaint for Injunctive Relief and Damages

# EXHIBIT 1

Dance Party! A Girls' Night Out! Tickets, Sat, Aug 26, 2017 at 5:00 PM | Eventbrite

Case 2:18-cv-03093-JFW-AS    Document 80-1    Filed 06/03/19    Page 342 of 361    Page ID #:2322



**AUG**
**26**

## Dance Party! A Girls' Night Out!

by DJ MandyMixes

$15    Tickets

**TICKET SALES HAVE ENDED**

Can't wait to see you on the dance floor on August 26th!

**DESCRIPTION**

## TICKETS ARE SOLD OUT, BUT CLICK THE GREEN "TICKETS" TO BE ADDED TO THE WAITLIST.

#MMDP2017

**DATE AND TIME**

Sat, August 26, 2017

5:00 PM – 9:00 PM PDT

**LOCATION**

SpringHill Suites San Diego Oceanside/Downtown
110 North Myers Street
Oceanside, CA 92054

View Map

**FRIENDS WHO ARE GOING**

 Connect

Dance Party! A Girls' Night Out! Tickets, Sat, Aug 26, 2017 at 5:00 PM | Eventbrite

Case 2:18-cv-03093-JFW-AS Document 80-1 Filed 06/03/19 Page 343 of 361 Page ID #:2323



Come dance the night away on the rooftop with ocean views to songs YOU want to hear...from "back in the day" to today! Here are the details:

Saturday, August 26, 2017
5pm-9pm
SpringHill Suites by Marriott Oceanside
110 North Myers Street, Oceanside, CA 92054
**DON'T FORGET TO CHECK OUT THE FAQS AT THE VERY BOTTOM**

**THEME:** Let's See Your Sparkle!

**ATTIRE:**
Sparkles! A sequin dress, a sparkly t-shirt, a bedazzled jean jacket or you FAVE sparkly jewelry!
Sparkles aren't your thing? No worries, come as you are! Have fun with it!

**FOOD:**
Appetizers provided!
Looking for a full dinner? *Consider having dinner before the party at "Hello Betty" right next door!

**BEVERAGE:**
Fully stocked *CASH BAR with beer, wine and cocktails right on the rooftop!
CASH ONLY! Remember to BRING CASH!

*Please only purchase your beverages from the on-site event bar NOT via Hello Betty as we have an agreement with the hotel. Thank you!

**SLUMBER PARTY!**
Get a hotel room that leads right to the dance floor! We only have 10 available for our party.

VIEW: VENUE & HOTEL ROOM TOUR

BOOK HOTEL ROOM

# FAQs

Dance Party! A Girls' Night Out! Tickets, Sat, Aug 26, 2017 at 5:00 PM | Eventbrite

Case 2:18-cv-03093-JFW-AS   Document 80-1   Filed 06/03/19   Page 344 of 361   Page ID
#:2324

**Can my friends still get tickets at the door?**
Sorry, no. The event is sold out and has reached its max capacity.

**Who can attend?**
This event is open to ALL ladies 21 and over! You just have to be
pre-registered and like to have fun! Invite and register as many
friends as you like!

**Why should I attend?**
Check out all the fun we had in the video coverage from the 1st
Annual Dance Party in 2016!

**Are there special discounted rates if I want to spend the night
at the hotel?**
Yep! In fact we encourage you to grab some friends and make it a
slumber party! Rooms are only $209 per night! Only 10 Rooms
available at this discounted price. Each room has a balcony that
connects directly to the dance floor with a gorgeous ocean view!
ROOMS sleep 4-8 people! (2 Queens OR 1 King, PLUS a pull-out
couch/mini-living room) BOOK HERE by August 1, 2017.

**Why does the event end at 9pm?**
We are sharing the balcony with other hotel guests; therefore the
hotel requires the music to be turned off at 9pm; however you are
welcome to hang out on the balcony for awhile afterwards!

**Are there ID requirements or an age limit to enter the event?**

It is a 21+ party, Wristbands will be handed out at the door that you
must wear to identify you are with our group.

**What are my transport/parking options getting to the event?**

PARKING:

- On-site is valet: $15 per day/$26 overnight (no self-parking)
- Metered Street Parking: $1 per hour, don't forget your coins!
- FREE Parking Garage: Oceanside Transit Station about 3
  blocks away (195 S. Tremont St.)
- There are other (fee-based) parking lots/garages in the area as
  well.

PUBLIC TRANSPORTATION:

- Amtrak & Sprinter stations are located within 1-2 blocks from
  the hotel

**What can/can't I bring to the event?**

No outside food or drinks, with the exception of food from the "Hello
Betty" Restaurant

**Where can I contact the organizer with any questions?**

Mandy@MandyMixes.com

**Is my registration/ticket transferrable?**

Yes, if you can't attend and want to give away your admission you
can make adjustments to your ticket here on Eventbrite or email

Dance Party! A Girls' Night Out! Tickets, Sat, Aug 26, 2017 at 5:00 PM | Eventbrite

Case 2:18-cv-03093-JFW-AS    Document 80-1    Filed 06/03/19    Page 345 of 361    Page ID #:2325

Mandy@MandyMixes.com with the name(s) of the new attendee no later than 5pm PST, August 25, 2017.

**TAGS**

Things To Do In Oceanside, CA | Party | Music

**SHARE WITH FRIENDS**

☐ ☐ ☐ ☐ ☐

---

# DJ MandyMixes

### Organizer of Dance Party! A Girls' Night Out!

🔲 mandymixes     🔲 mandymixes

DJ MandyMixes has been a lover of music since she first stepped on the dance floor at the age of 3 at her uncle's wedding and threw a fit when the DJ had to leave at the end of the night. She was in show choir throughout high school and has informally been the DJ and/or Emcee at many family and friend's parties almost her whole life. She spent 10 years in the event planning industry before becoming a full-time DJ and that experience gave her the ability to understand the details and importance of keeping the flow of your event moving while keeping the mood lively. With nearly 5 years experience and 125+ events since its inception, Mandy Mixes DJ & MC, is your experienced solution for your corporate and private events

**Why hire MandyMixes?**

• Pre-event planning and collaboration included in all packages

• Experienced DJ and MC knows how to read the crowd and keep the event flowing smoothly

• Affordable rates with all equipment, set up and pre-planning included

• Did you know people respond better to a female voice?

**Get the best for your event!**

  - Focus on your guests, not on the technical details

  - Reduce stress with pre-planning and collaboration

  - Feel at ease knowing the music is handled and the event will stay on schedule

  - Relax and enjoy your event as the music sets the mood

Contact or BOOK DJ MANDYMIXES

See DJ MandyMixes in Action!

**PROFILE**     **CONTACT**

# EXHIBIT 2

## Protections Under the Law Against Sex Discrimination

The Unruh Civil Rights Act (Civ. Code, § 51), originally enacted in 1959, was designed to protect the rights of Californians from arbitrary discrimination and to guarantee their rights to full and equal access to all public accommodations regardless of sex.

Discrimination by business establishments on the basis of sex is against the law. It is unlawful for any business that is open to the general public to discriminate against a patron based on any of the following classifications: sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation. The Unruh Act protection is not limited to these classifications. It is an Unruh Act violation for a business to offer special treatment, whether preferential or detrimental, to one class of patrons regardless of the business' motives for doing so.

## Businesses that are Governed by the Unruh Civil Rights Act

The list below includes examples of businesses that are covered by the Unruh Act. This list is non-exhaustive, and may include any place of public accommodation regardless of whether the entity is a traditional business or non-profit entity.

- Bars and Nightclubs.
- Restaurants.
- Hotels and Motels.
- Retail Shops.
- Golf Courses.
- Fitness Clubs or Gyms.
- Theaters.
- Hospitals.
- Barber Shops and Beauty Salons.
- Non-Profit Organizations (open to the public).
- Public Agencies.
- Housing Accommodations.

## Filing a Complaint

The Department of Fair Employment and Housing (DFEH or Department) is charged with the task of upholding the Unruh Act, and ensuring that its laws and principles are not violated. If you believe you are a victim of unlawful discrimination, do not hesitate to call the DFEH and file a complaint following these steps:

- Contact the DFEH by calling the toll free number at (800) 884-1684 to schedule an appointment.
- "Be prepared to present specific facts about the alleged harassment of discrimination.
- "Provide any copies you may have of documents that support the charges in the complaint.
- Keep records and documents about the complaint, such as receipts, stubs, bills, applications, flyers, witness contact information, and other materials.

## Examples of Sex-Based Discrimination Under the Unruh Violations

The following are examples of potential violations of the Unruh Act. The list is not meant to be exhaustive, and there is other conduct that may violate the Act.
- Providing free admission, discounts, or promotional gifts to only one sex.
- Charging men and women different prices for comparable services, such as clothing alterations, haircuts, dry cleaning, or drinks at a restaurant or bar.

- Maintaining "women only" or "men only" exercise areas of a fitness club or gym and excluding or deterring the opposite sex from those areas.
- Establishing a "women only" or "men only" business establishment which would otherwise be completely open to the public.
- Excluding one sex from a business premises during certain times.
- Posting signs or adopting policies for "women recommended" or "men preferred."
- Requiring members of one sex to submit to searches to gain admittance to a business.

establishment while providing admittance to members of the other sex without the same level or degree of search.
- Promoting a business with "ladies night" discounts on admission and services.
- Denying access to a business, such as a nightclub to a particular sex, or giving preference to one sex over the other.



Complaints must be filed within one year from the last act of discrimination. The DFEH will conduct an impartial investigation.

The Department is not an advocate for either the person complaining or the person complained against. The Department represents the state. The DFEH will, if possible, try to assist both parties to resolve the complaint. If a voluntary settlement cannot be reached, and there is sufficient evidence to establish a violation of the law, the Department may issue an accusation and litigate the case before the Fair Employment and Housing Commission or in civil court. This law provides for a variety of remedies that may include the following:

■ Out-of-pocket expenses.
■ Cease and desist orders.
■ Damages for emotional distress.
■ Statutory damages of three times the amount of actual damages, or a minimum of $4,000 for each offense.

For more information, contact the DFEH
Toll Free (800) 884-1684
Sacramento area and out-of-state (916) 227-0551
Videophone for the Deaf (916) 226-5285
E-mail  contact.center @dfeh.ca.gov
Web site  www.dfeh.ca.gov
Facebook
http://www.facebook.com /#!/pages/Department-of-Fair-Employment-and-Housing/183801915445
YouTube  http://www.youtube.com /califdfeh
Twitter  http://twitter.com /DFEH

In accordance with the California Government Code and Americans with Disabilities Act requirements, this publication can be made available in Braille, large print, computer disk, or tape cassette as a disability-related reasonable accommodation for an individual with a disability. To discuss how to receive a copy of this publication in an alternative format, please contact the DFEH at the telephone numbers and links above.



State of California
**DEPARTMENT OF
FAIR EMPLOYMENT & HOUSING**





## References

1. California Civil Code section 51.
2. *Rotary Club of Duarte v. Board of Directors* (1987) 178 Cal.App.3d 1035. A non-profit club was a business establishment under the Unruh Act because it offered its members substantial "commercial advantages and business benefits." Membership in these kinds of organizations is a privilege or advantage under the Unruh Act. Thus, termination of membership based on sex is prohibited.
3. *Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594. By offering the public access to its facilities, the County Club became a business establishment under the Unruh Act and could not exclude women.

4. *Ibister v. Boys' Club of Santa Cruz* (1985) 40 Cal.3d 72. A non-profit activities center for boys was a place of public accommodation, and excluding an entire class of patrons, such as women, was illegal.
5. *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160. It was a violation of the Unruh Act for a night club to charge its male patrons a higher price for admission. The patrons need not affirmatively request nondiscriminatory treatment, but rather, are entitled to it. The Unruh Act imposes a compulsory duty upon business establishments to serve all persons without arbitrary discrimination.
6. *Koire v. Metro Car Wash (* 1985) 40 Cal.3d 24. The Unruh Act broadly condemns any business establishment's policy of gender-based price discounts.

## Unruh Civil Rights Act

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

# EXHIBIT 3



# BUREAU OF GAMBLING CONTROL

EDMUND G. BROWN JR.
**Attorney General**

_____

**Mathew J. Campoy
Acting Bureau Chief**

| **NUMBER 8** | **GAMBLING ESTABLISHMENT ADVISORY** | **January 18, 2008** |

## "LADIES ONLY TOURNAMENTS"

It has come to the attention of the Bureau of Gambling Control that some gambling establishments conduct "ladies only" poker tournaments that exclude men from participating, or admit them on different terms from those accorded to women.  It is the Bureau's view that such tournaments may violate California's anti-discrimination laws.

Under the Unruh Civil Rights Act (Civil Code sections 51 and 51.5), businesses may not discriminate in admittance, prices, or services offered to customers based on the customers' sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation.  "Ladies only" tournaments or any other promotional events that fail to admit men and women to advertised activities on an equal basis regardless of sex are unlawful.  It may also be unlawful under the Unruh Act to advertise tournaments as "ladies only" even if men are in fact admitted.

The Bureau will approve only those events that include the following features: the event will be open to all customers, the promotional gifts will be given equally to all event participants, the fees and prices will be the same for all event participants, any discounts will not be based on gender or another personal characteristic protected by the Unruh Act, and the event's promotional materials do not advertise gender-based discounts or imply a gender-based entrance policy or any other unlawful discriminatory practice.

Gambling establishments should take notice that pursuant to Business and Professions Code section 125.6, violations of the Unruh Act are cause for discipline under the Gambling Control Act.

_For more information regarding this advisory, contact the California Department of Justice, Bureau of Gambling Control at (916) 263-3408._

1
2

# **EXHIBIT Z**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case Summary - Online Services | LA Court

Español  Tiếng Việt  한국어  中文 հայերեն

## THE SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

Search

**Home**    Online Services       **Forms, Filings & Files**    **Self-Help**       **Divisions**          **Jury**           **General Info**
           Pay Fines, Search Records...   Forms, Filing Fees...    Self-Rep, Info, FAQs...   Civil, Criminal, Family...   Jury Duty Portal, Q&A...   Courthouses, ADA ...

ONLINE SERVICES

# Case Access

LANGUAGE ACCESS



English ▼

## CASE INFORMATION

PRINT    NEW SEARCH

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

**Case Number:** BC437103
LOREN STONE VS FOUR SEASONS HOTELS LIMITED

**Filing Courthouse:** Stanley Mosk Courthouse

**Filing Date:** 05/05/2010
**Case Type:** Other Commercial/Business Tort (not fraud/ breach of contract) (General Jurisdiction)
**Status:** Legacy Judgment 01/29/2013

Click here to access document images for this case
If this link fails, you may go to the Case Document Images site and search using the case number displayed on this page

## FUTURE HEARINGS

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

None

## PARTY INFORMATION

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

ARIAS OZZELLO & GIGNAC LLP - Attorney for Plaintiff

CROUCH HARRY - Real Party in Interest

DBA FOUR SEASONS HOTEL WESTLAKE VILLAGECA - Defendant

FOUR SEASONS HOTELS LIMITED - Defendant

FRYE STEVE - Real Party in Interest

GOLDSTEIN HOWARD A. ESQ. - Attorney for Plaintiff

GREIFINGER DAVID ESQ. - Attorney for Plaintiff

LIPTON KENNETH M. LAW OFFICES OF - Attorney for Plaintiff

SILVER & FREEDMAN APLC - Attorney for Defendant

STONE LOREN - Plaintiff

WEBSTER KAPLAN SPRUNGER LLP - Attorney for Defendant

WESTLAKE WELLBEING PROPERTIES LLC - Defendant

WOODWARD CHRIS - Real Party in Interest

Case Summary - Online Services Court

## DOCUMENTS FILED

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

### Documents Filed (Filing dates listed in descending order)

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:

01/17/2012   09/09/2010

**02/01/2013** Notice of Entry of Judgment
Filed by Loren Stone (Plaintiff)

**01/29/2013** Order
Filed by Loren Stone (Plaintiff)

**01/28/2013** Miscellaneous-Other
Filed by Loren Stone (Plaintiff)

**01/28/2013** Miscellaneous-Other
Filed by Westlake Wellbeing Properties LLC (Defendant)

**01/28/2013** Declaration
Filed by Westlake Wellbeing Properties LLC (Defendant)

**01/28/2013** Declaration
Filed by Westlake Wellbeing Properties LLC (Defendant)

**01/08/2013** Stipulation and Order to use Certified Shorthand Reporter
Filed by Real Party in Interest

**01/07/2013** Notice of Related Case
Filed by Plaintiff/Petitioner

**01/04/2013** Reply/Response
Filed by Loren Stone (Plaintiff)

**12/31/2012** Objection Document
Filed by Real Party in Interest

**12/31/2012** Declaration
Filed by Real Party in Interest

**12/28/2012** Declaration
Filed by Loren Stone (Plaintiff)

**12/28/2012** Declaration
Filed by Loren Stone (Plaintiff)

**12/28/2012** Declaration
Filed by Loren Stone (Plaintiff)

**12/28/2012** Supplemental Declaration
Filed by Loren Stone (Plaintiff)

**12/28/2012** Response
Filed by Loren Stone (Plaintiff)

**11/02/2012** Order Appointing Court Approved Reporter as Official Reporter Pro Tempore
Filed by Real Party in Interest

**10/30/2012** Notice
Filed by Loren Stone (Plaintiff)

**10/30/2012** Opposition Document
Filed by Westlake Wellbeing Properties LLC (Defendant)

**10/26/2012** Case File - Public

**10/26/2012** Declaration
Filed by Loren Stone (Plaintiff)

**10/26/2012** Declaration
Filed by Loren Stone (Plaintiff)

**10/26/2012** Notice of Motion
Filed by Loren Stone (Plaintiff)

**10/23/2012** Amended Proof of Service
Filed by Real Party in Interest

**10/23/2012** Amended Proof of Service
Filed by Real Party in Interest

**10/09/2012** Declaration
Filed by Loren Stone (Plaintiff)

**10/09/2012** Declaration
Filed by Loren Stone (Plaintiff)

**10/09/2012** Declaration
Filed by Loren Stone (Plaintiff)

**10/09/2012** Notice
Filed by Loren Stone (Plaintiff)

**10/05/2012** Objection Document
Filed by Real Party in Interest

**09/20/2012** Points and Authorities
Filed by Real Party in Interest

**09/20/2012** Objection Document
Filed by Harry Crouch (Real Party in Interest)

**06/08/2012** Order
Filed by Loren Stone (Plaintiff)

**06/06/2012** Supplemental Declaration
Filed by Loren Stone (Plaintiff)

**05/24/2012** Substitution of Attorney
Filed by Westlake Wellbeing Properties LLC (Defendant)

**03/14/2012** Notice
Filed by Loren Stone (Plaintiff)

**02/21/2012** Notice
Filed by Loren Stone (Plaintiff)

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP   01/17/2012   09/09/2010

**01/17/2012** DECLARATION OF MARK A. OZZELLO IN SUPPORT OF MOTION OF THE PLAINTIFF CLASS FOR AN ORDER: (1) GRANTING PRELIMINARY APPROVAL TO T[IE IROPOSED CLASS-ACTION SETTLEMENT; ETC

**01/17/2012** Declaration
Filed by Loren Stone (Plaintiff)

**01/17/2012** Motion
Filed by Loren Stone (Plaintiff)

**01/17/2012** RR _ NOTICE OF MOTIOITIF THE PLAINTIFF CL1SA ORI)ER: _ .4 C.., (1) GRANTING PRELIM1ARY APPROVAL TO THE &ROPQ$ CLASS-ACTION SETTLEMT, ETC

**12/12/2011** NOIICI OF KII.ATII) CASIS

**12/12/2011** Notice of Related Case
Filed by Plaintiff/Petitioner

**12/07/2011** PEREMPTORY CHALLENGE TO THE HONORABLE MICHAEL STERN; DECLARATION OF MICHELLE C. CUENCA, ESQ., IN SUPPORT THEREOF

**10/05/2011** NOTICE OF SETTING I)AII FOR MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEM ENT

**10/05/2011** Notice
Filed by Loren Stone (Plaintiff)

**10/03/2011** Minute Order

**09/01/2011** NOTICE OF SETTLEMENT AND INTETION TO FILE MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

**09/01/2011** Notice of Settlement
Filed by Loren Stone (Plaintiff)

**07/26/2011** Minute Order

**06/17/2011** Minute Order

**06/03/2011** DEFENDANT WESTLAKE WELLBEING. PROPERTIES, LLCS ANSWER TO PLAINTIFF LOREN STONES SECOND AMENDED COMPLAINT

**06/03/2011** Answer to Second Amended Complaint
Filed by Westlake Wellbeing Properties LLC (Defendant)

**05/04/2011** Minute Order

**04/21/2011** NOTICE OF NON-OPPOSITION TO PLAINTIFFS MOTION FOR LEAVE TO AMEND CLASS ACTION COMPLAINT

**04/21/2011** Notice
Filed by Defendant/Respondent

**04/01/2011** NOTICE OF ASSOCIATION OF COUNSEL

**04/01/2011** Association of Attorney
Filed by Loren Stone (Plaintiff)

**03/22/2011** NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND CLASSACTION COMPLAINT; SUPPORTING MEMORANDUM; DECLARATION OF DAVID R. GRE1FINGER

**03/22/2011** Minute Order

**03/22/2011** Motion for Leave
Filed by Loren Stone (Plaintiff)

**02/04/2011** PROOF OF SERVICE BY FIRSTCLASS MAILO CIVIL

**02/04/2011** Proof of Service (not Summons and Complaint)
Filed by Loren Stone (Plaintiff)

**01/31/2011** NOTICE RE: CONTINUANCE OF HEARING

**01/31/2011** NOTICE RE: CONTINUANCE OF HEARING

**01/31/2011** NOTICE RE: CONTINUANCE OF HEARING

**01/31/2011** NOTICE RE: CONTINUANCE OF HEARING

**01/31/2011** Notice Re: Continuance of Hearing and Order
Filed by Clerk

**01/31/2011** Notice Re: Continuance of Hearing and Order
Filed by Clerk

**10/19/2010** Minute Order

**09/21/2010** Minute Order

**09/21/2010** NOTICE OF CONTINUANCE OF CASE MANAGEMENT CONFERECE

**09/21/2010** Notice Re: Continuance of Hearing and Order
Filed by Loren Stone (Plaintiff)

**09/14/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**09/14/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**09/14/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**09/14/2010** Notice of Case Management Conference
Filed by Clerk

**09/13/2010** Minute Order

**09/10/2010** Minute Order

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP   01/17/2012   09/09/2010

**09/09/2010** DEFENDANT WESTLAKE WELLBEING PROPERTIES, LLCS ANSWER TO PLAINTIFF LOREN STONES FIRST AMENDED COMPLAINT

**09/09/2010** Challenge To Judicial Officer - Cause (170.1/170.3)
Filed by Westlake Wellbeing Properties LLC (Defendant)

**09/09/2010** PEREMPTORY CHALLENGE TO THE HONORABLE DANIEL BUCKLEY; DECLARATION OF MICHELLE C. CUENCA, ESQ., IN SUPPORT THEREOF

**09/09/2010** Answer to First Amended Complaint
Filed by Westlake Wellbeing Properties LLC (Defendant); dba Four Seasons Hotel Westlake VillageCA (Defendant)

**08/25/2010** CASE MANAGEMENT STATEMENT

**08/25/2010** Case Management Statement
Filed by Defendant/Respondent

**08/16/2010** Case Management Statement
Filed by Plaintiff/Petitioner

**08/16/2010** CASE MANAGEMENT STATEMENT

**08/04/2010** AMENDMENT TO COMPLAINT

**08/04/2010** Amendment to Complaint
Filed by Loren Stone (Plaintiff)

**06/30/2010** AMENDMENT TO COMPLAINT

**06/30/2010** Amendment to Complaint
Filed by Loren Stone (Plaintiff)

**06/08/2010** PROOF OF SERVICE SUMMONS & COMPLAINT

**06/08/2010** Proof of Service (not Summons and Complaint)
Filed by Loren Stone (Plaintiff)

**05/26/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**05/26/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**05/26/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**05/26/2010** Notice of Case Management Conference
Filed by Clerk

**05/06/2010** SUMMONS

**05/05/2010** CLASS-ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELWF AND CIVIL PENALTIES I. VIOLATION OF CIVIL CODE 51.6(B); ETC.

**05/05/2010** Complaint
Filed by Loren Stone (Plaintiff)

**05/05/2010** Case File - Public

**05/03/2010** Summons
Filed by Loren Stone (Plaintiff)

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP  01/17/2012  09/09/2010

## PROCEEDINGS HELD

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

### Proceedings Held (Proceeding dates listed in descending order)

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
09/10/2010

**01/29/2013** at 3:00 PM in Department 310
Status Conference - **Held**

**01/08/2013** at 10:00 AM in Department 310
Unknown Event Type - **Held**

**11/02/2012** at 11:00 AM in Department 322
(Final Hearing; Matter continued) -

**10/19/2012** at 3:00 PM in Department 322
Court Order - **Held**

**06/08/2012** at 4:00 PM in Department 322
Court Order (Court Order; Court makes order) -

**04/19/2012** at 11:00 AM in Department 322
Hearing on Motion for Preliminary Approval of Settlement - **Held**

**03/09/2012** at 3:00 PM in Department 322
Court Order - **Held**

**02/10/2012** at 2:00 PM in Department 323
Unknown Event Type - **Held**

**01/24/2012** at 08:45 AM in Department 14
Non-Appearance Case Review - **Held**

**01/11/2012** at 08:46 AM in Department 14
Non-Appearance Case Review - **Held**

**12/15/2011** at 08:45 AM in Department 14
Unknown Event Type - **Held**

**10/17/2011** at 10:00 AM in Department 14
Non-Jury Trial (Court Trial - Short Cause; Vacated) -

**10/03/2011** at 08:45 AM in Department 14
Final Status Conference (Final Status Conference; Case Deemed Settled) -

**07/26/2011** at 08:45 AM in Department 14
Post-Mediation Status Conference - **Held**

**06/17/2011** at 08:45 AM in Department 14
Status Conference - **Held - Continued**

**05/04/2011** at 08:45 AM in Department 14
Post-Mediation Status Conference - **Held - Motion Granted**

**03/22/2011** at 08:45 AM in Department 14
Post-Mediation Status Conference (Conference-Post Mediation Status; Trial Date Set) -

**10/19/2010** at 08:45 AM in Department 14
Case Management Conference (Conference-Case Management; Trial Date Set) -

**09/21/2010** at 08:30 AM in Department 35
Case Management Conference - **Not Held - Advanced and Vacated**

**09/13/2010** at 10:46 AM in Department 1
(Order ReAssignment of Case; Transferred to different departmnt) -

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP   09/10/2010

**09/10/2010** at 09:30 AM in Department 35
Unknown Event Type - **Held**

**05/21/2010** at 08:30 AM in Department 324
Court Order (Court Order; Court makes order) -

**03/22/2010** at 08:45 AM in Department 14
Post-Mediation Status Conference

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP   09/10/2010

## REGISTER OF ACTIONS

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

### Register of Actions (Listed in descending order)

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
03/14/2012   03/22/2011

**02/01/2013** Notice of Entry of Judgment
Filed by Loren Stone (Plaintiff)

**01/29/2013** at 3:00 PM in Department 310
Status Conference - **Held**

**01/29/2013** Order
Filed by Loren Stone (Plaintiff)

**01/28/2013** Miscellaneous-Other
Filed by Westlake Wellbeing Properties LLC (Defendant)

**01/28/2013** Declaration
Filed by Westlake Wellbeing Properties LLC (Defendant)

**01/28/2013** Declaration
Filed by Westlake Wellbeing Properties LLC (Defendant)

**01/28/2013** Miscellaneous-Other
Filed by Loren Stone (Plaintiff)

**01/08/2013** at 10:00 AM in Department 310
Unknown Event Type - **Held**

**01/08/2013** Stipulation and Order to use Certified Shorthand Reporter
Filed by Real Party in Interest

**01/07/2013** Notice of Related Case
Filed by Plaintiff/Petitioner

**01/04/2013** Reply/Response
Filed by Loren Stone (Plaintiff)

**12/31/2012** Objection Document
Filed by Real Party in Interest

**12/31/2012** Declaration
Filed by Real Party in Interest

**12/28/2012** Declaration
Filed by Loren Stone (Plaintiff)

**12/28/2012** Declaration
Filed by Loren Stone (Plaintiff)

**12/28/2012** Supplemental Declaration
Filed by Loren Stone (Plaintiff)

**12/28/2012** Declaration
Filed by Loren Stone (Plaintiff)

**12/28/2012** Response
Filed by Loren Stone (Plaintiff)

**11/02/2012** at 11:00 AM in Department 322
(Final Hearing; Matter continued) -

**11/02/2012** Order Appointing Court Approved Reporter as Official Reporter Pro Tempore
Filed by Real Party in Interest

**10/30/2012** Notice
Filed by Loren Stone (Plaintiff)

**10/30/2012** Opposition Document
Filed by Westlake Wellbeing Properties LLC (Defendant)

**10/26/2012** Case File - Public

**10/26/2012** Declaration
Filed by Loren Stone (Plaintiff)

**10/26/2012** Declaration
Filed by Loren Stone (Plaintiff)

**10/26/2012** Notice of Motion
Filed by Loren Stone (Plaintiff)

**10/23/2012** Amended Proof of Service
Filed by Real Party in Interest

**10/23/2012** Amended Proof of Service
Filed by Real Party in Interest

**10/19/2012** at 3:00 PM in Department 322
Court Order - **Held**

**10/09/2012** Declaration
Filed by Loren Stone (Plaintiff)

**10/09/2012** Declaration
Filed by Loren Stone (Plaintiff)

**10/09/2012** Declaration
Filed by Loren Stone (Plaintiff)

**10/09/2012** Notice
Filed by Loren Stone (Plaintiff)

**10/05/2012** Objection Document
Filed by Real Party in Interest

**09/20/2012** Objection Document
Filed by Harry Crouch (Real Party in Interest)

**09/20/2012** Points and Authorities
Filed by Real Party in Interest

**06/08/2012** at 4:00 PM in Department 322
Court Order (Court Order; Court makes order) -

**06/08/2012** Order
Filed by Loren Stone (Plaintiff)

**06/06/2012** Supplemental Declaration
Filed by Loren Stone (Plaintiff)

**05/24/2012** Substitution of Attorney
Filed by Westlake Wellbeing Properties LLC (Defendant)

**04/19/2012** at 11:00 AM in Department 322
Hearing on Motion for Preliminary Approval of Settlement - **Held**

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP   03/14/2012   03/22/2011

**03/14/2012** Notice
Filed by Loren Stone (Plaintiff)

**03/09/2012** at 3:00 PM in Department 322
Court Order - **Held**

**02/21/2012** Notice
Filed by Loren Stone (Plaintiff)

Case Summary - Online Services - LA Court

**02/10/2012** at 2:00 PM in Department 323
Unknown Event Type - **Held**

**01/24/2012** at 08:45 AM in Department 14
Non-Appearance Case Review - **Held**

**01/17/2012** Motion
Filed by Loren Stone (Plaintiff)

**01/17/2012** Declaration
Filed by Loren Stone (Plaintiff)

**01/17/2012** DECLARATION OF MARK A. OZZELLO IN SUPPORT OF MOTION OF THE PLAINTIFF CLASS FOR AN ORDER: (1) GRANTING
PRELIMINARY APPROVAL TO T[IE IROPOSED CLASS-ACTION SETTLEMENT; ETC

**01/17/2012** RR _ NOTICE OF MOTIOITIF THE PLAINTIFF CL1SA ORI)ER: _ .4 C.., (1) GRANTING PRELIM1ARY APPROVAL TO THE &ROPQ$ CLASS-
ACTION SETTLEMT, ETC

**01/11/2012** at 08:46 AM in Department 14
Non-Appearance Case Review - **Held**

**12/15/2011** at 08:45 AM in Department 14
Unknown Event Type - **Held**

**12/12/2011** Notice of Related Case
Filed by Plaintiff/Petitioner

**12/12/2011** NOIICI OF KII.ATII] CASIS

**12/07/2011** PEREMPTORY CHALLENGE TO THE HONORABLE MICHAEL STERN; DECLARATION OF MICHELLE C. CUENCA, ESQ., IN SUPPORT
THEREOF

**10/17/2011** at 10:00 AM in Department 14
Non-Jury Trial (Court Trial - Short Cause; Vacated) -

**10/05/2011** NOTICE OF SETTING I)AII FOR MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEM ENT

**10/05/2011** Notice
Filed by Loren Stone (Plaintiff)

**10/03/2011** at 08:45 AM in Department 14
Final Status Conference (Final Status Conference; Case Deemed Settled) -

**10/03/2011** Minute Order

**09/01/2011** NOTICE OF SETTLEMENT AND INTETION TO FILE MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

**09/01/2011** Notice of Settlement
Filed by Loren Stone (Plaintiff)

**07/26/2011** at 08:45 AM in Department 14
Post-Mediation Status Conference - **Held**

**07/26/2011** Minute Order

**06/17/2011** at 08:45 AM in Department 14
Status Conference - **Held - Continued**

**06/17/2011** Minute Order

**06/03/2011** DEFENDANT WESTLAKE WELLBEING. PROPERTIES, LLCS ANSWER TO PLAINTIFF LOREN STONES SECOND AMENDED COMPLAINT

**06/03/2011** Answer to Second Amended Complaint
Filed by Westlake Wellbeing Properties LLC (Defendant)

**05/04/2011** at 08:45 AM in Department 14
Post-Mediation Status Conference - **Held - Motion Granted**

**05/04/2011** Minute Order

**04/21/2011** Notice
Filed by Defendant/Respondent

**04/21/2011** NOTICE OF NON-OPPOSITION TO PLAINTIFFS MOTION FOR LEAVE TO AMEND CLASS ACTION COMPLAINT

**04/01/2011** Association of Attorney
Filed by Loren Stone (Plaintiff)

**04/01/2011** NOTICE OF ASSOCIATION OF COUNSEL

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:
TOP   03/14/2012   03/22/2011

**03/22/2011** at 08:45 AM in Department 14
Post-Mediation Status Conference (Conference-Post Mediation Status; Trial Date Set) -

**03/22/2011** Minute Order

**03/22/2011** Motion for Leave
Filed by Loren Stone (Plaintiff)

**03/22/2011** NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND CLASSACTION COMPLAINT; SUPPORTING MEMORANDUM; DECLARATION OF DAVID R. GRE1FINGER

**02/04/2011** PROOF OF SERVICE BY FIRSTCLASS MAILO CIVIL

**02/04/2011** Proof of Service (not Summons and Complaint)
Filed by Loren Stone (Plaintiff)

**01/31/2011** Notice Re: Continuance of Hearing and Order
Filed by Clerk

**01/31/2011** NOTICE RE: CONTINUANCE OF HEARING

**01/31/2011** NOTICE RE: CONTINUANCE OF HEARING

**01/31/2011** Notice Re: Continuance of Hearing and Order
Filed by Clerk

**01/31/2011** NOTICE RE: CONTINUANCE OF HEARING

**01/31/2011** NOTICE RE: CONTINUANCE OF HEARING

**10/19/2010** at 08:45 AM in Department 14
Case Management Conference (Conference-Case Management; Trial Date Set) -

**10/19/2010** Minute Order

**09/21/2010** at 08:30 AM in Department 35
Case Management Conference - **Not Held - Advanced and Vacated**

**09/21/2010** Minute Order

**09/21/2010** Notice Re: Continuance of Hearing and Order
Filed by Loren Stone (Plaintiff)

**09/21/2010** NOTICE OF CONTINUANCE OF CASE MANAGEMENT CONFERECE

**09/14/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**09/14/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**09/14/2010** Notice of Case Management Conference
Filed by Clerk

**09/14/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**09/13/2010** at 10:46 AM in Department 1
(Order ReReassignment of Case; Transferred to different departmnt) -

**09/13/2010** Minute Order

**09/10/2010** at 09:30 AM in Department 35
Unknown Event Type - **Held**

**09/10/2010** Minute Order

**09/09/2010** PEREMPTORY CHALLENGE TO THE HONORABLE DANIEL BUCKLEY; DECLARATION OF MICHELLE C. CUENCA, ESQ., IN SUPPORT THEREOF

**09/09/2010** DEFENDANT WESTLAKE WELLBEING PROPERTIES, LLCS ANSWER TO PLAINTIFF LOREN STONES FIRST AMENDED COMPLAINT

**09/09/2010** Challenge To Judicial Officer - Cause (170.1/170.3)
Filed by Westlake Wellbeing Properties LLC (Defendant)

**09/09/2010** Answer to First Amended Complaint
Filed by Westlake Wellbeing Properties LLC (Defendant); dba Four Seasons Hotel Westlake VillageCA (Defendant)

**08/25/2010** Case Management Statement
Filed by Defendant/Respondent

**08/25/2010** CASE MANAGEMENT STATEMENT

**08/16/2010** Case Management Statement
Filed by Plaintiff/Petitioner

**08/16/2010** CASE MANAGEMENT STATEMENT

**08/04/2010** AMENDMENT TO COMPLAINT

**08/04/2010** Amendment to Complaint
Filed by Loren Stone (Plaintiff)

**06/30/2010** AMENDMENT TO COMPLAINT

**06/30/2010** Amendment to Complaint
Filed by Loren Stone (Plaintiff)

**06/08/2010** Proof of Service (not Summons and Complaint)
Filed by Loren Stone (Plaintiff)

**06/08/2010** PROOF OF SERVICE SUMMONS & COMPLAINT

**05/26/2010** Notice of Case Management Conference
Filed by Clerk

**05/26/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**05/26/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**05/26/2010** NOTICE OF CASE MANAGEMENT CONFERENCE

**05/21/2010** at 08:30 AM in Department 324
Court Order (Court Order; Court makes order) -

**05/06/2010** SUMMONS

**05/05/2010** CLASS-ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELWF AND CIVIL PENALTIES I. VIOLATION OF CIVIL CODE 51.6(B); ETC.

**05/05/2010** Case File - Public

**05/05/2010** Complaint
Filed by Loren Stone (Plaintiff)

**05/03/2010** Summons
Filed by Loren Stone (Plaintiff)

**03/22/2010** at 08:45 AM in Department 14
Post-Mediation Status Conference

Click on any of the below link(s) to see Register of Action Items on or before the date indicated:

TOP   03/14/2012   03/22/2011

NEW SEARCH

---

Privacy Statement   |   Disclaimer   |   Employment   |   ADA   |   Holidays   |   Comment on our Website     Copyright © 2019 Superior Court of California, County of Los Angeles