**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| LISA KIM, individually and on behalf of all others similarly situated, *Plaintiff-Appellee*, | No. 19-55807 |
| | D.C. No. 2:18-cv-3093-JFW-AS |
| v. | |
| RICH ALLISON; STEVE FRYE, *Objectors-Appellants*, | OPINION |
| v. | |
| TINDER, INC., a Delaware corporation; MATCH GROUP, LLC, a Delaware limited liability company; MATCH GROUP, INC., a Delaware corporation, *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted January 15, 2021
Pasadena, California

Filed August 17, 2021

Before:  Consuelo M. Callahan and Paul J. Watford, Circuit
         Judges, and Jed S. Rakoff,[*] District Judge.

Opinion by Judge Rakoff;
Dissent by Judge Callahan

## SUMMARY[**]

### Class Settlement

The panel reversed the district court's approval of a pre-certification class settlement, vacated the district court's judgment and attorneys' fees award, and remanded for the district court to conduct the more probing inquiry required for a pre-certification class settlement.

Plaintiff Lisa Kim brought suit against Tinder, Inc. in federal court pursuant to the Class Action Fairness Act of 2005 ("CAFA") for violations of California's Unruh Civil Rights Act and its unfair competition statute. Tinder successfully compelled arbitration, and Kim and Tinder reached a settlement, before class certification, that applied to a putative class. Class members Rich Allison and Steve Frye objected. The district court rejected the objections, certified the class for settlement purposes, granted final approval of the proposed settlement, and awarded Kim a

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

$5,000 incentive payment and her counsel $1.2 million in attorneys' fees.

Addressing the district court's approval of the settlement overall, the panel held that the district court correctly recited the fairness factors under Fed. R. Civ. P. 23(e)(2), but that the district court abused its discretion by underrating the strength of the plaintiff's case, overstating the settlement value, and overlooking the suggestions of collusion present.

The panel held that independent of the district court's abuse of discretion in its overall evaluation of the settlement, the approval of the attorneys' fees was itself an abuse of discretion. By adopting without any scrutiny the purported value of the injunctive relief and failing to consider the likely claims rate, the district court shirked its independent duty to assess the value of the settlement

Judge Callahan dissented. She agreed with the majority that the district court's $24 million valuation of the settlement agreement was to some degree overinflated, but she dissented because the district court nevertheless reasonably evaluated the settlement class's relatively weak claims. Because the settlement provided for fair, reasonable, and adequate value for the release of the class's claims, she would affirm on the ground that the district court did not abuse its discretion in approving the settlement. Judge Callahan also disagreed with the majority's opinion discussion of whether the award of attorneys' fees was an abuse of discretion because the discussion was superfluous, given the majority's holding that the district court's approval of the settlement should vacated, and because the objectors waived any challenge to the district court's lodestar calculations.

4                      ALLISON V. TINDER

## COUNSEL

Danielle Leonard (argued) and Michael Rubin, Altshuler Berzon LLP, San Francisco, California; Kimberly A. Kralowec, Kralowec Law P.C., San Francisco, California; Alfred G. Rava, Rava Law Firm, San Diego, California; for Objectors-Appellants.

Adrian R. Bacon (argued) and Todd M. Friedman, Law Offices of Todd M. Friedman P.C., Woodland Hills, California; John P. Kristensen, Kristensen LLP, Los Angeles, California; for Plaintiff-Appellee.

Donald R. Brown (argued), Robert H. Platt, and Benjamin G. Shatz, Manatt Phelps & Phillips LLP, Los Angeles, California, for Defendants-Appellees.

## OPINION

RAKOFF, District Judge:

Beginning in 2015, the dating app Tinder began offering reduced pricing for those under 30, later changed to those under 29. In 2017, plaintiff Lisa Kim purchased a premium version of the Tinder app, but because she was already in her thirties, she paid more for her monthly subscription than those in their twenties. Kim brought suit against Tinder in federal district court pursuant to the Class Action Fairness Act of 2005 ("CAFA") for violations of California's Unruh Civil Rights Act and its unfair competition statute. Over Kim's opposition, Tinder successfully compelled arbitration. After a daylong mediation session with a retired judge, Kim and Tinder reached a settlement, before class certification, that applied to a putative class.

Specifically, the settlement class included all California-based Tinder users who were at least 29 years old when they subscribed to Tinder's premium services and were charged a higher price than younger subscribers. As part of the settlement, Tinder agreed to eliminate age-based pricing in California for new subscribers. Class members who maintained or reactivated their Tinder accounts would automatically receive 50 "Super Likes" (described below), for which Tinder would ordinarily have charged $50. Finally, class members who submitted a valid claim form would also receive their choice of $25 in cash, 25 Super Likes, or a one-month free subscription to the premium Tinder service previously purchased.

Class members Rich Allison and Steve Frye, whose attorneys represent the lead plaintiff in a competing age-discrimination class action against Tinder in California state court, were among six class members who objected to the proposed settlement. These two objectors, in particular, argued that Tinder offered too paltry a cash payout, as well as Super Likes that premium subscribers did not need and subscriptions that former subscribers did not want, all in exchange for releasing valuable claims that had only been strengthened by recent victories in related California actions. Rejecting these objections, the district court certified the class for settlement purposes, granted final approval of the proposed settlement, and awarded Kim a $5,000 incentive payment and her counsel $1.2 million in attorneys' fees. Allison and Frye now appeal.

We conclude that, while the district court correctly recited the fairness factors under Fed. R. Civ. P. 23(e)(2), it materially underrated the strength of the plaintiff's claims, substantially overstated the settlement's worth, and failed to take the required hard look at indicia of collusion, including

a request for attorneys' fees that dwarfed the anticipated monetary payout to the class. We therefore reverse the district court's approval of the pre-certification class settlement, vacate the judgment and attorneys' fees award, and remand for the district court to conduct the "more probing inquiry" that a pre-certification class settlement demands. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

## BACKGROUND

Tinder is a dating app operated by Tinder, Inc., Match Group, LLC, and Match Group, Inc. (collectively, "Tinder") that uses computer technology to match users with nearby singles. Users "swipe right" on a dating profile to indicate interest and left to signify a lack of it. If two users both swipe right, the potential couple can message each other through the app. To indicate heightened interest, users can send one another a "Super Like." Users receive one free Super Like daily but can purchase additional Super Likes for $1 each.

In March 2015, Tinder launched Tinder Plus, an ad-free premium service that offered new features: users could swipe right unlimited times, change their minds about matches initially rejected, see dating profiles of users in other cities, and receive more than the one free "Super Like" per day allotted to regular users. Tinder Plus operated on a two-tiered pricing basis: subscribers thirty and under paid $9.99 a month, and subscribers over thirty paid $19.99. In March 2016, Tinder lowered the age cutoff for a reduced subscription price from 30 years old to 29 years old. In 2017, Tinder launched still another premium service, Tinder Gold, which used the same two-tiered pricing scheme for subscribers under and over 29.

To create a Tinder account, a user must agree to the Terms of Use. Since 2014, the Terms of Use have included a ban on class actions and a binding arbitration provision for all disputes arising from or relating to Tinder services that cannot be brought in small claims court. In July 2015, Tinder added a login screen disclosure ("the sign-in wrap agreement") informing users that continued use of the service indicated consent to the Terms of Use.

Kim created her first Tinder account in October 2013 and another in April 2015. She purchased a Tinder Plus subscription on February 21, 2017, paying $19.99 as a user over thirty. Two days later, after being presented with the sign-in wrap agreement, she logged into the account.

On April 12, 2018, Kim sued Tinder, alleging age discrimination in violation of the Unruh Civil Rights Act, Cal. Civ. Code §§ 51 *et seq*. Kim later amended her complaint to add a claim under California's unfair competition law. *See* Because the suit was a putative class action, it was brought, pursuant to CAFA, in the U.S. District Court for the Central District of California**.**

Tinder moved to compel arbitration, which Kim opposed. Kim argued that her Unruh Act claim sought public injunctive relief and that the arbitration agreement was unenforceable to the extent it barred such relief. Kim also sought discovery with respect to the evidence that she had viewed and consented to the arbitration agreement. The district court denied the discovery request as "vague." The court further determined that Kim consented to the sign-in wrap agreement and that the agreement was enforceable, not least because it still permitted Kim to seek injunctive relief through arbitration. The court stayed the case and directed Kim to arbitration.

Kim appealed the district court's arbitration ruling. But while the appeal was pending, Kim and Tinder participated in a full-day mediation with retired Judge Louis Meisinger on November 29, 2018. The parties reached a settlement on December 1, 2018 and entered an agreement memorializing that settlement on December 31, 2018.

### *The Settlement Agreement*

The settlement agreement defines the settlement class to include "every California subscriber to Tinder Plus or Tinder Gold during the Class Period who at the time of the subscription was at least 29 years old and was charged a higher rate than younger subscribers, except those who choose to opt out of the Settlement Class." The class contains about 240,000 members. Under the agreement, every class member who has or reactivates a Tinder account will automatically receive 50 Super Likes, regardless of whether the user files a claim. In addition, class members who file a timely claim will receive their choice of: "(1) $25.00 in cash; (2) 25 Super Likes (but only if the Class Member has a current Tinder account); or (3) a one-month subscription to Tinder Plus or Tinder Gold, depending on which of those services the Class Member had previously purchased (this option is not available to any Class Member who has a current subscription to Tinder Plus or Tinder Gold)." Finally, the settlement contained an injunctive component. Defendants agreed to eliminate age-based pricing for new subscribers in California, but "reserve[d] the right to offer a youth discount to subscribers age 21 or younger."

As part of the settlement, Tinder further agreed not to challenge an award of attorneys' fees of $1.2 million plus reasonable costs and expenses. Similarly, Tinder agreed not

to oppose an incentive award of $5,000 to Kim "for services performed in representing the Settlement Class."

### Objections

After the settlement was presented to the district court for approval, Allison and Frye filed objections, arguing that the plaintiff and class counsel were inadequate, that the claims form was burdensome, that the risk to the class posed by further litigation was low, and that the settlement was collusive and of little value.

Allison and Frye also argued that another, almost-identical class action lawsuit better demonstrated the value of the class members' claims: *Candelore v. Tinder, Inc.*, 228 Cal. Rptr. 3d 336 (2018), *review denied* (May 9, 2018).[1] In *Candelore*, as here, the class action plaintiff alleged that Tinder violated the Unruh Act by charging customers over 29 more than it charged younger customers for the same service. *Id.* at 339. While Tinder initially moved successfully to dismiss the complaint for failure to state a claim, *id.* at 340, on appeal, Candelore secured a ruling that his allegations did state a claim for age discrimination under the Unruh Act—and that, if his allegations were true, Tinder's age-based distinction would not be justified by public policy as a matter of law. *See id.* at 350. In the course of its decision, the *Candelore* court "recognize[d] . . . that past cases," like *Javorsky v. Western Athletic Clubs, Inc.*, 195 Cal. Rptr. 3d 706 (2015), "have embraced the notion that age may serve as a reasonable proxy for income in upholding age-based discounts against Unruh Act claims." 228 Cal. Rptr. 3d at 344. But those cases, the court reasoned, are "inconsistent

---

[1] Allison's and Frye's attorneys also represented lead plaintiff Allan Candelore in this lawsuit.

with the 'individual nature' of the right secured by the [Unruh] Act, which protects individuals from unequal treatment based on generalizations about 'a group' to which they belong." *Id.* at 347.

Allison and Frye argued that *Candelore* showed the relative weakness of Kim as a class representative. Unlike Kim, Candelore was not compelled to arbitration, because when Candelore signed up for Tinder Plus in March 2015, the sign-up wrap agreement was not yet in place. Allison and Frye also stressed that the appellate victory in *Candelore* showed that the class members had meritorious Unruh Act claims and significant leverage.

### *Preliminary Approval*

Despite Allison's and Frye's objections, the district court granted preliminary approval of the settlement agreement. In its preliminary approval order, the district court recognized that the settlement agreement contained a "clear sailing" provision—that is, an agreement by Tinder not to oppose plaintiff's attorneys' application for $1.2 million in attorneys' fees—and noted that such provisions "are considered troubling and a possible sign of collusion." However, the court reasoned that the provision was unlikely to indicate collusion here because "the attorneys' fees provision was not negotiated until after the parties had agreed to the other settlement terms," a neutral mediator oversaw the fee negotiation, and the fee award "represent[ed] . . . approximately 5 percent of the total estimated value of the Settlement." *Id.* Nevertheless, the court promised that it would "closely scrutinize the attorneys' fees requested at the Final Fairness Hearing" to confirm that collusion was unlikely. *Id.*

### *Final Approval*

At the final approval hearing, the district court determined that the proposed settlement was "fair, reasonable, and adequate" under Federal Rule of Civil Procedure 23(e). The district court's analysis focused on the perceived weakness of Kim's case, the supposed benefits the settlement would provide to class members, and the low number of class-member objections.

In the district court's estimation, Kim's case was weak. Kim's claim had been compelled to arbitration, and the court found that "over 95 percent of the Class Members" could be bound by similar arbitration agreements, which could present a bar to ultimate class certification. The court also determined that, while *Candelore* could help the class members survive a motion to dismiss, "the [unfavorable] holding of *Javorsky* [is] more compelling and more in line with the weight of authority" on summary judgment or at trial. The court also noted that other, as-of-yet unraised defenses could end the class's quest for relief, including arguments related to choice-of-law and contractual limits on liability.

At the same time, the court concluded that the agreement "will provide direct and meaningful benefits to the Settlement Class" to "a total value of $24 million." This value included $12 million worth of Super Likes disbursed automatically, up to $6 million in "potential cash or cash-equivalent benefits" distributed through the claims process, and $6 million in injunctive relief. In regard to the latter, the court noted that "Class Counsel estimates that the injunctive relief negotiated on behalf of the Class and the public has a value of at least $6 million," but the court did not otherwise evaluate why this was a reasonable value.

Finally, the district court also found that the "reaction of class members" favored the settlement, because of about 240,000 class members, only six had objected to the settlement. The court found Allison's and Frye's allegations of collusion unpersuasive, because the settlement offered a significant benefit of $12 million in Super Likes to class members automatically, those class members who preferred a cash benefit could submit a claim form, the parties had delayed negotiating attorneys' fees in mediation until after they had reached agreement on substantive settlement terms, and the attorneys' fees sought were proportionate to a $24 million settlement value.

Turning to attorneys' fees, *per se*, the court analyzed the proposed attorneys' fee award under the "percentage-of-fund" and "lodestar" methods and concluded that the fee award was reasonable under both. The court also found the incentive award to Kim was reasonable because of "the time and effort Plaintiff has devoted to this case" and because the $5,000 amount was "presumptively reasonable." (quoting *Faigman v. AT & T Mobility LLC*, 2011 WL 672648, at *5 (N.D. Cal. Feb. 16, 2011)).

The district court then granted final approval of the class action settlement and awarded $1.2 million in attorneys' fees and a $5,000 incentive payment to Kim.

## DISCUSSION

In general, we review for abuse of discretion both a district court's grant of approval of a pre-certification class action settlement and the court's calculation of attorneys' fees. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 963 (9th Cir. 2009); *In re Bluetooth Headset Prods. Liab.*, 654 F.3d 935, 940 (9th Cir. 2011). The factual findings underlying the

fee award are reviewed for clear error. *Bluetooth*, 654 F.3d at 940.

However, settlements that occur before class certification are subject to "a high procedural standard." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). The district court must act as a fiduciary, protecting the interests of absent class members by scrutinizing the settlement's fairness in light of well-established factors. *Id.* Accordingly, "the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (internal citations and quotation marks omitted). Reversal is warranted when the settlement terms "contain convincing indications" that the class representative and class counsel's self-interest won out over the class's interest, and "the district court was wrong in concluding otherwise." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003).

## I

We turn first to the approval of the settlement overall. Rule 23(e) authorizes district courts to approve class action settlements when they are "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2). In this Circuit, a district court examining whether a proposed settlement comports with Rule 23(e)(2) is guided by the eight "*Churchill* factors," viz., "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *In re Bluetooth*

*Headset Prods. Liab.*, 654 F.3d at 946 (citing *Churchill Vill. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004)); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). Only when the district court "explore[s] these factors comprehensively" can the settlement award "survive appellate review." *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000).

However, "consideration of these eight *Churchill* factors alone is not enough to survive appellate review." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 946; *see also Briseño v. Henderson*, 998 F.3d 1014, 10255–26 (9th Cir. 2021) (holding that the revised Rule 23(e) requires courts "to go beyond our precedent" by applying the heightened scrutiny set forth in *Bluetooth* to all class action settlements). Rule 23(e)(2) also requires the court to consider "the terms of any proposed award of attorney's fees" and scrutinize the settlement for evidence of collusion or conflicts of interest before approving the settlement as fair. *Briseño*, 998 F.3d at 1024–25.

As noted, the district court's determinations in these respects are reviewed on appeal for abuse of discretion. But even applying that deferential standard of review, we find that the district court so underrated the strength of the plaintiff's case, so overstated the settlement value, and so overlooked the suggestions of collusion present as to collectively constitute an abuse of discretion.

First, the district court discounted the strength and value of the class members' claims because the court "f[ound] the holding of *Javorsky* to be more compelling and more in line with the weight of authority than the holding in *Candelore*." In so doing, the district court ignored the fact that the settlement class members are also putative members of the class in *Candelore*—and the settlement agreement therefore

releases claims where *Candelore* is the law of the case, regardless of whether the district court finds the opinion persuasive.

The district court also substantially overstated the settlement's worth. Tinder's agreement to eliminate age-based pricing going forward applies only to new California-based subscribers—a group that, by definition, does not include the class members. Yet, the court accepted class counsel's unsupported representation that the injunctive relief was worth $6 million to the class. We see no basis for this conclusion.

Furthermore, the universal participation component, an award of 50 Super Likes, is available only to class members who maintain or reactivate their Tinder accounts. In December 2018, approximately 44% of the class did not have a Tinder account. For many obvious reasons, these class members might not want to resume their relationship with Tinder to receive the class benefit, *e.g.*, because in the intervening years, they had entered into a satisfactory romantic relationship, or because their experience of age discrimination soured them on Tinder entirely, or whatever. Further still, because those class members who still have Tinder Plus or Tinder Gold accounts already receive 150 Super Likes per month, the marginal value of 50 more is low.

Further still, the district court grossly overstated the value of the claims that Tinder would actually pay as being $6 million. This was based on the extremely doubtful assumption that all members of the class would not only file a claim but also elect the $25 cash alternative. In reality, based on the actual claims rate at the time of final approval of 0.745%, Tinder stood to pay less than $45,000.

Third, as for possible collusion, the district court did not adequately scrutinize the combination of a clear-sailing provision and an attorneys' fee award that outstripped the likely financial benefit to the class. Because these early, pre-certification settlements are so open to abuse and so little subject to scrutiny at the time by the district court, the court is required to search for "subtle signs" that plaintiff's counsel has subordinated class relief to self-interest. *In re Bluetooth Headset Prods. Liab.*, 654 F.3d at 947; *see also Briseño*, 998 F.3d at 1024–25 (explaining that although class certification "does not cleanse all sins, especially when it involves potential collusion over divvying up funds between class counsel and the class," "[t]he potential for collusion reaches its apex pre-class certification"). Signs of collusion can include: (1) a handsome fee award despite little to no monetary distribution for the class, (2) a "clear sailing" provision under which defendant agrees not to object to the attorneys' fees sought, and (3) an agreement that fees not awarded will revert to the defendant, not the class fund. *Allen*, 787 F.3d at 1224. The presence of these three signs is not a death knell—but when they exist, "they require[] the district court to examine them, . . . develop the record to support its final approval decision," and thereby "assure itself that the fees awarded in the agreement were not unreasonably high." *Id.* (quoting *In re Bluetooth Headset Prods. Liab.*, 654 F.3d at 947).

The settlement agreement here contained a clear-sailing provision. This Court has frequently stressed that "'clear sailing' agreements on attorneys' fees are important warning signs of collusion." *Roes, 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1051 (9th Cir. 2019) (quoting *Lane v. Facebook*, 696 F.3d 811, 832 (9th Cir. 2012)). When a district court encounters such a provision, it must "peer into the provision and scrutinize closely the relationship between

attorneys' fees and benefit to the class," even when the settlement has been negotiated "with a neutral mediator before turning to fees." *In re Bluetooth Headset Prods. Liab.*, 654 F.3d at 948.

Here, however, the district court did not develop the record to support its conclusion that the attorneys' fees were proportionate to the value to the class. Instead, the court, as noted above, calculated the settlement value based on a totally unrealistic claims rate and an unexplained injunctive relief valuation, and then found the attorneys' fee award proportional to that inflated settlement value.

The district court gave "deference to the mediation proceedings and the judgment of the parties regarding the reasonableness of fees," but in so doing abdicated its independent duty to see whether these actually excessive attorneys' fees evidenced collusion in the settlement. *See Allen*, 787 F.3d at 1224 (quoting *In re Bluetooth Headset Prods. Liab.*, 654 F.3d at 947).

## II

Independent of the district court's abuse of discretion in its overall evaluation of the settlement, the approval of the attorneys' fees was itself an abuse of discretion. The district court approved a $1.2 million attorneys' fee award, because "the $1,200,000 in attorneys' fees sought equates to approximately 5 percent of the estimated $24,000,000 in settlement benefit provided to the Class." But, as already noted, the $24,000,000 figure was greatly overstated.

This Circuit permits two methods of calculating attorneys' fee awards in class actions: (1) the "lodestar" method and (2) the "percentage-of-recovery" method. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th

Cir. 2019) (en banc). Under the lodestar method, the court multiplies the number of hours the prevailing party reasonably spent on litigation by a reasonable hourly rate to determine a presumptively reasonable fee award. *See Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 546 (9th Cir. 2016). The court may then "adjust" the award "by an appropriate positive or negative multiplier reflecting . . . the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 941–42 (quoting *Hanlon*, 150 F.3d at 1029). Benefit to the class is the "[f]oremost" consideration. *Id.* at 942. This method is especially appropriate in class actions "where the relief sought—and obtained—is . . . primarily injunctive." *Id.* at 941.

The percentage-of-recovery approach may be used "where the defendants provide monetary compensation to the plaintiffs" and class benefit is easy to quantify. *See In re Hyundai*, 926 F.3d at 570. Under this method, "the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee." *Hanlon*, 150 F.3d at 1029. Injunctive relief is inherently difficult to monetize. *Yamada*, 825 F.3d at 547. Thus, a district court must exercise caution when using the value of injunctive relief to determine proportional attorneys' fees and should generally avoid valuing hard-to-measure injunctive relief altogether, "because of the danger that parties will overestimate the value of injunctive relief in order to inflate fees." *SFBSC Mgmt., LLC*, 944 F.3d at 1055. When a settlement includes injunctive relief among other forms of relief, the court should (1) "explain[] why the value of the injunctive relief's benefits to individual class members was readily quantifiable and worth [the estimated value]" or (2) "exclude[] the injunctive relief from the valuation of the

settlement and explain[] why attorneys' fees ... were justified." *Id.* at 1056.

As already noted, the settlement agreement between Kim and Tinder provides injunctive relief that eliminates age-based pricing in California for new subscribers only, none of whom are members of the class. It does so by raising the price for new subscribers under 29 to match the price previously charged to those 29 and over, while allowing existing under-29 subscribers to be grandfathered in at the lower price. So it is hard to see how the court could credit the parties' assertion that this benefit was worth $6 million to the class, when it appears to be a benefit of zero. Instead, the district court justified its determination that injunctive relief was worth approximately $6 million without reference to anything other than class counsel's estimation.

Furthermore, the court should have excluded the injunctive relief estimate in its calculation of reasonable attorneys' fees under the percentage-of-recovery method. *See Staton*, 327 F.3d at 946 ("[P]arties ordinarily may not include an estimated value of undifferentiated injunctive relief in the amount of an actual or putative common fund for purposes of determining an award of attorneys' fees.").

As for the parties' suggestion that the award that Tinder would pay in cash under the settlement should be valued at $6 million, this again was totally without substance. When assessing whether the fee award is disproportionate to the class benefit the district court should have considered the amount of anticipated monetary relief based on the timely submitted claims already made. *See Allen*, 787 F.3d at 1224 n.4. Instead, the court assumed a 100% claims rate when less than 1% of class members had submitted claims by the date of final approval. In dollar terms, this meant that the actual

amount that Tinder would pay in cash was not $6 million, but something closer to $45,000.

By adopting without any scrutiny the purported value of the injunctive relief and failing to consider the likely claims rate, the district court shirked its independent duty to assess the value of the settlement. *See, e.g.*, *SFBSC Mgmt., LLC*, 944 F.3d at 1052–55 (reversing where the district court included an unjustified valuation of injunctive relief in a lodestar cross-check and did not "explain why the [claims-made relief] should nevertheless be valued at its $1 million maximum").

## CONCLUSION

For the foregoing reasons, we reverse the district court's approval of the settlement, finding that the district court did not subject the settlement agreement to a "a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Dennis*, 697 F.3d at 864 (internal quotation marks omitted). Further, the district court abused its discretion by awarding attorneys' fees with reference to an unsupported estimation of the value of injunctive relief and a wholly inflated assessment of benefit to the class. Accordingly, we vacate the judgment and remand the case to the district court for further proceedings consistent with this Opinion.

**REVERSED AND REMANDED.**

CALLAHAN, Circuit Judge, dissenting:

While I agree with the majority that the district court's $24 million valuation of the settlement agreement is to some degree overinflated, I respectfully dissent because the district court nevertheless reasonably evaluated the settlement class's relatively weak claims.  As the settlement provides fair, reasonable, and adequate value for the release of the class's claims, even when substantially discounted to reflect the problems identified by the majority, I would affirm on the ground that the district court did not abuse its discretion in approving the settlement.

The majority's criticism of the district court's evaluation of the class's claims is based entirely on an incomplete reading of the district court's application of *Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138 (2018).  Contrary to the majority's accusation, the district court did not "ignore[]" *Candelore*'s impact.  While the district court noted that it found the rationale of *Candelore* less "compelling" than other conflicting California court decisions, it did not dismiss *Candelore* as irrelevant.  Indeed, the district court emphasized the mediator's awareness of the decision and the parties' extensive discussion of its impact at mediation as evidence that its impact was properly considered by the parties in reaching their agreement.

The district court also accurately noted that *Candelore* merely held that the plaintiff's claim under the Unruh Civil Rights Act could survive a demurrer; the case did not establish that Candelore was necessarily entitled to relief. The district court further reasonably considered that the objectors had not identified any cases in which damages had ever been awarded for comparable Unruh Act violations. And as Tinder notes, *Candelore* leaves room for the company to defend the lawfulness of its age-based pricing

tiers in a subsequent summary judgment motion if it can establish that its discounts for those under 30 years of age "are independently justified by compelling 'social policy considerations as evidenced by *legislative enactments*.'" *Candelore*, 19 Cal. App. 5th at 1149 (quoting *Koire v. Metro Car Wash*, 40 Cal. 3d 24, 38 (1985)). While *Candelore* may be the law of the case for the settlement class's claims, the district court acted reasonably and within its discretion in determining that *Candelore* does not compel the conclusion that those claims are particularly valuable.

Critically, the majority also fails to address other barriers to the class's recovery that the district court identified and relied upon in discounting the value of the class's claims. For example, Tinder has required its users to agree to terms of service which provide that Texas law governs disputes regarding the company's services since at least July 31, 2015. If that provision is enforceable, the Unruh Act would not even apply to individuals who used Tinder's services during most of the class period, which began on March 2, 2015. The terms of service also include limitations on Tinder's liability and provisions compelling arbitration. The impact of the arbitration provision in particular has already proven to be a significant obstacle. The district court determined that Kim (the named plaintiff here) was compelled to arbitrate her claims against Tinder, a ruling that is not currently before us but would have to be overturned before Kim could even continue litigating the merits of her claim. The district court reasonably determined that the significant risks of failure on the merits, coupled with the prospect of lengthy and costly litigation, lowered the value of the class claims at issue.

There are, admittedly, good reasons to believe that the district court's $24 million settlement valuation was too

high.  But even disregarding the value the district court attributed to the injunctive relief ($6 million), the value of the cash benefits for class members who submitted a claim ($6 million), and the value of the automatic benefits (in the form of free "Super Likes") provided to inactive Tinder users (approximately $6 million), the settlement still provides approximately $6 million worth of automatic benefits to current users.  The significant obstacles the district court identified that the class would have to overcome to achieve certification and ultimately succeed on the merits support the conclusion that the district court did not abuse its discretion in approving the settlement, even at this substantially reduced value.

Nor did the district court abuse its discretion in determining that the $1.2 million in attorneys' fees provided for by the settlement agreement was proportionate to the value received by the class (again, even if that value were to be discounted to approximately $6 million).  This is a far cry from the situation recently presented in *Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021), which held that a nearly $7 million attorneys' fee award was disproportionate to the less than $1 million in value provided to the settlement class.  *Id.* at 1026.  Here, the proposed fee award represents only about 20 percent of the discounted value of the settlement.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) (noting that "courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award" in cases where settlement "produces a common fund for the benefit of the entire class").  Because the fees were proportionate to even the discounted recovery, I would hold that the district court did not abuse its discretion in analyzing the fairness of this pre-certification settlement.

Finally, I disagree with Part II of the majority's opinion discussing whether the district court's award of attorneys' fees was an abuse of discretion.  This section is entirely superfluous given the majority's conclusion that the approval of the settlement agreement should be vacated—in the absence of an approved settlement agreement, class counsel is obviously not entitled to the fees provided for by that agreement.

Further, in determining whether a proposed fee award is appropriate, a district court has discretion to apply "either the lodestar method or the percentage-of-recovery method." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th Cir. 2019) (en banc).  Here, the district court held that the fees were independently reasonable under *both* methods. Even if the district court's percentage-of-recovery analysis were flawed,[2] the objectors have not specifically challenged any aspect of the district court's lodestar analysis.  The only comment in the objectors' opening brief on this point is a footnote stating that they "raised other concerns with the fee calculation below, including the inflated amount of time that was submitted in light of the minimal amount of work performed."  The objectors do not articulate what those concerns were, explain how the lodestar calculation used inflated amounts of time, or otherwise press this argument on appeal.  Accordingly, they have waived any challenge to the district court's lodestar calculations.  *Greenwood v. F.A.A.*, 28 F.3d 971, 978 (9th Cir. 1994) (holding that an

---

[2] It is not clear that the district court necessarily erred in this analysis.  Applying the percentage-of-recovery method, the fees were likely in the reasonable range of about 20 percent of the settlement value even if the settlement value is discounted to about $6 million to address the problems identified in the majority's opinion.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 942 (identifying "25% of the fund as the 'benchmark' for a reasonable fee award").

argument not "specifically and distinctly" argued in the appellant's opening brief was waived); *Hilao v. Est. of Marcos*, 103 F.3d 767, 778 n.4 (9th Cir. 1996) ("The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal."). If the panel had affirmed the approval of the settlement and it became necessary to reach this issue, I would uphold the award based on the district court's unchallenged lodestar calculations.

I fear that the majority's embrace of the objectors' exaggerated view of the class's claims will ultimately result in the class receiving far less than it would under the district court's reasonable judgment. For these reasons, I respectfully dissent.