**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

| | |
|---|---|
| Case No.   **CV 18-3093-JFW(ASx)** | Date: November 3, 2021 |

Title:   Lisa Kim -v- Tinder, Inc., et al.

---

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| Shannon Reilly | None Present |
|---|---|
| Courtroom Deputy | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFFS: | ATTORNEYS PRESENT FOR DEFENDANTS: |
|---|---|
| None | None |

| PROCEEDINGS (IN CHAMBERS): | ORDER GRANTING PLAINTIFF LISA KIM'S AMENDED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS [filed 10/4/21; Docket No. 118] |
|---|---|

On October 4, 2021, Plaintiff Lisa Kim ("Plaintiff") filed an Amended Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class ("Amended Motion").  On October 8, 2021, Defendants Tinder, Inc., Match Group, LLC, and Match Group, Inc. (collectively, "Defendants") filed their Notice of Non-Opposition.  On October 11, 2021, Proposed Intervenors Allan Candelore ("Candelore"), Rich Allison ("Allison"), and Steve Frye ("Frye") (collectively, "Proposed Intervenors") filed an Opposition.[1]  On October 18, 2021, Plaintiff filed a Reply.  On October 18, 2021, Defendants filed a Reply.  On October 22, 2021, Plaintiff and Defendants filed a Supplement in Support of Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class ("Supplement").  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's November 1, 2021 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.    Factual and Procedural Background**

   **A.    Factual Background**

---

[1]  Although the Court considered the issues raised in the Proposed Intervenors' Opposition, the Court concludes that the objections and issues raised by the Proposed Intervenors are more appropriately considered at the Final Fairness Hearing, after all Class Members have been given notice and an opportunity to object or opt out of the settlement.

Tinder is a smartphone based dating application that is used by consumers throughout the world, including in California.  The core functionality of the application enables users to view profiles of other users in the same geographic location and to either indicate an interest in (*i.e.*, to "like") another user or, alternatively, indicate a lack of interest.  If two users indicate an interest in each other's profile, they can then communicate with each other through the application.  The application also allows a user to indicate a heightened degree of interest in another user through a feature known as a "Super Like."  In addition, the application offers another premium feature called "Boost," which allows a user to be one of the top profiles in their area for thirty minutes, which increases their chances for a match.  Users of the application may generally purchase Super Likes for $1.59 each and a Boost for $7.00 each.  Although the application may be downloaded and used for free, certain additional or premium features can only be accessed by purchasing a subscription to Tinder Plus or Tinder Gold, including, among other things, unlimited likes (the free version has a daily limit), no paid advertisements, the ability to undo dislikes, the ability to view profiles in other locales, and the ability to exert more control over other variables involved in using the application.  At the time the revised settlement was being negotiated, Defendants represented that approximately thirty-five percent of Class Members still have active Tinder accounts.  However, after conducting further investigation, Defendants now represent that approximately twenty-five percent of Class Members still have active Tinder accounts.

Plaintiff is a user over the age of 29 who alleges that when she and other users over the age of 29 purchased Tinder premium services, such as Tinder Plus or Tinder Gold, Defendants discriminated against them based on their age by charging them a higher price for the same services that Defendants charged consumers who were younger than 29 years old.

On April 12, 2018, Plaintiff filed her class action Complaint against Defendants.  On June 22, 2018, Plaintiff filed a First Amended Complaint, alleging claims for: (1) violation of the Unruh Civil Rights Act, California Civil Code §§ 51 *et seq.*; and (2) violation of the Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*

On June 11, 2018, Defendants filed a Motion to Compel Arbitration, claiming that Plaintiff had agreed to arbitrate by entering into a "sign-up wrap" arbitration agreement.[2]  On July 12, 2018, the Court granted Defendants' Motion to Compel Arbitration, and on July 16, 2018, Plaintiff appealed the Court's ruling.

On November 29, 2018, the parties attended a mediation with Judge Louis Meisinger (Ret.).  The parties reached a settlement on December 1, 2018.  On March 1, 2019, this Court granted Plaintiff's Motion for Preliminary Approval of Class Settlement and, on June 19, 2019, granted Plaintiff's Motion for Final Approval of Class Settlement and Plaintiff's Motion for Attorneys' Fees,

---

[2]  In a sign-up wrap agreement, the consumer must click an "I agree" box, indicating that the consumer agrees to the application's terms of use before the consumer can access the application.  With Tinder, the consumer consents to the terms of use by tapping the Tinder Log In button directly below a disclosure that states that doing so constitutes agreement to the terms of use, which are available via a hyperlink.  Since 2014, Tinder's terms of use have included an arbitration agreement.

Costs, and Incentive Awards.[3]  On July 11, 2019, Allison and Frye appealed the Court's June 19, 2019 Order.  On August 17, 2021, the Ninth Circuit reversed this Court's June 19, 2019 Order granting Plaintiff's Motion for Final Approval of Class Settlement Plaintiff's Motion for Attorneys' Fees, Costs, and Incentive Awards.

Following remand to this Court, on September 3, 2021, the Plaintiff and Defendants attended another mediation with Judge Meisinger.  Although the case did not settle on the day of the mediation, after subsequent discussions and with guidance from Judge Meisinger, the parties reached agreement on the principal terms of a revised settlement and entered into an Amended Class Action Settlement Agreement on September 24, 2021 (the "Amended Settlement Agreement").  *See* Declaration of Todd M. Friedman in Support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement and Certification of Settlement Class, Exh. A (Docket No. 118-1).

### B.      The Settlement Class

The "Settlement Class" is defined in the Amended Settlement Agreement as:

> Every California subscriber to Tinder Plus or Tinder Gold during the Class Period who at the time of subscribing was at least 29 years old and was charged a higher rate than younger subscribers, except those who choose to opt out of the Settlement Class.

Amended Settlement Agreement, § 2.21.  The Class Period is from March 2, 2015 through March 1, 2019.  The Settlement Class contains approximately 240,000 consumers.

### C.      The Terms of the Revised Settlement

The value of the revised settlement has been increased, by the following changes: (1) the injunctive relief remains the same (but is not assigned a value); (2) the automatic benefits have been improved (with an additional Boost feature, and with an increase in the value of each Super Like); and (3) the monetary component has been revised by increasing the cash payment to each Class Member (from $25 to $50) making a valid claim as well as giving each of those Class Members a pro rata share of any remaining funds in the Settlement Fund.  Specifically, under the Amended Settlement Agreement, Defendants will create a "Settlement Fund," which is "a non-reversionary fund in the amount of $5.2 Million to be deposited by Defendants for the purpose of paying (i) Valid Claims, (ii) settlement administration fees and costs, (iii) incentive fee, if any, awarded to plaintiff Lisa Kim, and (iv) an award if any, of attorneys' fees and costs to Plaintiff's Counsel."  Amended Settlement Agreement, § 2.22.  Pursuant to Section 3.3 of the Amended Settlement Agreement:

> Every Settlement Class Member . . . is eligible to apply for a monetary payment by

---

[3] Candelore filed an Opposition to Plaintiff's Motion for Preliminary Approval of Class Settlement, and Allison and Frye filed an Objection to the Settlement prior to the Court hearing Plaintiff's Motion for Final Approval of Class Settlement.

submitting a Claim Form.  The payment will be in the amount of $50, subject to the following potential adjustments, and will [be] made in the form of a check that will be mailed by the Settlement Administrator:

(a)  To the extent the amount of the Settlement Fund ($5.2 Million) would otherwise end up exceeding the total amount of all payments for which the Settlement Fund is intended to be the source of payment (the types of payments are covered by the Settlement Fund are listed in Section 2.22 above), the $50 payment for each Valid Claim will be increased pro rata.

(b)  Conversely, to the extent the amount of the Settlement Fund would otherwise end up being less than the total amount of payments for which the Settlement Fund is intended to be the source of payments, the $50 payment for each Valid Claim will be decreased pro rata, subject to a floor of $30 per Valid Claim.  Defendants shall increase the Settlement Fund amount in order to enable payment in the amount of $30 for each Valid Claim.[4]

In addition to the Settlement Fund monetary relief, Defendant will deposit: (1) fifty free Super Likes (valued at $79.50, with each Super Like valued at its current selling price of $1.59); and (2) one Boost (valued at its current selling price of $7) into the Tinder account of every Class Member who has an active Tinder account as of the benefit deadline, so long as the email address associated with the account is the same as when the Class Member purchased Tinder Plus or Tinder Gold during the Class Period.[5]  Amended Settlement Agreement, § 3.2.  Defendants have determined that twenty-five percent of Class Members have active Tinder accounts.  Class

---

[4] Class Counsel anticipates that the claims' participation rate would have to exceed fifty percent, which would be uncharacteristically high for settlements of this nature, in order for the minimum to be triggered.  However, it was important to Class Counsel to guarantee that Class Members received equal, if not greater, financial incentive to participate in the revised settlement than in the prior settlement.

[5] In the October 22, 2021 Supplement (Docket No. 136), the parties state that at the time they entered into the Amended Settlement Agreement, Defendants estimated that approximately thirty to thirty-five percent of the Settlement Class had an active Tinder account.  However, after conducting further investigation, Defendants have now determined that the percentage of the Settlement Class with an active Tinder account is twenty-five percent.  As a result, the parties have agreed to adjust the benefits available to the members of the Settlement Class with an active Tinder account so that the collective value of those benefits are approximately the same as if thirty-five percent of the Settlement Class had active Tinder accounts.  Accordingly, upon preliminary approval of the revised settlement by the Court, the parties will execute an addendum to the Amended Settlement Agreement to provide a total of seventy Super Likes and one Boost to each member of the Settlement Class with an active Tinder account as of the benefit deadline.  The value of those benefits for each Class Member who qualifies will be $118.30, and the collective value of those benefits would be $7,100,000.  The Court has considered the enhanced benefits that will be available under the anticipated addendum to the Amended Settlement Agreement, but warns the parties that failure to execute the addendum will result in the denial of final approval of the revised settlement.

Members without active accounts will still be eligible for the automatic benefits upon reactivation of their account.  *Id.*  The proposed Class Notice advises Class Members that they must have an active account in place in order to receive the deposit of Super Likes and Boost.  *Id.*

In addition, pursuant to the Amended Settlement Agreement, Class Notice will be sent via email to the approximately 240,000 members of the Settlement Class.  Amended Settlement Agreement, §§ 1.4, 4.3-4.4, and Exh. A-2.  The Class Notice will explain that:

> Subject to final Court approval, every Class Member who does not ask to be excluded will automatically receive a one-time allotment of 50 Super Likes and one Boost at no cost, so long as the Member has a Tinder account at the time of the allotment.  That allotment is worth $86.50, with each Super Like valued at its selling price of $1.59 and the Boost valued at its selling price of $7.[6]
>
> In addition, every Class Member may elect to receive additional compensation in the amount of $50, although the payment could end up being higher or lower than $50 (but in no event less than $30).  As part of the settlement, Defendants will create a Settlement Fund in the amount of $5.2 Million to cover the costs of settlement administration, an award, if any, of attorneys' fees and costs to Class Counsel, an award, if any, of compensation to Kim for serving as the Class Representative, and payment of claims submitted by Class Members to receive additional compensation.  The amount each Class Member who submits a claim for additional compensation will receive will be affected by the amount available in the Settlement Fund after satisfying other purposes of the Settlement Fund, and by the number of Class Members who submit claims.
>
> If you submitted a Claim Form in connection with the previous settlement, you do not need to submit a new Claim Form. Defendants will honor your previous Claim Form.  The Claim Form for the previous settlement offered certain benefits as alternatives to a cash payment.  Those other benefits are not part of this new settlement, so you will receive payment under the new settlement regardless of which benefit you previously selected in the Claim Form.  If you previously submitted a Claim Form but also submit a new Claim Form, only one form will be honored.

*Id.*  Settlement payments will made in the form of a check that will be mailed by the Settlement Administrator.  Amended Settlement Agreement, § 3.3.  Moreover, Defendants will retain and pay from the Settlement Fund for the services of a Settlement Administrator.  Defendants will also pay from the Settlement Fund any and all costs associated with administering the revised settlement, including Class and CAFA Notice, handling of claims and the distribution of monetary payments to Class Members who submit a valid claim form, and developing and maintaining the Settlement Website.  Amended Settlement Agreement, §§ 4.3-4.5 and 5.4.

---

[6]  This paragraph of the Class Notice must be revised by the parties to reflect the addendum to the Amended Settlement Agreement, which provides that each Class Member with an active Tinder account as of the benefit deadline will receive 70 Super Likes and that the value of these benefits is $118.30.

CAFA notice was provided within ten days after the filing of this Motion. Amended Settlement Agreement, § 4.1. The Settlement Administrator, as a result of the prior settlement, already has the information necessary to provide email notice to the Class Members, which Defendants will update as appropriate.[7] Amended Settlement Agreement, §§ 4.3 and 4.4. Similarly, a Settlement Website was created as a result of the prior settlement, and the Settlement Administrator will update the website so that it contains relevant documents pertaining to the revised settlement, including the Amended Settlement Agreement, the Claim Form, the Class Notice, and the Preliminary Approval Order. Amended Settlement Agreement, § 4.5.

### D.   The Scope of the Release

The Amended Settlement Agreement provides that Class Members who do not request exclusion from the revised settlement will release any and all claims, known or unknown, they may have against the Released Parties arising from the claims that subscribers to Tinder Plus or Tinder Gold were charged a higher price depending on their age. Amended Settlement Agreement, § 8.1.

### E.   Opportunity to Opt Out and Object

Class Members will have the right to object to the terms of the revised settlement or to opt out of the revised settlement. A Class Member who wishes to opt out of the revised settlement must, no later than thirty days after the Class Notice Date, mail an opt-out request to counsel for the Parties. Amended Settlement Agreement, § 4.8. A Class Member who does not opt out and who wishes to object to the revised settlement may do so by filing with the Court and mailing to counsel for the parties, no later than thirty days after the Class Notice Date, a notice of objection and/or request to be heard at the Final Approval Hearing in accordance with the provisions of the Class Notice. Amended Settlement Agreement, § 4.7.

### F.   Class Representative's Proposed Incentive Award

The revised settlement provides that "Plaintiff may apply to the Court for an incentive award for services performed in representing the Settlement Class. Defendants may oppose any such application." Amended Settlement Agreement, § 7.2.

### G.   Class Counsel's Application for Fees, Costs, and Expenses

Pursuant to the Amended Settlement Agreement, Class Counsel may request an award of attorneys' fees plus reasonable costs, which Defendants may oppose – the so called "clear-sailing" provision has been eliminated. Amended Settlement Agreement, § 7.1 ("Plaintiff's Counsel may apply to the Court for an award of attorneys' fees, plus reasonable costs and expenses actually incurred in connection with the Litigation. Defendant[s] may oppose any such application"). If awarded, the payment of attorneys' fees and reasonable costs will be made out of the Settlement

---

[7] Email is the best notice practicable because Defendants generally maintain email address data for Class Members, but not physical addresses or other information (such as landline phone numbers) that would permit Class Counsel to efficiently conduct a reverse lookup and sent notice via U.S. mail.

Fund.  Amended Settlement Agreement, § 2.22.  Class Counsel states that they intend to request attorneys' fees in the amount of $1,200,000, under the lodestar and percentage of the fund methods.  However, Class Counsel will not request fees for the additional work they performed in connection with the revised settlement, despite the increased value of the revised settlement and the additional hours spend since the Court's June 19, 2019 Order granting Plaintiff's Motion for Final Approval of Class Settlement Plaintiff's Motion for Attorneys' Fees, Costs, and Incentive Awards.

### II.     Legal Standard

The settlement approval procedures take place over three stages.  First, the parties present a proposed settlement asking the Court to provide "preliminary approval" for both (a) the settlement class and (b) the settlement terms.  *See, e.g., Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)  (discussing the district court's use of a preliminary approval order).  Second, if the court does preliminarily approve the settlement and class: (1) notice is sent to the class describing the terms of the proposed settlement; (2) class members are given an opportunity to object or opt out; and (3) the court holds a fairness hearing at which class members may appear and support or object to the settlement.  *Id.*  Third, taking account of all of the information learned during the aforementioned processes, the court decides whether or not to give final approval to the settlement and class certification.  *Id.*

### III.    Discussion

In her Motion, Plaintiff seeks: (1) preliminary certification of the Class for purposes of the revised settlement; (2) preliminary approval of the class action revised settlement; (3) provisional appointment of Class Counsel and Class Representative; (4) appointment of a Settlement Administrator; and (5) a hearing date for final approval of the revised settlement.

#### A.     The Settlement Class Meets the Requirements for Preliminary Class Certification

In the settlement context, courts must pay "undiluted, even heightened, attention" to class certification requirements, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997), and conduct a "rigorous analysis."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  The party seeking class certification bears the burden of demonstrating that the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) have been satisfied.  *Id.*

Under Rule 23(a), a class action is only proper if:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Proc. 23(a).

If the Rule 23(a) prerequisites are met, the Court must decide if certification is appropriate under Rule 23(b). In this case, Plaintiff seeks certification of the Class under Rule 23(b)(3), which authorizes certification if:

> [T]he court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 131 S. Ct. at 2551. "When considering class certification under Rule 23, district courts are not only at liberty to, but must perform 'a rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (quoting *Wal-Mart*, 131 S. Ct. at 2551). "In many cases, 'that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped.'" *Id.*

### 1. Numerosity is Satisfied

To satisfy the numerosity requirement of Rule 23(a), the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Joinder need not be impossible so long as potential class members would suffer a strong litigation hardship or inconvenience if joinder were required." *Rannis v. Recchia*, 2010 WL 2124096, at *3 (9th Cir. May 27, 2010) (citing *Harris v. Palms Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964)). Courts routinely find the numerosity requirement satisfied when the class consists of 40 or more members. See *EEOC v. Kovacevich "5" Farms*, 2007 WL 1174444, at *21 (E.D. Cal. Apr. 19, 2007). In this case, the numerosity requirement is easily satisfied as Plaintiff's proposed Class consists of approximately 240,000 consumers.

### 2. Commonality is Satisfied

The commonality requirement is satisfied "if there are questions of fact and law which are common to the class." Fed. R. Civ. P. 23(a)(2). "The Supreme Court has recently emphasized that commonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke.'" *Mazza v. Am. Honda Motor* Co., 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart*, 131 S. Ct. at 2551) (internal alteration omitted). "What matters to class certification is not the raising of common 'questions' – even in droves – but rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 1331 S. Ct. at 2551 (quotations and citations omitted). "This does not, however, mean that *every* question of law or fact must be common to the class; all that Rule 23(a)(2) requires is 'a single *significant* question of law or fact.'" *Abdullah v. U.S. Security Associates, Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Mazza*, 666 F.3d at 589).

The Court concludes that Plaintiff has met her burden of demonstrating that there are common questions of law and fact that will generate common answers likely to drive the resolution of the litigation. In this case, the proposed Class Members' claims all arise from the same factual circumstances, specifically that consumers age 29 and older who subscribed to Tinder Plus or Tinder Gold paid a higher price than those under the age of 29. In addition, whether or not this policy by Defendants violated the Unruh Act and the UCL is common to all potential Class Members and does not depend on individual factual or legal issues.

### 3. Typicality is Satisfied

Typicality exists when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.1998). "Although the claims of the purported class representative need not be identical to the claims of other class members, the class representative 'must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Lymburner v. U.S. Financial Funds, Inc.*, 263 F.R.D. 534, 540 (N.D. Cal. 2010) (quoting *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)). To assess whether or not the representative's claims are typical, the Court examines "'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D.Cal.1985)). In addition, "class certification is inappropriate where the putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Id.* (citing cases).

The Court concludes that Plaintiff's claims are typical of the claims of the Class because they arise from the same factual circumstances and raise the same legal issues.

### 4. Adequacy is Satisfied

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). To satisfy constitutional due process concerns, "absent class members must be afforded adequate representation before entry of a judgment which binds them." *Hanlon.*, 150 F.3d at 1020 (citing *Hansberry v. Lee*, 311 U.S. 32, 42-3 (1940)). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).

Plaintiff and Class Counsel have no conflicts of interest with other Class Members because, for purposes of the revised settlement, Plaintiff's claims are typical of those of other Class Members. Plaintiff and other Class Members share the common goal of protecting and improving consumer and privacy rights throughout California, and there is no conflict among them. In addition, Plaintiff and Class Counsel have been prosecuting this action vigorously on behalf of the Class. Class Counsel have extensive experience in business and corporate litigation, including the prosecution of class actions seeking to protect privacy and consumer rights. Class Counsel is qualified to represent the interests of the Class. Therefore, Rule 23(a)(4) is satisfied for purposes of preliminarily certifying the Settlement Class. Because Rule 23(a)(4) is satisfied for purposes of preliminarily certifying the Settlement Class, the Court also preliminarily appoints Plaintiff as Class Representative, and preliminarily appoints the Law Offices of Todd M. Friedman, P.C. and Kristensen, LLP as Class Counsel.[8]

### 5. Preliminary Class Certification Under 23(b)(3) is Appropriate

Having concluded that the Rule 23(a) requirements are satisfied, the Court must consider whether certification is appropriate under Rule 23(b)(3). In order to certify a class pursuant to Rule 23(b)(3), Plaintiff must demonstrate that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). A showing of commonality under Rule 23(a)(2) is not sufficient to fulfill the requirements of Rule 23(b)(3). *See Hanlon*, 150 F.3d at 1022. To satisfy the requirements of Rule 23(b)(3), common questions must constitute a significant aspect of the case which can be resolved for members of the class in a single action. *Id.* "[T]o meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof.'" *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001). "The overarching focus [is] whether trial by class representation would further the goals of efficiency and judicial economy." *Vinser v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009).

In this case, the Court concludes that Plaintiff has demonstrated that common issues

---

[8] In addition, the parties jointly propose that the Court appoint Epiq Class Action & Claims Solutions, Inc. ("Equip") to continue to serve as Settlement Administrator. Based upon the recommendations of the parties, the Court appoints Equip to continue to serve as Settlement Administrator.

predominate and that a class action is superior for the proposed Class.  The central inquiry for purposes of the proposed revised settlement is whether Defendants violated the Unruh Act and the UCL with their pricing scheme.  "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Hanlon,* 150 F.3d at 1022.

Accordingly, because the requirements of Rule 23(a) and 23(b)(3) have been satisfied, the Court **GRANTS** Plaintiffs' Motion requesting preliminary certification of the Class for settlement purposes, provisional appointment of Class Counsel, provisional appointment of a Class Representative, and appointment of a Settlement Administrator.

> **B.     The Revised Settlement Meets the Requirements for Preliminary Approval**
>
>> **1.     The Revised Settlement Satisfies Notice Requirements Under Rule 23(c)(2)(B)**

For proposed settlements under Rule 23, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Rule 23(e)(1).  When a class is certified under Rule 23(b)(3), the notice must meet the requirements of Rule 23(c)(2)(B), which requires the "best notice ... practicable under the circumstances ... to all members who can be identified through reasonable effort."  However, actual notice is not required under Rule 23(c)(2)(B).  *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir.1994).

The Amended Settlement Agreement provides that CAFA notice will be provided within ten days after the filing of this Motion and Class Notice will be provided "[a]s soon as reasonably practicable" after the Court issues this Order.  Amended Settlement Agreement, §§ 4.1, 4.3, and 4.4.  In addition, Defendants have already provided the Settlement Administrator with the necessary information to contact Class Members.  The Settlement Administrator has already developed the Settlement Website and the Settlement Website will be updated no later than the date that notices are sent to Class Members, with the updates addressing recent developments in the case, including the revised settlement, and will contain relevant documents pertaining to the revised settlement.  Amended Settlement Agreement, §§ 4.5 and 5.3.

The Court concludes that the parties' notice procedure is the best practicable means available to provide notice under the circumstances, and is reasonably calculated to provide notice to potential Class Members and satisfies Rule 23(c)(2)(B).

Rule 23(c)(2)(B) also requires that the notice must state in clear, concise, plain, and easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

The parties' proposed Notice includes information about the nature of the litigation, the scope of the class involved, and claims against Defendants.  The proposed Notice also clearly

explains that Class Members may enter an appearance (including entering an appearance through Class Members' own counsel), or "opt-out" of the proposed Class and the binding effect of a judgment. Therefore, the Court concludes that the proposed Notice, with the necessary revisions to reflect the parties' addendum to the Amended Settlement Agreement, generally "alerts those with adverse viewpoints to investigate and to come forward and be heard" (*In re Online DVD*, 779 F.3d 934, 946 (9th Cir. 2015)) and otherwise satisfies the requirements of Rule 23(c)(2)(B).

### 2. The Revised Settlement Meets the Requirements for Preliminary Approval under Rule 23(e)

#### (a) Legal Standard Under Rule 23(e)

Settlements that take "place prior to formal class certification," such as in this case, require "a higher standard of fairness" and a "more probing inquiry." *See Hanlon*, 150 F.3d at 1026. These requirements are necessary because "settlements in class actions present unique due process concerns for absent class members, including the risk that class counsel may collude with the defendants." *In re Online DVD*, 779 F.3d at 944 (internal quotations omitted). As a result, the Court must review the relevant documents and conduct a searching inquiry "to determine whether [the proposed settlement] is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027.

In determining whether a settlement that was reached prior to certification is fair, adequate, and free from collusion, courts must "comprehensively" consider a number of factors including: (1) a defendant's ability to pay a larger settlement; (2) the strength of the plaintiff's case; (3) the extent of discovery completed and the stage of the proceedings; (4) the risk, expense, complexity, and likely duration of further litigation; (5) the amount offered in settlement; (6) the experience and views of counsel; (7) the reaction of the class members to the proposed settlement; (8) the presence of a governmental participant; (9) whether the attorney fees request is indicative of collusion; and (10) whether distribution favors certain class members at the expense of others. *See In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 946–47 (9th Cir. 2011); *see also Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000) ("The district court must show that it has explored these factors comprehensively to survive appellate review.").

Several of the aforementioned factors cannot be properly examined until the Final Fairness Hearing. Therefore, at this preliminary approval stage, the Court conducts a less searching inquiry of each factor and only requires that the proposed settlement be within the range that would likely receive final approval by the Court. *See Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 665 (E.D. Cal. 2008) (discussing that at the preliminary stage courts merely conduct a "cursory" analysis of fairness, seeking merely to identify any "glaring deficiencies" prior to sending notice to class members).

#### (b) The Revised Settlement Is the Result of Arms' Length Negotiation

After carefully considering the terms of the revised settlement, the Court concludes that the revised settlement award that each Class Member will receive is fair, appropriate, and reasonable given the purposes of the Unruh Act and UCL. *See Shames*, 2012 WL 5392159 at *13 (holding that settlement was fair where the parties "negotiated a settlement that provide[d] direct payment

to class members"); *Hopson v. Hanesbrands Inc.*, 2009 WL 928133, at *11 (N.D. Cal. Apr. 3, 2009) ("the benefits can be accurately traced because they are monetary payments directly to Class Members"); *Briggs v. United States*, 2010 WL 1759457 (N.D. Cal. Apr. 30, 2010) (holding that settlement agreement was fair where it did not require class members to file claim forms). Moreover, although the Unruh Act provides for statutory damages of $4,000.00 per violation, it is well settled that a proposed settlement may be acceptable even though it amounts to only a percentage of the potential recovery that might be available to the class members at trial. *See e.g., National Rural Tele. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) (holding that it is "well settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery"). Courts have also upheld the reasonableness of Unruh Act class action settlements that provided for no monetary relief, but rather only injunctive relief. *See, e.g., Carter v. City of Los Angeles*, 224 Cal. App. 4th 808 (2014).

This case involves complex legal and factual issues, and the revised settlement was agreed to after three and one-half years of adversarial litigation and arms-length settlement negotiations, including two all day mediation session before Judge Meisinger.  *See In re Wireless Facilities, Inc. Sec. Litig. II*, 253 F.R.D. 607, 612 (S.D. Cal. 2008) (holding that time and effort spent examining and investigating claims militates in favor of preliminary approval of a proposed settlement because it indicates that there was no collusion).  Defendants have vigorously contested the claims asserted by Plaintiff, and although both sides strongly believe in the merits of their respective cases, there are risks to both sides in continuing to litigate this case.  For example, if this case continued, Plaintiff's primary initial challenge will be to prevail on the pending appeal of this Court's ruling that Plaintiff's claims are subject to arbitration.  Importantly, whether claims against Defendants are subject to arbitration is not limited to this Plaintiff but also applies to the majority of the Class Members because, according to Defendants, over ninety-five percent of the Class Members have entered into the same or similar "sign-up wrap" arbitration agreements.  The Ninth Circuit has held that similar types of arbitration agreements can be a bar to class certification under the right circumstances.  *See Lee v. Ticketmaster* L.L.C., 817 Fed. Appx. 393 (9th Cir. 2020); *see also O'Conner v. Uber Technologies, Inc.*, 904 F.3d 1087 (9th Cir. 2018); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014).  In addition, even if Plaintiff prevails on her appeal, Defendants would likely oppose any additional class certification motion, thereby placing in substantial doubt whether a class will be certified in this action.  Moreover, Plaintiff would face other substantive challenges, including a likely motion for summary judgment.  Similarly, although Defendants contend that they have strong and meritorious defenses to this action and are likely to prevail on Plaintiff's pending appeal, Defendants recognize that if a class was certified and Plaintiff prevailed at trial, there is a risk of a damages award substantially higher than the value of the revised settlement.  Both parties are represented by competent counsel with substantial experience in class action litigation, who have considered the challenges of continuing to litigate this case, and counsel believe that the proposed revised settlement accounts for the expense, delay, and uncertainty that continued litigation, including resolution of the pending appeal, would necessarily entail and that the proposed revised settlement is fair, reasonable, and adequate.

Based on all the foregoing, the Court concludes that the revised settlement is the result of intensive arms'-length negotiation, including a second all day mediation session before Judge Meisinger, and not the result of collusion.  After Plaintiff and Defendants failed to reach an agreement at the end of the second all day mediation, the parties continued to engage in negotiations with the assistance of Judge Meisinger by email and phone.  Ultimately, with the

guidance of Judge Meisinger, the parties were able to reach a second proposed resolution of this case. The time and effort spent in further analysis and investigation of the claims strongly favors preliminary approval of the proposed revised settlement, as the process clearly demonstrates that there was absolutely no collusion. *See In re Wireless Facilities, Inc. Sec. Litig. II*, 253 F.R.D. 607, 610 (S.D. Cal. 2008) ("Settlements that follow sufficient discovery and genuine arms-length negotiation are presumed fair").

### (c) The Revised Settlement is Fair, Reasonable, and Adequate

The Court also concludes that the monetary and non-monetary benefits provided for in the revised settlement will directly and meaningfully benefit the Class. *See Staton*, 327 F.3d at 961 (holding that for settlement approval in the Ninth Circuit, district courts must evaluate whether "fees and relief provisions clearly suggest the possibility that class interests gave way to self interests"); *see also Shames v. Hertz Corp.*, 2012 WL 5392159 at *13 (S.D. Cal. Nov. 5, 2012) (settlement was fair where the parties "negotiated a settlement that provide[d] direct payment to class members"). Pursuant to the Amended Settlement Agreement, Defendants have agreed to create a $5,200,000 non-reversionary cash Settlement Fund (subject to an increase in the amount of the fund in the event of a high claims rate), together with other substantial non-monetary and injunctive benefits to the Class Members.[9] The non-reversionary Settlement Fund adequately addresses the concern expressed by the Ninth Circuit that the low claims rate for monetary relief in the prior settlement would have resulted in Defendants paying a mere $45,000, which was substantially below the attorneys' fees awarded to Plaintiff's counsel by increasing the cash payment to each

---

[9] Class Counsel's attorneys' fees, if awarded, will be paid out of the Settlement Fund. However, this is a standard feature of common fund settlements and is regularly approved, including in cases settling claims under statutes that, like the Unruh Act, have a prevailing party attorneys' fee provision. *See, e.g., Carrillo v. Schneider Logistics Transloading and Distrib., Inc.*, 2015 WL 12698305 *6 (C.D. Cal. Sept. 24, 2015) (approving final settlement in wage and hour class action where counsel requested fees and costs amounting to thirty-three percent of $21 million common fund); *Blair v. Rent-A-Center, Inc.*, 2020 WL 408970 (N.D. Cal. Jan. 24, 2020) (approving final settlement in CLRA class action where counsel requested fees amounting to thirty percent of common fund); *In re Pep Boys Overtime Actions*, 2008 WL 11343369 (C.D. Cal. Nov. 12, 2008) (awarding unopposed fee request amounting to twenty-five percent of maximum potential settlement fund amount in partially reversionary wage-and-hour class settlement). Moreover, the prior settlement provided for a maximum award of attorneys' fees for Class Counsel of $1,200,000, and Defendants agreed not to contest the amount of attorneys' fees to be awarded as long as the award is less than $1,200,000. However, such "clear sailing" provisions are considered troubling and a possible sign of collusion as noted by Judge Rakoff. *Kim*, 8 F.4th at 1180. As a result, Plaintiff and Defendants renegotiated the attorneys' fees award provision, and the Amended Settlement Agreement no longer contains a clear sailing provision. Instead, under Section 7.1 of the Amended Settlement Agreement, "Plaintiff's Counsel may apply to the Court for an award of attorneys' fees, plus reasonable costs and expenses actually incurred in connection with the Litigation [and] Defendants may oppose any such request." Because Class Counsel's request for attorneys' fees will be the subject of a separate motion (as will Plaintiff's request for an incentive award), the Court will consider the reasonableness of that request under Rule 23(h) when ruling on Class Counsel's motion for attorneys' fees and costs.

Class Member (from $25 to $50) making a valid claim as well as giving each of those Class Members a pro rata share of any remaining funds in the Settlement Fund.  *See* Amended Settlement Agreement 3.3(a) ("To the extent the amount of the Settlement Fund ($5.2 Million) would otherwise end up exceeding the total amount of all payments for which the Settlement Fund is intended to be the source of payment (the types of payments covered by the Settlement Fund are listed in Section 2.22 above), the $50 payment for each Valid Claim will be increased pro rata"); s*ee also Kim*, 8 F.4th at 1179.  Moreover, to maximize the claim rate, Defendants have agreed that valid claim forms from the prior settlement will be honored (unless the Class Member opts out), eliminating any need for those Class Members to submit a new claim form.  Amended Settlement Agreement, § 5.2.  In light of the reality of claims rates in consumer litigation (and based on the previous claims rate), the actual amount to be paid to each Class Member who submits or has submitted a valid claim is likely to be substantially higher than $50, because there is no cap on a prorated adjustment to these payments.[10]

The revised settlement also increases the value of the automatic benefits for Class Members who have a Tinder account (including those who reactivate their previously closed accounts).  Under the Amended Settlement Agreement and the addendum the parties have agreed to execute, Class Members will receive seventy Super Likes and a Boost valued at $7.00.  The Super Likes have substantially increased in value because, due to the passage of time, the a la carte price of Super Likes is now $1.59 rather than $1.00.  Moreover, Tinder no longer gives all users one free Super Like per day, and subscribers to Tinder Plus and Tinder Gold no longer receive five free Super Likes per day.  Instead, Tinder Gold subscribers receive only five Super Likes per week, which expire if not used during that week, and Tinder Plus subscribers no longer receive any Super Likes.  Thus, the Ninth Circuit's concern that Super Likes were over-valued in the prior settlement because subscribers already received a substantial allotment of Super Likes as part of their subscriptions has now been satisfied.  *See Kim*, 8 F.4th at 1179.  With a combined value of $118.30 for the Super Likes and Boost ($111.30 + $7.00), the value of the relief on a class-wide basis is $28,392,000.  Even if limited to the approximately twenty-five percent of the Class Members who still have a Tinder account (ignoring the fact that other Class Members could reactivate their accounts to participate in such relief), the value of this aspect of the settlement is approximately $7,100,000.  Thus, the Court concludes that the combined value of the claimed and automatic benefits, in addition to the agreed injunctive relief, is more than adequate, especially considering the  hyper-technical nature of the claims in this action, the fact that, as Defendants

---

[10]  In addition, the revised settlement carefully avoids providing significant benefits to a *cy pres* recipient at the expense of the class.  *See Dennis v. Kellogg Co.*, 697 F.3d 858, 862-63 (9th Cir. 2012) (holding that the amount of a cy pres award "must be examined with great care to eliminate the possibility that it serves only the 'self-interests' of the attorneys and the parties, and not the class"); *Lane v. Facebook, Inc.*, 709 F.3d 791, 793 (9th Cir. 2013) ("We require district judges to be reasonably certain that class members will benefit before approving a *cy pres* settlement"); *see also Molski v. Gleich*, 318 F.3d 937, 954-55 (9th Cir. 2003), *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010) (holding that a *cy pres* provision is a disfavored substitute for distribution of benefits directly to class members); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) ("[T]he *cy pres* doctrine – unbridled by a driving nexus between the plaintiff class and the cy pres beneficiaries – poses many nascent dangers to the fairness of the distribution process").

point out, there do not appear to be any cases that have ever awarded damages under the Unruh Act based on a plaintiff's failure to qualify for a price discount, and the fact that approximately ninety-five percent of the Settlement Class is bound by an arbitration agreement that, unless Plaintiff prevails on her appeal, will preclude them from participating in a contested class action.

For purposes of preliminary approval, the Court concludes that the terms of the proposed revised settlement are fair, adequate, and reasonable. However, the Court's conclusion will be subject to further review for fairness, and evidence of overreaching and/or collusion, following Notice to the Class Members and a Final Fairness Hearing. Accordingly, because each of the factors weighs in favor of preliminary approval, the Court **GRANTS** Plaintiffs' Motion requesting preliminary approval of the revised class action settlement.

### IV.     Conclusion

For all the foregoing reasons, Plaintiff's Amended Motion is **GRANTED**. The Court signs, as modified, the proposed Order Granting Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class, lodged with the Court on October 4, 2021. *See* Docket No. 118-3.

IT IS SO ORDERED.