**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>CIVIL MINUTES -- GENERAL</u>

Case No.    **CV 18-3093-JFW(ASx)**                          Date: March 4, 2022

Title:        Lisa Kim -v- Tinder, Inc., et al.

═══════════════════════════════════════════════════════════════

**PRESENT:**

      **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

      **Shannon Reilly**                          **None Present**
      **Courtroom Deputy**                    **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
        None                                                    None

**PROCEEDINGS (IN CHAMBERS):**        **ORDER GRANTING OBJECTORS' MOTION FOR
                                        ATTORNEYS' FEES AND EXPENSES [filed 11/29/21;
                                        Docket No. 152];**

                                        **ORDER GRANTING PLAINTIFF LISA KIM'S AMENDED
                                        MOTION FOR ATTORNEYS' FEES, COSTS, AND
                                        INCENTIVE AWARDS [filed 11/29/21; Docket No. 153];
                                        and**

                                        **ORDER GRANTING PLAINTIFF LISA KIM'S AMENDED
                                        MOTION FOR FINAL APPROVAL OF CLASS
                                        SETTLEMENT [filed 12/13/21; Docket No. 156]**

On November 29, 2021, Objector Rich Allison ("Allison"), and Objector Steve Frye's ("Frye")
(collectively, the "Objectors") filed a Motion for Attorneys' Fees and Expenses ("Motion for
Attorneys' Fees").[1]  Docket No. 152.  On December 20, 2021, Plaintiff Lisa Kim ("Plaintiff") filed her
Opposition.  Docket No. 162.  On December 20, 2021, Defendants Tinder, Inc., Match Group, LLC,
and Match Group, Inc. (collectively, "Defendants") filed a Response to the Objectors' Motion for
Attorneys' Fees.  Docket No. 161.  On December 27, 2021, the Objectors filed a Reply.  Docket
No. 163.  On November 29, 2021, Plaintiff filed an Amended Motion for Attorneys' Fees, Costs,
and Incentive Awards ("Motion for Attorneys' Fees").  Docket No. 153.  Defendants did not file an
Opposition.  On December 20, 2021, Allison and Frye filed an unauthorized Opposition to Plaintiff's

───────────────────────

[1]  Allan Candelore ("Candelore") also joined the Objectors in filing the Motion for Attorneys'
Fees.  *See* Notice of Motion for Attorneys' Fees (Docket No. 152), 1: 4-10.  However, Candelore is
not an Objector.  Instead, Candelore opted out of the revised Settlement.

Initials of Deputy Clerk  _sr_

Motion for Attorneys' Fees, which the Court has considered.  On December 27, 2021, Plaintiff filed a Reply.  Docket No. 165.  On December 13, 2021, Plaintiff filed an Amended Motion for Final Approval of Class Settlement ("Motion for Final Approval").  Docket No. 156.  Defendants did not file an Opposition.  On December 14, 2021, Allison and Frye objected to the Settlement.  Docket No. 157.  On December 20, 2021, Allison and Frye filed an unauthorized Opposition to Plaintiff's Motion for Final Approval, which the Court has considered.  Docket No. 159.  On December 27, 2021, Defendants filed a Response to Allison and Frye's Objections.  Docket No. 166.  On December 27, 2021, Plaintiff filed a Reply.  Docket No. 164.  On January 31, 2022, the Objectors filed the Declaration of P. Casey Pitts Authenticating State Court Class Action Filing, in Support of Objectors' Opposition to Final Settlement Approval ("Pitts Declaration").  Docket No. 175.  On February 7, 2022, Defendants filed a Response to the Pitts Declaration.  Docket No. 176.  On February 7, 2022, Plaintiff filed a Response to the Pitts Declaration.  Docket No. 177.

On November 3, 2021, the Court granted Plaintiff's Amended Motion for Preliminary Approval fo Class Settlement and Certification of Settlement Class ("Motion for Preliminary Approval") and entered its Order, which set the Final Fairness Hearing for January 10, 2022, at 1:30 p.m.  Docket Nos. 140 and 141.  The Final Fairness Hearing was later continued to February 25, 2022, at 1:30 p.m.

The Court conducted the Final Fairness Hearing on Plaintiff's Motion for Final Approval and a hearing on Plaintiff's Motion for Attorneys' Fees and the Objectors' Motion for Attorneys' Fees on February 25, 2022.  After the Final Fairness Hearing, on February 28, 2022, Plaintiff filed a Supplement to Plaintiff's Motion for Final Approval.  Docket No. 183.  On March 1, 2022, the Objectors filed a Supplemental Declaration of Kimberly A. Kralowec in Support of Objectors' Motion for Attorneys' Fees and Costs ("Supplemental Kralowec Declaration").  Docket No. 185.  For the reasons stated herein, the Court **GRANTS** Plaintiff's Motion for Final Approval, Plaintiff's Motion for Attorneys' Fees, and the Objectors' Motion for Attorneys' Fees:

I.      **Factual and Procedural Background**[2]

   A.     **Factual Background**

Tinder is a smartphone based dating application that is used by consumers throughout the world, including in California.  The core functionality of the application enables users to view profiles of other users in the same geographic location and to either indicate an interest in (*i.e.*, to "like") another user or, alternatively, indicate a lack of interest.  If two users indicate an interest in each other's profile, they can then communicate with each other through the application.  The application also allows a user to indicate a heightened degree of interest in another user through a feature known as a "Super Like."  In addition, the application offers another premium feature called "Boost," which allows a user to be one of the top profiles in their area for thirty minutes, which increases their chances for a match.  Users of the application may generally purchase Super Likes for $1.59 each and a Boost for $7.00 each.  Although the application may be downloaded and used

---

   [2]  To the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections.  As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

Initials of Deputy Clerk __sr__

for free, certain additional or premium features can only be accessed by purchasing a subscription to Tinder Plus or Tinder Gold, including, among other things, unlimited likes (the free version has a daily limit), no paid advertisements, the ability to undo dislikes, the ability to view profiles in other locales, and the ability to exert more control over other variables involved in using the application. At the time the revised settlement was being negotiated, Defendants represented that approximately thirty-five percent of Class Members still have active Tinder accounts.  However, after conducting further investigation, Defendants now represent that approximately twenty-five percent of Class Members still have active Tinder accounts.

Plaintiff is a user over the age of 29 who alleges that when she and other users over the age of 29 purchased Tinder premium services, such as Tinder Plus or Tinder Gold, Defendants discriminated against them based on their age by charging them a higher price for the same services that Defendants charged consumers who were younger than 29 years old.

On April 12, 2018, Plaintiff filed her class action Complaint against Defendants.  On June 22, 2018, Plaintiff filed a First Amended Complaint, alleging claims for: (1) violation of the Unruh Civil Rights Act, California Civil Code §§ 51 *et seq.*; and (2) violation of the Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*

On June 11, 2018, Defendants filed a Motion to Compel Arbitration, claiming that Plaintiff had agreed to arbitrate by entering into a "sign-up wrap" arbitration agreement.[3]  On July 12, 2018, the Court granted Defendants' Motion to Compel Arbitration, and on July 16, 2018, Plaintiff appealed the Court's ruling.[4]

On November 29, 2018, the parties attended a mediation with Judge Louis Meisinger (Ret.). The parties reached a settlement on December 1, 2018.  On March 1, 2019, this Court granted Plaintiff's Motion for Preliminary Approval of Class Settlement and, on June 19, 2019, granted Plaintiff's Motion for Final Approval of Class Settlement and Plaintiff's Motion for Attorneys' Fees,

---

[3]  In a sign-up wrap agreement, the consumer must click an "I agree" box, indicating that the consumer agrees to the application's terms of use before the consumer can access the application.  With Tinder, the consumer consents to the terms of use by tapping the Tinder Log In button directly below a disclosure that states that doing so constitutes agreement to the terms of use, which are available via a hyperlink.  Since 2014, Tinder's terms of use have included an arbitration agreement.

[4]  On June 28, 2019, the Ninth Circuit granted the parties' request to dismiss Plaintiff's appeal without prejudice, which the parties made after the Court conducted the Final Fairness hearing with respect to the prior Settlement.  On August 30, 2021, after the Ninth Circuit reversed the Court's June 19, 2019 Order granting Plaintiff's Motion for Final Approval of Class Settlement Plaintiff's Motion for Attorneys' Fees, Costs, and Incentive Awards, Plaintiff filed a new Notice of Appeal regarding the Court's July 18, 2018 Order granting Defendants' Motion to Compel Arbitration ("Renewed Appeal").  On February 28, 2022, the parties filed a Stipulated Voluntary Dismissal of Appeal Without Prejudice with the Ninth Circuit, asking that the Renewed Appeal be dismissed without prejudice.  On March 3, 2022, the parties filed an Amended Stipulation Regarding Dismissal of Plaintiff's Pending Appeal.

Initials of Deputy Clerk  _sr_

Costs, and Incentive Awards.[5]  On July 11, 2019, Allison and Frye appealed the Court's June 19, 2019 Order.  On August 17, 2021, the Ninth Circuit, in a 2-1 decision, reversed this Court's June 19, 2019 Order granting Plaintiff's Motion for Final Approval of Class Settlement Plaintiff's Motion for Attorneys' Fees, Costs, and Incentive Awards.  The Ninth Circuit, in an opinion written by District Court Judge Jed Rakoff, concluded that the Court's approval of the prior Settlement constituted an abuse of discretion and that the Court's approval of the attorneys' fees provision in the prior Settlement constituted an abuse of discretion.  With respect to the prior Settlement, the Ninth Circuit concluded that the Court "discounted the strength and value of the class members' claims because the court '[found] the holding of *Javorsky* to be more compelling and more in line with the weight of authority than the holding in *Candelore*.'  In so doing, the district court ignored the fact that the settlement class members are also putative members of the class in *Candelore* – and the settlement agreement therefore releases claims where *Candelore* is the law of the case, regardless of whether the district court finds the opinion persuasive."  The Ninth Circuit also concluded that the Court overstated the prior Settlement's worth because: (1) there was no basis for Class Counsel's unsupported representation that the injunctive relief (Defendants agreeing to eliminate age-based pricing going forward) was worth $6 million to the Class; (2) the award of 50 Super Likes is available only to Class Members who maintain or reactivate their Tinder accounts and Class Members may not want to reactivate their Tinder accounts and those who still have Tinder Plus or Tinder Gold accounts receive 150 Super Likes per month, making the marginal value of 50 lower; and (3) the Court overstated the claims that Tinder would actually pay at $6 million, which was based on all members of the Class filing a claim and electing a $25 cash alternative, when the actual claims rate was 0.745%, meaning Tinder would only pay less than $45,000.  In addition, the Ninth Circuit concluded that the Court did not adequately scrutinize the combination of a clear-sailing provision and an attorneys' fee award that outstripped the likely financial benefit to the Class.  The Ninth Circuit disagreed with the Court's finding that the attorneys' fee award was proportional to the value of the prior Settlement because the value of the prior Settlement was based on an unrealistic claims rate and an unexplained injunctive relief valuation.  Finally, the Ninth Circuit concluded that, independent of the Court's abuse of discretion in its overall evaluation of the prior Settlement, the approval of the attorneys' fee award itself was an abuse of discretion.

Following remand to this Court, on September 3, 2021, the Plaintiff and Defendants attended another mediation with Judge Meisinger.  Although the case did not settle on the day of the mediation, after subsequent discussions and with guidance from Judge Meisinger, the parties reached agreement on the principal terms of a revised settlement and entered into an Amended Class Action Settlement Agreement on September 24, 2021 (the "Amended Settlement Agreement").  *See* Declaration of Todd M. Friedman in Support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement and Certification of Settlement Class, Exh. A (Docket No. 118-1).

On November 3, 2021, the Court granted Plaintiff's Motion for Preliminary Approval and entered its Order, which set the Final Fairness Hearing for January 10, 2022.  The Final Fairness Hearing was later continued to February 25, 2022.

---

[5]  Candelore filed an Opposition to Plaintiff's Motion for Preliminary Approval of Class Settlement, and Allison and Frye filed an Objection to the Settlement prior to the Court hearing Plaintiff's Motion for Final Approval of Class Settlement.

Initials of Deputy Clerk  _sr_

### B.    The Settlement Class

The "Settlement Class" is defined in the Amended Settlement Agreement as:

Every California subscriber to Tinder Plus or Tinder Gold during the Class Period who at the time of subscribing was at least 29 years old and was charged a higher rate than younger subscribers, except those who choose to opt out of the Settlement Class.

Amended Settlement Agreement, § 2.21.  The Class Period is from March 2, 2015 through March 1, 2019.  The Settlement Class contains approximately 240,000 consumers.

### C.    The Terms of the Revised Settlement

The value of the revised settlement has been increased, by the following changes: (1) the injunctive relief remains the same (but is not assigned a value); (2) the automatic benefits have been improved (with an additional Boost feature, and with an increase in the value of each Super Like); and (3) the monetary component has been revised by increasing the cash payment to each Class Member (from $25 to $50) making a valid claim as well as giving each of those Class Members a pro rata share of any remaining funds in the Settlement Fund.  Specifically, under the Amended Settlement Agreement, Defendants will create a "Settlement Fund," which is "a non-reversionary fund in the amount of $5.2 Million to be deposited by Defendants for the purpose of paying (i) Valid Claims, (ii) settlement administration fees and costs, (iii) incentive fee, if any, awarded to plaintiff Lisa Kim, and (iv) an award if any, of attorneys' fees and costs to Plaintiff's Counsel."  Amended Settlement Agreement, § 2.22.  Pursuant to Section 3.3 of the Amended Settlement Agreement:

Every Settlement Class Member . . . is eligible to apply for a monetary payment by submitting a Claim Form.  The payment will be in the amount of $50, subject to the following potential adjustments, and will [be] made in the form of a check that will be mailed by the Settlement Administrator:

(a)    To the extent the amount of the Settlement Fund ($5.2 Million) would otherwise end up exceeding the total amount of all payments for which the Settlement Fund is intended to be the source of payment (the types of payments are covered by the Settlement Fund are listed in Section 2.22 above), the $50 payment for each Valid Claim will be increased pro rata.

(b)    Conversely, to the extent the amount of the Settlement Fund would otherwise end up being less than the total amount of payments for which the Settlement Fund is intended to be the source of payments, the $50 payment for each Valid Claim will be decreased pro rata, subject to a floor of $30 per Valid Claim.  Defendants shall increase the Settlement Fund amount in order to enable payment in the amount of $30 for each Valid Claim.[6]

---

[6]  Class Counsel anticipates that the claims' participation rate would have to exceed fifty percent, which would be uncharacteristically high for settlements of this nature, in order for the

In addition to the Settlement Fund monetary relief, Defendant will deposit: (1) seventy free Super Likes (valued at $111.30, with each Super Like valued at its current selling price of $1.59); and (2) one Boost (valued at its current selling price of $7) into the Tinder account of every Class Member who has an active Tinder account as of the benefit deadline, so long as the email address associated with the account is the same as when the Class Member purchased Tinder Plus or Tinder Gold during the Class Period.  Amended Settlement Agreement, § 3.2; *see also* Addendum to Amended Class Action Settlement Agreement, § 3.2.  Defendants have determined that twenty-five percent of Class Members have active Tinder accounts.  Class Members without active accounts will still be eligible for the automatic benefits upon reactivation of their account.  *Id*.  The proposed Class Notice advises Class Members that they must have an active account in place in order to receive the deposit of Super Likes and Boost.  *Id*.

Moreover, Defendants have retained and paid from the Settlement Fund for the services of a Settlement Administrator.  Defendants have also paid from the Settlement Fund any and all costs associated with administering the revised settlement, including Class and CAFA Notice, handling of claims and the distribution of monetary payments to Class Members who submit a valid claim form, and developing and maintaining the Settlement Website.  Amended Settlement Agreement, §§ 4.3-4.5 and 5.4.

CAFA notice was provided as required.  Amended Settlement Agreement, § 4.1.  The Settlement Administrator, as a result of the prior settlement, already had the information necessary to provide email notice to the Class Members, which Defendants updated as appropriate.[7] Amended Settlement Agreement, §§ 4.3 and 4.4.  Similarly, a Settlement Website was created as a result of the prior settlement, and the Settlement Administrator updated the website so that it contained relevant documents pertaining to the revised settlement, including the Amended Settlement Agreement, the Claim Form, the Class Notice, and the Preliminary Approval Order.  Amended Settlement Agreement, § 4.5.

### D.     The Scope of the Release

The Amended Settlement Agreement provides that Class Members who do not request exclusion from the revised settlement will release any and all claims, known or unknown, they may have against the Released Parties arising from the claims that subscribers to Tinder Plus or Tinder Gold were charged a higher price depending on their age.  Amended Settlement Agreement, § 8.1.

### E.     Notice to the Settlement Class

Because Defendants maintain email addresses for the majority of Tinder's users, on

---

minimum to be triggered.  However, it was important to Class Counsel to guarantee that Class Members received equal, if not greater, financial incentive to participate in the revised Settlement.

[7] Email was the best notice practicable because Defendants generally maintain email address data for Class Members, but not physical addresses or other information (such as landline phone numbers) that would permit Class Counsel to efficiently conduct a reverse lookup and sent notice via U.S. mail.

Initials of Deputy Clerk  _sr_

November 15, 2021, Class Notice was emailed by the Settlement Administrator, Epiq Class Action & Claims Solutions, Inc. (the "Settlement Administrator"), to the 240,390 Class Members for whom Defendants had email addresses.  Declaration of Brian Pinkerton ("Pinkerton Decl."), ¶¶ 9-10.  A total of 220,332 of those Class Notices were successfully delivered, which is ninety percent of the Class Members for whom Defendants had email addresses and approximately eighty-four percent of all Class Members (including those for whom Defendants lacked an email address).  *Id*.  A second Class Notice was emailed to Class Members on December 17, 2021.

As of February 25, 2022, the Settlement Administrator had received 5,671 Claim Forms (94 paper claims and 5,577 web claims) from Class Members.  Supplemental to Plaintiff's Motion for Final Approval (Docket No. 183), 2:10-14.  In addition, the Settlement Agreement provides that Claim Forms submitted in connection with the prior settlement will be honored.  Settlement Agreement, § 5.2.  There were 2,730 valid Claim Forms submitted for the previous Settlement.  As a result, the total number of Claim Forms submitted as of February 25, 2022 was 8,401, excluding duplicates.[8]  *Id., at* 2:10-11.  Moreover, a third Class Notice will be emailed after final approval of the Settlement.  During the Notice and Claims Period, the Settlement Administrator has maintained, and will continue to maintain, a Settlement Website that contains relevant documents pertaining to the Settlement and through which Claim Forms may be submitted.  Settlement Agreement, § 4.5; Pinkerton Decl., ¶¶ 12-14.  In addition, the Settlement Administrator has processed, and will continue to process, inquiries from Class Members via email and telephone.  Pinkerton Decl., ¶¶ 15-17.

### F.      Opt Outs and Objections

The Class Notice informed Class Members that they had until December 15, 2021 to submit an objection to the Settlement.  Similarly, the Class Notice informed Class Members that they had until December 16, 2021 to submit an opt out to the Settlement.

A total of 979 opt outs have been received.  On December 6, 2021, Candelore submitted an opt out through his counsel.  In addition, the Swigart Law Group submitted 391 opt outs on behalf of Class Members who have filed arbitration claims against Defendants.  Davis & Norris also submitted 504 opt outs on behalf of Class Members who have also filed arbitration claims against Defendants.

In addition, Allison and Frye, who are represented by the same counsel as Candelore, objected to the Settlement on December 13, 2021.

## II.    Legal Standard

The settlement approval procedures take place over three stages.  First, the parties present

---

[8]  Twenty-eight of the Claimants have submitted an opt out and a Claim Form.  Fourteen Claimants submitted opt outs to the revised Settlement but had submitted a Claim Form in connection with the prior Settlement.  Another fourteen submitted opt outs to the revised Settlement but also submitted a Claim Form for the revised Settlement.  Plaintiff and Defendants have agreed that the latter in time of the two submissions (opt out or Claim Form) by these twenty-eight Class Members will control, so long as both submissions were otherwise timely and valid.

Initials of Deputy Clerk __sr__

a proposed settlement asking the Court to provide "preliminary approval" for both (a) the settlement class and (b) the settlement terms.  *See, e.g., Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)  (discussing the district court's use of a preliminary approval order). Second, if the court does preliminarily approve the settlement and class: (1) notice is sent to the class describing the terms of the proposed settlement; (2) class members are given an opportunity to object or opt out; and (3) the court holds a fairness hearing at which class members may appear and support or object to the settlement.  *Id.*  Third, taking account of all of the information learned during the aforementioned processes, the Court decides whether or not to give final approval to the settlement and class certification.  *Id.*

## III.    Discussion

In her Motion for Final Approval, Plaintiff seeks final approval of the class action settlement that was preliminarily approved by this Court on November 3, 2021.  In her Motion for Attorneys' Fees, Plaintiff seeks: (1) an award of attorneys' fees of $1,200,000; (2) a payment of $29,633.76 for costs; and (3) an Incentive Award of $5,000 for Plaintiff. In their Motion for Attorneys' Fees, Allison and Frye seek: (1) an award of attorneys' fees of $1,560,000; and (2) a payment of $15,602.58 for costs.

### A.    The Settlement Class Meets the Requirements for Class Certification

Before granting final approval of a class action settlement agreement, the Court must first determine whether the proposed class can be certified.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (holding that a district court must apply "undiluted, even heightened, attention [to class certification] in the settlement context" in order to protect absentees).  In this case, the Court previously preliminarily certified the Settlement Class for settlement purposes only.  Because nothing has changed to affect the propriety of certification of the Settlement Class, the Court's analysis is largely the same as set forth in its November 3, 2021 Order Granting Plaintiff's Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class ("Preliminary Settlement Order").

#### 1.    Legal Standard for Class Certification

Class actions are governed by Federal Rule of Civil Procedure 23.  In order to certify a class, each of the four requirements of Rule 23(a) must first be met.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  Rule 23(a) allows a class to be certified only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to Rule 23(a)'s requirements, the proposed class must satisfy the requirements of one of the subdivisions of Rule 23(b).  *Zinser,* 253 F.3d at 1186.  In this case, Plaintiff seeks to certify the Settlement Class under subdivision Rule 23(b)(3), which permits certification if "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Initials of Deputy Clerk  _sr_

### 2.    Numerosity is Satisfied

Federal Rule of Civil Procedure 23(a)(1) requires that a class must be "so numerous that joinder of all members is impracticable."  "[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer."  *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007).

In this case, the numerosity requirement is easily satisfied as Plaintiff's proposed Class consists of approximately 240,000 members.

### 3.    Commonality is Satisfied

Federal Rule of Civil Procedure 23(a)(2) requires that there be "questions of law or fact common to the class."  Commonality requires that "the class members 'have suffered the same injury.'"  *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (*quoting Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

In this case, the Court concludes that Plaintiff has met her burden of demonstrating that there are common questions of law and fact.  For example, the Class Members' claims all arise from the same factual circumstances, specifically that consumers age 29 and older who subscribed to Tinder Plus or Tinder Gold paid a higher price than those under the age of 29.  In addition, whether or not this pricing policy violated the Unruh Act and the UCL is common to all Class Members and does not depend on individual factual or legal issues.

### 4.    Typicality is Satisfied

To satisfy Federal Rule of Civil Procedure 23(a)(3), Plaintiff's claims must be typical of the claims of the Class.  The typicality requirement is "permissive" and requires only that Plaintiff's claims "are reasonably coextensive with those of absent class members."  *Hanlon*, 150 F.3d at 1020.  "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (*quoting Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)).  "[C]lass certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'"  *Id*. (citation omitted).

In this case, the Court concludes that Plaintiff's claims are typical of the claims of the Class because they arise from the same factual circumstances and raise the same legal issues.

### 5.    Adequacy is Satisfied

Federal Rule of Civil Procedure 23(a)(4) requires that the named representatives fairly and adequately protect the interests of the class. "To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of judgment which

binds them." *Hanlon*, 150 F.3d at 1020 (*citing Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940)).  To determine legal adequacy, the Court must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id*.

Plaintiff and Class Counsel have no conflicts of interest with other Class Members because, for purposes of the Settlement, Plaintiff's claims are typical of those of other Class Members. Plaintiff and other Class Members share the common goal of protecting and improving consumer and privacy rights throughout California, and there is no conflict among them.  In addition, Class Counsel have extensive experience in business and corporate litigation, including the prosecution of class actions seeking to protect privacy and consumer rights.  Based on Class Counsel's extensive experience in business and corporate litigation, including the successful prosecution of numerous class actions seeking to protect privacy and consumer rights, the Court concludes that Class Counsel is qualified to represent the interests of the Class.  Moreover, Plaintiff and Class Counsel have been prosecuting this action vigorously on behalf of the Class.  Accordingly, the Court concludes that Plaintiff and Class Counsel adequately represent the members of the Settlement Class, and, thus, Rule 23(a)(4)'s adequacy requirement is met.

### 6.      Certification Under 23(b)(3) is Appropriate

Federal Rule of Civil Procedure 23(b)(3) permits certification if "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Whether a class is being certified for litigation or settlement affects the predominance inquiry.  As the Ninth Circuit explained in *In re Hyundai and Kia Economy Litigation ("In re Hyundai")*, 926 F.3d 539 (9th Cir. 2019):

> In *Amchem*, the district court found that predominance was satisfied based in part on class members' common interest in the settlement benefits – prompt and fair compensation without the risk and cost of litigation.  521 U.S. at 622.  The Supreme Court held that this was error because predominance looks at the cohesiveness of "the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Id*. at 623.  But whether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement.  A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable. *See* 2 William B. Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ("Courts . . . regularly certify settlement classes that might not have been certifiable for trial purposes because of manageability concerns").

The final requirement for certification pursuant to Federal Rule of Civil Procedure 23(b)(3) is "that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy."  The superiority inquiry requires the Court to consider the four factors listed in Rule 23(b)(3): (A) the class members' interests in individually controlling the prosecution or defense of

Initials of Deputy Clerk  _sr_

separate actions; (B) the extent and nature of any litigation concerning the controversy already
begun by or against class members; (C) the desirability or undesirability of concentrating the
litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class
action.  *See also Zinser*, 253 F.3d at 1190.  However, a court need not consider the fourth factor
when certification is solely for the purpose of settlement.  *See Amchem*, 521 U.S. at 620
("Confronted with a request for settlement-only class certification, a district court need not inquire
whether the case, if tried, would present intractable management problems, for the proposal is that
there be no trial"); *see also In re Hyundai*, 926 F.3d 538 (9th Cir. 2019) ("These factors must be
considered in light of the reason for which certification is sought – litigation or settlement – which
"is relevant to a class certification") (*quoting Amchem*, 521 U.S. at 619).  The superiority inquiry
focuses "'on the efficiency and economy elements of the class action so that cases allowed under
[Rule 23(b)(3)] are those that can be adjudicated most profitably on a representative basis.'"
*Zinser*, 253 F.3d at 1190 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
*Federal Practice and Procedure,* § 1780, at 562 (2d ed. 1986)).  A district court has "broad
discretion" in determining whether class treatment is superior.  *Kamm v. Cal. City Dev. Co.*, 509
F.2d 205, 210 (9th Cir. 1975).

        In this case, the Court concludes that Plaintiff has demonstrated that common issues
predominate and that a class action is superior for the proposed Class.  The central inquiry for
purposes of the Settlement is whether Defendants violated the Unruh Act and the UCL with their
pricing model.  "When common questions present a significant aspect of the case and they can be
resolved for all members of the class in a single adjudication, there is clear justification for handling
the dispute on a representative rather than on an individual basis."  *Hanlon,* 150 F.3d at 1022; *see
also In re Hyundai*, 926 F.3d 539 ("We have held that these types of common issues, which turn on
a common course of conduct by the defendant, can establish predominance in nationwide class
actions").  In addition, individual cases would consume a significant amount of the Court's and the
Class Members' resources.  It is also likely that Class Members would not pursue litigation on an
individual basis due to the high costs of pursuing individual claims.  The interests of the Class
Members in individually controlling the litigation are minimal, especially given the same
broad-based policy and practices would be at issue.  Moreover, although the Court has received
two objections to the revised Settlement, which are addressed in more detail below, none seriously
challenge the resolution of this matter on a class-wide basis.

        Accordingly, because the requirements of Rule 23(a) and 23(b)(3) have been satisfied, the
Court finds certification of the Settlement Class proper and reaffirms certification of the Settlement
Class for settlement purposes only.

    **B.    The Amended Settlement Agreement Meets the Requirements for Final
           Approval**

        Having certified the Settlement Class, the Court must next determine whether the proposed
settlement is "fair, reasonable, and adequate" pursuant to Federal Rule of Civil Procedure 23(e).
Relevant factors to this determination include:

        The strength of the plaintiffs' case; the risk, expense, complexity, and likely duration
        of further litigation; the risk of maintaining class action status throughout the trial; the
        amount offered in settlement; the extent of discovery completed and the stage of the

Initials of Deputy Clerk  _sr_

proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026.  In addition, due to the "dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court designated class representative," any "settlement approval that takes place prior to formal class certification requires a higher standard of fairness."  *Id.*

> **1.    The Strength of Plaintiff's Case, the Risk and Expense of Further Litigation, and the Risk of Maintaining Class Action Status Throughout Trial**

In this case, the parties dispute who would prevail on the merits if this litigation continued. In order to succeed on the merits, Plaintiff would have to prove that Defendants violated the Unruh Act.  The parties vigorously disagree on whether Unruh Act liability can be proven and, in fact, there is a split of authority regarding whether an age-based price discount, such as the one offered by Defendants, is lawful under the Unruh Act.  *See, e.g., Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138 (2018) (holding that the plaintiff's allegations based on Tinder's age based price discounts state a claim for age discrimination in violation of the Unruh Act); *see also Javorsky v. Western Athletic Clubs, Inc.*, 242 Cal. App. 4th 1386 (2015) (affirming trial court and holding that age-based price discount at health club did not violate Unruh Act or UCL).

Although the Ninth Circuit found that the Court "ignored" *Candelore*'s impact on the strength of the Class Members' claims, as the dissent pointed out, the Court did not ignore the impact, but, instead, found that the rationale of *Candelore* was less "compelling" that other conflicting California court decisions.  In addition, the dissent concluded that the Court "acted reasonably and within its discretion in determining that *Candelore* does not compel the conclusion that those claims are particularly valuable" because *"Candelore* merely held that the plaintiff's claim under the Unruh Civil Rights Act could survive demurrer; the case did not establish that Candelore was necessarily entitled to relief.  The district court further reasonably considered that the objectors had not identified any cases in which damages had ever been awarded for comparable Unruh Act violations."  Therefore, in determining the strength of Plaintiff's case for purposes of granting final approval to the revised Settlement, the Court has carefully considered the impact of *Candelore* on the Class Members' claims.  However, as the dissent concluded, because *Candelore* merely held that the plaintiff's claim under the Unruh Act could survive demurrer, the Court has also – as it must – considered the impact of *Javorsky* and other relevant case law in determining the strength of Plaintiff's case.

In addition, although Defendants do not object to a finding that the class elements are met for purposes of settlement, Defendants have stated that they will vigorously oppose class certification in the absence of a settlement and Defendants have raised several other viable defenses to Plaintiff's claims.  For example, Defendants argue, among other defenses, that Plaintiff's claims are governed by Texas, not California, law and that Tinder's Terms of Use include a limitation of liability provision that would bar Class Members from recovering statutory damages under the Unruh Act.  Moreover, Plaintiff and the overwhelming majority of Class Members – approximately ninety-five percent – are subject to an arbitration provision, and this Court has already concluded that, in the absence of this Amended Settlement, Plaintiff (and the majority of

Initials of Deputy Clerk __sr__

Class Members) would be required to arbitrate her claims.

Accordingly, if this case had not settled, the parties would each bear a significant risk and a strong likelihood of protracted and contentious litigation that would be costly to the parties.  As a result, the Court concludes that the risk and expense of further litigation weighs strongly in favor of the Court's conclusion that the Settlement is fair, reasonable, and adequate.  *See, e.g., Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) ("Avoiding such a trial and the subsequent appeals in this complex case strongly militates in favor of settlement rather than further protracted and uncertain litigation."); *see also Bond v. Ferguson Enters., Inc.*, 2011 WL 284962, at *7 (E.D. Cal. Jan. 25, 2011) ("Even if Plaintiffs were to prevail, they would be required to expend considerable additional time and resources potentially outweighing any additional recovery obtained through successful litigation").  The Court's conclusion that the Settlement is fair, reasonable, and adequate is strengthened by the fact that Defendants do not object to a finding that the class elements are met for purposes of this Settlement, but would vigorously oppose class certification in the absence of the Settlement.  *See, e.g., Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *Couser v. Comenity Bank*, 125 F.Supp.3d 1034, 1042 (S.D. Cal. 2015) ("Where there is a risk of maintaining class action status throughout the trial, this factor favors approving the settlement") (citation omitted).

### 2.    The Revised Settlement Provides a Fair and Substantial Benefit to Class Members.

In this case, the Settlement resulted from three and one-half years of adversarial litigation and arms-length negotiations, including two all day mediation sessions before Judge Meisinger.

The Amended Settlement provides all Class Members with significant monetary and non-monetary benefits. Defendants have agreed to create a $5,200,000 non-reversionary cash Settlement Fund.  The Settlement Fund adequately addresses the concern expressed by the Ninth Circuit that a low claims rate for monetary relief in the prior Settlement would have resulted in Defendants paying a mere $45,000, which was substantially below the attorneys' fees awarded to Class Counsel, by increasing the cash payment to each Class Member making a valid claim from $25 to $50 as well as giving each of those Class Members a pro rata share of any remaining funds in the Settlement Fund.  Indeed, as of the time Plaintiff filed her Reply to her Motion for Final Approval, the cash payment to each Class Member filing a valid claim was projected to be $485.57.[9]  In addition, to maximize the claims rate, Defendants agreed that all valid Claims Forms from the prior Settlement will be honored without the Class Members being required to file new Claim Forms.  Indeed, the claims rate is approximately three percent, which is significantly higher than the prior Settlement, which had a claims rate of less than one percent, and the claims rate is likely to rise before final disbursement because the deadline to file a claim is thirty days after entry of Final Approval of the Settlement.

The revised Settlement also increases the value of automatic benefits for Class Members

---

[9]  Because additional Claim Forms have been submitted since Plaintiff filed her Reply and the period to file a valid Claim Form will remain open for thirty days after the Court issues its Order granting final approval of the revised Settlement, the actual amount of the cash payment will be slightly lower.

who have Tinder accounts, including those who reactivate their previously closed accounts. Under the Amended Settlement, Class Members will receive seventy Super Likes and a Boost, which is valued at $7.00. In the time since the prior Settlement, the value of Super Likes has greatly increased, with a la carte pricing for a Super Like at $1.59, rather than $1.00. In addition, Tinder no longer gives all users one free Super Like per day, and subscribers to Tinder Plus and Tinder Gold no longer receive 5 free Super Likes per day. Instead, Tinder Gold subscribers receive only 5 Super Likes per week, which expire if not used during that week, and Tinder Plus subscribers no longer receive any Super Likes. Thus, the Ninth Circuit's concern that Super Likes were over-valued in the prior settlement because subscribers already received a substantial allotment of Super Likes as part of their subscription has been satisfied. The value of this aspect of the revised Settlement when limited to the approximately twenty-five percent of the Class Members who have active Tinder accounts is approximately $7,100,000.

In addition, the injunctive relief agreed to in the prior Settlement – that Defendants will no longer charge different prices based on age for new Tinder Plus or Tinder Gold subscriptions purchased in California – remains the same in the revised Settlement, but is not assigned a value, which addresses another concern raised by the Ninth Circuit.

Moreover, the clear sailing provision included in the prior Settlement Agreement has been removed from the Amended Settlement Agreement. Indeed, Section 7.1 of the Amended Settlement Agreement now provides that "Plaintiff's Counsel may apply to the Court for an award of attorneys' fees, plus reasonable costs and expenses actually incurred in connection with the Litigation [and] Defendants may oppose any such request." In addition, under the Amended Settlement Agreement, Class Counsel's attorneys' fees, if awarded, will be paid out of the Settlement Fund, which is a standard feature of common fund settlements and is regularly approved, including in cases settling claims under statutes such as the Unruh Act that have a prevailing party attorneys' fee provision.

The Court concludes that especially in light of the fact that no Class Member suffered any monetary harm or damages as a result of Defendants' pricing model, the revised Settlement will provide direct and meaningful benefits to the Settlement Class. *See Shames v. Hertz Corp.*, 2012 WL 5392159, *13 (S.D. Cal. Nov. 5, 2012) (holding that settlement was fair where the parties "negotiated a settlement that provide[d] direct payment to class members"). In addition, although the Unruh Act provides for statutory damages of $4,000.00 per violation, it is well settled that a proposed settlement may be acceptable even though it amounts to only a percentage of the potential recovery that might be available to the class members at trial. *See e.g., National Rural Tele. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004). In addition, the California Court of Appeal has upheld the reasonableness of Unruh Act class action settlements that provided for no monetary relief, but only injunctive relief. *See Carter v. City of Los Angeles*, 224 Cal. App. 4th 808 (2014).

Moreover, the revised Settlement was the result of intensive arms-length negotiation, including two all day mediation session and subsequent settlement discussions with Judge Meisinger. The time and effort spent examining and investigating the claims in preparation for the mediation and other settlement discussions weighs in favor of final approval of the Settlement, because the process strongly indicates that there was no collusion. *See In re Wireless Facilities, Inc. Sec. Litig. II*, 253 F.R.D. 607, 610 (S.D. Cal. 2008) (holding that settlements that follow

Initials of Deputy Clerk  _sr_

"genuine arms-length negotiation are presumed fair").

In addition, "[t]he recommendations of plaintiff's counsel should be given a presumption of reasonableness." *Boyd v. Bechtel Corp.,* 485 F. Supp. 610, 622 (N.D. Cal. 1979). Class Counsel has extensive experience in complex class actions and particular expertise in class actions relating to consumer protection, and they opine that the revised Settlement is fair, reasonable, adequate, and in the best interest of the Settlement Class. Given the judgment of these experienced counsel, this factor weighs in favor of the Court's conclusion that the revised Settlement is fair, reasonable, and adequate. *See, e.g., Rodriguez*, 563 F.3d at 967 ("[P]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation") (citation omitted); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 821–23 (9th Cir. 2012) ("[T]he district court properly declined to undermine [the parties'] negotiations by second-guessing the parties' decision as part of its fairness review over the settlement agreement"); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 490 (E.D. Cal. 2010) ("[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel") (*quoting Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).

Therefore, the Court concludes that the revised Settlement provides fair and substantial benefits to Class Members and, thus, the revised Settlement is fair, reasonable, and adequate.

### 2.    The Reaction of Class Members to the Revised Settlement

"The reactions of the members of a class to a proposed settlement is a proper consideration for the trial court." *Vasquez*, 266 F.R.D. at 490 (*quoting Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528). "Class representatives' opinions of the settlement are especially important because '[t]he representatives' views may be important in shaping the agreement and will usually be presented at the fairness hearing; they may be entitled to special weight because the representatives may have a better understanding of the case than most members of the class.'" *Id.* (*quoting Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528 (*citing Manual for Complex Litigation, Third*, § 30.44 (1995))). "Generally, 'the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members.'" *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *11 (N.D. Cal. Apr. 1, 2011) (*quoting Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 529).

Class Notice was sent to approximately 240,000 Class Members and only 979, or approximately 0.37 percent, opted out. In addition, only two, or less than 0.008 percent, objected. The extremely low number of Class Members either opting out or objecting to the Amended Settlement, indicates significant overall support for the Amended Settlement and strongly supports final approval. *See, e.g., Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming final approval where approximately 0.61% of class members either opted out or objected); *In re Lifelock, Inc. Mktg. & Sales Practices Litig.*, 2010 WL 3715138, at *6 (D. Ariz. Aug. 31, 2010) (holding that low number of timely written objections and requests for exclusion supported settlement approval).

With respect to the two Objectors, Allison and Frye concede that the proposed settlement fund of $5,200,000 dollars is "an improvement over the prior $45,000 fund," but argue that the Amended Settlement remains unfair, unreasonable, and inadequate when measured against the

Initials of Deputy Clerk  _sr_

strength and value of the putative class members Unruh Act and UCL claims in *Candelore*.
However, to the extent a Class Member concludes the settlement amount is insufficient, that Class
Member was free to opt out.  In addition, even considering the substance of the objections, none of
the objections persuade the Court that the revised Settlement is not fair, reasonable, and
adequate.  In assessing these objections, the Court "keep[s] in mind that objectors to a class
action settlement bear the burden of proving any assertions they raise challenging the
reasonableness of a class action settlement."  *Noll v. eBay, Inc.*, 309 F.R.D. 593, 611 (N.D. Cal.
2015) (*citing United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990)).

The Court concludes that Allison's and Frye's argument that the revised Settlement remains
unfair, unreasonable, and inadequate is insufficient to rebut the parties' contrary evidence that the
revised Settlement is fair, adequate, and free of collusion.  Indeed, the question before the Court
"is not whether the final product could be prettier, smarter or snazzier, but whether it is fair,
adequate and free from collusion.'  Even if every suggestion represents an actual potential
'improvement,' and even considering all the suggestions cumulatively, they do not support a
conclusion that *this* settlement is the product of collusion, or otherwise fails to meet the minimum
threshold of fairness and adequacy."  *Fraley v. Facebook, Inc.*, 966 F.Supp. 2d 939, 948 (N.D. Cal.
2013), *aff'd sub nom. Fraley v. Batman*, 638 Fed. Appx. 594 (9th Cir. 2016) (*citing Hanlon*, 150
F.3d at 1027).

In addition, the Court overrules the objections because they raise concerns that are not
supported by evidence or facts, are already adequately addressed by the Amended Settlement
Agreement, or are specific to the individual objectors such that they do not raise a genuine concern
as to all Class Members.

Accordingly, the Court **GRANTS** Plaintiff's Motion for Final Approval.

### C.    Plaintiff's Motion for Attorneys' Fees and the Objectors' Motion for Attorneys' Fees

In Plaintiff's Motion for Attorneys' Fees, Class Counsel requests an award of attorneys' fees
of $1,200,000.00, costs in the amount of $29,633.76, and an incentive award of $5,000 to Plaintiff.
Defendants do not oppose an award of attorneys' fees, costs, or an incentive award.  However,
Defendants do not agree that the amounts requested are appropriate.  Instead, Defendants argue
that "it is incumbent on Plaintiff to establish an entitlement to the amounts requested under the
applicable standard."  Defendant's Response (Docket No. 160), 1:12-13.  In their Opposition, the
Objectors make the disingenuous and frivolous argument that although they oppose approval of
the revised Settlement, if the Court does approve the revised Settlement, Plaintiff and Class
Counsel are not entitled to any award of fees, costs, or incentive payments because the revised
Settlement is not attributable to any work done by Plaintiff and Class Counsel, but, instead, is
attributable entirely to the efforts of the Objectors, Candelore, and their counsel.

In the Objectors' Motion for Attorneys' Fees, the Objectors seek an award of attorneys' fees
of $1,560,000 and costs in the amount of $15,602.58.  The Objectors argue that they are entitled
to an award of attorneys' fees and costs based on the same equitable principles applicable to
Class Counsel and that the $5,200,000 Settlement Fund is the direct result of the efforts of the
Objectors and their counsel.  In their Response (Docket No. 161), Defendants state that they do

not oppose an award of fees and costs to the Objectors provided it is consistent with the value that the Objectors contributed to the revised Settlement and provided any award does not deplete the Settlement Fund.  In addition, Defendants argue that the Objectors should withdraw their Objections to the Settlement if they want to be paid for their contribution to the Settlement. Defendants point out that it is inherently inconsistent and contradictory to seek an award of attorneys' fees and costs for allegedly improving the revised Settlement while at the same time also objecting that the revised Settlement is unfair.  In her Opposition, Plaintiff argues that it is Plaintiff and Defendants, and not the Objectors, who are responsible for the improvements in the revised Settlement and that a careful review of the Ninth Circuit's Opinion demonstrates that the Ninth Circuit did not adopt the majority of arguments raised on appeal by the Objectors.  The Court raised this issue with the Objectors' counsel at the Final Fairness Hearing and never received a satisfactory response.[10]

### 1.    Requests for Attorneys' Fees

Federal Rules of Civil Procedure provide that "[i]n a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties agreement." Fed. R. Civ. P. 23(h).  The guiding principle is that attorneys' fees "be reasonable under the circumstances."  *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990).

When, as in this case, a settlement creates a common fund for the benefit of the entire class, the Court has discretion to evaluate the reasonableness of the award under the percentage of the fund method or the lodestar calculation method.  *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 942 (9th Cir. 2011).  "Because the benefit to the class is easily quantified in common fund settlements, we have allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar."  *Id.* However, courts routinely cross-check the percentage of fund calculation with the lodestar method. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002).  The primary, if not only, purpose of the cross-check is to ensure counsel is not overcompensated.  *See, e.g., In re Bluetooth*, 654 F.3d at 944–45 (explaining how a cross-check guards against unreasonably high fee awards).

The benchmark percentage of the fund for attorneys' fees in a common fund settlement is twenty-five percent of the total settlement fund.  *In re Bluetooth*, 654 F.3d at 942; *see Boeing Co. v. Van Gemert,* 444 U.S. 472, 478–80 (1980).  However, a district court "may adjust the benchmark when special circumstances indicate a higher or lower percentage would be appropriate."  *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (*citing Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).  Courts consider a number of factors to determine the appropriate percentage of the fund to awarding as attorneys' fees in a common fund case including: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee; and, (5) awards made in similar cases.  *Vizcaino*, 290 F.3d at 1047-1050.

---

[10]  As the Court commented at the Final Fairness Hearing, and Class Counsel agreed, this attorneys' fees dispute is representative of the larger issue in class action litigation that these cases often focus more on securing a large award of attorneys' fees for counsel than benefitting the class members.

Initials of Deputy Clerk  _sr_

The lodestar method requires the Court to multiply the "number of hours reasonably expended by a reasonable hourly rate." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1029 (9th Cir. 1998). That figure, which is the lodestar, may then be "adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id.*

"Reasonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig*., 109 F.3d 602, 607 (9th Cir. 1997).

### a.    Class Counsel's Request for Attorneys' Fees

Although attorneys' fee provisions included in class action settlements are subject to the determination of whether the provision is fundamentally fair, adequate and reasonable, the Ninth Circuit has held that "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon*, 150 F.3d at 1027 (*citing Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)); *see also Lundell v. Dell, Inc*., 2006 WL 3507938 (N.D. Cal. Dec. 5, 2006). In *Hanlon*, the Ninth Circuit also held that where settlement terms, including attorneys' fees, are reached through formal mediation, the Court may rely upon the mediation proceedings "as independent confirmation that the fee was not the result of collusion or a sacrifice of the interests of the class." *Hanlon*, 150 F.3d at 1029; *see also Milliron v. T-Mobile USA, Inc*., 2009 WL 3345762, at *5 (D.N.J. Sept. 14, 2009) (holding that "the participation of an independent mediator in settlement negotiation virtually insures that the negotiations were conducted at arm's length and without collusion between the parties"); *Sandoval v. Tharaldson Emp. Mgmt., Inc*., 2010 WL 2486346, at *6 (C.D. Cal. June 15, 2010) (holding that "the assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive"); *Dennis v. Kellogg Co*., 2010 WL 4285011, at *4 (S.D. Cal. Oct. 14, 2010) (holding that the parties engaged in a "full-day mediation session," which helped to establish that the proposed settlement was noncollusive); 2 *McLaughlin on Class Actions*, § 6:7 (8th ed.) ("A settlement reached after a supervised mediation receives a presumption of reasonableness and the absence of collusion").

In this case, the revised Settlement resulted from extensive arm's length negotiations. Specifically, as discussed above, the parties attended two full day mediation session with Judge Meisinger (one in conjunction with negotiating the prior Settlement and one in conjunction with negotiating the revised Settlement), and it was only after the second full day mediation and subsequent settlement discussions that the parties were able to agree on the terms of the revised Settlement. The parties had also conducted extensive informal and formal discovery surrounding Plaintiff's claims and Defendants' defenses prior to engaging in the settlement talks. In addition, Class Counsel is requesting the identical amount of attorneys' fees – $1,200,000 – that it requested and the Court approved as fair and reasonable in connection with the prior Settlement, despite having spent significant additional time and effort in the intervening period. Most importantly, as the Court noted in its Order Granting Preliminary Approval, the clear sailing provision that the Ninth Circuit questioned has been eliminated. The Court concludes that the

Initials of Deputy Clerk  _sr_

current award of attorneys' fees of $1,200,000 requested by Class Counsel is fair and reasonable, especially in light of Class Counsel's decision not to request fees for the work done (over a two and one-half year period) on the appeal and in negotiating the revised Settlement.

The Court concludes that the requested attorneys' fees are supported by both the percentage of the fund and lodestar methods.  With respect to the percentage of the fund method, the first two factors – results achieved and the risks of litigation – were addressed above in discussing the adequacy of the Settlement for the Class.  With respect to the third factor, the "prosecution and management of a complex . . . class action requires unique legal skills and abilities" that are to be considered when evaluating fees.  *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008).  Class Counsel are experienced class action litigators who have been appointed "class counsel" in numerous UCL and related consumer protection class actions and have successfully litigated such cases.  With respect to the fourth and fifth factors, Class Counsel undertook this case entirely on a contingency basis, and the $1,200,000 in attorneys' fees sought equates to approximately twenty-three percent of the $5,200,000 Settlement Fund, which is slightly below, but very close to the Ninth Circuit benchmark of twenty-five percent for attorneys' fee awards.  Moreover, as discussed above, although Class Counsel spent significant additional time and effort on this case from the time the prior Settlement was approved until now, including fees incurred on appeal, Class Counsel is seeking the same amount of attorneys' fees – $1,200,000 – that it requested and the Court approved in conjunction with the prior Settlement.

In addition, the lodestar method, which can be used as a "cross-check" on the percentage of the fund method, confirms that the requested attorneys' fees award is reasonable.  Class Counsel worked a combined total of 1,627.95 hours litigating this action for a total lodestar of $1,072,448.75, as of the date of the filing of the current Motion for Attorneys' Fees.[11]  Taking into account all the hours reasonably worked by Class Counsel, the attorneys' fee request represents a lodestar multiplier of approximately 1.2, which is "within the range of multipliers applied in common fund cases."  *See Vizcaino*, 290 F.3d at 1051 (finding a range of multipliers applied in common fund cases of 0.6 to 19.6).

Therefore, the Court concludes that the $1,200,000 in attorneys' fees requested by Class Counsel is reasonable under both the percentage of the fund and the lodestar methods.

**b.    The Objectors' Request for Attorneys' Fees**

Under certain circumstances, attorneys for objectors may be entitled to attorneys' fees from the fund created by class action litigation.  Non-named members of a certified class have the authority to object to the fairness of a settlement at the fairness hearing required by Rule 23(e) of the Federal Rules of Civil Procedure.  *See Devlin v. Scardelletti*, 536 U.S. 1, 8–9 (2002).  If these objections result in an increase to the common fund, the objectors may claim entitlement to fees on the same equitable principles as class counsel.  *Vizcaino*, 290 F.3d at 1051–52.  Conversely, objectors who do "not increase the fund or otherwise substantially benefit the class members" are not entitled to fees, even if they bring "about minor procedural changes in the settlement agreement."  *Id*. at 1051; *see also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th

---

[11]  The Court finds that Class Counsel's hourly rates are reasonable.

Initials of Deputy Clerk  _sr_

Cir.2002) (explaining that "[t]he principles of restitution that authorize" the award of fees to objectors "also require, however, that the objectors produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class"). In addition, it is not error for a court to deny fees to objectors whose work is duplicative, or who merely echo each others' arguments and confer no unique benefit to the class. *See Reynolds*, 288 F.3d at 288–89.

In this case, the Court concludes that the Objectors, Allison and Frye, are entitled to an award of attorneys' fees.  Although, as Plaintiff points out, the Objectors did not prevail on appeal on many of their challenges to the prior Settlement, the Ninth Circuit did reverse in a 2 to 1 decision the Court's June 19, 2019 Order, which resulted in Plaintiff and Defendants entering into renewed negotiations that resulted in a new and improved revised Settlement, which includes a $5,200,000 Settlement Fund.  Therefore, the Court concludes that the Objectors did contribute to the improvement of the revised Settlement and, as a result, the only issue is the appropriate amount of attorneys' fees that should be awarded to the Objectors for their efforts.

The Court must now determine the appropriate amount to be awarded to the Objectors.  In this case, there is a quantifiable benefit to the Class, which is the creation of the $5,200,000 Settlement Fund.  As Plaintiff correctly points out, because the Objectors did not participate in either the prior settlement negotiations or the renewed settlement negotiations, the creation of the Settlement Fund was due to the hard work and efforts of Plaintiff and Defendants, not the Objectors.  However, had the Objectors not successfully appealed the Court's Order approving the prior Settlement, the current Settlement Fund benefit of $5,200,000 for Class Members would not exist.  The Objectors argue that because the creation of the $5,200,000 Settlement Fund was due to their efforts, they should be awarded $1,560,000 in attorneys' fees, which represents thirty percent of the Settlement Fund.  The Court agrees that awarding the Objectors a percentage of the Settlement Fund for attorneys' fees is appropriate because it ties the award of attorneys' fees to the benefit the Objectors obtained for the Class and aligns the interest of the Objectors with those of the Class.  *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018) ("By tying the award to the recovery of the Class, Class Counsel's interests are aligned with the Class, and Class Counsel are incentivized to achieve the best possible result.").  However, the Court concludes that $1,040,000, or approximately twenty percent of the Settlement Fund, is a more reasonable award of attorneys' fees for the Objectors.  An award of $1,040,000 in attorneys' fees is only $160,000 less than the amount awarded to Class Counsel, and is only slightly below the Ninth Circuit benchmark of twenty-five percent.  *See Arnett v. Bank of Am.*, 2014 WL 5419125, at *3 (D. Or. Oct. 22, 2014) (finding that where the objector's challenges to class counsel's requested expenses led to a $38,267.11 increase in the settlement fund, a fee award to objector's counsel of twenty-five percent of this amount, or $9,566.78, was appropriate).  Because all of the work in arriving at the revised Settlement was done by Plaintiff, the Court concludes that it is only reasonable that the Objectors' award of attorneys' fees should be less, albeit only slightly, than the award to Plaintiff's counsel.

In addition, the lodestar method, which can be used as a "cross-check" on the percentage of the fund method, confirms that an award of $1,040,000 in attorneys' fees is reasonable.[12]  The

---

[12]  The Court finds that the Objectors' counsel's hourly rates are reasonable.

Initials of Deputy Clerk  _sr_

Objectors' counsel worked a combined total of 1,453.60 hours litigating this action[13] for a total lodestar of $1,219,525.00, as of the date of the filing of the Motion for Attorneys' Fees.[14]  Taking into account the hours reasonably worked by counsel for the Objectors, $1,040,000 in attorneys' fees represents a lodestar multiplier of approximately 0.85, which is "within the range of multipliers applied in common fund cases."  *See Vizcaino*, 290 F.3d at 1051 (finding a range of multipliers applied in common fund cases of 0.6 to 19.6).

Therefore, the Court concludes that an award of $1,040,000 in attorneys' fees to the Objectors is reasonable under both the percentage of the fund and the lodestar methods.

### 2.    Requests for Costs

"Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit from the settlement."  *In re Media Vision Tech. Sec. Litig.*, 913 F.Supp. 1362, 1366 (N.D. Cal. 1996) (*citing Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391-392 (1970)).

### a.    Class Counsel's Request for Costs

The Court concludes that the costs incurred by Class Counsel – which include the cost of filing the case, service, courier fees, mediation expenses, and appeal fees – are fair, reasonable, and recoverable.  *See, e.g., In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166, 1177 (S.D. Cal. 2007) (holding that "filing fees and photocopies are also a necessary expense of litigation"; that "'[t]he reimbursement for travel expenses, both under 28 U.S.C. § 1920 and [Rule] 54(d), is within the broad discretion of the Court'"; and that "mediation expenses in this case are both reasonable and necessary").  These costs were necessary to advance this action on behalf of the Class and, ultimately, secure the resolution of this action.  In addition, Class Counsel advanced these costs without assurance that Class Counsel would ever be recovered.  *See, e.g., Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (noting an attorney usually may recover "out-of-pocket expenses that 'would normally be charged to a fee paying client'" and holding that facts of the case demonstrated the reasonableness of costs for "service of summons and complaint, service of trial subpoenas, fee for defense expert at deposition, postage, investigator, copying costs, hotel bills, meals, messenger service and employment record reproduction").

Accordingly, the Court concludes that the $15,602.58 in costs requested by Class Counsel are fair, reasonable, and recoverable.

---

[13]  Although the Objectors' counsel included hours spent litigating the *Candelore* and *Hansen* matters, the Court will not award attorneys' fees to counsel for work performed in other cases, or for Class Members, such as Candelore, who have chosen to opt out of the Amended Settlement in this action.  Although not raised by the parties, the Court questions whether the Objectors are entitled to an award of attorneys' fees incurred for the appeal to the Ninth Circuit. *See Cummings v. Connell*, 402 F.3d 936 (9th Cir. 2005).

[14]  The lodestar as of the filing of the Supplemental Kralowec Declaration on March 1, 2022 was $1,226,362.00.

Initials of Deputy Clerk  _sr_

### b.    The Objectors' Request for Costs

Similarly, the Court finds that the costs of $7,241.63 incurred by the Objectors in this are fair, reasonable, and recoverable.[15]  These costs were necessary to the Objectors' efforts in opposing the prior Settlement in this action and, as a result, ultimately helped accomplish the new and improved revised Settlement, including the creation of a $5,200,000 Settlement Fund.

Accordingly, the Court concludes that the $7,241.63 in costs incurred by the Objectors in this action are fair, reasonable, and recoverable.

### 3.    Plaintiff's Requested Incentive Award is Reasonable.

The Ninth Circuit recognizes that named plaintiffs in class action litigation are eligible for reasonable incentive payments.  *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).  The district court must evaluate each incentive award individually, using "'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . the amount of time and effort the plaintiff expended in pursuing the litigation...and reasonabl[e] fear[s of] workplace retaliation.'" *Id*. (*quoting Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).  This individualized inquiry naturally means that "a court need not award all named plaintiffs the same incentive payment."  *In re High–Tech Emp. Antitrust Litig*., 2015 WL 5158730, at *17 (N.D. Cal. Sept. 2, 2015).

In this case, the Settlement Agreement provides for a $5,000 Incentive Award to Plaintiff. The Court concludes that the Incentive Award in the amount of $5,000 is reasonable in light of other incentive awards in class actions in this Circuit and given the time and effort Plaintiff has devoted to this case, which ultimately resulted in the Settlement.  *See Faigman v. AT & T Mobility LLC*, 2011 WL 672648, *5 (N.D. Cal. Feb. 16, 2011) (approving incentive payment of $3,333.33 and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable"); *In re Toys R Us–Delaware, Inc—Fair & Accurate Credit Transactions Act (FACTA) Litig*., 295 F.R.D. 438, 472 (C.D. Cal. 2014) (approving $5,000 incentive award).

## IV.    Conclusion

For all the foregoing reasons, Plaintiff's Motion for Final Approval and Plaintiff's Motion for Attorneys' Fees are **GRANTED**.  In addition, the Objectors' Motion for Attorneys' Fees is **GRANTED**.  The Court signs, as modified, the Proposed Judgment, lodged with the Court on February 28, 2022 (Docket No. 182).

IT IS SO ORDERED.

---

[15]  As with attorneys' fees, the Court will not award the Objectors costs that were incurred in other cases.

Initials of Deputy Clerk _sr_