**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LISA KIM, individually and on behalf of all others similarly situated, | No. 22-55345 |
| *Plaintiff-Appellee*, | D.C. No. 2:18-cv-03093-JFW-AS |
| v. | |
| RICH ALLISON and STEVE FRYE, | OPINION |
| *Objectors-Appellants*, | |
| v. | |
| TINDER, INC., a Delaware corporation; MATCH GROUP, LLC, a Delaware limited liability company and MATCH GROUP, INC., a Delaware corporation, | |
| *Defendants-Appellees*. | |

| | |
|---|---|
| LISA KIM, individually and on behalf of all others similarly situated, | No. 22-55346 |
| *Plaintiff-Appellant*, | D.C. No. 2:18-cv-03093-JFW-AS |

v.

TINDER, INC., a Delaware corporation; MATCH GROUP, LLC, a Delaware limited liability company and MATCH GROUP, INC., a Delaware corporation,

        *Defendants-Appellees*.

and

RICH ALLISON and STEVE FRYE,

        *Objectors*,

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted September 11, 2023
Pasadena, California

Filed December 5, 2023

Before: MILAN D. SMITH, JR., MICHELLE T. FRIEDLAND, and ERIC D. MILLER, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

# SUMMARY[*]

### Class Action / Settlement

The panel vacated the district court's order approving a revised class action settlement between plaintiff Lisa Kim and Tinder, Inc., a mobile dating application.

The panel held that Kim was not an adequate representative of the putative class, as required by Fed. R. Civ. P. 23(a)(4). First, Kim had a conflict of interest with other class members. She had a strong interest in settling her claim because, unlike the 7,000 or more class members who may not be bound by arbitration at all, she had no chance of going to trial. Kim's conflict was exacerbated by other provisions in Tinder's Terms of Use. Second, Kim did not vigorously litigate this case on behalf of the putative class. She failed to provide record evidence that the parties conducted extensive discovery prior to engaging in the settlement talks, and her approach to opposing Tinder's motion to compel arbitration was not suggestive of vigor.

The panel remanded for the district court to consider Kim's individual action against Tinder, which has been compelled to arbitration.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Adrian R. Bacon (argued), Todd M. Friedman, and Thomas E. Wheeler, Law Offices of Todd M. Friedman PC, Woodland Hills, California; John P. Kristensen, Carpenter Zuckerman, Beverly Hills, California; for Plaintiff-Appellee.

Eve H. Cervantez (argued), Michael Rubin, P. Casey Pitts, Jonathan Rosenthal, and Danielle Leonard, Altshuler Berzon LLP, San Francisco, California; Kimberly A. Kralowec, Kralowec Law PC, San Francisco, California; Alfred G. Rava, Rava Law Firm, San Diego, California; for Objectors-Appellants.

Robert H. Platt, Donald R. Brown, Benjamin G. Shatz, and Benjamin E. Strauss, Manatt Phelps & Phillips LLP, Los Angeles, California, for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Objector-Appellants Rich Allison and Steve Frye (Objectors) appeal, for a second time, the district court's final approval of a class action settlement between Defendant-Appellees Tinder, Inc., Match Group, LLC, and Match Group, Inc. (collectively, Tinder) and Plaintiff-Appellee Lisa Kim. In the first appeal, a panel of our court reversed the district court's approval of a settlement between Tinder and Kim because its terms were suggestive of collusion. *Kim v. Allison*, 8 F.4th 1170, 1174–75 (9th Cir. 2021) (*Kim I*). On remand, the parties entered into a revised

settlement, which the district court again approved over objections. Because we agree with the Objectors that Kim is not an adequate representative of the putative class, we vacate the district court's order approving the revised settlement, reverse, and remand.

## FACTS AND PROCEDURAL BACKGROUND

### I. Tinder's Pricing Model

Tinder is a mobile dating application that allows users in geographical proximity to view and "like" each other's profiles. Users also can send one another a "Super Like," which they can purchase for $1.59 each. *Kim I*, 8 F.4th at 1175.[1]

The Tinder app is free for anyone who downloads the basic version, but users can pay extra to access certain premium features. In March 2015, Tinder unveiled "Tinder Plus," which offered purchasers a variety of premium features. *Kim I*, 8 F.4th at 1175. In 2017, Tinder launched a similar premium service called "Tinder Gold." *Id.*

Until February 2019, Tinder Plus and Tinder Gold operated on a two-tiered pricing model based on age. Specifically, Tinder charged customers over thirty around ten dollars more per month for Tinder Plus than it charged younger customers, and it charged them around fifteen dollars more per month for Tinder Gold. *Id.* (explaining that, for Tinder Plus, subscribers aged thirty years and younger paid $9.99 a month, and subscribers over thirty paid $19.99).

---

[1] The price of a Super Like has increased from $1 each to $1.59 each during the course of this litigation. *Cf. Kim I*, 8 F.4th at 1175 (discussing $1 Super Likes).

Tinder later lowered the age cutoff from thirty to twenty-nine.

## II. The Parallel Litigation

Tinder's pricing model triggered two parallel class actions: (1) *Candelore v. Tinder*, which was filed in California Superior Court in May 2015, and (2) *Kim v. Tinder*, which was filed in the United States District Court for the Central District of California in April 2018. Although this case is only an appeal of the latter, assessment of its merits requires an understanding of both actions.

### A. The *Candelore* Litigation

In May 2015, Allan Candelore filed a class action lawsuit against Tinder in state court, alleging that its age-discriminatory pricing scheme violated California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51 *et seq*. (Unruh Act), and California's unfair competition law, Cal. Bus. & Prof. Code §§ 17200 *et seq*. *See Candelore v. Tinder, Inc*., 228 Cal. Rptr. 3d 336, 339–40 (Cal. App. 2018), *review denied*, No. S247527 (Cal. May 9, 2018).

Shortly after Candelore filed his suit, on July 31, 2015, Tinder began using a "sign-in wrap" method of requiring users to assent to its Terms of Use (TOU) before they could log in. The TOU agreement contained a Texas choice-of-law provision, a limited liability provision, an arbitration clause, and a waiver of participation in class actions.

Tinder never filed a motion to compel arbitration in the *Candelore* action. Instead, Tinder filed a demurrer, which the Superior Court sustained. The California Court of Appeal reversed. The Court of Appeal held that Candelore's allegations stated a claim for age discrimination under the Unruh Act and the unfair competition law, rejecting as a

matter of law the argument that discrimination was justified "by public policies that promote (a) increased access to services for the general public and (b) profit maximization by [a] vendor." *Id.* at 348 (quotation marks omitted); *see also Kim I*, 8 F.4th at 1176 (characterizing the *Candelore* opinion as standing for the proposition that "if [Candelore's] allegations were true, Tinder's age-based distinction would not be justified by public policy as a matter of law"). On May 9, 2018, the California Supreme Court denied review of the Court of Appeal's decision. *See Candelore*, 228 Cal. Rptr. 3d at 351. That same day, Tinder issued an updated TOU to its users which purported to retroactively waive users' rights to join pending lawsuits, including the *Candelore* action.[2]

Having survived demurrer, Candelore continued to litigate his action in the Superior Court. In January 2022, Candelore sought to certify the class, proposing to break the class into subclasses. The subclasses would distinguish between those class members who may have agreed to Tinder's TOU through its July 31, 2015 sign-in wrap process and those who had not, "to facilitate a carveout . . . with respect to Tinder's [TOU] defense, if necessary."[3] The Superior Court denied the certification motion, but did so

---

[2] The waiver was subject to a 30-day opt-out period.

[3] We grant the parties' motions to take judicial notice of the publicly filed documents in the *Candalore* litigation. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc*., 971 F.2d 244, 248 (9th Cir. 1992) (noting that courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue" (quoting *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979)); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (noting that courts may take judicial notice of undisputed "matters of public record").

8                     KIM V. TINDER, INC.

"without prejudice to renewal following the Ninth Circuit's ruling" in this case.[4]

### B. This Action: *Kim v. Tinder*

In April 2018, approximately three years after Candelore filed his action in state court, Kim sued Tinder in the Central District of California, alleging the same Unruh Act and Unfair Competition claims as had Candelore in his state court case. Unlike in the *Candelore* litigation, however, Tinder did move to compel arbitration of Kim's claims. The district court granted the motion, because Kim had "on multiple occasions after [Tinder implemented its sign-in wrap method on] July 31, 2015, [] logged in to her Tinder account." The district court stayed the case pending the outcome of the arbitration.

Kim appealed the arbitration order. While the appeal was pending, however, Kim and Tinder reached a settlement, and the district court lifted the stay so that the parties could submit their settlement papers. Unlike the proposed class in *Candelore*, the proposed settlement class in *Kim* was not (and is not) divided into any subclasses. The single class is defined to include "every California subscriber to Tinder Plus or Tinder Gold during the Class Period who at the time of the subscription was at least 29 years old and was charged a higher rate than younger subscribers . . . ." The settlement agreement defines the Class Period as starting on March 2, 2015—almost two months before the *Candelore* litigation began.

Allison and Frye—whose counsel also represents Candelore—objected to the settlement. The district court

---

[4] The *Candelore* action is currently stayed "until a ruling by [our court] as to whether the settlement" in this action "was properly approved."

approved the settlement over their objections, and the Objectors appealed. A panel of our court reversed the district court's order. *Kim I*, 8 F.4th at 1175. Without reaching the Objectors' challenges to class certification, the panel held that the district court had erred in evaluating the settlement. *Id.* at 1179. Our court explained that "while the district court correctly recited the fairness factors under Fed. R. Civ. P. 23(e)(2), it materially underrated the strength of the plaintiff's claims, substantially overstated the settlement's worth, and failed to take the required hard look at indicia of collusion, including a request for attorneys' fees that dwarfed the anticipated monetary payout to the class." *Id.* at 1174–75. The panel therefore remanded the case back to the district court to "conduct the 'more probing inquiry' that a pre-certification class settlement demands." *Id.* at 1175 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

On remand, Kim and Tinder again settled, and entered into an Amended Class Action Settlement Agreement. Candelore and another 978 members of the class opted out; Allison and Frye again objected. Among other things, the Objectors argued that Kim was an inadequate class representative because, unlike the remainder of the class, she was subject to a binding arbitration order. The district court nonetheless certified the class and approved the settlement. The Objectors now appeal.[5]

---

[5] The district court also awarded attorneys' fees to the Objectors' counsel, and Kim appeals that award. Because we vacate the district court's approval of the settlement, Kim's appeal regarding fees is dismissed as moot.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. While we review class certification for an abuse of discretion, *Castillo v. Bank of Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020), we pay "heightened attention" where, as here, the district court certified a class for settlement purposes only. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 849 (1999).

## ANALYSIS

Before certifying a class, a district court must ensure that the class satisfies the prerequisites of Rule 23, including that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 895 F.3d 597, 606 (9th Cir. 2018). In addition, adequacy of representation is relevant to the court's inquiry into whether a proposed class settlement is fair under the revised Rule 23(e). *See* Fed. R. Civ. P. 23(e)(2)(A). The adequacy inquiry is addressed by answering two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Here, both inquiries lead to the conclusion that Kim is not an adequate class representative.

### I. Conflict of Interest

The initial inquiry in assessing adequacy of representation is whether "the named plaintiffs and their counsel have any conflicts of interest with other class members." *Id.* "That general standard must be broken down for specific application; conflicts within classes come in

many guises." *Volkswagen*, 895 F.3d at 607. "Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 942 (quoting 1 William B. Rubenstein et al., *Newberg on Class Actions* § 3:58 (5th ed. 2011)).

The district court disposed of the Objectors' adequacy argument in the following two sentences: "Plaintiff and Class Counsel have no conflicts of interest with other Class Members because, for purposes of the Settlement, Plaintiff's claims are typical of those of other Class Members. Plaintiff and other Class Members share the common goal of protecting and improving consumer and privacy rights throughout California, and there is no conflict among them."

As a threshold matter, the district court conflated a class representative's adequacy with her typicality. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The typicality inquiry, on the other hand, involves a more "permissive standard," simply asking whether a representative's claims "are reasonably co-extensive with those of absent class members." *See Castillo*, 980 F.3d at 729 (quoting *Hanlon*, 150 F.3d at 1120). While a lack of typicality can indicate that a class representative may be inadequate, *see Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir. 2010), the two inquiries are not the same.

The landmark case discussing adequacy and conflicts of interest is *Amchem Products*. In that case, the Supreme Court held that a group of named plaintiffs who included those with present injuries from their exposure to asbestos

could not adequately represent a class that included members who could not yet show injury, but who might develop exposure-related injuries in the future. 521 U.S. at 625–27. The interests of the presently injured plaintiffs conflicted with those of the exposure-only class members because the former had an interest in maximizing immediate payouts, while the latter had an interest in preserving the settlement funds for future claims. *Id.* at 626. Thus, by maximizing their own interests, the putative representatives who already had injuries would necessarily undercut the interests of another portion of the class. *Id.*

Similarly, in *Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010), we held that a class representative who had settled his Kansas state and federal regulatory claims with Sprint could not adequately represent class members who alleged that Sprint violated Washington state laws in a follow-on suit in federal court. *Id.* at 585, 588–89. The settlement in the Kansas state court action, which preceded the federal court action, purported to release Sprint from future, broader claims such as the Washington claims. *Id.* at 586. We explained that interpreting the Kansas judgment to encompass the Washington plaintiffs' claims would violate Rule 23(a)(4) as well as due process, because the Kansas plaintiff's "interest in settling his federal [] claims, even at the cost of a broad release of other claims he did not possess, was in conflict with the Washington [p]laintiffs' unrepresented interest in prosecuting their [state law] claims." *Id.* at 589. We therefore held that the Kansas plaintiff's representation of the Washington plaintiffs was inadequate as to those claims. *Id.* at 588.

In this case, Kim faces a conflict of interest similar to those found in *Amchem* and *Hesse*. As discussed above, the district court already held that Kim is subject to arbitration

because there was evidence that she signed into her Tinder account multiple times after Tinder began using its sign-in wrap method of notifying users of the TOU. However, Tinder concedes that—at least at this point in the litigation—it lacks any evidence of an agreement to arbitrate as to over 7,000 members of the class that was certified for settlement. Therefore, like the Kansas Plaintiff in *Hesse*, Kim has a strong "interest in settling" her claim, "even at the cost of a broad release of other claims" that are not subject to arbitration, because unlike the 7,000 or more members who may not be bound by arbitration at all, she has no chance of going to trial. *See id.* at 589.

Kim's conflict is exacerbated by other provisions of the TOU. Not only is Kim's claim subject to arbitration; her entire dispute may be governed by Texas law, in which case she may not be able to assert an Unruh Act claim at all. And even if she could assert such a claim, the TOU's limitation on liability would limit her recovery to "the amount paid, if any, by [Kim] to Tinder" during the twenty-four-month period prior to this litigation, which no one disputes is significantly less than what the Unruh Act provides. *See* Cal. Civ. Code § 52(a) (providing for damages "in no case less than four thousand dollars" for each count).[6]

Kim argues that any conflict between herself and the class is insignificant because the district court concluded that the 7,000-plus members for which there is no evidence of an agreement to arbitrate would only constitute five percent of the 240,000-member class. But there may be even more class members who are not subject to an arbitration

---

[6] At the same time, Kim (and only Kim) would receive a $5,000 incentive award for her role as class representative, pursuant to the revised agreement approved by the district court.

14                      Kim v. Tinder, Inc.

agreement. As the Objectors note, an additional 24,000 members agreed to the May 9, 2018 version of the TOU—a retroactive waiver of rights that may be invalid under California law.[7] But even if the district court's estimate is correct, we have never determined adequacy by deferring to a percentage-of-the-class formula. And even assuming that could be a proper approach in some case, it does not make sense to adopt that approach for the first time here, where five percent of a class represents a sizeable number of potential class members. Ultimately, Kim and her counsel's willingness to put even a minority of class members' claims at risk for a fee is precisely the kind of conflict Rule 23(a)(4) was designed to avoid.

## II. Vigorous Advocacy

To meet Rule 23's adequacy requirement, "plaintiffs and their counsel [must have also] prosecute[d] the action vigorously on behalf of the class." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 943 (quoting *Hanlon*, 150 F.3d at 1020). "Although there are no fixed standards by which 'vigor' can be assayed, considerations include competency of counsel and, in the context of a settlement-only class, an

---

[7] *See Cobb v. Ironwood Country Club*, 183 Cal. Rptr. 3d 282, 286–87 (Cal. App. 2015). Tinder argues that the TOU is governed by Texas, rather than California, law, but that is not immediately apparent from the TOU's terms, which state only that "the laws of Texas . . . shall apply" *unless* "[the] arbitration agreement is prohibited by law." And while the district court noted that Kim logged in to her account "multiple times" after Tinder implemented its sign-in wrap system, it is unclear whether she ever agreed to the May 9, 2018 version of the TOU. Notably, the record does not provide answers because Kim herself never made any formation or unconscionability challenge to the TOU when opposing the motion to compel. *See* Section II *infra*.

assessment of the rationale for not pursuing further litigation." *Hanlon*, 150 F.3d at 1021.

In certifying the class, the district court stated that "Plaintiff and Class Counsel have been prosecuting this action vigorously on behalf of the Class," but did not elaborate. The Objectors argue that the district court erred in reaching this conclusion. We agree.

First, the Objectors argue that although the district court stated that the parties "conducted extensive informal and formal discovery . . . prior to engaging in the settlement talks," Kim actually conducted "no discovery." The Objectors argue that the district court's statement to the contrary is not supported by the record evidence, because the entries submitted in support of Kim's proposed fee award "do not contain any entries referring to any review of any documents, discovery, or informational exchange with Tinder before the original mediation" on November 29, 2018.

The Objectors refer to two entries (totaling five and a half hours) for "drafting" and "finalizing" written discovery and one 30-minute entry for "discuss[ing] informal exchange of class data and information for settlement purposes" in June 2018, prior to the date of the first mediation. A month later, in its July 12, 2018 order granting Tinder's motion to compel, the district court rejected Kim's "vague request for unspecified discovery." Although this is not "no discovery," it is certainly not "extensive." *Cf. id.* at 1022 (concluding that "document request[s] and production, interrogatories, and the taking and defending of depositions" supported a determination that "counsel's prosecution was sufficiently vigorous" under Rule 23(a)(4)); Fed. R. Civ. P. 23(e)(2) advisory committee note to 2018 amendment

16          KIM V. TINDER, INC.

(noting that fairness of a settlement can include consideration of "the nature and amount of discovery," which "may indicate whether counsel negotiating on behalf of the class had an adequate information base"). Kim claims that she did "engage[] in discovery," but the portion of her brief asserting that she vigorously litigated the case does not provide any citations to the record and her counsel similarly failed to provide citations at oral argument.

Second, Kim's approach to opposing Tinder's motion to compel is not suggestive of vigor. The only argument Kim made to oppose Tinder's motion to compel is that the motion would have prevented imposition of a public injunction and would therefore violate *McGill v. Citibank, N.A.*, 393 P.3d 85, 90 (Cal. 2017). Although Kim and Tinder attribute this briefing to "strategy," that too is not borne out by the record, which shows that Kim belatedly raised formation challenges in a motion to file a supplemental brief. Of course, there is no strategic benefit to waiving objections to arbitration by a plaintiff who desires to maximize her leverage at the negotiating table. Class representatives will often need to choose which arguments to pursue, and ordinarily they will not be rendered inadequate simply because they failed to raise an argument that appears strong in hindsight. But Kim's failure to make obvious arguments until after they were forfeited calls into question whether she vigorously litigated this case on behalf of the class. In all, it is clear that Kim did not "vigorously" litigate this case on behalf of the putative class.

## CONCLUSION

In light of Kim's conflict of interest and failure to vigorously litigate the case, the district court abused its discretion in holding that Kim was an adequate

representative of the class. We therefore vacate the district court's order approving the revised settlement, which had certified the class for settlement purposes only. On remand, the only matter before the district court will be Kim's individual action against Tinder, which has been compelled to arbitration.

**ORDER VACATED; REVERSED** and **REMANDED.**